**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**
Thurgood Marshall U.S. Courthouse    40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

**MOTION INFORMATION STATEMENT**

**Docket Number(s):** _____        _____ Caption [use short title]

**Motion for:** _____

Set forth below precise, complete statement of relief sought:

_____
_____
_____
_____

**MOVING PARTY:**_____        **OPPOSING PARTY:** _____
    ☐ Plaintiff        ☐ Defendant
    ☐ Appellant/Petitioner    ☐ Appellee/Respondent

**MOVING ATTORNEY:** _____        **OPPOSING ATTORNEY**: _____
[name of attorney, with firm, address, phone number and e-mail]

_____        _____
_____        _____
_____        _____

Court-Judge/Agency appealed from: _____

**Please check appropriate boxes:**        **FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has movant notified opposing counsel (required by Local Rule 27.1):        Has request for relief been made below?    ☐ Yes  ☐ No
    ☐ Yes ☐ No (explain):_____        Has this relief been previously sought in this Court?  ☐ Yes  ☐ No
        Requested return date and explanation of emergency:_____

Opposing counsel's position on motion:
    ☐ Unopposed ☐ Opposed ☐ Don't Know        _____
Does opposing counsel intend to file a response:
    ☐ Yes ☐ No ☐ Don't Know        _____

Is oral argument on motion requested?    ☐ Yes  ☐ No  (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?    ☐ Yes  ☐ No  If yes, enter date:_____

**Signature of Moving Attorney:**

_____**Date:** _____        Has service been effected?  ☐ Yes  ☐ No [Attach proof of service]

## ORDER

**IT IS HEREBY ORDERED THAT** the motion is **GRANTED  DENIED**.

                                             **FOR THE COURT:**
                                           CATHERINE O'HAGAN WOLFE, Clerk of Court

Date: _____        By: _____

**Form T-1080**

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,                              :

                 Appellee,                    :          <u>AFFIRMATION</u>

   - v. -                                          :          Docket Nos. 13-1837(L),
                                        13-1917(CON)
TODD NEWMAN, and                                    :
ANTHONY CHIASSON
                                     :

               Defendants-Appellants.

                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

STATE OF NEW YORK                    )
COUNTY OF NEW YORK                :     ss.:
SOUTHERN DISTRICT OF NEW YORK   )

         ANTONIA M. APPS, pursuant to Title 28, United States Code, Section 1746,

hereby affirms under penalty of perjury:

         1.       I am an Assistant United States Attorney in the Office of Preet Bharara,

United States Attorney for the Southern District of New York.  I represented the Government in

the proceedings below, and I represent the Government in this appeal.  I submit this affirmation

in opposition to the motions of the defendants, Todd Newman and Anthony Chiasson, for bail

pending appeal, and in support of the Government's motion for leave to file an oversized

response.

**Preliminary Statement**

         2.       Todd Newman and Anthony Chiasson appeal from judgments of

conviction entered on May 9, 2013, and May 14, 2013, respectively, in the United States District

Court for the Southern District of New York, following a six-week jury trial before the

Honorable Richard J. Sullivan, United States District Judge.

3.      Superseding Indictment S2 12 Cr. 121 (RJS) (the "Indictment") was filed on August 28, 2012 in twelve counts.  Count One charged Newman, Chiasson, and a co-defendant with conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371.  Each of Counts Two through Five charged Newman and each of Counts Six through Ten charged Chiasson with securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2; and Title 18, United States Code, Section 2.[1]

4.      Trial commenced on November 7, 2012, and ended on December 17, 2012, when the jury returned its verdict, finding Newman and Chiasson guilty on each of the counts in which they were charged.

5.      On May 2, 2013, the District Court sentenced Newman to an aggregate term of 54 months' imprisonment, to be followed by one year of supervised release, imposed a $500 mandatory special assessment, and ordered Newman to pay a $1 million fine and to forfeit $737,724.  At the conclusion of his sentencing proceeding, Newman moved for bail pending appeal.  By order dated May 8, 2013, the Court denied Newman's motion.

6.      On May 13, 2013, the District Court sentenced Chiasson to an aggregate term of 78 months' imprisonment, to be followed by one year of supervised release, imposed a $600 mandatory special assessment, and ordered Newman to pay a $5 million fine and forfeiture

---

[1]A co-defendant was charged with securities fraud in Counts Eleven and Twelve.

2

in an amount not to exceed $2 million.[2]  Chiasson moved for bail pending appeal, and the Court

denied his motion for the reasons set forth in the May 8, 2013 order.

**Statement of Facts**

**A.     The Government's Case**

7.     The evidence at trial established that Newman, a portfolio manager at a

hedge fund called Diamondback Capital Management ("Diamondback"), and Chiasson, a co-

founder of a hedge fund called Level Global Investors ("Level Global"), participated in an

insider trading scheme along with a cohort of corrupt analysts at various hedge funds and

investment firms who exchanged material, nonpublic information obtained from employees of

publicly traded technology companies.  These analysts provided the inside information they

obtained to their portfolio managers – including Newman and Chiasson – who, in turn, used that

information to trade in securities.

8.     The trial focused largely on tips from insiders at Dell, Inc. ("Dell") and

NVIDIA Corporation ("NVIDIA"), who breached the fiduciary duties they owed to their

employers by disclosing their companies' earnings numbers before that information was publicly

released.  Based on this inside information, which was passed to analysts at Diamondback and

Level Global, Newman and Chiasson executed trades in Dell and NVIDIA stock, earning

approximately $4 million and $68 million, respectively, in illicit profits for their funds.

---

[2]The District Court did not determine the precise amount to be forfeited during
Chiasson's sentencing proceeding.

1.    **Newman's and Chiasson's Trades on Inside Tips Regarding Dell**

9.    The Dell insider, Rob Ray, had access to Dell's financial information as the company consolidated its earnings numbers from its various business units each quarter, and tipped Sandy Goyal, an analyst at the investment firm Neuberger Berman.  Ray disclosed Dell's consolidated earnings numbers for eight quarters in a row, and provided multiple updates each quarter during the consolidation process.  (Tr. 2769, 2782, 2804, 2808, 2813; GX 39, 1704A, 1707).[3]  Ray, who worked in a cubicle where his criminal conversations could be overheard, provided this information to Goyal at night and on weekends.  (GX 26, 27; Tr. 1631).  Upon receiving the information from Ray, Goyal shared it with Jesse Tortora, an analyst who worked for Newman at Diamondback. (Tr. 136, 144).  Tortora, in turn, provided the information to Newman and to certain other analysts with whom Tortora shared inside information, including Sam Adondakis of Level Global.  Adondakis passed the tips along to Chiasson.  (Tr. 159; GX 214).  Both Newman and Chiasson traded on the inside information Ray provided about Dell's earnings in advance of Dell's earnings announcements in May, August, and November of 2008, and earned substantial profits in connection with two of those quarters.  (GX 51, 56, 59, 64).

10.    As a member of Dell's investor relations department in 2008 and early 2009, Ray had received training on Dell's polices prohibiting the disclosure of confidential earnings numbers before their release to the public.  (*See* Tr. 2764-65, 2768, 2774, 2779, 2781, 2786, 2826; GX 1650, 1655A).  He had also been explicitly warned not to disclose Dell's

---

[3]"Tr." refers to the trial transcript; "GX" refers to a Government Exhibit introduced at trial; "DX" refers to a Defense Exhibit introduced at trial; "Docket Entry" refers to an entry in the docket for this case; and "Newman Mot." and "Chiasson Mot." refer to the defendants' respective motions for bail pending appeal.

earnings results ahead of their public announcement.  For example, on May 12, 2008, Ray and other members of Dell's investor relations team received an e-mail that contained Dell's financial results for the quarter, to be announced on May 29, 2008.  (GX 1712, 1712A; Tr. 2186).  In the e-mail, Lynn Tyson, the head of Dell's investor relations team, warned that she would "hunt . . . down" anyone who "breath[ed] a peep" of the results.  (GX 1712; *see also* GX 1730 (August 8, 2008 e-mail advising investor relations personnel to be "especially vigilant about not sharing current information"), 1733 (August 20, 2008 e-mail stating, "[w]e are keeping a tight lid on this due to our performance in the quarter")).  Notwithstanding these warnings, on May 11 and May 15 of 2008, Ray had lengthy telephone conversations with Goyal during which he disclosed Dell's confidential earnings numbers.  (GX 31, 32, 33, 600A (showing Tortora passed to a member of the analyst circle Dell's internal results indicating "18.5-18.6% GM [gross margin]"), 1712A at 2 (May 12, 2008 internal Dell report showing non-GAAP and GAAP gross margins of 18.6% and 18.5% respectively)).[4]  Both Newman and Chiasson traded on Ray's information in advance of Dell's May 2008 earnings announcement, reaping over $1 million and $4 million in profits, respectively.  (GX 51, 56).

> 2.    **Newman's and Chiasson's Trades on Inside Tips Regarding NVIDIA**

11.    Chris Choi worked in NVIDIA's finance department and had access to the company's earnings numbers before they were publicly announced.  (GX 1858A; Tr. 3095-96).  Although Choi was strictly prohibited from disclosing NVIDIA's internal numbers to anyone outside the company, he nonetheless repeatedly relayed those numbers to Hyung Lim, a friend

---

[4]The financial information contained in Government Exhibit1712A was available on a shared network drive to which Ray had access.  (Tr. 2817, 2843).

he knew from church, over the course of more than two years, providing multiple updates before each earnings announcement.  (Tr. 3097-98, 3101-03; GX 1952, 1959).  Lim passed the information to his friend, Danny Kuo, who Lim knew worked at an investment company in California.[5]  Kuo shared the information with his boss and the circle of analyst friends, including Tortora and Adondakis.  (GX 804, 818).  Both Newman and Chiasson traded on the information ahead of NVIDIA's May 7, 2009 earnings announcement, earning over $73,000 and $10 million, respectively.  (GX 71, 73).

### 3.    The Benefits Ray and Choi Received for Disclosing Inside Information

12.    Ray and Choi each disclosed inside information about their companies for their personal benefit.  In exchange for providing material, nonpublic information about Dell to Goyal, Ray received career advice from Goyal.  After attending business school with Ray, Goyal worked at Dell before becoming a Wall Street analyst.  (Tr. 1390).  Ray wanted to follow in Goyal's path.  (Tr. 1396-1403; *see also* GX 700 (Ray stating, "I wanted to call and chat with you sometime and get some feedback about your experience so far when you have a little time.  As you know, I am extremely interested in the equity research area and it will be great to get some perspective from you."), 708 ("I am still desperately looking to break into the buy/sell side")).  Goyal advised Ray on a range of topics, from discussing an examination that is required in order to become a financial analyst to editing Ray's résumé and sending it to a Wall Street recruiter.  (Tr. 1396-1403; GX 703, 705, 710, 715, 719, 719B, 720, 733).

---

[5]Kuo, in turn, gave Lim $15,000 in cash and various valuable items in return for the information.  (Tr. 3010, 3039, 3042).

13.     Ray and Goyal often exchanged earnings numbers for career advice in the very same conversation.  For example, on August 14, 2008, two weeks before Dell's earnings announcement, Ray received by e-mail the "final" internal consolidation of Dell's earnings numbers.  (GX 1732).  That evening, Goyal sent an e-mail to Ray containing an investment pitch for Ray to use in connection with job interviews.  (GX 734; Tr. 1461).  A few hours later, Ray and Goyal had a lengthy telephone conversation.  (GX 39).[6]  The next day, Goyal contacted Tortora, who passed the information along to Newman and Adondakis.  (Tr. 266-70, 1203-07).  Both Newman and Chiasson subsequently traded on the information.  (GX 2501-DA, 2501-LA).[7]

14.     Choi provided NVIDIA's earnings numbers to his friend Lim in advance of each quarterly earnings announcement in 2009, after Lim told Choi that he was trading NVIDIA stock.  (Tr. 3082-83).

---

[6]Goyal testified that he had repeated, lengthy calls with Ray because he was paid by Diamondback for the information he provided to Tortora.  (Tr. 1630).

[7]The defendants sought to elicit proof of a legitimate reason for Ray's disclosures based on the fact that Ray was a member of Dell's investor relations department, which sought to "target" institutional investors like Neuberger Berman, where Goyal worked.  But the evidence belied that claim.  A representative of Dell testified that disclosure of the company's revenue and gross margin numbers before their public release would violate both Dell's own confidentiality policies and the Fair Disclosure Regulation promulgated by the Securities and Exchange Commission ("Reg FD"), which prohibits companies from disclosing material information to selective investors.  (Tr. 2777-78, 2784; *see also* GX 1665A (defining material, nonpublic information covered by Reg FD to include "[f]inancial and operating performance of the business before it has been released as part of the earnings process").  Ray received training on this regulation.  (Tr. 2910-12, 2774-77).  Moreover, Goyal viewed his primary contact at Dell for any legitimate communications to be another investor relations employee, Shep Dunlap, not Ray, and Goyal had those legitimate communications during the day, rather than at night.  (Tr. 1472-73, 1475, 1631; GX 736, 759).  Further, Ray continued to provide the Dell inside information after he left investor relations in May 2009 and joined a corporate development department, where he had no legitimate reason to discuss Dell's performance with any analyst.  (GX 1657; Tr. 2867).

    **4.**     **Newman and Chiasson Knew the Dell and NVIDIA Tips Came from Corporate Insiders In Breach of Fiduciary Duty**

      15.     Both Newman and Chiasson knew that the information their analysts gave them concerning Dell and NVIDIA had come from corporate insiders who disclosed the information in breach of their fiduciary duties, and not for any legitimate corporate purpose. Indeed, the defendants' analysts – Tortora and Adondakis – informed their bosses that the information they provided about Dell and NVIDIA came from company insiders with access to earnings information. Tortora gave Newman the Dell tips he received from Goyal "verbatim," including references to Dell's "roll-up" (*i.e.*, consolidation) of its financial numbers. (Tr. 160).[8] As for NVIDIA, in the quarter before Newman made the illicit trade charged in the Indictment, Newman received an e-mail forwarded from Tortora stating that the NVIDIA earnings numbers were from "an accounting manager at [NVIDIA]," and that Kuo had received them "through a friend." (GX 805). Adondakis similarly explained to Chiasson that his information on Dell came from "someone within Dell," and that this information had been passed from Goyal to Tortora to him. (Tr. 1708; *see also* Tr. 1792 (Adondakis testifying that he told Chiasson in mid-August 2008 that he expected another earning's update in advance of Dell's final consolidation)). Adondakis told Chiasson that he obtained NVIDIA's inside information from a friend of Tortora's who, in turn, got it from a friend with whom he went to church. (Tr. 1878).[9]

---

     [8]Tortora's testimony on this subject was corroborated by e-mails. (*See, e.g.*, GX 287 (Newman writing to Tortora, "hey when u th[in]k sandy checks in," and Tortora responding, "most likely next week as close [of the quarter] today, but let me ask him today"), 296 (Tortora forwarding e-mail to Newman in which Goyal wrote to Tortora, "waiting for qtr to end or come closer so that numbers more firm")).

     [9]Adondakis referred to the source as a "NVIDIA contact," which, based on Adondakis' course of dealings with Chiasson, meant a company insider. (Tr. 1879). In this regard,

16.     The timing and frequency of the updates about Dell and NVIDIA demonstrated that the insiders disclosed the information in breach of a duty of confidentiality and for an improper purpose.  Ray provided a preliminary estimate of Dell's earnings approximately one month before the close of each quarter and gave multiple updates during Dell's "quiet period," that is, between the close of the quarter and the announcement.  (GX 26, 27).  Only a company insider with access to earnings numbers as they were being consolidated for a quarterly announcement could provide such disclosures.  Moreover, given the large number of tips over the course of two years, it was obvious that the disclosures were not inadvertent.  In this regard, in the weeks leading up to Dell's earnings announcement in August 2008, Newman and Chiasson received four updates on Dell's earnings numbers.  (GX 37, 39).  These updates were obviously based on changes to the company's internal numbers.  For example, a few days before the announcement, Chiasson asked Adondakis if there had been any "chatter over the weekend" about the Dell numbers.  (*See* GX 505; Tr. 1795-96).  After receiving an update from Tortora, Adondakis informed Chiasson (along with a handful of other co-conspirators) of "another Dell update" confirming that "gross margins were just a little below the number that [they] had gotten before."  (Tr. 1804-08; GX 523).

17.     As with Dell, Newman and Chiasson received multiple updates on NVIDIA's earnings numbers between the close of the quarter and the company's earnings

---

Adondakis obtained material, nonpublic information about other technology companies either from friends of his who had friends at the companies or through expert-networking firms.  (*See, e.g.*, Tr. 1618 (Chiasson, in an instant message, asking if Adondakis had established any "GOOD [] CONTAX" at a particular company through an expert networking firm, and Adondakis responding that he had "no mole in the organization yet"), 1678-91 (discussing contacts at Intel in 2007)).

announcement.  For example, in advance of the company's May 2009 announcement, Newman

and Chiasson received two updates, one in late April and the other in early May.  (GX 45, 46,

47).  After learning through the first of these updates that NVIDIA was going to report worse

than expected margins, Chiasson closed out a long position in the stock, and explained to a co-

conspirator at Level Global that Adondakis's "check" indicated that gross margins would be 30-

percent, noting that Adondakis "thinks [he] will get a firmer read shortly."  (GX 907).

   18. The nature and specificity of the information Newman and Chiasson

received further established that corporate insiders disclosed the information in breach of a duty

of confidentiality and for no legitimate corporate purpose.  Newman and Chiasson received

consolidated earnings numbers, including margin and operating expense numbers, often to the

decimal point – the kind of information that can be obtained only from insiders and cannot be

disclosed absent a breach.  For example, in advance of NVIDIA's February 2009 earnings

announcement, Newman received an e-mail from Kuo containing NVIDIA's revenue and gross

margin numbers to the decimal point.  (GX 805 (Kuo e-mail), 1975 (earnings report)).  The

following quarter, when Newman received Kuo's e-mail containing NVIDIA's gross margin

information approximately 10 days before the public announcement, Tortora confirmed that the

source at NVIDIA had "[n]ailed everything including gm [gross margin] last q[uarter]."  (GX

818).

   19. In stark contrast to the specific gross margin and revenue numbers

Newman and Chiasson received from their analysts, the defendants presented evidence

indicating that Dell's head of investor relations was willing to provide only general sentiments

about Dell's business, such as "sound[ing] fairly confident on [gross margin] and [operating

margin]" (DX 952).[10]  Additionally, it was clear to the defendants that investor relations

personnel were not disseminating the earnings information in advance of the earnings

announcements, because market expectations diverged dramatically from the actual numbers.

For example, in advance of Dell's August 2008 earnings announcement, analyst "consensus"

numbers indicated that Dell would report a gross margin of 18.3 percent.  (GX 3003S).  By

contrast, the inside information Ray provided revealed that Dell's actual gross margin number

for the quarter was in the low 17 percent range.  (GX 214; Tr. 249).  When Dell publicly

announced its results, including a gross margin number that was in fact in the low 17 percent

range, Dell's stock price fell by almost 14 percent, the largest single-day decline in more than

eight years.  (Tr. 3558, 3560).  Similarly, Newman and Chiasson received inside information in

advance of NVIDIA's May 2009 earnings announcement that the company would report a gross

margin of 30 percent, whereas the market expected NVIDIA to report gross margins of 35

percent.  (GX 818, 936; Tr. 500).  NVIDIA's stock also fell nearly 14 percent following the

announcement in May 2009.  (GX 2501)  Based in large part on the difference between market

expectations and the numbers actually reported by Dell and NVIDIA, Newman and Chiasson

were able to reap enormous profits trading Dell and NVIDIA stock.

---

[10]The timing of the discussions with investor relations offered by the defendants was also critical.  Virtually all of these discussions occurred in the beginning or middle of the quarter, when the company's sales had not been completed, and any information provided therefore was not a reliable guide to the company's ultimate earnings report.  Further, other evidence suggested that investor relations personnel would not hold any substantive discussions during the companies' "quiet period" immediately before the earnings announcements.  One of the corrupt analysts who shared inside information wrote in an e-mail that the head of NVIDIA's investor relations group "ha[d] [a] firm policy about not calling back even in last month of quarter."  (Tr. 493-94).

20.     A series of e-mail and instant message exchanges between Chiasson and a friend at another hedge fund, Jeremy Yuster, demonstrated that Chiasson understood that only a Dell insider without authorization to disclose earnings information would have leaked Dell's gross margin numbers in advance of a quarterly announcement.  After receiving an update on Dell from Adondakis a few days after the quarter ended, Chiasson reported to Yuster that he had "checks on gm [gross margin for Dell] this qtr [quarter]" indicating that gross margins would not be good, and that Chiasson was waiting for the "final read."  (GX 448).  In response to Yuster's question as to how Chiasson could have "checks on gm%," Chiasson wrote, "Not your concern. I just do." (GX 448).[11]

21.     Knowing that the information about Dell's and NVIDIA's earnings came from corporate insiders and was inconsistent with market expectations, both Newman and Chiasson made large investments in Dell and NVIDIA stock based on the inside information.  In advance of Dell's August 2008 earnings announcement, Newman took the largest short position he had ever taken in a single stock during his time at Diamondback.  (Tr. 3551-55; GX 8529A). Before that same announcement, Chiasson's Dell trade was the largest short of a technology stock – and the second largest short of any stock – Level Global had ever made.  (DX 39).

22.     Newman knew that Goyal communicated with his contact at Dell at night and on the weekend, rather than during the work day.  When Newman asked Tortora in late October 2008 to confirm whether Dell would be issuing a mid-quarter update, Tortora responded

---

[11]Subsequently, after Chiasson received the "final" update from Adondakis, Chiasson confirmed the numbers with Yuster:  "Gm 17.4 – 17.7."  (GX 476).  When Yuster questioned whether that was possible, Chiasson responded, "My view on gm more convicted than [yours]." (GX 477).

that he had "spoke[n] to sandy," who was "putting in a call to [his] main contact," but that Goyal "usually wont hear back from him til evening as calls him outside of work."  (GX 322; *see also* GX 197 (in e-mail chain forwarded to Newman, Tortora asked Goyal for "anything new on dell," and Goyal responded that he was not able to reach his contact over the weekend), 242 (Sandy "spoke to his guy over weekend and didn't hear anything . . . ").

23.    That Newman authorized $175,000 in secret payments to Goyal through a sham consulting arrangement with Goyal's wife further demonstrated that Newman knew he was improperly obtaining material, nonpublic information regarding Dell.  (GX 750-754, 775A, 776, 780A, 781A, 2270).[12]  Indeed, Newman would have had no reason to pay Goyal if Goyal's contact at Dell was authorized to disclose the information for a legitimate corporate purpose.

24.    As for Chiasson, Level Global had an internal reporting system in which employees were supposed to record the basis for trades in order to provide transparency to investors.  More than a month after Chiasson began shorting Dell stock based on the confidential information he obtained from the Dell insider, Chiasson directed Adondakis to create a bogus research report that did not include any information about the Dell contact as the basis for the trade.  (Tr. 1785).  He similarly instructed Adondakis to create a sham report for the NVIDIA

---

[12]Newman authorized four quarterly payments of $18,750 and a lump sum bonus payment of $100,000.  (GX 2269, 2270, 2271; Tr. 1353).  Moreover, Newman knew that it was Sandy Goyal, and not his wife, who was providing the information about Dell.  When Tortora provided to Newman on August 5, 2008, Goyal's report that Dell's gross margins would be around "17.5% vs street at 18.3%" for the quarter that ended on August 1, 2008, Newman responded one minute later in an instant message stating, "the dell from sandy?"  (GX 215).  Tortora confirmed, "y on with him now."  (GX 215; *see also* GX 287 (Newman writing to Tortora, "hey when u thk sandy checks in")).

trade in 2009 that omitted reference to the inside source.  (GX 928 (e-mail in which Chiasson told Adondakis to create a "Hi level trading template" for the NVIDIA trade)).

**B.     The Defense Case**

25.     Both defendants offered numerous documents during the cross-examination of Government witnesses.  Additionally, Newman presented expert testimony concerning the size of the charged Dell and NVIDIA trades in comparison to the remainder of his portfolio.  The defendants also called the case agent and questioned him about various consensually recorded telephone calls made at the direction of law enforcement officers, as well as prior statements by the cooperating witnesses.

**C.     The Jury Instructions and Verdict**

26.     The District Court instructed the jury, in pertinent part, that in order to establish that the defendants were guilty of insider trading, the Government had to prove that (1) the tippers had a fiduciary duty or other relationship of trust and confidence with their employers; (2) the tippers intentionally breached that duty by disclosing material, nonpublic information; (3) the tippers received a personal benefit from the tip; (4) the defendant tippees knew that the inside information was disclosed in breach of a duty; and (5) the defendant tippees intentionally took part in the scheme to defraud.  Specifically, the Court gave the following instructions on the tippers' intent and the personal benefit requirement:

> Now, if you find that Mr. Ray and Mr. Choi had a fiduciary or other relationship of trust and confidence with their employers, then you must next consider whether the government has proven beyond a reasonable doubt that they intentionally breached that duty of trust and confidence by disclosing material, nonpublic information for their own benefit.

(Tr. 4030).[13]

27.    As to the defendant tippees, the District Court instructed the jury as follows:

> To meet its burden, the government must also prove beyond a reasonable doubt that the Defendant you are considering knew that the material nonpublic information had been disclosed by the insider in breach of a duty of trust and confidence. The mere receipt of material, nonpublic information by a Defendant, and even trading on that information, is not sufficient; he must have known that it was originally disclosed by the insider in violation of a duty of confidentiality.

(Tr. 4033). The Court further instructed the jury that the Government was required to prove that the defendants "participated in . . . the insider trading scheme . . . knowingly, willfully, and with intent to defraud," that is, that the defendants knew "of the fraudulent nature of the scheme and acted with the intent that it succeed." (Tr. 4036-37).

28.    On December 17, 2012, the jury returned its verdict, finding Newman and Chiasson guilty on each of the counts in which they were charged.

**D.    The Sentencings and the District Court's Orders Denying Bail Pending Appeal**

29.    On May 2, 2013, the District Court sentenced Newman principally to an aggregate term of 54 months' imprisonment. That same day, Newman requested bail pending

---

[13]The District Court separately defined "personal benefit" to include maintaining a business contact or making a gift of confidential information to a trading relative or friend. (Tr. 4032-33).

appeal, raising the sole issue presented in his current motion, namely, that the Court erred in

failing to instruct the jury that the Government must prove that a downstream tippee who

received material, nonpublic information originating from an insider knew that the tipper

disclosed the information *for a personal benefit*.  The Court denied Newman's motion, finding

that Newman had failed to raise a substantial question of law.  Specifically, the Court concluded

that, in *SEC* v. *Obus*, 693 F.3d 276, 289 (2d Cir. 2012), this Court had made clear that "the

*tipper*'s breach of fiduciary duty and receipt of a personal benefit are *separate* elements and that

the *tippee* need know only of the former."  (Docket Entry 258 at 2 (emphasis in original)).  The

Court further rejected Newman's arguments that *Obus* was not controlling precedent. (Docket

Entry 258 at 3).  In this regard, the Court found none of the district court decisions that preceded

*Obus*, and that reached a contrary conclusion, were persuasive.  Moreover, the Court found that

the only other district court decision to address the issue after *Obus*, namely*, United States* v.

*Whitman*, No. 12 Cr. 125 (JSR), 2012 WL 5505080 (S.D.N.Y. Nov. 14, 2012),"ignore[d] [*Obus*]

almost entirely in concluding that insider trading liability require[d] tippee knowledge of a

personal benefit to the tipper."  (Docket Entry 258 at 3-4). The Court thus denied Newman's

motion for bail pending appeal.  On May 13, 2013, after sentencing Chiasson principally to an

aggregate term of 78 months' imprisonment, the Court also denied Chiasson's motion for bail

pending appeal.

16

**ARGUMENT**

**Newman and Chiasson Have Failed to Present a Substantial Question of Law or Fact Warranting Bail**

30.     Newman and Chiasson both seek bail pending appeal.  Each of them contends that the District Court erred in refusing to instruct the jury that the Government was required to prove that they knew the corporate insiders had disclosed material, nonpublic information in return for a personal benefit.  The defendants are mistaken.  Because the jury instructions were proper, the defendants have failed to present a substantial question of law or fact.  Their motions for bail pending appeal should therefore be denied.

**A.     Applicable Law**

31.     The standards governing bail pending appeal are set forth in Section 3143(b) of Title 18, United States Code, which provides that a judicial officer "shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment" be detained pending appeal unless the judicial officer finds "by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community if released," and

> that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in – (i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

18 U.S.C. § 3143(b).  That provision gives effect to Congress's view that "'once a person has been convicted and sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or even to permit it in the absence of exceptional circumstances.'"  *United States*

17

v. *Miller*, 753 F.2d 19, 22 (3d Cir. 1985) (quoting H. Rep. No. 907, 91st Cong., 2d Sess. 186-87 (1970)).  Following a guilty verdict and sentencing, there is a "presumption in favor of detention."  *United States* v. *Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004).  It is the defendant's burden to "rebut that presumption with clear and convincing evidence."  *Id.*

32.    As defined by this Court, a "substantial question" is "one more of substance than would be necessary to a finding that it was frivolous.  It is a close question or one that very well could be decided the other way."  *United States* v. *Randell*, 761 F.2d 122, 125 (2d Cir. 1985) (citation and internal quotation marks omitted).  "If a court does find that a question raised on appeal is 'substantial,' it must then consider whether that question is 'so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial.'"  *Id.* at 125 (quoting *United States* v. *Miller*, 753 F.2d at 23).  With respect to these issues, "the burden of persuasion rests on the defendant."  *Id.*

33.    This Court gives great deference to the district court's bail decisions, and will reverse only where there is "clear error" – that is, only if "on the entire evidence," the Court is "left with the definite and firm conviction that a mistake has been committed."  *United States* v. *Sabhnani*, 493 F.3d 63,75 (2d Cir. 2007) (citation and internal quotation marks omitted).

**B.    Discussion**

**1.    The District Court's Jury Instructions Were Correct**

34.    Contrary to Newman's and Chiasson's contentions, the District Court was not required to instruct the jury that, in order to convict, it must find that the defendants knew that the corporate insiders received a personal benefit for the disclosure of confidential corporate

18

information.  The Supreme Court addressed tippee liability in insider trading cases – and

established the requirement that a tipper who is a corporate insider is guilty of insider trading

only if he disclosed nonpublic information for a personal benefit – in *Dirks* v. *SEC*, 463 U.S. 646

(1983).  Dirks was a first-level tippee who received information from a company insider

suggesting that the company's management was committing fraud.  *Dirks* v. *SEC*, 463 U.S. at

649.  The tipper had notified various regulatory agencies of the fraud, but they had failed to act;

accordingly, he urged Dirks to verify the fraud and disclose it publicly.  *Id.*  Dirks conducted an

investigation, and unsuccessfully sought to persuade the Wall Street Journal to publish the fraud

allegations.  *Id.*  Although Dirks himself did not trade in the company's stock, he openly

discussed his findings with various clients and investors, some of whom did so.  *Id.*

       35.     In finding that Dirks was not liable for insider trading, the Supreme Court

affirmed the principle that tippees assume a corporate insider's duty to the company's

shareholders to disclose or abstain from trading in the company's stock if the inside information

"has been made available to them *improperly.*"  *Id.* at 660 (emphasis in original).  In discussing

the "improper" receipt of inside information, the Supreme Court did not adopt the position

advocated by Newman and Chiasson here, namely, that a tippee must know the tipper benefitted

from the tip.  Rather, notwithstanding the Court's holding that a *tipper* must benefit from a

disclosure in order to be liable for insider trading, *id.* at 662, the Court did not explicitly require

that a *tippee* know about this benefit.  Instead, the Court required only that the tippee know that

the tipper disclosed the information in breach of a fiduciary duty.  *Id.* at 660.  As the Court

stated:

> [A] tippee assumes a fiduciary duty to the shareholders of a
> corporation not to trade on material nonpublic information only

19

> when the insider has breached his or her fiduciary duty to the
> shareholders by disclosing the information to the tippee and the
> tippee knows or should know that there has been a breach.

*Id.*; *see also id.* at 661 n.20 (listing authorities which equated knowledge of obtaining

information "improperly" with knowledge of obtaining information "in breach of duty").

      36.    Following *Dirks*, this Court has never required the Government to prove

that a tippee knew that a company insider who disclosed confidential corporate information

benefitted from the tip. Nor have Newman and Chiasson identified a decision of any other Court

of Appeals requiring such proof. In fact, this Court has repeatedly stated that the Government is

required to prove only that a tippee knew the tipper breached a fiduciary duty. *See, e.g.*, *United*

*States* v. *Falcone*, 257 F.3d 226, 234 (2d Cir. 2001) ("To support a conviction of the tippee

defendant, the government was simply required to prove a breach by [ ] the tipper, of a duty

owed to the owner of the misappropriated information, and defendant's knowledge that the

tipper had breached the duty."); *United States* v. *Mylett*, 97 F.3d 663, 668 (2d Cir. 1996)

(explaining that tippee defendants must "subjectively believe that the [inside] information was

obtained in breach of a fiduciary duty"); *United States* v. *Libera*, 989 F.2d 596, 600 (2d Cir.

1993) (holding that requirements for tippee liability are "(i) a breach by the tipper of a duty owed

to the owner of the nonpublic information; and (ii) the tippee's knowledge that the tipper had

breached the duty"). The *Falcone*, *Mylett*, and *Libera* Courts all affirmed the defendant tippees'

convictions over challenges that the tippees lacked knowledge of the breach of duty by the

tipper. *See United States* v. *Falcone*, 257 F.3d at 235; *United States* v. *Mylett*, 97 F.3d at 668;

*United States* v. *Libera*, 989 F.2d at 602.

37.     To be sure, *Falcone*, *Mylett*, and *Libera* were misappropriation cases.[14] But in each case, this Court cited *Dirks* as establishing the requirements for tippee liability, and none of these cases interpreted *Dirks* to require that a tippee have knowledge of any benefit to the tipper.  Moreover, this Court has explicitly recognized that, for purposes of tippee liability, there is no material difference between a classical insider-trading case and a misappropriation case.  *See SEC* v. *Obus*, 693 F.3d at 288 (applying the standard for tippee liability set forth in *Dirks* – a classical case – in a misappropriation case).

38.     In *Obus*, as the Supreme Court had in *Dirks*, this Court directly confronted the question of whether tipper liability required a personal benefit, *see Obus*, 693 F.3d at 291, yet did not hold that tippee liability required knowledge of that benefit.  Instead, the Court summarized tipping liability as follows:

> [W]e hold that tipper liability requires that (1) the tipper had a duty to keep material non-public information confidential; (2) the tipper breached that duty by intentionally or recklessly relaying the information to a tippee who could use the information in connection with securities trading; and (3) the tipper received a personal benefit from the tip.  Tippee liability requires that (1) the tipper breached a duty by tipping confidential information; (2) the tippee know or had reason to know that the tippee improperly obtained the information (i.e., that the information was obtained through the tipper's breach); and (3) the tippee, while in knowing possession of the material non-public information, use the information by trading or by tipping for his own benefit.

*Id*. at 289.

_____

[14]Under the misappropriation theory, "persons who are not corporate insiders but to whom material non-public information has been entrusted in confidence" are guilty of insider trading if they "breach a fiduciary duty to the source of the information to gain personal profit in the securities market." *SEC* v. *Obus*, 693 F.3d 276, 284 (2d Cir. 2012). Under the classical theory of insider trading, by contrast, "a corporate insider is prohibited from trading shares of that corporation based on material non-public information in violation of the duty of trust and confidence insiders owe to shareholders."  *Id.*

39.     Newman and Chiasson argue that because *Obus* is a civil case, it does not control here.  (Newman Mot. 17-18; Chiasson Mot. 17-18).  As the District Court noted, however, much of the criminal law of insider trading has been developed through civil cases (like *Dirks* itself, upon which the defendants rely).  (Docket Entry 258 at 3).  That *Obus* is a civil case provides no reason to disregard it, just as the Court cannot disregard *Dirks* on the ground that it too is a civil case.

40.     Newman and Chiasson further contend that *Obus* is not controlling here because the parties in *Obus* did not argue that the defendant in the case, who was a second-level tippee, had to know that the tipper received a benefit.  (Newman Mot. 15-16; Chiasson Mot. 16-17).  The level of knowledge required on the tippee's part as to the tipper's breach, however, was squarely presented in *Obus*.  The Securities and Exchange Commission ("SEC") argued that *Dirks* requires only that the tippees "knew or should have known" that the tipper disclosed the information in breach of a duty.  Opening Brief for Plaintiff-Appellant in *United States* v. *Obus*, No. 10-4749, 2011 WL 1228158, at *42-43 (March 29, 2011).  The defendants contended that the SEC had to prove that the tippees knew, or were reckless in not knowing, that the insider was violating his fiduciary duties and that the insider was tipping "for a purpose other than carrying out his job duties."  *See* Brief for Defendants-Appellees in *United States* v. *Obus*, No. 10-4749, 2011 WL 2612814, at *65-66 (June 28, 2011).  The defendants further claimed that the second-level tippee's limited knowledge about the tipper's job responsibilities precluded a finding of scienter.  *Id*.  This Court held that the SEC had to show only that the second-level tippee "knew or had reason to know" that the inside information "was obtained through a breach of fiduciary duty."  *Obus*, 693 F.3d at 292-93.  Given the issue in dispute in *Obus*, the Court's description of the requirements for tipping liability – including its conclusion that a tippee need know only that

22

the tipper breached a duty of confidentiality – cannot be disregarded as *dicta*, as the defendants would have it.

41.     Newman also suggests that the District Court's jury instructions could result in a tippee being convicted of insider trading absent the element of "self-dealing" that *Dirks* found to be essential to tipper liability.  (Newman Mot. 11-13).  But there is no such risk where the jury is instructed, as it was here, that the Government must prove an intentional breach of a duty by the tipper for a benefit.  Insofar as *Dirks* imposed the requirement that a tipper benefit from a disclosure in order to ensure that the element of self-dealing is present in insider trading cases, that purpose is satisfied in remote tippee cases by an instruction that the jury must find that the corporate insider benefitted from the disclosure in order to convict.  Such an instruction ensures that a tippee will not be convicted of insider trading absent self-dealing by the tipper, and it is sufficient for the jury to find that the tippee knew the tipper breached a duty in disclosing the information.

42.     Both Newman and Chiasson further contend that a defendant cannot act "willfully" if he is unaware of the benefit to the tipper, because that fact transforms "otherwise innocent conduct into an illegal act," citing, along with another case, a child pornography case that required proof that the defendant knew the performers in pornographic films were underage.  (Newman Mot. 14; Chiasson Mot. 15 (citing *United States* v. *X-Citement Video, Inc*., 513 U.S. 64, 73 (1994))).  The defendants' reliance on this case is misplaced.  The Supreme Court required proof that the defendant knew the performers were underage to ensure that the statute did not "sweep within [its] ambit . . . actors who had no idea that they were even dealing with sexually explicit material."  *United States* v. *X-Citement Video, Inc*., 513 U.S. at 67.  Under the jury instructions given here, by contrast, there is no risk that the securities fraud statute will

reach innocent conduct because the Government had to prove the defendants knew a tipper disclosed material, nonpublic information in breach of a duty of trust and confidence.  *See Liparota* v. *United States*, 471 U.S. 419, 426 (1985) (reading statute to avoid "criminaliz[ing] a broad range of apparently innocent conduct").  Indeed, even where the reach of a statute's *mens rea* requirement is ambiguous, this Court has "demand[ed] knowledge of enough facts to distinguish conduct that is likely culpable from conduct that is entirely innocent," that is, "knowledge only of facts that in a reasonable person would create an expectation that his conduct was likely subject to strict regulation."  *United States* v. *Weintraub*, 273 F.3d 139, 147 (2d Cir. 2001).  Trading securities based on nonpublic information disclosed by a corporate insider in violation of a duty of confidentiality "is easily sufficient to trigger an expectation of regulation in a reasonable person and to distinguish in his or her mind innocent from wrongful conduct."  *Id.* at 149.[15]  Moreover, the jury was instructed that it could convict only if it found that the defendants acted "with a bad purpose to disobey and disregard the law," and only if they

---

[15]In this regard, many federal statutes either allow conviction or provide enhanced penalties for obviously antisocial conduct based on proof of a fact of which the defendant need not be aware.  *See, e.g.*, *United States* v. *King*, 345 F.3d 149, 152 (2d Cir. 2003) (holding that the scienter requirements of 21 U.S.C. § 841(a) apply only to the possession of some quantity of illegal drugs, and not to drug type and quantity); *United States* v. *Griffith*, 284 F.3d 388, 350-51 (2d Cir . 2002) (holding that a prosecution under the Mann Act, 18 U.S.C. § 2423, does not require proof of the defendant's knowledge of the victim's age); *United States* v. *Weintraub*, 273 F.3d at 147-51 (holding that the scienter provision of the Clean Air Act, 42 U.S.C. § 7413(c)(1), only required proof that the defendant knew asbestos was involved, not the kind and quantity of asbestos that triggered the applicable regulation); *United States* v. *Falu*, 776 F.2d 46, 49-50 (2d Cir. 1985) (holding that predecessor statute to 21 U.S.C. § 860 did not require proof that a defendant knew he was distributing a controlled substance within 1,000 feet of a school); *United States* v. *Roglieri*, 700 F.2d 883, 885 (2d Cir. 1983) (knowledge that stolen item came from the mail is not required under 18 U.S.C. § 1708); *United States* v. *Baker*, 693 F.2d 183, 185-86 (D.C. Cir. 1982) (18 U.S.C. § 641 does not require proof of knowledge that stolen property belonged to the government); *United States* v. *Mingoia*, 424 F.2d 710, 713 (2d Cir. 1970) (knowledge that stolen goods were transported in interstate commerce is not required by 18 U.S.C. § 2314).

knew of the "fraudulent nature of the scheme."  (Tr. 4037).  Accordingly, Chiasson's contention

that he could have been convicted without "a realization [that they were] doing a wrongful act"

is without foundation.  (Chiasson Mot. 14).[16]

        43.     Both Newman and Chiasson finally urge this Court to find that whether a

tippee is required to know that that the tipper benefitted from the disclosure is a substantial

question based on the fact that district courts have reached different conclusions on the issue.

(Newman Mot. 14-15, 18-19; Chiasson Mot. 18-19).  The defendants cite two cases that pre-date

this Court's decision in *Obus*, namely, *State Teachers Ret. Bd.* v. *Fluor Corp.*, 592 F. Supp. 592,

594 (S.D.N.Y. 1984), and *United States* v. *Rajaratnam*, 802 F. Supp. 2d 491, 498-99 (S.D.N.Y.

2011), both of which held that tippee liability required proof of knowledge that the tipper

received a benefit for the disclosure.[17]  Both cases relied on *Dirks* in reaching this conclusion.

Yet, as discussed above, *Dirks* does not require proof that the tippee knew of the benefit the

insider received for the tip.  Nor has this Court ever required such proof.

---

[16]There is also no risk that the defendants could have been found guilty on the mere receipt of inside information, as Chiasson's reference to *Chiarella* v. *United States*, 445 U.S. 222, 233 (1980), might suggest. (Chiasson Mot. 12).  In fact, the District Court instructed the jury to acquit in such circumstances.  (Tr. 4033 ("The mere receipt of material, nonpublic information by a Defendant, and even trading on that information, is not sufficient; he must have known that it was originally disclosed by the insider in violation of a duty of confidentiality.")).

[17]Other district courts have held that a remote tippee need not know the precise circumstances of the tipper's disclosure to the first-level tippee, which would include whether the tipper received a personal benefit.  *See*, *e.g.*, *SEC* v. *Thrasher*, 152 F. Supp. 2d 291, 304 (S.D.N.Y. 2001) (holding that "[t]he SEC need not prove that [the defendant] knew of the details of [the insider tipper's] involvement," or "how the initial breach of fiduciary duty occurred"); *SEC* v. *Musella*, 678 F. Supp. 1060, 1062-63 (S.D.N.Y. 1988) (finding scienter and granting summary judgment against remote tippees who did not know the identity of the source or have any "direct link with a first tier tippee").

44.     Only one of the district court cases upon which Newman and Chiasson rely post-dated *Obus*.  In *United States* v. *Whitman*, No. 12 Cr. 125 (JSR), 2012 WL 5505080 (S.D.N.Y. Nov. 14, 2012), Judge Rakoff concluded that *Dirks* requires a tippee to know that the tipper received a benefit for disclosing confidential corporation information.  This conclusion is incorrect, for the reasons set forth above.  Moreover, as the District Court commented, *Whitman* did not adequately address *Obus*, with which it is inconsistent.  (Docket Entry 258 at 4).[18] Accordingly, the mere fact that *Whitman* reached a conclusion contrary to the District Court's does not make the question whether a tippee must know that a tipper received a benefit for the disclosure a substantial one.

### 2.     Even If the District Court Were Incorrect, Reversal Would Not Be Required

45.     The defendants argue that if this Court were to require the Government to prove that they knew that the tippers personally benefitted, their convictions must be reversed. (Newman Mot. 19-20; Chiasson Mot. 20).  This is not correct.  *Cf. Neder* v. *United States*, 527 U.S. 1, 18 (1999) (omission of element in jury instructions is harmless if it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error"). Absent mistake, a company insider discloses confidential corporate information either for a corporate purpose or a personal benefit.  There was ample proof in this case that the repeated disclosures by the insiders were intentional.  Moreover, there was no plausible corporate purpose that could have been achieved by the early, selective, and repeated disclosures of confidential

---

[18]Indeed, although *Whitman* states that, in a misappropriation case, there is no need for proof that the tippee knew of any benefit provided to the tipper, *United States* v. *Whitman*, 2012 WL 5505080 at *5, this Court in *Obus* drew no distinction between the proof required to establish tippee liability in misappropriation and classical insider-trading cases, *Obus*, 693 F.3d at 288.

26

earnings information.  Newman argues, as he did at trial, that the evidence supported his belief

that the information was disclosed by the insiders for the corporate purpose of "promot[ing]

strong institutional relationships with financial firms who might buy the companies' stock."

(Newman Mot. 19-20).  As described above, this claim was belied by the evidence, which

demonstrated that Dell's investor relations personnel were strictly prohibited from selectively

disclosing financial results before the earnings announcement.  *See supra* ¶ 13 n.7.[19]  In light of

the instruction that the jury could convict only if the defendants knew an insider had disclosed

material, nonpublic information in breach of a duty of confidentiality, the jury obviously

concluded that the defendants knew that the information was disclosed for an improper purpose.

(Tr. 4033).

       46.    As sophisticated investors, Newman and Chiasson had every reason to

know that corporate insiders are not authorized to disclose earnings information before it is

publicly announced.  Indeed, there was ample evidence that the defendants understood that the

insiders at Dell and NVIDIA did not disclose the information for any legitimate purpose and,

accordingly, must have done so for a personal benefit.  Newman knew that the Dell insider

disclosed information to Goyal at night and on weekends.  To compensate Goyal for sharing this

information, Newman arranged for secret payments to Goyal, disguised as payments to Goyal's

wife, that exceeded Goyal's annual salary.  Chiasson took steps to conceal his reliance on the

inside information in making trades in Dell and NVIDIA stock by instructing his analyst to

---

[19]In fact, Newman did not even know that Ray worked in investor relations at Dell.  With
respect to the NVIDIA insider, Newman affirmatively knew that he did not work in investor
relations, having received an email stating that the insider worked in NVIDIA's accounting
department, which was plainly not authorized to speak to investors.  (GX 805).  Accordingly,
there was no support for the notion that Newman actually held this belief.

misrepresent the basis for the trades in Level Global's internal reporting system. He further demonstrated that he knew the tippers had provided the information improperly when he told a friend that it was "not [his] concern" how Chiasson could have Dell's gross margin number before the company announced it. Moreover, Adondakis told Chiasson that the NVIDIA insider disclosed the information to a friend, which qualifies as an improper exploitation of nonpublic information. (Tr. 1878). *See Dirks*, 463 U.S. at 664. Thus, even if the District Court had instructed the jury that it must find that the defendants were aware of the benefit to the tippers, there was ample proof here that the disclosures were made solely for illegitimate personal reasons, and not for legitimate corporate reasons. Accordingly, assuming *arguendo* that Newman and Chiasson have raised a substantial question, they have failed to carry their burden of demonstrating that their claim is likely to result in reversal.

## Conclusion

47.     Having failed to identify a substantial question of law or fact, the defendants' motion for bail pending appeal should be denied.

48.     Pursuant to the Local Rules of the Second Circuit and the Federal Rules of Appellate Procedure, a response to a motion may exceed 20 pages upon permission of the Court. Responding to Newman's and Chiasson's motions has required extensive discussions of the trial evidence and portions of the procedural history of the case. In order to respond adequately to the arguments raised by both defendants and adequately set forth the factual and legal background necessary to decide their motions, it is respectfully submitted that the length of the

Government's brief should not be limited to 20 pages. I have consulted with counsel for the

defendants, neither of whom opposes the Government's motion.

Dated: May 29, 2013
     New York, New York

                               /s Antonia Apps
                          _____
                          Antonia M. Apps
                          Richard C. Tarlowe
                          John T. Zach
                          Assistant United States Attorneys
                          Southern District of New York
                          Telephone: (212) 637-2198/2330/2410