# 13-1837-cr(L)

## 13-1917-cr(con)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

◆▪◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

JON HORVATH, DANNY KUO, HYUNG G. LIM, MICHAEL STEINBERG,

*Defendants,*

TODD NEWMAN, ANTHONY CHIASSON,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX
## VOLUME IV OF XII
### (Pages A-742 to A-987)

MICHAEL A. LEVY, ESQ.
ANTONIA M. APPS, ESQ.
BRENT S. WIBLE, ESQ.
United States Attorney's Office
Southern District of New York
1 St. Andrew's Plaza
New York, New York 10007
(212) 637-2200

*Attorneys for Appellee*
   *United States of America*

STEPHEN FISHBEIN, ESQ.
JOHN A. NATHANSON, ESQ.
JASON M. SWERGOLD, ESQ.
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000

*Attorneys for Defendant-Appellant*
   *Todd Newman*

*(Counsel continued on inside cover)*

MARK F. POMERANTZ, ESQ.
MATTHEW J. CARHART, ESQ.
PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000

ALEXANDRA A.E. SHAPIRO, ESQ.
DANIEL J. O'NEILL, ESQ.
JEREMY LICHT, ESQ.
SHAPIRO, ARATO & ISSERLES LLP
500 Fifth Avenue, 40th Floor
New York, New York 10110
(212) 257-4880

GREGORY R. MORVILLO, ESQ.
MORVILLO LLP
1 World Financial Center, 27th Floor
New York, New York 10281
(212) 796-6330

*Attorneys for Defendant-Appellant Anthony Chiasson*

# TABLE OF CONTENTS

## VOLUME I

**Pre-Trial Materials**                                        Page

Docket Entries,
   No. 12-cr-121 (RJS) (S.D.N.Y.) ........................................................ A-1

Hearing Transcript,
   June 29, 2012 ................................................................................. A-50

Order,
   June 29, 2012, Dkt. No. 104 .......................................................... A-142

DOJ Production Letter from Preet Bharara to All Parties,
   July 10, 2012 ................................................................................ A-144

Letter from Joanna Hendon to Antonia Apps & Richard Tarlowe,
   July 26, 2012 ................................................................................ A-146

Superseding Indictment,
   August 28, 2012, Dkt. No. 112 ...................................................... A-148

Bill of Particulars, August 28, 2012 ................................................. A-169

Proposed Joint Requests to Charge,
   October 18, 2012, Dkt. No. 160 ..................................................... A-178

## VOLUME II

Hearing Transcript,
   October 23, 2012 .......................................................................... A-256

**Transcripts of Trial Proceedings**

November 13, 2012 .......................................................................... A-359

November 14, 2012 .......................................................................... A-457

## **VOLUME III**

November 15, 2012 ........................................................................... A-542

November 19, 2012 ........................................................................... A-638

## **VOLUME IV**

November 20, 2012 ........................................................................... A-742

November 21, 2012 ........................................................................... A-844

November 26, 2012 ........................................................................... A-895

## **VOLUME V**

November 27, 2012 ........................................................................... A-988

November 28, 2012 ......................................................................... A-1095

November 29, 2012 ......................................................................... A-1168

## **VOLUME VI**

December 3, 2012 ........................................................................... A-1270

December 4, 2012 ........................................................................... A-1384

## **VOLUME VII**

December 5, 2012 ........................................................................... A-1499

December 6, 2012 ........................................................................... A-1601

December 7, 2012 ........................................................................... A-1657

December 10, 2012 ......................................................................... A-1680

## **VOLUME VIII**

December 11, 2012 ......................................................................... A-1768

December 12, 2012 ......................................................................... A-1860

December 13, 2012 ......................................................................... A-1960

December 17, 2012 ........................................................................ A-1970

**Exhibits**

GX 26, Certain Communications Between Rob Ray and Sandeep Goyal Between
Jan. 1, 2008 and Dec. 31, 2008.................................................... A-1980

GX 27, Certain Communications Between Rob Ray and Sandeep Goyal Between
Jan. 1, 2009 and Aug. 31, 2009 .................................................. A-1982

GX 31, Certain Communications Between Ray, Goyal, Tortora, Adondakis and
Chiasson From May 11, 2008 to May 12, 2008.......................... A-1984

GX 32, Certain Communications Between Ray, Goyal, Tortora, Horvath &
Steinberg From May 11, 2008 to May 12, 2008 ........................ A-1985

GX 33, Certain Communications Between Ray, Goyal, Tortora, and Newman
From May 15, 2008 to May 16, 2008.......................................... A-1986

GX 37, Certain Communications Between Ray, Goyal, and Tortora From
July 23, 2008 to July 24, 2008.................................................... A-1987

GX 39, Certain Communications Between Ray, Goyal, Tortora and Newman
From Aug. 14, 2008 to Aug. 15, 2008 ........................................ A-1988

GX 45, Certain Communications Between Choi, Lim and Kuo From
Apr. 22, 2009 to Apr. 25, 2009.................................................... A-1989

GX 46, Certain Communications Between Choi, Lim and Kuo
on May 2, 2009 ............................................................................ A-1990

GX 47, Certain Communications Between Choi, Lim, Kuo and Others From
May 5, 2009 to May 6, 2009 ....................................................... A-1991

GX 51, Diamondback Profits From Trading Dell Inc.
From May 15, 2008 to June 3, 2008............................................ A-1992

GX 56, Level Global Profits From Trading Dell Inc.
From May 12, 2008 to June 2, 2008............................................ A-1993

GX 59, Diamondback Profits From Trading Dell Inc.
From Aug. 5, 2008 to Sept. 4, 2008 ........................................... A-1994

GX 64, Level Global Total Profits From Trading Dell Inc.
From July 8, 2008 to Sept. 16, 2008 ............................................................ A-1995

GX 71, Diamondback Profits From Trading Nvidia
From Apr. 27, 2009 to May 8, 2009................................................................ A-1996

GX 73, Level Global Profits From Trading NVIDIA Corporation
From May 1, 2009 to May 13, 2009................................................................ A-1997

GX 119, Jesse Tortora Email to Todd Newman Re: "Dell/NVLS,"
Nov. 30, 2007 ................................................................................................ A-1998

GX 175, Jesse Tortora Email to Adondakis, Horvath, Kuo, and
Abassi Re: "dell checks," July 29, 2009 ........................................................ A-2001

GX 197, Todd Newman Email to Jesse Tortora Re: "dell," June 24, 2008 ..... A-2006

GX 204 Sandy Goyal Email to Jesse Tortora, July. 15, 2008 ......................... A-2008

GX 214, Jesse Tortora Email to Adondakis, Horvath, and Kuo Re: "dell,"
Aug. 5, 2008 .................................................................................................. A-2011

GX 215, IM Conversation between Todd Newman ("tnewman") and
Jesse Tortora ("jtortoradb"), Aug. 5, 2008 (8:40 AM)................................... A-2012

GX 238-A, IM Conversation between Todd Newmand ("tnewman") and
Jesse Tortora ("jtortoradb"), Aug.28, 2008 (12:50 PM) ............................... A-2015

GX 242, Jesse Tortora Email to Sam Adondakis Re: "dell,"
Sept. 16, 2008 ............................................................................................... A-2021

GX 287, IM Conversation between Todd Newman ("tnew") and Jesse Tortora
("jtortora"), May 1, 2009 (8:57 AM) ............................................................ A-2022

GX 315, Jesse Tortora Email to Todd Newman Re: "[DELL +1] Notes from BMO
lunch w Lynne Tyson," Apr. 16, 2009 ........................................................... A-2024

GX 316, 2007 Annual/Interim Performance Review ....................................... A-2026

GX 322, IM Conversation between Todd Newman ("tnew150") and Jesse Tortora
("jtortora"), Oct. 28, 2008 (10:41 AM) ......................................................... A-2032

GX 446, Sam Adondakis Email to Hardware Re: "[DELL 3] Expected value for
the print," Aug. 11, 2008 ............................................................................... A-2033

GX 448, IM Conversation between Jeremy Yuster ("jyuster910") and Anthony Chiasson ("chiassonlevel"), Aug. 12, 2008 (7:24 PM) ................................. A-2035

GX 476, Jeremy Yuster Email to Anthony Chiasson Re: "Economics: Frugal future showed up in the CPI data – United States – 3pp," Aug. 18, 2008............... A-2045

GX 477, Jeremy Yuster Email to Anthony Chiasson Re: "Economics: Frugal future showed up in the CPI data – United States – 3pp," Aug. 18, 2008............... A-2052

GX 505, Sam Adondakis Email to Anthony Chiasson Re: "DELL," Aug. 24, 2008 .............................................................................................. A-2061

GX 513, Anthony Chiasson Email to David Ganek Re: "Since Monday AM," Aug. 26, 2008 .............................................................................................. A-2062

## VOLUME IX

GX 515, IM Conversation between David Ganek ("ganeklevel") and Anthony Chiasson ("chiassonlevel"), Aug. 26, 2008 (3:02 PM) ................................. A-2063

GX 523, Anthony Chiasson Email to Adondakis, Ganek, and Brenner Re: "**More on DELL**," Aug. 27, 2008 ................................................... A-2070

GX 600-A, Tamale Note Report ..................................................................... A-2067

GX 700, Rob Ray Email to Sandy Goyal Re: "Hi," Sept. 27, 2006................. A-2071

GX 703, Rob Ray Email to Sandy Goyal Re: "I am heading to IR!" Mar. 19, 2007................................................................................................ A-2073

GX 705, Rob Ray Email to Sandy Goyal Re: "Hey Sandy," June 21, 2007.... A-2076

GX 708, Rob Ray Email to Sandy Goyal Re: "Hey Sandy," September 23, 2007 ...................................................................................... A-2077

GX 710, Sandy Goyal Email to Rob Ray Re: "Updated Resume," Feb. 12, 2008 ................................................................................................ A-2080

GX 713, Sandy Goyal Email to Fayed Abasi et al., ........................................ A-2081

GX 715, Rob Ray Email to Sandy Goyal Re: "Hey Sandy…" Apr. 14, 2008 ................................................................................................ A-2082

GX 719, Rob Ray Email to Sandy Goyal Re: "My Resume…"
    May 5, 2008 ................................................................. A-2083

GX 719-B, Sandy Goyal Email to Kate Morris Re: "Referral request,"
    May 8, 2008 ................................................................. A-2085

GX 720, Rob Ray Email to Sandy Goyal Re: "As discussed,"
    May 11, 2006 ................................................................ A-2089

GX 733, Rob Ray Email to Sandy Goyal Re: "Follow Up…"
    Aug. 5, 2008 ................................................................ A-2092

GX 734, Rob Ray Email to Sandy Goyal Re: "framework,"
    Aug. 14, 2008 ............................................................... A-2093

GX 736, Sandy Goyal Email to Jesse Tortora Re: "dell/lehman,"
    Sept. 16, 2008 .............................................................. A-2094

GX 750, Payment to Ruchi Goyal, Feb. 7, 2008 ........................... A-2095

GX 751, Payment to Ruchi Goyal, May 14, 2008 .......................... A-2096

GX 752, Payment to Ruchi Goyal, July 21, 2008 ......................... A-2097

GX 753, Payment to Ruchi Goyal, Sept. 25, 2008 ........................ A-2098

GX 754, Payment to Ruchi Goyal, Jan. 16, 2009 ......................... A-2099

GX 755, Sandy Goyal Email to Fayad Abbasi Re: "Dell data points,"
    Jan. 7, 2008 ................................................................ A-2100

GX 759, Sandy Goyal Email to Fayed Abassi Re: "Assuming everything is
    business as usual, we should try to set up call with Schuckenbrock...
    Maybe two to three weeks from now?" June 20, 2008 ................ A-2101

GX 775-A, Ruchi Goyal Invoice, Jan. 2, 2008 ............................ A-2102

GX 776, Todd Newman Email to Betty Valouktzis Re: "Invoice,"
    Mar. 31, 2008 ............................................................... A-2103

GX 780-A, Ruchi Goyal Invoice, July 15, 2008 .......................... A-2105

GX 781-A, Ruchi Goyal Invoice, Sept. 10, 2008 ......................... A-2106

GX 804, Jesse Tortora Email to Todd Newman Re: "nvda," Feb. 9, 2009 ...... A-2107

GX 805, Jesse Tortora Email to Todd Newman Re: "nvda," Feb. 10, 2009 .... A-2108

GX 806, Jesse Tortora Email to Todd Newman Re: "nvda," Feb. 10, 2009 .... A-2109

GX 810, Jesse Tortora Email to Todd Newman Re: "nvda," Feb. 10, 2009 .... A-2111

GX 818, Jesse Tortora Email to Todd Newman Re: "nvda," Apr. 27, 2009 ... A-2112

GX 907, Anthony Chiasson Email to David Ganek Re: "NVDA,"
Apr. 28, 2009 ............................................................................................... A-2114

GX 928, Sam Adondakis Email to Anthony Chiasson Re: "Hi level trading
template," May 4, 2009 ................................................................................ A-2115

GX 936, Sam Adondakis Email to "Hardware" Re: "(3) NVDA EPS preview – call
at 5 PM," May 7, 2009 ................................................................................ A-2116

GX 1650, Dell Code of Conduct ...................................................................... A-2117

GX 1655, Dell Investor Relations Overview, May 2008 ................................. A-2132

GX 1655-A, "Dell Disclosure Policies: Why They Matter" Presentation ....... A-2159

GX 1657, Rob Ray Employment Record ......................................................... A-2167

GX 1657-A, Rob Ray Employee Performance Review, FY2008 .................... A-2173

GX 1657-B, Rob Ray Employee Performance Review, FY2009 .................... A-2177

GX 1704-A, Dell Worldwide Financial Results, Q4 FY08 .............................. A-2181

GX 1707, Robert Williams Email to Dunlap, Molina, Polizzotto, Ray, and Scott
Re: "Q4 Operational CFR's," Feb. 22, 2008 ................................................ A-2222

GX 1712, Lynn Tyson Email to Williams, Molina, Ray, Scott, and Dunlap Re: "Q1
FY09 Preliminary Financials- External segments," May 13, 2008 .............. A-2223

GX 1712-A, Dell Worldwide Financial Results, Q1 FY09 .............................. A-2224

GX 1730, Robert Williams Email to Dunlap, Litzier-Hollier, Molina, Ray, and
Scott Re: "E Series – Meeting with Analysts – Briefing Note,"
Aug. 11, 2008 .............................................................................................. A-2233

GX 1732, Robert Williams Email to Scott, Ray, Dunlap, and Molina Re: "Q2 FY09 Consolidated Financial Results," Aug. 14, 2008 ................................ A-2235

GX 1802, Dell Earnings Announcement, May 29, 2008 .................................. A-2237

GX 1803, Dell Condensed Consolidated Statement of Income and Related Financial Highlights .................................................................................... A-2243

GX 1804, Dell Earnings Announcement, Aug. 28, 2008 ................................. A-2248

GX 1807, Dell Condensed Consolidated Statement of Income and Related Financial Highlights .................................................................................... A-2253

GX 1818, Transcript of Q1 FY09 Dell Earnings Conference Call, May 29, 2008 .............................................................................................. A-2257

GX 1952, NVIDIA Policy Concerning Trading in Company Securities ......... A-2268

GX 1958-A, Chris Choi Employee Performance Review, Feb. 25, 2010 ........ A-2270

GX 1959, NVIDIA Employee Confidentiality and Inventions Assignment Agreement, executed by Chris Choi on May 7, 2005 ................................... A-2272

GX 1975, Transcript of Q4 2008 NVIDIA Earning Conference Call, Feb. 10, 2009 .............................................................................................. A-2280

GX 1979-A, Transcript of Q1 2010 NVIDIA Earnings Conference Call, May 7, 2009 ................................................................................................ A-2295

GX 2254, Todd Newman Application for Employment, Mar. 1, 2006 ............ A-2312

GX 2257, Letter from Mark Hadlock to Todd Newman, Feb. 2, 2006 .............................................................................................. A-2316

GX 2269, Diamondback Soft Dollar Request Form, July 17, 2008 ................. A-2320

GX 2270, Diamondback Soft Dollar Request Form, Dec. 23, 2008 ................ A-2323

GX 2271, Diamondback Policy and Procedures for Communicating with Consultants, Sept. 4, 2008 ........................................................................... A-2328

GX 2501-DA, Diamondback Trading Records for Trading in Dell ................. A-2331

# **VOLUME X**

GX 3003-S, Trial Stipulation, Nov. 2012 ........................................................ A-2362

GX 8529-A, Excerpt from Diamondback Position Database
for Trading in Dell ....................................................................................... A-2365

DX 1, Newman Securities Traded Each Year Demonstrative .......................... A-2366

DX 2, Newman Frequency of Trading Demonstrative .................................... A-2367

DX 4, Newman Alleged Insider Trading Profits Compared to Total Portfolio
Profits Demonstrative ................................................................................... A-2368

DX 6, Newman Losses Prior to Earnings Announcement Demonstrative ....... A-2369

DX 9, Newman Alleged Insider Trading Profits Compared to Total Portiolio
Profits Demonstrative ................................................................................... A-2370

DX 16, Newman Losses Prior to Earnings Announcement Demonstrative ..... A-2371

DX 17, Newman Losses Prior to Earnings Announcement Demonstrative ..... A-2372

DX 24, Newman Alleged Insider Trading Profits Compared to Total Portolio
Profits Demonstrative ................................................................................... A-2373

DX 31, Newman Losses Prior to Earnings Announcement Demonstrative ..... A-2374

DX 32, Newman Losses Prior to Earnings Announcement Demonstrative ..... A-2375

DX 33, Newman Losses Prior to Earnings Announcement Demonstrative ..... A-2376

DX 117-A, IM Conversation between Todd Newman ("tnewman") and Jesse
Tortora ("jtortoradb"), Jan. 16, 2008 (4:31 PM) ........................................... A-2377

DX 126, Jesse Tortora Email to Todd Newman Re: "Dell Call,"
Mar. 26, 2008 ................................................................................................ A-2379

DX 208, Sandy Goyal Email to "ResearchEMail@lehman.com" Re: "Dell (DELL,
$19.03, B): UPGRADING TO BUY ON LOW STREET EXPECTATIONS
AND POSITIVE NEAR-TERM CATALYSTS," May 11, 2008 ................. A-2380

DX 307, Jesse Tortora Email to Todd Newman Re: "OUT OF GS THIS AM."
May 20, 2008 ................................................................................................ A-2383

DX 312, Jesse Tortora Email to Todd Newman Re: "HPQ,"
    May 20, 2008 ............................................................................ A-2384

DX 321, Jesse Tortora Email to Jon Hovarth Re: "DELL/HPQ,"
    Sept. 19, 2008 .......................................................................... A-2386

DX 798, Todd Newman Email to Jesse Tortora Re: "DELL,"
    Sept. 19, 2008 .......................................................................... A-2387

DX 866, Jesse Tortora Email to Todd Newman Re: "[DELL -1 ] IR chatter,"
    Nov. 6, 2008 ............................................................................. A-2388

DX 900, Jesse Tortora Email to Adondakis, "horvaj2@yahoo.com," and Kuo Re:
    "pmcs/dell," Nov. 14, 2008 ...................................................... A-2389

DX 901, Jesse Tortora Email to Todd Newman Re: "pmcs/dell,"
    Nov. 14, 2008 ........................................................................... A-2390

DX 903, Sam Adondakis Email to Ganek, Chiasson, and Brenner Re: "**DELL
    IR**" Nov. 14, 2008 .................................................................. A-2391

DX 951, Jesse Tortora Email to Gilchrist and Tyson Re: "hi,"
    Dec. 12, 2008 ........................................................................... A-2392

DX 952, Jesse Tortora Email to Adondakis, "horvaj2@yahoo.com," Kuo, and
    Abbasi Re: "dell," Dec. 15, 2008 ............................................. A-2394

DX 957, Todd Newman Email to Jesse Tortora Re: "akam/yhoo,"
    Jan. 16, 2009 ............................................................................ A-2395

DX 972, IM Conversation between Sam Adondakis ("sadondakislevel") and Jesse
    Tortora ("jtortora"), Feb. 20, 2009 (9:14 AM) ........................... A-2396

DX 994, Sandy Goyal Email to Jesse Tortora Re: "BMO Lunch
    with Dell (Lynn Tyson, VP IR)," Apr. 16, 2009 .......................... A-2397

DX 1175, Jesse Tortora Email to Todd Newman Re: "dell," Apr. 7, 2010 ..... A-2399

DX 1227, Jesse Tortora Email to Todd Newman, Sept. 24, 2007 .................... A-2401

DX 1228, Transcript of Q1 2010 Dell Earning Call, May 28, 2009 ............... A-2402

DX 2146, Jesse Tortora Email to Adondakis, Horvath, Kuo,
    and Abbasi Re: "Nvda ir," Mar. 3, 2009 ................................... A-2417

DX 2198, Sam Adondakis Email to Horvath, Kup, Abbasi, and Tortora Re: "Level General NVDA, XLNX, MXIM, MRVL : SV Meetings," Mar. 28, 2009 ................................................................................. A-2419

DX 2199, IDEA Template, Level Global Investors, Mar. 30, 2009 ................ A-2421

DX 2682, NVIDIA Corporation, Form 8-K, Feb. 17, 2010 ............................. A-2423

DX 8222, Barron's Tech Trader Daily.," Jul. 10, 2012 .................................... A-2435

DX 8228, Citi Analyst Report "Dell Inc.," May 30, 2008 ............................... A-2437

DX 8230, Lehman Brothers Analyst Report "Dell Inc.," May 30, 2008 ......... A-2448

DX 8270, UBS Analyst Report "Weekly Results Preview," Nov. 14, 2008 ... A-2453

DX 8437, Gartner Analyst Report "Gartner Says In the Fourth Quarter of 2008 the PC Industry Suffered Its Worst Shipment Growth Rate Since 2002," Jan. 15, 2009 .................................................................................. A-2472

DX 8535, Jesse Tortora 2008 Annual Performance Review ............................ A-2476

DX 8536, Jesse Tortora 2009 Performance Review ........................................ A-2482

DX 9598, David Ganek Email to "team" Re: "weather update," Aug. 11, 2008 ............................................................................... A-2488

DX 9599, "Team" Email to Ganek, Toub, and Chiasson Re: "Heli is in position," Aug. 12, 2008 ............................................................................... A-2490

DX 9819, Email from Jesse Tortora Aug. 5, 2008 .......................................... A-2493

DX 9902, Transcript of Q3 2008 Hewlett-Packard Earnings Conference Call, Aug. 19, 2008 .................................................... A-2494

DX 9903, Transcript of Q2 2008 Hewlett-Packard Earnings Conference Call, May 20, 2008 .................................................... A-2515

## VOLUME XI

### Post-Trial Materials

Memorandum in Aid of Sentencing on Behalf of Anthony Chiasson,
  April 29, 2013, Dkt. No. 247 ....................................................................... A-2534

Sentencing Transcript of Todd Newman,
  May 2, 2013 ................................................................................................. A-2693

Letter from Gregory Morvillo to the Honorable Richard J. Sullivan,
  May 4, 2013, Dkt. No. 251 .......................................................................... A-2765

Government's Sentencing Memorandum,
  May 6, 2013 ................................................................................................. A-2774

Order,
  May 7, 2013, Dkt. No. 258 .......................................................................... A-2803

Judgment in a Criminal Case,
  May 8, 2013, Dkt. No. 263 .......................................................................... A-2807

### VOLUME XII

Notice of Appeal by Todd Newman,
  May 10, 2013 ............................................................................................... A-2814

Sentencing Transcript of Anthony Chiasson,
  May 13, 2013 ............................................................................................... A-2874

Judgment in a Criminal Case,
  May 14, 2013, Dkt. No. 265 ........................................................................ A-2940

Order,
  May 14, 2013, Dkt. No. 266 ........................................................................ A-2947

Notice of Appeal by Anthony Chiasson,
  May 15, 2013 ............................................................................................... A-2948

Order,
  June 21, 2013, Dkt. No. 97 .......................................................................... A-2997

Letter from Gregory Morvillo to the Honorable Richard J. Sullivan,
    June 27, 2013, Dkt. No. 279 ........................................................... A-2998

Order,
    June 28, 2013, Dkt. No. 280 ........................................................... A-3002

Joint Letter from Preet Bharara to the Honorable Richard J. Sullivan,
    July 12, 2013 ................................................................................. A-3005

Order,
    July 15, 2013, Dkt. No. 292 ........................................................... A-3007

**In The Matter Of:**

*UNITED STATES OF AMERICA, v*
*TODD NEWMAN*

*November 20, 2012*

*SOUTHERN DISTRICT REPORTERS*

*500 PEARL STREET*

*NEW YORK, NY 10007*

*212 805-0330*

Original File CBKFNEWF.txt
Min-U-Script® with Word Index

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x
 3  UNITED STATES OF AMERICA,
 4            v.                    12 Cr. 121 (RJS)
 5  TODD NEWMAN,
    ANTHONY CHIASSON,
 6
              Defendants.
 7
    ------------------------------x
 8                                New York, N.Y.
                                  November 20, 2012
 9                                   9:30 a.m.
10  Before:
11            HON. RICHARD J. SULLIVAN,
12                                   District Judge
13                APPEARANCES
14  PREET BHARARA
         United States Attorney for the
15       Southern District of New York
    ANTONIA APPS
16  JOHN ZACH
    RICHARD TARLOWE
17       Assistant United States Attorneys
18  SHEARMAN & STERLING
         Attorneys for Defendant Newman
19  BY:  STEPHEN R. FISHBEIN
         JOHN A. NATHANSON
20
    STEPTOE & JOHNSON
21       Attorneys for Defendant Chiasson
    BY:  REID WEINGARTEN
22       ERIK KITCHEN
         MICHELLE LEVIN
23       -and-
    MORVILLO LLP
24  BY:  GREGORY R. MORVILLO
25
```

1      (Trial resumed)

2      (In open court; jury not present)

3      THE COURT: We're waiting for one more juror, but
4  while we're waiting is there anything that we need to address?

5      MS. APPS: Your Honor, just one small matter. Mr.
6  Weingarten presented us some of the exhibits he intends to use
7  in his cross-examination, the government has a 403 objection to
8  a handful of them. May I hand them up?

9      THE COURT: Great, thanks.

10      MS. APPS: Essentially, what these relate to are,
11  they're e-mails relating to the relationship between the
12  analysts, and the first one has a picture, they're talking
13  about Hamptons and golf, things like that. And the
14  government's position is the witness has already testified to
15  the nature of the friendship. This has little probative value
16  over and above that testimony and has potential prejudice.

17      THE COURT: I don't understand. What is the relevance
18  of this stuff?

19      MR. WEINGARTEN: Your Honor, in my opening, I said to
20  the jury the nature of the relationship between the analysts is
21  important. The government did elicit evidence in the direct
22  examination of Mr. Tortora about the relationship. We were
23  very, very careful --

24      THE COURT: The fact that they go to a Jets game,
25  they're up for watching a Jets game at five and dinner at Tao

1  is important?

2      MR. WEINGARTEN: What we did, we selected carefully
3  from an enormous universe.

4      THE COURT: The fact that you think it's important and
5  selected carefully gives me great consolation, but what about
6  the fact that they went to dinner at Pallazo and a Jets game at
7  five is indicative of anything but that they're friends?

8      MR. WEINGARTEN: It's more than that.

9      THE COURT: Come on, Mr. Weingarten, give me a break.
10  We've got a photo of these guys here. What does this get us?

11      MR. WEINGARTEN: We have photos that makes them
12  looking like mug shots that they're intending to use. We're
13  trying to establish a relationship, that they're very, very
14  good friends, spend a lot of time together, they're loyal to
15  each other and the logical inference from that more loyal to
16  each other as we will establish from the evidence, than they
17  are to the employer, Mr. Chiasson.

18      THE COURT: And this is brought out by the fact that
19  they watched a Jets game on Thursday night. This seems to me
20  designed to make the jury dislike these guys because they have
21  disposable income, which is exactly what you were objecting
22  against before.

23      MR. WEINGARTEN: Well, again, your Honor --

24      THE COURT: Very hard to see why this is relevant to
25  anything.

1      MR. WEINGARTEN: Again, if I may, what we will seek to
2  establish, that this was more than -- this was far more than a
3  professional friendship. They spent time together --

4      THE COURT: There's no question. Is anybody disputing
5  that, are you disputing that, that they spent a lot of time
6  together?

7      MS. APPS: No, your Honor.

8      MR. WEINGARTEN: My point is, sometimes the expression
9  is a picture is worth a thousand words, sometimes an exhibit is
10  worth a thousand words. If I'm unable to elicit from him on
11  cross-examination, I should be able to prove it with documents.

12      THE COURT: It's not in dispute, right? Well, what is
13  the prejudice, I guess, let me ask the government?

14      MS. APPS: The prejudice is just that you know, the
15  nature of the photograph, for example, I mean --

16      THE COURT: The nature of the photograph is just a
17  bunch of guys hanging out. They've all got their arms around
18  each other. I don't know who's who.

19      MS. APPS: There is alcohol in the picture. It's
20  additional things like golf -- it's not that it's disputed,
21  your Honor, but by having it in exhibits like this, it just
22  adds to the prejudice, essentially, as you say, people with
23  high net worth income spending it in ways that not everybody
24  would be able to spend it in. That's really part of the
25  concern here.

1        Now, look, we're not objecting to eliciting
2 compensation information, that obviously has come out or
3 anything like that, but this just, we say goes one step too far
4 in that direction.
5        THE COURT: I'm just looking at these now.  So e-mail
6 exchanges back and forth about where they're going to go on
7 vacation is relevant?
8        MR. WEINGARTEN: Your Honor, again, there's an
9 enormous universe of exhibits like this.  We tried to select
10 carefully anticipating the possibility --
11        THE COURT: But what makes this one relevant?
12        MR. WEINGARTEN: It's an example of the relationship
13 these people had.  It was incredibly important to them to spend
14 time together, it was incredibly important to them where they
15 were going to go together.  Sometimes the conversation took
16 place during the workday.  It is consistent with our theory
17 that their first loyalty was to each other.  That's
18 corroborated by the fact that they were sending this
19 information around to each other and not to my client.  It is
20 part and parcel of our overall story.
21        THE COURT: Your overall story has to be relevant to a
22 defense.  The fact he has a friend or that he's got friendships
23 is not a defense.
24        MR. WEINGARTEN: The defense is that these analysts,
25 this clique coordinated information together, they were

1 consistently together, they spent time together, they traveled.
2        THE COURT: You're going to elicit all that on cross.
3 I don't see why e-mails about whether they're choosing,
4 Scottsdale, Miami, L.A., Vegas, the Hamptons, Iceland or Sweden
5 is particularly relevant.  In any event, I don't see why where
6 they're going to spend Thursday night or Saturday night with
7 respect to football games in Vegas is relevant.  And I'm not
8 going to put them all in as exhibits.  Talk about getting
9 drunk, talk about going out for dinner.  If you want to bring
10 out the fact that they socialized together, that they saw each
11 other a lot, that they traveled together, that's fine, but I
12 don't think it has to be proven up with extrinsic evidence
13 which I think is of really questionable relevance and at least
14 some of it is potentially prejudicial with no probative value.
15 The fact that they drink is relevant?
16        MR. WEINGARTEN: No, not particularly relevant.
17        THE COURT: Is the government going to introduce any
18 evidence about the defendant's drinking?  Could we just get
19 into lifestyles and whether these guys are leading the sort of
20 lifestyles the jury would approve of?  Are we going to get into
21 who uses first class travel, who doesn't use first class
22 travel, what sort of luggage they use?  I'll look at this, but
23 I don't think it's coming in.  If you want to question his
24 relationship, if you want to get into who his first loyalty is
25 to you can get into that, but if it's just to show that the guy

1 is leading an adolescent lifestyle by zipping off to Vegas and
2 other golf locations, I don't see why that matters.
3        Mr. Fishbein?
4        MR. FISHBEIN: One other mechanical issue, there are a
5 handful of documents I'm going to show Mr. Tortora that have
6 those undisclosed recipient lists.  In other words, you can't
7 see the "to" that it was sent to, but it came out of his
8 mailbox.  We've agreed with the government and I propose in my
9 showing it to him that we've agreed with the government that
10 this came out of your e-mail box.
11        THE COURT: Phrase as it as stipulation so the jury
12 understands, but that's fine.  It's a stipulation, the jury
13 knows it's a fact that they should accept.
14        All right, we're still waiting for a juror.  We've now
15 spent a week on one witness and we're not done, so at this
16 rate, I assume this is going to take about three months.
17        MS. APPS: If it's any consolation, your Honor, and
18 I'm sure it's not, this is unquestionably the longest witness
19 on direct.  I could only infer it will be the longest witness
20 on cross-examination.  There is one other witness who will be
21 long; Mr. Adonakis.
22        THE COURT: Who is next?  Do we know the lineup on
23 this?
24        MS. APPS: Yes, your Honor.  We're calling a former
25 Diamondback employee by the name of Mark Hadlock.  I expect the

1 direct to be 30 minutes, 45 minutes.  I don't know what the
2 cross will be.  We're then going to proceed with Mr. Sandy
3 Goyal whose direct I would say is approximately two to three
4 hours, and thereafter it gets much shorter, so the only other
5 cooperating witness then is Mr. Lim and I think his direct will
6 be even shorter than Mr. Goyal's potentially.
7        THE COURT: Hadlock and Goyal we're not going to get
8 too deep into by tomorrow, I would think, right?  You think
9 we'll get to Hadlock today?
10        MS. APPS: Based on Mr. Fishbein's latest predictions
11 I would say no.  And in fact, your Honor, in terms of
12 scheduling issues, Mr. Hadlock currently has another job.
13 We'll have Mr. Goyal here if we do finish Mr. Tortora before
14 five.  I can't recall if your Honor is going to 5:30 or 5
15 today.  We'll put a witness on if Mr. Tortora finishes today.
16 We'll put Mr. Goyal on just because Mr. Hadlock is not going to
17 be here today.  We'll figure out what happens tomorrow, whether
18 we interrupt Mr. Goyal or fully proceed.  I fully expect to get
19 through Mr. Hadlock tomorrow and hopefully as much of the
20 direct of Mr. Goyal as we can manage.
21        THE COURT: All right, let's see where we are I guess
22 at the end of the day, but I am getting concerned that we're
23 not moving very quickly and we've got jurors who presumably had
24 plans over the holidays.  So, okay.  Dan, can you check to see
25 what's going on?  See if the juror is there and if they just

1 haven't knocked, but otherwise let's give a call to that juror.

2    Anything else we can cover productive?

3    (Pause)

4    MS. APPS: Your Honor, while we have another minute,
5 we actually have another potential objection here, an actual
6 objection, I should say. Mr. Tortora testified that he had a
7 personal trading account, traded in ETF's, exchange traded
8 funds, didn't trade in individual stocks. Mr. Fishbein wants
9 to introduce the account statements from that personal trading
10 account and go through multiple account statements to show, as
11 I understand from Mr. Fishbein, that Mr. Tortora was spending a
12 lot of time trading instead of working at his job, and
13 secondly, I think try and show some correlation between some of
14 the ETF funds and some of the information that Mr. Tortora was
15 receiving during his time, information about the market that he
16 was receiving during his time at Diamondback and we have a 401
17 and 403 objection to those.

18    First of all, on the amount of time he's spending
19 doing this trading, that's not something that Mr. Newman had
20 any idea about, at least I don't understand Mr. Fishbein to be
21 making that claim, so we don't see the relevance of it. And
22 secondly, with respect to trying to establish a link between
23 some ETF or basket, which is a basket of stocks, in the
24 information that Mr. Tortora was receiving on a day-to-day
25 basis about individual stocks like Intel or Dell or what have

1 you, there's a 403 concern because then we're going to have to
2 get into more detail about what an ETF is, that kind of thing.

3    So we would propose that Mr. Fishbein not be permitted
4 to introduce the account statements from Mr. Tortora's personal
5 trading account.

6    THE COURT: What is the point of these, Mr. Fishbein?
7 You're suggesting he's engaging in insider trading through
8 these accounts?

9    MR. FISHBEIN: Your Honor, it's parallel trading.
10 He's already said that the ETFs are correlated with companies
11 like Intel and Texas Instruments. He testified if you have
12 positive or negative news about Intel a proxy for the Intel
13 trade would be trading in the ETFs. He's losing lots of money
14 trading in these ETFs at the same time he says he has lots of
15 information about these companies. Now, I'm not going to go
16 through a lot of these account statements and walk through
17 individual trades like this. But I am going to establish that
18 he traded these ETFs, some of them, and the two he traded the
19 most are correlated with the stocks at issue.

20    THE COURT: What does that mean, correlated with the
21 stocks at issue?

22    MR. FISHBEIN: Because it's a basket of stocks. For
23 example, semiconductor holders, a huge chunk of that is Texas
24 Instruments and AMD. What he said is that like a proxy if you
25 have good news about Intel you might trade in the ETF. He said

1 that. He was not allowed to trade individual stocks but he was
2 allowed to trade ETFs and he said I had in my mind this inside
3 information.

4    THE COURT: So you're saying it was insider trading
5 but it was through ETFs. The inside information was informing
6 his decision which to invest in?

7    MR. FISHBEIN: We're not trying to make the point he
8 was doing something illegal, insider trading. We're trying to
9 make the point that at the time that he says he has special
10 useful inside information about Texas Instruments, Intel and
11 AMD he's trading this ETF which is correlated and losing money.
12 So that's one point. Second point is --

13    THE COURT: And that's a defense against insider
14 trading if you lost money? Am I missing something?

15    MR. FISHBEIN: It shows that the information wasn't
16 very useful to him.

17    THE COURT: Again, that's not a defense, right? The
18 issue is whether or not it was material non-public information.
19 The fact that other information trumped it and made you lose
20 money is not a defense. So I guess I'm trying to figure out
21 where you're going with it. And it's not only your client's
22 state of mind, it's his state of mind.

23    MR. FISHBEIN: If I was making the accusation that he
24 was guilty of insider trading I would understand that. But
25 that's not what we're doing. We're trying to show that the

1 information he had was not --

2    THE COURT: Was not useful.

3    MR. FISHBEIN: Not useful.

4    THE COURT: Again, I'm not sure, that's I assume a
5 stretch to say that because it's not useful means that it's not
6 non-public or not material?

7    MR. FISHBEIN: Well, the term that the government used
8 when they were questioning Mr. Tortora over and over again is
9 was it useful, and he testified dozens of times this was useful
10 because it told me this, and this was useful because it told me
11 that. So I think the utility of it is relevant.

12    And the second point, your Honor, is that he testified
13 that the reason the relationship deteriorated or the reason
14 that he wasn't so focused on his job towards the end of 2009
15 was that the Galleon case came out and he couldn't get inside
16 information anymore. And we do want to establish that he spent
17 huge amounts of time distracted by trading options in his
18 personal account and on certain days it's literally hundreds of
19 options trades that he was doing in his personal account when
20 he was supposed to be doing his job. I think that's relevant
21 in 2009 to the circumstances under which he was no longer doing
22 an effective job. And you may even recall that he said he
23 rejected it, Mr. Newman's offer to run his own book because he
24 wanted to focus on Mr. Newman's book, didn't want to be
25 distracted by having his own. Here he is, he does have his own

1 book which is his personal book and he's spending huge amounts
2 of time on it. Again, this is not going to be long. This is
3 going to be ten minutes where I just want to establish those
4 two points.
5          THE COURT: I think the latter point is one that can
6 be established. I don't know why we need extrinsic evidence to
7 do it unless he's disputing that he didn't spend a lot of time.
8 The first point I think is a little bit hard to follow. I
9 mean, you're basically saying that he's trading in ETFs, which
10 I'm not sure I fully understand what they are, some of which
11 involve the stocks of companies that he has access to inside
12 information on and because he's lost money on those, that one
13 can infer from that that the information wasn't useful and
14 wasn't good? That would seem to me to be an equally
15 supportable inference is that the other stocks that make up
16 that bundle tanked.
17          MR. FISHBEIN: Except for he said that they're
18 correlated and I'll ask him that question.
19          THE COURT: They're correlated because apparently the
20 Intel stock is in the bundle of stocks. That would be a
21 correlation but it doesn't explain -- I mean, I think it really
22 is not a plausible inference to assume that his information was
23 no good because the bundle of stocks lost money.
24          MR. FISHBEIN: In fairness, he said it's more than
25 that Intel is in there. First of all, these are not like

1 mutual funds that have 50 stocks. It's a relatively small
2 number.
3          THE COURT: Well, what is it? What is it?
4          MR. FISHBEIN: I'll tell you. Hold on. But he
5 testified, he testified that you would trade these ETFs based
6 on what you thought Intel and some of these other things would
7 do.
8          MS. APPS: I think he testified more like it was along
9 the lines of look, I'm not denying I got a bunch of inside
10 information in my job and that somehow removed that when I was
11 doing my personal trading, but I think the larger point here is
12 the correlation point that your Honor points out because Intel
13 is one stock in one of these ETFs there's lots of other stocks
14 and there are different reasons for trading ETFs than you would
15 trade other stocks --
16          THE COURT: And Dell is not one of these stocks? It's
17 not a stock in there?
18          MR. FISHBEIN: Semiconductor holders, 38 percent of it
19 is Intel, Texas Instruments and AMD.
20          MS. APPS: But the point is we didn't have to go into
21 what is that ETF, how they move. It's just a sort of a side
22 show, we could say.
23          MR. FISHBEIN: Here's what he testified to.
24 "Q. You said I don't mean to say I would remove anything about
25 stocks. What do you mean by that?"

1          Because he said I can't remove the information I got
2 from my decisions on the ETFs.
3          Then he said, "Meaning on a day-to-day basis we're
4 doing research, we're talking to a number of different
5 companies as we discussed, sometimes inside information. That
6 collective information could help derive an opinion on which
7 way an exchange traded fund is going to go. For instance,
8 semiconductor index, that's the one we're talking about, is an
9 index that I traded. If I'm talking to a number of
10 semiconductor stocks and they're all saying business is great I
11 may buy the semi conductor index."
12          THE COURT: That's not saying it's inside information.
13 That's just saying that's where he's focused.
14          MR. FISHBEIN: We're trying to say that his
15 information about Intel, AMD, Texas Instruments was not very
16 good. He claims he has special, unique, useful information --
17          THE COURT: None of the indictment involved -- is the
18 indictment involving Intel, Texas Instruments and AMD?
19          MR. FISHBEIN: If we can agree that those stocks are
20 out of the case, we won't do it.
21          MS. APPS: Your Honor, there was evidence, testimony
22 about -- the indictment has two sets of substantives; Dell and
23 Invidia. It also as a conspiracy charge. First of all, on
24 Intel and AMD what the government actually elicited was --
25          THE COURT: What page of the transcript is this in?

1          MR. FISHBEIN: 540.
2          THE COURT: What day?
3          MR. FISHBEIN: November 15.
4          THE COURT: This is in connection with -- he's asked
5 about his own personal trading, asked whether he's lost money,
6 he said he's lost a lot of money, about 450,000. What was the
7 basis on which you made the trading decisions in your account
8 with respect to these exchange traded funds? It was day
9 trading, market speculation, sometimes on a minute-by-minute
10 basis. Is he saying that he used inside information as a basis
11 for trading in there?
12          MR. FISHBEIN: If you go down to 540 he says he is
13 using the information he got from these stocks.
14          THE COURT: Where? 540 what line?
15          MR. FISHBEIN: The question is line 1 and 2 and the
16 answer starts at line, 3 but it's really at the end there where
17 he says, "For instance, semiconductor index is an index that I
18 traded."
19          THE COURT: What line, for instance?
20          MR. FISHBEIN: Line 8. And I'll ask him, your Honor,
21 I'll ask him whether Intel is correlated. If he says no then I
22 guess the line of argument won't have much weight, but I should
23 be able to pursue it.
24          THE COURT: I'm not sure what the argument is. The
25 argument is he should have done better in his day trading?

1      MR. FISHBEIN: He says he has unique access.
2      THE COURT: Where does it say he has unique access?
3  What are you talking about?
4      MR. FISHBEIN: When we talked about Intel he said he
5  spoke to Lacey Higgins who had a source at Intel that gave him
6  unit and pricing information.  When we talked about Texas
7  Instruments and AMD he said he talked to PGR that gave him
8  various revenue information, and in each case he was asked
9  whether it was public or non-public he said it was confidential
10  non-public.
11      THE COURT: Where in here does it say he relied in his
12  personal trading on inside information?
13      MR. FISHBEIN: Here, again, it's that same answer,
14  because she said what do you mean by not removing information
15  from your mind when you're trading these stocks and he says
16  meaning on a day-to-day basis we're doing research, we're
17  talking to a number of different companies, we're getting
18  information, as we have discussed sometimes inside information.
19  That's lines 5 and 6.
20      For what it's worth, your Honor, I have one, two,
21  three, four, five questions on this subject in my outline.  I
22  was going to spend more time on the other issue we talked
23  about, which is the distractions, because there are some other
24  e-mails in which he says that his state of mind was that he was
25  extremely distracted.  This is going to be a second point.  It

1  will be short and it's simply going to be that you said you
2  used some of this inside information in connection with these
3  purchases, you lost this money and that's really a point we're
4  going to make.
5      THE COURT: What are you going to ask him; why did you
6  lose money?
7      MR. FISHBEIN: No, we're going to establish that he
8  lost the money, we're going to establish that this particular
9  ETF had a big chunk of Intel, Texas Instruments and AMD.
10      THE COURT: And the inference to be drawn from that is
11  he couldn't actually have had the information because people
12  with inside information only make money.  That's not the
13  argument?
14      MR. FISHBEIN: We're going to counter the argument
15  that this was unique and useful information.  It's obviously
16  not very useful if he was correlating ETFs and didn't make
17  money.
18      THE COURT: It might have been extremely useful, it
19  could have offset the other stocks that he didn't have inside
20  information on.
21      MR. FISHBEIN: I think that really goes to the weight,
22  your Honor.  We have the argument that we have this
23  information, it's useful, we're using it to trade and make
24  piles of money, he's doing it himself, he's the one who is
25  supposedly getting the information directly and sharing it with

1  Mr. Newman, but when he uses it himself he loses money.
2      THE COURT: And the next question on redirect or
3  perhaps on cross is if this was such great information why did
4  you lose money?  Then we're going to have all kinds of
5  speculation about what the other stocks did and call somebody
6  in for that and have a whole side trial on that?
7      MR. FISHBEIN: He's going to answer.
8      THE COURT: How is he going to answer?  He's going to
9  answer, yeah, well, some other stock, I don't know, some stock
10  he doesn't have inside information on is in the, what is it,
11  EFC?
12      MR. FISHBEIN: ETF.
13      THE COURT: ETF, tanked.  I just think this is an
14  utter side show.
15      MR. FISHBEIN: Your Honor, for what it's worth, the
16  government elicited it.  They elicited it.  They elicited that
17  he had ETFs, they elicited it was correlated, they elicited he
18  was using inside information when he was making the trading
19  decisions.
20      THE COURT: I don't think it's elicited to show how
21  accurate and useful his information was, I think it's offered
22  to show his intent was impure.  If you want to ask questions
23  about intent, that's fine, but I think you're asking a
24  different set of questions to show that he didn't actually have
25  inside information and that can be inferred from the fact that

1  these bundles of funds, the funds that are bundles of stock
2  didn't make money.
3      MR. FISHBEIN: Actually, to be precise, it's that he
4  didn't have useful information.  We obviously contend that it
5  was not inside information, okay?  Our defense doesn't think
6  any of this is inside information, okay?  What we're saying is
7  that they're arguing as a factual matter that it's useful and
8  we're arguing countering that, that it's not useful.  That's
9  the issue.  It's not useful to him --
10      THE COURT: I'm going to instruct the jury that it
11  doesn't have to be, you don't have to make money to be guilty
12  of insider trading.  So your defense is that this guy didn't
13  engage in any insider trading, that's your defense, that he
14  mistakenly pled guilty to it, but it wasn't inside information.
15      MR. FISHBEIN: Certainly with Intel and these other
16  stocks.  There's going to be more now, we're going to show a
17  lot of this information was public, that is our defense, yes.
18  And I think it certainly goes to the weight of how useful
19  something is as to whether you make money or not.  It may not
20  be a complete defense, but it's relevant whether you make
21  money, the utility.  Really, your Honor, we're spending more
22  time arguing about it than if we cover it.
23      THE COURT: That may be.  I'm going to look at my
24  instructions because I don't think usefulness is going to be
25  the key word.

# A-748

1     MR. FISHBEIN: Materiality refers to whether it's
2 going to be useful in making trading decisions.
3     THE COURT: They're here.  When are we going to get to
4 this?
5     MR. FISHBEIN: Later.
6     THE COURT: Just flag it when we get to it.  I may ask
7 questions too that relate to lines 4 through 8 of page 540, but
8 I really don't want to have a side show about why it was that
9 he lost money in his personal trading accounts.
10     MR. FISHBEIN: And, your Honor, I take it that the
11 other issue, the distraction, the hundreds of options trades,
12 that I am going to inquire about --
13     THE COURT: To the extent that he has testified that
14 the reason he fell out of favor was because of his, after
15 Galleon inside tips dried up was another reason, actually, I
16 think that door has been opened up.
17     MS. APPS: Your Honor, I think this can be very
18 confusing to the jury so we may ask your Honor to give the
19 instruction that your Honor talked about if Mr. Fishbein goes
20 there?
21     THE COURT: We'll see about what instruction will be
22 appropriate.  I may have to formulate it based on the
23 testimony.  Let's get Mr. Tortora out and let's get the jury
24 in.
25     (Continued on next page)

1     (In open court; jury present)
2 JESSE TORTORA,
3     called as a witness by the Government,
4     having been previously duly sworn, testified as follows:
5     THE COURT: Well, we've lost a bit of time again.
6 Again, make sure you build in time to get here and make sure
7 you call us if you're in trouble.  Again, that may be hard in
8 the subway, but that gives us little alternative but to sit
9 around.
10     So we're going to resume the cross-examination of Mr.
11 Tortora by Mr. Fishbein and I think maybe we will, unless
12 somebody really needs to go to the bathroom, I think we're
13 probably going to skip a morning break.  If you're
14 uncomfortable raise your hand and we'll take a short break but
15 I think we want to use as much time as we can since we've lost
16 about 40 minutes.  Okay?
17     Mr. Fishbein, you may proceed.
18 CROSS-EXAMINATION
19 BY MR. FISHBEIN: (Continued)
20 Q.  Mr. Tortora, when we ended yesterday, we were talking about
21   the Invidia quarter ended April of 2009 that was reported on
22   May 7, 2009.  Do you recall that?
23 A.  Yes.
24 Q.  And you mentioned that at some point Mr. Kuo's information
25   of a significant revenue beat got into the market before the

1   quarter was announced, is that right?
2 A.  Mr. Kuo's information or just the general, the general
3   expectation?
4 Q.  Remember we went over some e-mails in which Mr. Kuo said
5   that the company looked like they were going to exceed
6   expectations on revenue.  Do you recall that?
7 A.  Yes.
8 Q.  And then you said at some point before the quarter was
9   announced that information got out into the marketplace?
10 A.  Yes, that's fair.
11 Q.  How did that information get into the marketplace, if you
12   know?
13 A.  Well, first off, that's my opinion that it got into the
14   marketplace.  I could never know conclusively, but what I do
15   recall is that the stock had been going up and I saw various
16   reports that Invidia was going to significantly beat on the
17   revenue or was tracking to beat on the revenue for the quarter.
18   You had shown me some of those reports so that was just my best
19   assumption at that time.
20 Q.  What kind of reports are you referring to?
21 A.  Well, there was a combination of e-mails, conversations,
22   sell side reports, etc.
23 Q.  So that would include analyst reports that have the same
24   information that you were getting from Mr. Kuo?
25 A.  With respect to the revenue in this particular case?

1 Q.  Yes.
2 A.  Yes.
3 Q.  Did you yourself deal with the investor relations
4   department at Invidia?
5 A.  I have spoken to him in the past, but I had not that much
6   interaction with him relative to other investor relation
7   departments.
8 Q.  Him is Mr. Hara, right?
9 A.  Yes.
10 Q.  Did you hear that Invidia investor relations was known as
11   the leaky ship?
12     MS. APPS: Objection.
13     THE COURT: Overruled.  You can answer.
14 A.  Your Honor, I have not heard that.
15 Q.  Have you had experience in your time as an analyst in
16   situations in which information gets out of a company and then
17   quickly spreads among sell side analysts and others in the
18   financial community?
19 A.  Mr. Fishbein, I think you'd have to give me a specific time
20   that you're referring to.  Even in this case, the case at hand,
21   it's unclear if information got out or the belief of the market
22   just became different, meaning we talked about higher revenues.
23   Did the company, did it get out that they were actually
24   tracking to high revenues or did people just start believing
25   that and rumors became the norm?

1  Q. But in any event, your recollection is that that
2  information about the higher revenues, you saw that in a number
3  of sources other than Mr. Kuo, is that right?
4  A. That's right.
5  Q. And that's before Invidia announced its quarterly results?
6  A. Yes, it was during the quarter.
7  Q. The other piece is gross margin which I think you testified
8  on direct, is that right?
9  A. Yes.
10  Q. And specifically that Invidia's gross margin was going to
11  be weaker, that was the information?
12  A. Yes.
13  Q. Isn't that something that you also got reports on that the
14  market knew about?
15  A. I don't recall.
16  Q. Let's look at Defense Exhibit 2146 which is your tab 214.
17  A. Okay, I found the exhibit.
18  Q. Do you recognize that as a report that you and Mr. Newman
19  received from a gentleman named Souza?
20  A. Yes.
21  Q. And it refers to, it's reported to refer to a conversation
22  with Invidia investor relations, correct?
23  A. Yes.
24  Q. That's in March of 2009, the quarter that we're talking
25  about, correct?

1  A. Yes.
2       MR. FISHBEIN: Defense offers Exhibit 2146.
3       MS. APPS: No objection.
4       THE COURT: All right, defense Exhibit 2146 is
5  received.
6       (Defendant's Exhibit 2146 received in evidence)
7  Q. Mr. Tortora, who is Mr. Souza?
8  A. John Souza was my former boss at Intel. He also worked for
9  me at Prudential and he did consulting for Todd and me at
10  Diamondback.
11  Q. At this time he was a consultant for Diamondback, right?
12  A. That's correct.
13  Q. One of the things he did was take meetings for companies
14  and report back results to you, correct?
15  A. That's correct.
16  Q. Was he located on the east coast or west coast?
17  A. West coast.
18  Q. Where is Invidia located?
19  A. West coast.
20  Q. So it would make sense if there was contact with Invidia
21  investor relations he would be the one to do it, right?
22  A. Yes.
23  Q. Here he's giving you a report about Invidia investor
24  relations?
25  A. That's correct.

1  Q. You understood that investor relations was authorized to
2  meet with people like Mr. Souza, correct?
3  A. Right.
4  Q. If we look at the e-mail, the very top says, "Sounds bad.
5  Said 09 will suck. Pessimism on and demand, low visibility.
6  Stabilization in February but no demand pick up. Not clear
7  what level they can get margins back to." Right?
8  A. Yes.
9  Q. So you understood this to be a negative report, right?
10  A. Your Honor, can I request that we put the Invidia earnings
11  exhibit up here so I can get my bearings about the date just
12  like we did with Dell?
13       THE COURT: All right, that's fine.
14       MR. FISHBEIN: That's fine.
15  A. Mr. Fishbein, just, you said this e-mail was on the quarter
16  that you're referring to ending April 26 reporting May 7, is
17  that correct?
18  Q. Right.
19  A. And this is a March 3rd e-mail, which was roughly three
20  weeks after they reported the prior quarter on February 10.
21  Q. All right, but just so we're clear, the quarter is
22  February, March, April, right?
23  A. That's right, it's roughly one month into the quarter. I'm
24  just getting my bearings.
25  Q. So my question is, you understood that to be a negative

1  report, correct?
2  A. Yes.
3  Q. And what did you understand the phrase "not clear what
4  level they can get margins back to" to mean?
5  A. How I interpret that now is perhaps margins were at a lower
6  level the prior quarter than they had been in the past and
7  they're not clear what level they can get those back up to.
8  Q. So there's uncertainty as to whether they can get margins
9  back up, right?
10  A. That's correct.
11  Q. And if you look further down the page to the paragraph
12  starting "margins," do you see that?
13  A. Yes.
14  Q. It says, quote, "Margins have been hit by collapse of work
15  station demand (down 45 percent no sign of pick up), higher mix
16  to chipsets. Drop in DT margins. DT only place that margins
17  actually dropped, rest was mix," end quote. Do you see that?
18  A. Yes.
19  Q. Do you understand that work station is a product that
20  Invidia sells?
21  A. Yes.
22  Q. And work stations were their highest margin product, right?
23  A. I'm not a hundred percent sure if it was their highest
24  margin product, but it was a high margin product.
25  Q. So if demand goes down for a high margin product that

1 adversely affects the company's margin, correct?
2 A. Yes.
3 Q. And then it says "higher mix to chipsets." Did you
4 understand chipsets were also a product that Invidia sold?
5 A. Yes.
6 Q. And that is a lower margin product, right?
7 A. Yes.
8 Q. So if the mix of your sales goes towards more lower margin
9 products and fewer higher margin products your margin suffers,
10 right?
11 A. Yes.
12 Q. And then it says, "Drop in DT margins." You understood
13 that to be drop in desktop margins, correct?
14 A. Yes.
15 Q. And this information you received before the quarter
16 reported on May 7, 2009, right?
17 A. I don't agree with that statement.
18 Q. Did you receive this e-mail -- I mean, you received it
19 before May 7, 2009, right?
20 A. I received the e-mail but the context of the e-mail appears
21 to be past tense. Referring to the prior quarter.
22 Q. At the very top it says "sounds bad," right?
23 A. Yes, but I'm referring to the lines you're pointing me to
24 that we're reading.
25 Q. Let me just ask you a question. The top it says "sounds

1 bad," right?
2 A. Yes.
3 Q. Then it said "09 will suck," right?
4 A. Yes.
5 Q. And you understood 09 to be 2009, right?
6 A. Yes.
7 Q. Let me switch topics. Mr. Tortora, yesterday we talked
8 about comments that Michael Dell made the day before the Dell
9 announcement on May 29, 2008. Do you recall that?
10 A. Yes.
11 Q. And you said you thought that Mr. Dell did the same thing
12 the following quarter, that there were comments the day before.
13 Do you remember that?
14 A. Yes.
15 Q. So that would be the August quarter that reported on
16 August 28, right?
17 A. Yes.
18 Q. Now, did you have in mind the Business Week article that
19 Ms. Apps showed you on direct?
20 A. Yes.
21 Q. If you could look at Government Exhibit 211, it's in front
22 of you, it's in evidence, perhaps we could put it up on the
23 screen. Government Exhibit 211 is an e-mail and within it is a
24 Business Week article that quotes Michael Dell, correct?
25 A. Yes.

1 Q. Now, this was not the day before the quarterly announcement
2 on August 28, 2008, correct?
3 A. Right.
4 Q. In fact, it wasn't even in August, right?
5 A. It was not in August.
6 Q. It was in July. So that's a month before, right?
7 A. That is. However, there was -- then I correct my statement
8 to you earlier, then. There was another comment the day before
9 earnings.
10 Q. Okay, so what you had in mind during the testimony
11 yesterday was this article, is that right?
12 A. No. No, no, no. I correct my statement. There was
13 another comment out of Michael Dell, a positive comment the day
14 before earnings.
15 Q. Do you think it was an article?
16 A. I don't. I actually think it was commentary that hit the
17 wires, hit Bloomberg or the other news sources, and I recall
18 reviewing an e-mail between Todd and myself talking about that
19 comment.
20 Q. So, in other words, I'm not going to be able to find an
21 article on August 27 quoting Michael Dell?
22 A. There won't be an article, correct.
23 Q. And you believe there's an e-mail?
24 A. I believe there's an exhibit.
25 Q. In this case?

1 A. Yes.
2 Q. Was it shown to you on direct?
3 A. I don't recall. But I remember having seen that.
4 Q. And you believe that was for August, not May?
5 A. That's correct.
6 Q. Now, two other stocks that you mention were Texas
7 Instruments and AMD. Do you recall that?
8 A. Yes.
9 Q. And those were both stocks where the information you talked
10 about came from experts with this PGR network, correct?
11 A. Yes.
12 Q. And PGR referring to Primary Global Research, right?
13 A. Yes.
14 Q. Which is as we talked about a company that matched up
15 experts in various fields with analysts like yourself, right?
16 A. Yes.
17 Q. And during this period, 2007 to 2009, PGR was a well-known
18 company in the industry, correct?
19 A. Yes.
20 Q. And there were other companies like it, right?
21 A. Yes.
22 Q. Some of the other companies were GLG?
23 A. Yes.
24 Q. Vista?
25 A. Yes.

# A-751

1 Q. Coleman?
2 A. Yes.
3 Q. And TriBeCa?
4 A. TriBeCa may have come on later.
5 Q. But it was sometime in that period?
6 A. Yes.
7 Q. They all provided this service, matching analysts with
8   industry experts, right?
9 A. Yes.
10 Q. Now, Diamondback permitted the use of these experts,
11   correct?
12 A. Yes.
13 Q. I think you said that you first started using PGR after
14   Mr. Abbasi did, right?
15 A. I believe so, yes.
16 Q. And was he the one that gave you the idea that they might
17   be useful?
18 A. I'm not sure. That may have been how I learned about PGR.
19 Q. And then at Diamondback, you're the one that managed the
20   PGR relationship for Todd's team at Diamondback, is that
21   correct?
22 A. It was a mix. I had interaction with the salesperson from
23   PGR, but Todd had the authority in approving the money and the
24   amount, the terms.
25 Q. Let's look at Defense Exhibit 8700. It's your tab 232.

1   I'm sorry, 231. Is this an e-mail from you to Mr. Newman and
2   others about PGR?
3 A. Yes.
4       MR. FISHBEIN: Defense offers Exhibit 8700.
5       MS. APPS: No objection.
6       THE COURT: Defense Exhibit 8700 is received.
7       (Defendant's Exhibit 8700 received in evidence)
8 Q. The date of this, Mr. Tortora, is March 31, 2008. Do you
9   recall that's when you brought, that's when your team started
10   using PGR?
11 A. Sounds like.
12 Q. And who is Ms. Valouktzis to whom you sent this?
13 A. Betty was someone who worked in the Diamondback human
14   resources department.
15 Q. And how about Ms. Magee who is the CC?
16 A. She was in HR.
17 Q. Does she also have a compliance role?
18 A. I'm not sure.
19 Q. But in any event you were not trying to hide the fact that
20   you were using PGR, right?
21 A. No.
22 Q. In the e-mail you see it starts with the fact we'd like to
23   bring on PGR, correct?
24 A. Yes.
25 Q. So this is when it started?

1 A. Yes.
2 Q. So it describes the service?
3 A. Yes.
4 Q. It says, "At this time we would like to sign up for a
5   single user license for $5,000 a month." Do you see that?
6 A. Yes.
7 Q. And it says, "I will be that user for our team." Do you
8   see that?
9 A. Yes.
10 Q. So does that reflect that you're the one that had the
11   interaction with the PGR experts?
12 A. Yes. I was doing calls with them, yes.
13 Q. And to your knowledge Mr. Newman didn't do any calls with
14   PGR, right?
15 A. I don't know that.
16 Q. But you don't have any affirmative recollection that he
17   did, right?
18 A. No, I don't know either way.
19 Q. Then you say further, "I believe there are already two
20   users of this service at Diamondback," and you mention some
21   names, right?
22 A. Yes.
23 Q. As a matter of fact, there were several people at
24   Diamondback that already were using this PGR service, is that
25   correct?

1 A. There were others. I don't know how many.
2 Q. So it wasn't unique to Mr. Newman's team, correct?
3 A. That's right.
4 Q. You understood that PGR was reviewed by the compliance
5   department at Diamondback before you could use PGR, right?
6 A. As a firm, yes.
7 Q. And in fact, Diamondback the firm had compliance, the
8   compliance department review all consultants before you sign
9   them up, right?
10       MS. APPS: Objection.
11       THE COURT: Do you know that?
12       THE WITNESS: I don't know that, your Honor.
13 Q. The consultants that you had experience with, was it your
14   experience that they were vetted by compliance?
15 A. I understood the expert networking firms to be. I don't
16   know about the consultants.
17 Q. You don't know one way or the other?
18 A. I don't, and I didn't see the affirmative, as you say.
19 Q. With respect to the consulting, the expert firms, do you
20   recall that in 2009 you sought to bring on another one called
21   TriBeCa?
22 A. Yes.
23 Q. And do you remember in that connection having a discussion
24   with Mr. Newman about the compliance process for bringing on a
25   consulting firm?

1  A.  Yes.
2  Q.  If we can look at Defense Exhibit 8985, it's your tab 234.
3    Is that an e-mail from you to Mr. Newman and others on March 4,
4    2009 about due diligence with respect to the TriBeCa firm?
5  A.  Maybe I'm not seeing that.  Exhibit 8985?
6  Q.  Yes, you see at the bottom there's some correspondence with
7    TriBeCa?
8  A.  No, I have the exhibit, I'm just not finding where I'm
9    involved here.
10  Q.  If you look towards the top, it's the second e-mail from
11    the top.
12  A.  Okay, out of this one e-mail, yes.  There's one piece of
13    this six-page document where I'm sending e-mail to Todd and
14    others.
15  Q.  But you're forwarding the ones below it, right?
16  A.  So when I reply I guess the rest are forwarded.  Yes, okay.
17  Q.  Okay.
18        MR. FISHBEIN: Defense offers Exhibit 8985.
19        THE COURT: Any objection?
20        MS. APPS: No objection.
21        THE COURT: Defense 8985 is received.
22        (Defendant's Exhibit 8985 received in evidence)
23  Q.  And what you're doing is here you write to Mr. Newman, and,
24    by the way, who is Peter Wade?
25  A.  I don't know his position, but he held a high-level

1    position at Diamondback.
2  Q.  You write to them and you say, "These guys working to try
3    to meet our compliance requirements."  By these guys you're
4    referring to TriBeCa, right?
5  A.  Yes.
6  Q.  Which was another expert network, right?
7  A.  Yes.
8  Q.  Then you say, "I believe there's a strong business case to
9    use them, but I know they need to clear our compliance
10    requirements first consistent with the other firms we use; GLG,
11    PGR, Vista, etc."  Do you see that?
12  A.  Yes.
13  Q.  So you're particularly noting that PGR had to go through a
14    compliance process, right?
15  A.  Yes.
16  Q.  And that was an e-mail that was sent to Mr. Newman,
17    correct?
18        MS. APPS: On the screen, could you just bring down,
19    make the box a little bit larger so it's not concealing the
20    part underneath it?
21        MR. FISHBEIN: Actually, we're moving on.
22        MS. APPS: Just so you can see what's underneath the
23    e-mail?
24        THE COURT: It's in evidence.
25        MR. FISHBEIN: They can do that.  Okay.

1        (Continued next page)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  Q.  I believe you said the PGR expert at AMD was Tony, is that
2    right?
3  A.  Yes.
4  Q.  Did you speak to him yourself?
5  A.  I did.
6  Q.  When you spoke to him yourself did you do notes about it?
7  A.  I did.
8  Q.  If you could go to Government Exhibit 1455.  It's your tab
9    259.
10        THE COURT: 259, did you say?
11        MR. FISHBEIN: 259.  Government Exhibit 1455.
12  Q.  Do you see, Mr. Tortora, that this is an e-mail from you to
13    Mr. Newman, subject AMD, call that you then forward to others?
14  A.  Yes.
15        MR. FISHBEIN: Defense offers Exhibit 1455.
16        MS. APPS: No objection.
17        THE COURT: Mr. Weingarten, I have not been asking
18    you, but if you are objecting, you will let me know.
19        Government Exhibit 1455 is received.
20        (Government's Exhibit 1455 received in evidence)
21  Q.  What is this, Mr. Tortora?
22  A.  This appears to be a summary that I did with the PGR expert
23    from AMD.
24  Q.  I guess you started off saying that the overall tone sounds
25    much better than has been in years, is that right?

1 A. Yes.
2 Q. And then if you look about two-thirds down the page it
3 says: GM 42 percent in Q1 and then there is some details about
4 gross margin, is that right?
5 A. Yes.
6 Q. Are you sure this is with the PGR expert?
7 A. No, I'm not.
8 Q. You had a contact at AMD named Ruth Cotter, didn't you?
9 A. Ruth was investor relations head there.
10 Q. Aren't these notes of a conversation you had with investor
11 relations?
12 A. I don't think I clearly specify here who this is with. But
13 if I look through the details now, then it most likely is. It
14 seems much less specific where the FGR expert, Tony, was giving
15 specific information on the quarter and this looks like more
16 like a call that matches one I would have with Ruth.
17 Q. I may be able to help you with this, Mr. Tortora. If you
18 look at Defense Exhibit 10025. It's your tab 261. Why don't
19 you just take a look at it to refresh your memory. See if that
20 refreshes your memory that in fact this is a call with Ruth
21 Cotter of investor relations?
22 A. Yes.
23 Q. Does that refresh your memory?
24 A. Yes. It doesn't refresh my memory, but it shows it's on
25 the same date, setting up the call.

1 Q. If we look again at that gross margin information it says
2 GM 42 percent in Q1. That's the prior quarter, right?
3 A. Yes.
4 Q. And then she tells you they are sticking to plan for 46 to
5 50 percent for the full year and you compare it to the street,
6 and saying this with conviction.
7     Do you see that?
8 A. Yes.
9 Q. And so you understood her to be giving you some conviction
10 from the company's point of view about their gross margin,
11 right?
12 A. The way I write this is they are sticking to a plan, which
13 means they had prior forecasted a plan for gross margin in a
14 public forum.
15 Q. And then it says: Will be profitable in Q3 and Q4.
16     What did you mean by that?
17 A. Earnings positive. Again, likely -- I don't recall, but
18 the way I wrote it appears that it's something that that they
19 had set prior.
20 Q. If you look at the next sentence it says: Saying this with
21 conviction, which is change from prior, right?
22 A. My interpretation of the tone, the body language of
23 how they are saying it, which is a change from prior.
24 Q. So this was useful information to get from somebody at the
25 company as to how they view profitability going forward, right?

1 A. One of the main reasons you talk to investor relations is
2 to gauge their tone and body language, as I've said over and
3 over again, and it's your interpretation of how they are saying
4 something. Do they sound positive, do they sound shaky on
5 something, et cetera.
6 Q. From that you concluded that they would be profitable in
7 the coming quarter and the following, right?
8 A. The way she was answering the questions, which were
9 consistent with their prior messaging, I believed I heard
10 conviction in her voice.
11 Q. When you said, which is changed from prior, what did you
12 mean by that?
13 A. I don't remember what I meant, but if I'm interpreting this
14 e-mail, perhaps they weren't saying it with such authority,
15 but, again, that's just my interpretation. I don't remember at
16 the time.
17 Q. Would it be fair to say that perhaps she was telling you
18 something that was different than what you had understood
19 previously?
20 A. Not in this case because the which is changed from prior is
21 referring to saying this with conviction, not the messaging of
22 profitability or the gross margin.
23 Q. By the way, Mr. Tortora, this was a one-on-one conversation
24 that you had with Ms. Cotter, right?
25 A. That's correct.

1 Q. You understood Ms. Cotter to be authorized to have this
2 discussion with you, correct?
3 A. Yes.
4 Q. And you never gave Ms. Cotter any personal benefits to
5 speak to you, right?
6 A. No.
7 Q. Let's turn to Texas Instruments. And I believe you said
8 that the information you got was from a gentleman by the name
9 of Tyson?
10 A. Yes.
11 Q. If you could look at Government Exhibit 1414, it's your tab
12 271.
13     If you look at the top e-mail, is that an e-mail from
14 you to Mr. Newman, re text TXN, August 14, 2009?
15 A. Yes.
16     MR. FISHBEIN: Defense offers Government Exhibit 1414.
17     MS. APPS: No objection.
18     THE COURT: Government Exhibit 1414 is received.
19     (Government's Exhibit 1414 received in evidence)
20 Q. Mr. Tortora, is that a write-up of one of your calls with
21 Tyson?
22 A. Mr. Fishbein, now I have to read line by line for a few
23 minutes. Things are going to be delayed a little bit now.
24     It appears to be, based on the write-up here.
25 Q. Is this consistent with the type of information that you

1   receive from Tyson during these calls?
2   A. It is certainly consistent. It's two calls here. However,
3   I would say that I at some point we began to receive much or I
4   began to receive from him much more specific revenue numbers
5   which I don't see in these two calls.
6   Q. Would it be fair to say that your information from Tyson
7   focused on demand and revenue?
8   A. Yes.
9   Q. And not gross margin or EPS or operating expense?
10  A. Not to my recollection, yes.
11  Q. If you look at Defense Exhibit 7229. It's tab 272.
12      Mr. Tortora, is this an e-mail that you forwarded to
13  Mr. Newman reflecting a report for Mr. Adondakis on a
14  conversation with Texas Instruments investor relations?
15  A. Yes.
16      MR. FISHBEIN: Defense offers Exhibit 7229.
17      MS. APPS: No objection.
18      THE COURT: Defense 7229 is received.
19      (Defendant's Exhibit 7229 received in evidence)
20  Q. Mr. Tortora, this is exactly the same date as the write-up
21  we just looked at with your call with Tyson, right?
22  A. Yes.
23  Q. So this is information you received the very same day, but
24  this is from the investor relations department or at least it's
25  attributed to the investor relations department, right?

1   A. Yes.
2   Q. And was it your understanding that Mr. Adondakis had had a
3   conversation with investor relations at Texas Instruments?
4   A. I'm not sure where -- I am not sure if he had a meeting or
5   he was listening to a presentation.
6   Q. But you believe that whatever it was, he was getting
7   information from investor relations, right?
8   A. Yes.
9   Q. And those letters there, IR, that stands for investor
10  relations, right?
11  A. Yes.
12  Q. And the information that was conveyed included how the
13  current quarter was tracking, right, at the very top? You see
14  that? Sounds like Q3 tracking data.
15  A. Just from reading that particular line I interpret that --
16  I don't know if that means something was said or that is Sam's
17  read of body language and tone.
18  Q. Fair enough.
19      In other words, in this you don't know exactly what
20  came from investor relations and what part of it is
21  Mr. Adondakis' interpretation, right?
22  A. That's correct.
23  Q. But it does include a statement, sounds like Q3 tracking
24  better versus guidance, correct?
25  A. Yes.

1   Q. If you look further down do you see there is also
2   information about gross margin?
3   A. Yes.
4   Q. And specifically there are set out several items that
5   Mr. Adondakis says will positively affect gross margin, right?
6   A. Yes.
7   Q. And at the end there is a conclusion: "Overall, positive
8   and sounds like tracking to beat and raise for Q3/Q4 on better
9   revs, higher GM, and lower opex."
10      Do you see that?
11  A. Yes.
12  Q. Did you understand beat and raise for Q3/Q4 to refer to
13  earnings for the current quarter or the next quarter?
14  A. Yes. Again, unclear if that's Sam's interpretation or
15  something he said.
16  Q. It then says that revs means revenues, right?
17  A. Yes.
18  Q. Higher GM means gross margin, right?
19  A. Yes.
20  Q. And lower opex means operating expense, right?
21  A. Yes.
22  Q. And this was all the same day as the report you got from
23  Tyson, right?
24  A. Yes.
25  Q. But Tyson didn't tell you anything about gross margin,

1   opex, or profits, right?
2   A. No, he did not.
3   Q. If you could now look at Defense Exhibit 9165. And there
4   is a loose pile of what's called additional documents in front
5   of you and it's in there. It's Defense Exhibit 9165.
6   A. Yes, I got it.
7   Q. Do you recognize this as an e-mail that you sent to
8   Mr. Newman re Texas Instruments forwarding information from
9   Mr. Kuo?
10  A. Yes.
11      MR. FISHBEIN: Defense offers Exhibit 9165.
12      MS. APPS: No objection.
13      THE COURT: No objection. Defense 9165 is received.
14      (Defendant's Exhibit 9165 received in evidence)
15  Q. And the information from Mr. Kuo is titled TXN call with
16  IR.
17      Do you see that?
18  A. Yes.
19  Q. Did you understand that to mean that Mr. Kuo attended a
20  call with the Texas Instruments investor relations department?
21  A. Yes.
22  Q. By the way, September 16 of 2009 -- let me take that back.
23      Are you aware that Texas Instruments is on a calendar
24  quarter?
25  A. They are.

1  Q. So the third quarter is July, August, and September,
2  correct?
3  A. That's correct.
4  Q. And September 15, the date of this, is about two weeks
5  before the quarter ends, right?
6  A. Yes. However, there is one important distinction to make
7  with Texas Instruments. They regularly conducted a mid-quarter
8  update, which means at some point in the middle of the quarter
9  or actually, I believe, roughly speaking, two of three months
10  through the quarter, they essentially made a public earnings
11  announcement.
12  Q. Do you know if they did that this quarter?
13  A. I know that was their regular practice. I believe they did
14  that every quarter. I don't know those dates. But if we were
15  theoretically to look at a chart like this for Texas
16  Instruments, it would be prudent to add those mid-quarter
17  updates.
18  Q. But you don't remember if they did it or, if so, when they
19  did it?
20  A. I don't remember the date, but I just -- I feel like that's
21  an extremely important point because that's when information
22  becomes disseminated to the public.
23  Q. Fair enough. But this would have been after that, right?
24  A. This would have been after that, yes.
25  Q. And this is, again, two weeks before the quarter ends,

1  right?
2  A. Right. My guess is it would have been two weeks after
3  that, but that's just an approximation.
4  Q. Now, Mr. Kuo says: Sounds like 3Q tracking 5 to 10 million
5  above the mid point of revenue guide and 4Q tracking to flat Q
6  on Q.
7      Do you see that?
8  A. Yes.
9  Q. And then he says, quote: Biggest surprise from
10  conversation if the upside in GM for 4Q.
11      Do you see that?
12  A. Yes.
13  Q. And did you understand the if to really be is? Did you
14  understand that's a typo?
15  A. How do you know that?
16  Q. I'm asking you.
17      THE COURT: Did you understand that to be a typo, is
18  instead of if, yes, no, or I don't know?
19      THE WITNESS: Your Honor, I don't know. It could make
20  sense if it said if as well.
21  Q. In any event, he was referring to a surprise from the
22  conversation, correct?
23  A. I don't know. This is not my words. I don't know.
24  Q. All I can ask you is if you have an understanding, having
25  received it, of what he meant. My question is, did you

1  understand there to be something new in this conversation he
2  had with investor relations?
3  A. Again, the sentence doesn't make that much sense. It's
4  clearly talking about gross margin in Q4. That's what I know.
5  I can't make heads or tails of it, so I don't want to
6  speculate.
7  Q. Q4 is an upcoming quarter, correct?
8  A. Yes.
9  Q. If you turn the page, there is a section called GM.
10      Do you see that?
11  A. Yes.
12  Q. Do you understand that to refer to gross margin?
13  A. Yes.
14  Q. And what is your understanding of what's listed there?
15  A. Looks like they are giving the gross margin by business
16  units. Not generally clear if that's historical data or not.
17  But it looks like it's an approximation of gross margin by
18  business unit, and a comment here about the royalties for 2009.
19  Q. But the percentages next to those various names, like
20  wireless, analogue, those are business units of Texas
21  Instruments, yes?
22  A. Yes.
23  Q. You understood the percentages to be gross margins?
24  A. Yes.
25  Q. You understood that Texas Instruments investor relations

1  was authorized to speak to people like Mr. Kuo?
2  A. Yes.
3  Q. Did you have any knowledge of Mr. Kuo giving any personal
4  benefits to anybody at Texas Instruments investor relations?
5  A. No.
6  Q. Let's turn to Altera. You testified that you got
7  information about Altera from Mr. Kuo, correct?
8  A. Yes.
9  Q. By the way, I think you said that you first met Mr. Kuo in
10  the fall of 2007, is that right?
11  A. I spoke to? Spoke to.
12  Q. The first time you had contact was fall of '07, right?
13  A. Yes.
14  Q. That's because you noticed that his analyst reports were
15  accurate, right?
16  A. Yes.
17  Q. So how did that happen? Did you just call him out of the
18  blue? What happened?
19  A. I called Gurinder, the senior analyst at Bear Stearns. It
20  was his reports. He was the head name on the report.
21  Q. How did you get to Mr. Kuo?
22  A. I believe Gurinder passed me to Mr. Kuo at some point.
23  Q. Do you remember your first conversation with Mr. Kuo?
24  A. No.
25  Q. Do you remember when it was that he told you that he had a

1  contact at Altera?
2  A. I remember that in the initial conversation. One of the
3  initial conversations, I should say, very early on he told me
4  that. I don't remember if it was the first conversation,
5  second conversation.
6  Q. When he told you, it was early in your knowing him?
7  A. I'm sorry?
8  Q. It was early in the period in which you knew it. It was
9  right after you had first met him?
10  A. Yeah. It would have been some time in 2007.
11  Q. And at the time he told you he had this contact you had
12  never met him in person, correct?
13  A. That's correct.
14  Q. You had just spoken to him on the phone?
15  A. That's correct.
16  Q. You didn't know him previously and he didn't know you
17  previously, right?
18  A. Yes.
19  Q. Was he hesitant in any way to tell you that he had this
20  contact?
21  A. I don't recall.
22  Q. Do you remember having to push him on it?
23  A. I don't recall.
24  Q. Or make any promises to him before he told you he had a
25  contact?

1  A. I certainly didn't make any promises to him.
2  Q. He volunteered it, right?
3  A. Again, I don't recall.
4  Q. With respect to this contact did you ever know a name?
5  A. No.
6  Q. Did you ever know a position that this contact had at
7  Altera?
8  A. No.
9  Q. Did you know anything about the level of authorization the
10  contact had to provide information?
11  A. No.
12  Q. And you didn't ever hear anything about any benefit being
13  provided to this contact, did you?
14  A. No.
15  Q. Isn't it a fact, Mr. Tortora, that the information that
16  Mr. Kuo gave you about Altera had already been published in
17  Mr. Kuo's research reports at Bear Stearns?
18  A. It would depend on which instance you are talking about.
19  Q. Mr. Kuo is an analyst, right? I'm sorry. A sell side
20  analyst, right?
21  A. Yes.
22  Q. At this time?
23  A. Yes.
24  Q. And his job was to issue research reports, right?
25  A. One of them, yeah.

1  Q. As you know from being a sell side analyst yourself, sell
2  side analysts talk to people at companies and then they issue
3  research reports based on that and other information they
4  gather, right?
5  A. That's one of the responsibilities, yes.
6  Q. Didn't you observe that he put in his research reports
7  information that he got through these checks?
8  A. As I mentioned, Mr. Fishbein, that's one of the ways I
9  first discovered that they were extremely accurate, because I
10  had analyzed historical research reports.
11  Q. Let's look at Government Exhibit 1358, your tab 278.
12      Is this an e-mail from you to Mr. Newman about Altera
13  and Xilinx?
14  A. Yes.
15  Q. And I think you testified on direct about this particular
16  quarter, which was the fourth quarter of 2007 reported at the
17  end of January 2008, right?
18  A. Yes.
19      MR. FISHBEIN: Defense offers Government Exhibit 1358.
20      MS. APPS: No objection.
21      THE COURT: Government Exhibit 1358 is received.
22      (Government's Exhibit 1358 received in evidence)
23  Q. I believe you identified this as an example of the
24  information you received from Mr. Kuo, right?
25  A. Did we see this exhibit before?

1  Q. I take that back.
2      If you look at the second paragraph, you write to
3  Mr. Newman: Spoke to Bear contact.
4      Do you see that?
5  A. Yes.
6  Q. And the Bear contact was Mr. Kuo, right?
7  A. Yes.
8  Q. So is this an example of information you got from Mr. Kuo
9  with respect to the quarter that you testified about?
10  A. Just to be clear, I think, again, from my interpretation of
11  what's going on here, I believe that -- it's difficult without
12  the dates, which we should have for every company that we talk
13  about, but it appears, based on this note, that Xilinx is
14  reporting on this day.
15  Q. That's right. That was going to be my next question.
16  Xilinx already reported.
17  A. So it appears that the comment you just pointed out, the
18  first line of the second paragraph, is that he's making
19  comments on the already public comments of Xilinx in this
20  particular case.
21  Q. My question is just Bear contact. Is that Mr. Kuo?
22  A. Yes.
23  Q. Then in the next paragraph re, ALTR?
24  A. Yes.
25  Q. That's Altera?

1  A.  Yes.
2  Q.  It says he expects.
3        Do you see that?
4  A.  Yes.
5  Q.  Do you understand that to be Mr. Kuo expects?
6  A.  Yes.
7  Q.  Is this an example of information you got from Mr. Kuo that
8   you thought came from his contact?
9  A.  Yes.
10  Q.  And there are two things that he says he's expecting with
11   respect to Altera.
12        Do you see that?
13  A.  Yes.
14  Q.  One is, if you look towards the end of the sentence it
15   says:  Q4 beat looks to be bigger than Xilinx, according to his
16   checks.
17        Do you see that?
18  A.  Yes.
19  Q.  Did you understand that to mean that for the fourth quarter
20   ended end of December, Mr. Kuo was saying that Altera was going
21   to beat their guidance more than Xilinx had beat theirs?
22  A.  Yes.
23  Q.  The second piece of information he gave you was that Altera
24   is going to guide higher for Q1, which is the upcoming quarter,
25   the next quarter?

1  A.  Yes.
2  Q.  Now, if you'll look with me at Defense Exhibit 8185, is
3   your tab 279, do you recognize that as a Bear Stearns research
4   report issued by or authorized by Mr. Kuo and his boss?
5  A.  I'm sorry.  Can you repeat that.
6  Q.  Yeah.  Do you recognize Defense Exhibit 8185 as a Bear
7   Stearns research report authored by Mr. Kuo and his boss?
8  A.  Yes.
9  Q.  And it relates to Altera and Xilinx, the same two companies
10   we are talking about, right?
11  A.  Yes.
12        MR. FISHBEIN:  Now, defense offers Exhibit 8185.
13        MS. APPS:  No objection.
14        THE COURT:  Defense 8185 is received.
15        (Defendant's Exhibit 8185 received in evidence)
16  Q.  Now, your note, Mr. Tortora, to Mr. Newman was dated
17   Friday, January 18, right?
18  A.  Yes.
19  Q.  And if you look at the Bear Stearns research report, that
20   is dated January 15, right?
21  A.  Yes.
22  Q.  So it's several days before, right?
23  A.  Yes.
24  Q.  Now Mr. Kuo writes in the report, the first words are, our
25   checks indicate, right?

1  A.  Yes.
2  Q.  So he's indicating to the reader that he's done checks to
3   get this information, right?
4  A.  Whatever the word checks means, yes.
5  Q.  How did you understand it?
6  A.  Well, I understood it, because I spoke to Danny, that he
7   would talk to contacts from Altera and/or Xilinx.
8  Q.  Actually, that's a common understanding of checks, is that
9   you talked to people in the industry, including people at the
10   company, right?
11  A.  Again, it depends on the author and depends on the
12   interpretation, because it could mean people at the company,
13   could mean people at competitors, suppliers, et cetera.
14  Q.  Will you agree with me, Mr. Tortora, that both pieces of
15   information contained in your e-mail to Mr. Newman on January
16   18 were included in this research report dated January 15?
17  A.  Let me read through it.
18  Q.  I can direct your attention.  It's the first bullet point
19   and the third bullet point and you can walk you through it, but
20   why don't you read it to yourself first.
21  A.  Sure.
22        You might need to point me to this because I'm not --
23  Q.  I'm happy to.  Let's start with the 18th, the e-mail from
24   you to Mr. Newman.
25  A.  Okay.

1  Q.  And the first piece of information you talked about was
2   that for Q4, which is the quarter ending December, right?
3  A.  Yes.
4  Q.  Altera's beat looks to be bigger than Xilinx, right?
5  A.  Yes.
6  Q.  Now, if you look at the first bullet of the Bear Stearns
7   report, it says:  We expect Altera to report QCY fourth quarter
8   of '07 revenues.  It gives numbers, right?
9        And then it says:  Above the company's guidance,
10   right?  Do you see that, above the company's guidance?
11  A.  Yes.
12  Q.  So he's expecting Altera to report revenue above guidance,
13   right?
14  A.  Yes.
15  Q.  And then with respect to Xilinx it says they are going to
16   report in the upper end of their guidance, right?
17  A.  Yes.
18  Q.  And reporting above guidance is better than reporting at
19   the upper end of guidance, right?
20  A.  Generally speaking, yes.
21  Q.  So that's the first piece.  Then the second piece he says,
22   Altera, he expects, a higher Q1 guide based on his checks,
23   right?  If you go to the Bear Stearns report, the third bullet,
24   it says, quote:  We expect Altera and Xilinx to guide for
25   revenues to increase low to mid single digit.

1        Do you see that?

2  A.  Yes.

3  Q.  Then it says:  We expect Altera to guide to a slightly

4  higher mid point than Xilinx.

5        You see that?

6  A.  Yes.  It makes sense.

7  Q.  Would you agree with me that the information in your e-mail

8  to Mr. Newman on January 18 is reflected in the Bear Stearns

9  report issued three days earlier?

10  A.  Yes.

11  Q.  If we could now go to Intel.  And with respect to Intel you

12  said you got information from Lacey Higgins, right?

13  A.  Yes.

14  Q.  And she also was a sell side analyst, right?

15  A.  Yes.

16  Q.  And she issued research reports in conjunction with her

17  colleagues, right?

18  A.  Yes.

19  Q.  And you understood that the information that she was giving

20  you she was also putting in research reports, right?

21  A.  As with Danny Kuo, at times some of the information would

22  have been in the research reports.  Lacey Higgins, at times,

23  some of the information would have been in the research

24  reports.

25  Q.  Let's look at Government Exhibit 1176.

1  A.  Which is the tab?

2  Q.  I'm sorry.  It's tab 292.

3        Is that an e-mail from you to Mr. Newman regarding

4  Intel, May 4, 2009?

5  A.  Yes.

6        MR. FISHBEIN:  Defense offers Government Exhibit 1176.

7        MS. APPS:  No objection.

8        THE COURT:  Go Exhibit 1176 is received.

9        (Government's Exhibit 1176 received in evidence)

10  Q.  You say here, Mr. Tortora, that you had a call with Lacey,

11  MS checks late Friday, et cetera.

12        Do you see that?

13  A.  Yes.

14  Q.  Is this an example of information that you got from

15  Ms. Higgins about Intel?

16  A.  Yes.

17  Q.  And do you see that it says:  Call with Lacey, MS checks,

18  late Friday, made them pull trigger on UG over weekend.

19        Do you see that?

20  A.  Yes.

21  Q.  What is UG?

22  A.  Upgrade.

23  Q.  What is an upgrade?

24  A.  An upgrade is where they are increasing their

25  recommendation on Intel from either a sell to a neutral or a

1  from a neutral to a buy.

2  Q.  Are upgrades something that are published?

3  A.  Yes.

4  Q.  They are published as part of the research reports, right?

5  A.  Yes.

6  Q.  And distributed to the finance community, right?

7  A.  Yes.

8  Q.  What she was telling you is, here is some information, but

9  we have already done an upgrade, right?

10  A.  Yes.

11  Q.  So she was pointing out that the information she is giving

12  you is already in a report, right?

13  A.  Well, I'm not denying that some of the information is in

14  this report.  That's not necessarily what's being said here.  I

15  think there is two separate thoughts.

16  Q.  Let's look at the information here.  It says:  ASP holding

17  in mix looking good.

18        What is that referring to?

19  A.  That ASP's selling prices are stable and the product mix is

20  positive.

21  Q.  And then there is a comment, by the way, it's the third to

22  last bullet point.  It says:  Paul getting bullish, Maloney

23  still cautious.

24        What does that refer to?

25  A.  Paul Otellini was Intel's CEO and I believe Sean Maloney

1  was the head of sales.

2  Q.  I take it they are saying different things, that there is

3  some contrary information here?

4  A.  Yeah.  They have differing opinions on the economy.

5  Q.  But the overall takeaway at the end, it says, but getting

6  more positive?

7  A.  Yes.

8  Q.  Is that something she said or is that your interpretation?

9  A.  My interpretation of what I wrote here was that it was

10  something that she said.

11  Q.  And now let's look at Defense Exhibit 8424.  It's your tab

12  293.

13        Do you recognize that as a Morgan Stanley research

14  report about Intel?

15  A.  Yes.

16  Q.  Authored by Ms. Higgins and her colleagues, right?

17  A.  Yes.

18  Q.  Dated May 4, 2009, the same date as the e-mail?

19  A.  Yes.

20        MR. FISHBEIN:  Defense offers Defense Exhibit 8424.

21        MS. APPS:  No objection.

22        THE COURT:  Defense Exhibits 8424 is received.

23        (Defendant's Exhibit 8424 received in evidence)

24  Q.  If you will look, Mr. Tortora, under what's new.

25        Do you see that?

# A-759

1  A.  Yes.
2  Q.  It's on the left-hand column in the middle.  Do you see it
3  says, quote:  Near term, our checks, right?
4         You see the word checks?
5  A.  Yes.
6  Q.  You understood she was indicating that they had done some
7  checks?
8  A.  Yes.
9  Q.  Indicate positive business trends in the PC supply chain.
10        Do you see that?
11  A.  Yes.
12  Q.  And she comments that there is upside to consensus, 2Q09
13  estimates.
14        Do you see that?
15  A.  Yes.
16  Q.  Did you understand her to mean that based on the checks,
17  they think Intel will do better than the consensus estimates at
18  the time?
19  A.  Yes.
20  Q.  Would you agree that this is information similar to what
21  was conveyed in your conversation with Ms. Higgins on the same
22  date?
23  A.  Based on that one line, it's certainly in the same
24  direction.  Obviously, the information was much more specific
25  that Lacey provided in the e-mail we just reviewed.  Again,

1  just based on this one line that you pointed out.
2  Q.  Well, I'll ask you, Mr. Tortora, in the research report
3  there is a comment, quote:  Our analysis indicates that Intel's
4  margins and revenues have suffered from a severe decline
5  shipment, et cetera.
6         Did Ms. Higgins say anything to you in her e-mail
7  about margins?
8  A.  Sorry, Mr. Fishbein.  Are you reading a partial sentence or
9  can you direct me?
10  Q.  Really, the question is, in the research report, where she
11  says, our checks indicates positive business trends, there is
12  some commentary about Intel's margins, is that correct?
13  A.  The line that's highlighted on the screen here, is that
14  what you are asking?
15  Q.  And after that, because it also says we think that server
16  MPU revenues will reaccelerate by early 2010, which should
17  translate to upside to gross margins and EPS.
18         Do you see that?
19  A.  Okay.
20  Q.  You see that the research report there is commentary about
21  margins and EPS?
22  A.  Yes.
23  Q.  And in your write-up of your call with Lacey, is there
24  anything about margins or EPS?
25  A.  No.

1  Q.  Mr. Tortora, we can move on.
2         As I understand it, when you first took the job at
3  Diamondback, you worked out of the office in Connecticut, is
4  that correct?
5  A.  Yes.
6  Q.  And did you commute up there every day?
7  A.  I believe it was four days a week.
8  Q.  That is the same office building that Mr. Newman worked in,
9  right?
10  A.  Yes.
11  Q.  Were you in the same office?
12  A.  Yes.
13  Q.  In other words, the same physical location?
14  A.  Same floor.
15  Q.  Same floor.  But what was the setup like?  In other words,
16  did you each have an office or is there a trading floor?  How
17  does it work?
18  A.  He worked on the trading floor and I shared an office.
19  Q.  Who did you share an office with?
20  A.  I believe the office mate changed over time.
21  Q.  But you were not sitting next to Mr. Newman, correct?
22  A.  No.
23  Q.  And at a certain point you started spending more time in
24  New York, is that right?
25  A.  Yes.

1  Q.  When was that?
2  A.  I believe the transition occurred about six to nine months
3  after I started working for Diamondback, so some time in 2008.
4  Q.  Then starting at that point, when you were in New York and
5  he was in Connecticut, is it fair to say that you communicated
6  by telephone and e-mail and IM?
7  A.  For the most part, except when I would see him in person.
8  Q.  When would that be?
9  A.  At conferences.
10  Q.  How many conferences would you say that you attended per
11  year?
12  A.  Well, if you include all events -- all events or just phone
13  conferences?
14  Q.  You mentioned you might see Mr. Newman at conferences?
15  A.  The type of events I would see Mr. Newman at?  Is that what
16  you are asking?
17  Q.  Yes.
18  A.  Two to three per quarter.
19  Q.  Part of your job was to attend those conferences, right?
20  A.  Yes.
21  Q.  Wasn't part of the idea was you would attend them and give
22  him reports?
23  A.  Yes.  If he wasn't attending them, yes.
24  Q.  In fact, he didn't attend many of them, right?
25  A.  Yes.

1 Q. So a lot of your communication was by e-mail, correct?
2 A. E-mail and IM and, to a lesser extent, on the phone. I'm
3 sorry. As a whole. Sandy Goyal, most of the information was
4 on the phone.
5 Q. You had both a working e-mail and personal e-mail, correct?
6 A. Yes.
7 Q. And your personal e-mail is your Gmail account, is that
8 correct?
9 A. That's right.
10 Q. Mr. Newman never gave you a personal account for himself,
11 is that correct?
12 A. I am not sure.
13 Q. Do you recall ever sending an e-mail to Mr. Newman's
14 personal account?
15 A. I don't recall one way or another.
16 Q. Have you seen any e-mails in this case that had a personal
17 account for --
18 A. I don't believe so.
19 Q. Now, you understood from the beginning of your employment
20 at Diamondback that e-mails sent on the Diamondback e-mail
21 system were subject to review by the Diamondback compliance
22 department, is that right?
23 A. No. I don't recall.
24 Q. Do you ever recall learning that e-mails on the official
25 system were subject to review by people other than the

1 recipient?
2 A. What do you mean, learning? Like as a standard practice?
3 Q. However you could learn something. Somebody told you,
4 standard practice, it's in the email footer.
5 A. There was one point when Todd mentioned something about it
6 years later.
7 Q. At the beginning, did you come to understand that e-mails
8 on the official system were not confidential, just between the
9 people that sent them?
10 A. Again, I don't remember learning that.
11 Q. Do you ever recall hearing anything about that the
12 compliance department did periodic reviews of people's e-mails?
13 A. Again, I don't recall that.
14 Q. Let's look at Government Exhibit 100, which is an exhibit
15 already in the case. You have it in your loose documents.
16 This is August 3, 2007, so right before you actually
17 started at Diamondback, is that correct?
18 A. Yes.
19 Q. And if you just look at the footer of the e-mail that on
20 the second page where Mr. Newman sends you an e-mail from
21 tnewman@diamondbackcap.com.
22 You see that?
23 A. Yes.
24 Q. The footer, if you look towards the bottom it says: All
25 e-mails sent to or received from this address will be received

1 by Diamondback Capital Management's company e-mail system and
2 it is subject to archival and possible review by someone other
3 than the recipient.
4 Do you see that?
5 A. Yes.
6 Q. Just looking at that, does that refresh your memory that
7 early on you were aware that company e-mails were not private
8 between the two people that sent them?
9 A. Mr. Fishbein, if you are asking me if I'm aware of Sarbanes
10 Oxley and the archival of e-mails, I am. I've been aware of
11 that for years. That's different than somebody reviewing
12 e-mails that are sent on a real time basis.
13 Q. There is two thoughts there. One is they are archived,
14 right?
15 A. Yes.
16 Q. Which means that they are saved and you can't delete them,
17 right?
18 A. Sure.
19 Q. And another thought is that they can possibly be reviewed
20 by somebody other than the recipient?
21 A. Of course. If something is archived for a matter of years,
22 that's implied.
23 Q. I take it on the archiving, on the fact that your e-mails
24 on the official system would be saved, that you knew about?
25 A. Yes.

1 Q. You understood that once you send it on the official
2 system, it's saved and you can't delete it, right?
3 A. That's correct.
4 Q. If you want to take it back or delete something, that's a
5 problem, you can't do it, right?
6 A. Sure.
7 Q. Did you understand from Sarbanes Oxley that regulators
8 might have access to those archived e-mails?
9 A. Sure. But let me be clear. Prudential, when I was at
10 Prudential, there was actually a real time live process of
11 compliance officers reviewing e-mails and there were times when
12 they would actually real time look for key words and approach
13 somebody there. That's a big difference than something being
14 archived due to legislation.
15 Q. So you don't have a recollection of Diamondback compliance
16 doing these periodic reviews. Is that what you are saying?
17 A. That's correct. Until Todd mentioned something years later
18 in one particular instance.
19 Q. But you do recall that you knew that archived e-mails were
20 saved, right?
21 A. Yes.
22 Q. And were potentially subject to review by regulators?
23 A. Sure.
24 Q. Like the SEC?
25 A. Yes.

UNITED STATES OF AMERICA, v
TODD NEWMAN

**November 20, 2012**

1 Q. Now, you used your own personal e-mail account, the Gmail
2 account, for some of the e-mails while you were working at
3 Diamondback, right?
4 A. Yes.
5 Q. For example, we saw that the e-mail exchange between you
6 and Sandy Goyal about the Dell model, right, that was on your
7 Gmail account?
8 A. Sandy sent that to my Gmail, yes.
9 Q. There were other occasions where you sent e-mails on your
10 Gmail relating to some of the stocks at issue here, right?
11 A. Yes.
12 Q. For example, when you e-mailed your stepfather, Marshall
13 Ingel, about Dell, it was on your Gmail, right?
14 A. That's correct, although that's conversations with families
15 or friends. That's not Diamondback-related issues.
16 Q. You felt that was private, right?
17 A. Yes.
18 Q. And you didn't want the rest of Diamondback to know about
19 it necessarily, right?
20 A. Well, I wouldn't even go that far. Do you e-mail your wife
21 on your business account? That's just --
22 Q. I get to ask the questions.
23 A. But my point is, my point is, I don't e-mail my girlfriend
24 on my Diamondback account.
25 Q. In other words, if you have something private that you

1 don't want others than a recipient to see, you use your Gmail?
2 A. The way you implied is something is secretive and something
3 is hidden, so I don't want to answer the question in the
4 affirmative. If my private life I communicate on certain means
5 and in my work life I communicate with certain means.
6 Q. Were the e-mails with Sandy Goyal about the Dell model, was
7 that relating to your private life?
8 A. I answered your question yesterday that I had no
9 recollection of why Mr. Goyal e-mailed those on my Gmail
10 account.
11 I can also say that the most common reason I use my
12 Gmail account for Diamondback purposes is because the inbox
13 would fill up and they wouldn't allow me to send or receive
14 e-mails and it would take me a long time to delete those. If I
15 was at conferences, I would say, sending from my Gmail, my
16 inbox is full, and I actually saw several documents in several
17 exhibits where I said that and that was the primary reason why
18 I did that.
19 Q. Actually, when that happened, and you used your Gmail, you
20 would apologize to Mr. Newman for using your Gmail, right?
21 A. There may have been times when I did. I just wanted to
22 notify him why I was using my Gmail.
23 Q. But the reason you apologized and said, sorry, I'm using my
24 Gmail is he actually instructed you to use the official system,
25 right?

1 A. No.
2 Q. But you agree that you would apologize to him when you used
3 your Gmail instead of the official system?
4 A. Not only did Mr. Newman not tell me to use the official
5 system --
6 Q. This is a different question. I said, do you agree that
7 you apologized to Mr. Newman when you used your Gmail account
8 instead of the official system?
9 A. Mr. Fishbein, I don't recall, but I would have notified him
10 at times that I was using that.
11 Q. And my question is, did you apologize? Did you say sorry?
12 MS. APPS: Asked and answered, your Honor.
13 THE COURT: You should answer the question. The
14 question is: Do you agree that you apologized to Mr. Newman
15 when you used your Gmail account instead of the official?
16 THE WITNESS: Your Honor, I don't have a recollection
17 of that.
18 Q. We can look at Government Exhibit 280, your tab 59.
19 A. I'm sorry, Mr. Fishbein. Can you speak in the mic.
20 Q. Government Exhibit 280, your tab 59.
21 Do you recognize that as an e-mail from you to
22 Mr. Newman on February 27, 2009?
23 A. Yes.
24 MR. FISHBEIN: I believe this is in evidence already.
25 Q. And this is this situation you talked about, right, where

1 you couldn't get into the network?
2 A. Yes.
3 Q. So you were using your Gmail account, right?
4 A. Yes.
5 Q. And you said, sorry, right?
6 A. I did.
7 Q. Just so we are clear, just so the record is clear, you are
8 not aware, as you sit here now, of ever sending an e-mail to
9 any personal e-mail account of Mr. Newman, correct?
10 A. I don't recall.
11 Q. Are you aware now of doing that?
12 A. What do you mean, am I aware now?
13 Q. As you sit here right now, do you have a recollection in
14 your mind of having sent an e-mail to Mr. Newman's personal --
15 A. Mr. Fishbein, I said I don't recall. That means I have no
16 recollection.
17 Q. Do you have any recollection of ever having received an
18 e-mail from Mr. Newman from a personal e-mail account?
19 A. No, I do not.
20 Q. And just also so I'm clear, your knowledge that e-mails on
21 the official system were archived and potentially subject to
22 review by regulators, that dates back to when you started at
23 Diamondback, right?
24 A. Yes.
25 Q. If you could turn to Defense Exhibit 6017. It's tab 6 in

UNITED STATES OF AMERICA, v
TODD NEWMAN

1 your binder.
2       What is this?
3 A. An e-mail from myself to Todd Newman on April 16, 2008.
4 Q. And it refers to JAVA checks, is that right?
5 A. Yes.
6       MR. FISHBEIN: Defense offers Exhibit 6017.
7       MS. APPS: No objection.
8       THE COURT: Defense Exhibit 6017 is received.
9       (Defendant's Exhibit 6017 received in evidence)
10 Q. What does JAVA checks mean, Mr. Tortora?
11 A. JAVA is a company -- is a ticker symbol for the company Sun
12  Microsystems.
13 Q. So you are conveying information to Mr. Newman about Sun?
14 A. Yes.
15 Q. Do you remember what the checks were that you did?
16       MS. APPS: You mean on this particular document?
17       MR. FISHBEIN: Yes.
18 A. No, I do not remember in this particular document.
19 Q. Would it be fair to say that what you were conveying here
20  to Mr. Newman is that you had made some inquiries and you had
21  developed this various information here about Sun?
22 A. Yes.
23 Q. Now, if you could turn to Government Exhibit 1218, that's
24  your tab 5. That is an e-mail exchange on the same date, April
25  16, 2008, between you and Mr. Horvath, also about Sun?

1 A. Yes.
2       MR. FISHBEIN: Defense offers Government Exhibit 1218.
3       MS. APPS: No objection.
4       THE COURT: Government's 1218 is received.
5       (Government's Exhibit 1218 received in evidence)
6       MR. FISHBEIN: If we could put up both documents side
7  by side. That should be one of the ones that we see.
8 Q. Mr. Tortora, feel free to take your time and look at both
9  of them because I am going to sort of compare them.
10 A. Sure.
11       Yes.
12 Q. Let's look for now at the one that's up on the screen which
13  is Government Exhibit 1218.
14       Mr. Horvath tells you: Caught up with him briefly
15  today.
16       Do you know what that refers to?
17 A. So Jon Horvath had a friend who worked at Sun for a period
18  of time. Then he left Sun. I don't recall exactly when he
19  left Sun. But I do know that in 2007, and early 2008, he was
20  there. He used to provide specific earnings-related
21  information of which I passed to Todd and Todd traded on. Most
22  of that conversation was via the phone. There were some on
23  e-mails.
24 Q. What you just testified about trading, you didn't say that
25  on direct, did you?

1 A. I was not asked.
2 Q. You are just throwing that in now, right?
3 A. You are asking me questions. I'm trying to answer.
4       MS. APPS: Objection.
5 Q. You don't like Mr. Newman, do you? Can you answer? Do you
6  like Mr. Newman?
7 A. I do not like Mr. Newman.
8 Q. Now, if we look at this e-mail, April 16 from Mr. Horvath,
9  do you understand that to be his summary of what he heard from
10  his friend?
11 A. It's unclear what he's being told and what he's
12  summarizing.
13 Q. But it's from Horvath and it includes information he's
14  getting from his friend, right?
15 A. Yes.
16 Q. And there is a reference if you look in the middle, it
17  says, but I talked to some guys in the finance department.
18       Do you see that?
19 A. Yes.
20 Q. Did you understand that to be Sun's finance department?
21 A. Yes.
22 Q. Now, this e-mail you received at 4:34 p.m. on April 16,
23  2008, right?
24 A. Yes.
25 Q. And then you sent the e-mail to Mr. Newman at 4:42 p.m. on

1  April 16, 2008, right?
2 A. Yes.
3 Q. So that's eight minutes later, right?
4 A. Yes.
5 Q. And in that eight minutes what you did is you took the
6  e-mail from Horvath, you jumbled around the sentences and you
7  resent it, right?
8 A. Jumbled around the sentences?
9 Q. I'll walk you through it. Look at Government Exhibit 1218.
10  That's the one from Horvath, right?
11 A. Yes.
12 Q. Let's start the at bottom. You see it says hardware was
13  soft all around?
14 A. Yes.
15 Q. And in your e-mail to Newman you start off, HW was soft all
16  around, right?
17 A. Okay.
18 Q. Then in the first sentence of Horvath's it says, quote: We
19  just missed at the high end, which would hurt margins, of
20  course.
21       Do you see that?
22 A. Which e-mail?
23 Q. The e-mail from Mr. Horvath.
24 A. Okay.
25 Q. We just missed at the high end, which would hurt margins,

1 of course.
2 A. Yes.
3 Q. Then you wrote to Mr. Newman: Primary driver of revenue
4 missed. Was in high end servers, which implies negative for
5 GM.
6     You see that?
7 A. Yes.
8 Q. Then at the bottom of the Horvath e-mail it says: Close
9 rates for the deals that rolled over from 3Q into 4Q is not
10 very good so far.
11     Do you see that?
12 A. Yes.
13 Q. And then when you sent it to Mr. Newman, you put in closed
14 rates for the deals that slipped for March have not been good
15 so far into April.
16     Do you see that?
17 A. Yes.
18 Q. Then from Mr. Horvath's e-mail to you says: You were right
19 about what AVT says. That was us.
20     Do you see that?
21 A. Yes.
22 Q. And then you wrote to Mr. Newman: It was them that caused
23 the AVT miss.
24     Do you see that?
25 A. Yes.

1 Q. Is it fair to say you repackaged what Mr. Horvath gave you
2 and you repackaged it to Mr. Newman, right?
3 A. Yes. I tried to articulate it a little better than the way
4 Mr. Horvath wrote it.
5 Q. You spent those eight minutes rearranging what Horvath said
6 and sent it on to Newman, right?
7 A. You can't possibly -- I can't possibly recall what I spent
8 the eight minutes doing, but I tried to rearrange those words
9 to become more clear, concise, articulate.
10 Q. In making it more clear there was one piece of information
11 you left out, wasn't there?
12 A. One piece of information --
13 Q. Look at the Horvath e-mail and see if you can find a piece
14 of information that you did not convey to Mr. Newman.
15 A. I don't see the words, caught up with him briefly today.
16 Q. How about, but I talked to some guys in the finance
17 department. That's in the Horvath e-mail, right?
18 A. Yes. And as I've testified, I got explicit instructions
19 from Mr. Newman not to put the details around the people's
20 positions because he knows who they are coming from.
21 Q. And you did not include that in the e-mail to Mr. Newman?
22 A. Per his instruction, yes.
23 Q. You saw it in your interest to make this seem like work you
24 did, right?
25 A. No.

1 Q. And rather than simply forwarding an e-mail from
2 Mr. Horvath, right?
3 A. No.
4 Q. Let's go back. You said that you got gross margin
5 information on Dell from this company IPR -- strike that.
6     You said that Mr. Newman got gross margin information
7 on Dell from IPR in August of 2008, right?
8 A. Yes.
9 Q. And you said you can't recall who Mr. Newman's contact was
10 at IPR, right?
11 A. I don't know if I was told who he was. I am not sure.
12 Q. As you sit here now you can't tell us who that contact was,
13 right?
14 A. A name?
15 Q. Yes.
16 A. No.
17 Q. We saw an instant message, and you should look at
18 Government Exhibit 243B, already in evidence.
19 A. Tab, please?
20 Q. It's the loose documents in front of you.
21 A. One more time, the exhibit number.
22 Q. 243B.
23 A. It's just one page?
24 Q. Yup.
25 A. I got it.

1 Q. Do you remember this is the one where you are talking about
2 canceling IPR?
3 A. Todd is talking about canceling?
4 Q. Right.
5 A. Yes.
6 Q. We already went over it. And this is on September 18,
7 2008, correct?
8 A. Yes.
9 Q. And Mr. Newman says: Don't use much at all, so a waste,
10 right?
11 A. Yes.
12 Q. Then you refer to a guy Al who does storage who is no good.
13     Do you see that?
14 A. Yes.
15 Q. Was that a contact that you had at IPR?
16 A. I believe I told Ms. Apps in direct I did not recall who
17 this was.
18 Q. Is it Al Zielinski at IPR?
19 A. Again, I don't recall.
20 Q. Do you know whether IPR is a big firm or a small firm?
21 A. I could guess.
22 Q. Don't guess. Have you ever seen a brochure, a marketing
23 terms for IPR?
24 A. I don't recall.
25 Q. Why don't you look, just to refresh your memory -- don't

1  say anything about it -- just look at Exhibit 10042 and see if
2  that refreshes your memory about IPR.  It's one 10042 and
3  10042A.  Look at it first and then I'll ask you some questions.
4  A.  Okay.
5  Q.  You can flip through it.
6  A.  Okay.
7  Q.  Have you looked through it?
8  A.  Yes.
9  Q.  Does that refresh your memory who at IPR covered Dell?
10  A.  No.
11  Q.  Have you ever heard of somebody named Eric Nagel?
12  A.  I believe you asked me that the other day.  That name
13  doesn't ring a bell, outside of reading it now on this
14  document.
15  Q.  It still doesn't ring a bell, is that right?
16  A.  Correct.
17  Q.  I am going to show you a document that's been labeled
18  Defense Exhibit 894.  That should also be in front of you.
19  A.  In one of the loose documents?
20  Q.  Yes.
21  A.  894.
22  Q.  Defense 894.
23  A.  Got it.
24  Q.  You see that's an e-mail from Inflection Point Research?
25  A.  Yes.

1  Q.  And the parties have stipulated, Mr. Tortora, that this
2  e-mail was found in your e-mail box at Diamondback, okay?
3  A.  Okay.
4       MR. FISHBEIN: Defense offers Exhibit 894.
5       THE COURT: No objection?
6       MS. APPS: No objection.
7       THE COURT: Defense 894 is received.
8       (Defendant's Exhibit 894 received in evidence)
9  Q.  Mr. Tortora, we talked this about it a little bit.  From
10  time to time, you received these -- what were they referred to,
11  blast e-mails or marketing e-mails?  How would you refer to an
12  e-mail like this?
13  A.  It looks like it's a Dell earnings preview.
14  Q.  This is from Inflection Point Research, a research firm?
15  A.  Yes.
16  Q.  Occasionally, or maybe more frequently, research firms
17  would widely distribute various reports, right?
18       MS. APPS: Objection, form.
19       MR. FISHBEIN: I'll rephrase.
20       THE COURT: Rephrase.
21  Q.  What type of document is this?
22  A.  Looks to be an e-mail for Dell earnings preview.
23  Q.  What is an earnings preview that a research firm would send
24  out?
25  A.  A note that forecasts what a company is going to do in a

1  particular quarter.
2  Q.  Do you recall that you were on the mailing lists of some of
3  these research firms?
4  A.  Certainly I was on the mailing list of some research firms,
5  yes.
6       (Continued on next page)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  Q.  A lot of them or a few of them?
2  A.  A lot.
3  Q.  And do you recall receiving quite a few of these type of
4  research -- excuse me, quite a few of these type of releases?
5  A.  Type of releases?
6  Q.  Take that back.  Do you recall being on the mailing list
7  for Inflection Point Research?
8  A.  I don't recall.
9  Q.  Now, looking at this, this is a preview of Dell, right?
10  A.  Yes.
11  Q.  Typically when a research firm sends out a preview about a
12  company, the person who sends it is the person at the company
13  covering the stock, right?
14       MS. APPS: Objection.  Foundation.
15       THE COURT: Well, if you know.  Is that your
16  understanding?
17  A.  Your Honor, it varies.  You showed an example yesterday of
18  Ashton Curtis from Morgan Stanley about Katy Huberty's upgrade.
19  Ashton Curtis was certainly not the research analyst on that.
20  Q.  Looking at this, does this refresh your recollection at all
21  as to Mr. Nagel's role in Inflection Point Research?
22  A.  No, it does not.
23  Q.  Or that he had any connection with Dell?
24  A.  No, it does not.
25  Q.  Do you recall receiving any information about Dell from

# A-765

1  Inflection Point Research from anyone other than Eric Nagel?
2  A.  I don't recall receiving it from Eric Nagel or anybody
3  else.
4  Q.  And the date of this is November 14, 2008?
5  A.  This e-mail yes.
6  Q.  That's after the IM exchange between you and Mr. Newman
7  where you talk about canceling IPR, right?
8  A.  Where he talked, yes.  He asked me if I want to cancel.
9  He's saying he's thinking about canceling, yes.
10 Q.  So at least as of November 14, 2008, if Mr. Nagel is
11 sending this, Mr. Nagel is at IPR at that time, right?
12 A.  That appears to be the case.
13 Q.  You said on direct that Mr. Newman had seen -- I wasn't
14 quite clear -- Mr. Horvath, Adonakis and Kuo, that they had met
15 or seen each other at some point?  Did you say that?
16 A.  I don't recall my specific words, but at conferences
17 oftentimes I would see Todd and those individuals at the same
18 lunch table or same area.
19 Q.  These are conferences attended by hundreds of people,
20 right?
21 A.  Yes.
22 Q.  And these would be attended by a lot of people in the
23 industry, right?
24 A.  Yes.
25 Q.  Now, let's take Mr. Horvath.  Have you ever been present

1  for an actual conversation between Mr. Newman and Mr. Horvath?
2  A.  Yes.
3  Q.  When?
4  A.  They were -- I can remember one time in Scottsdale,
5  Arizona, one of the conferences, I believe it's CSFB.  Again,
6  there was an outdoor lunch table and he was sitting down and
7  Todd was to my left and Horvath was to my right, and, you know,
8  my general conversation, really, Todd, you know John; John,
9  Todd; yeah, yeah.  Whatever pleasantries are exchanged.
10 Q.  So you recall pleasantries?
11 A.  Yes.
12 Q.  Do you recall any substantive discussion about Dell?
13 A.  No.
14 Q.  Or any other stock?
15 A.  I don't recall.
16 Q.  And what about Mr. Adonakis?  Did you ever observe in
17 actual conversation between Mr. Adonakis and Mr. Newman?
18 A.  Same type of conversation, yes.
19 Q.  So basically you're saying they might have met each other
20 at a conference and exchanged pleasantries?
21 A.  That was my observation, yes.
22 Q.  But you're not saying that they were friends, right?
23 A.  Correct.
24 Q.  That they socialized together, right?
25 A.  Correct.

1  Q.  That they ever had a one-on-one meeting, correct?
2  A.  Not that I'm aware of.  No, I take that back.  There were
3  several times which I was told that they were in the same --
4  one or more --
5  Q.  Hold on.  I'm asking for your personal recollection.
6       THE COURT:  Let him finish the answer.  Go ahead.
7  A.  You asked me a one-on-one meeting.
8  Q.  I think you said "I heard."  Your Honor, before we get into
9  hearsay --
10 A.  Let me just point that out, then I'll take that back.
11 There were times at which Todd was in a company meeting,
12 one-on-one small group meeting and one or more of the other
13 members of the group was as well.
14 Q.  Okay, so I understand it, I just want to clarify that.
15 When you say one-on-one, what you're referring to is a
16 representative of a company, right?
17 A.  Yes.
18 Q.  Who meets with analysts, right?
19 A.  Yes.
20 Q.  And this is something that would happen at conferences,
21 right?
22 A.  Yes.
23 Q.  In other words, the purpose of some of these conferences
24 was for companies to sort of tell their story to analysts,
25 right?

1  A.  Yes.
2  Q.  And in addition to the CEO or CFO giving a big speech they
3  would offer what are called one-on-ones, right?
4  A.  Yes.
5  Q.  And a one-on-one is you get somebody from the company,
6  right?
7  A.  Yes.
8  Q.  And then analysts have an opportunity to meet with that
9  person, just that person at the company, not a whole lot of
10 other people, right?
11 A.  Right.
12 Q.  And what types of people from the companies would do these
13 one-on-ones?
14 A.  CEO, CFO, investor relations.
15 Q.  Did you ever get like representatives of geographic areas?
16 A.  Yeah.
17 Q.  And also product managers?
18 A.  Yep.
19 Q.  And these are free-flowing conversations where they would
20 tell you about the business, right?
21 A.  Free-flowing, I wouldn't use that word.
22 Q.  You get to ask questions, right?
23 A.  Yes.
24 Q.  And they answer them, right?
25 A.  Yes.

1  Q. And the subject would be the business of the company,
2   right?
3  A. At times.
4  Q. Including the current business, right?
5  A. At times.
6  Q. So by one-on-one you weren't suggesting that Mr. Horvath
7   and Mr. Newman by themselves had a conversation?
8  A. Correct, outside of the pleasantries I described.
9  Q. So just to be clear, when you said one-on-one, you didn't
10   mean a one-on-one conversation between Horvath and Newman?
11  A. Mr. Fishbein, you said one-on-one and I responded with that
12   answer.
13  Q. Right, because people may not be familiar with this term
14   one-on-one as it refers to these conference meetings, okay, so
15   I want to clarify the record.
16  A. I understand.
17  Q. So you are not saying that you observed Mr. Newman and
18   Mr. Horvath speak to each other with just the two of them in
19   the conversation?
20  A. Again, at lunch tables there would be dialogue between the
21   two. I don't know, there was more dialogue than "Hi, hi."
22  Q. So you refer to that as pleasantries?
23  A. And other conversations, although I'm not suggesting, I
24   don't recall any specific conversations about Dell or other
25   stocks.

1  Q. All right. And same is true for Adonakis and Kuo, right?
2   When you said one-on-one, you were referring to these
3   one-on-one meetings meaning one person from the company?
4  A. Yes.
5  Q. And how many analysts would attend a one-on-one?
6  A. It could be one to several.
7  Q. Several meaning how many?
8  A. Several could mean three, four, five, six, seven, eight, I
9   mean --
10  Q. The purpose of that, that is an official meeting at a
11   conference, right?
12  A. Yes.
13  Q. The purpose is to ask questions of the company person
14   right?
15  A. Yes.
16  Q. So the analysts take turns asking questions of the company
17   and the company answers, right?
18  A. Yeah, and sometimes there's general dialogue between the
19   group as well.
20  Q. And, by the way, you said previously that there was one
21   example where a company person gave you some specific
22   information. You related one particular example.
23  A. There was one specific example, yeah, there may have been
24   more, but there was one specific.
25  Q. What exact people, do you remember --

1      MS. APPS: If you could let him finish answering.
2  Q. The one example you remember, was that one of these
3   one-on-ones at a conference?
4  A. Yes.
5  Q. Now, there's been some testimony that Mr. Newman had
6   analysts other than you, correct?
7  A. Yes.
8  Q. There was James at one point, right?
9  A. James Yang.
10  Q. Is that right?
11  A. Yes.
12  Q. And there was Mr. Molloy for a short period of time, right?
13  A. Yes.
14  Q. Now, Mr. Newman came up with a number of trading ideas on
15   his own without your input, is that correct?
16  A. Yes.
17  Q. Do you know how many different stocks Mr. Newman actively
18   traded in his portfolio?
19  A. A lot.
20  Q. Several hundred?
21  A. I don't know the number, but dozens.
22  Q. Dozens? Do you think it was more like several hundred?
23  A. I don't know if it was several hundred.
24  Q. How many did you cover?
25  A. What do you mean by cover?

1  Q. In other words, how many stocks were you responsible for
2   actively following and doing research on?
3  A. I don't think that it was explicitly defined what my
4   coverage was.
5  Q. We talked a lot about Dell, right?
6  A. Yes.
7  Q. And we've seen lots of e-mails where you were giving
8   information and recommendations and thoughts about Dell, right?
9  A. Yes.
10  Q. So would it be fair to say that with respect to Dell, one
11   of your responsibilities was to do research with respect to
12   Dell?
13  A. Yes.
14  Q. And same with HP, right, you've seen that?
15  A. Yes.
16  Q. And some of the other stocks in this case, right?
17  A. Yes.
18  Q. So what I'm asking you is how many stocks that Mr. Newman
19   traded were you responsible for doing research?
20  A. Mr. Fishbein, I could come up with guesses and estimates,
21   but then you appear not to like my guesses or estimates.
22  Q. No, let's just ask --
23  A. I could come up with another guess or estimate, but it's
24   not a factual response. It's not a specific factual number.
25   We can debate any number I say.

# A-767

1  Q. Let me ask it this way.  When I asked you how many stocks
2   he traded you said dozens, right?
3  A. I said dozens.
4  Q. So I take it that the stocks you were involved in were
5   somewhere dozens or less, right?
6  A. Yes.
7  Q. Of the dozens of stocks he traded, how many, what
8   percentage do you think you were involved in?
9  A. Is my answer acceptable?
10  Q. Yeah.
11  A. Okay.  I'd say I had some involvement in 25 to 50 percent.
12  Q. Okay.  Of the dozens that you're aware of?
13  A. Yes.
14  Q. You were just talking here about guessing.  Could we put
15   Government Exhibit 214 on the screen?  Just highlight that.
16   Mr. Tortora, when we were talking about this August 15 e-mail
17   to Mr. Newman and we were talking about the EPS analysis there,
18   in your prior testimony you used the word swag, that you might
19   have taken a swag.  Do you remember that?
20  A. I remember using that word, but I don't know if it was in
21   response to this.
22  Q. All right.  What does swag mean?
23  A. A guess, prediction, quick calculation.
24  Q. Actually, it's an acronym, isn't it?
25  A. I am not aware.

1  Q. Like FBI stands for Federal Bureau of Investigation?
2  A. I know what acronym means.  I'm not aware that swag is an
3   acronym.
4  Q. Have you ever heard that swag stands for scientific wild
5   ass guess?
6       THE COURT: Have you ever heard that?
7  A. No.
8  Q. But you viewed it as a guess?
9  A. Yes.
10  Q. I want to direct your attention now towards the end of the
11   year 2009, okay?  And I think you said that your relationship
12   with Mr. Newman had started to deteriorate, is that correct?
13  A. It deteriorated over time, yes.
14  Q. And your work became very sloppy, right?
15  A. What are you referring to?
16  Q. Did you take short cuts in the research that you were
17   doing?
18  A. I don't recall what you're speaking about.
19  Q. You said something to the effect that you tried to do some
20   real research and real analysis, right?
21  A. There were specific times I remember in 2010 doing thorough
22   detailed analysis and got little or no feedback from Todd.
23  Q. But there were times at the end of 2009 where you took some
24   shortcuts and did some sloppy work, aren't there?
25  A. Again, I don't know what you're referring to.

1  Q. Less look at Defense Exhibit 9226.  It's your tab 7.  Do
2   you recognize that as an e-mail from you to Mr. Newman
3   December 31, 2009 relating to some research on different stock?
4   Including in the second paragraph down?
5  A. Yes, I see Dell mentioned here.
6       MR. FISHBEIN: Defense offers Defense Exhibit 9226.
7       MS. APPS: No objection.
8       THE COURT: Defense 9226 is received.
9       (Defendant's Exhibit 9226 received in evidence)
10  Q. Now, December 31, 2009 you were in Australia, right?
11  A. Can you ask that question again?
12  Q. Were you in Australia on vacation on December 31, 2009?
13  A. Yes.
14  Q. And you wanted to let Mr. Newman know that you were working
15   while you were on vacation, right?
16  A. Where do you see that?
17  Q. Well, you said you were on vacation, right?
18  A. Yes.
19  Q. And you wanted to update him on some work-related matters,
20   right?
21  A. I updated him on some work-related matters while I was in
22   Australia.  They're very different than what you just asked.
23  Q. Okay, while you were on vacation you updated Mr. Newman on
24   work-related matters, right?
25  A. Yes.

1  Q. The first one, it says, "Henry King convo."  Do you see
2   that?
3  A. Yes.
4  Q. "Short Henry King convo.  Tracked him down on vacay in Hong
5   Kong."  Do you see that?
6  A. Yes.
7  Q. Did you track down Mr. King in Hong Kong?
8  A. I don't recall.  This appears to be something coming from
9   Sam possibly or John.  The reason I say that is I never talked
10   to Henry King.
11  Q. But that's what you conveyed here, right, that you tracked
12   down Mr. King in Hong Kong, right?
13  A. That's not what I conveyed, no.
14  Q. Well you said, quote, "Short Henry King convo.  Tracked him
15   down on vacay in Hong Kong," end quote.  Do you see that?
16  A. I see what is written here.
17  Q. Okay, and then there's a summary of what Mr. King
18   supposedly said, right?
19  A. Yes.
20  Q. And are you saying that you did not intend to convey to Mr.
21   Newman that you were the one that had the conversation?
22  A. Yeah.  Exactly.  This is not my, these aren't my words.
23   These are cut and paste from the group.
24  Q. Did you tell Mr. Newman that it was a cut and paste?
25  A. No, I didn't explicitly write in this e-mail that it was a

1   cut and paste.
2   Q. Let's look at the next one. It says, "Future electronics."
3     Do you see that?
4   A. Yes.
5   Q. Quote, "Checked with in Future today because they told me
6     last check December," unquote. Do you see that?
7   A. Yes.
8   Q. You told Mr. Newman that you were doing checks with Future,
9     right?
10  A. No, Mr. Fishbein. No, no, no.
11  Q. So what you acknowledge is that what this really is you cut
12    and paste e-mails that you got from others, right.
13  A. Instead of forwarding from the group I'm doing one e-mail
14    and cutting and pasting it and forwarding it.
15  Q. But you didn't tell him --
16  A. Excuse me, let me finish. I didn't tell him in this case
17    and when I was told this I didn't tell him either.
18  Q. Just so it's in the record let's look at Defense Exhibit
19    9255. That's tab 8. That's the e-mail you got from
20    Mr. Horvath, right?
21        MR. FISHBEIN: Defense offers Exhibit 9225.
22        THE COURT: Any objection?
23        MS. APPS: No.
24        THE COURT: Defense 9225 received.
25        (Defendant's Exhibit 9225 received in evidence)

1         MR. FISHBEIN: Next one is 9224. It's from
2     Mr. Horvath dated 12/28/09.
3   Q. And that's also one that you cut and paste, right?
4   A. That's correct.
5         MR. FISHBEIN: Defense offers 9224.
6         MS. APPS: No objection.
7         THE COURT: 9224 is also received.
8         (Defendant's Exhibit 9224 received in evidence)
9   Q. You mentioned, Mr. Tortora, that you had a personal trading
10    account, right?
11  A. Yes.
12  Q. And that was in 2009, right?
13  A. I believe 2009, 2010.
14  Q. But not in 2008?
15  A. I believe I opened it the last month of 2008.
16  Q. But did you do any trading in '08?
17  A. I don't believe I did.
18  Q. But basically this is an '09-'10 issue, right?
19  A. Yes.
20  Q. And you traded what are called exchange traded funds,
21    right?
22  A. Yes.
23  Q. And those are baskets of stock that cover certain industry
24    sectors, right?
25  A. Yes.

1   Q. And one of the ones you traded is Semiconductor Holders,
2     correct?
3   A. Yes.
4   Q. I believe you testified that that included -- well, let me
5     just ask you. What stocks were Semiconductor Holders?
6   A. It's a collection of semiconductor stocks, may have been
7     weighted by market cap, which means their relevant position
8     from a stock value standpoint, clearly the largest
9     semiconductor companies, Intel would have made up the largest
10    portion. Second would have been Texas Instruments or Applied
11    Materials, on down the list. Again, I don't know the exact
12    weightings, but that's my best estimation what it would
13  Q. And I believe you testified on direct that information
14    regarding Intel and AMD and Texas Instruments could be relevant
15    in trading those ETFs, is that right?
16  A. Yes.
17  Q. And what did you mean by that?
18  A. Well, let's say theoretically you knew every single
19    semiconductor company's business was going great, you could
20    imply, you could imply that their stocks would go up and you
21    could imply that the semiconductor index as a whole would go
22    up.
23  Q. So you see some correlation between the ETFs, the
24    Semiconductor Holders and companies like Intel, Texas
25    Instruments?

1   A. Again, the correlation would be, correlation is a
2     mathematical term. It would be weighted with respect to the
3     percentage that it's made up for. So the percentage that each
4     individual entity makes up the whole. So the higher the
5     correlate, the higher the degree of correlation would be the
6     more of the parts that, the more complete information you have
7     for all the individual parts. If you just have one part, ten,
8     fifteen percent, the correlation would be much weaker.
9   Q. And did you understand that the biggest stock within
10    Semiconductor Holders was Intel?
11  A. Yes, I did.
12  Q. Now, how did you actually mechanically do your trading?
13  A. What do you mean by that?
14  Q. In other words, did you use a personal computer or how did
15    you do it?
16  A. A computer.
17  Q. And you did a large volume of trading, is that correct?
18  A. Yes, during the periods of time when I was trading.
19  Q. And I'll show you what's been marked as Defense Exhibits
20    9876 to 9893, which are your account statements, so you could
21    just have those for your reference. You've got one of those
22    for each month, December '08 to May 2010.
23        Now, Mr. Tortora, isn't it a fact that there were days
24    when you literally did hundreds of trades in your account?
25  A. Yes.

1  Q. And so, for example, on May 5th of 2009, do you recall that
2  you did hundreds of options trades just on that day?
3  A. No, but I don't deny that.
4  Q. Could you just, just look at May 5 and see if that
5  refreshes your memory?
6       MS. APPS: Is there an exhibit number?
7       MR. FISHBEIN: 9881.
8  A. Yes, I see that.
9  Q. And another example, do you recall that you did hundreds of
10  your own personal securities trades on a single day October 27,
11  2009? And that's going to be Exhibit 9886.
12  A. Yes. I mean, I don't recall, but I see that.
13  Q. Now, when you do hundreds of trades in a single day like
14  that, you have to input each one?
15  A. Yes.
16  Q. How many hours would you spend on a given day for those
17  hundreds of trades?
18       MS. APPS: Objection. Time.
19       THE COURT: Sustained. On a particular day are you
20  asking?
21       MR. FISHBEIN: October 27, 2009. You see that you did
22  hundreds of trades. How long did that take?
23  A. Not that long.
24  Q. What does "not that long" mean?
25  A. Well, it would be a matter of seconds to execute a trade.

1  Q. And would you do them all at once or you would follow the
2  market and do them over a period of time?
3  A. Correct.
4  Q. Follow the market and do it over a period of time?
5  A. Correct.
6  Q. Weren't you concerned yourself about how distracting your
7  personal trading was during that period of time?
8  A. Yes.
9  Q. You regard yourself as an impulsive trader, right?
10  A. No.
11  Q. You don't think you're an impulsive trader?
12  A. No. I think during those periods of time it was impulsive.
13  The period of time it was short and relative to the period of
14  time at Diamondback and those specific days that you refer to
15  were short. The time is not the issue. It's a matter of
16  seconds. Even if you want to say it's a hundred trades at
17  seconds, you're still talking minutes. It was more the act of
18  what I was doing, which I had defined as gambling.
19  Q. And it was distracting to be following the market and
20  worrying about what was happening with your personal portfolio,
21  right?
22  A. Yes, that's correct.
23  Q. If you could look at Defense Exhibit 9845. It's in your
24  tab 3. I'm sorry, it's tab 338. Do you see that?
25  A. Hold on. I'm sorry? 8591?

1  Q. No, it's your tab 338, it's Exhibit 9845.
2  A. I thought you said tab 3.
3       THE COURT: You did.
4  A. I'm with you.
5  Q. And is this an e-mail correspondence between you and your
6  stepfather in which you describe your attitude at that time
7  about your trading, your personal trading.
8  A. Yes. We have some discussion --
9       MS. APPS: Just a moment. Your Honor, I object. It's
10  not in evidence.
11       MR. FISHBEIN: I'm just asking what the document is.
12  I will offer Exhibit 9845.
13       MS. APPS: Objection.
14       MR. FISHBEIN: And your Honor I believe it goes to his
15  state of mind.
16       THE COURT: Let me just look.
17       MR. FISHBEIN: 9845, tab 338 and I can direct your
18  attention, your Honor, to the part I'm looking at.
19       THE COURT: What part is that?
20       MR. FISHBEIN: It's one, two, three e-mails down,
21  March 31, 2009, 3:09 p.m., the last phrase on the first
22  paragraph.
23       THE COURT: So you're just looking to introduce that
24  section?
25       MR. FISHBEIN: Yes.

1       THE COURT: All right, I'll allow that.
2       (Defendant's Exhibit 9845 received in evidence)
3  Q. Mr. Tortora, do you see on March 31, 2009 at 3:08p.m. you
4  wrote to your stepfather, you talked about that?
5  A. Yes.
6       MR. FISHBEIN: This is in evidence. I suppose, your
7  Honor, we can put it up on the screen because we've admitted
8  this in evidence.
9       THE COURT: If you can isolate it.
10       MR. FISHBEIN: Yes, Mr. Tortora, just that one e-mail,
11  March 31, 2009 at 3:09 p.m.
12  Q. So you're talking to your stepfather about your trading,
13  right?
14  A. Both -- the first paragraph is trading, my trading. The
15  second paragraph is Todd's trading.
16  Q. We're just looking at, because the Court has only admitted
17  the e-mail at 3:09 p.m., right?
18       THE COURT: He's saying it's two paragraphs.
19       MR. FISHBEIN: I'm sorry, I'm sorry, I'm sorry. I
20  apologize.
21  Q. So the first paragraph. You say, "Yeah, I round tripped my
22  gains and then lost some of my own money and I can't deal with
23  that because worked too hard for it." Do you see that?
24  A. Yes.
25  Q. Would it be fair to say that you have some concern about

1   what's going on in your personal account?
2   A.  Well, it's what I'm saying there, I lost money and I work
3   too hard for it and I can't deal with that.  It's pretty
4   explicit.
5   Q.  At the end you say, quote, "I'm too impulsive/aggressive to
6   trade options.  I think I'm in Vegas."  Do you see that?
7   A.  Yes.
8   Q.  Would that fairly characterize at the time in March 2009
9   your attitude about your trading?
10  A.  Yes.  As I said, it was like gambling.
11  Q.  And then at a later point in April of 2009, you actually
12  made a vow to yourself that you would no longer trade options,
13  is that correct?
14  A.  I don't recall.
15  Q.  I'm sorry, strike that.  You decided that you would only,
16  you would only trade with profits above the initial investment
17  you made in your personal account.  Do you remember that?
18  A.  I don't recall.
19  Q.  If you look at Defense Exhibit 9847, it's tab 335.  Do you
20  see it?
21  A.  Yes.
22  Q.  And if you look at the top e-mail, does that refresh your
23  memory that as of April 9, 2009 you had made a vow to yourself
24  that you would only trade with profits above the original
25  investment you made so that you did not lose the original

1   amount of money you put into your account?
2   A.  Mr. Fishbein, can you give me your definition or the proper
3   definition of vow?
4        MR. FISHBEIN:  Defense offers Exhibit 9847.  Again,
5   it's only the top e-mail.
6        THE COURT:  Overruled -- I mean, sustained.  I'm not
7   allowing it, no.
8   Q.  Did you think to yourself you would no longer trade with
9   money above the original investment?
10  A.  I don't recall, Mr. Fishbein.
11  Q.  Is it true that you originally had invested 900,000?
12  A.  No, I had 900,000 put into a Fidelity account which was
13  inclusive of like a money market account.
14  Q.  But in any event you lost, as you said, hundreds of
15  thousands of dollars?
16  A.  That's correct.
17  Q.  And that was in the second half of 2009, right?
18  A.  I don't remember over what stretch, but as I mentioned the
19  trading was 2009 and 2010.
20  Q.  Now, you said, you said on direct, I believe, that Mr.
21  Newman offered you to have your own book within M-Tech, right?
22  A.  Yes.
23  Q.  In 2008, right?
24  A.  Yes.
25  Q.  And I believe you said the reason you didn't take that

1   offer was because you didn't want to spend every day trading in
2   M-Tech, yes?
3   A.  Yes.
4   Q.  And weren't you concerned that this trading you were doing
5   in your own account in 2009 would be a distraction?
6   A.  No, because there's a difference.  When I'm trading
7   Diamondback money and trying to help Todd with Diamondback
8   money, which is other people's money, versus doing whatever I
9   want with my own money.
10       MR. FISHBEIN:  Your Honor, I know you don't want to
11  break, we're very near the end, and if I could perhaps have one
12  minute, two minutes, that I can discuss with the government --
13       THE COURT:  Do you people need a bathroom break?
14  Okay, five minutes.
15       (Continued on next page)
16
17
18
19
20
21
22
23
24
25

1        (In open court; jury not present)
2        THE COURT:  Okay, have a seat.  Do you need to discuss
3   with the government on the record?
4        MR. FISHBEIN:  No, I just need a few minutes to confer
5   and talk about some documents.
6        THE COURT:  All right, so take five minutes.  Meet and
7   confer.
8        (Recess)
9        THE COURT:  Okay, have a seat.
10       (Continued on next page)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1       (In open court; jury present)

2       THE COURT: With that, I think Mr. Fishbein is going

3   to wind down.

4       MR. FISHBEIN: Yes. The first thing is I'm going to

5   offer some exhibits, your Honor, which we've agreed with the

6   government, I'm going to list the exhibit numbers and offer

7   them. The first one is Defense Exhibit 2184, which is a

8   research report to undisclosed recipients and the government

9   and we stipulate that this came from Mr. Tortora's e-mail box

10   at Diamondback, so we offer that.

11       THE COURT: Keep going. I'll receive them all once

12   you've finished.

13       MR. FISHBEIN: The next one is Defense Exhibit 2165,

14   also a research report to undisclosed recipients and the

15   parties stipulate that it came from Mr. Tortora's e-mail box at

16   Diamondback. The last one is Defense Exhibit 216, a research

17   report to undisclosed recipients which the parties stipulate

18   came from Mr. Tortora's e-mail box.

19       THE COURT: So Defense Exhibits 2184, 2165 and 216 are

20   received.

21       (Defendant's Exhibits 2184, 2165 and 216 received in

22   evidence)

23   Q. And Mr. Tortora, you have in front of you three additional

24   loose documents. I'll start with Defense Exhibit 591. Do you

25   see that?

1   A. Yes.

2   Q. Do you recognize that as an e-mail you got from Deutsche

3   Bank to you August 4, 2008?

4   A. Yes.

5   Q. And this is during the quarter, Dell quarter ended

6   August 28, right?

7   A. Yes.

8   Q. And do you see at the bottom of the first --

9       MR. FISHBEIN: Well, Defense offers 591.

10       MS. APPS: No objection.

11       THE COURT: Defendant's 591 is received.

12       (Defendant's Exhibit 591 received in evidence)

13   Q. Okay, if it's received, I'm not going to ask further

14   questions. Defense Exhibit 8173. Do you see that, Mr.

15   Tortora?

16   A. Yes.

17   Q. Is this an example of another Kanowitz tracker that you

18   received in November of 2008?

19   A. Yes.

20   Q. And that's the Kanowitz tracker that deals with average

21   selling prices, etc., right?

22   A. Yes.

23       MR. FISHBEIN: Defense offers 8173.

24       THE COURT: Any objection?

25       MS. APPS: No objection.

1       THE COURT: Defendant's 8173 is received.

2       (Defendant's Exhibit 8173 received in evidence)

3   Q. And Defense Exhibits 8924, Mr. Tortora, do you see that?

4   A. Yes.

5   Q. An e-mail from you to Mr. Newman on November 20, 2008, is

6   that correct?

7   A. Yes.

8   Q. And that was the date of Dell's earnings announcement in

9   the quarter ended October, is that correct?

10   A. I don't recall.

11   Q. Okay. You recall we talked about Dell's quarter ending in

12   November of 2008? I'm sorry, reported in November 2008.

13   A. Yes.

14   Q. Okay, and do you see that in this e-mail at the bottom is a

15   reference to Dell?

16   A. Yes.

17       MR. FISHBEIN: Defense offers Exhibit 8924.

18       MS. APPS: I have a conditional no objection, your

19   Honor. If Mr. Fishbein plans to ask questions about this

20   exhibit, that's fine, but just to put it in without any

21   explanation, we don't think that's appropriate.

22       MR. FISHBEIN: We're offering the exhibit. If I need

23   to ask any questions to authenticate it I will, but if she

24   objects --

25       THE COURT: I'll overrule it. Defense Exhibit 8924 is

1   received.

2       (Defendant's Exhibit 8924 received in evidence)

3   Q. Mr. Tortora, over the course of several days now you

4   testified about exchanging what you believed to be confidential

5   company information, correct?

6   A. Yes.

7   Q. And the people, as I understand it, in addition to your

8   statement that you gave certain information to Mr. Newman,

9   other than Mr. Newman you talked about Sandy Goyal, right?

10   A. Yes.

11   Q. John Horvath, correct?

12   A. Yes.

13   Q. Danny Kuo, right?

14   A. Yes.

15   Q. Sam Adonakis, right?

16   A. Yes.

17   Q. Ron Dennis?

18   A. Yes.

19   Q. And Lacey Higgins, right?

20   A. Yes.

21   Q. How about Mr. Abbasi? Did you view the information that

22   you got from Mr. Abbasi as confidential company information as

23   well?

24   A. At times.

25   Q. So we'll include Mr. Abbasi. Now, these are people other

1 than Mr. Kuo who you knew before you came to Diamondback, is
2  that right?
3 A.  Yes.
4 Q.  So Mr. Goyal you knew quite well from your job at
5  Prudential, right?
6 A.  Yes.
7 Q.  And that was before you ever came to Diamondback, correct?
8 A.  Yes.
9 Q.  Before you knew Todd Newman?
10 A.  Yes.
11 Q.  Mr. Abbasi, same; you knew him from Prudential, right?
12 A.  Yes.
13 Q.  Before you met Todd Newman, correct?
14 A.  Yes.
15 Q.  And Mr. Horvath was a client of yours at Prudential, right?
16 A.  Yes.
17 Q.  So you knew him before you knew Todd Newman or before you
18  came to Diamondback, right?
19 A.  Yes.
20 Q.  Mr. Adonakis you also knew from Prudential, right?
21 A.  Yes.
22 Q.  And you knew him before you met Todd Newman or before you
23  came to Diamondback, right?
24 A.  Yes.
25 Q.  How about Ron Dennis; how did you know him?

1 A.  He was a client at Prudential.
2 Q.  So you also knew him before you met Todd Newman or came to
3  Diamondback, right?
4 A.  Yes.
5 Q.  Now, Mr. Kuo we just talked about you met early on once you
6  were at Diamondback, right?
7 A.  I spoke to him.
8 Q.  You spoke to him.
9 A.  Yes.
10 Q.  But you reached out for him, right?
11 A.  I reached out to Gurinder, who put me in touch with him.
12 Q.  But that was your initiative, correct?
13 A.  Reaching out to Gurinder?
14 Q.  Mr. Kuo wasn't somebody that Mr. Newman had a relationship
15  with, correct?
16 A.  Not that I knew.
17 Q.  And Ms. Higgins; how do you know her?
18 A.  From Intel.
19 Q.  That was many years before you came to Diamondback, right?
20 A.  Yes.
21 Q.  And before you knew Todd Newman, right?
22 A.  Yes.
23 Q.  Now, you continued to stay in touch with Mr. Kuo,
24  Mr. Horvath and Mr. Adonakis after you left Diamondback, didn't
25  you?

1 A.  Yes.
2 Q.  And you continued to receive confidential information about
3  companies afterwards, right?
4 A.  Yes.
5 Q.  And so that included as late as August of 2010, right?
6 A.  Probably, but I don't know the specific date.
7 Q.  Let's look at two Exhibits, Defense Exhibit 5712 which is
8  tab 317.  Do you see that?
9 A.  Yes.  5712?  Exhibit --
10 Q.  Your tab 317.  Hold on.  Yes.  Defense Exhibit 5712.  Do
11  you see that?
12 A.  Yes.
13 Q.  Is that an e-mail from John Horvath to you, Adonakis, Kuo
14  and Abbasi dated July 8, 2010?
15 A.  Yes.
16     MR. FISHBEIN: Defense offers Exhibit 5712.
17     MS. APPS: No objection.
18     THE COURT: All right, Defendant's 5712 is received.
19     (Defendant's Exhibit 5712 received in evidence)
20 Q.  And the subject, Mr. Tortora, is MS INTC checks, right?
21 A.  Yes.
22 Q.  And that's Intel checks, right?
23 A.  Yes.
24 Q.  Did you understand this to come from -- who did you
25  understand this to come from?

1 A.  At the time I was not even paying attention because I
2  wasn't working and it's not a hundred percent clear who it's
3  coming from.  There could be more than one person this could
4  have came from, me and John Horvath.
5 Q.  Well, when you wrote e-mails called MS INTC checks, you
6  said that the information came from Ms. Higgins, right?
7 A.  When I wrote MS INTC checks, the information generally came
8  from Miss Higgins.  It could have been relayed from Mark
9  Lipacis to me, but either it came from Ms. Higgins to me or
10  from Mark Lipacis to me.
11 Q.  And you see here seeing MS INTC checks, you don't know who
12  it's from?
13 A.  I just told you two people it may have came from.  If you
14  want me to speculate --
15 Q.  I don't want you to speculate.  Do you know it was coming
16  from John Horvath?
17 A.  No.
18 Q.  You told me that you were not paying attention?
19 A.  At that time I was not paying attention to e-mails.  I had
20  just given them my e-mail after I left Diamondback to keep me
21  in the loop in things, regardless of what the information was.
22  If you want me to go line by line to determine if it's
23  confidential --
24 Q.  No, I don't want you to do that.  Your last day at
25  Diamondback was April 21, 2010?

# A-773

1  A. Yes.
2  Q. This is July 8, 2010?
3  A. Yes.
4  Q. So you had not just lost your Diamondback account.
5  A. If I said that, it was in error.  When I lost my
6  Diamondback account, I transferred it to the G-Mail.
7  Q. You told your friends, Mr. Horvath, Mr. Adonakis, Mr. Kuo
8  and Mr. Abbasi to keep you in the loop, right?
9  A. Yes.
10  Q. To keep giving you the kind of information you were
11  exchanging before?
12  A. Every type of information, whatever information was on
13  those e-mail lists just add me to that distribution list.
14  Remove my Diamondback, put it on my G-Mail.  The reason would
15  be as, I mentioned, I was interviewing and wanted to be kept up
16  to date with market ongoings.
17  Q. And if you'll now look at Defense Exhibit 2674.  It's your
18  tab 319.  Do you see that?
19  A. Yes.
20  Q. Is that an e-mail from Danny Kuo to you, Adonakis, Horvath
21  and Abbasi in October of 2010?
22  A. Yes.
23  Q. Defense offers Exhibit 2674.
24      MS. APPS: No objection.
25      THE COURT: All right, defendant's 2674 is received.

1      (Defendant's Exhibit 2674 received in evidence)
2  Q. Mr. Horvath -- I mean, Mr. Tortora, this is an Invidia
3  update, right?
4  A. Yes.
5  Q. It says tracking to 835 million for the quarter, 10 million
6  shy of consensus, right?
7  A. Yes.
8  Q. GM doesn't look too good.  Do you see that?
9  A. Yes.
10  Q. So as of October of 2010 you still were receiving
11  information from your group about these various stocks, right?
12  A. Yes.
13  Q. And did you believe this to be confidential company
14  information?
15  A. Once again, I was not paying attention to these e-mails.  I
16  don't even remember reading these e-mails.  If you would like
17  me to go line by line and determine that, I will.
18  Q. No, that's okay.  Now, you acknowledged, I believe, that
19  you got information while you were at Prudential that you
20  regarded to be confidential company information, right?
21  A. Yes.
22  Q. And that was information about Intel, for example?  Right?
23  A. Yes.
24  Q. And you see here, you continued to get -- strike that.
25  This information, you continued to get information from this

1  group of friends, that is, Adonakis, Horvath and Kuo, after you
2  left Diamondback, right?
3  A. Rephrase that question?
4  Q. Yes, and you continued to receive information from Kuo,
5  Adonakis and Horvath after you left Diamondback, right?
6  A. Yes, if you mean e-mails as information, yes.
7  Q. Like we just looked at, right?
8  A. Yes.
9  Q. So the activities that you talked about in your testimony
10  started before you came to Diamondback, right?
11  A. Activities?  Can you be more specific?
12  Q. The first thing Ms. Apps asked you or one of the first
13  things is whether you received confidential company
14  information, right?
15  A. Yes.
16  Q. And that started with you in your mind before you came to
17  Diamondback, right?
18  A. That's correct.
19  Q. And before you met Todd Newman, right?
20  A. That's correct.
21  Q. And you continued to do it after you left Diamondback,
22  right?
23  A. Continued to do it?  What does "it" refer to?
24  Q. Receive information from this group.
25  A. Yes, but, Mr. Fishbein, it sounds like you're trying to say

1  I received confidential information before and confidential
2  information after.  I don't think we established that I
3  recalled receiving confidential information after.
4  Q. So your testimony is that these e-mails I just showed you,
5  you just don't know whether it's confidential or not, is that
6  right?
7  A. Correct.  Today would be the first time I'm reading them.
8      MR. FISHBEIN: Thank you very much.  I have nothing
9  further.
10      THE COURT: Nothing further.  All right, Mr.
11  Weingarten.
12      MR. WEINGARTEN: Can we step up two seconds?
13      THE COURT: All right.  Ready.
14      (Continued next page)
15
16
17
18
19
20
21
22
23
24
25

1      (At the sidebar)
2      MR. WEINGARTEN: Only this, that Mr. Fishbein covered
3  a lot of stuff I was going to cover.  I would be much more
4  efficient if we both go to lunch and came back.  I know we
5  usually go to one, it would save time, I would be more
6  efficient, I would cut stuff and I would be much quicker.  If
7  you wish I can go through it now and thumb through it a little,
8  but I would be more efficient if we broke now and came back at
9  1:30.
10      THE COURT: I'm not sure, I mean, why do you think it
11  will be more efficient?
12      MR. WEINGARTEN: Because I'll sit down and think about
13  just what happened and I'll cut as opposed to trying to do it
14  on the fly.  That's all.
15      THE COURT: Any views?
16      MS. APPS: No objection, your Honor.
17      THE COURT: It's just kind of early.  Do you have any
18  views?
19      MR. NATHANSON: No, we don't have.
20      MR. WEINGARTEN: I mean, to be cleaner and more
21  efficient, that's all.
22      THE COURT: No, let's gets started.  I want to get
23  started.
24      (Continued next page.
25

1      (In open court)
2      THE COURT: Okay, we'll have cross-examination by Mr.
3  Weingarten of Mr. Tortora.
4      MR. WEINGARTEN: May I proceed, your Honor?
5      THE COURT: Yes, please.
6      MR. WEINGARTEN: Thank you, your Honor.
7  CROSS-EXAMINATION
8  BY MR. WEINGARTEN:
9  Q.  Mr. Tortora, good afternoon, sir.
10  A.  Good afternoon.
11  Q.  Reed Weingarten.  We haven't met before.
12  A.  That's correct.
13  Q.  I have the privilege of representing Mr. Chiasson, seated
14    over there.
15  A.  Yes, sir.
16  Q.  Do you know Mr. Chiasson?
17  A.  I do.
18  Q.  When did you meet him?
19  A.  I recall speaking to him on a number of occasions.
20  Q.  This is the first time during this trial that you've ever
21    been in his physical presence?
22  A.  I don't recall if I would have crossed paths with him at a
23    conference, I don't remember.  It's possible, I don't remember
24    one way or the other.
25  Q.  There's no occasion when you actually shook his hand and

1  had a conversation with him?
2  A.  I don't recall, no.
3  Q.  It's true you had a conversation with him when you were an
4    analyst at Prudential?
5  A.  That was one occasion, yes.
6  Q.  Do you remember the subject?
7  A.  I believe it was related to Dell.
8  Q.  And Level Global was a customer of Prudential, correct?
9  A.  That's correct.
10  Q.  So in other words, Level Global, the hedge fund, paid
11    Prudential, a sell side operation, for information, correct?
12  A.  That's correct.
13  Q.  And you were the analyst who was providing the information
14    on Dell, correct?
15  A.  That's correct.
16  Q.  At some point in the trial we saw one of your sell side
17    reports on Dell, do you remember that?
18  A.  Yes.
19  Q.  And your name was under the byline, correct?
20  A.  Yes.
21  Q.  How many sell side reports did you put out under your own
22    name?  Do you have any idea?
23  A.  Dozens.
24  Q.  Dozens.  And how many stocks did you cover?
25  A.  Roughly ten at Prudential.

1  Q.  And how frequently would those reports come out?
2  A.  Well, if you're speaking a particular stock maybe it would
3    be two reports, two to three reports in a given order.
4  Q.  And for how long a period were you the author of those
5    reports?
6  A.  I believe it was about eight months, give or take.
7  Q.  And in response to that work you had a conversation with
8    Mr. Chiasson about Dell, do you recall?
9  A.  Yes.
10  Q.  And did you have any other conversations with him in your
11    life?
12  A.  Yes, I recall one conversation at Diamondback.
13  Q.  Do you remember what that was about?
14  A.  Apple.
15  Q.  And you had a conversation with Mr. Chiasson or were there
16    other people on the phone?
17  A.  I believe both instances Sam was on the line.
18  Q.  That's --
19  A.  Sam Adonakis and Sam asked me if I would mind speaking with
20    Chiasson and he put me on the phone.
21  Q.  The Dell conversation was when you were at Diamondback, is
22    that correct?
23  A.  That's correct.
24  Q.  Now, were there ever occasions where you actually
25    physically visited Level Global?

# A-775

1 A. There may have been a time when I met Sam for lunch, but I
2  don't believe ever, I don't ever believe I was actually in the
3  office. I may have been in the lobby.
4 Q. Do you have any recollection of Mr. Chiasson being up at
5  Diamondback?
6 A. Not when I was there, no.
7 Q. I'm just a little unclear. So when you worked at
8  Diamondback there was a period of time when you would commute
9  from Manhattan up to Connecticut, correct?
10 A. Yes.
11 Q. And then after a short while you worked from Manhattan?
12 A. Yes.
13 Q. And was that at a Diamondback facility in Manhattan or from
14  your home?
15 A. The large majority was from my home. There were times in
16  which I visited, I worked from the Diamondback facility in
17  Manhattan.
18 Q. But generally you, I guess your home or apartment you were
19  working from home?
20 A. That's correct.
21 Q. Now, is it fair to say that in connection with your work at
22  Diamondback you had sort of many, many contacts in the Wall
23  Street world from whom you received information and shared
24  information, correct?
25 A. Can you just define what you mean by contacts?

1 Q. Well, people in the business with whom you spoke.
2 A. Yes.
3 Q. When you were cooperating with the FBI did you make an
4  effort to compile that list?
5 A. I didn't make an effort to compile the entire list of
6  people within the Wall Street world that I spoke with, but I
7  did provide them with lists of individuals that I spoke with in
8  varying different buckets. For example, company management I
9  would give them a list of who I spoke with at company
10  management as per an example.
11 Q. Jenks material 351681, it should be in the book, if you
12  could take a look at it.
13 A. Mr. Weingarten, what tab would that be?
14 Q. It should be listed 351681. Do you have it? It should be
15  right in the front.
16 A. Yes.
17 Q. Is that the list that you compiled for the FBI?
18 A. Hang on. Let me just go through this. Yes.
19     MR. WEINGARTEN: Move it into evidence, your Honor?
20     THE COURT: Any objection?
21     MS. APPS: Yes, your Honor. I don't understand what
22  grounds under which it's coming in. It's hearsay. Prior,
23  something prepared at the direction of the FBI. 401 objection
24  as well.
25     THE COURT: You want to introduce the whole thing, Mr.

1 Weingarten?
2     MR. WEINGARTEN: Yes.
3     THE COURT: All right. Ladies and gentlemen, I want
4 to I think talk about this exhibit. Rather than do it on your
5 time I think I'll do it on our time. Why don't we break for an
6 early lunch today. We'll pick up at 1:30. Don't discuss the
7 case, of course, but stretch your legs, get a bite to eat and
8 I'll see you at 1:30.
9     (Luncheon recess)
10     (Continued next page)

1     THE COURT: I am trying to figure out why this is
2 relevant and what all the rest of this thing is. Maybe we can
3 take this time to figure out if there are going to more
4 objections going forward.
5     You're looking to get in the entire exhibit as what?
6     MR. WEINGARTEN: I'm particularly interested in
7 certain parts. I'm particularly interested in part about the
8 company representatives. I thought it would be easier to have
9 a document than simply elicit the information without help.
10     THE COURT: It's the defendant's statement, but what
11 are you trying -- should I excuse the witness?
12     Mr. Tortora, you get lunch, too. There is no reason
13 to keep you here at this point.
14     THE WITNESS: Thank you, your Honor.
15     THE COURT: Be here a little before 1:30.
16 Who is not on this list? Is that the point?
17     MR. WEINGARTEN: No, your Honor. I thought it would
18 an easy way to sum up. His conduct has been a significant part
19 of the conversation, particularly the company representatives.
20 I don't feel particularly strong about it.
21     THE COURT: I don't know why his contacts in the world
22 are relevant.
23     MR. WEINGARTEN: The company representatives truly
24 are.
25     THE COURT: Only if they are giving him inside

UNITED STATES OF AMERICA, v
TODD NEWMAN

1   information.  I guess conceivably if they are not -- I am not
2   sure where you are going with it.  If it's to prove that your
3   client's name is not on the list, I don't even know if it is.
4   Is it?
5        MR. WEINGARTEN: It is not.
6        Your Honor, I will make this easy.  I withdraw this.
7        THE COURT: You've ended up getting your wish, Mr.
8   Weingarten.
9        MR. WEINGARTEN: It was not designed that way.  Maybe
10  it was.
11       THE COURT: I'm not suggesting you did anything
12  improper.  I am just saying we have now broken.
13       Should we be talking about other exhibits that you
14  intend to introduce through the cross?
15       MR. WEINGARTEN: I provided all my exhibits to the
16  government this morning.  We had a discussion about the
17  exhibits they objected to this morning.
18       THE COURT: This one didn't make the list, apparently.
19  Are there others that didn't make the list?  You told them you
20  were going to introduce this exhibit, 3516-81?
21       MR. WEINGARTEN: Yes.
22       MS. APPS: I didn't realize.  It's my mistake.  I
23  apologize.
24       THE COURT: Are you looking to introduce everything
25  that's in the two binders?

1        MR. WEINGARTEN: There is just one binder.
2        THE COURT: I have two.  One is 3500 material and one
3   is cross.
4        MR. WEINGARTEN: Jencks material I'm having just in
5   case I need to refresh or impeach.  You can put that one aside.
6   And in truth, my statements at the bench were exactly how I
7   felt.  Over lunch I am going to pare down.
8        THE COURT: I want to know if we need to use time now
9   or save some time at the end of the lunch hour to go over the
10  exhibits that were controversial.
11       MR. WEINGARTEN: The list of the exhibits are in the
12  binder.
13       THE COURT: You are not objecting to anything in the
14  binder?
15       MS. APPS: No.  We already waived the objections.  I
16  just missed this one.
17       THE COURT: I know you don't eat, so you are just
18  going to work here.
19       Let's get ready to go at about 1:25 or so.
20       (Luncheon recess)
21
22
23
24
25

1              AFTERNOON SESSION
2              1:30 p.m.
3        THE COURT: The jury is ready to go.  Mr. Weingarten
4   is ready to go.
5        Anything else we need to discuss before we bring them
6   out?
7        MS. APPS: No.
8        THE COURT: Let's do this thing.
9        (Jury present)
10       THE COURT: I hope you had a good lunch.  You like the
11  earlier lunch or you like the 1:00 lunch?
12       JURORS: 1:00.
13       THE COURT: I think it is usually better to have the
14  afternoon a little shorter than the morning.  There is a little
15  advantage to that.
16       We are going to resume the cross-examination of
17  Mr. Tortora by Mr. Weingarten.
18  Q. Mr. Tortora, good afternoon, sir.
19  A. Good afternoon.
20  Q. I would like to turn to your relationship with Sam
21  Adondakis.  Did I understand your testimony correctly that you
22  became acquainted with Mr. Adondakis in California?
23  A. That's correct.
24  Q. And he worked with you at Prudential?
25  A. That's correct.

1   Q. And that's the first time you came to know him?
2   A. Yes.
3   Q. And did you actually work together?
4   A. We did work under Mark Lipacis on the same team.
5   Q. Were there occasions when you worked together on the same
6   projects?
7   A. I don't believe so.
8   Q. Did he have anything to do with Intel?
9   A. No, he did not.
10  Q. But you did?
11  A. I did.
12  Q. But he didn't assist you on Intel?
13  A. He did not.
14  Q. Now, when you sought employment at Diamondback did you seek
15  Mr. Adondakis' help?
16  A. I don't recall.  He was employed at the time.  It's
17  certainly possible that I may have reached out to friends, but
18  I don't recall.
19  Q. Let me show you Defense Exhibit 8591.  It would be in your
20  book in order.  I think the defense exhibits are first.
21       THE COURT: 8591?
22       MR. WEINGARTEN: Yes.
23  Q. Are you able to identify that, sir?
24  A. Yes.
25  Q. Is that an e-mail exchange between you and Mr. Adondakis

1 relating to your efforts to get employed by Diamondback?
2     MS. APPS: I'm sorry. I don't have the document.
3 A. Defense Exhibit 8591?
4 Q. Yes.
5     THE COURT: Are you still looking for it, Ms. Apps?
6     MS. APPS: I don't have it.
7 Q. Is that an e-mail at the top of July 19, 2007 between you
8 and Mr. Adondakis?
9 A. And that supersedes your earlier question, Mr. Weingarten?
10 Q. Yes.
11 A. Yes, it is.
12     MR. WEINGARTEN: Move it into evidence.
13     THE COURT: Any objection?
14     MS. APPS: No objection.
15     THE COURT: Defense Exhibit 8591 is received.
16     (Defendant's Exhibit 8591 received in evidence)
17     MR. WEINGARTEN: Can we publish, please?
18     THE COURT: Sure.
19 Q. You go from the back to the front in terms of finality. Do
20 you see that, Mr. Tortora?
21 A. Yes.
22 Q. Could you start with the e-mail from you to Mr. Adondakis
23 on July 18 at 3:32 p.m. on page 2 in the middle of the page
24 where you say: Hey, Sam.
25     You see where I am?

1 A. Yes.
2 Q. Read it to yourself and then, if you could, summarize what
3 you are asking Mr. Adondakis to do.
4 A. So I'm asking Sam for assistance in financial analysis on a
5 company called Microsemi. The ticker is MSCC. There are
6 several items I am asking if he could help with, many of those
7 items which a person out of work wouldn't have access to.
8 Q. You're out of work now?
9 A. Yes.
10 Q. And Sam is at Level Global, correct?
11 A. That's correct.
12 Q. So you're asking him friend to friend for some help?
13 A. Yes.
14 Q. And you're asking for specific help at a company because
15 the company where you want to work has asked you to opine that,
16 correct?
17 A. Yes.
18 Q. And does Sam comply?
19 A. Yes, I believe he does.
20 Q. And do you also ask him for access to some Internet or some
21 computer system that he has because he's employed at Level
22 Global?
23 A. Which number here?
24 Q. Same document, the e-mail above.
25     Did you ask to borrow his access to first call to get

1 reports on MSCC?
2 A. Yes.
3 Q. And does he comply with that?
4 A. Yes, he does.
5 Q. So Sam was helping you here, correct?
6 A. Yes, he was.
7 Q. And you get the job, correct?
8 A. No, I do not get the job.
9 Q. This was not to Diamondback?
10 A. Correct.
11 Q. This was to some other company?
12 A. Yes.
13 Q. You eventually do get a job at Diamondback, correct?
14 A. Yes.
15 Q. You begin working when?
16 A. September 4.
17 Q. And soon thereafter do you seek to start working informally
18 with Sam Adondakis?
19 A. I'm sorry. Could ask you that again.
20 Q. Soon after starting work at Diamondback, did you contact
21 Mr. Adondakis at Level Global and seek to work with him?
22 A. What do you mean by seek to work with him?
23 Q. Let's look at 8616 and see if that helps.
24     Are you able to identify that document, sir?
25 A. Yes.

1 Q. What is it?
2 A. It's an e-mail exchange between Sam and myself on October
3 1, 2007.
4 Q. And this would be a couple of weeks after you started at
5 Diamondback?
6 A. Yes. Roughly a month.
7     MR. WEINGARTEN: Move it into evidence.
8     MS. APPS: No objection.
9     THE COURT: Defendant's Exhibit 8616 received.
10     (Defendant's Exhibit 8616 received in evidence)
11     MR. WEINGARTEN: Published.
12 Q. Starting at the bottom, the e-mail from you at 7:22 p.m.,
13 you to Mr. Adondakis. Your start date was the beginning of
14 September?
15 A. That's correct.
16 Q. So you're at Diamondback three or four weeks?
17 A. Yes.
18 Q. And what do you say to Sam?
19 A. Sam, hey, we should start swapping data points on names.
20 Let's catch up later this week.
21 Q. To your knowledge, would that be the first time you're at
22 Diamondback when you're making the suggestion to Sam, or were
23 there earlier ones?
24 A. I don't recall.
25 Q. What's Sam's response?

1  A.  Sounds good.  Let's chat tomorrow, gives me his office
2  number.
3  Q.  Thereafter, did you in fact exchange data points with Sam
4  Adonakis at Level Global?
5  A.  Do you want my definition of data points or your
6  definition?
7  Q.  The data points that you are talking about in the exhibit
8  we just looked at.
9  A.  Data points in this case would be general information.  And
10  to my recollection, it was months later before Sam and I
11  started at volume exchanging data points.  I say at volume
12  because I don't know if there was one or two conversations that
13  occurred.  But when Ms. Apps asked me to explain how the group
14  formed, Sam was one of the later ones to come into that group.
15  Q.  Let's take a look at 8620.
16      Can you identify that, sir?
17  A.  It's an e-mail between Sam and I.
18  Q.  Date?
19  A.  I'm sorry.  On October 11 and October -- no.  October 5,
20  October 11, and October 12 of 2007.
21      MR. WEINGARTEN: Move it into evidence.
22      MS. APPS: No objection.
23      THE COURT: Defendant's 8620 is received.
24      (Defendant's Exhibit 8620 received in evidence)
25      MR. WEINGARTEN: Publish.

1  Q.  So October 5 is an e-mail from you to Mr. Adondakis.  It
2  just says e-mail and has no information.  Do you have any idea
3  what that's about?
4  A.  No.
5  Q.  So let's look at the one where we have some idea what it's
6  about.  That would be the one above that.  That's dated October
7  11, 2007 and that's from -- the one above that is earlier.  Do
8  you see that?  No.  The one -- I'm sorry.  The one in the
9  middle from Sam to you and he says:  Have a second to chat?  If
10  so, you can call my cell.  And then the e-mail on top of that
11  is from you to Sam, and what do you say to him?
12  A.  Got -- hey, Sam, got some data points from contact.  We can
13  talk today or Monday.  Let me know.
14  Q.  This is about a month after you're at Diamondback, correct?
15  A.  Yes.
16  Q.  You're offering him data points, correct?
17  A.  Yes.
18  Q.  And let's look at 8623.  Are you able to identify that?
19  A.  Yes.
20  Q.  And is that another e-mail exchange between the two of you?
21  A.  Yes.
22  Q.  Dated what?
23  A.  October 16 and October 17 of 2007.
24      MR. WEINGARTEN: Move it in.
25      MS. APPS: No objection.

1      THE COURT: Defendant's Exhibit 8623 is received.
2      (Defendant's Exhibit 8623 received in evidence)
3      MR. WEINGARTEN: Publish, please.
4  Q.  So the one below from you to Sam, would you read that,
5  please?
6  A.  Hey, you back.  Give me a ring to catch up, and there is my
7  work number.
8  Q.  I assume sitting here today you don't remember the
9  conversation that took place just then, correct?
10  A.  Was there a conversation?
11  Q.  Or if there was.
12  A.  No, I don't recall.
13  Q.  Let's look at the e-mail on top of that where Sam says to
14  you:  Got your voice mail and no worries.  I'll keep everything
15  on the D-low.  Did you determine that to be the down low?
16  A.  Yes.
17  Q.  Do you know what he was talking about there?
18  A.  No idea.
19  Q.  But this follows a couple of occasions when you are
20  offering data points to Sam, correct?
21  A.  Yes.
22  Q.  Let's just look at 8629, please.
23      Are you able to identify that one?
24  A.  Yes.
25  Q.  And that's an e-mail exchange on October 23, 2007 between

1  the two of you?
2  A.  Yes.
3      MR. WEINGARTEN: Move it in.
4      MS. APPS: No objection.
5      THE COURT: Defendant's 8629 is received.
6      (Defendant's Exhibit 8629 received in evidence)
7      MR. WEINGARTEN: Publish.
8  Q.  And this is another e-mail from you to Sam, October 23,
9  correct?
10  A.  Yes.
11  Q.  And now you're at Diamondback six or seven weeks?
12  A.  Yes.
13  Q.  And what do you say to Sam?
14  A.  I say, hey, Sam, give me a call some time this week to
15  catch up and swap ideas/data points around earnings.
16  Q.  Now, in response to questions from the prosecutor you
17  talked about PGR, correct?
18  A.  Yes.
19  Q.  And PGR, just to get us together, is the expert network
20  where hedge fund people were connected to people in the
21  industry by the expert corporation or the expert company, PGR,
22  correct?
23  A.  Yes.
24  Q.  And as you testified, I think, yesterday, it was your
25  conclusion that many of these experts spoke to many hedge fund

1  people, correct?
2  A. Yes.
3  Q. You introduced PGR to Sam Adondakis, isn't that correct?
4  A. When you say introduced, I introduced Sam to someone at PGR
5  or PGR the entity?
6  Q. Let's see if that helps, 8723.
7       Are you able to identify that document, sir?
8  A. Yes.
9  Q. What is it?
10 A. It's an e-mail between Sam and myself.
11 Q. And is it dated April 14, 2008?
12 A. Yes.
13 Q. And does it relate to PGR?
14 A. Yes.
15      MR. WEINGARTEN: Move it in.
16      MS. APPS: No objection.
17      THE COURT: Defendant's 8723 is received.
18      (Defendant's Exhibit 8723 received in evidence)
19 Q. Is it fair to say that you did a thorough review or
20 attempted to do a thorough review of the consultants at PGR
21 yourself?
22 A. Yes. Again, this question supersedes the previous one?
23 Q. Yes, that's fair.
24 Q. I'm sorry. Can you repeat that again?
25 Q. The first one or the second one?

1  A. Whichever one you are asking me.
2  Q. Is it fair to say that you did a review of the PGR
3  consultants yourself trying to determine which ones were
4  useful?
5  A. Well, I don't recall, but based on this it appears I am
6  informing Sam who I have met with and who I have not met with,
7  but I'm not even sure how I would get the list of people that I
8  haven't met with.
9  Q. You prepared the list, correct?
10 A. I did prepare the list. And I'm trying to deduce what this
11 list is.
12 Q. On the already met, just at the top, those are the ones
13 that you have interviewed or worked with, correct?
14 A. They would have been the list that I have spoken to.
15 Q. And you gave Sam a report on how good they were, correct?
16 A. Yes.
17 Q. And then the group that you haven't met you were advising
18 him that those were available, but you hadn't worked with them
19 yet, correct?
20 A. I believe so.
21 Q. Didn't you work out an arrangement with Sam Adondakis at
22 Level Global where you would work together with some of these
23 PGR consultants?
24 A. There were times at which Sam and I discussed that it did
25 not make sense for us to overlap. The way I recall it

1  happening, though, I would see Sam doing calls with some of the
2  people I were doing calls with and I would tell Sam, Sam, I am
3  not going to do calls with those people. I'll spend my time
4  doing calls with other people.
5  Q. So you reached an agreement with your friend that you would
6  do calls with expert X and provide him with the results and he
7  would do interviews with expert Y and provide you with the
8  results, correct?
9  A. Well, again, it was bigger than just with Sam and I, but
10 yes.
11 Q. But you certainly did that with Sam Adondakis?
12 A. Yes.
13 Q. Is it also true that you endeavored to encourage Sam to
14 hire certain consultants?
15 A. Who are you referring to?
16 Q. Let's take a look at 3185.
17      Are you able to identify that?
18 A. Yes.
19 Q. What is it?
20 A. It's an e-mail from myself to Todd which I forwarded to Sam
21 and Sam responds to me on January 21, 2009.
22      MR. WEINGARTEN: Move it in.
23      MS. APPS: No objection.
24      THE COURT: Defense Exhibit 3185 is received.
25      (Defendant's Exhibit 3185 received in evidence)

1       MR. WEINGARTEN: If we could highlight the second
2  e-mail from Mr. Tortora to Mr. Adondakis on January 21 at 8:57
3  a.m.
4  Q. Would you read your language, please.
5  A. FYI, we signed up Scott today and we will sign up venk
6  Friday. You should sign up both.
7  Q. You're communicating to your friend Sam Adondakis, correct?
8  A. Yes.
9  Q. And Sam doesn't work with you; he works at a different
10 hedge fund?
11 A. That's right.
12 Q. He's an analyst there, right?
13 A. Yes.
14 Q. Scott is Scott Jones?
15 A. Scott is Scott Jones.
16 Q. Is he a friend of yours?
17 A. Yes.
18 Q. And he was working for Diamondback as a consultant?
19 A. Scott was working for JP Morgan, then he left JP Morgan and
20 then signed up for Diamondback as a consultant.
21 Q. And you were encouraging Sam to do the same with him at
22 Level Global, correct?
23 A. Sam and I had discussions about it with Scott, and Sam knew
24 Scott -- Sam and Scott had a separate relationship, which I
25 can't comment on what their relationship was. So I will

1  acknowledge here that I said you should sign up both.  And I
2  don't believe to my recollection venk was ever signed up.
3  Q.  Scott Jones, he was a friend of yours that you were
4  encouraging your friend Sam Adondakis to hire at Level Global,
5  correct?
6  A.  Again, that's not how I recall it playing out, but I will
7  acknowledge I said you should sign up both here.
8  Q.  Did you encourage Mr. Adondakis to hire any of your other
9  friends?
10  A.  Any of the consultants at Diamondback?
11  Q.  Yes.
12  A.  Go ahead.  Show me.
13  Q.  9874.
14      Are you able to identify that?
15  A.  Yes.  E-mail exchange between Sam and I, June 10, 2009.
16      MR. WEINGARTEN: Move it in.
17      MS. APPS: No objection.
18      THE COURT: Defense Exhibit 9874 is received.
19      (Defendant's Exhibit 9874 received in evidence)
20  Q.  Let's start at the very bottom, your e-mail to Sam on June
21  10 at 9:23 a.m.  We may have to go to the second page.  It's on
22  the back of mine, Mr. Tortora.  I don't know if you see it.
23  A.  Why don't I see that.
24  Q.  Do you have that, where it says, would you be interested in
25  paying John?

1  A.  Yes, yes, yes, got you.
2  Q.  Would you read that?
3  A.  Would you be interested in paying John, like you do Scott?
4  Just don't want to lose him, and we could also get him to do
5  more if you pay him.  Let's chat about this whenever.
6  Q.  First of all, this Scott the same Scott we were referring
7  to two minutes ago?
8  A.  Yes.
9  Q.  And who is John?
10  A.  John Souza.
11  Q.  Is John Souza the person that you mentioned that you used
12  to work for and then he worked for you and he's also a friend?
13  A.  That's correct.
14  Q.  He's a consultant in the world?
15  A.  I'm sorry?
16  Q.  He's a consultant?
17  A.  He was a consultant for Diamondback, yes.
18  Q.  And you were encouraging Mr. Adondakis to hire him at Level
19  Global, correct?
20  A.  I was asking him if he would be interested.
21  Q.  Now, did you ask Mr. Adondakis at Level Global to provide
22  you with some of the work that he was producing at Level
23  Global?
24  A.  Yes.
25      MR. WEINGARTEN: 8995, please.

1  Q.  Are you able to identify that, sir?
2  A.  Yes.
3  Q.  What is it?
4  A.  An e-mail from Bill Williams from JNK to myself, which I
5  forwarded to Todd, then to Sam.  I have an e-mail exchange with
6  Sam on March 18, 2009.
7      MR. WEINGARTEN: Move it in.
8      MS. APPS: No objection.
9      THE COURT: Defense Exhibit 8995 is received.
10      (Defendant's Exhibit 8995 received in evidence)
11  Q.  Do you see on the fourth e-mail down, on March 18, 1:57
12  p.m., you say: Sam, you cool with forwarding me JNK e-mails
13  and giving me updates?  I hate these guys.
14      Do you see that?
15  A.  Yes.
16  Q.  JNK, I think we established earlier in the trial, was a
17  sell side outfit?
18  A.  Did we?
19  Q.  I don't know if we or we didn't.  Are they?
20  A.  I am not sure.
21  Q.  Why were you asking for these e-mails?
22  A.  I'm sorry?
23  Q.  What were you asking for here?
24  A.  I was asking him if he could forward the JNK e-mails.
25  Q.  Why did you want them?

1  A.  Because they had a market influence.
2  Q.  So what were they?  What was the market?
3  A.  I believe -- I am not sure if they were a sell side firm.
4  They may have been.  But they would send out data points to a
5  wide distribution list of their clients, and many times a stock
6  would be moving only -- whether it was true or not only because
7  JNK sent out an e-mail.
8  Q.  So, to your knowledge, Mr. Adondakis at Level Global was
9  receiving them, but you at Diamondback were not?
10  A.  We were -- hang on a second.  At some point we were not
11  receiving e-mails, if that's what you are asking.
12  Q.  There is a reason you sent this e-mail, correct?
13  A.  Yes.
14  Q.  You wanted the e-mails because you weren't getting --
15  A.  At that point.  But I was making it clear that at some
16  point I believe we were.
17  Q.  And Level Global was paying for the information?
18  A.  I believe they were.
19  Q.  And you asked Sam to send it to you, correct?
20  A.  Yes.
21  Q.  And did he?
22  A.  I believe he did.
23  Q.  Now, it's fair to say that you were close friends with
24  Mr. Adondakis and you worked together and you also had a
25  personal relationship, correct?

1  A. Mr. Weingarten, let me just say --
2      THE COURT: Just answer the question.
3  A. Can you repeat the question?
4  Q. The point is, you are not sure whether or not Sam complied
5   with your request?
6  A. No. I am sure about that. I believe that was the case.
7   You asked me if Level Global was paying them. I don't know. I
8   have no insight as to whether Level Global --
9  Q. Does JNK give out the information willy nilly?
10  A. There is -- in the exhibit you pointed out, Sam explains
11   how he's getting the information from JNK and apparently
12   Chiasson had a good relationship with somebody there. I don't
13   know.
14  Q. But you didn't pick up the phone to JNK and say, I want to
15   have your data points, correct?
16  A. I did not.
17  Q. You asked Sam Adondakis to get them for you, correct?
18  A. Yes.
19  Q. Now, the question that followed, you had a personal and
20   professional relationship with Mr. Adondakis, correct?
21  A. Yes.
22  Q. And you also were personal friends with Fayad Abbasi,
23   correct?
24  A. Yes.
25  Q. You were also personal friends with Mr. Horvath, correct?

1  A. Yes.
2  Q. And you guys, I think you testified, on direct socialized?
3  A. That's correct.
4  Q. You went out to eat, correct?
5  A. Yes.
6  Q. You went out to clubs, correct?
7  A. At times.
8  Q. And did you all rent a house together a couple of summers
9   in the Hamptons?
10  A. Not all of us, no.
11  Q. Which ones of the group rented the house?
12  A. Sam, Fayad, and myself.
13  Q. Did Horvath visit you sometimes?
14  A. I believe he was there once, to my knowledge.
15  Q. How many summers did you rent a house together?
16  A. It was either two or three.
17  Q. So at least the three of you, Mr. Abassi, Mr. Adondakis,
18   and Jesse Tortora, rented the house together at least two
19   summers, perhaps three?
20  A. That's correct.
21  Q. Did you travel together?
22  A. Usually, we would be at the same conferences. There are
23   probably one or two times that we did a trip outside the
24   conference.
25  Q. Did you ever go to Vegas together?

1  A. For the conferences, yes. I believe there was one time, I
2   think it was Fayad's bachelor party where we went to Vegas
3   other than the conferences.
4  Q. When you would be at the conferences, did you socialize
5   together?
6  A. Yes.
7  Q. How often would you socialize if you were in the city
8   together, typically during the period when you were at
9   Diamondback?
10  A. In New York City?
11  Q. Yes.
12  A. Just Sam, Fayad and myself?
13  Q. Yes.
14  A. Fairly frequently.
15  Q. I know this is a rough estimate. Once a week, twice a
16   week, three times a week?
17  A. Once every two, three weeks. Outside of the summers, of
18   course, when we were sharing the house.
19  Q. Now, I believe it was your testimony on direct examination
20   that there came a time, I guess in the spring of 2008, where
21   you organized an e-mail exchange amongst your friends where you
22   exchanged data points?
23  A. Yes.
24  Q. And the group would have been the three gentlemen I just
25   mentioned, you, and Danny Kuo. Would that generally be it?

1  A. Can you just name, just to be clear?
2  Q. Abbasi, Adondakis, you, Horvath, and Danny Kuo.
3  A. Yes.
4  Q. So the five of you exchanged a great deal of information by
5   e-mail, correct?
6  A. Yes.
7  Q. And in a sarcastic way did you refer to the e-mail list as
8   the fight club?
9  A. No, not to my recollection.
10      THE WITNESS: The first time your Honor mentioned that
11   was the first time I had heard that.
12      THE COURT: First time who mentioned it?
13      THE WITNESS: You did, your Honor. You referred to
14   Mr. Weingarten's testimony. You mentioned that.
15      MR. WEINGARTEN: Defense Exhibit 9002.
16      THE COURT: But I'm not a witness, ladies and
17   gentlemen.
18  A. I'm sorry, Mr. Weingarten. What's --
19  Q. 9002.
20      THE COURT: It's not in the binder?
21      MR. WEINGARTEN: No.
22  Q. Mr. Tortora, are you able to identify 9002?
23  A. Yes.
24  Q. What is it?
25  A. It's an e-mail from myself to the group.

# A-782

1  Q.  Date?
2  A.  March 26, 2009.
3          MR. WEINGARTEN: Move it in.
4          MS. APPS: No objection.
5          THE COURT: Defense 9002 is received.
6          (Defendant's Exhibit 9002 received in evidence)
7          MR. WEINGARTEN: Publish.
8  Q.  Why don't we start with the e-mail at 11:06 a.m., and,
9     again, it's from you to the group, correct?
10 A.  Yes.
11 Q.  And what do you say?
12 A.  We are adding Jeff to e-mail list.  He caved.  Danny, Jeff
13    is our close friend who worked at Pru with me, Fayad and Sam.
14    Jeff, rule number one about e-mail list, these is no e-mail
15    list, fight club reference.  Rule number two, only data points
16    can be sent, no sarcastic comments.  Enjoy.  Your performance
17    will now go up by 100 percent in '09 and your boss will love
18    you.  Game theory, look it up.
19         Fair to say I did not recall.
20 Q.  Did you ever see the movie?
21 A.  I did, yeah, I did.
22 Q.  There is a famous line in it, correct?
23 A.  Yes.
24 Q.  What's the famous line?
25 A.  There is no -- I guess there is no fight club.

1  Q.  You are saying to the group, learn from that, there is no
2     e-mail list, correct?
3  A.  I was joking, but that's what I was referencing.  And yeah,
4     just leave it at that.
5  Q.  Let's talk about Mr. Constantino because I guess he's on
6     this e-mail, correct?
7  A.  Yes.
8  Q.  And I believe the prosecutor asked you questions about
9     Mr. Constantino.
10         Do you remember that?
11 A.  Yes.
12 Q.  I think you said he's -- is he a consultant or is he at a
13    hedge fund?
14 A.  He's at UBS.
15         THE COURT: Is that where he was in 2009?
16         THE WITNESS: That's where he was in 2009, yes.  I am
17    not sure if it was a hedge fund or mutual fund part of it.
18 Q.  There was a time when he was on that e-mail list, correct?
19 A.  Yes, very short time.
20 Q.  And you advised or you responded in questions from the
21    prosecutor that Mr. Constantino would have no knowledge
22    whatsoever of any wrongdoing, no knowledge whatsoever of any
23    impropriety involving the members of this group, correct?
24 A.  I think that's a lot of words that I did not say, to my
25    recollection.

1  Q.  The import?
2  A.  I'm sorry?
3  Q.  When you were cooperating with the government and they
4     asked you for wrongdoers, did you ever mention
5     Mr. Constantino's name?
6  A.  I mentioned Mr. Constantino and I explained what role he
7     had.
8  Q.  It's your view that whatever information Mr. Constantino
9     received, he didn't receive enough to cause you to conclude he
10    was engaged in any wrongdoing, correct?
11 A.  That's not my job to conclude.
12 Q.  Did he?
13 A.  Did he what?
14 Q.  Did he receive any inside information?
15 A.  Are you asking if I gave -- if I believe if I gave Jeff
16    Constantino inside information?
17 Q.  Yes.
18 A.  As I stated, I believe I did not give Jeff Constantino the
19    source or the level of detail that I gave others.
20 Q.  And he's a friend of yours, correct?
21 A.  He's a friend, yes.
22 Q.  You socialize with him, correct?
23 A.  Yes, at times.
24 Q.  You play hoops with him, correct?
25 A.  Yes.

1  Q.  And your report to the government, when asked, is, in your
2     view, Constantino did not receive any information that would
3     have caused you to believe that he was engaged in wrongdoing,
4     fair?
5  A.  Ask that one more time.
6  Q.  Did you tell the government that in your view Constantino
7     did not receive information that would make him an inside
8     trader?
9  A.  Again, I don't recall that language.  I don't recall what I
10    told him, but I recall what I just -- I could say what I just
11    said.
12 Q.  In your view, did he not receive enough information to put
13    him into jeopardy, legal jeopardy?
14 A.  Mr. Weingarten, I don't -- in my view, I did not provide --
15    personally.  I don't know what he received from anyone else --
16    I personally didn't provide him with the same level of detail
17    and the sources as I did the others.
18         MR. WEINGARTEN: Defense Exhibit 5476, please.
19 Q.  Can you identify this, sir?
20 A.  An e-mail from myself to Todd of -- then I forwarded to the
21    group, on March 26, 2009.
22         MR. WEINGARTEN: Move it in.
23         MS. APPS: No objection.
24         THE COURT: Defense 5476 is received.
25         (Defendant's Exhibit 5476 received in evidence)

1    MR. WEINGARTEN: Publish.
2 Q. Just to get us together, this is a check relating to Intel,
3    correct?
4 A. Yes.
5 Q. And on 2:38 you provide this check to Mr. Newman, correct?
6 A. Yes.
7 Q. Then one minute later you send it out to your crew,
8    correct?
9 A. To the group, yes.
10 Q. To the group, sorry. Correct?
11 A. Yes.
12 Q. And on this instance, in this instance, Mr. Constantino is
13    on e-mail, right?
14 A. He is.
15 Q. Let's see what is contained in the check. Consultant Intel
16    checks, seeing strengthening in March. Thinks -- why don't you
17    read it?
18 A. Seeing strengthening in March. Thinks inventory
19    restocking, definitely beat this quarter. Guess is 5 plus
20    percent. Not as optimistic for Q2 as being cautious and
21    calling it push out from Q4 to Q1, hopefully for recovery in
22    back half. Q2 looking flat to slightly up. Best guess now is
23    flat guide off higher Q1 base versus street flat off lower
24    base, so still beat and raise.
25 Q. Who is the consultant in this instance, sir?

1 A. I don't recall.
2 Q. You don't remember sitting here?
3 A. Correct.
4 Q. Let's take a look at 6108.
5    Are you able to identify that, sir?
6 A. Yes.
7 Q. What is that?
8 A. E-mail from myself to Todd, January 20 and March 3 and
9    March 27 of '09, at which point I started exchanging e-mails
10    with the group on March 27 of '09, and Fayad Abbasi responds.
11    MR. WEINGARTEN: Move it in.
12    MS. APPS: No objection.
13    THE COURT: Defense Exhibit 6108 is received.
14    (Defendant's Exhibit 6108 received in evidence)
15    MR. WEINGARTEN: Your Honor, publish, please.
16 Q. The top e-mail from Abbasi, it's sent to the group,
17    including Mr. Constantino, correct?
18 A. Yes.
19 Q. Let's go down to your report on March 27, 2009, at 1:10
20    p.m. where it goes: ARW systems check.
21    Do you see that?
22 A. Yes.
23 Q. Would you kindly read the first paragraph, please?
24 A. All those bullet points, you mean?
25 Q. Yes.

1 A. Last checked three weeks ago and things were in line, now a
2    big downtick. Q not firming up at all. Not going to meet
3    plan. All brands across board trafficking to 15 percent miss.
4    Storage and software weak, missing by 10 percent, downtick from
5    prior when that was strong point. X86 biggest miss at 30 to 40
6    percent.
7 Q. Thank you. That's fine.
8    Let's take a look at 9370. Are you able to identify
9    that one?
10 A. Yes.
11 Q. What is it?
12 A. It's an e-mail from Danny to his boss which he forwards to
13    the group on March 26, 2009.
14    MR. WEINGARTEN: Move it in.
15    THE COURT: Any objection?
16    MS. APPS: No objection.
17    THE COURT: Defense Exhibit 9370 is received.
18    (Defendant's Exhibit 9370 received in evidence)
19    MR. WEINGARTEN: Publish, please.
20 Q. Mr. Tortora, this is from Danny Kuo to his boss, Victor
21    Dosti, correct?
22 A. Yes.
23 Q. And it says: IDTI checks.
24    What company is that?
25 A. That's a semiconductor company, Integrated Device

1    Technology.
2 Q. That was one of the companies that Danny Kuo covered?
3 A. I am not sure.
4 Q. And this e-mail goes to Mr. Constantino, does it not?
5 A. It does.
6 Q. Would you read the first paragraph, please?
7 A. March quarter revenues tracking 112 to 114 million, a miss
8    versus consensus of 120 million. March quarter EPS zero to
9    negative two cents. Consensus at two cents.
10 Q. Please continue.
11 A. Revenue miss in computing this quarter. 60 percent of
12    sales through distribution and of that two-thirds is on a
13    sell-in basis. Distributors are still burning through excess
14    inventories of timing clocks, but fairly confident that they
15    will start shipping to end demand next quarter. June quarter
16    computing revenues up 5 to 8 percent quarter on quarter off of
17    the 44 to 45 million number in the March quarter.
18 Q. Thank you.
19    Mr. Tortora, I want to ask you just a couple of
20    questions about Mr. Goyal. Okay?
21 A. Sure.
22 Q. So just so I'm clear on this, you also knew him from San
23    Francisco?
24 A. From Prudential, yes.
25 Q. And he actually worked for you?

1  A.  That's correct.
2  Q.  And his name would appear on some of the reports that you
3    authored that went out to the customers of Prudential who
4    bought your research, correct?
5  A.  Yes.
6  Q.  Did you develop a personal relationship with him?
7  A.  I developed a respect for him.  I would say that it was a
8    business relationship.
9  Q.  What year did you first meet him?
10  A.  I guess it would have been 2006.
11  Q.  So you knew him for a number of years by the time -- I
12    guess a couple of years by the time you started working with
13    him at Dell -- excuse me -- at Diamondback?
14  A.  One year.
15  Q.  So you came to know him at Prudential when?
16  A.  July, August '06.
17  Q.  That's fine.
18      So he started reporting to you information about Dell,
19    correct?
20  A.  From his friends -- are you talking at Prudential, Mr.
21    Weingarten?
22  Q.  Yes.
23  A.  Yes, he spoke to his friends at Dell, yes.
24  Q.  He had friends at Dell because he used to work there?
25  A.  Yes.

1  Q.  How old a guy is Mr. Goyal?
2  A.  I don't know his age.
3  Q.  How long did he work for Dell, years?
4  A.  I don't recall.  I don't recall.
5  Q.  Is it one, is it ten, is it five?
6  A.  Again, I don't think it's one and I don't think it's ten.
7    I don't know.  It may be ten.
8  Q.  Did I hear you correctly that he had as many as a half a
9    dozen sources at Dell that was giving him information that he
10    was sharing with you?
11  A.  I am not sure if it was half a dozen, but there were at
12    least a few.
13  Q.  And it's fair to say that you didn't know the identity of
14    any of them?
15      MS. APPS:  Time frame.
16      MR. WEINGARTEN:  At any point?
17      THE COURT:  This is while he was at Prudential or at
18    any point?
19      MR. WEINGARTEN:  Prudential or Diamondback.
20  A.  By identity you mean names?
21  Q.  Yes.
22  A.  I don't believe I knew any of their names as I sit here
23    today.
24  Q.  You never met any?
25  A.  No.

1  Q.  You never sat down with them.  This is all through
2    Mr. Goyal, correct?
3  A.  Correct.
4  Q.  Did you ever ask for their names?
5  A.  No.
6  Q.  Were any of the sources of information from Mr. Goyal from
7    investor relations?
8  A.  What do you mean by any of the sources?  Are you asking did
9    he speak to anyone in investor relations?
10  Q.  And shared it with you, any of the sources that we are
11    referring to now.
12      MS. APPS:  Objection to form.
13      THE COURT:  As to the definition of sources, is that
14    what you mean?
15      MS. APPS:  Yes.
16      THE COURT:  Your understanding of sources is sources
17    of inside information or any information?
18      THE WITNESS:  Your Honor, I'm sorry.  I was a bit
19    confused by the entire questioning.
20  Q.  I'll start again.
21      I believe on direct examination you said that
22    Mr. Goyal provided you insights about Dell with the help of a
23    number of sources he had inside the company, correct?
24  A.  Yes.  And, again, specific when I was at Prudential?
25  Q.  I'm talking about Diamondback right now.

1  A.  You're talking about Diamondback now.  I'm sorry.
2  Q.  Were there different sources that Mr. Goyal had that he was
3    reporting to you at Prudential and then at Diamondback?
4  A.  Yes.
5  Q.  Let's take it in the entirety.  Both jobs.  Understood?
6  A.  Okay.
7  Q.  Any of those sources where he was providing you
8    information, you, the analyst from Dell from IR?
9  A.  He did speak to people at IR as well as friends that he had
10    at the company.
11  Q.  Did you know the names of the people at IR?
12  A.  I knew at least one which I had mentioned prior, Shep
13    Dunlap.
14  Q.  Now, you indicated that the art of dealing with IR
15    sometimes involves the interpretation of body language and
16    things of that nature.
17      Do you recall that testimony?
18  A.  Yes, I do.
19  Q.  I just want to make sure I understand that.  First of all,
20    what do you mean by that?  Why don't you start.
21  A.  So if you are speaking to someone and you try to gauge
22    their mood, are they happy, are they sad, are they excited, are
23    they optimistic, are they pessimistic.  If you ask them a
24    question, do they get defensive.  Are they telling the truth.
25  Q.  You read into those gestures or those mood swings whether

# A-785

1  or not the company is doing well?

2  A.  You do your best to try to interpret the tone and the body

3  language and the commentary, yes.

4  Q.  And it's an important part of your job when you are dealing

5  with IR, correct?

6  A.  It's an important part of my job when I'm dealing with IR,

7  yes.

8  Q.  It's very subjective because beauty is in the eye of the

9  beholder.  One analyst can see one thing and another analyst

10  can see another, correct?

11  A.  Yes.

12  Q.  And expertise and experience matter, correct, in assessing

13  what IR is saying to you, correct?

14  A.  Yes.

15  Q.  And sometimes IR wants to send subtle messages to the

16  analyst community, correct?

17  A.  I don't know.  Who specifically are you referring to?

18  Q.  Just as a general matter.  If you can't answer it, that's

19  fine.

20         Now, you have said that you came to believe that

21  Mr. Goyal had one special source at Dell that was giving you

22  inside information, correct?

23  A.  Yes.

24  Q.  Did you believe that that person was from IR?

25  A.  No.

1  Q.  Now, did there come a time when Mr. Goyal asked you not to

2  share the information he was providing to you with anyone else?

3  A.  Yes.

4  Q.  And did you agree to do that?

5  A.  I believe I said okay.

6  Q.  And you misled him, correct?

7  A.  You could say that, yes.

8  Q.  Because you in fact provided the information to your

9  friends?

10  A.  I continued -- I had been providing it.  At some point he

11  asked me not to share it with Sam specifically, and I continued

12  to provide it to the rest of my friends and Sam, yes.

13  Q.  Did you tell him that you would not provide it to

14  Mr. Adondakis?

15  A.  I believe I said -- the best of my recollection, he made a

16  comment, don't share this with Sam, and I said okay.

17  Q.  Now, in response to a question from the prosecutor, I

18  believe, a couple of days ago, you said you were curious as to

19  why the Dell source was providing this detailed information to

20  Mr. Goyal, correct?

21  A.  Yes.

22  Q.  And you asked Sandy Goyal that very question, correct?

23  A.  Yes.

24  Q.  And did I understand your answer to be because he liked to

25  talk stocks and wanted to hear stock tips from Sandy Goyal?

1  Was that the gist of it?

2  A.  That was the gist of it, yes.

3  Q.  So the information Sandy Goyal was providing you is that

4  this Dell source was providing this inside information in

5  return for chitchatting about stock, is that correct?

6  A.  That was the message I got from Sandy.

7         MR. WEINGARTEN:  If we could put up Government Exhibit

8  202.  I believe it's admitted, your Honor.

9         THE COURT:  What exhibit?

10         MR. WEINGARTEN:  202, Government Exhibit.

11         MS. APPS:  I think it was admitted, your Honor.

12         THE COURT:  Go ahead.  You can put it up.

13  Q.  Do you remember this exhibit?

14  A.  Yes.

15  Q.  Just refresh us.  What are we talking about here?

16  A.  Looks like Sandy forwards me his résumé or attaches his

17  résumé, and I tell Todd that Sandy is looking for a job.

18  Q.  So we are talking now the summer of 2008, correct?

19  A.  Yes.

20  Q.  And Sandy Goyal had been providing you with information

21  about Dell for a significant period of time, correct?

22  A.  Yes.

23  Q.  And I believe in response to questions from either Mr.

24  Fishbein or Ms. Apps you described him in an evaluation as a

25  technical wizard, or words to that effect, correct?

1  A.  Yes, at Prudential review, yes.

2  Q.  You thought highly of him, correct?

3  A.  I did.

4  Q.  On top of that he had all this inside information at Dell,

5  correct?

6  A.  Yes.

7  Q.  Did you ask your friend, Mr. Adondakis, to try to get him

8  hired at Level Global?

9  A.  I don't recall.

10  Q.  You don't recall doing it?

11  A.  I don't recall either way.

12  Q.  Did he get a job at Level Global?

13  A.  No.

14  Q.  Did he interview at Level Global?

15  A.  I'm not aware.

16  Q.  Now, there is some testimony that Sandy Goyal was

17  compensated for his information through his wife Ruchi Goyal,

18  right?

19  A.  Yes.

20  Q.  Did you tell Sam Adondakis that information?

21  A.  I did not.

22  Q.  You did not share that with him?

23  A.  I did not.

24  Q.  One or two more questions about Dell.

25         MR. WEINGARTEN:  Government Exhibit 237, if I may.

UNITED STATES OF AMERICA, v
TODD NEWMAN

November 20, 2012

1   It's in, your Honor.
2       THE COURT: 237?
3       MR. WEINGARTEN: Yes.
4   Q.  Do you remember this exhibit, sir?
5   A.  Yes.
6   Q.  So this is a day or two before Dell reports earnings,
7   correct?
8   A.  Yes.
9   Q.  In the second quarter of '08, right?
10  A.  Yes.
11  Q.  And this is an e-mail from you to Mr. Newman, correct?
12  A.  Yes.
13  Q.  And I believe it was your testimony that you were reporting
14   that Level met with Vista contact, right?
15  A.  Correct.
16  Q.  When you say level, you mean your friend Sam, right?
17  A.  Yes.
18  Q.  Vista, I believe your testimony is, is one of those expert
19   network operations?
20  A.  Yes.
21  Q.  Did you know who Sam's contact was at Vista?
22  A.  No, not to my recollection.
23  Q.  Would you read the first line?
24  A.  Guy left Dell one month ago, did HDD procurement there.
25  Q.  Just so we are together on this, this is someone who you

1   are learning from Sam used to work at Dell, right?
2   A.  It says, yes, exactly that, used to work at Dell.
3   Q.  If this e-mail is to be believed, he is no longer there,
4   right?
5   A.  That's correct.
6   Q.  Please keep reading.
7   A.  Been good last couple quarters on drives, but also on Dell,
8   parenthesis, positive last quarter confirming other checks.
9   Continue?
10  Q.  Yes, please.
11  A.  Even though left, still talks to people there.  Message he
12   got was that barely made rev targets by selling low margin
13   business end of quarter.
14  Q.  One more line.
15  A.  Missed all of internal margin targets.
16  Q.  So in this e-mail, a day or two before reported earnings,
17   this guy who used to work at Dell is providing information
18   about margin targets, correct?
19  A.  Yes.
20  Q.  And he is reporting that Dell is going to miss all of its
21   internal margin labels or margin targets, correct?
22  A.  Yes.
23  Q.  And this is, of course -- this is right before the report,
24   right?
25  A.  Yes.

1   Q.  Thank you.
2       MR. WEINGARTEN: If we could put up Government Exhibit
3   274.  I don't think this one is in.
4       THE COURT: Don't put it up then.  You don't think it
5   is?
6       MR. WEINGARTEN: I don't think.
7       THE COURT: Can you tell if it is in?
8       MS. APPS: I don't think it is.
9       THE COURT: If you plan on offering it, then lay a
10   foundation.
11  Q.  Do you see it, sir?
12  A.  Yes.
13  Q.  Can you identify it?
14  A.  An e-mail from myself to Todd which I forwarded to the
15   group, February 4, '09.
16       MR. WEINGARTEN: Move it in.
17       MS. APPS: No objection.
18       THE COURT: Government Exhibit 274 is received.
19       (Government's Exhibit 274 received in evidence)
20  Q.  Start at the very top.  This is February 4, 2009, at 10:22
21   a.m.
22       You're sending this check out to your friends, right?
23  A.  Yes.
24  Q.  One minute before you're sharing it with your boss, right?
25  A.  Yes.

1   Q.  And it's a call with a new Dell contact?
2   A.  Yes.
3   Q.  Do you remember who the contact was?
4   A.  No, I do not.
5   Q.  It's fair to say that you had many, many Dell contacts,
6   correct?
7   A.  How do you define many, many?
8   Q.  How many did you have?
9   A.  How many people did I speak to at Dell?
10  Q.  How many people -- do we know if this is a person that you
11   spoke to at Dell or this was a person speaking to you about
12   Dell?
13  A.  I don't recall who this is.
14  Q.  Read the first paragraph, if you would.
15  A.  Call with new Dell contact.  Will be good, has read into
16   overall units.  January Q held up relatively okay for consumer,
17   parenthesis, made 95 percent of plan, but was a disaster for
18   commercial, parenthesis, 80 percent to plan.
19  Q.  To save time, could you just read quickly to yourself and
20   then summarize what you are saying here?
21  A.  You want me to read the entire e-mail?
22  Q.  Yes.
23  A.  Okay.
24  Q.  Let me help a little.  Is it fair to say it's not a good
25   report?

1 A. I know you want to save time, but I don't recall this.
2 Q. Okay.
3 A. Yes, that's fair.
4 Q. And just specifically, right in the middle, ASP has been
5   stable this Q in commercial and consumer. And ASP is average
6   sales price?
7 A. Average selling price.
8 Q. That's a reasonably important metric?
9 A. Yes.
10 Q. Not giving deals, no elasticity. And what does the next
11   sentence say?
12 A. April quarter not looking good.
13 Q. Fair enough. And then the last line or the first line of
14   the second to last paragraph: My read is that this is a
15   disaster on the top line.
16      That's earnings or revenues?
17 A. Yes.
18 Q. The bottom, very negative for Dell, correct?
19 A. Yes.
20 Q. So it's fair to say that this was a significantly negative
21   report about Dell with facts and figures to support it, right?
22 A. I don't know if they were facts. They were figures.
23 Q. There came a time, as you've testified, where you ceased to
24   work for Diamondback, correct?
25 A. Yes.

1 Q. And you sought employment in the hedge fund industry?
2 A. In the financial industry, not just hedge funds.
3 Q. And on that occasion did you go to your friend Sam for
4   help?
5 A. I don't recall specifically Sam, but I reached out to my
6   friends, so it wouldn't surprise me.
7 Q. Did you ask your friend Sam to get Anthony Chiasson to
8   provide you with a recommendation?
9 A. I don't recall.
10 Q. Isn't it true that you did and in fact Mr. Chiasson refused
11   to do so?
12 A. I have no recollection of that.
13 Q. No recollection of that?
14 A. None.
15      MR. WEINGARTEN: Thank you, your Honor. I have
16   nothing further.
17      THE COURT: Redirect examination.
18      MS. APPS: Yes, your Honor.
19 REDIRECT EXAMINATION
20 BY MS. APPS:
21 Q. Mr. Tortora, I want to start with some questions that Mr.
22   Fishbein asked you and some documents that he showed you about
23   trading from August of 2008 and July of 2008.
24      Now, Mr. Fishbein started by showing you a chart from
25   July of 2008.

1      MS. APPS: If we could put that on the screen.
2 Q. Do you recall being asked questions about this chart in
3   July of 2008? I don't know if you can see that there.
4      MS. APPS: One second, your Honor. I am going to
5   switch the charts.
6 Q. Do you recall being asked questions about this chart that
7   shows trades in July of 2008? Do you see that?
8 A. Yes.
9 Q. What trades does that show on that chart?
10 A. This shows that on July 24, Todd had executed a series of
11   buy to covers, which means he closed out his short position
12   throughout the day. Then it also shows a short sale on
13   8/5/2008.
14 Q. Mr. Fishbein asked you about this trading in connection
15   with another exhibit, Government Exhibit 206.
16      Do you see, Mr. Tortora, Government Exhibit 206 on the
17   screen there?
18 A. Yes, I do.
19 Q. And whose information is contained in this e-mail?
20 A. This is information from Sandy Goyal.
21 Q. And Mr. Fishbein asked you about the information that was
22   contained in this e-mail. Do you recall those questions?
23      And in this e-mail you write: GM could be an issue.
24   Will know more in two weeks.
25      Do you see that?

1 A. Yes.
2 Q. What did you mean by that?
3 A. I meant we had been hearing that gross margin could miss,
4   but we won't know for sure until we get the roll-up, which was
5   approximately two weeks. That's when we would get another
6   update from Sandy's contact.
7 Q. No more than two weeks refers to an update from Mr. Goyal's
8   contact, is that correct?
9 A. Yes.
10 Q. And Mr. Fishbein then -- first of all, look at the date
11   there, July 24 at 3:24 p.m.
12      Do you see that?
13 A. Yes.
14 Q. And Mr. Fishbein then directed you to the chart that I just
15   showed you.
16      MS. APPS: If you could put that up again,
17   Mr. Hoffman.
18 Q. He asked you if there were any trades after 3:24 p.m. on
19   July 24.
20      Are there any trades?
21 A. Yes.
22 Q. After 3:24?
23 A. On July 24 specifically?
24 Q. Exactly.
25 A. No, there is not.

1  Q. The next chart that Mr. Fishbein showed you was a chart for
2   trading between August 8, 2008 and August 14, 2008.
3          Do you recall being asked about that chart,
4   Mr. Tortora?
5  A. Yes.
6  Q. Now, the last trade on the chart before was August 5.
7          MS. APPS: You can put both of those charts together.
8  Q. After the July 24 trade, the next trade is on August 5.
9          Do you see that?
10 A. Yes.
11 Q. Mr. Fishbein didn't ask you about that trade.
12         Do you recall that, Mr. Tortora?
13 A. Yes.
14 Q. And the next trade on the chart that starts below is August
15  8.
16         Do you see that?
17 A. Yes.
18 Q. Do you recall that Mr. Fishbein did not show you the trades
19  between August 5 and August 8 on your cross-examination?
20 A. I don't recall seeing a chart for those dates.
21 Q. What's the share balance, the ending share balance on the
22  top chart there?
23 A. It's a short position of negative -- of 20,000 shares.
24 Q. What is the first share balance on the second chart on the
25  screen?

1  A. Short position of 330,000 shares.
2  Q. Now, Mr. Tortora, could you take a look at Government
3   Exhibit 214. I think we are going to put it on the screen.
4          Mr. Tortora, if you could look at the second and third
5   bullet points: Rev could be slightly above 16 billion and
6   below that it talks about GM looking at 17.5 percent.
7          Do you see that?
8  A. Yes.
9  Q. Where did that information come from?
10 A. Sandy Goyal.
11 Q. And just to be clear, what is the date of this e-mail?
12 A. August 5, 2008.
13 Q. And do you recall that there was an instant message the
14  same day?
15         MS. APPS: Mr. Hoffman, if you could put up Government
16  Exhibit 215.
17 Q. There is a line on this instant message from Mr. Newman
18  that says: The Dell from Sandy.
19         Do you see that?
20 A. Yes.
21 Q. What time and what date did Mr. Newman write the Dell from
22  Sandy?
23 A. August 5, 2008, 8:40 a.m.
24         (Continued on next page)
25

1  Q. And when was that in relation to the e-mail we just saw in
2   Government Exhibit 214?
3  A. It's on the same day one minute later.
4  Q. And if you look back at Government Exhibit 215, the instant
5   message, first of all, what does the "Dell from Sandy" mean?
6  Q. What did you understand that to mean when Mr. Newman wrote it?
7  A. The e-mail that I sent him, the exhibit we were just
8   referencing is that e-mail from Sandy, that information.
9  Q. You say, "Y on with him now," what does that mean?
10 A. Yes I'm on the phone with him now.
11 Q. And what is Mr. Newman's response?
12 A. "Cool thank you."
13 Q. When you got the information that's in Government Exhibit
14  214, the revenue and the gross margin information from
15  Mr. Goyal, was it public or non-public?
16 A. Non-public.
17 Q. Did you understand when you got that information that it
18  was wrong to trade on it?
19 A. Yes. Absolutely.
20 Q. I'm going to go back to the trading, Mr. Tortora. I'd like
21  you to look at the trades between August 5 and August 8 that
22  Mr. Fishbein did not show you. Those are on the screen. Do
23  you see that?
24 A. Yes.
25 Q. And let's talk about what Mr. Newman did on August 5th.

1   Can you describe the trades that he made on August 5th?
2  A. Starting at 9:39 a.m., concluding at 3:29 p.m., he executes
3   a series of short sales on Dell totaling 180,000 share balance.
4  Q. Now, the first trade is 9:39 a.m. Do you see that?
5  A. Yes.
6  Q. When does the market open?
7  A. 9:30 a.m.
8  Q. And, Mr. Tortora, what was the time on the exhibit GX 214
9   that we just looked at? Do you happen to have that there?
10 A. I don't have it in front of me, so just to get the exact
11  time. 8:39 a.m.
12 Q. So 9:39 a.m., approximately an hour later but nine minutes
13  after the market opened, is that right?
14 A. That's correct.
15 Q. And what was the total number of shares that Mr. Newman
16  shorted on August 5, 2008?
17 A. 180,000.
18 Q. And what did he do between August 5, 2008 and August 8,
19  2008 that's on the chart on the screen that Mr. Fishbein did
20  not show you?
21 A. He continues to short more.
22 Q. Mr. Tortora, I want to ask you about another series of
23  records that Mr. Fishbein showed you. Let's start with
24  Government Exhibit 223. Do you recall being asked about this
25  series of e-mails?

# A-789

1  A.  Yes.

2  Q.  And when asked about this, Mr. Fishbein asked that it would

3  appear from this exhibit that you had asked Mr. Goyal for

4  lunch.  Do you recall being asked that question?

5  A.  Yes.

6  Q.  And further in the questioning Mr. Fishbein asked you,

7  excuse me, Mr. Fishbein stated that you had asked Mr. Goyal

8  rather than him asking you.  Do you recall Mr. Fishbein asking

9  you about that?

10  A.  Yes.

11  Q.  And I believe you responded something to the effect of

12  Mr. Goyal may in fact have called you earlier that day, you

13  weren't sure.

14  A.  Yes.

15  Q.  Do you recall that testimony?

16  A.  Yes.

17  Q.  Now, earlier in the cross-examination before Mr. Fishbein

18  asked you about this exhibit he had shown you some telephone

19  records.  Do you recall that?

20  A.  Yes.

21  Q.  Was it the first time you saw these telephone records since

22  being approached by the FBI, was that on the witness stand a

23  few days ago?

24  A.  Yes.

25  Q.  Now, Mr. Fishbein didn't show you -- withdrawn.  Just to be

1  clear, the phone records you looked at, those were your cell

2  phone records?

3  A.  Yes.

4  Q.  On the witness stand I'm talking about.

5  A.  Yes.

6  Q.  Now, when Mr. Fishbein showed you Government Exhibit 223

7  and you told him that Mr. Goyal may have called you earlier

8  that day, do you recall whether Mr. Fishbein showed you any of

9  your cell phone records during that part of the testimony?

10      MR. FISHBEIN:  Objection, your Honor.  This is getting

11  argumentative.  She can show him records she wants.

12      THE COURT:  I'll allow it.  Do you have a

13  recollection?

14      THE WITNESS:  I do not remember seeing those phone

15  records, your Honor.

16  Q.  I'm going to show you an excerpt from the phone records.

17  There's a stipulation between the parties as to these phone

18  records coming into evidence and I'm just showing an excerpt

19  and just for clarification of the record, I've marked it as

20  Government Exhibit 2606A.  If I may approach the witness, your

21  Honor.

22      THE COURT:  You may.

23  Q.  This is in evidence.  Now, Mr. Tortora, I want to direct

24  your attention to line 1131 on August 15, 2008.  Do you see

25  that?

1  A.  Yes.

2  Q.  Do you see that's a telephone, it lists a telephone number

3  of 212-476-9000 and it's calling a number 415-596-4020.  Do you

4  see that?

5  A.  Yes.

6      MS. APPS:  Just for the record, your Honor, the

7  parties have stipulated that the first number, 212-476-9000 is

8  the main number for Neuberger Berman.

9  Q.  Mr. Tortora, where did Mr. Goyal work?

10  A.  At Neuberger Berman.

11  Q.  And the other number on this phone record, 212 -- excuse

12  me, withdrawn.  The other number on this entry in the phone

13  records, 415-596-4020, whose telephone number is that?

14  A.  That's my cell phone number.

15  Q.  Did Mr. Goyal have your cell phone number?

16  A.  Yes.

17  Q.  So does this record here refresh your recollection about

18  whether Mr. Goyal in fact called you at 8:49 a.m. on August 15,

19  2008?

20  A.  Ms. Apps, I remember that Sandy had asked me to have lunch

21  that day and there was something he wanted to talk to me about.

22  And as I mentioned prior, I said he may have called me.

23  Q.  Now, in cross-examination Mr. Fishbein asked you about

24  trading on August 15, 2008.

25      MS. APPS:  Mr. Hoffman, if you could put up the trades

1  for August 15, 2008.

2  Q.  And Mr. Fishbein asked you whether or not the trading that

3  day on August 15, 2008 began before or after you had lunch with

4  Mr. Goyal.  Do you recall those questions?

5  A.  Yes.

6  Q.  And just for your reference, Mr. Tortora, if you look on

7  Government Exhibit 223, if you recall, it talks about you have

8  a late lunch there.  Do you see that?

9  A.  Yes.

10  Q.  Okay, so coming back to the trading records, Mr. Tortora,

11  Mr. Fishbein asked you what trades happened after lunch.  Do

12  you see that?

13  A.  Yes.

14  Q.  Do you recall what his question was?  Now, can you identify

15  any trades on August 15 that happened after your 8:49 a.m. call

16  with Mr. Tortora?

17  A.  With Mr. --

18      MR. FISHBEIN:  Objection.

19  Q.  Excuse me, call with Mr. Goyal.

20      MR. FISHBEIN:  Objection.  I don't think that's

21  correct.

22      THE COURT:  I'll allow it.

23  A.  Ms. Apps, all of the trades on this day would have occurred

24  after that call.

25  Q.  Now, if you look, if you could come again to look at the

1   phone records that's Exhibit 2606-A. And if you look to the
2   next page, and if you see there's some items on line 1148.
3 A. Yes.
4 Q. And there's an entry at 1:54 p.m. between the number which
5   is your cell phone ending in 4020, do you see that?
6 A. Yes.
7 Q. And it's with a number 415-216-6961. Do you see that?
8 A. Yes.
9 Q. And the parties have stipulated that that number,
10   415-216-6961 is one of Sandy Goyal's phone numbers. And
11   there's another series of calls shortly after that at line 1150
12   and line 1151 between the same two numbers. Do you see that?
13 A. Yes.
14 Q. And again, what time are those calls?
15 A. 2:05 p.m.
16 Q. And how long are they?
17 A. Looks like mere seconds.
18 Q. So looking at those records, what do you think is happening
19   on that day?
20 A. I have a recollection of trying to -- if you look back at
21   the e-mail it's like we were trying to meet up somewhere on
22   Third, and Sandy and I were outside and he and I were calling
23   each other to figure out exactly what block to meet up on,
24   where each other was.
25 Q. And if you look at the line -- so after the exchange of

1   phone numbers between your cell phone number and Mr. Goyal's
2   cell phone number, do you see that the next completed call is
3   line 1153 with a call at 3:10 p.m. Do you see that?
4 A. Yes.
5 Q. And what telephone number is it that you call at that time?
6 A. Do you want me to read the number?
7 Q. Could you read the number into the record?
8 A. Sure. It's 617-817-1138.
9      MS. APPS: And the parties have stipulated, your
10   Honor, that that number, 617-817-1138 is Mr. Newman's phone
11   number.
12 Q. Now, did Mr. Fishbein show you those call records when he
13   was asking you about Government Exhibit 223?
14 A. No, he did not.
15 Q. Now, Mr. Hoffman, if you could put up the trading records
16   for August 15 again. So now that you've looked at your phone
17   records, Mr. Tortora, when did Mr. Newman start trading in Dell
18   stock in relation to the call that you had with Mr. Newman at
19   3:10 p.m.?
20 A. He began shorting more Dell three minutes after I spoke
21   with him.
22 Q. And how many short shares did he short after 3:31, excuse
23   me, after 3:13 p.m., if you can add that up?
24 A. 300,000 shares. Short.
25 Q. How big of an increase was that in his position at the

1   time?
2 A. 300 percent.
3 Q. Now I want to take a step back for a moment to -- just one
4   moment, your Honor. I want to step back to the day before.
5   We've been talking about August 15. If you could take a look
6   at Government Exhibit 222. What is the date on that e-mail?
7 A. August 14, 2008.
8      MS. APPS: Mr. Hoffman, if you could blow that up. Do
9   the top three e-mails.
10 Q. And do you see that, Mr. Tortora, at 3:31 p.m. you tell Mr.
11   Newman, "Trying to get Dell read tonight." Do you see that?
12 A. Yes.
13 Q. What did you mean by that?
14 A. I was going to talk to Sandy to see if he can get an update
15   from his contact.
16 Q. And what is Mr. Newman's response?
17      MR. FISHBEIN: Your Honor, I object. This was not the
18   subject of cross. We didn't discuss this e-mail at all.
19      THE COURT: Overruled. I'll allow it.
20 A. He says, "Great. This one primed if data same."
21 Q. And I want to show you, again, the parties stipulated about
22   the phone records. This is another excerpt from the phone
23   records. Showing you what's in evidence as Government Exhibit
24   2607-A. Mr. Tortora, have you ever seen this document before?
25 A. No, I have not.

1 Q. Now, I want to ask you about a number, I want to ask you
2   about an entry on -- withdrawn.
3      MS. APPS: For the record, your Honor, the parties
4   have also stipulated that these particular phone records which
5   belong to, these particular phone records which belong to
6   Mr. Goyal, I should say the number that is Mr. Goyal's is
7   415-738-2210, that's what the parties have stipulated. In
8   addition with respect to these telephone records, they're
9   actually in Greenwich mean time.
10 Q. Mr. Tortora, can you look at the entry there that's highlighted
11   there and just read what it says? From what number it says?
12 A. Yes. 813-380-4010.
13 Q. And again, the parties have stipulated that that telephone
14   number belongs to a man by the name of Rob Ray. Have you ever
15   heard that name before?
16 A. No, I have not.
17 Q. And this indicates, is it fair to say that this indicates a
18   telephone call of 49 minutes in length and change between the
19   two numbers that I've just identified on August 15 at 2:13 a.m.
20   Greenwich mean time? Do you see that?
21 A. Yes, I do.
22 Q. And that is 10:30 p.m. on eastern standard time?
23      THE COURT: Well, that's a question. Do you know what
24   Greenwich mean time is relative to eastern standard time?
25      THE WITNESS: I do not, your Honor.

1  Q. And the very next day, Mr. Tortora, you spoke to Mr.
2  Tortora at 8:49 a.m. Do you recall seeing that telephone
3  record a few moments ago?
4  A. Yes.
5  Q. And later that same day, on August 15, you had lunch with
6  Mr. Goyal, is that right?
7  A. That's right.
8  Q. And we just saw the trading records showing that Mr. Newman
9  shorted 350,000 shares of Dell stock the day that you met
10  Mr. Goyal for lunch.
11     THE COURT: Is that a question?
12  Q. Do you see that there?
13  A. Yes.
14  Q. Mr. Tortora, you were asked a number of questions on
15  cross-examination about financial models. Do you recall some
16  of those questions?
17  A. Yes.
18  Q. And you were asked about the kind of modeling you did at
19  Prudential and you talked about a bottoms up model.
20  A. Yes.
21  Q. Do you recall that testimony? What is a bottoms up model?
22  A. A bottoms up model is when you try to take all the parts of
23  a company to create the whole. One example would be looking at
24  a company like Dell, for instance, looking at all their
25  different PC lines; notebook, laptop, consumer notebook,

1  consumer laptop, commercial laptop, commercial desktop, server,
2  storage, etc. estimating all of their units for all of these
3  different, or all the unit sales for all these different
4  businesses, the average selling price for all these different
5  businesses, and taking all those parts at the lowest level of
6  granularity and trying to come up with a total revenue number.
7     The same thing would be done for gross margin. For
8  all the products you have all the different unit sales and all
9  the different selling prices and then you have to layer in all
10  the different costs, how much it costs to make, how much each
11  component costs, hard drive, microprocessor, etc., so you go
12  from the bottoms up, to take all the parts at the most granular
13  level detail to try to come up with a final answer on the
14  income statement in terms of revenue, gross margin, earnings
15  per share, etc.
16  Q. When you built that kind of model when you were at
17  Prudential, did you have to make assumptions in order to try to
18  come up with some kind of estimate for revenue?
19  A. The vast, vast, vast majority was assumptions because it's
20  such a granular level of detail, there's so many variables
21  needed.
22  Q. Could you just explain what kind of assumptions you had to
23  make or give some examples of some of those assumptions?
24  A. Sure. For instance, let's just take one of Dell's product
25  lines, consumer laptops. Let's say they sell seven models of

1  consumer laptops. You have to estimate how many of each of
2  those models they'll sell. You can do it in terms of
3  percentage, maybe they'll sell one model A that makes it
4  10 percent of those overall sales, maybe model B makes up
5  20 percent or you can do it in terms of units. You also have
6  to estimate the prices and how they're going to change. You
7  also have to estimate the cost, what type of hard drive goes in
8  there what type of microprocessor, graphic processor, what goes
9  in there. And that's just a small piece of Dell's overall
10  products, that's an example.
11  Q. You also testified that when you were at Diamondback for a
12  certain period of time you received specific numbers from Sandy
13  Goyal that he had gotten from his contact at Dell relating to
14  earnings. Do you recall that testimony?
15  A. Yes.
16  Q. Now, when you got the information from Mr. Goyal as to what
17  the revenue would be in Dell's earnings announcement before it
18  was announced to the public, did you have to make any
19  assumptions?
20  A. Zero assumptions.
21  Q. And why is that?
22  A. Because he gave us the answer.
23  Q. When you got the revenue number from Sandy Goyal did you
24  need any kind of model to figure out the revenue?
25  A. No.

1  Q. And what about gross margins? When you got the information
2  from Mr. Goyal about gross margins while you were at
3  Diamondback did you need any kind of model to assist you in
4  determining the gross margins?
5  A. No.
6  Q. Why not?
7  A. Because he gave us the answer.
8  Q. Now, if you're doing a kind of bottoms up modeling that you
9  talked about that you did at Prudential, would that kind of
10  model need to be changed based on a rollup of numbers?
11     MR. FISHBEIN: Objection to form.
12     THE COURT: Leading? Is that your -- I'll allow it.
13  You can answer the question if you can answer the question.
14  A. Yes, your Honor. The rollup, Ms. Apps, is Dell in that
15  case doing their own internal bottoms up model with actual
16  results. They're taking all their different product segments,
17  all of their different business units, all their different
18  geographies, average selling price, the units, they're rolling
19  it up internally and they're coming up with the final number.
20  So to answer your question, no, when we got those final rolled
21  up numbers, that was it. That was the answer.
22  Q. Now, Mr. Fishbein showed you some exhibits with the word
23  "model" in it that you used when some of Sandy Goyal's
24  information was passed to you. I want to show you Government
25  Exhibit 257.

# A-792

1    MS. APPS: And, Mr. Hoffman, if you could just
2  highlight the bottom part of that e-mail. On November 14, 2008
3  at 11:43 you sent an e-mail to Mr. Newman with the subject line
4  Dell and you see there it says "ran model" and then it has some
5  numbers. Do you see that?
6  A. Yes.
7  Q. What were you doing when you say ran model in that sentence
8  there?
9  A. So we take the answers that Sandy gave us for revenue and
10  for margin and simply putting it into an income statement and
11  calculating earnings per share. So revenue and margin, the
12  only additional calculations that needed to be made to get to
13  earnings per share as I mentioned on the first day is tax rate
14  and share count.
15  Q. When you talked to Mr. Newman about Mr. Goyal's
16  information, did you ever talk about modeling with him, do you
17  remember?
18  A. I don't recall ever speaking to Todd about modeling.
19  Q. When you provided Goyal's information to Mr. Newman, what
20  did you tell him?
21  A. I told him exactly what Sandy was telling me, exactly what
22  the information was and then the only commentary on modeling
23  would be, such as this. If you plug Sandy's numbers into a
24  model, looks like they could get to X, whatever the number was
25  in terms of earnings per share.

1  Q. In the conversations you had with Mr. Newman when were you
2  passing on Sandy Goyal's information, was there anything that
3  you said that could have led Mr. Newman to believe that you
4  were doing the kind of bottoms up modeling you did at
5  Prudential?
6    MR. FISHBEIN: Objection to what Mr. Newman believed.
7    THE COURT: Sustained.
8  Q. In this e-mail, Mr. Tortora, what information is coming
9  from Sandy Goyal?
10  A. The revenue of 15.15 and the operating margin which is of
11  course inclusive of gross margin of 6.1 percent, and the EPS
12  would be the simple calculation.
13  Q. And I want to show you again what's in evidence, that's an
14  excerpt from cell phone records, it's marked as 2606-B.
15    THE COURT: But the entire exhibit is in evidence?
16    MS. APPS: The entire exhibit is in evidence.
17    THE COURT: So are you offering 2606-B or you're just
18  using it to illustrate what's already in evidence as 2606?
19    MS. APPS: I'll offer it, your Honor, it's technically
20  in evidence, but it just makes it clearer with a particular
21  number, so I'll offer it.
22    THE COURT: Any objection?
23    MR. FISHBEIN: No objection.
24    THE COURT: So Government Exhibit 2606-B is received.
25  Q. Mr. Tortora, could you take a look at the line on the

1  bottom of the first page that has 3876 next to it? Do you see
2  that?
3  A. Yes.
4  Q. And again there's a call between a number 415-216-6961 and
5  the parties have stipulated that this is Mr. Goyal's number.
6  And then there is the second number there ending in 4020.
7  Whose number is that?
8  A. That's mine.
9  Q. And what is the time of this call?
10  A. 8:31 a.m.
11  Q. And again the date?
12  A. 11/14/08.
13  Q. If you turn to the next page of this phone record, the
14  entry at the top next to the number 3877. What time is that
15  and what date is that?
16  A. 8:38 a.m. on the same day, November 14, 2008.
17  Q. And the first number ending in 4020, whose telephone number
18  is that?
19  A. That's mine.
20  Q. And the next number, the parties have stipulated that the
21  next number is the number of Todd Newman, 617-817-1138. How
22  long was that call that day?
23  A. Five minutes and 57 seconds.
24  Q. If you look further down there's another number
25  highlighted, 3885 on November 14 at 9:45 a.m. And it's from

1  your cell phone number, 4020, to the telephone number
2  212-287-5382. The parties have stipulated that that is the
3  number for Sam Adonakis at Level Global. Do you see that
4  number?
5  A. Yes.
6  Q. How long was that call?
7  A. Four minutes and 47 seconds.
8  Q. Again, if you could come back to Government Exhibit 257.
9  After you send the e-mail to Mr. Newman that we looked at a few
10  moments ago at 11:43 a.m., there's another exchange, Mr. Newman
11  responds "TY." What does TY mean?
12  A. Thank you.
13  Q. And you send another e-mail from Level on Dell at the top
14  of that. Do you see that?
15  A. Yes.
16  Q. When you use the word "level" in e-mails such as this one,
17  whom are you referring to?
18  A. Sam Adonakis.
19  Q. Now, you mentioned that you started to do some modeling in
20  2010 while you were working at Diamondback?
21  A. Yes.
22  Q. What kind of modeling was that?
23  A. It was modeling using publicly available sources to try to
24  determine stock prices. I would look at historical data and
25  try to determine the impact that had in the past, that

# A-793

1 particular data had in the past on stock prices and then I
2 looked at current data and tried to predict if it would have
3 the same impact as it had in the past. Examples could be
4 factory utilization, inventory. These were, this is
5 information I would get from company financial statements.
6 Q. And why did you start doing that kind of modeling in 2010?
7 A. Well, as I mentioned post Galleon it became difficult to
8 get information. Our relationship with Todd had deteriorated.
9 I was unable to provide him information up to the level that I
10 had and I began to revert back to things I had done at
11 Prudential, my days at Prudential, research based on publicly
12 available information, bottoms up type modeling.
13 Q. And what was Mr. Newman's response to what you said to him
14 around this financial modeling around 2010?
15     MR. FISHBEIN: Objection. Could we have a particular
16 example, time, date or anything?
17     MS. APPS: We're talking about the period when he
18 started to do this in and around 2010. You sent models to Mr.
19 Newman.
20     THE COURT: Could you be a little more specific about
21 when in 2010, Mr. Tortora?
22     THE WITNESS: Your Honor, I was only there for the
23 first four months, I can't give a specific month but I remember
24 doing several analyses I conducted over those months.
25     THE COURT: All right.

1 Q. What was Mr. Newman's response when you sent him those
2 models?
3 A. His response was either nothing or showed very little
4 interest or even some negative comment response.
5 Q. Now, Mr. Fishbein also asked you a series of questions
6 about what you were supposed to do as an analyst at Diamondback
7 and he showed you your performance evaluation from 2007. Do
8 you recall those questions?
9 A. Yes, I do.
10 Q. And there was something in those performance evaluations
11 that talked about maintaining positive relationships with sell
12 side people and with industry contacts. Do you recall that?
13 A. Yes.
14 Q. And Mr. Newman suggested that because it was in the --
15     THE COURT: Mr. Fishbein.
16 Q. Sorry. Thank you, your Honor. Mr. Fishbein suggested that
17 because it was in that performance review it was somehow
18 something Diamondback wanted you to do as an analyst. Do you
19 recall those questions?
20 A. Yes, I do.
21 Q. Did Diamondback have a compliance policy?
22 A. Yes.
23 Q. I want to show you what's been marked for identification as
24 Government Exhibit 2252.
25     MS. APPS: Can we get it on the screen?

1     THE COURT: While we're doing that, I'm the one in the
2 robe, I find it a little warm in here, but Mr. Feith doesn't.
3 How do you find it? Comfortable, too warm, too hot?
4 Comfortable. Anybody find it too hot? No one.
5     MR. FISHBEIN: Your Honor?
6     THE COURT: You find it too hot?
7     MR. FISHBEIN: I have a different issue of being
8 uncomfortable. Could I have two minutes?
9     THE COURT: All right. Let's take an afternoon break.
10     MR. FISHBEIN: Thank you.
11     THE COURT: I'll leave the temperature alone but you
12 can get a cold drink or a hot drink if you like.
13     (Jury excused)
14     (Recess)
15          o0o
16     THE COURT: All right, have a seat. We'll now resume
17 with the redirect examination of Mr. Tortora by Ms. Apps.
18     BY MS. APPS:
19 Q. You have in front of you, Mr. Tortora, what's been marked
20 for identification as Government Exhibit 2252.
21 A. Yes.
22 Q. Do you see that?
23 A. Yes.
24 Q. Do you recognize what that is?
25 A. Yes.

1 Q. What is it?
2 A. Diamondback's compliance manual.
3     MS. APPS: The government offers 2252.
4     MR. FISHBEIN: Your Honor, I object with this witness.
5 I think it's his understanding that's relevant, in other words,
6 his understanding of the policy. I'm not sure the policy
7 itself at this point is relevant.
8     MS. APPS: Your Honor, this came up in respect to a
9 series of questions that Mr. Fishbein asked about what
10 Diamondback's --
11     THE COURT: The objection is overruled. I'll allow
12 it. Government Exhibit 2252 is received.
13     (Government's Exhibit 2252 received in evidence)
14 Q. Mr. Tortora, if you could turn to the page that's marked
15 G-2 at the bottom. Look at the heading C, communicating with
16 paid research consultants, and underneath that, number 1.
17 "Prior to communicating with a consultant to conduct research
18 on a particular company, employees should take reasonable steps
19 to minimize the risk that, by communicating with the advisor,"
20 meaning Diamondback, "or its employees, the consultant will be
21 breaching any confidentiality obligations owed by the
22 consultant to the company. Specifically, the advisor should,"
23 and subsection A, "confirm that the consultant is not employed
24 or recently within the past six months formerly employed by the
25 company." Do you see that?

1  A. Yes.

2  Q. Is that consistent with your recollection of the

3  Diamondback policy for talking with consultants?

4  A. Yes.

5  Q. When you worked there in 2008 and 2009?

6  A. Yes.

7  Q. Now, Mr. Tortora, if you could look back at Government

8  Exhibit 237, Mr. Weingarten actually showed you a moment ago,

9  and again, this is, it says "Level met with Vista contact," and

10  Vista is what?

11  A. Vista is an expert networking firm. Sorry.

12  Q. And it says, the first line "guy left Dell one month ago."

13  Do you see that?

14  A. Yes.

15  Q. If I take it that's within six months of that conversation --

16  withdrawn. That's within the six month rule that we just saw

17  in Diamondback's compliance policy, is that fair to say?

18  A. Yes.

19  Q. And you spoke to Mr., somebody you knew as Dan at Dell

20  through a different consulting expert networking group, do you

21  recall that testimony?

22  A. Yes.

23  Q. At the time, did you know his last name?

24  A. I don't believe I knew his last name at the time.

25  Q. Do you recall why it was that you were not made aware of

1  his last name?

2  A. It was the standard practice of these expert networking

3  firms to conceal their identity, and generally provided a last

4  initial.

5  Q. And did you understand what Mr., what Dan's last initial

6  was?

7  A. D.

8  Q. Now, Mr. Fishbein asked you a series of questions about

9  Mr. DeVore. Have you learned since you were approached by the

10  FBI that his last name was in fact Mr. DeVore?

11  A. Yes.

12  Q. While at Diamondback did you understand that he worked at

13  Dell?

14  A. Yes.

15  Q. Is that true when you spoke to him?

16  A. Yes.

17  Q. And Mr. Fishbein asked you a series of questions about how

18  long you spoke to Mr. DeVore and if you could look at what was

19  in evidence -- excuse me, Government Exhibit 175 that's on the

20  screen, and on the first page there's an e-mail on July 29,

21  2009. If you could blow that up, Mr. Hoffman. Do you see

22  there that Mr. DeVore is providing you specific numbers, 2.1

23  versus last check for 2.2 to 2.5. Do you see that?

24  A. Yes.

25  Q. What are those numbers referring to?

1  A. Those are the actual unit sales in this particular case for

2  Dell notebooks in the month of July.

3  Q. And did you understand at the time you were receiving these

4  numbers that those were numbers that were internal to Dell?

5  A. Yes, I did.

6  Q. And that they were confidential?

7  A. Yes, I did.

8  Q. Did you know one way or another how many clients PGR had?

9  A. I did not.

10  Q. Was it part of their marketing pitch that they actually had

11  relatively few clients so that their clients could get an edge?

12      MR. FISHBEIN: Objection, leading.

13      THE COURT: Yes, sustained. Let's watch that.

14  Q. Could you turn to the second page of this document, Mr.

15  Tortora. If you look at the e-mail that's dated June 17, 2009

16  at 2:33 p.m., do you see that?

17  A. Yes.

18  Q. And again, why are these e-mails so stacked on top of each

19  other?

20  A. So I can show Todd and the group how the conversations had

21  progressed with the same expert, how the information has

22  changed and we could create a living track record of how

23  accurate his information was relative to what Dell actually

24  reports.

25  Q. So coming to this June 17 e-mail, and I'm just referring

1  you to this, Mr. Tortora, because Mr. Fishbein asked a series

2  of questions about Mr. DeVore's accuracy, and you said in this

3  e-mail beneath the words "Dell checks" under the first bullet

4  point, it says, "This check has been good for very long time.

5  Every Q but for some reason last Q he was POS on demand all Q

6  and Dell results weren't good. He didn't have explanation on

7  why, so will use with caution going forward." Could you

8  explain what this means?

9  A. Yes, Ms. Apps. I had said Dan, it's my recollection he was

10  very accurate for a long period of time and at some point later

11  on he became less accurate. And this is exactly that. I'm

12  basically saying that he's been good for a really long time but

13  he was inaccurate last quarter and he couldn't explain to me

14  why, so I'm a little cautious going forward using his

15  information.

16  Q. And the date of this is June 17, 2009. Do you recall when

17  you first started speaking to Mr. DeVore?

18  A. I believe it was early 2008.

19  Q. Mr. Tortora, you were asked a series of questions by Mr.

20  Fishbein around the May 2008 quarter for Dell and showing a

21  series of sell side reports and I just want to come to some of

22  those. Do you have a binder with Defense Exhibit 8228 in it?

23      THE COURT: Defense or Government Exhibit?

24      MS. APPS: It's Defense Exhibit 8228, it's in

25  evidence. Mr. Tortora was actually asked about this particular

UNITED STATES OF AMERICA, v
TODD NEWMAN

November 20, 2012

1   document.  It's actually on the screen.
2   Q.  Now, Mr. Fishbein showed you this and asked you about the
3     margin information contained in this document.  Do you recall
4     those questions?
5   A.  Yes.
6   Q.  And I think Mr. Fishbein was pointing out that the margin
7     in this -- what is this report referring to, this sell side
8     report, what time frame?
9   A.  Ms. Apps, it's a little blurry on my screen.  Is there any
10    way to blow up maybe the top half so I can --
11  Q.  Okay.
12  A.  Yes, so it's a Citi, Citigroup e-mail report on Dell post
13    the earnings call, the date of which was up top, I saw it
14    earlier when you blew up the first half.  Oh, May 30, 2008.
15  Q.  So that's after the earnings call?
16  A.  Yes.  Yes, the day after.
17  Q.  And do you recall Mr. Fishbein pointed out that in this
18    sell side report there's some indication that margins were less
19    than the market expectations.  Do you recall that testimony?
20  A.  Yes, I do.
21  Q.  What does the report say about what the revenue did that
22    quarter?  If you look at the first line in the first paragraph
23    of that document.
24  A.  I don't think, well, there's a line about revenue there.
25    It says while 1F quarter 09 revenue beat was largely

1   expected -- I think that's their commentary on the revenue
2     beat.  So it suggests there was a revenue beat and their
3     opinion is that it was largely expected.
4   Q.  And the, what does it say about EPS?  And again what is
5     EPS?
6   A.  Earnings per share.
7   Q.  What does it say about the EPS?
8   A.  That it was 38 cents, four cents above expectations.
9   Q.  And what do you recall, or do you recall what information
10    Mr. Goyal provided that quarter in advance of that quarterly
11    earnings announcement?
12  A.  Yes.  I recall it being revenue, gross margin and/or
13    operating margin.
14        MS. APPS: If you could, Mr. Hoffman, put up
15    Government Exhibit 187.
16  Q.  And Mr. Fishbein also asked you about this document, but in
17    particular the e-mail from you to Mr. Goyal on May 16, 2008 at
18    7:53 a.m., do you see that, "Hey street at 33, I get 36 to 37."
19    Do you see that?
20  A.  Yes.
21        (Continued next page)
22
23
24
25

1   Q.  What is that referring to?
2   A.  That's the consensus estimates or sell side has Dell
3     modeled at 33 cents for the quarter while using Sandy's
4     information we are able to calculate or we expect a 36 to 37
5     cent earnings per share result.
6   Q.  I think you testified on cross-examination that you
7     recalled that Sandy Goyal's information was that margin was
8     approximately in line with the consensus estimates.
9        Do you remember that testimony?
10  A.  Yes.
11  Q.  Do you recall as you sit here today which of the other
12    variables that go into EPS that led to the beat on consensus
13    here?
14  A.  My recollection that it was mostly revenue driven.
15  Q.  Now, I want to ask you -- let's just talk for a second
16    about, there was a lot of questions.  You were shown a lot of
17    different sell side reports during your cross-examination,
18    Mr. Tortora.
19        For Dell, I think you testified there were a lot of
20    sell side analysts covering Dell.
21        Do you recall that?
22  A.  Yes.
23  Q.  They come up with different predictions.  Is that fair to
24    say?
25  A.  That's fair to say.

1   Q.  And how did those sell side reports relate to what Mr.
2     Fishbein also showed you, which was the first call or consensus
3     numbers?
4   A.  Can you ask that question again?
5   Q.  Mr. Fishbein asked you also about the Thompson Reuters
6     first call numbers?
7   A.  Yes.
8   Q.  What are they?
9   A.  The Thompson Reuters first call numbers is the aggregate or
10    average estimate of all the different sell side reports.  So if
11    there is 30 sell side analysts, then they all make an earnings
12    prediction on Dell.  The first call would be the average of
13    those 30.
14  Q.  And you were also asked a number of questions about
15    somebody by the name of Katy Huberty.
16        Who is she?
17  A.  Katy Huberty was the sell side analyst at Morgan Stanley
18    covering Dell and other stocks.
19  Q.  She was one of those analysts that went into the first call
20    numbers?
21  A.  Yes.
22  Q.  If you could look at Government Exhibit 235.
23        Again, Mr. Fishbein asked you a number of questions
24    about your dialogue with Katy Huberty.
25        Do you recall some of those questions?

1  A.  Yes.

2  Q.  I want to ask you, you say here in the third sentence down:

3  I reiterated GM concern.  She believes me but still skeptical

4  as doesn't understand how.

5        Do you see that?

6  A.  Yes.

7  Q.  When you wrote that, what did you mean?

8  A.  Basically, I told her that there is -- that there is some

9  risk or there is some concern about Dell's gross margin for the

10  quarter, and she basically took it with a grain of salt.  She

11  basically said, okay, I hear what you are saying, but I don't

12  necessarily believe you or, I'm sorry, I don't necessarily see

13  how that's going to happen, understand how, see how that's

14  going to happen.

15  Q.  I want to show you, it's in evidence as a stipulation, but

16  I want to show you some of the first call data for the quarter,

17  August of 2008.

18        MS. APPS: One moment, your Honor.  I'm just looking

19  for a document.  I am just trying to find the stipulation.

20  Thank you.

21        May I approach, your Honor?

22        THE COURT: You may.

23  Q.  If you look at stipulation signed between the parties

24  containing the first call information, did that first call

25  information say what the consensus number was for gross margin

1  in August of 2008, before Dell reported?

2  A.  18.3 percent.

3  Q.  And we looked at Government Exhibit 214 earlier,

4  Mr. Tortora.  What was the gross margin number that Mr. Goyal

5  gave you in advance of the earnings report?  And in this case

6  on August 5 of 2008.

7  A.  On August 5, it was 17.5 percent.

8  Q.  And you testified, I think, that you got additional updates

9  after August 5?

10  A.  Yes.

11  Q.  Do you recall that testimony?

12        Do you recall what direction the update went with

13  respect to gross margin?

14  A.  Lower.

15  Q.  And do you recall what happened to the stock price when

16  earnings were announced on August 28, 2008?

17  A.  It went down significantly.

18  Q.  I'm showing you what's been marked for identification as

19  Government Exhibit 93.

20        THE COURT: 93?

21        MS. APPS: Yes.

22  Q.  Do you recognize this?

23  A.  I don't recognize the format, but it appears to be a

24  Bloomberg -- the stock price of Dell off of Bloomberg.

25        MS. APPS: One moment, your Honor.  One moment, your

1  Honor.  Sorry.

2  Q.  If I could show you what's been marked for identification

3  as Defense Exhibit 1234.

4        Do you recognize that, Mr. Tortora?

5  A.  Yes.

6        MR. FISHBEIN: I just need to see a copy.

7        MS. APPS: It's an exhibit that --

8        THE COURT: Doesn't matter.  Show him the original.

9        MR. FISHBEIN: What number is it?

10        MS. APPS: 1234.

11        MR. FISHBEIN: I got it.

12  Q.  Mr. Tortora, do you recognize --

13        MS. APPS: Just one moment, your Honor.  I'm sorry.  I

14  think there is no objection, your Honor.  It's a Bloomberg

15  stock price chart for Dell.

16        MR. FISHBEIN: Just one second.

17        MS. APPS: The government offers Defendant's Exhibit

18  1234.

19        MR. FISHBEIN: No objection.

20        THE COURT: Is there a stipulation as to what it is?

21        MS. APPS: Your Honor, it's a stock price chart for

22  Dell US equities starting on January 2, 2008 through December

23  31, 2009.

24        THE COURT: So Defendant's Exhibit 1234 is received.

25        (Defendant's Exhibit 1234 received in evidence)

1  Q.  Mr. Tortora, could you look at the page that indicates the

2  prices on August 28?

3  A.  Yes.  Of '08?

4  Q.  Yes, on the day of the earnings announcement.

5  A.  Yes.

6  Q.  For the August quarter for 2008.

7  A.  Yes.

8  Q.  And do you see that there is a percentage under the column

9  price change?

10  A.  Yes.

11  Q.  On August 29 from August 28?

12  A.  Yes.

13  Q.  That's 13.8 percent.  Do you see that?

14  A.  Yes.

15  Q.  Does that refresh your recollection about the amount of the

16  price drop after the earnings announcement for Dell?

17  A.  Yes, Ms. Apps, I remember it was very significant, in the

18  neighborhood of double digit percent decline.

19  Q.  I want to show you, just as Mr. Fishbein showed you some

20  sell side reports for the May quarter, I want to show you a

21  couple of sell side reports for the August quarter.

22        Mr. Tortora, just to clarify, that was for the quarter

23  that was announced by Dell on August 28, 2008, is that fair to

24  say?

25  A.  That is correct, yes.

1  Q. Showing you what's been marked as Government Exhibit 4002,
2  do you recognize that document?
3  A. Yes.
4  Q. What is it?
5  A. It's a sell side report on Dell from Goldman Sachs.
6       MS. APPS: The government offers 4002.
7       MR. FISHBEIN: Your Honor, I object. This is beyond
8  the scope of cross. We didn't do anything about stock prices
9  in August. This whole subject, we talked about May. I don't
10 know why we are talking about August now. That is the basis of
11 my objection.
12      THE COURT: I recall there being various analyst
13 reports that were introduced. You are saying they are for a
14 different quarter?
15      MR. FISHBEIN: Right.
16      THE COURT: There was cross about what took place in
17 connection with sales in August, so overruled. I'll allow it.
18      (Government's Exhibit 4002 received in evidence)
19 Q. Can you explain what this is? Whose report is it?
20 A. It's Goldman Sachs, the analyst at Goldman Sachs, David
21 Bailey, and he is basically reporting post Dell's quarter
22 reported on August 28, 2008.
23 Q. What does it say in the heading there?
24 A. The heading says: Dell's margins and stock take a step
25 back due to growth-first focus.

1  Q. I want to show you two more exhibits. I'm showing you
2  what's been marked for identification as Government Exhibit
3  4004 and 4005.
4       Do you recognize those?
5  A. Yes.
6  Q. What are they?
7  A. Similar type of reports on Dell's quarter that Dell
8  reported on August 28, 2008, this time by Lehman Brothers and
9  Merrill Lynch.
10      MS. APPS: The government offers 4004 and 4005.
11      THE COURT: Same objection, I presume?
12      MR. FISHBEIN: And also if they are being offered for
13 the truth, I would object to that basis, too, as opposed to
14 what information --
15      THE COURT: Let's have a side bar. I want to make
16 sure I understand what they are being offered for, but I don't
17 want to do that in front of the jury.
18      (Continued on next page)
19
20
21
22
23
24
25

1       (At the side bar)
2       THE COURT: This is being offered for what purpose?
3       MS. APPS: They are not being offered for the truth,
4  your Honor.
5       THE COURT: What are they being offered for?
6       MS. APPS: The same way that Mr. Fishbein showed that
7  after the May announcement, the May 2008 announcement, there
8  was sell side reports showing that margin was in line or lower
9  than what the street had expected. In this quarter what the
10 sell side reports show was the market thought there was a big
11 surprise on the downward side to the margin. So it's the same
12 narrative -- it's the same sort of argument that Mr. Fishbein
13 was making or presenting through the May quarter, and we are
14 trying to show the contrast for the August quarter.
15      MR. FISHBEIN: We were very precise in May.
16 Mr. Tortora said that he believed that Mr. Goyal's information
17 was accurate and so the issue was his state of mind as he
18 receives information from Mr. Goyal as to whether it's accurate
19 or not. So the fact that he was put on notice that in May the
20 gross margin was off, we felt went to the issue of his state of
21 mind in May about the accuracy of the gross margin number he is
22 getting from Goyal. That's what we did it for. Now we are in
23 a different quarter. It seems to me, from Ms. Apps' questions,
24 what she is really doing is just using these analyst reports to
25 show that the stock price went down, which is for the truth.

1       MS. APPS: No.
2       THE COURT: It's being offered to show the difference,
3  the delta between the information that was provided by Goyal,
4  and the expectations of the market or that the market
5  expectations were well founded or not I guess is for others to
6  debate. But I think it's the fact of the difference and -- I
7  don't have these.
8       MS. APPS: Sorry, your Honor. These reflect -- Mr.
9  Fishbein was using it to make the point that the market had a
10 different -- trying to show that the market had a different
11 number and now we are saying that in the second quarter the
12 market came out with the number that Mr. Goyal had given them.
13      THE COURT: I think there is smallish points. I am
14 going to allow it. I'll allow the exhibits. Let's move on.
15      How much more do you have?
16      MS. APPS: About 15, 20 minutes.
17      THE COURT: You are going to do some recross?
18      MR. FISHBEIN: Yes.
19      THE COURT: How long do you think --
20      MR. FISHBEIN: Right now it would be 10, 15 minutes.
21      MR. WEINGARTEN: Three hours.
22      (Continued on next page)
23
24
25

# A-798

| CBKMNEW6 | Tortora - redirect | Page 1237 |
|---|---|---|

1    (In open court)

2    MS. APPS: The government offers 4004 and 4005.

3    THE COURT: I'll allow those. Government's 4004 and

4  4005 are received.

5    (Government's Exhibits 4004 and 4005 received in

6  evidence)

7  Q. Mr. Tortora, can you just explain what 4004 is?

8  A. 4004, it's a sell side report by Lehman Brothers on Dell

9  after Dell reported the same August quarter on August 28, 2008.

10  Q. What does it say at the top there? Margins hit a snag.

11    Do you see that?

12  A. Yes.

13  Q. What did you understand that to mean?

14  A. They missed margins.

15  Q. And then if you could look at 4005.

16    Again, what is this report?

17  A. Merrill Lynch is issuing a similar report on Dell's

18  earnings in the same time period.

19  Q. What does it say happened with respect to earnings?

20  A. Again, similar commentary on gross margins, that the title

21  is strong revenue growth offset by lower gross margins. The

22  adjusted gross margin of 17.3 percent was well below our

23  estimate of 18.4 percent.

24  Q. Mr. Tortora, do you have in front of you Defense Exhibit

25  8924? It was something Mr. Fishbein showed you towards the

| CBKMNEW6 | Tortora - redirect | Page 1238 |
|---|---|---|

1  end.

2  A. I don't believe I have Mr. Fishbein's exhibits anymore.

3  Q. One of the documents that Mr. Fishbein showed you at the

4  end and didn't really ask too many questions.

5    First of all, this e-mail comes from Mr. Horvath to

6  you --

7    THE COURT: What number is this?

8    MS. APPS: It's Defense Exhibit 8924.

9  Q. Do you see at the bottom it's an e-mail from Mr. Horvath to

10  Mr. Adondakis to you and to Mr. Kuo on November 20, 2008.

11    Do you see that?

12  A. Yes.

13  Q. And the heading is Christian CH on STX.

14    Do you see that?

15  A. Yes.

16  Q. What is Christian CH?

17  A. Christian from Craig Hallum. He was a sell side analyst

18  who worked for Craig Hallum.

19  Q. What is STX?

20  A. STX is a ticker symbol for Seagate, a large hard disk drive

21  maker.

22  Q. Do you recall what information, if anything, Mr. Hallum

23  provided on Seagate?

24  A. Yes, I do.

25  Q. What was that?

| CBKMNEW6 | Tortora - redirect | Page 1239 |
|---|---|---|

1    MR. FISHBEIN: Objection. Beyond the scope. Seagate

2  has not been mentioned.

3    THE COURT: I don't recall any mention of Seagate.

4  This is in evidence, but I don't recall any discussion of

5  Seagate. I think it is beyond the scope.

6  Q. Let me ask you then if there is a line there, BTW,

7  Christian also saying Dell will be good?

8  A. Yes.

9  Q. Revs miss margins better than expected and EPS upside.

10    Do you see that?

11  A. Yes.

12  Q. What did you understand that to mean?

13  A. That Christian is saying Dell will have a good quarter

14  because EPS will beat due to margins despite a revenue miss.

15  Q. Do you recall during your time at Diamondback whether this

16  person Christian from Craig Hammel had any -- provided you with

17  information regarding Dell?

18  A. I don't recall that. I actually -- let me say it this way.

19  It's not somebody that was used regularly, and I don't recall

20  this particular e-mail.

21  Q. And Mr. Fishbein also showed you another exhibit for

22  Christian at Craig Hallum. It's Defense Exhibit 1111.

23    Mr. Tortora, if I could direct your attention to the

24  e-mail at the bottom of the page. Do you see it talks about

25  gross margin there?

| CBKMNEW6 | Tortora - redirect | Page 1240 |
|---|---|---|

1  A. Yes.

2  Q. And this is a report from Mr. Adondakis, is that correct?

3  A. Yes.

4  Q. So you don't recall having a conversation with Christian?

5  A. That's correct.

6  Q. It says there in the second bullet point from the bottom on

7  the first paragraph: Does not get -- there is a hash tag S,

8  but thinks GM could be better than 17.7 percent.

9    Do you see that?

10  A. Yes.

11  Q. What did you understand that to mean?

12  A. That he does not get internal numbers from the company, but

13  he's of the opinion that gross margin can be better than 17.7

14  percent.

15  Q. Now, just to be clear, Mr. Tortora, you did get numbers

16  through Mr. Goyal for gross margin information, right?

17  A. Yes.

18  Q. And this e-mail talks about checks as well.

19    Do you see that?

20  A. Yes.

21  Q. There were a lot of questions that Mr. Fishbein asked you

22  about the meaning of checks, and you testified in substance

23  that it depends on who is saying the word and what the context

24  is.

25    Do you recall that?

1　A. Yes, that's correct.

2　Q. Now, Mr. Fishbein, along similar lines, showed you to sell

3　side reports from Mr. Kuo which also used the word checks.

4　　　Do you recall those questions?

5　A. Yes.

6　　　MS. APPS: Mr. Hoffman, if you could put up

7　Government's Exhibit 1350.

8　Q. This is an exhibit -- if you could turn to the second page.

9　Do you recognize that, Mr. Tortora? Again, this is a document

10　in evidence?

11　A. Yes.

12　Q. What is it?

13　A. This was a Bear Stearns report by Gurinder and Danny Kuo on

14　Altera.

15　Q. And it uses the word there channel checks.

16　　　Do you see that?

17　A. Yes.

18　Q. Now, when you first looked at Mr. Kuo's information and you

19　saw the words channel checks, before you spoke to him, did you

20　know one way or another where that information was coming from?

21　A. I did not.

22　Q. And then when you subsequently spoke to Mr. Kuo, what did

23　you learn about where the information was coming from in that

24　first paragraph?

25　A. That he had a contact directly at the company Altera.

1　Q. And the information that his contact was providing, is that

2　contained in the first paragraph there?

3　A. Yes.

4　Q. Did knowing that Mr. Kuo was obtaining this information

5　from somebody inside the company have any significance in terms

6　of your evaluation of Mr. Kuo's analysis or his sell side

7　reports?

8　A. Yes.

9　Q. And can you explain that?

10　A. Yes. It provides a level of comfort, a level of

11　credibility, a level of access that others don't have.

12　Q. And when you talked with Mr. Newman about information from

13　sell side analysts in general, did you discuss with him where

14　they would get their information from, if you knew it?

15　　　MR. FISHBEIN: Objection to the form.

16　　　THE COURT: Sustained. Let's try to ask it in a

17　nonleading way.

18　Q. Do you recall discussing with Mr. Newman different sell

19　side analysts and where they got information from?

20　A. Yes.

21　Q. And when you had those discussions, did you hold anything

22　back about what you had learned?

23　A. No.

24　Q. I am going to show you what's been marked for

25　identification as Government Exhibit 308.

1　　　Do you recognize that document?

2　A. Yes.

3　Q. What is it?

4　A. It's an instant message exchange between myself and Todd

5　Newman on July 9 of 2008.

6　　　MS. APPS: The government offers 308.

7　　　MR. FISHBEIN: I just need a minute to read it.

8　　　THE COURT: Do you have a copy for me?

9　　　MS. APPS: Yes.

10　　　THE COURT: Thanks.

11　　　Any objection?

12　　　MR. FISHBEIN: Yes, your Honor. On hearsay grounds.

13　I don't know if we should approach. Hearsay within hearsay. I

14　believe there are statements --

15　　　THE COURT: Let's have a side bar.

16　　　I'm sorry, ladies and gentlemen. I try to keep this

17　to a minimum, but sometimes you can't avoid it.

18　　　(Continued on next page)

19

20

21

22

23

24

25

1　　　(At the side bar)

2　　　MR. FISHBEIN: The objection is this appears to be

3　Mr. Tortora repeating what a B of A analyst who is unnamed

4　said. And the analyst or other people who were also unnamed

5　say that the analyst has a mole, apparently. That's like

6　double hearsay about the mole. And I know if this comes in we

7　are going to hear in the summation and everywhere else that

8　Mr. Newman somehow knows about a mole. I think the fact that

9　it's double hearsay, I think it's both hearsay and I think

10　prejudice outweigh probative.

11　　　MS. APPS: Just to be clear, it is not being offered

12　for the truth. The dialogue is with Mr. Newman about the

13　accuracy about a sell side's analyst's calls or predictions and

14　Mr. Newman is convinced, based on the accuracy, that he must

15　have somebody inside the company. And I think it responds to a

16　line of Mr. Fishbein's cross-examination that talks about how

17　when you see channel checks in sell side reports that somehow

18　that means that is all legitimate or not legitimate.

19　Mr. Newman doesn't really understand what the different sell

20　side analysts or companies are saying, but this suggests a

21　level of sophistication and understanding of the depth of

22　different sell side analyst's sources beyond that.

23　　　THE COURT: Where does it say where he is?

24　　　MS. APPS: It says speaking to B of A sem analyst,

25　Bank of America semiconductor analyst. Mr. Tortora is

1   saying -- he is reporting that the B of A analyst is saying he
2   has no contacts, the truth of which we don't care about. And
3   Mr. Tortora says: Just have had good calls, meaning good stock
4   predictions with Intel. And then down below he's talking about
5   wanting to own the stock into print because of expectations low
6   and Taiwan PC data. And Newman says: That's strange, he was
7   pretty precise last quarter. And Newman says: I will get
8   sales guy to call him. He not telling the truth. In other
9   words, not telling the truth about whether he has sources.
10   Mr. Newman says: I had blowup with him while back, so
11   wondering if he not saying because of that. So he is saying, I
12   wonder if Mr -- if the analyst is hiding the fact of the
13   source. And Mr. Tortora says: Strange, he sounds honest, said
14   everyone thinks he has a mole, but says he is not close to
15   management and has no contact.
16      So it's not for the truth of whether this guy has a
17   contact or not. It's the discussion between Mr. Tortora and
18   Mr. Newman about other analysts' sources. And part of the
19   defense that Mr. Fishbein I think has put forward is that
20   Mr. Tortora didn't tell Mr. Newman where information was coming
21   from or didn't distinguish whether it's coming from I or a sell
22   side person or if it's coming from a sell side person, whether
23   it's legitimate or not legitimate. And what this shows is that
24   Mr. Newman is in the weeds about those very issues.
25      MR. FISHBEIN: Your Honor, I think the length of the

1   explanation shows how confusing it is. Honestly, I don't
2   follow it. I am not even sure what they are talking about.
3      THE COURT: I think the main point is, there is a
4   reference to a mole and understanding the mole was inside the
5   company and Mr. Newman's response wasn't, no, that's
6   outrageous, I can't believe that. Let's stop.
7      MR. FISHBEIN: Although he says weird.
8      THE COURT: He says weird.
9      MR. FISHBEIN: Your Honor, but this is like triple
10   hearsay. This is people saying --
11      THE COURT: It's not being offered for the truth.
12   It's being offered to explain the relationship between Newman
13   and Tortora and Newman's understanding that some of these
14   sources are inside sources and his reaction to that.
15      MR. FISHBEIN: Although the substance of this is that
16   people are saying that, but that it's not true. In other
17   words, what they say right at the beginning is he has no
18   contact, but he has good cause. People say he has a mole, but
19   he has no contact. I just think that's horribly confusing and
20   prejudicial. What this really is saying is the opposite.
21      THE COURT: I am not sure that that's the right way --
22   do you agree with his interpretation?
23      MS. APPS: No. I think the point of this is it's just
24   showing that Mr. Newman sees that an analyst has a high degree
25   of accuracy and believes that the analyst must have some kind

1   of contact. And Mr. Tortora is just saying, no, he doesn't.
2   Whether or not the analyst has any kind of contact is
3   irrelevant and it's no more triple hearsay than the multiple
4   e-mails Mr. Fishbein introduced showing statements attributable
5   to Lynne Tyson. In that respect, I think the objection is not
6   well taken.
7      THE COURT: I think that the only issue is whether
8   it's confusing. I am not sure if the witness is up to
9   explaining all this.
10      MR. FISHBEIN: It's incredibly confusing. It is one
11   thing if Mr. Newman said mole or something like that. But
12   everyone. Who is everyone? Thinks he has a mole. But he says
13   he's not close to management and has no contact. That is
14   confusing. The analyst says he has no contact, but there are
15   people, we don't know who they are, who say he has a mole. I
16   just think once that gets in, this is a charged word, the
17   government is going to use it. They are going to really
18   emphasize it. The prejudice outweighs the probative.
19      THE COURT: Overruled. I don't think it is that
20   complicated. I think you opened the door to this by suggesting
21   that your client was in the dark and didn't know anything about
22   the sources. I think that that's -- I think it's a fair
23   argument. I don't know that the witness will get you very far.
24   Let's do that.
25      (Continued on next page)

1      (In open court)
2      THE COURT: Let's proceed.
3      MS. APPS: The government offers 308.
4      THE COURT: 308 is received.
5      (Government's Exhibit 308 received in evidence)
6      MR. FISHBEIN: Just for the record I have my
7   objection.
8      THE COURT: Right.
9   Q. Mr. Tortora, if you could look at the beginning of this
10   instant message, the line at the top starts with: Statement
11   from you speaking to B of A semi analyst now.
12      What does that mean?
13   A. That means I was on the phone with the sell side analyst
14   from Bank of America that covers semiconductors.
15   Q. The next line you say, says have no contact, just have had
16   good calls.
17      Can you explain what you meant by that when you wrote
18   it?
19   A. Yes. That he does not have a direct source at the company
20   giving him information. He has just made the accurate
21   predictions in the past.
22   Q. And Mr. Newman responds: WINTC, question mark.
23      Do you see that?
24   A. Yes.
25   Q. What does that mean?

1  A. He is asking me with respect to Intel, if my comments are
2  with respect to Intel.
3  Q. And then states WTF and below that, you respond why? And
4  you say: He wants to own into print because he thinks
5  expectations low and Taiwan PC data okay, but has no read on
6  what will say.
7      Can you explain what you meant by that when you wrote
8  it?
9  A. Yes. That this Bank of America analyst is making a
10  positive call into the Intel earnings announcement because he
11  thinks the market expectations are low and there was some
12  positive personal computer data out of Taiwan and that's
13  specific to the companies that make the actual PCs themselves,
14  and he is saying -- he further goes on to say or I go on to say
15  that he has no read on what they will say, meaning he will have
16  no insight on what the company will actually say on the
17  earnings call.
18  Q. And then you write: Or do for Q2. What did that mean?
19  A. I continue my thought. He will have no read on what the
20  company will say or do for Q2.
21  Q. Mr. Newman responds: That strange, he was pretty precise
22  last Q.
23      What did you understand that to mean?
24  A. That means he's a little surprised that he does not have a
25  direct contact because the information was detailed and

1  accurate for last quarter.
2  Q. Mr. Newman continues: I will get sales guy to call him.
3  He not telling the truth. I had blow up with him while back,
4  so wonder if he not saying cause of that.
5      Can you explain what you understood Mr. Newman to be
6  saying in those two lines?
7  A. Yes. Mr. Newman believes he is lying, that he does have a
8  contact at the company and that he had a fight with this
9  analyst a while back, so he wonders if this analyst is just not
10  telling me, knowing that I'm working for Todd.
11  Q. Then you respond: Yep, strange, sounds honest, said
12  everyone thinks he has mole, says not close to management and
13  has no contact, but not even saying I think they will do this
14  or that, just saying could be this or could be that, and if
15  that, then stock will do this.
16      What did that mean, Mr. Tortora?
17  MR. FISHBEIN: Objection. This is his understanding.
18  THE COURT: What did you mean to convey when you wrote
19  that?
20  THE WITNESS: Yes, your Honor. I say that he sounds
21  honest and that he was telling me that everyone thinks he has a
22  mole, which means he has a friend or a contact at the company,
23  but he was telling me that he's not even close to management.
24  He has no contact. And then I move on to tell Todd, he is not
25  even telling me that here is what the numbers will be and

1  hiding his contact. He is saying -- he is not even giving
2  specific numbers and he is saying he has no contact. He is
3  just saying if the company reports this, a certain number, a
4  market expectations are low, then the stock will do something
5  off of that. He is just being very general, very vague.
6  Q. Mr. Newman responds: Weird. And then you respond to that:
7  He said he was playing expectations game in past two quarters.
8      Do you see that?
9  A. Yes.
10  Q. What did that mean?
11  A. Again, he was gauging what market expectations were and
12  taking the approach based on those market expectations whether
13  to buy or sell the stock into the quarter.
14  Q. And Mr. Newman then responds: Wish I could do that as well
15  as him on all names.
16      What did you understand that to mean?
17  A. Basically, that the guy has been right the last couple of
18  quarters and he's been right on Intel and he has gauged market
19  expectations and made money off of it and that he wished he
20  could do that.
21  Q. Mr. Tortora, Mr. Fishbein asked you a number of questions
22  about the stock tips you gave your stepfather, including Dell,
23  in August 2008.
24      Do you recall those questions?
25  A. Yes.

1  Q. And he asked you to compare information that you gave to
2  your stepfather to the information you gave to Mr. Newman.
3      Do you recall that?
4  A. Yes.
5  Q. Was your step father ever a hedge fund manager of a
6  multibillion dollar hedge fund?
7  A. No.
8  Q. Did your stepfather ever pay a consultant for confidential
9  information?
10  A. I did not.
11  Q. And Mr. Fishbein asked you about a particular e-mail that
12  you sent to him on August 5, which is Defense Exhibit 9819?
13  THE COURT: Do you want him to look at it?
14  MS. APPS: Yes, your Honor. I think we actually have
15  this one on the screen. It's in evidence.
16      I want to ask you, Mr. Hoffman, if you could also put
17  up Government Exhibit 214 on the same page, which we looked at
18  earlier.
19  Q. Mr. Tortora, what I want to ask you is, in the e-mail at
20  the top of the screen, which is a communication with you and
21  your stepfather, did you give any numbers to your stepfather?
22  A. And is it the same day as you sent the e-mail to Mr. Newman
23  Q. And is it the same day as you sent the e-mail to Mr. Newman
24  that contained the specific numbers on margin and revenue for
25  Dell?

1  A.  Yes.
2  Q.  What did your stepfather do for a living?
3  A.  He owned a courier company that ran errands for another
4  companies.
5  Q.  When you were working at Diamondback, was he still working?
6  A.  He was retired.
7  Q.  And whose money was he investing in his trading?
8  A.  His own.
9  Q.  And did he ever tell you the stocks that comprised the bulk
10  of his portfolio?
11       MR. FISHBEIN: Objection.  Hearsay.
12       THE COURT: Sustained.
13  Q.  Did you understand Dell to be a large holding in his
14  portfolio?
15  A.  No.
16  Q.  Earlier on in the cross-examination Mr. Fishbein asked you
17  a number of questions about your obligations under the
18  cooperation agreement that you had with the government?
19  A.  Yes.
20  Q.  First of all, what do you understand your obligations to be
21  under that cooperation agreement?
22  A.  Tell the truth, cooperate fully, and commit no further
23  crimes.
24  Q.  And in cooperating fully or meeting with the government,
25  what are you required to tell them in terms about the conduct

1  that you're aware of?
2  A.  Cooperate fully, tell the truth, which means don't hold
3  anything back, tell them everything I know about everything
4  they ask.
5  Q.  And is that just your conduct?
6  A.  No.  About my conduct and others as well.
7  Q.  If you could take a look at the cooperation agreement,
8  Government Exhibit 3516-3 that's in evidence.  And if you could
9  turn to the second page.
10       You see there it sets forth -- it says under
11  subparagraph A, Mr. Tortora, that you shall truthfully and
12  completely disclose all information with respect to activities
13  of himself, meaning you, and others concerning all matters
14  about which this office, meaning the United States Attorney's
15  Office, asks of him, meaning you.
16       Do you see that there?
17  A.  Yes, I do.
18  Q.  Is this a document that you signed?
19  A.  Yes, it is.
20  Q.  Are you permitted to withhold information about any
21  particular individuals under the terms of your agreement?
22  A.  I'm not.
23  Q.  Now, you testified that you had dozens of meetings with the
24  government over the last two years.
25       Do you recall that testimony?

1  A.  Yes.
2  Q.  And did you talk about the criminal conduct of some people
3  that you knew about or all of the people you knew about?
4  A.  All of the people I knew about.
5  Q.  And, Mr. Tortora, the first picture on this board is a
6  picture of Sandy Goyal.  It's in evidence.
7       Did you provide information about Mr. Goyal when you
8  were approached by the FBI?
9  A.  I did.
10       MR. FISHBEIN: Objection to the relevance.  I get the
11  cooperation agreement, but this part, I am not sure.
12       THE COURT: Overruled.
13  A.  I did.
14  Q.  Did you provide information about Mr. Goyal to the
15  government before Mr. Goyal was criminally charged?
16  A.  I did.
17  Q.  Did you provide information to the government that was
18  incriminating to Mr. Adondakis?
19  A.  Yes.
20  Q.  Did you provide information to the government that was
21  incriminating to Mr. Kuo?
22  A.  Yes.
23  Q.  Did you provide information to the government that was
24  incriminating to Mr. Horvath?
25  A.  Yes.

1  Q.  Did you provide information to the government that was
2  incriminating about a number of other people that we have not
3  even discussed at this trial?
4  A.  Yes.
5  Q.  Now, Mr. Fishbein in this connection also asked you about
6  substantial assistance and a letter that the government will
7  write at the time of sentencing called a 5K letter.
8       Do you recall those questions?
9  A.  Yes.
10  Q.  And what is your understanding of what will be contained in
11  that 5K letter with respect to the assistance you provide to
12  the government?
13  A.  It will outline the extent of my cooperation as well as the
14  extent of my crimes.
15  Q.  Is it your understanding that that letter will contain some
16  but not all of the assistance that you provided in terms of the
17  multiple different individuals you gave information about?
18  A.  My understanding is it will include all of the assistance.
19  Q.  Now, Mr. Tortora, by the way, you were also asked, as you
20  sit here today, if this is the only trial that you testified in
21  today.
22       Do you recall that testimony?
23  A.  Yes.
24  Q.  Now, do you know whether there is going to be any other
25  trials you may have to testify about in the future?

# A-803

1  A.  I don't know if there is going to be any other trials that
2   I have to testify.
3  Q.  Now, you were also asked about a recording, a telephone
4   call that you made at the FBI direction in December of 2010
5   with Mr. Kuo?
6      Do you recall that?
7  A.  Yes.
8      MS. APPS: I don't know if the defense exhibit is
9   still there.  It's 9531T.
10      MR. FISHBEIN: That's not offered yet.
11  Q.  Now, was that call recorded?
12  A.  Yes.
13  Q.  How was it recorded?
14  A.  At the FBI's direction they told me -- they taught me how
15   to set up a mechanism that it would record the call for their
16   purposes.
17  Q.  And so did you do what it is that you need to do to have it
18   recorded?
19  A.  Yes.
20  Q.  When you were talking to Mr. Kuo, you understood that
21   everything you were saying was being recorded?
22  A.  Of course.
23  Q.  At the time of that call in December of 2010, do you recall
24   what was happening in terms of the news media about your
25   involvement?

1  A.  Yes.
2  Q.  What do you recall?
3      MR. FISHBEIN: Objection.
4      THE COURT: Overruled.  I'll allow it.
5  A.  The FBI had raided the headquarters of Diamondback, Level
6   Global, Block Capital, and there was a lot of press reports
7   being written about this investigation.
8  Q.  Do you recall that Mr. Kuo said on the call a number of
9   times, he referenced the fact that your phone could be tapped
10   or taped?
11  A.  Yes.
12  Q.  Do you remember that?
13      You said things like:  I have a high suspicion that
14   your phone is tapped.
15      Do you recall that?
16  A.  Yes.
17  Q.  He says:  I don't even know why I'm talking to you, things
18   like that?
19  A.  Yes.
20  Q.  He referenced the Bloomberg news article and the search and
21   other things.
22      Do you recall that?
23  A.  Yes.
24  Q.  Now, the FBI -- withdrawn.
25      Was the purpose of this call to get evidence on

1      Mr. Newman or Mr. Kuo?
2      MR. FISHBEIN: Objection.  Leading.
3      THE COURT: Did you have an understanding as to what
4   the purpose of the call was?
5      THE WITNESS: Yes, your Honor.  The FBI instructed me
6   that it was to elicit information from Mr. Kuo, not Mr. Newman.
7  Q.  Now, you testified on cross-examination that the FBI came
8   up with a rouse or a fiction to assist you in that purpose on
9   the telephone call with Mr. Kuo.
10      Do you recall that testimony?
11  A.  Yes.
12  Q.  And did you try to carry out the rouse as the FBI had
13   instructed you?
14  A.  I did, to the best of my ability, yes.
15  Q.  And did you ever ask the FBI why they picked one particular
16   rouse over another particular rouse?
17  A.  No, I did not.
18  Q.  Again, Mr. Tortora -- withdrawn.
19      Now, Mr. Fishbein asked you a series of questions
20   about the consultants that you recommended to Mr. Newman during
21   your time at Diamondback.
22      Do you recall that testimony?
23  A.  Yes.
24  Q.  And he actually put up an exhibit, Defense Exhibit 8599,
25   and it had something from John Souza.

1      Do you recall testimony about John Souza?
2  A.  Yes, I do.
3      MS. APPS: One moment, your Honor.  I was looking for
4   an exhibit.  While we do that, I'll show another one.
5  Q.  Was another consultant that you referenced -- was another
6   consultant that you referenced K.C. Sentz?
7  A.  Yes.  Ms. Apps, when you asked if I referenced it, what are
8   you specifically referring to?
9  Q.  Mr. Fishbein asked you a number of questions about
10   different consultants.
11  A.  Yes.
12  Q.  Who was K.C. Sentz?
13  A.  K.C. Sentz was actually a family friend of mine who joined
14   as a consultant for Diamondback for a period of time.
15  Q.  I'm showing you what's been marked for identification as
16   Government Exhibit 325.
17      Do you recognize that document?
18  A.  Yes.
19  Q.  What is it?
20  A.  It's an e-mail exchange -- it's an e-mail between Betty
21   Valouktzis and K.C. Sentz that gets sent to Cathy Magee and it
22   gets sent from Cathy Magee to Todd and I, and then Todd and I
23   have dialogue, and this is on January 8, 2008.
24      MS. APPS: The government offers 325.
25      MR. FISHBEIN: Objection to relevance.

1 THE COURT: I don't remember any testimony about this
2 individual.
3 MS. APPS: Your Honor, I don't have Defense Exhibit
4 8599, but I think he was one of the ones on there and Mr.
5 Fishbein asked a number of questions about consultants that
6 Mr. Tortora recommended to Mr. Newman, and I think this is one
7 of those consultants. This is a follow-up to that. It will be
8 very brief.
9 MR. FISHBEIN: I did not ask about this consultant.
10 THE COURT: If the exhibit is in, consultants were
11 discussed.
12 Do you have the exhibit that was introduced by the
13 defendant?
14 MR. FISHBEIN: What exhibit is it?
15 MS. APPS: It's 8599.
16 THE COURT: Defense 8599, right?
17 MS. APPS: Right.
18 THE COURT: Does anybody have it? It's one of the
19 ones you put in this morning or the other day?
20 Let's move on.
21 MS. APPS: I take it --
22 THE COURT: If somebody can find me the exhibit,
23 great. I'll take a look. Until then, I will sustain.
24 Q. You were asked about John Souza.
25 Do you recall those questions, Mr. Tortora?

1 A. Yes.
2 Q. What services did Mr. Souza provide Diamondback?
3 A. He provided a variety of services, including attending
4 industry conferences on the west coast.
5 Q. And did he provide periodic reports to you and Mr. Newman?
6 A. He did.
7 Q. And how did those reports get transmitted?
8 A. Generally, on e-mail.
9 Q. And who were they transmitted to?
10 A. I believe both myself and Todd.
11 Q. And do you recall how often were those reports?
12 A. Generally, every time there was a west coast conference
13 that Todd or I did not attend, which was one or more times per
14 quarter, again, that's just one example of what he did. He did
15 other things as well.
16 Q. You talked about Mr. Kanowitz, who provided the tracker
17 reports.
18 Mr. Fishbein asked you a couple of those questions,
19 right?
20 A. Yes.
21 Q. It was a document that was provided on a regular basis to
22 Mr. Newman, is that fair to say?
23 A. Todd and myself twice a week, yes.
24 Q. With respect to the approval of these consultants, what was
25 Mr. Newman's role?

1 A. He was the primary approver.
2 Q. And did he get involved in handling certain things like
3 fees of being consultants and how much to pay the consultants?
4 MR. FISHBEIN: Objection to form.
5 THE COURT: Overruled. You can answer.
6 A. Yes, he did.
7 Q. Now, with respect to Ruchi Goyal, Mr. Tortora, did Ruchi
8 Goyal ever provide any weekly reports like John Souza or
9 Mr. Kanowitz?
10 MR. FISHBEIN: Objection, your Honor. We did not go
11 into this on cross. This is beyond the scope.
12 THE COURT: I think it's fair to compare and contrast
13 Ruchi Goyal with the ones you did go into, so overruled.
14 A. I'm sorry. Ms. Apps, can you ask that one more time.
15 Q. Did Ruchi Goyal ever provide kind of weekly or biweekly
16 reports that the consultants, John Souza and Scott Kanowitz,
17 provided to you and Mr. Newman?
18 A. She never provided any report of any kind.
19 Q. Did Mr. Sandy Goyal provide regular weekly or biweekly
20 reports like those that Mr. Kanowitz provided?
21 A. No.
22 Q. Now, Mr. Fishbein actually asked you a couple of questions
23 about your Gmail account.
24 Do you recall those questions?
25 A. Yes.

1 Q. And you were asked whether Mr. Newman instructed you not to
2 use Gmail for work and then Mr. Fishbein cut you off.
3 Do you recall that exchange this morning?
4 A. Yes.
5 Q. What is it that you were trying to say?
6 A. I was trying to say that there was a specific time I
7 remember he asked me if I used a BlackBerry instant messenger,
8 and he specifically made reference to the fact that that was
9 not tracked by the company.
10 Q. Do you recall when that conversation was?
11 A. I don't recall a specific month, but I do recall it was
12 early on.
13 Q. Now, Mr. Fishbein also put up an e-mail, it's Defense
14 Exhibit 9845.
15 MS. APPS: Mr. McLeod, do you mind putting that up.
16 Can you just put up the portion that was admitted, which was
17 the e-mail on March 21, 2009, at 2:09 p.m.
18 Can you just do that. Thank you very much.
19 Q. Mr. Fishbein asked a couple of questions about this
20 exchange between you and Mr. Ingel.
21 Who is Mr. Ingel?
22 A. My stepfather.
23 Q. And he asked you about the top line which talks about you
24 losing some of your own money. You say: I can't deal with
25 that because I work too hard for it.

# A-805

1        Do you see that?

2  A.  Yes.

3  Q.  But he didn't ask you about this next sentence and I want

4    to ask you what it is you meant by the next sentence which

5    says:  Plus, we have proven system to make money, me doing

6    research, him trading.

7  A.  That's the system in which Todd makes money -- Todd makes

8    money for his book, we, meaning Todd and myself, or I send him

9    research, more information, and he makes the trading decisions.

10  Q.  Now, Mr. Tortora, with respect to Intel, you got

11    information while you're at Prudential from Intel, right?

12  A.  Yes.

13  Q.  And the person that gave that to you, what relationship did

14    you have with that person?

15  A.  Friend of mine, Ariel Jaduszliwer.

16  Q.  When you were at Diamondback, you got information on Intel

17    through Lacey Higgins.

18        Do you recall that testimony?

19  A.  Yes.

20  Q.  What was your relationship with Lacey Higgins?

21  A.  Lacey was a friend of mine at Diamondback.  We were also

22    clients of Morgan Stanley.

23  Q.  Did Lacey Higgins talk to you about the relationship that

24    she had with the contacts who were giving her information about

25    Intel?

1  A.  She had said it was a friend of hers at Intel.

2  Q.  Mr. Tortora, I just want to ask you about a couple --

3        MS. APPS:  One moment.

4  Q.  Mr. Fishbein asked you about a meeting that you had with

5    the FBI in October of 2012.  And he asked you in connection

6    with that if you told the FBI, quote, that Mr. Goyal led you to

7    believe his contact worked at Dell rather than Mr. Goyal told

8    you that his contact worked at Dell.

9        Do you recall those series of questions?

10  A.  Yes.

11  Q.  And then again, that it was 2012.

12        Do you recall that the very first meeting you had with

13    the agents in which you gave substance took place some time in

14    2010, in November of 2010?

15  A.  Yes.

16  Q.  And do you recall at that very early meeting telling the

17    FBI that Goyal in fact told you that he spoke with his contact

18    at Dell?

19        MR. FISHBEIN: Objection.

20        THE COURT: Grounds?

21        MR. FISHBEIN: I think she should first ask whether he

22    remembers what he said before she presents --

23        THE COURT: Leading.  Basically leading?

24        MR. FISHBEIN: Yes.

25        THE COURT: Sustained.  Rephrase.

1  Q.  Do you recall what it is you told the FBI very early on in

2    this case about what Mr. Goyal told you about his contact?

3  A.  Yes, that he had -- I do recall and it was that he had a

4    friend at Dell that provided him information.

5        MS. APPS:  One moment, your Honor.

6        This is just the last series of questions, your Honor.

7  Q.  I am going to ask you about Defense Exhibit 972?

8        THE COURT: 972.

9  Q.  And an exchange that you have with Mr. Adondakis.  And this

10    exchange takes place in February of 2009.

11        Do you see that up there?

12  A.  Yes.

13  Q.  And there is an exchange there when you talk about Mr --

14    can put that a little lower -- Mr. Fishbein asked you about

15    something you said on February 20, 2009, about being dead

16    wrong.

17        Do you see that?

18  A.  Yes, I remember.

19        (Continued on next page)

20

21

22

23

24

25

1        MS. APPS:  Mr. McLeod, can you go a little bit lower

2    on the screen?  Thank you.

3  Q.  What is it that you were referring to when you talked

4    about, when you said they're dead wrong.

5  A.  Which direction Dell stock would go on the quarter.  Not

6    the information Sandy provided.

7  Q.  And so for the quarter ending on November 20, 2008, was the

8    information, was your recollection, what was your recollection

9    about the accuracy of the information that Mr. Goyal had

10    provided to you?

11  A.  That it was very accurate.

12  Q.  And in fact, if you look even for the quarter that's ending

13    in February of 2009, if you could look at Government Exhibit

14    280.  Thank you.  Thank you.  You see here the date is

15    2/27/2009.

16  A.  Yes.

17  Q.  And the second bullet says, "January Q results what

18    we thought REV, GM, OM, EPS," do you see that?

19  A.  Yes.

20  Q.  What did you mean by that?

21  A.  That means for the previous quarter that Dell had reported

22    that the information Sandy Goyal provided on revenue, gross

23    margin, operating margin were accurate, as well as our

24    deduction of earnings per share from that information that

25    Sandy provided.

1          MS. APPS: Just one moment, your Honor.  No further
2     questions.
3          THE COURT: Okay.  Recross.
4          MR. FISHBEIN: Yes, your Honor.
5          THE COURT: Hold on one second.
6          (Pause)
7     RECROSS EXAMINATION
8     BY MR. FISHBEIN:
9     Q.  Mr. Tortora, do you have in front of you what Ms. Apps
10    showed you at the beginning of the redirect, 2606A. It's an
11    excerpt of the phone record of August 16, two pages.  Perhaps
12    we could get it put up on the screen.  2606A, it's an excerpt
13    from the phone records.  Is it possible to get it put up on the
14    screen?
15    A.  I have that here.
16         MR. FISHBEIN: Our technology is gone.  I'll try to
17    continue and explain as I go along.
18    Q.  Mr. Tortora, you were asked about a call on the morning of
19    August 15 at 8:49 a.m., do you see it there?
20    A.  Yes.
21    Q.  This is the day that you met Sandy Goyal for lunch in the
22    afternoon, right?
23    A.  Yes.
24    Q.  And do you recall being shown a trading chart where Mr.
25    Newman started the short sales in the morning sometime around

1     10 or 10:30, something like that, do you remember seeing that?
2     A.  If I recall, Mr. Fishbein, there was a single trade in the
3     morning and there was the remainder of the trades later that
4     afternoon.
5     Q.  That's right and we can all go back to the records but
6     there was the first trade in the morning and that's what Ms.
7     Apps was asking about, okay, do you remember that?
8     A.  I do remember.
9     Q.  So that's why I'm focused on the morning.  On August 15,
10    2008, 8:49 a.m., there's a call from, to your number, correct,
11    415-964, whatever, 02 -- ending in 4020, right?
12    A.  Yes.
13    Q.  That's your number, correct?
14    A.  Yes.
15    Q.  And the originating number is 212-476-9000, right?
16    A.  Yes.
17    Q.  That's not Sandy Goyal's cell phone, right?
18    A.  That's correct.
19    Q.  You did communicate with Mr. Goyal on a cell phone,
20    correct?
21    A.  In addition to the office --
22    Q.  At other times?
23    A.  Yes, yes.
24    Q.  We've seen other calls where you called Mr. Goyal and it
25    was on his cell phone, right?

1     A.  It was interchangeable yes.
2     Q.  Did you call him on his cell phone on other occasions?
3     A.  Yes, I did.
4     Q.  Now, this number, do you know what that number is
5     associated with?
6     A.  I believe Miss Apps said.
7     Q.  Yes, Ms. Apps, I believe you said the stipulation said it's
8     Neuberger Berman, right?
9          THE COURT: Are you asking Ms. Apps or are you
10    asking --
11         MR. FISHBEIN: There was a representation.
12         THE COURT: I believe that was the stipulation.
13         MS. APPS: That's the stipulation.
14    Q.  So that's a central number for Neuberger Berman, right?
15    A.  Yes.
16    Q.  And you know other people at Neuberger Berman, don't you?
17    A.  I do know other individuals, yes.
18    Q.  And you talked to Mr. Abbasi, for example, by phone on
19    occasion?
20    A.  Yes.
21    Q.  So you don't know who it is that called you on this
22    occasion, right?
23    A.  Not at this specific time, no.
24    Q.  Now, again, if we can get the trading records for the
25    morning of the 15th.  That I think we have.  Okay.  So just so

1     we're clear there was a short sale at 10:24 a.m., correct?
2     A.  Yes.
3     Q.  Now, do you see on the phone records any call between you
4     and Mr. Newman prior to 10:24 a.m.?
5     A.  On 8/15?
6     Q.  Correct.
7     A.  And what's -- do you want to give me Mr. Newman's cell
8     phone number?  How does that work?
9     Q.  Well, if you look at the next page, you identified his
10    number at 3:10 at (617)817-1138, right?
11    A.  No, no, your Honor, I don't believe I was the one who
12    identified an e-mail --
13    Q.  The parties have stipulated that that was Mr. Newman's
14    number, the 617 number.  That's at 3:10 p.m. okay?
15    A.  Okay.
16    Q.  So do you see a call to Mr. Newman on the morning of
17    August 15 before 10:24 when he made the short sale?
18    A.  There's numbers on here that I -- so if you're asking me if
19    I see a call to Mr. Newman to that number which you just
20    pointed out which I believe we discussed was Mr. Newman's cell
21    phone number, I do not, but that was not my only method of
22    communication with Mr. Newman.
23    Q.  Do you recognize any of these other numbers -- as you sit
24    here now can you testify that any of these other numbers are
25    Mr. Newman's numbers on the morning of the 15th?

1  A. I don't remember what Mr. Newman's office number was, for
2  instance.
3  Q. Do you recall speaking to Mr. Newman on the morning of the
4  15th?
5  A. I don't recall if I spoke to him that morning.
6  Q. Now, you were shown a policy, a Diamondback policy
7  concerning the use of expert networks. Do you recall that?
8  A. Yes.
9  Q. And when is it that you recall that policy going into
10  effect, namely the policy concerning experts who work at
11  companies.
12  A. Which policy are you referring to?
13  Q. Ms. Apps showed you a policy. She read you language. I
14  can read it to you again --
15        MS. APPS: It has a date on it.
16  A. The compliance policy?
17  Q. The compliance policy. But I'm asking for your
18  recollection, Mr. Tortora.
19  A. And, I'm sorry, what was the question again?
20  Q. The question, okay. Put that to the side. Do you recall
21  at the time when Diamondback's policy concerning the use of
22  expert networks changed?
23  A. I do.
24  Q. When did that occur, to your recollection?
25  A. Post Galleon.

1  Q. And Galleon was when?
2  A. Late 2009.
3  Q. So during 2008 you don't recall that policy being in
4  effect, right?
5  A. Mr. Fishbein, you asked me if I recall there was a period
6  of time when the policy changed?
7  Q. Okay, fair enough. What did it change from and what did it
8  change to?
9  A. The part that I recall, and again, I don't remember if the
10  actual written policy changed, but I was told --
11  Q. Right.
12  A. -- that at that time you could no longer use the expert
13  networks to speak directly to a public company employee,
14  regardless of what public company that employee -- what company
15  that employee worked for. If it was a public company you could
16  not speak to them directly through the expert networks.
17  Q. So the change was that you could no longer use these expert
18  networks to speak to an employee of a public company, correct?
19  A. Yes.
20  Q. And that change, as far as you understood, occurred after
21  Galleon in the late fall of 2009, correct?
22  A. Yes.
23  Q. And so when you were having these calls with the PGR
24  experts in 2008 and the 2009 up until Galleon, you were not
25  aware of any policy change such as the one you just described?

1  A. Correct.
2  Q. If you could look at Government Exhibit 4002, which is the
3  Goldman Sachs analyst report after the August announcement. Do
4  you have it?
5  A. I do.
6  Q. You see this is an analyst report after Dell announced its
7  results on August 28, correct?
8  A. Yes.
9  Q. And as we've discussed, there were gross margin issues,
10  right, and that's what you testified to with respect to Dell
11  that quarter?
12  A. Yes.
13  Q. Now, if you look at the first paragraph which Ms. Apps
14  pointed you to do you see about half, third of the way down
15  there's a sentence, quote, "Despite another solid top line beat
16  Dell's turnaround took a step backward July quarter with gross
17  and operating margin taking a hit due to overly aggressive
18  pricing." Do you see that?
19  A. Yes.
20  Q. And you understood, Mr. Tortora, that analysts attributed
21  the gross margin issues in August to Dell's overly aggressive
22  pricing, correct?
23  A. Are you asking me if that's my interpretation of what David
24  Bailey's saying here?
25  Q. Yes.

1  A. Yes, the line you just read, that appears, David Bailey
2  appears to be pointing that out as a primary driver.
3  Q. And aggressive pricing means the prices that Dell is
4  getting for its computers, right?
5  A. The price they're offering.
6  Q. Yes, that's what -- the price they're selling their
7  computers for?
8  A. Selling the computers for, yes.
9  Q. And that's the subject of Mr. Kanowitz' tracker?
10  A. That was one of the subjects of Mr. Kanowitz' tracker, yes.
11  Q. In fact you pointed out to Mr. Newman before the August
12  earnings report that the Kanowitz data showed aggressive
13  pricing, right?
14  A. Yes, before the earnings reports for HP and Dell I showed
15  that, I pointed out that there was a consumer PC price war if
16  you remember, yes.
17  Q. Now, the last questions that Ms. Apps asked you were about
18  your comment that you were dead wrong in the quarter ended
19  November of 2008. Do you remember that?
20  A. Yes.
21  Q. And you said that dead wrong referred to the way the stock
22  price moved? Did I understand that right?
23  A. Yes.
24  Q. Now, we also saw e-mails to the effect of good call. Do
25  you remember that?

# A-808

1 A. Yes.

2 Q. And do those refer to the way the stock price moved?

3 A. Which IM's or e-mails are you specifically referring to?

4 Q. You were shown some e-mails from Mr. Adonakis, from

5 Mr. Horvath following the various quarters where they said to

6 you good call. Do you remember that?

7 A. Yes.

8 Q. And were they simply saying that you had made a good call

9 as to where you thought the stock price was going to go?

10 A. I don't know if they were, whether they're referring to the

11 stock price movement, the information or both. I could tell

12 you --

13 Q. What did you understand?

14 A. Again, I don't -- it was either the stock price move, the

15 information -- my understanding it was both, but again that's

16 just an extrapolation.

17 Q. So you assume if they said good call to you that they were

18 congratulating you at least in part for the information you

19 were providing, is that your understanding?

20 A. Yes.

21 Q. But when they said you were dead wrong it's your

22 understanding that they were not referring to the information?

23 A. That's correct, because the information was accurate.

24      MR. FISHBEIN: That's all I have.

25      THE COURT: Mr. Weingarten? Nothing. Any redirect?

1      MS. APPS: One second.

2      (Pause)

3 REDIRECT EXAMINATION

4 BY MS. APPS:

5 Q. Mr. Tortora, even before the policy changed at Diamondback,

6 did you understand -- withdrawn. Even before the policy

7 changed at Diamondback after Galleon as Mr. Fishbein just

8 referenced, did you understand that you couldn't speak to a

9 company like Dell to get information confidential about Dell

10 from that individual?

11      MR. FISHBEIN: Objection. Leading.

12      THE COURT: Sustained. Rephrase.

13 Q. Before the policy changed, Mr. Tortora, what did you

14 understand Diamondback policy to prohibit when you were

15 speaking to a company, public company insider?

16 A. That you were able to talk to a company insider but you

17 could not get confidential information.

18      MS. APPS: Nothing further.

19      THE COURT: Okay. All right, Mr. Tortora, you can

20 step down. Thank you.

21      (Witness excused)

22      THE COURT: All right, ladies and gentlemen. I think

23 we're going to break there for the day. I have another matter

24 that I'm going to try to get in. So we're going to pick up

25 tomorrow at 9:30. We'll go till 12:30 and then we'll break for

1 the Thanksgiving holiday. So we'll turn to another witness.

2 So don't discuss the case. Keep an open mind. Bring your

3 notebooks with you to the jury room and there Mr. Feith will

4 collect them. Don't discuss the case, but have a nice evening.

5 Okay, thanks. All rise for the jury.

6      (Jury excused)

7      (Continued on next page)

1      (In open court; jury not present)

2      THE COURT: All right, have a seat. Tomorrow who is

3 the next witness?

4      MS. APPS: Mark Hadlock. He's a Diamondback employee.

5 It should be done quickly.

6      THE COURT: And then?

7      MS. APPS: Sandy Goyal.

8      THE COURT: You anticipate that will take us through

9 the day?

10      MR. FISHBEIN: May I ask if there will be cross of

11 Mr. Goyal?

12      THE COURT: Do you think the direct will take us

13 through the end of the day?

14      MR. TARLOWE: Yes.

15      THE COURT: It's your witness, Mr. Tarlowe?

16      MR. TARLOWE: Yes.

17      THE COURT: If we finish a few minutes before 12:30

18 I'll just end it there, get Mr. Weingarten home.

19      (Adjourned to November 21, 2012 at 9:30 a.m.)

Page 1281

1    INDEX OF EXAMINATION
2    Examination of:                              Page
3    JESSE TORTORA
4    Cross By Mr. Fishbein . . . . . . . . . . .1038
5    Cross By Mr. Weingarten . . . . . . . . . .1142
6    Redirect By Ms. Apps . . . . . . . . . . .1194
7    Recross By Mr. Fishbein . . . . . . . . . .1269
8    Redirect By Ms. Apps . . . . . . . . . . . .1278
9            GOVERNMENT EXHIBITS
10   Exhibit No.                              Received
11   1455   . . . . . . . . . . . . . . . . . .1056
12   1414   . . . . . . . . . . . . . . . . . .1060
13   1358   . . . . . . . . . . . . . . . . . .1071
14   1176   . . . . . . . . . . . . . . . . . .1078
15   1218   . . . . . . . . . . . . . . . . . .1094
16   274    . . . . . . . . . . . . . . . . . .1191
17   2252   . . . . . . . . . . . . . . . . . .1220
18   4002   . . . . . . . . . . . . . . . . . .1233
19   4004 and 4005   . . . . . . . . . . . . . .1237
20   308    . . . . . . . . . . . . . . . . . .1248
21            DEFENDANT EXHIBITS
22   Exhibit No.                              Received
23   2146   . . . . . . . . . . . . . . . . . .1042
24   8700   . . . . . . . . . . . . . . . . . .1050
25   8985   . . . . . . . . . . . . . . . . . .1053

Page 1282

1    7229   . . . . . . . . . . . . . . . . . .1061
2    9165   . . . . . . . . . . . . . . . . . .1064
3    8185   . . . . . . . . . . . . . . . . . .1074
4    8424   . . . . . . . . . . . . . . . . . .1080
5    6017   . . . . . . . . . . . . . . . . . .1093
6    894    . . . . . . . . . . . . . . . . . .1102
7    9226   . . . . . . . . . . . . . . . . . .1115
8    9225   . . . . . . . . . . . . . . . . . .1117
9    9224   . . . . . . . . . . . . . . . . . .1118
10   9845   . . . . . . . . . . . . . . . . . .1124
11   2184, 2165 and 216   . . . . . . . . . . . .1129
12   591    . . . . . . . . . . . . . . . . . .1130
13   8173   . . . . . . . . . . . . . . . . . .1131
14   8924   . . . . . . . . . . . . . . . . . .1132
15   5712   . . . . . . . . . . . . . . . . . .1135
16   2674   . . . . . . . . . . . . . . . . . .1138
17   8591   . . . . . . . . . . . . . . . . . .1153
18   8616   . . . . . . . . . . . . . . . . . .1156
19   8620   . . . . . . . . . . . . . . . . . .1157
20   8623   . . . . . . . . . . . . . . . . . .1159
21   8629   . . . . . . . . . . . . . . . . . .1160
22   8723   . . . . . . . . . . . . . . . . . .1161
23   3185   . . . . . . . . . . . . . . . . . .1163
24   9874   . . . . . . . . . . . . . . . . . .1165
25   8995   . . . . . . . . . . . . . . . . . .1167

Page 1283

1    9002   . . . . . . . . . . . . . . . . . .1173
2    5476   . . . . . . . . . . . . . . . . . .1176
3    6108   . . . . . . . . . . . . . . . . . .1178
4    9370   . . . . . . . . . . . . . . . . . .1179
5    1234   . . . . . . . . . . . . . . . . . .1231

**$**

**$5,000 (1)**
1051:5

**A**

**Abassi (1)**
1170:17
**Abbasi (13)**
1049:14;1132:21,22,
25;1133:11;1135:14;
1137:8,21;1169:22;
1172:2;1178:10,16;
1271:18
**ability (1)**
1259:14
**able (18)**
1020:11,24;1032:13;
1047:20;1057:17;
1152:23;1155:24;
1158:18;1159:23;
1161:7;1163:17;
1165:14;1167:1;
1172:22;1178:5;
1179:8;1227:4;
1278:16
**above (14)**
1018:16;1066:5;
1076:9,10,12,18;
1125:16,24;1126:9;
1154:24;1158:6,7;
1198:5;1226:8
**Absolutely (1)**
1199:19
**accept (1)**
1023:13
**acceptable (1)**
1113:9
**access (8)**
1029:11;1033:1,2;
1088:8;1154:7,20,25;
1242:11
**according (1)**
1073:15
**account (38)**
1025:7,9,10,10;
1026:4,5,16;1028:18,
19;1032:7;1085:7,10,
14,17;1089:1,2,7,21,
24;1090:10,12;1091:7,
15;1092:3,9,18;
1118:10;1120:20,24;
1125:1,17;1126:1,12,
13;1127:5;1137:4,6;
1263:23
**accounts (2)**
1026:8;1037:9
**accuracy (6)**
1224:2;1235:21;
1244:13,14;1246:25;
1268:9

**accurate (13)**
1035:21;1068:15;
1071:9;1223:23;
1224:10,11;1235:17,
18;1248:20;1250:1;
1268:11,23;1277:23
**accusation (1)**
1027:23
**acknowledge (3)**
1117:11;1165:1,7
**acknowledged (1)**
1138:18
**acquainted (1)**
1151:22
**acronym (3)**
1113:24;1114:2,3
**across (1)**
1179:3
**act (1)**
1122:17
**actively (2)**
1111:17;1112:2
**activities (3)**
1139:9,11;1254:12
**actual (7)**
1025:5;1106:1,17;
1212:15;1223:1;
1249:13;1274:10
**actually (38)**
1025:5;1031:24;
1034:11;1035:24;
1036:3;1037:15;
1040:23;1044:17;
1047:16;1054:21;
1065:9;1075:8;
1086:16;1088:10,12;
1090:16,19,24;
1113:24;1120:12;
1125:11;1142:25;
1144:24;1145:2;
1152:3;1180:25;
1208:9;1221:8;
1223:10,23;1224:25;
1225:1;1239:18;
1249:16;1252:14;
1259:24;1260:13;
1263:22
**add (3)**
1065:16;1137:13;
1206:23
**adding (1)**
1173:12
**addition (4)**
1108:2;1132:7;
1208:8;1270:21
**additional (5)**
1020:20;1064:4;
1129:23;1213:12;
1230:8
**address (2)**
1018:4;1086:25
**adds (1)**
1020:22

**Adjourned (1)**
1280:19
**adjusted (1)**
1237:22
**admitted (5)**
1124:7,16;1187:8,
11;1264:16
**adolescent (1)**
1023:1
**Adonakis (17)**
1023:21;1105:14;
1106:16,17;1110:1;
1132:15;1133:20;
1134:24;1135:13;
1137:7,20;1139:1,5;
1144:19;1216:3,18;
1277:4
**Adondakis (36)**
1061:13;1062:2;
1063:5;1151:21,22;
1152:25;1153:8,22;
1154:3;1155:18,21;
1156:13;1157:4;
1158:1;1161:3;
1162:21;1163:11;
1164:2,7;1165:4,8;
1166:18,21;1168:8,24;
1169:17,20;1170:17;
1172:2;1186:14;
1188:7,20;1238:10;
1240:2;1255:18;
1267:9
**Adondakis' (2)**
1062:21;1152:15
**advance (2)**
1226:10;1230:5
**advantage (1)**
1151:15
**adversely (1)**
1045:1
**advised (1)**
1174:20
**advising (1)**
1162:17
**advisor (2)**
1220:19,22
**affect (1)**
1063:5
**affects (1)**
1045:1
**affirmative (3)**
1051:16;1052:18;
1090:4
**afternoon (9)**
1142:9,10;1151:1,
14,18,19;1219:9;
1269:22;1270:4
**afterwards (1)**
1135:3
**again (71)**
1019:23;1020:1;
1021:8;1027:17;
1028:4,8;1029:2;

1033:13;1038:5,6,7;
1058:1,17;1059:3,15;
1063:14;1065:25;
1067:3;1070:3;
1072:10;1075:11;
1081:25;1086:10,13;
1100:19;1106:5;
1109:20;1114:25;
1115:11;1119:11;
1120:1;1126:4;
1138:15;1155:19;
1161:22,24;1163:9;
1165:6;1173:9;1176:9;
1182:6;1183:20,24;
1196:16;1204:25;
1205:14;1206:16;
1207:21;1208:13;
1214:13;1215:4,11;
1216:8;1221:9;
1223:18;1226:4;
1228:4,23;1237:16,20;
1241:9;1251:11;
1259:18;1262:14;
1266:11;1271:24;
1273:14,19;1274:9;
1277:14,15
**against (2)**
1019:22;1027:13
**age (1)**
1182:2
**agents (1)**
1266:13
**aggregate (1)**
1228:9
**aggressive (4)**
1275:17,21;1276:3,
12
**ago (9)**
1166:7;1179:1;
1186:18;1189:24;
1201:23;1209:3;
1216:10;1221:8,12
**agree (10)**
1031:19;1045:17;
1075:14;1077:7;
1081:20;1091:2,6,14;
1186:4;1246:22
**agreed (3)**
1023:8,9;1129:5
**agreement (6)**
1163:5;1253:18,21;
1254:7,21;1255:11
**ahead (3)**
1107:6;1165:12;
1187:12
**AI (2)**
1100:12,18
**alcohol (1)**
1020:19
**allow (12)**
1090:13;1124:1;
1202:12;1204:22;
1207:19;1212:12;

1220:11;1233:17;
1236:14,14;1237:3;
1258:4
**allowed (2)**
1027:1,2
**allowing (1)**
1126:7
**alone (1)**
1219:11
**along (3)**
1030:8;1241:2;
1269:17
**Altera (19)**
1068:6,7;1069:1;
1070:7,16;1071:12;
1072:25;1073:11,20,
23;1074:9;1075:7;
1076:7,12,22,24;
1077:3;1241:14,25
**Altera's (1)**
1076:4
**alternative (1)**
1038:8
**although (4)**
1089:14;1109:23;
1246:7,15
**ALTR (1)**
1072:23
**AMD (17)**
1026:24;1027:11;
1030:19;1031:15,18,
24;1033:7;1034:9;
1048:7;1056:1,13,23;
1057:8;1119:14
**America (3)**
1244:25;1248:14;
1249:9
**among (1)**
1040:17
**amongst (1)**
1171:21
**amount (4)**
1025:18;1049:24;
1126:1;1232:15
**amounts (2)**
1028:17;1029:1
**analogue (1)**
1067:20
**analyses (1)**
1217:24
**analysis (6)**
1082:3;1113:17;
1114:20,22;1154:4;
1242:6
**analyst (41)**
1039:23;1040:15;
1068:14,19;1070:19,
20;1071:1;1077:14;
1104:19;1143:4,13;
1164:12;1184:8;
1185:9,9,16;1218:6,18;
1228:17;1233:12,20;
1235:24;1238:17;

1244:3,4,5,24,25;
1245:1,12;1246:24,25;
1247:2,14;1248:11,13;
1249:9;1250:9,9;
1275:3,6
**analysts (20)**
1018:12,20;1021:24;
1040:17;1048:15;
1049:7;1071:2;
1107:18,24;1108:8;
1110:5,16;1111:6;
1227:20;1228:11,19;
1242:13,19;1244:20;
1275:20
**analyst's (2)**
1244:13,22
**analysts' (1)**
1245:18
**analyzed (1)**
1071:10
**and/or (2)**
1075:7;1226:12
**announced (7)**
1039:1,9;1041:5;
1211:18;1230:16;
1232:23;1275:6
**announcement (12)**
1046:9;1047:1;
1065:11;1131:8;
1211:17;1226:11;
1232:4,16;1235:7,7;
1249:10;1275:3
**answered (2)**
1090:8;1091:12
**Anthony (1)**
1194:7
**anticipate (1)**
1280:8
**anticipating (1)**
1021:10
**anymore (2)**
1028:16;1238:2
**apartment (1)**
1145:18
**apologize (5)**
1090:20;1091:2,11;
1124:20;1149:23
**apologized (3)**
1090:23;1091:7,14
**apparently (4)**
1029:19;1149:18;
1169:11;1244:5
**appear (3)**
1112:21;1181:2;
1201:3
**appears (13)**
1045:20;1056:22;
1058:18;1060:24;
1072:13,17;1105:12;
1116:8;1162:5;
1230:23;1244:2;
1276:1,2
**Apple (1)**

1144:14
**Applied (1)**
1119:10
**approach (5)**
1088:12;1202:20;
1229:21;1243:13;
1251:12
**approached (3)**
1201:22;1222:9;
1255:8
**appropriate (2)**
1037:22;1131:21
**approval (1)**
1262:24
**approve (1)**
1022:20
**approver (1)**
1263:1
**approving (1)**
1049:23
**approximately (4)**
1024:3;1196:5;
1200:12;1227:8
**approximation (2)**
1066:3;1067:17
**APPS (164)**
1018:5,10;1020:7,
14,19;1023:17,24;
1024:10;1025:4;
1030:8,20;1031:21;
1037:17;1040:12;
1042:3;1046:19;
1050:5;1052:10;
1053:20;1054:18,22;
1056:16;1060:17;
1061:17;1064:12;
1071:20;1074:13;
1078:7;1080:21;
1091:12;1093:7,16;
1094:3;1095:4;
1100:16;1102:6,18;
1104:14;1111:1;
1115:7;1117:23;
1118:6;1121:6,18;
1123:9,13;1130:10,25;
1131:18;1135:17;
1137:24;1139:12;
1141:16;1146:21;
1149:22;1150:15;
1151:7;1153:2,5,6,14;
1156:8;1157:13,22;
1158:25;1160:4;
1161:16;1163:23;
1165:17;1167:8;
1173:4;1176:23;
1178:12;1179:16;
1182:15;1183:12,15;
1187:11,24;1191:8,17;
1194:18,20;1195:1,4;
1196:16;1197:7;
1198:15;1203:6,20,25;
1204:23;1206:9;
1207:8;1208:3;

1212:14;1213:1;
1214:16,19;1217:17;
1218:25;1219:17,18;
1220:3,8;1224:9,24;
1225:9;1226:14;
1229:18;1230:21,25;
1231:7,10,13,17,21;
1232:17;1233:6;
1234:10;1235:3,6;
1236:1,8,16;1237:2;
1238:8;1241:6;1243:6,
9;1244:11,24;1246:23;
1248:3;1252:14;
1257:8;1260:3,7,24;
1261:3,15,17,21;
1263:14;1264:15;
1266:3;1267:5;1268:1;
1269:1,9;1270:7;
1271:6,7,9,13;1273:13,
15;1275:13;1276:17;
1278:1,4,18;1280:4,7
**Apps' (1)**
1235:23
**April (14)**
1038:21;1043:16,22;
1093:3,24;1095:8,22;
1096:1;1097:15;
1125:11,23;1136:25;
1161:11;1193:12
**archival (2)**
1087:2,10
**archived (6)**
1087:13,21;1088:8,
14,19;1092:21
**archiving (1)**
1087:23
**area (1)**
1105:18
**areas (1)**
1108:15
**arguing (3)**
1036:7,8,22
**argument (8)**
1032:22,24,25;
1034:13,14,22;
1235:12;1247:23
**argumentative (1)**
1202:11
**Ariel (1)**
1265:15
**Arizona (1)**
1106:5
**arms (1)**
1020:17
**around (14)**
1020:17;1021:19;
1038:9;1096:6,8,13,16;
1098:19;1160:15;
1148:18;
1224:20;1269:25
**arrangement (1)**
1162:21
**art (1)**

1184:14
**article (7)**
1046:18,24;1047:11,
15,21,22;1258:20
**articulate (2)**
1098:3,9
**ARW (1)**
1178:20
**Ashton (2)**
1104:18,19
**aside (1)**
1150:5
**ASP (3)**
1079:16;1193:4,5
**ASP's (1)**
1079:19
**ass (1)**
1114:5
**assessing (1)**
1185:12
**assist (3)**
1152:12;1212:3;
1259:8
**assistance (5)**
1154:4;1256:6,11,
16,18
**associated (1)**
1271:5
**assume (5)**
1023:16;1028:4;
1029:22;1159:8;
1277:17
**assumption (1)**
1039:19
**assumptions (6)**
1210:17,19,22,23;
1211:19,20
**attaches (1)**
1187:16
**attempted (1)**
1161:20
**attend (5)**
1084:19,21,24;
1110:5;1262:13
**attended (4)**
1064:19;1084:10;
1105:19,22
**attending (2)**
1084:23;1262:3
**attention (9)**
1075:18;1114:10;
1123:18;1136:1,18,19;
1138:15;1202:24;
1239:23
**attitude (2)**
1123:6;1125:9
**Attorney's (1)**
1254:14
**attributable (1)**
1247:4
**attributed (2)**
1061:25;1275:20
**August (74)**

1046:15,16;1047:2,
4,5,21;1048:4;
1060:14;1065:1;
1086:16;1099:7;
1113:16;1130:3,6;
1135:5;1181:16;
1194:23;1197:2,2,6,8,
14,19,19;1198:12,23;
1199:21,21,25;1200:1,
16,18,18;1202:24;
1203:18,24;1204:1,3,
15;1206:16;1207:5,7;
1208:19;1209:5;
1229:17;1230:1,6,7,9,
16;1232:2,6,11,11,21,
23;1233:9,10,17,22;
1234:8;1235:14;
1237:9,9;1251:23;
1252:12;1269:11,19;
1270:9;1272:17;
1275:3,7,21;1276:11
**Australia (3)**
1115:10,12,22
**authenticate (1)**
1131:23
**author (2)**
1075:11;1144:4
**authored (3)**
1074:7;1080:16;
1181:3
**authority (2)**
1049:23;1059:14
**authorization (1)**
1070:9
**authorized (4)**
1043:1;1060:1;
1068:1;1074:4
**available (3)**
1162:18;1216:23;
1217:12
**average (7)**
1130:20;1193:5,7;
1210:4;1212:18;
1228:10,12
**avoid (1)**
1243:17
**AVT (2)**
1097:19,23
**aware (15)**
1064:23;1087:7,9,
10;1092:8,11,12;
1107:2;1113:12,25;
1114:2;1188:15;
1221:25;1254:1;
1274:25

**B**

**bachelor (1)**
1171:2
**back (36)**
1021:6;1042:14;
1043:7;1044:4,7,9;

1064:22;1072:1;
1088:4;1092:22;
1099:4;1104:6;1107:2,
10;1141:4,8;1153:19;
1159:6;1165:22;
1177:22;1199:4,20;
1204:10;1205:20;
1207:3,4;1216:8;
1217:10;1221:7;
1233:25;1242:22;
1245:10;1250:3,9;
1254:3;1270:5
**backward (1)**
1275:16
**bad (3)**
1043:4;1045:22;
1046:1
**Bailey (2)**
1233:21;1276:1
**Bailey's (1)**
1275:24
**balance (4)**
1197:21,21,24;
1200:3
**Bank (4)**
1130:3;1244:25;
1248:14;1249:9
**bar (4)**
1234:15;1235:1;
1243:15;1244:1
**barely (1)**
1190:12
**base (2)**
1177:23,24
**Based (15)**
1024:10;1030:5;
1037:22;1060:24;
1071:3;1072:13;
1076:22;1081:16,23;
1082:1;1162:5;
1212:10;1217:11;
1244:14;1251:12
**basically (10)**
1029:9;1106:19;
1118:18;1224:12;
1229:8,10,11;1233:21;
1251:17;1266:23
**basis (11)**
1025:25;1031:3;
1032:7,10,10;1033:16;
1087:12;1180:13;
1233:10;1234:13;
1262:21
**basket (3)**
1025:23,23;1026:22
**baskets (1)**
1118:23
**bathroom (2)**
1038:12;1127:13
**Bear (12)**
1068:19;1070:17;
1072:3,6,21;1074:3,6,
19;1076:6,23;1077:8;

1241:13
**bearings (2)**
1043:11,24
**beat (17)**
1038:25;1039:16,17;
1063:8,12;1073:15,21,
21;1076:4;1177:19,24;
1225:25;1226:2,2;
1227:12;1239:14;
1275:15
**beauty (1)**
1185:8
**became (6)**
1040:22,25;1114:14;
1151:22;1217:7;
1224:11
**become (1)**
1098:9
**becomes (1)**
1065:22
**began (5)**
1061:3,4;1204:3;
1206:20;1217:10
**begin (1)**
1155:15
**beginning (6)**
1085:19;1086:7;
1156:13;1246:17;
1248:9;1269:10
**beholder (1)**
1185:9
**belief (1)**
1040:21
**believes (3)**
1229:3;1246:25;
1250:7
**believing (1)**
1040:24
**bell (2)**
1101:13,15
**belong (2)**
1208:5,5
**belongs (1)**
1208:14
**below (7)**
1053:15;1159:4;
1197:14;1198:6;
1237:22;1245:4;
1249:3
**bench (1)**
1150:6
**beneath (1)**
1224:3
**benefit (1)**
1070:12
**benefits (2)**
1060:4;1068:4
**Berman (5)**
1203:8,10;1271:8,
14,16
**best (6)**
1039:18;1119:12;
1177:22;1185:2;

1186:15;1259:14
**better (11)**
1032:25;1056:25;
1062:24;1063:8;
1076:18;1081:17;
1098:3;1151:13;
1239:9;1240:8,13
**Betty (2)**
1050:13;1260:20
**beyond (5)**
1233:7;1239:1,5;
1244:22;1263:11
**big (7)**
1034:9;1088:13;
1100:20;1108:2;
1179:2;1206:25;
1235:10
**bigger (3)**
1073:15;1076:4;
1163:9
**Biggest (3)**
1066:9;1120:9;
1179:5
**Bill (1)**
1167:4
**billion (1)**
1198:5
**binder (6)**
1093:1;1150:1,12,
14;1172:20;1224:22
**binders (1)**
1149:25
**bit (7)**
1029:8;1038:5;
1054:19;1060:23;
1102:9;1183:18;
1268:1
**bite (1)**
1147:7
**biweekly (2)**
1263:15,19
**BlackBerry (1)**
1264:7
**blast (1)**
1102:11
**blew (1)**
1225:14
**block (2)**
1205:23;1258:6
**Bloomberg (5)**
1047:17;1230:24,24;
1231:14;1258:20
**blow (4)**
1207:8;1222:21;
1225:10;1250:3
**blowup (1)**
1245:10
**blue (1)**
1068:18
**blurry (1)**
1225:9
**board (2)**
1179:3;1255:5

**body (5)**
1058:22;1059:2;
1062:17;1184:15;
1185:2
**book (8)**
1028:23,24;1029:1,
1;1126:21;1146:11;
1152:20;1265:8
**borrow (1)**
1154:25
**boss (7)**
1042:8;1074:4,7;
1173:17;1179:12,20;
1191:24
**both (17)**
1048:9;1075:14;
1085:5;1094:6,8;
1124:14;1141:4;
1144:17;1164:6;
1165:1,7;1184:5;
1197:7;1244:9;
1262:10;1277:11,15
**bottom (15)**
1053:6;1086:24;
1096:12;1097:8;
1130:8;1131:14;
1156:12;1165:20;
1193:18;1213:2;
1215:1;1220:15;
1238:9;1239:24;
1240:6
**bottoms (8)**
1209:19,21,22;
1210:12;1212:8,15;
1214:4;1217:12
**bought (1)**
1181:4
**box (6)**
1023:10;1054:19;
1102:2;1129:9,15,18
**brands (1)**
1179:3
**breaching (1)**
1220:21
**break (9)**
1019:9;1038:13,14;
1127:11,13;1147:5;
1219:9;1278:23,25
**brief (1)**
1261:8
**briefly (2)**
1094:14;1098:15
**bring (6)**
1022:9;1050:23;
1052:20;1054:18;
1151:5;1279:2
**bringing (1)**
1052:24
**brochure (1)**
1100:22
**broke (1)**
1141:8
**broken (1)**

1149:12
**Brothers (2)**
1234:8;1237:8
**brought (2)**
1019:18;1050:9
**BTW (1)**
1239:6
**buckets (1)**
1146:8
**build (1)**
1038:6
**building (1)**
1083:8
**built (1)**
1210:16
**bulk (1)**
1253:9
**bullet (10)**
1075:18,19;1076:6,
23;1079:22;1178:24;
1198:5;1224:3;1240:6;
1268:17
**bullish (1)**
1079:22
**bunch (2)**
1020:17;1030:9
**bundle (3)**
1029:16,20,23
**bundles (2)**
1036:1,1
**Bureau (1)**
1114:1
**burning (1)**
1180:13
**business (18)**
1031:10;1046:18,24;
1054:8;1067:15,18,20;
1081:9;1082:11;
1089:21;1108:20;
1109:1,4;1119:19;
1146:1;1181:8;
1190:13;1212:17
**businesses (2)**
1210:4,5
**buy (4)**
1031:11;1079:1;
1195:11;1251:13
**byline (1)**
1143:19

**C**

**calculate (1)**
1227:4
**calculating (1)**
1213:11
**calculation (2)**
1113:23;1214:12
**calculations (1)**
1213:12
**calendar (1)**
1064:23
**California (1)**

1151:22
**call (64)**
1025:1;1035:5;
1038:7;1056:13;
1057:16,20,25;
1061:21;1064:15,20;
1068:17;1078:10,17;
1082:23;1154:25;
1158:10;1160:14;
1192:1,15;1204:15,19,
24;1206:2,3,5,12,18;
1208:18;1215:4,9,22;
1216:6;1225:13,15;
1228:2,6,9,12,19;
1229:16,24,24;1245:8;
1249:10,17;1250:2;
1257:4,11,15,23;
1258:8,25;1259:4,9;
1269:18;1270:10;
1271:2;1272:3,16,19;
1276:24;1277:6,8,17
**called (16)**
1038:3;1052:20;
1064:4;1067:9;
1068:19;1108:3;
1118:20;1136:5;
1154:5;1201:12;
1202:7;1203:18,22;
1256:7;1270:24;
1271:21
**calling (4)**
1023:24;1177:21;
1203:3;1205:22
**calls (18)**
1051:12,13;1060:20;
1061:1,2,5;1163:1,2,3,
4,6;1205:11,14;
1244:13;1245:3;
1248:16;1270:24;
1274:23
**came (33)**
1023:7,10;1028:15;
1048:10;1062:20;
1073:8;1111:14;
1129:9,15,18;1133:1,7,
18,23;1134:2,19;
1136:4,6,7,9,13;
1139:10,16;1141:4,8;
1152:1;1171:20;
1181:15;1185:20;
1193:23;1220:8;
1236:12;1259:7
**can (97)**
1022:25;1024:20,24;
1025:2;1029:5,13;
1031:19;1035:25;
1037:17;1038:15;
1040:13;1043:7,10,11;
1044:4,7,8;1053:2;
1054:22,25;1066:24;
1074:5;1075:18,19;
1082:9;1083:1;
1087:19;1090:11;

1091:18,19;1095:5;
1098:13;1101:5;
1106:4;1112:25;
1115:11;1123:17;
1124:7,9;1126:2;
1127:12;1139:11;
1140:12;1141:7;
1145:25;1148:2;
1150:5;1153:17;
1157:16;1158:10,12;
1161:24;1169:3;
1172:1;1173:16;
1176:19;1185:9,10;
1187:12;1191:7,13;
1195:3;1197:7;1200:1;
1202:11;1204:14;
1206:23;1207:14;
1208:10;1211:2,5;
1212:13,13;1218:25;
1219:12;1223:20;
1225:10;1228:4;
1233:19;1237:7;
1240:13;1242:9;
1248:17;1249:7;
1250:5;1261:22;
1263:5,14;1264:16,18;
1267:14;1268:1;
1270:5;1271:24;
1272:24;1273:14;
1278:19
**cancel (1)**
1105:8
**canceling (4)**
1100:2,3;1105:7,9
**cap (1)**
1119:7
**Capital (2)**
1087:1;1258:6
**care (1)**
1245:2
**careful (1)**
1018:23
**carefully (3)**
1019:2,5;1021:10
**carry (1)**
1259:12
**case (25)**
1028:15;1031:20;
1033:8;1039:25;
1040:20,20;1047:25;
1054:8;1059:20;
1072:20;1085:16;
1086:15;1105:12;
1112:16;1117:16;
1147:7;1150:5;1157:9;
1169:6;1212:15;
1223:1;1230:5;1267:2;
1279:2,4
**catch (3)**
1156:20;1159:6;
1160:15
**Cathy (2)**
1260:21,22

**Caught (2)**
1094:14;1098:15
**cause (3)**
1175:9;1246:18;
1250:4
**caused (2)**
1097:22;1176:3
**caution (1)**
1224:7
**cautious (3)**
1079:23;1177:20;
1224:14
**caved (1)**
1173:12
**CC (1)**
1050:15
**ceased (1)**
1193:23
**cell (16)**
1158:10;1202:1,9;
1203:14,15;1205:5;
1206:1,2;1214:14;
1216:1;1270:17,19,25;
1271:2;1272:7,20
**cent (1)**
1227:5
**central (1)**
1271:14
**cents (3)**
1180:9,9;1226:8,8;
1227:3
**CEO (3)**
1079:25;1108:2,14
**certain (11)**
1028:18;1083:23;
1090:4,5;1118:23;
1132:8;1148:7;
1163:14;1211:12;
1251:3;1263:2
**Certainly (9)**
1036:15,18;1061:2;
1070:1;1081:23;
1103:4;1104:19;
1152:17;1163:11
**cetera (4)**
1059:5;1075:13;
1078:11;1082:5
**CFO (2)**
1108:2,14
**CH (2)**
1238:13,16
**chain (1)**
1081:9
**change (10)**
1058:21,23;1208:18;
1211:6;1232:9;1274:7,
8,17,20,25
**changed (11)**
1059:11,20;1083:20;
1212:10;1223:22;
1273:22;1274:6,10;
1278:5,7,13
**channel (3)**

1241:15,19;1244:17
**characterize (1)**
1125:8
**charge (1)**
1031:23
**charged (2)**
1247:16;1255:15
**chart (18)**
1065:15;1194:24;
1195:2,6,9;1196:14;
1197:1,1,3,6,14,20,22,
24;1200:19;1231:15,
21;1269:24
**charts (2)**
1195:5;1197:7
**chat (3)**
1157:1;1158:9;
1166:5
**check (9)**
1024:24;1117:6;
1177:2,5,15;1178:20;
1191:22;1222:23;
1224:4
**Checked (2)**
1117:5;1179:1
**checks (33)**
1071:7;1073:16;
1074:25;1075:2,4,8;
1076:22;1078:11,17;
1081:3,4,7,16;1082:11;
1093:4,10,15;1117:8;
1135:20,22;1136:5,7,
11;1177:16;1179:23;
1190:8;1224:3;
1240:18,22;1241:3,15,
19;1244:17
**Chiasson (10)**
1019:17;1142:13,16;
1144:8,15,20;1145:4;
1169:12;1194:7,10
**chipsets (3)**
1044:16;1045:3,4
**chitchatting (1)**
1187:5
**choosing (1)**
1022:3
**Christian (8)**
1238:13,16,17;
1239:7,13,16,22;
1240:4
**chunk (2)**
1026:23;1034:9
**circumstances (1)**
1028:21
**Citi (1)**
1225:12
**Citigroup (1)**
1225:12
**city (2)**
1171:7,10
**claim (1)**
1025:21
**claims (1)**

1031:16
**clarification (1)**
1202:19
**clarify (3)**
1107:14;1109:15;
1232:22
**class (2)**
1022:21,21
**cleaner (1)**
1141:20
**clear (24)**
1043:6,21;1044:3,7;
1054:9;1067:16;
1072:10;1088:9;
1092:7,7,20;1098:9,10;
1105:14;1109:9;
1136:2;1168:15;
1172:1;1180:22;
1198:11;1202:1;
1240:15;1244:11;
1272:1
**clearer (1)**
1214:20
**clearly (3)**
1057:12;1067:4;
1119:8
**client (4)**
1021:19;1133:15;
1134:1;1247:21
**clients (5)**
1168:5;1223:8,11,
11;1265:22
**client's (2)**
1027:21;1149:3
**clip (1)**
1021:25
**clocks (1)**
1180:14
**Close (7)**
1097:8;1168:23;
1173:13;1245:14;
1247:13;1250:12,23
**closed (2)**
1097:13;1195:11
**club (3)**
1172:8;1173:15,25
**clubs (1)**
1170:6
**coast (6)**
1042:16,16,17,19;
1262:4,12
**cold (1)**
1219:12
**Coleman (1)**
1049:1
**collapse (1)**
1044:14
**colleagues (2)**
1077:17;1080:16
**collect (1)**
1279:4
**collection (1)**
1119:6

**collective (1)**
1031:6
**column (2)**
1081:2;1232:8
**combination (1)**
1039:21
**comfort (1)**
1242:10
**Comfortable (2)**
1219:3,4
**coming (17)**
1022:23;1059:7;
1098:20;1116:8;
1136:3,15;1146:22;
1202:18;1204:10;
1212:19;1214:8;
1223:25;1241:20,23;
1245:20,21,22
**comment (11)**
1047:8,13,13,19;
1067:18;1072:17;
1079:21;1082:3;
1164:25;1186:16;
1276:18
**commentary (8)**
1047:16;1082:12,20;
1185:3;1213:22;
1218:4;1226:1;
1237:20
**comments (7)**
1046:8,12;1072:19,
19;1081:12;1173:16;
1249:1
**commercial (4)**
1192:18;1193:5;
1210:1,1
**commit (1)**
1253:22
**common (2)**
1075:8;1090:11
**communicate (3)**
1090:4,5;1270:19
**communicated (1)**
1084:5
**communicating (4)**
1164:7;1220:15,17,
19
**communication (3)**
1085:1;1252:20;
1272:22
**community (3)**
1040:18;1079:6;
1185:16
**commute (2)**
1083:6;1145:8
**companies (20)**
1026:10,15;1029:11;
1031:5;1033:17;
1042:13;1048:20,22;
1071:2;1074:9;
1107:24;1108:12;
1119:9,24;1135:3;
1180:2;1244:20;

1249:13;1253:4;
1273:11
**company (75)**
1039:5;1040:16,23;
1048:14,18;1058:25;
1072:12;1075:10,12;
1087:1,7;1093:11,11;
1099:5;1102:25;
1104:12,12;1107:11,
16;1108:5,9;1109:1;
1110:3,13,16,17,21;
1132:5,22;1138:13,20;
1139:13;1146:8,9;
1148:8,19,23;1154:5,
14,15;1155:11;
1160:21;1179:24,25;
1183:23;1184:10;
1185:1;1209:23,24;
1217:5;1220:18,22,25;
1240:12;1241:25;
1242:5;1244:15;
1246:5;1248:19;
1249:16,20;1250:8,22;
1251:3;1253:3;1264:9;
1274:13,14,14,15,18;
1278:9,15,15,16
**company's (5)**
1045:1;1058:10;
1076:9,10;1119:19
**compare (4)**
1058:5;1094:9;
1252:1;1263:12
**compensated (1)**
1188:17
**compensation (1)**
1021:2
**competitors (1)**
1075:13
**compile (2)**
1146:4,5
**compiled (1)**
1146:17
**complete (2)**
1036:20;1120:6
**completed (1)**
1206:2
**completely (1)**
1254:12
**compliance (18)**
1050:17;1052:4,7,8,
14,24;1054:3,9,14;
1085:21;1086:12;
1088:11,15;1218:21;
1220:2;1221:17;
1273:16,17
**complicated (1)**
1247:20
**complied (1)**
1169:4
**comply (2)**
1154:18;1155:3
**component (1)**
1210:11

**comprised (1)**
1253:9
**computer (4)**
1120:14,16;1154:21;
1249:12
**computers (3)**
1276:4,7,8
**computing (2)**
1180:11,16
**conceal (1)**
1222:3
**concealing (1)**
1054:19
**conceivably (1)**
1149:1
**concern (5)**
1020:25;1026:1;
1124:25;1229:3,9
**concerned (3)**
1024:22;1122:6;
1127:4
**concerning (4)**
1254:13;1273:7,10,
21
**concise (1)**
1098:9
**conclude (2)**
1175:9,11
**concluded (1)**
1059:6
**concluding (1)**
1200:2
**conclusion (2)**
1063:7;1160:25
**conclusively (1)**
1039:14
**conditional (1)**
1131:18
**conduct (6)**
1148:18;1220:17;
1253:25;1254:5,6;
1255:2
**conducted (2)**
1065:7;1217:24
**conductor (1)**
1031:11
**confer (2)**
1128:4,7
**conference (7)**
1106:20;1109:14;
1110:11;1111:3;
1142:23;1170:24;
1262:12
**conferences (16)**
1084:9,10,13,14,19;
1090:15;1105:16,19;
1106:5;1107:20,23;
1170:22;1171:1,3,4;
1262:4
**confident (1)**
1180:14
**confidential (17)**
1033:9;1086:8;

1132:4,22;1135:2;
1136:23;1138:13,20;
1139:13;1140:1,1,3,5;
1223:6;1252:8;1278:9,
17
**confidentiality (1)**
1220:21
**confirm (1)**
1220:23
**confirming (1)**
1190:8
**confused (1)**
1183:19
**confusing (6)**
1037:18;1246:1,19;
1247:8,10,14
**congratulating (1)**
1277:18
**conjunction (1)**
1077:16
**connected (1)**
1160:20
**Connecticut (3)**
1083:3;1084:5;
1145:9
**connection (9)**
1032:4;1034:2;
1052:23;1104:23;
1145:21;1195:14;
1233:17;1256:5;
1266:5
**consensus (10)**
1081:12,17;1138:6;
1180:8,9;1227:2,8,12;
1228:2;1229:25
**consistent (6)**
1021:16;1054:10;
1059:9;1060:25;
1061:2;1221:2
**consistently (1)**
1022:1
**consolation (2)**
1019:5;1023:17
**conspiracy (1)**
1031:23
**Constantino (12)**
1174:5,9,21;1175:6,
8,16,18;1176:2,6;
1177:12;1178:17;
1180:4
**Constantino's (1)**
1175:5
**consultant (18)**
1042:11;1164:18,20;
1166:14,16,17;
1174:12;1177:15,25;
1220:17,20,22,23;
1252:8;1260:5,6,14;
1261:9
**consultants (19)**
1052:8,13,16;
1161:20;1162:3,23;
1163:14;1165:10;

1220:16;1221:3;
1259:20;1260:10;
1261:5,7,10;1262:24;
1263:3,3,16
**consulting (5)**
1042:9;1052:19,25;
1221:20
**consumer (7)**
1192:16;1193:5;
1209:25;1210:1,25;
1211:1;1276:15
**contact (52)**
1042:20;1057:8;
1068:12;1069:1,11,20,
25;1070:4,6,10,13;
1072:3,6,21;1073:8;
1099:9,12;1100:15;
1155:20;1158:12;
1189:14,21;1192:1,3,
15;1196:6,8;1207:15;
1211:13;1221:9;
1241:25;1242:1;
1245:15,17;1246:18,
19;1247:1,2,13,14;
1248:15;1249:25;
1250:8,13,22,24;
1251:1,2;1266:7,8,17;
1267:2
**contacts (8)**
1075:7;1145:22,25;
1148:21;1192:5;
1218:12;1245:2;
1265:24
**contain (1)**
1256:15
**contained (8)**
1075:15;1177:15;
1195:19,22;1225:3;
1242:2;1252:24;
1256:10
**containing (1)**
1229:24
**contend (1)**
1036:4
**context (2)**
1045:20;1240:23
**continue (4)**
1180:10;1190:9;
1249:19;1269:17
**Continued (26)**
1037:25;1038:19;
1055:1;1103:6;
1127:15;1128:10;
1134:23;1135:2;
1138:24,25;1139:4,21,
23;1140:14;1141:24;
1147:10;1186:10,11;
1198:24;1226:21;
1234:18;1236:22;
1243:18;1247:25;
1267:19;1279:7
**continues (2)**
1200:21;1250:2

**contrary (1)**
1080:3
**contrast (2)**
1235:14;1263:12
**controversial (1)**
1150:10
**conversation (35)**
1021:15;1041:21;
1057:10;1059:23;
1061:14;1062:3;
1066:10,22;1067:1;
1068:23;1069:2,4,5;
1081:21;1094:22;
1106:1,8,17,18;1109:7,
10,19;1116:21;1143:1,
3;1144:7,12,15,21;
1148:19;1159:9,10;
1221:15;1240:4;
1264:10
**conversations (10)**
1039:21;1069:3;
1089:14;1108:19;
1109:23,24;1144:10;
1157:12;1214:1;
1223:20
**convey (3)**
1098:14;1116:20;
1250:18
**conveyed (4)**
1062:12;1081:21;
1116:11,13
**conveying (2)**
1093:13,19
**conviction (5)**
1058:6,9,21;
1059:10,21
**convinced (1)**
1244:14
**convo (3)**
1116:1,4,14
**cool (2)**
1167:12;1199:12
**cooperate (2)**
1253:22;1254:2
**cooperating (4)**
1024:5;1146:3;
1175:3;1253:24
**cooperation (5)**
1253:18,21;1254:7;
1255:11;1256:13
**coordinated (1)**
1021:25
**copy (2)**
1231:6;1243:8
**corporation (1)**
1160:21
**correctly (2)**
1151:21;1182:8
**correlate (1)**
1120:5
**correlated (8)**
1026:10,19,20;
1027:11;1029:18,19;

1032:21;1035:17
**correlating (1)**
1034:16
**correlation (8)**
1025:13;1029:21;
1030:12;1119:23;
1120:1,1,5,8
**correspondence (2)**
1053:6;1123:5
**corroborated (1)**
1021:18
**cost (1)**
1211:7
**costs (3)**
1210:10,10,11
**Cotter (5)**
1057:8,21;1059:24;
1060:1,4
**count (1)**
1213:14
**counter (1)**
1034:14
**countering (1)**
1036:8
**couple (13)**
1156:4;1159:19;
1170:8;1180:19;
1181:12;1186:18;
1190:7;1232:21;
1251:17;1262:18;
1263:22;1264:19;
1266:2
**courier (1)**
1253:3
**course (9)**
1087:21;1096:20;
1097:1;1132:3;1147:7;
1171:18;1190:23;
1214:11;1257:22
**court (265)**
1018:2,3,9,17,24;
1019:4,9,18,24;1020:4,
12,16;1021:5,11,21;
1022:2,17;1023:11,22;
1024:7,21;1026:6,20;
1027:4,13,17;1028:2,4;
1029:5,19;1030:3,16;
1031:12,17,25;1032:2,
4,14,19,24;1033:2,11;
1034:5,10,18;1035:2,8,
13,20;1036:10,23;
1037:3,6,13,21;1038:1,
5;1040:13;1042:4;
1043:13;1050:6;
1052:11;1053:19,21;
1054:24;1056:10,17;
1060:18;1061:18;
1064:13;1066:17;
1071:21;1074:14;
1078:8;1080:22;
1091:13;1093:8;
1094:4;1102:5,7,20;
1104:15;1107:6;

1114:6;1115:8;
1117:22,24;1118:7;
1121:19;1123:3,16,19,
23;1124:1,9,16,18;
1126:6;1127:13;
1128:1,2,6,9;1129:1,2,
11,19;1130:11,24;
1131:1,25;1135:18;
1137:25;1140:10,13;
1141:10,15,17,22;
1142:1,2,5;1146:20,25;
1147:3;1148:1,10,15,
21,25;1149:7,11,18,24;
1150:2,8,13,17;1151:3,
8,10,13;1152:21;
1153:5,13,15,18;
1156:9;1157:23;
1159:1;1160:5;
1161:17;1163:24;
1165:18;1167:9;
1169:2;1172:12,16,20;
1173:5;1174:15;
1176:24;1178:13;
1179:15,17;1182:17;
1183:13,16;1187:9,12;
1189:2;1191:4,7,9,18;
1194:17;1202:12,22;
1204:22;1207:19;
1208:23;1209:11;
1212:12;1214:7,15,17,
22,24;1217:20,25;
1218:15;1219:1,6,9,11,
16;1220:11;1223:13;
1224:23;1229:22;
1230:20;1231:8,20,24;
1233:12,16;1234:11,
15;1235:2,5;1236:2,13,
17,19;1237:1,3;
1238:7;1239:3;
1242:16;1243:8,10,15;
1244:23;1246:3,8,11,
21;1247:7,19;1248:1,2,
4,8;1250:18;1252:13;
1253:12;1255:12;
1258:4;1259:3;1261:1,
10,16,18,22;1263:5,12;
1266:20,23,25;1267:8;
1269:3,5;1271:9,12;
1277:25;1278:12,19,
22;1280:1,2,6,8,12,15,
17
**cover (7)**
1025:2;1036:22;
1111:24,25;1118:23;
1141:3;1143:24
**coverage (1)**
1112:4
**covered (3)**
1101:9;1141:2;
1180:2
**covering (3)**
1104:13;1227:20;
1228:18

**covers (2)**
1195:11;1248:14
**Craig (3)**
1238:17,18;1239:16,
22
**create (2)**
1209:23;1223:22
**credibility (1)**
1242:11
**crew (1)**
1177:7
**crimes (2)**
1253:23;1256:14
**criminal (1)**
1255:2
**criminally (1)**
1255:15
**cross (10)**
1022:2;1024:2;
1035:3;1149:14;
1150:3;1207:18;
1233:8,16;1263:11;
1280:10
**crossed (1)**
1142:22
**cross-examination (17)**
1018:7;1020:11;
1023:20;1038:10,18;
1142:2,7;1151:16;
1197:19;1201:17;
1203:23;1209:15;
1227:6,17;1244:16;
1253:16;1259:7
**CSFB (1)**
1106:5
**curious (1)**
1186:18
**current (4)**
1062:13;1063:13;
1109:4;1217:2
**currently (1)**
1024:12
**Curtis (2)**
1104:18,19
**customer (1)**
1143:8
**customers (1)**
1181:3
**cut (8)**
1116:23,24;1117:1,
11;1118:3;1141:6,13;
1264:2
**cuts (1)**
1114:16
**cutting (1)**
1117:14

### D

**Dan (3)**
1024:24;1221:19;
1224:9
**Danny (11)**

1075:6;1077:21;
1132:13;1137:20;
1171:25;1172:2;
1173:12;1179:12,20;
1180:2;1241:13
**Dan's (1)**
1222:5
**dark (1)**
1247:21
**data (24)**
1062:14;1067:16;
1156:19;1157:3,5,7,9,
11;1158:12,16;
1159:20;1168:4;
1169:15;1171:20;
1173:15;1207:20;
1216:24;1217:1,2;
1229:16;1245:6;
1249:5,12;1276:12
**date (27)**
1043:11;1050:8;
1057:25;1061:20;
1065:4,20;1080:18;
1081:22;1093:24;
1105:4;1131:8;1135:6;
1137:16;1156:13;
1157:18;1173:1;
1196:10;1198:11,21;
1207:6;1215:11,15;
1217:16;1224:16;
1225:13;1268:14;
1273:15
**dated (10)**
1074:16,20;1075:16;
1080:18;1118:2;
1135:14;1158:6,22;
1161:11;1223:15
**dates (4)**
1065:14;1072:12;
1092:22;1197:20
**David (3)**
1233:20;1275:23;
1276:1
**day (47)**
1024:22;1032:2,8,
25;1046:8,12;1047:1,8,
13;1061:23;1063:22;
1072:14;1083:6;
1101:12;1121:2,10,13,
16,19;1127:1;1136:24;
1189:6;1190:16;
1195:12;1198:14;
1199:3;1201:12;
1202:8;1203:21;
1204:3,23;1205:19;
1207:4;1209:1,5,9;
1213:13;1215:16,22;
1225:16;1232:4;
1252:23;1261:19;
1269:21;1278:23;
1280:9,13
**days (10)**
1028:18;1074:22;

1077:9;1083:7;
1120:23;1122:14;
1132:3;1186:18;
1201:23;1217:11
**day-to-day (3)**
1025:24;1031:3;
1033:16
**dead (5)**
1267:15;1268:4;
1276:18,21;1277:21
**deal (5)**
1040:3;1124:22;
1125:3;1172:4;
1264:24
**dealing (3)**
1184:14;1185:4,6
**deals (4)**
1097:9,14;1130:20;
1193:10
**debate (2)**
1112:25;1236:6
**December (10)**
1073:20;1076:2;
1115:3,10,12;1117:6;
1120:22;1231:22;
1257:4,23
**decided (1)**
1125:15
**decision (1)**
1027:6
**decisions (5)**
1031:2;1032:7;
1035:19;1037:2;
1265:9
**decline (2)**
1082:4;1232:18
**deduce (1)**
1162:10
**deduction (1)**
1268:24
**deep (1)**
1024:8
**defendant (1)**
1261:13
**defendant's (46)**
1022:18;1042:6;
1050:7;1053:22;
1061:19;1064:14;
1074:15;1080:23;
1093:9;1102:8;1115:9;
1117:25;1118:8;
1124:2;1129:21;
1130:11,12;1131:1,2;
1132:2;1135:18,19;
1137:25;1138:1;
1148:10;1153:16;
1156:9,10;1157:23,24;
1159:1,2;1160:5,6;
1161:17,18;1163:25;
1165:19;1167:10;
1173:6;1176:25;
1178:14;1179:18;
1231:17,24,25

**defense (104)**
1021:22,23,24;
1027:13,17,20;1036:5,
12,13,17,20;1041:16;
1042:2,4;1049:25;
1050:4,6;1053:2,18,21;
1056:15;1057:18;
1060:16;1061:11,16,
18;1064:3,5,11,13;
1071:19;1074:2,6,12,
14;1078:6;1080:11,20,
20,22;1092:25;1093:6,
8;1094:2;1101:18,22;
1102:4,7;1115:1,6,6,8;
1117:18,21,24;1118:5;
1120:19;1122:23;
1125:19;1126:4;
1129:7,13,16,19,24;
1130:9,14,23;1131:3,
17,25;1135:7,10,16;
1137:17,23;1152:19,
20;1153:3,15;1163:24;
1165:18;1167:9;
1172:15;1173:5;
1176:18,24;1178:13;
1179:17;1224:22,23,
24;1231:3;1237:24;
1238:8;1239:22;
1245:19;1252:12;
1257:8;1259:24;
1261:3,16;1264:13;
1267:7
**defensive (1)**
1184:24
**define (2)**
1145:25;1192:7
**defined (2)**
1112:3;1122:18
**definitely (1)**
1177:19
**definition (5)**
1126:2,3;1157:5,6;
1183:13
**degree (2)**
1120:5;1246:24
**delayed (1)**
1060:23
**delete (4)**
1087:16;1088:2,4;
1090:14
**Dell (120)**
1025:25;1030:16;
1031:22;1043:12;
1046:8,8,11,24;
1047:13,21;1089:6,13;
1090:6;1099:5,7;
1101:9;1102:13,22;
1104:9,23,25;1106:12;
1109:24;1112:5,8,10,
12;1115:5;1130:5;
1131:15;1143:7,14,17;
1144:8,21;1181:13,18,
23,24;1182:3,9;

1183:22;1184:8;
1185:21;1186:19;
1187:4,21;1188:4,24;
1189:6,24;1190:1,2,7,
17,20;1192:1,5,9,11,
12,15;1193:18,21;
1198:18,21;1199:5;
1200:3;1206:17,20;
1207:11;1209:9,24;
1211:13;1212:14;
1213:4;1216:13;
1221:12,19;1222:13;
1223:2,4,23;1224:3,6,
20;1225:12;1227:2,19,
20;1228:12,18;1230:1,
24;1231:15,22;
1232:16,23;1233:5;
1234:7;1237:8,9;
1239:7,13,17;1251:22;
1252:25;1253:13;
1266:7,8,18;1267:4;
1268:5,21;1275:6,10;
1276:3,14;1278:9,9
**Dell's (12)**
1131:8,11;1210:24;
1211:9,17;1229:9;
1233:21,24;1234:7;
1237:17;1275:16,21
**delta (1)**
1236:3
**demand (7)**
1043:5,6;1044:15,
25;1061:7;1180:15;
1224:5
**Dennis (2)**
1132:17;1133:25
**deny (1)**
1121:3
**denying (2)**
1030:9;1079:13
**department (12)**
1040:4;1050:14;
1052:5,8;1061:24,25;
1064:20;1085:22;
1086:12;1095:17,20;
1098:17
**departments (1)**
1040:7
**depend (1)**
1070:18
**depends (3)**
1075:11,11;1240:23
**depth (1)**
1244:21
**derive (1)**
1031:6
**describe (2)**
1123:6;1200:1
**described (3)**
1109:8;1187:24;
1274:25
**describes (1)**
1051:2

**designed (2)**
1019:20;1149:9
**desktop (2)**
1045:13;1210:1
**despite (2)**
1239:14;1275:15
**detail (5)**
1026:2;1175:19;
1176:16;1210:13,20
**detailed (3)**
1114:22;1186:19;
1249:25
**details (3)**
1057:3,13;1098:19
**deteriorate (1)**
1114:12
**deteriorated (3)**
1028:13;1114:13;
1217:8
**determine (6)**
1136:22;1138:17;
1159:15;1162:3;
1216:24,25
**determining (1)**
1212:4
**Deutsche (1)**
1130:2
**develop (1)**
1181:6
**developed (2)**
1093:21;1181:7
**Device (1)**
1179:25
**DeVore (5)**
1222:9,10,18,22;
1224:17
**DeVore's (1)**
1224:2
**dialogue (6)**
1109:20,21;1110:18;
1228:24;1244:12;
1260:23
**Diamondback (101)**
1023:25;1025:16;
1042:10,11;1049:10,
19,20;1050:13;
1051:20,24;1052:5,7;
1054:1;1083:3;1084:3;
1085:20,20,21;
1086:17;1087:1;
1088:15;1089:3,18,24;
1090:12;1092:23;
1102:2;1122:14;
1127:7,7;1129:10,16;
1133:1,7,18,23;1134:3,
6,19,24;1136:20,25;
1137:4,6,14;1139:2,5,
10,17,21;1144:12,21;
1145:5,8,13,16,22;
1152:14;1153:1;
1155:9,13,20;1156:5,
16,22;1158:14;
1160:11;1164:18,20;

1165:10;1166:17;
1168:9;1171:9;
1181:13;1182:19;
1183:25;1184:1,3;
1193:24;1211:11;
1212:3;1216:20;
1218:6,18,21;1220:20;
1221:3;1222:12;
1239:15;1253:5;
1258:5;1259:21;
1260:14;1262:2;
1265:16,21;1273:6;
1278:5,7,14;1280:4
**Diamondback-related (1)**
1089:15
**Diamondback's (4)**
1220:2,10;1221:17;
1273:21
**difference (3)**
1088:13;1127:6;
1236:2,6
**different (39)**
1030:14;1031:4;
1033:17;1035:24;
1040:22;1059:18;
1080:2;1087:11;
1091:6;1111:17;
1115:3,22;1146:8;
1164:9;1184:2;
1209:25;1210:3,3,4,8,
9,10;1212:16,17,17;
1219:7;1221:20;
1227:17,23;1228:10;
1233:14;1235:23;
1236:10,10;1242:18;
1244:19,22;1256:17;
1260:10
**differing (1)**
1080:4
**difficult (2)**
1072:11;1217:7
**digit (2)**
1076:25;1232:18
**diligence (1)**
1053:4
**dinner (3)**
1018:25;1019:6;
1022:9
**direct (27)**
1018:21;1023:19;
1024:1,3,5,20;1041:8;
1046:19;1048:2;
1071:15;1075:18;
1082:9;1094:25;
1100:16;1105:13;
1114:10;1119:13;
1123:17;1126:20;
1170:2;1171:19;
1183:21;1202:23;
1239:23;1248:19;
1249:25;1280:12
**directed (1)**
1196:14

**direction (7)**
1021:4;1081:24;
1146:23;1230:12;
1257:4,14;1268:5
**directly (4)**
1034:25;1241:25;
1274:13,16
**disaster (2)**
1192:17;1193:15
**disclose (1)**
1254:12
**discovered (1)**
1071:9
**discuss (8)**
1127:12;1128:2;
1147:6;1151:5;
1207:18;1242:13;
1279:2,4
**discussed (7)**
1031:5;1033:18;
1162:24;1256:3;
1261:11;1272:20;
1275:9
**discussing (1)**
1242:18
**discussion (7)**
1052:23;1060:2;
1106:12;1123:8;
1149:16;1239:4;
1245:17
**discussions (2)**
1164:23;1242:21
**disk (1)**
1238:20
**dislike (1)**
1019:20
**disposable (1)**
1019:21
**dispute (1)**
1020:12
**disputed (1)**
1020:20
**disputing (3)**
1020:4,5;1029:7
**disseminated (1)**
1065:22
**distinction (1)**
1065:6
**distinguish (1)**
1245:21
**distracted (3)**
1028:17,25;1033:25
**distracting (2)**
1122:6,19
**distraction (2)**
1037:11;1127:5
**distractions (1)**
1033:23
**distribute (1)**
1102:17
**distributed (1)**
1079:6
**distribution (3)**

1137:13;1168:5;
1180:12
**Distributors (1)**
1180:13
**D-low (1)**
1159:15
**document (25)**
1053:13;1093:16,18;
1101:14,17;1102:21;
1123:11;1148:9;
1153:2;1154:24;
1155:24;1161:7;
1207:24;1223:14;
1225:1,3,23;1226:16;
1229:19;1233:2;
1241:9;1243:1;
1254:18;1260:17;
1262:21
**documents (12)**
1020:11;1023:5;
1064:4;1086:15;
1090:16;1094:6;
1099:20;1101:19;
1128:5;1129:24;
1194:22;1238:3
**dollar (1)**
1252:6
**dollars (1)**
1126:15
**done (8)**
1023:15;1032:25;
1075:2;1079:9;1081:6;
1210:7;1217:10;
1280:5
**door (2)**
1037:16;1247:20
**Dosti (1)**
1179:21
**double (3)**
1232:18;1244:6,9
**down (29)**
1032:12;1044:11,15,
25;1054:18;1057:2;
1063:1;1106:6;1115:4;
1116:4,7,12,15;
1119:11;1123:20;
1129:3;1141:12;
1150:7;1159:15;
1167:11;1178:19;
1183:1;1215:24;
1229:2;1230:17;
1235:25;1245:4;
1275:14;1278:20
**downtick (2)**
1179:2,4
**downward (1)**
1235:11
**dozen (2)**
1182:9,11
**dozens (11)**
1028:9;1111:21,22;
1113:2,3,5,7,12;
1143:23,24;1254:23

**drawn (1)**
1034:10
**dried (1)**
1037:15
**drink (3)**
1022:15;1219:12,12
**drinking (1)**
1022:18
**drive (3)**
1210:11;1211:7;
1238:20
**driven (1)**
1227:14
**driver (2)**
1097:3;1276:2
**drives (1)**
1190:7
**Drop (4)**
1044:16;1045:12,13;
1232:16
**dropped (1)**
1044:17
**drunk (1)**
1022:9
**DT (3)**
1044:16,16;1045:12
**due (5)**
1053:4;1088:14;
1233:25;1239:14;
1275:17
**duly (1)**
1038:4
**Dunlap (1)**
1184:13
**during (18)**
1021:16;1025:15,16;
1041:6;1047:10;
1048:17;1061:1;
1120:18;1122:7,12;
1130:5;1142:20;
1171:8;1202:9;
1227:17;1239:15;
1259:20;1274:3

## E

**earlier (14)**
1047:8;1077:9;
1151:11;1153:9;
1156:23;1158:7;
1167:16;1201:12,17;
1202:7;1225:14;
1230:3;1252:18;
1253:16
**early (13)**
1069:3,6,8;1082:16;
1087:7;1094:19;
1134:5;1141:17;
1147:6;1224:18;
1264:12;1266:16;
1267:1
**earnings (37)**
1043:10;1047:9,14;

1058:17;1063:13;
1065:10;1102:13,22,
23;1131:8;1160:15;
1189:6;1190:16;
1193:16;1210:14;
1211:14,17;1213:11,
13,25;1225:13,15;
1226:6,11;1227:5;
1228:11;1230:5,16;
1232:4,16;1237:18,19;
1249:10,17;1268:24;
1276:12,14
**earnings-related (1)**
1094:20
**easier (1)**
1148:8
**east (1)**
1042:16
**eastern (2)**
1208:22,24
**easy (2)**
1148:18;1149:6
**eat (3)**
1147:7;1150:17;
1170:4
**economy (1)**
1080:4
**edge (1)**
1223:11
**EFC (1)**
1035:11
**effect (6)**
1114:19;1187:25;
1201:11;1273:10;
1274:4;1276:24
**effective (1)**
1028:22
**efficient (5)**
1141:4,6,8,11,21
**effort (2)**
1146:4,5
**efforts (1)**
1153:1
**eight (6)**
1096:3,5;1098:5,8;
1110:8;1144:6
**either (9)**
1051:18;1078:25;
1117:17;1136:9;
1170:16;1187:23;
1188:11;1218:3;
1277:14
**elasticity (1)**
1193:10
**electronics (1)**
1117:2
**elicit (5)**
1018:21;1020:10;
1022:2;1148:9;1259:6
**elicited (7)**
1031:24;1035:16,16,
16,17,17,20
**eliciting (1)**

1021:1
**else (6)**
1025:2;1105:3;
1151:5;1176:15;
1186:2;1244:7
**e-mail (177)**
1021:5;1023:10;
1043:4,15,19;1045:18,
20,20;1046:23;
1047:18,23;1050:1,22;
1053:3,10,12,13;
1054:16,23;1056:12;
1059:14;1060:13,13;
1061:12;1064:7;
1071:12;1075:15,23;
1077:7;1078:3;
1080:18;1081:25;
1082:6;1084:6;1085:1,
2,5,5,7,13,20;1086:4,
19,20;1087:1;1089:1,5,
20,23;1091:21;1092:8,
9,14,18,18;1093:3,24;
1095:8,22,25;1096:6,
15,22,23;1097:8,18;
1098:13,17,21;1099:1;
1101:24;1102:2,2,12,
22;1105:5;1113:16;
1115:2;1116:25;
1117:13,19;1123:5;
1124:10,17;1125:22;
1126:5;1129:9,15,18;
1130:2;1131:5,14;
1135:13;1136:20;
1137:13,20;1152:25;
1153:7,22;1154:24;
1156:2,12;1157:17;
1158:1,2,10,20;
1159:13,25;1160:8;
1161:10;1163:20;
1164:2;1165:15,20;
1167:4,5,11;1168:7,12;
1171:21;1172:5,7,25;
1173:8,12,14,14;
1174:2,6,18;1176:20;
1177:13;1178:8,16;
1179:12;1180:4;
1189:11;1190:3,16;
1191:14;1192:21;
1195:19,22,23;
1198:11;1199:1,7,8;
1205:21;1207:6,18;
1213:2,3;1214:8;
1216:9,13;1222:20;
1223:15,25;1224:3;
1225:12;1226:17;
1238:5,9;1239:20,24;
1240:18;1252:11,19,
23;1260:20,20;1262:8;
1264:13,17;1272:12
**e-mailed (2)**
1089:12;1090:9
**e-mails (49)**
1018:11;1022:3;

1033:24;1039:4,21;
1085:16,20,24;1086:7,
12,25;1087:7,10,12,23;
1088:8,11,19;1089:2,9;
1090:6,14;1092:20;
1094:23;1102:11,11;
1112:7;1117:12;
1123:20;1136:5,19;
1138:15,16;1139:6;
1140:4;1167:12,21,24;
1168:11,14;1178:9;
1200:25;1207:9;
1216:16;1223:18;
1247:4;1276:24;
1277:3,4
**emphasize (1)**
1247:18
**employed (5)**
1152:16;1153:1;
1154:21;1220:23,24
**employee (6)**
1023:25;1274:13,14,
15,18;1280:4
**employees (2)**
1220:18,20
**employer (1)**
1019:17
**employment (3)**
1085:19;1152:14;
1194:1
**encourage (2)**
1163:13;1165:8
**encouraging (3)**
1164:21;1165:4;
1166:18
**end (26)**
1024:22;1028:14;
1032:16;1044:17;
1063:7;1071:17;
1073:14,20;1076:16,
19;1080:5;1096:19,25;
1097:4;1114:10,23;
1116:15;1125:5;
1127:11;1150:9;
1180:15;1190:13;
1238:1,4;1280:13,18
**endeavored (1)**
1163:13
**ended (7)**
1038:20,21;1073:20;
1130:5;1131:9;1149:7;
1276:18
**ending (10)**
1043:16;1076:2;
1131:11;1197:21;
1205:5;1215:6,17;
1268:7,12;1270:11
**ends (2)**
1065:5,25
**engage (1)**
1036:13
**engaged (2)**
1175:10;1176:3

**engaging (1)**
1026:7
**Enjoy (1)**
1173:16
**enormous (2)**
1019:3;1021:9
**enough (6)**
1062:18;1065:23;
1175:9;1176:12;
1193:13;1274:7
**entire (6)**
1146:5;1148:5;
1183:19;1192:21;
1214:15,16
**entirety (1)**
1184:5
**entity (2)**
1120:4;1161:5
**entry (5)**
1203:12;1205:4;
1208:2,10;1215:14
**EPS (14)**
1061:9;1082:17,21,
24;1113:17;1180:8;
1214:11;1226:4,5,7;
1227:12;1239:9,14;
1268:18
**equally (1)**
1029:14
**equities (1)**
1231:22
**Eric (3)**
1101:11;1105:1,2
**errands (1)**
1253:3
**error (1)**
1137:5
**Essentially (3)**
1018:10;1020:22;
1065:10
**establish (9)**
1019:13,16;1020:2;
1025:22;1026:17;
1028:16;1029:3;
1034:7,8
**established (3)**
1029:6;1140:2;
1167:16
**estimate (8)**
1112:23;1171:15;
1210:18;1211:1,6,7;
1228:10;1237:23
**estimates (6)**
1081:13,17;1112:20,
21;1227:2,8
**estimating (1)**
1210:2
**estimation (1)**
1119:12
**et (4)**
1059:5;1075:13;
1078:11;1082:5
**etc (6)**

1039:22;1054:11;
1130:21;1210:2,11,15
**ETF (9)**
1025:14,23;1026:2,
25;1027:11;1030:21;
1034:9;1035:12,13
**ETFs (15)**
1026:10,13,14,18;
1027:2,5;1029:9;
1030:5,13,14;1031:2;
1034:16;1035:17;
1119:15,23
**ETF's (1)**
1025:7
**evaluation (3)**
1187:24;1218:7;
1242:6
**evaluations (1)**
1218:10
**even (22)**
1024:6;1028:22;
1040:20;1047:4;
1089:20;1122:16;
1136:1;1138:16;
1149:3;1162:7;
1190:11;1218:4;
1246:2;1250:13,23,25;
1251:1;1256:3;
1258:17;1268:12;
1278:5,6
**evening (1)**
1279:4
**event (5)**
1022:5;1041:1;
1050:19;1066:21;
1126:14
**events (3)**
1084:12,12,15
**eventually (1)**
1155:13
**everybody (1)**
1020:23
**everyone (5)**
1245:14;1247:12,12;
1250:12,21
**everywhere (1)**
1244:7
**evidence (77)**
1018:21;1019:16;
1022:12,18;1029:6;
1031:21;1042:6;
1046:22;1050:7;
1053:22;1054:24;
1056:20;1060:19;
1061:19;1064:14;
1071:22;1074:15;
1078:9;1080:23;
1091:24;1093:9;
1094:5;1099:18;
1102:8;1115:9;
1117:25;1118:8;
1123:10;1124:2,6,8;
1129:22;1130:12;

1131:2;1132:2;
1135:19;1138:1;
1146:19;1153:12,16;
1156:7,10;1157:21,24;
1159:2;1160:6;
1161:18;1163:25;
1165:19;1167:10;
1173:6;1176:25;
1178:14;1179:18;
1191:19;1202:18,23;
1207:23;1214:13,15,
16,18,20;1220:13;
1222:19;1224:25;
1229:15;1231:25;
1233:18;1237:6;
1239:4;1241:10;
1248:5;1252:15;
1254:8;1255:6;
1258:25
**exact (3)**
1110:25;1119:11;
1200:10
**exactly (12)**
1019:21;1061:20;
1062:19;1094:18;
1116:22;1150:6;
1190:2;1196:24;
1205:23;1213:21,21;
1222:11
**examination (8)**
1018:22;1171:19;
1183:21;1194:17,19;
1219:17;1269:7;
1278:3
**example (25)**
1020:15;1021:12;
1026:23;1071:23;
1072:8;1073:7;
1078:14;1089:5,12;
1104:17;1110:21,22,
23;1111:2;1121:1,9;
1130:17;1138:22;
1146:8,10;1209:23;
1211:10;1217:16;
1262:14;1271:18
**examples (2)**
1210:23;1217:3
**exceed (1)**
1039:5
**Except (2)**
1029:17;1084:7
**excerpt (6)**
1202:16,18;1207:22;
1214:14;1269:11,12
**excess (1)**
1180:13
**exchange (24)**
1025:7;1031:7;
1032:8;1089:5;
1093:24;1105:6;
1118:20;1152:25;
1156:2;1157:3;
1158:20;1159:25;

1165:15;1167:5;
1171:21;1205:25;
1216:10;1243:4;
1260:20;1264:3,20;
1267:9,10,13
**exchanged (4)**
1106:9,20;1171:22;
1172:4
**exchanges (1)**
1021:6
**exchanging (4)**
1132:4;1137:11;
1157:11;1178:9
**excited (1)**
1184:22
**excuse (9)**
1104:4;1117:16;
1148:11;1181:13;
1201:7;1203:11;
1204:19;1206:22;
1222:19
**excused (3)**
1219:13;1278:21;
1279:6
**execute (1)**
1121:25
**executed (1)**
1195:10
**executes (1)**
1200:2
**exhibit (218)**
1020:9;1041:16,17;
1042:2,4,6;1043:11;
1046:21,23;1047:24;
1049:25;1050:4,6,7;
1053:2,5,8,18,22;
1056:8,11,15,19,20;
1057:18;1060:11,16,
18,19;1061:11,16,19;
1064:3,5,11,14;
1071:11,19,21,22,25;
1074:2,6,12,15;
1077:25;1078:6,8,9;
1080:11,20,23;
1086:14,14;1091:18,
20;1092:25;1093:6,8,9,
23;1094:2,5,13;
1096:9;1099:18,21;
1101:1,18;1102:4,8;
1113:15;1115:1,6,9;
1117:18,21,25;1118:8;
1121:6,11;1122:23;
1123:1,12;1124:2;
1125:19;1126:4;
1129:6,7,13,16,24;
1130:12,14;1131:2,17,
20,22,25;1132:2;
1135:7,9,10,16,19;
1137:17,23;1138:1;
1147:4;1148:5;
1149:20;1152:19;
1153:3,15,16;1156:9,
10;1157:7,24;1159:1,

2;1160:6;1161:18;
1163:24,25;1165:18,
19;1167:9,10;1169:10;
1172:15;1173:6;
1176:18,25;1178:13,
14;1179:17,18;1187:7,
9,10,13;1188:25;
1189:4;1191:2,18,19;
1195:15,15,16;1198:3,
16;1199:2,4,7,13;
1200:8,24;1201:3,18;
1202:6,20;1204:7;
1205:1;1206:13;
1207:6,23;1212:25;
1214:15,16,24;1216:8;
1218:24;1219:20;
1220:12,13;1221:8;
1222:19;1224:22,23,
24;1226:15;1228:22;
1230:3,19;1231:3,7,17,
24,25;1233:1,18;
1234:2;1237:24;
1238:8;1239:21,22;
1241:7,8;1242:25;
1248:5;1252:12,17;
1254:8;1257:8;
1259:24,24;1260:4,16;
1261:3,10,12,14,22;
1264:14;1267:7;
1268:13;1275:2

**exhibits (23)**
1018:6;1020:21;
1021:9;1022:8;
1080:22;1090:17;
1120:19;1129:5,19,21;
1131:3;1135:7;
1149:13,15,17;
1150:10,11;1152:20;
1212:22;1234:1;
1236:14;1237:5;
1238:2

**expect (6)**
1023:25;1024:18;
1076:7,24;1077:3;
1227:4

**expectation (1)**
1039:3

**expectations (13)**
1039:6;1225:19;
1226:8;1236:4,5;
1245:5;1249:5,11;
1251:4,7,11,12,19

**expected (4)**
1226:1,3;1235:9;
1239:9

**expecting (2)**
1073:10;1076:12

**expects (3)**
1073:2,5;1076:22

**expense (2)**
1061:9;1063:20

**experience (2)**
1040:15;1052:13,14;

1185:12

**expert (22)**
1052:15,19;1054:6;
1056:1,22;1057:6,14;
1160:19,21,21;1163:6,
7;1189:18;1221:11,20;
1222:2;1223:21;
1273:7,22;1274:12,16,
17

**expertise (1)**
1185:12

**experts (8)**
1048:10,15;1049:8,
10;1051:11;1160:25;
1273:10;1274:24

**explain (13)**
1029:21;1157:13;
1210:22;1224:8,13;
1233:19;1237:7;
1242:9;1246:12;
1248:17;1249:7;
1250:5;1269:17

**explained (1)**
1175:6

**explaining (1)**
1247:9

**explains (1)**
1169:10

**explanation (3)**
1131:21;1224:6;
1246:1

**explicit (2)**
1098:18;1125:4

**explicitly (2)**
1112:3;1116:25

**expression (1)**
1020:8

**extent (4)**
1037:13;1085:2;
1256:13,14

**extrapolation (1)**
1277:16

**extremely (4)**
1033:25;1034:18;
1065:21;1071:9

**extrinsic (2)**
1022:12;1029:6

**eye (1)**
1185:8

## F

**facility (2)**
1145:13,16

**fact (37)**
1018:24;1019:4,6,
18;1021:18,22;
1022:10,15;1023:13;
1024:11;1027:19;
1035:25;1047:4;
1050:19,22;1051:23;
1052:7;1057:20;
1070:15;1084:24;

1087:23;1120:23;
1157:3;1186:8;
1194:10;1201:12;
1203:18;1222:10;
1235:19;1236:6;
1244:8;1245:12;
1258:9;1264:8;
1266:17;1268:12;
1276:11

**factory (1)**
1217:4

**facts (2)**
1193:21,22

**factual (3)**
1036:7;1112:24,24

**fair (32)**
1039:10;1059:17;
1061:6;1062:18;
1065:23;1084:5;
1093:19;1098:1;
1112:10;1124:25;
1145:21;1161:19,23;
1162:2;1168:23;
1173:19;1176:4;
1182:13;1192:5,24;
1193:3,13,20;1208:17;
1221:17;1227:23,25;
1232:23;1247:22;
1262:22;1263:12;
1274:7

**fairly (3)**
1125:8;1171:14;
1180:14

**fairness (1)**
1029:24

**fall (3)**
1068:10,12;1274:21

**familiar (1)**
1109:13

**families (1)**
1089:14

**family (1)**
1260:13

**famous (2)**
1173:22,24

**far (7)**
1020:2;1021:3;
1089:20;1097:10,15;
1247:23;1274:20

**father (1)**
1252:5

**favor (1)**
1037:14

**Fayad (5)**
1169:22;1170:12;
1171:12;1173:13;
1178:10

**Fayad's (1)**
1171:2

**FBI (18)**
1114:1;1146:3,17,
23;1201:22;1222:10;
1255:8;1257:4;1258:5,

24;1259:5,7,12,15;
1266:5,6,17;1267:1

**FBI's (1)**
1257:14

**February (9)**
1043:6,20,22;
1091:22;1191:15,20;
1270:10,15;1268:13

**Federal (1)**
1114:1

**feedback (1)**
1114:22

**feel (3)**
1065:20;1094:8;
1148:20

**fees (1)**
1263:3

**Feith (2)**
1219:2;1279:3

**fell (1)**
1037:14

**felt (3)**
1089:16;1150:7;
1235:20

**few (11)**
1060:22;1104:1,3,4;
1128:4;1182:12;
1201:23;1209:3;
1216:9;1223:11;
1280:17

**fewer (1)**
1045:9

**FGR (1)**
1057:14

**fiction (1)**
1259:8

**Fidelity (1)**
1126:12

**fields (1)**
1048:15

**fifteen (1)**
1120:8

**fight (4)**
1172:8;1173:15,25;
1250:8

**figure (6)**
1024:17;1027:20;
1148:1,3;1205:23;
1211:24

**figures (2)**
1193:21,22

**fill (1)**
1090:13

**final (3)**
1210:13;1212:19,20

**finality (1)**
1153:19

**finance (4)**
1079:6;1095:17,20;
1098:16

**financial (6)**
1040:18;1154:4;
1194:2;1209:15;

1217:5,14

**find (8)**
1047:20;1098:13;
1219:2,3,4,6;1229:19;
1261:22

**finding (1)**
1053:8

**fine (9)**
1022:11;1023:12;
1035:23;1043:13,14;
1131:20;1179:7;
1181:17;1185:19

**finish (5)**
1024:13;1107:6;
1111:1;1117:16;
1280:17

**finished (1)**
1129:12

**finishes (1)**
1024:15

**firm (11)**
1052:6,7,25;1053:4;
1100:20,20;1102:14,
23;1104:11;1168:3;
1221:11

**firming (1)**
1179:2

**firms (7)**
1052:15,19;1054:10;
1102:16;1103:3,4;
1222:3

**first (91)**
1018:12;1021:17;
1022:21,21,24;
1025:18;1029:8,25;
1031:23;1039:13;
1049:13;1054:10;
1068:9,12,23;1069:4,9;
1071:9;1072:18;
1074:24;1075:18,20;
1076:1,6,21;1083:2;
1096:18;1101:3;
1116:1;1123:21;
1124:14,21;1129:4,7;
1130:8;1139:12,12;
1140:7;1142:20;
1152:1,20;1154:25;
1156:21;1161:25;
1166:6;1172:10,11,12;
1178:23;1180:6;
1181:9;1184:19;
1189:23;1192:14;
1193:13;1196:10;
1197:24;1199:5;
1200:4;1201:21;
1203:7;1213:13;
1215:1,17;1217:23;
1221:12;1222:20;
1224:3,17;1225:14,22,
22;1228:2,6,9,12,19;
1229:16,24,24;1238:5;
1240:7;1241:18,24;
1242:2;1253:20;

1255:5;1266:12,21;
1270:6;1275:13
**Fishbein (234)**
1023:3,4;1025:8,11,
20;1026:3,6,9,22;
1027:7,15,23;1028:3,7;
1029:17,24;1030:4,18,
23;1031:14,19;1032:1,
3,12,15,20;1033:1,4,
13;1034:7,14,21;
1035:7,12,15;1036:3,
15;1037:1,5,10,19;
1038:11,17,19;
1040:19;1042:2;
1043:14,15;1050:4;
1053:18;1054:21,25;
1056:11,15;1060:16,
22;1061:16;1064:11;
1071:8,19;1074:12;
1078:6;1080:20;
1082:8;1087:9;1091:9,
19,24;1092:15;1093:6,
17;1094:2,6;1102:4,
19;1109:11;1112:20;
1115:6;1117:10,21;
1118:1,5;1121:7,21;
1123:11,14,17,20,25;
1124:6,10,19;1126:2,4,
10;1127:10;1128:4;
1129:2,4,13;1130:9,23;
1131:17,19,22;
1135:16;1139:25;
1140:8;1141:2;
1187:24;1194:22,24;
1195:14,21;1196:10,
14;1197:1,11,18;
1199:22;1200:19,23;
1201:2,6,7,8,17,25;
1202:6,8,10;1203:23;
1204:2,11,18,20;
1206:12;1207:17;
1212:11,22;1214:6,23;
1217:15;1218:5,15,16;
1219:5,7,10;1220:4,9;
1222:8,17;1223:12;
1224:1,20;1225:2,6,17;
1226:16;1228:2,5,23;
1231:6,9,11,16,19;
1232:19;1233:7,15;
1234:12;1235:6,12,15;
1236:9,18,20;1237:25;
1238:3;1239:1,21;
1240:21;1241:2;
1242:15;1243:7,12;
1244:2;1245:19,25;
1246:7,9,15;1247:4,10;
1248:6;1250:17;
1251:21;1252:11;
1253:11,16;1255:10;
1256:5;1257:10;
1258:3;1259:2,19;
1260:9,25;1261:5,9,14;
1262:18;1263:4,10,22;

1264:2,13,19;1266:4,
19,21,24;1267:14;
1269:4,8,16;1270:2;
1271:11;1274:5;
1277:24;1278:7,11;
1280:10
**Fishbein's (3)**
1024:10;1238:2;
1244:16
**five (10)**
1018:25;1019:7;
1024:14;1033:21;
1110:8;1127:14;
1128:6;1172:4;1182:5;
1215:23
**flag (1)**
1037:6
**flat (4)**
1066:5;1177:22,23,
23
**flip (1)**
1101:5
**floor (4)**
1083:14,15,16,18
**fly (1)**
1141:14
**focus (2)**
1028:24;1233:25
**focused (4)**
1028:14;1031:13;
1061:7;1270:9
**follow (4)**
1029:8;1122:1,4;
1246:2
**followed (1)**
1169:19
**following (5)**
1046:12;1059:7;
1112:2;1122:19;
1277:5
**follows (2)**
1038:4;1159:19
**follow-up (1)**
1261:7
**football (1)**
1022:7
**footer (3)**
1086:4,19,24
**forecasted (1)**
1058:13
**forecasts (1)**
1102:25
**form (5)**
1102:18;1183:12;
1212:11;1242:15;
1263:4
**format (1)**
1230:23
**formed (1)**
1157:14
**former (2)**
1023:24;1042:8
**formerly (1)**

1220:24
**formulate (1)**
1037:22
**forth (2)**
1021:6;1254:10
**forum (1)**
1058:14
**forward (7)**
1056:13;1058:25;
1148:4;1167:24;
1224:7,14;1245:19
**forwarded (6)**
1053:16;1061:12;
1163:20;1167:5;
1176:20;1191:14
**forwarding (6)**
1053:15;1064:8;
1099:1;1117:13,14;
1167:12
**forwards (2)**
1179:12;1187:16
**found (2)**
1041:17;1102:2
**Foundation (2)**
1104:14;1191:10
**founded (1)**
1236:5
**four (7)**
1033:21;1083:7;
1110:8;1156:16;
1216:7;1217:23;
1226:8
**fourth (4)**
1071:16;1073:19;
1076:7;1167:11
**frame (2)**
1182:15;1225:8
**Francisco (1)**
1180:23
**free (1)**
1094:8
**free-flowing (2)**
1108:19,21
**frequently (3)**
1102:16;1144:1;
1171:14
**Friday (4)**
1074:17;1078:11,18;
1164:6
**friend (25)**
1021:22;1094:17;
1095:10,14;1154:12,
12;1163:5;1164:7,16;
1165:3,4;1166:12;
1173:13;1175:20,21;
1188:7;1189:16;
1194:3,7;1250:22;
1260:13;1265:15,21;
1266:1;1267:4
**friends (20)**
1019:7,14;1089:15;
1106:22;1137:7;
1139:1;1152:17;

1165:9;1168:23;
1169:22,25;1171:21;
1181:20,23,24;1184:9;
1186:9,12;1191:22;
1194:6
**friendship (2)**
1018:15;1020:3
**friendships (1)**
1021:22
**front (12)**
1046:21;1064:4;
1099:20;1101:18;
1129:23;1146:15;
1153:19;1200:10;
1219:19;1234:17;
1237:24;1269:9
**full (2)**
1058:5;1090:16
**fully (6)**
1024:18,18;1029:10;
1253:22,24;1254:2
**fund (11)**
1031:7;1143:10;
1160:20,25;1164:10;
1174:13,17,17;1194:1;
1252:5,6
**funds (8)**
1025:8,14;1030:1;
1032:8;1036:1,1;
1118:20;1194:2
**further (13)**
1044:11;1051:19;
1063:1;1130:13;
1140:9,10;1194:16;
1201:6;1215:24;
1249:14;1253:22;
1269:1;1278:18
**Future (1)**
1117:2,5,8;1256:25
**FYI (1)**
1164:5

## G

**G-2 (1)**
1220:15
**gains (1)**
1124:22
**Galleon (8)**
1028:15;1037:15;
1217:7;1273:25;
1274:1,21,24;1278:7
**gambling (2)**
1122:18;1125:10
**game (6)**
1018:24,25;1019:6,
19;1173:18;1251:7
**games (1)**
1022:7
**gather (1)**
1071:4
**gauge (2)**
1059:2;1184:21

**gauged (1)**
1251:18
**gauging (1)**
1251:11
**gave (24)**
1033:5,7;1049:16;
1060:4;1070:16;
1073:23;1085:10;
1098:1;1110:21;
1132:8;1162:15;
1175:15,15,19;
1211:22;1212:7;
1213:9;1230:5;
1251:22;1252:1,2;
1256:17;1265:13;
1266:13
**general (8)**
1039:2,2;1106:8;
1110:18;1157:9;
1185:18;1242:13;
1251:5
**generally (8)**
1067:16;1076:20;
1136:7;1145:18;
1171:25;1222:3;
1262:8,12
**gentleman (2)**
1041:19;1060:8
**gentlemen (5)**
1147:3;1171:24;
1172:17;1243:16;
1278:22
**geographic (1)**
1108:15
**geographies (1)**
1212:18
**gestures (1)**
1184:25
**gets (6)**
1024:4;1040:16;
1141:22;1247:16;
1260:21,22
**girlfriend (1)**
1089:23
**gist (2)**
1187:1,2
**given (4)**
1121:16;1136:20;
1144:3;1236:12
**gives (4)**
1019:5;1038:8;
1076:8;1157:1
**giving (18)**
1042:23;1057:14;
1058:9;1067:15;
1068:3;1077:19;
1079:11;1108:2;
1112:7;1137:10;
1148:25;1167:13;
1182:9;1185:21;
1193:10;1248:20;
1251:1;1265:24
**GLG (2)**

# A-821

1048:22;1054:10

**Global (23)**
1048:12;1143:8,10;
1144:25;1154:10,22;
1155:21;1157:4;
1162:22;1164:22;
1165:4;1166:19,21,23;
1168:8,17;1169:7,8;
1188:8,12,14;1216:3;
1258:6

**GM (13)**
1057:3;1058:2;
1063:9,18;1066:10;
1067:9;1097:5;1138:8;
1195:23;1198:6;
1229:3;1240:8;
1268:18

**Gmail (20)**
1085:7;1089:1,7,8,
10,13;1090:1,9,12,15,
19,20,22,24;1091:3,7,
15;1092:3;1263:23;
1264:2

**G-Mail (2)**
1137:6,14

**goes (12)**
1021:3;1034:21;
1036:18;1037:19;
1044:25;1045:8;
1123:14;1178:20;
1180:4;1211:7,8;
1249:14

**Goldman (4)**
1233:5,20,20;1275:3

**golf (3)**
1018:13;1020:20;
1023:2

**good (35)**
1019:14;1026:25;
1029:14,23;1031:16;
1079:17;1097:10,14;
1100:12;1138:8;
1142:9,10;1151:10,18,
19;1157:1;1162:15;
1169:12;1190:7;
1192:15,24;1193:12;
1224:4,6,12;1239:7,13;
1245:3,3;1246:18;
1248:16;1276:24;
1277:6,8,17

**government (99)**
1018:7,21;1020:13;
1022:17;1023:8,9;
1028:7;1031:24;
1035:16;1038:3;
1046:21,23;1056:8,11,
19;1060:11,16,18;
1071:11,19,21;
1077:25;1078:6;
1086:14;1091:18,20;
1093:23;1094:2,13;
1096:9;1099:18;
1113:15;1127:12;

1128:3;1129:6,8;
1149:16;1175:3;
1176:1,6;1187:7,10;
1188:25;1191:2,18;
1195:15,16;1198:2,5;
1199:2,4,13;1200:24;
1202:6,20;1204:7;
1206:13;1207:6,23;
1212:24;1214:24;
1216:8;1218:24;
1219:20;1220:3,12;
1221:7;1222:19;
1224:23;1226:15;
1228:22;1230:3,19;
1231:17;1233:1,6;
1234:2,10;1237:2;
1242:25;1243:6;
1247:17;1248:3;
1252:17;1253:18,24;
1254:8,24;1255:15,17,
20,23;1256:1,6,12;
1260:16,24;1268:13;
1275:2

**government's (14)**
1018:14;1056:20;
1060:19;1071:22;
1078:9;1094:4,5;
1191:19;1220:13;
1233:18;1237:3,5;
1241:7;1248:5

**Goyal (75)**
1024:3,7,13,16,18,
20;1085:3;1089:6;
1090:6,9;1132:9;
1133:4;1180:20;
1182:1;1183:2,6,22;
1184:2;1185:21;
1186:1,20,22,25;
1187:3,20;1188:16,17;
1195:20;1198:10;
1199:15;1201:3,7,12;
1202:7;1203:9,15,18;
1204:4,19;1208:6;
1209:6,10;1211:13,16,
23;1212:2;1214:9;
1226:10,17;1230:4;
1235:18,22;1236:3,12;
1240:16;1255:6,7,14,
15;1263:7,8,13,15,19;
1266:6,7,17;1267:2;
1268:9,22;1269:21;
1270:19,24;1280:7,11

**Goyal's (13)**
1024:6;1196:7;
1205:10;1206:1;
1208:6;1212:23;
1213:15,19;1214:2;
1215:5;1227:7;
1235:16;1270:17

**grain (1)**
1229:10

**granular (2)**
1210:12,20

**granularity (1)**
1210:6

**graphic (1)**
1211:8

**Great (8)**
1018:9;1019:5;
1031:10;1035:3;
1119:19;1172:4;
1207:20;1261:23

**Greenwich (3)**
1208:9,20,24

**gross (45)**
1041:7,10;1057:4;
1058:1,10,13;1059:22;
1061:9;1063:2,5,18,25;
1067:4,12,15,17,23;
1082:17;1099:4,6;
1196:3;1199:14;
1210:7,14;1212:1,2,4;
1214:11;1226:12;
1229:9,25;1230:4,13;
1235:20,21;1237:20,
21,22;1239:25;
1240:13,16;1268:22;
1275:9,16,21

**grounds (3)**
1146:22;1243:12;
1266:20

**group (26)**
1107:12,13;1110:19;
1116:23;1117:13;
1138:11;1139:1,24;
1157:13,14;1162:17;
1170:11;1171:24;
1172:25;1173:9;
1174:1,23;1176:21;
1177:9,10;1178:10,16;
1179:13;1191:15;
1221:20;1223:20

**growth (1)**
1237:21

**growth-first (1)**
1233:25

**guess (23)**
1020:13;1024:21;
1027:20;1032:22;
1053:16;1056:24;
1066:2;1100:21,22;
1112:23;1113:23;
1114:5,8;1145:18;
1149:1;1171:20;
1173:25;1174:5;
1177:19,22;1181:10,
12;1236:5

**guesses (2)**
1112:20,21

**guessing (1)**
1113:14

**guidance (8)**
1062:24;1073:21;
1076:9,10,12,16,18,19

**guide (6)**
1066:5;1073:24;

1076:22,24;1077:3;
1177:23

**guilty (3)**
1027:24;1036:11,14

**Gurinder (5)**
1068:19,22;1134:11,
13;1241:13

**guy (11)**
1022:25;1036:12;
1100:12;1182:1;
1189:24;1190:17;
1221:12;1245:8,16;
1250:2;1251:17

**guys (10)**
1019:10,20;1020:17;
1022:19;1054:2,3;
1095:17;1098:16;
1167:13;1170:2

**GX (1)**
1200:8

## H

**Hadlock (7)**
1023:25;1024:7,9,
12,16,19;1280:4

**half (7)**
1126:17;1177:22;
1182:8,11;1225:10,14;
1275:14

**Hallum (4)**
1238:17,18,22;
1239:22

**Hammel (1)**
1239:16

**Hamptons (3)**
1018:13;1022:4;
1170:9

**hand (4)**
1018:8;1038:14;
1040:20;1142:25

**handful (2)**
1018:8;1023:5

**handling (1)**
1263:2

**Hang (2)**
1146:18;1168:10

**hanging (1)**
1020:17

**happen (5)**
1068:17;1107:20;
1200:9;1229:13,14

**happened (7)**
1068:18;1090:19;
1141:13;1204:11,15;
1230:15;1237:19

**happening (4)**
1122:20;1163:1;
1205:18;1257:24

**happens (2)**
1024:17

**happy (2)**
1075:23;1184:22

**Hara (1)**
1040:8

**hard (9)**
1019:24;1029:8;
1038:7;1124:23;
1125:3;1210:11;
1211:7;1238:20;
1264:25

**hardware (1)**
1096:12

**hash (1)**
1240:7

**hate (1)**
1167:13

**HDD (1)**
1189:24

**head (3)**
1057:9;1068:20;
1080:1

**heading (4)**
1220:15;1233:23,24;
1238:13

**headquarters (1)**
1258:5

**heads (1)**
1067:5

**hear (6)**
1040:10;1070:12;
1182:8;1186:25;
1229:11;1244:7

**heard (9)**
1040:14;1059:9;
1095:9;1101:11;
1107:8;1114:4,6;
1172:11;1208:15

**hearing (1)**
1086:11;1196:3

**hearsay (11)**
1107:9;1146:22;
1243:12,13,13;1244:6,
9,9;1246:10;1247:3;
1253:11

**hedge (10)**
1143:10;1160:20,25;
1164:10;1174:13,17;
1194:1,2;1252:5,6

**held (2)**
1053:25;1192:16

**help (11)**
1031:6;1057:17;
1127:7;1148:9;
1152:15;1154:6,12,14;
1183:22;1192:24;
1194:4

**helping (1)**
1155:5

**helps (2)**
1155:23;1161:6

**Henry (4)**
1116:1,4,10,14

**Here's (1)**
1030:23

**hesitant (1)**

1069:19

**Hey (6)**
1153:24;1156:19;
1158:12;1159:6;
1160:14;1226:18

**hi (2)**
1109:21,21

**hidden (1)**
1090:3

**hide (1)**
1050:19

**hiding (2)**
1245:12;1251:1

**Higgins (15)**
1033:5;1077:12,22;
1078:15;1080:16;
1081:21;1082:6;
1132:19;1134:17;
1136:6,8,9;1265:17,20,
23

**high (9)**
1020:23;1040:24;
1044:24,25;1096:19,
25;1097:4;1246:24;
1258:13

**higher (13)**
1040:22;1041:2;
1044:15;1045:3,9;
1063:9,18;1073:24;
1076:22;1077:4;
1120:4,5;1177:23

**highest (2)**
1044:22,23

**high-level (1)**
1053:25

**highlight (3)**
1113:15;1164:1;
1213:2

**highlighted (3)**
1082:13;1208:10;
1215:25

**highly (1)**
1188:2

**himself (4)**
1034:24;1035:1;
1085:10;1254:13

**hire (3)**
1163:14;1165:4,8;
1166:18

**hired (1)**
1188:8

**historical (3)**
1067:16;1071:10;
1216:24

**hit (5)**
1044:14;1047:16,17;
1237:10;1275:17

**Hoffman (10)**
1196:17;1198:15;
1203:25;1206:15;
1207:8;1213:1;
1222:21;1226:14;
1241:6;1252:16

**Hold (7)**
1030:4;1107:5;
1122:25;1135:10;
1242:21;1254:2;
1269:5

**holders (6)**
1026:23;1030:18;
1119:1,5,24;1120:10

**holding (2)**
1079:16;1253:13

**holiday (1)**
1279:1

**holidays (1)**
1024:24

**home (5)**
1145:14,15,18,19;
1280:18

**honest (3)**
1245:13;1250:11,21

**Honestly (1)**
1246:1

**Hong (4)**
1116:4,7,12,15

**Honor (97)**
1018:5,19;1019:23;
1020:7,21;1021:8;
1023:17,24;1024:11,
14;1025:4;1026:9;
1028:12;1030:12;
1031:21;1032:20;
1033:20;1034:22;
1035:15;1036:21;
1037:10,17,18,19;
1040:14;1043:10;
1052:12;1066:19;
1091:12,16;1104:17;
1107:8;1123:9,14,18;
1124:7;1127:10;
1129:5;1131:19;
1141:16;1142:4,6;
1146:19,21;1148:14,
17;1149:6;1172:10,13;
1178:15;1183:18;
1187:8,11;1189:1;
1194:15,18;1195:4;
1202:10,15,21;1203:6;
1206:10;1207:4,17;
1208:3,25;1212:14;
1214:19;1217:22;
1218:16;1219:5;
1220:4,8;1229:18,21;
1230:25;1231:1,13,14,
21;1233:7;1235:4;
1236:8;1243:12;
1245:25;1246:9;
1250:20;1252:14;
1259:5;1260:3;1261:3;
1263:10;1267:5,6;
1269:1,4;1272:11

**hoops (1)**
1175:24

**hope (1)**
1151:10

**hopefully (2)**
1024:19;1177:21

**horribly (1)**
1246:19

**Horvath (42)**
1093:25;1094:14,17;
1095:8,13;1096:6,10,
23;1097:8;1098:1,4,5,
13,17;1099:2;1105:14,
25;1106:1,7;1109:6,10,
18;1117:20;1118:2;
1132:11;1133:15;
1134:24;1135:13;
1136:4,16;1137:7,20;
1138:2;1139:1,5;
1169:25;1170:13;
1172:2;1238:5,9;
1255:24;1277:5

**Horvath's (2)**
1096:18;1097:18

**hot (4)**
1219:3,4,6,12

**hour (2)**
1150:9;1200:12

**hours (3)**
1024:4;1121:16;
1236:21

**house (5)**
1170:8,11,15,18;
1171:18

**HP (2)**
1112:14;1276:14

**HR (1)**
1050:16

**Huberty (3)**
1228:15,17,24

**Huberty's (1)**
1104:18

**huge (3)**
1026:23;1028:17;
1029:1

**human (1)**
1050:13

**hundred (6)**
1044:23;1111:20,22,
23;1122:16;1136:2

**hundreds (10)**
1028:18;1037:11;
1105:19;1120:24;
1121:2,9,13,17,22;
1126:14

**hurt (2)**
1096:19,25

**HW (1)**
1096:15

# I

**Iceland (1)**
1022:4

**idea (7)**
1025:20;1049:16;
1084:21;1143:22;

1158:2,5;1159:18

**ideas (1)**
1111:14

**ideas/data (1)**
1160:15

**identification (7)**
1218:23;1219:20;
1230:18;1231:2;
1234:2;1242:25;
1260:15

**identified (4)**
1071:23;1208:19;
1272:9,12

**identify (15)**
1152:23;1155:24;
1157:16;1158:18;
1159:23;1161:7;
1163:17;1165:14;
1167:1;1172:22;
1176:19;1178:5;
1179:8;1191:13;
1204:14

**identity (3)**
1182:13,20;1222:3

**IDTI (1)**
1179:23

**illegal (1)**
1027:8

**illustrate (1)**
1214:18

**IM (3)**
1084:6;1085:2;
1105:6

**impact (2)**
1216:25;1217:3

**impeach (1)**
1150:5

**implied (2)**
1087:22;1090:2

**implies (1)**
1097:4

**imply (3)**
1119:20,20,21

**import (1)**
1175:1

**important (10)**
1018:21;1019:1,4;
1021:13,14;1065:6,21;
1185:4,6;1193:8

**improper (1)**
1149:12

**impropriety (1)**
1174:23

**impulsive (3)**
1122:9,11,12

**impulsive/aggressive (1)**
1125:5

**impure (1)**
1035:22

**IM's (1)**
1277:3

**inaccurate (1)**
1224:13

**inbox (2)**
1090:12,16

**include (6)**
1039:23;1062:23;
1084:12;1098:21;
1132:25;1256:18

**included (4)**
1062:12;1075:16;
1119:4;1135:5

**includes (1)**
1095:13

**including (6)**
1075:9;1109:4;
1115:4;1178:17;
1251:22;1262:3

**inclusive (2)**
1126:13;1214:11

**income (4)**
1019:21;1020:23;
1210:14;1213:10

**increase (2)**
1076:25;1206:25

**increasing (1)**
1078:24

**incredibly (3)**
1021:13,14;1247:10

**incriminating (4)**
1255:18,21,24;
1256:2

**index (6)**
1031:8,9,11;
1032:17,17;1119:21

**indicate (2)**
1074:25;1081:9

**indicated (1)**
1184:14

**indicates (5)**
1082:3,11;1208:17,
17;1232:1

**indicating (2)**
1075:2;1081:6

**indication (1)**
1225:18

**indicative (1)**
1019:7

**indictment (3)**
1031:17,18,22

**individual (8)**
1025:8,25;1026:17;
1027:1;1120:4,7;
1261:2;1278:10

**individuals (5)**
1105:17;1146:7;
1254:21;1256:17;
1271:17

**industry (10)**
1048:18;1049:8;
1075:9;1105:23;
1118:23;1160:21;
1194:1,2;1218:12;
1262:4

**infer (2)**
1023:19;1029:13

**inference (4)**
1019:15;1029:15,22;
1034:10
**inferred (1)**
1035:25
**Inflection (5)**
1101:24;1102:14;
1104:7,21;1105:1
**influence (1)**
1168:1
**informally (1)**
1155:17
**information (251)**
1021:2,19,25;
1025:14,15,24;
1026:15;1027:3,5,10,
15,18,19;1028:1,16;
1029:12,13,22;
1030:10;1031:1,5,6,12,
15,16;1032:10,13;
1033:6,8,12,14,18,18;
1034:2,11,12,15,20,23,
25;1035:3,10,18,21,25;
1036:4,5,6,14,17;
1038:24;1039:2,9,11,
24;1040:16,21;1041:2,
11;1045:15;1048:9;
1057:15;1058:1,24;
1060:8,25;1061:6,23;
1062:7,12;1063:2;
1064:8,15;1065:21;
1068:7;1070:10,15;
1071:3,7,24;1072:8;
1073:7,23;1075:3,15;
1076:1;1077:7,12,19,
21,23;1078:14;1079:8,
11,13,16;1080:3;
1081:20,24;1085:3;
1093:13,21;1094:21;
1095:13;1098:10,12,
14;1099:5,6;1104:25;
1110:22;1112:8;
1119:13;1120:6;
1132:5,8,21,22;1135:2;
1136:6,7,21;1137:10,
12,12;1138:11,14,19,
20,22,25,25;1139:4,6,
14,24;1140:1,2,3;
1143:11,13;1145:23,
24;1148:9;1149:1;
1157:9;1158:2;
1168:17;1169:9,11;
1172:4;1175:8,14,16;
1176:2,7,12;1181:18;
1182:9;1183:6,17,17;
1184:8;1185:22;
1186:2,8,19;1187:3,4,
20;1188:4,17,20;
1190:17;1195:19,20,
21;1198:9;1199:8,13,
14,17;1211:16;1212:1,
24;1213:16,19,22;
1214:2,8;1217:5,8,9,

12;1223:21,23;
1224:15;1225:3;
1226:9;1227:4,7;
1229:24,25;1234:14;
1235:16,18;1236:3;
1238:22;1239:17;
1240:16;1241:18,20,
23;1242:1,4,12,14,19;
1245:20;1248:20;
1249:25;1252:1,2,9;
1254:12,20;1255:7,14,
17,20,23;1256:1,17;
1259:6;1265:9,11,16,
24;1267:4;1268:6,8,9,
22,24;1277:11,15,18,
22,23;1278:9,17
**informing (2)**
1027:5;1162:6
**Ingel (3)**
1089:13;1264:20,21
**initial (5)**
1069:2,3;1125:16;
1222:4,5
**initiative (1)**
1134:12
**input (2)**
1111:15;1121:14
**inquire (1)**
1037:12
**inquiries (1)**
1093:20
**inside (34)**
1027:2,5,10;
1028:15;1029:11;
1030:9;1031:5,12;
1032:10;1033:12,18;
1034:2,12,19;1035:10,
18,25;1036:5,6,14;
1037:15;1148:25;
1175:14,16;1176:7;
1183:17,23;1185:22;
1187:4;1188:4;1242:5;
1244:15;1246:4,14
**insider (9)**
1026:7;1027:4,8,13,
24;1036:12,13;
1278:15,16
**insight (2)**
1169:8;1249:16
**insights (1)**
1183:22
**instance (11)**
1031:7;1032:17,19;
1070:18;1088:18;
1177:12,12,25;
1209:24;1210:24;
1273:2
**instances (1)**
1144:17
**instant (7)**
1099:17;1198:13,17;
1199:4;1243:4;
1248:10;1264:7

**instead (6)**
1025:12;1066:18;
1091:3,8,15;1117:13
**instruct (1)**
1036:10
**instructed (4)**
1090:24;1259:5,13;
1264:1
**instruction (3)**
1037:19,21;1098:22
**instructions (2)**
1036:24;1098:18
**Instruments (23)**
1026:11,24;1027:10;
1030:19;1031:15,18;
1033:7;1034:9;1048:7;
1060:7;1061:14;
1062:3;1064:8,20,23;
1065:7,16;1067:21,25;
1068:4;1119:10,14,24
**INTC (4)**
1135:20;1136:5,7,11
**Integrated (1)**
1179:25
**Intel (48)**
1025:25;1026:11,12,
12,25;1027:10;
1029:20,25;1030:6,12,
19;1031:15,18,24;
1032:21;1033:4,5;
1034:9;1036:15;
1042:8;1077:11,11;
1078:4,15,25;1080:14;
1081:17;1119:9,14,24;
1120:10;1134:18;
1135:22;1138:22;
1152:8,12;1177:2,15;
1245:4;1249:1,2,10;
1251:18;1265:10,11,
16,25;1266:1
**Intel's (3)**
1079:25;1082:3,12
**intend (2)**
1116:20;1149:14
**intending (1)**
1019:12
**intends (1)**
1018:6
**intent (2)**
1035:22,23
**interaction (3)**
1040:6;1049:22;
1051:11
**interchangeable (1)**
1271:1
**interest (2)**
1098:23;1218:4
**interested (5)**
1148:6,7;1165:24;
1166:3,20
**internal (5)**
1190:15,21;1212:15;
1223:4;1240:12

**internally (1)**
1212:19
**Internet (1)**
1154:20
**interpret (3)**
1044:5;1062:15;
1185:2
**interpretation (12)**
1058:22;1059:3,15;
1062:21;1063:14;
1072:10;1075:12;
1080:8,9;1184:15;
1246:22;1275:23
**interpreting (1)**
1059:13
**interrupt (1)**
1024:18
**interview (1)**
1188:14
**interviewed (1)**
1162:13
**interviewing (1)**
1137:15
**interviews (1)**
1163:7
**into (39)**
1022:19,20,24,25;
1024:8;1026:2;
1030:20;1038:25;
1039:9,11,13;1043:23;
1092:1;1097:9,15;
1107:8;1126:1,12;
1146:19;1153:12;
1156:7;1157:14,21;
1176:13;1184:25;
1192:15;1202:18;
1206:7;1213:10,23;
1227:12;1228:19;
1245:5;1249:4,10;
1251:13;1263:11,13;
1273:9
**introduce (8)**
1022:17;1025:9;
1026:4;1123:23;
1146:25;1149:14,20,24
**introduced (6)**
1161:3,4,4;1233:13;
1247:4;1261:12
**inventories (1)**
1180:14
**inventory (2)**
1177:18;1217:4
**invest (1)**
1027:6
**invested (1)**
1126:11
**Investigation (2)**
1114:1;1258:7
**investing (1)**
1253:7
**investment (3)**
1125:16,25;1126:9
**investor (25)**

1040:3,6,10;
1041:22;1042:21,23;
1043:1;1057:9,10,21;
1059:1;1061:14,24,25;
1062:3,7,9,20;1064:20;
1067:2,25;1068:4;
1108:14;1183:7,9
**Invidia (14)**
1031:23;1038:21;
1039:16;1040:4,10;
1041:5,22;1042:18,20,
23;1043:10;1044:20;
1045:4;1138:2
**Invidia's (1)**
1041:10
**involve (1)**
1029:11
**involved (5)**
1031:17;1053:9;
1113:4,8;1263:2
**involvement (2)**
1113:11;1257:25
**involves (1)**
1184:15
**involving (2)**
1031:18;1174:23
**IPR (12)**
1099:5,7,10;1100:2,
15,18,20,23;1101:2,9;
1105:7,11
**IR (11)**
1062:9;1064:16;
1184:8,9,11,14;1185:5,
6,13,15,24
**irrelevant (1)**
1247:3
**isolate (1)**
1124:9
**issue (17)**
1023:4;1026:19,21;
1027:18;1033:22;
1036:9;1037:11;
1070:24;1071:2;
1089:10;1118:18;
1122:15;1195:23;
1219:7;1235:17,20;
1247:7
**issued (3)**
1074:4;1077:9,16
**issues (5)**
1024:12;1089:15;
1245:24;1275:9,21
**issuing (1)**
1237:17
**items (4)**
1063:4;1154:6,7;
1205:2

---

**J**

**Jaduszliwer (1)**
1265:15
**James (2)**

1111:8,9
**January (13)**
1071:17;1074:17,20;
1075:15,16;1077:8;
1163:21;1164:2;
1178:8;1192:16;
1231:22;1260:23;
1268:17
**JAVA (3)**
1093:4,10,11
**Jeff (5)**
1173:12,12,14;
1175:15,18
**Jencks (1)**
1150:4
**Jenks (1)**
1146:11
**jeopardy (2)**
1176:13,13
**JESSE (2)**
1038:2;1170:18
**Jets (4)**
1018:24,25;1019:6,
19
**JNK (8)**
1167:4,12,16,24;
1168:7;1169:9,11,14
**job (18)**
1024:12;1025:12;
1028:14,20,22;
1030:10;1070:24;
1083:2;1084:19;
1133:4;1155:7,8,13;
1175:11;1185:4,6;
1187:17;1188:12
**jobs (1)**
1184:5
**John (18)**
1042:8;1106:8,8;
1116:9;1132:11;
1135:13;1136:4,16;
1165:25;1166:3,9,10,
11;1259:25;1260:1;
1261:24;1263:8,16
**joined (1)**
1260:13
**joking (1)**
1174:3
**Jon (1)**
1094:17
**Jones (3)**
1164:14,15;1165:3
**JP (2)**
1164:19,19
**July (20)**
1047:6;1065:1;
1135:14;1137:2;
1153:7,23;1181:16;
1194:23,25;1195:3,7,
10;1196:11,19,23;
1197:8;1222:20;
1223:2;1243:5;
1275:16

**jumbled (2)**
1096:6,8
**June (6)**
1165:15,20;1180:15;
1223:15,25;1224:16
**juror (4)**
1018:3;1023:14;
1024:25;1025:1
**jurors (2)**
1024:23;1151:12
**jury (20)**
1018:2,20;1019:20;
1022:20;1023:11,12;
1036:10;1037:18,23;
1038:1;1128:1;1129:1;
1151:3,9;1219:13;
1234:17;1279:3,5,6;
1280:1

## K

**Kanowitz (7)**
1130:17,20;1262:16;
1263:9,16,20;1276:12
**Kanowitz' (2)**
1276:9,10
**Katy (4)**
1104:18;1228:15,17,
24
**KC (4)**
1260:6,12,13,21
**Keep (9)**
1129:11;1136:20;
1137:8,10;1148:13;
1159:14;1190:6;
1243:16;1279:2
**kept (1)**
1137:15
**key (2)**
1036:25;1088:12
**kind (19)**
1026:2;1039:20;
1137:10;1141:17;
1209:18;1210:16,18,
22;1211:24;1212:3,8,
9;1214:4;1216:22;
1217:6;1246:25;
1247:2;1263:15,18
**kindly (1)**
1178:23
**kinds (1)**
1035:4
**King (7)**
1116:1,4,7,10,12,14,
17
**knew (27)**
1041:14;1069:8;
1087:24;1088:19;
1119:18;1133:1,4,9,11,
17,17,20,22;1134:2,16,
21;1164:23;1180:22;
1181:11;1182:22;
1184:12;1221:19,24;

1242:14;1255:3,3,4
**knocked (1)**
1025:1
**knowing (3)**
1069:6;1242:4;
1250:10
**knowledge (8)**
1051:13;1068:3;
1092:20;1156:21;
1168:8;1170:14;
1174:21,22
**known (1)**
1040:10
**knows (3)**
1023:13;1098:20;
1244:8
**Kong (4)**
1116:5,7,12,15
**Kuo (55)**
1039:4,24;1041:3;
1064:9,15,19;1066:4;
1068:1,3,7,9,21,22,23;
1070:16,19;1071:24;
1072:6,8,21;1073:5,7,
20;1074:4,7,24;
1077:21;1105:14;
1110:1;1132:13;
1133:1;1134:5,14,23;
1135:13;1137:7,20;
1139:1,4;1171:25;
1172:2;1179:20;
1180:2;1238:10;
1241:3,13,22;1242:4;
1255:21;1257:5,20;
1258:8;1259:1,6,9
**Kuo's (5)**
1038:24;1039:2;
1070:17;1241:18;
1242:6

## L

**LA (1)**
1022:4
**labeled (1)**
1101:17
**labels (1)**
1190:21
**Lacey (12)**
1033:5;1077:12,22;
1078:10,17;1081:25;
1082:23;1132:19;
1265:17,20,21,23
**Ladies (4)**
1147:3;1172:16;
1243:16;1278:22
**language (8)**
1058:22;1059:2;
1062:17;1164:4;
1176:9;1184:15;
1185:3;1273:13
**laptop (3)**
1209:25;1210:1,1

**laptops (2)**
1210:25;1211:1
**large (4)**
1120:17;1145:15;
1238:20;1253:13
**largely (2)**
1225:25;1226:3
**larger (2)**
1030:11;1054:19
**largest (2)**
1119:8,9
**last (28)**
1079:22;1117:6;
1118:15;1123:21;
1129:16;1136:24;
1179:1;1190:7,8;
1193:13,14;1197:6;
1221:23,24;1222:1,3,5,
10,23;1224:5,13;
1245:7;1249:22;
1250:1;1251:17;
1254:24;1267:6;
1276:17
**late (6)**
1078:11,18;1135:5;
1204:8;1274:2,21
**Later (15)**
1037:5;1049:4;
1086:6;1088:17;
1096:3;1125:11;
1156:20;1157:10,14;
1177:7;1199:3;
1200:12;1209:5;
1224:10;1270:3
**latest (1)**
1024:10
**latter (1)**
1029:5
**lay (1)**
1191:9
**layer (1)**
1210:9
**leading (8)**
1022:19;1023:1;
1212:12;1223:12;
1259:2;1266:23,23;
1278:11
**leaky (1)**
1040:11
**learn (3)**
1086:3;1174:1;
1241:23
**learned (3)**
1049:18;1222:9;
1242:22
**learning (4)**
1085:24;1086:2,10;
1190:1
**least (9)**
1022:13;1025:20;
1061:24;1105:10;
1170:17,18;1182:12;
1184:12;1277:18

**leave (2)**
1174:4;1219:11
**led (3)**
1214:3;1227:12;
1266:6
**left (13)**
1094:18,19;1098:11;
1106:7;1134:24;
1136:20;1139:2,5,21;
1164:19;1189:24;
1190:11;1221:12
**left-hand (1)**
1081:2
**legal (1)**
1176:13
**legislation (1)**
1088:14
**legitimate (4)**
1244:18,18;1245:23,
23
**legs (1)**
1147:7
**Lehman (2)**
1234:8;1237:8
**length (2)**
1208:18;1245:25
**less (5)**
1057:14;1113:5;
1115:1;1224:11;
1225:18
**lesser (1)**
1085:2
**letter (4)**
1256:6,7,11,15
**letters (1)**
1062:9
**level (42)**
1043:7;1044:4,6,7;
1070:9;1143:8,10;
1144:25;1154:10,21;
1155:21;1157:4;
1162:22;1164:22;
1165:4;1166:18,21,22;
1168:8,17;1169:7,8;
1175:19;1176:16;
1188:8,12,14;1189:14,
16;1210:5,13,20;
1216:3,13,16;1217:9;
1221:9;1242:10,10,11;
1244:21;1258:5
**license (1)**
1051:5
**life (4)**
1090:4,5,7;1144:11
**lifestyle (1)**
1023:1
**lifestyles (2)**
1022:19,20
**liked (1)**
1186:24
**likely (2)**
1057:3;1058:17
**Lim (1)**

1024:5
**line (47)**
  1032:14,15,16,19,20,
  22;1060:22,22;
  1062:15;1072:18;
  1081:23;1082:1,13;
  1136:22,22;1138:17,
  17;1144:17;1173:22,
  24;1179:1;1189:23;
  1190:14;1193:13,13,
  15;1198:17;1202:24;
  1205:2,11,12,25;
  1206:3;1213:3;
  1214:25;1221:12;
  1225:22,24;1227:8;
  1235:8;1239:6;
  1244:16;1248:10,15;
  1264:23;1275:15;
  1276:1
**lines (8)**
  1030:9;1033:19;
  1037:7;1045:23;
  1209:25;1210:25;
  1241:2;1250:6
**lineup (1)**
  1023:22
**link (1)**
  1025:22
**Lipacis (3)**
  1136:9,10;1152:4
**list (26)**
  1103:4;1104:6;
  1119:11;1129:6;
  1137:13;1146:4,5,9,17;
  1148:16;1149:3,18,19;
  1150:11;1162:7,9,10,
  11,14;1168:5;1172:7;
  1173:12,14,15;1174:2,
  18
**listed (2)**
  1067:14;1146:14
**listening (1)**
  1062:5
**lists (5)**
  1023:6;1103:2;
  1137:13;1146:7;
  1203:2
**literally (2)**
  1028:18;1120:24
**little (22)**
  1018:15;1029:8;
  1038:8;1054:19;
  1060:23;1098:3;
  1102:9;1114:22;
  1141:7;1145:7;
  1148:15;1151:14,14;
  1192:24;1217:20;
  1218:3;1219:2;
  1224:14;1225:9;
  1249:24;1267:14;
  1268:1
**live (1)**
  1088:10

**living (2)**
  1223:22;1253:2
**lobby (1)**
  1145:3
**located (2)**
  1042:16,18
**location (1)**
  1083:13
**locations (1)**
  1023:2
**logical (1)**
  1019:15
**long (16)**
  1023:21;1029:2;
  1090:14;1121:22,23,
  24;1144:4;1182:3;
  1205:16;1215:22;
  1216:6;1222:18;
  1224:4,10,12;1236:19
**longer (6)**
  1028:21;1125:12;
  1126:8;1190:3;
  1274:12,17
**longest (2)**
  1023:18,19
**look (104)**
  1021:1;1022:22;
  1030:9;1036:23;
  1041:16;1043:4;
  1044:11;1046:21;
  1049:25;1053:2,10;
  1057:2,13,18,19;
  1058:1,20;1060:11,13;
  1061:11;1063:1;
  1064:3;1065:15;
  1071:11;1072:2;
  1073:14;1074:2,19;
  1076:6;1077:25;
  1079:16;1080:11,24;
  1086:14,19,24;
  1088:12;1091:18;
  1094:8,12;1095:8,16;
  1096:9;1098:13;
  1099:17;1100:25;
  1101:1,3;1115:1;
  1117:2,18;1121:4;
  1122:23;1123:16;
  1125:19,22;1135:7;
  1137:17;1138:8;
  1146:12;1155:23;
  1157:15;1158:5,18;
  1159:13,22;1163:16;
  1173:18;1178:4;
  1179:8;1196:10;
  1198:2,4;1199:4,21;
  1204:6,25,25;1205:1,
  20,25;1207:5;1208:10;
  1214:25;1215:24;
  1216:24;1220:15;
  1221:7;1222:18;
  1223:15;1225:22;
  1228:22;1229:23;
  1232:1;1237:15;

1248:9;1252:13;
  1254:7;1261:23;
  1268:12,13;1272:9;
  1275:2,13
**looked (13)**
  1039:5;1061:21;
  1101:7;1139:7;1157:8;
  1200:9;1202:1;
  1206:16;1216:9;
  1217:2;1230:3;
  1241:18;1252:17
**looking (21)**
  1019:12;1021:5;
  1079:17;1087:6;
  1104:9,20;1123:18,23;
  1124:16;1148:5;
  1149:24;1153:5;
  1177:22;1187:17;
  1193:12;1198:6;
  1205:18;1209:23,24;
  1229:18;1260:3
**looks (10)**
  1057:15;1067:15,17;
  1073:15;1076:4;
  1102:13,22;1187:16;
  1205:17;1213:24
**loop (2)**
  1136:21;1137:8
**loose (5)**
  1064:4;1086:15;
  1099:20;1101:19;
  1129:24
**lose (5)**
  1027:19;1034:6;
  1035:4;1125:25;
  1166:4
**loses (1)**
  1035:1
**losing (3)**
  1026:13;1027:11;
  1264:24
**lost (15)**
  1027:14;1029:12,23;
  1032:5,6;1034:3,8;
  1037:9;1038:5,15;
  1124:22;1125:2;
  1126:14;1137:4,5
**lot (22)**
  1019:14;1020:5;
  1022:11;1025:12;
  1026:16;1029:7;
  1032:6;1036:17;
  1085:1;1104:1,2;
  1105:22;1108:9;
  1111:19;1112:5;
  1141:3;1174:24;
  1227:16,16,19;
  1240:21;1258:6
**lots (4)**
  1026:13,14;1030:13;
  1112:7
**love (1)**
  1173:17

**low (8)**
  1043:5;1076:25;
  1159:15;1190:12;
  1245:5;1249:5,11;
  1251:4
**lower (11)**
  1044:5;1045:6,8;
  1063:9,20;1177:23;
  1230:14;1235:8;
  1237:21;1267:14;
  1268:1
**lowest (1)**
  1210:5
**loyal (2)**
  1019:14,15
**loyalty (2)**
  1021:17;1022:24
**luggage (1)**
  1022:22
**lunch (20)**
  1105:18;1106:6;
  1109:20;1141:4;
  1145:1;1147:6;
  1148:12;1150:7,9;
  1151:10,11,11;1201:4;
  1203:20;1204:3,8,11;
  1209:5,10;1269:21
**Luncheon (2)**
  1147:9;1150:20
**lying (1)**
  1250:7
**Lynch (2)**
  1234:9;1237:17
**Lynne (1)**
  1247:5

---

# M

**Magee (3)**
  1050:15;1260:21,22
**mail (1)**
  1159:14
**mailbox (1)**
  1023:8
**mailing (3)**
  1103:2,4;1104:6
**main (3)**
  1059:1;1203:8;
  1246:3
**maintaining (1)**
  1218:11
**majority (2)**
  1145:15;1210:19
**maker (1)**
  1238:21
**makes (10)**
  1019:11;1021:11;
  1077:6;1120:4;1211:3,
  4;1214:20;1265:7,7,9
**making (10)**
  1025:21;1027:23;
  1035:18;1037:2;
  1072:18;1098:10;

1156:22;1168:15;
  1235:13;1249:9
**Maloney (2)**
  1079:22,25
**man (1)**
  1208:14
**manage (1)**
  1024:20
**managed (1)**
  1049:19
**management (6)**
  1146:8,10;1245:15;
  1247:13;1250:12,23
**Management's (1)**
  1087:1
**manager (1)**
  1252:5
**managers (1)**
  1108:17
**Manhattan (4)**
  1145:9,11,13,17
**manual (1)**
  1220:2
**many (35)**
  1052:1;1084:10,24;
  1110:5,7;1111:17,24;
  1112:1,18;1113:1,7;
  1121:16;1134:19;
  1143:21,24;1145:22,
  22;1154:6;1160:25,25;
  1168:5;1170:15;
  1182:8;1192:5,5,7,7,8,
  9,10;1206:22;1210:20;
  1211:1;1223:8;1238:4
**March (25)**
  1041:24;1043:19,22;
  1050:8;1053:3;
  1097:14;1123:21;
  1124:3,11;1125:8;
  1167:6,11;1173:2;
  1176:21;1177:16,18;
  1178:8,9,10,19;
  1179:13;1180:7,8,17;
  1264:17
**margin (63)**
  1041:7,10;1044:22,
  24,24,25;1045:1,6,8,9,
  9;1057:4;1058:1,10,
  13;1059:22;1061:9;
  1063:2,5,18,25;1067:4,
  12,15,17;1099:4,6;
  1190:12,15,18,21,21;
  1196:3;1199:14;
  1210:7,14;1213:10,11;
  1214:10,11;1225:3,6;
  1226:12,13;1227:7;
  1229:9,25;1230:4,13;
  1235:8,11,20,21;
  1237:22;1239:25;
  1240:13,16;1252:24;
  1268:23,23;1275:9,17,
  21
**margins (30)**

1043:7;1044:4,5,8,
12,14,16,16;1045:12,
13;1067:23;1082:4,7,
12,17,21,24;1096:19,
25;1212:1,2,4;
1225:18;1233:24;
1237:10,14,20,21;
1239:9,14
**Mark (6)**
1023:25;1136:8,10;
1152:4;1248:22;
1280:4
**marked (12)**
1120:19;1202:19;
1214:14;1218:23;
1219:19;1220:14;
1230:18;1231:2;
1233:1;1234:2;
1242:24;1260:15
**market (27)**
1025:15;1032:9;
1038:25;1040:21;
1041:14;1119:7;
1122:2,4,19;1126:13;
1137:16;1168:1,2;
1200:6,13;1225:19;
1235:10;1236:4,4,9,10,
12;1249:11;1251:4,11,
12,18
**marketing (3)**
1100:22;1102:11;
1223:10
**marketplace (3)**
1039:9,11,14
**Marshall (1)**
1089:12
**matched (1)**
1048:14
**matches (1)**
1057:16
**matching (1)**
1049:7
**mate (1)**
1083:20
**material (5)**
1027:18;1028:6;
1146:11;1150:2,4
**Materiality (1)**
1037:1
**Materials (1)**
1119:11
**mathematical (1)**
1120:2
**matter (10)**
1018:5;1036:7;
1051:23;1087:21;
1121:25;1122:15;
1185:12,18;1231:8;
1278:23
**matters (5)**
1023:2;1115:19,21,
24;1254:13
**May (58)**

1018:8;1020:1;
1028:22;1031:11;
1036:19,23;1037:6,18,
22;1038:7,17,22;
1043:16;1045:16,19;
1046:9;1048:4;1049:4,
18;1057:17;1078:4;
1080:18;1090:21;
1109:13;1110:23;
1119:6;1120:22;
1121:1,4;1136:13;
1142:4;1145:1,3;
1152:17;1165:21;
1168:4;1182:7;
1188:25;1201:12;
1202:7,20,22;1203:22;
1224:20;1225:14;
1226:17;1229:21,22;
1232:20;1233:9;
1235:7,7,13,15,19,21;
1256:25;1280:10
**maybe (9)**
1038:11;1053:5;
1102:16;1144:2;
1148:2;1149:9;1211:3,
4;1225:10
**McLeod (2)**
1264:15;1268:1
**mean (64)**
1020:15;1026:20;
1029:9,21;1030:24,25;
1033:14;1044:4;
1045:18;1058:16;
1059:12;1064:19;
1073:19;1075:12,13;
1081:16;1086:2;
1092:12;1093:10,16;
1109:10;1110:8,9;
1111:25;1113:22;
1119:17;1120:13;
1121:12,24;1126:6;
1138:2;1139:6;
1141:10,20;1145:25;
1155:22;1178:24;
1182:20;1183:8,14;
1184:20;1189:16;
1196:2;1199:5,6,9;
1207:13;1208:9,20,24;
1216:11;1229:7;
1237:13;1239:12;
1240:11;1248:12,25;
1249:18,23;1250:16,
18;1251:10,16;
1268:20
**Meaning (13)**
1031:3;1033:16;
1040:22;1110:3,7;
1220:20;1240:22;
1245:3;1249:15;
1254:13,14,15;1265:8
**means (23)**
1028:5;1058:13;
1062:16;1063:16,18,

20;1065:8;1075:4;
1087:16;1090:4,5;
1092:15;1114:2;
1119:7;1195:11;
1224:8;1244:18;
1248:13;1249:24;
1250:22;1254:2;
1268:21;1276:3
**meant (6)**
1059:13;1066:25;
1196:3;1248:17;
1249:7;1265:4
**mechanical (1)**
1023:4
**mechanically (1)**
1120:12
**mechanism (1)**
1257:15
**media (1)**
1257:24
**meet (9)**
1043:2;1054:3;
1108:8;1128:6;
1142:18;1179:2;
1181:9;1205:21,23
**meeting (10)**
1062:4;1107:1,7,11,
12;1110:10;1253:24;
1266:4,12,16
**meetings (4)**
1042:13;1109:14;
1110:3;1254:23
**meets (1)**
1107:18
**members (2)**
1107:13;1174:23
**memory (10)**
1057:19,20,23,24;
1087:6;1100:25;
1101:2,9;1121:5;
1125:23
**mention (4)**
1048:6;1051:20;
1175:4;1239:3
**mentioned (21)**
1038:24;1071:8;
1084:14;1086:5;
1088:17;1115:5;
1118:9;1126:18;
1137:15;1166:11;
1171:25;1172:10,12,
14;1175:6;1184:12;
1203:22;1213:13;
1216:19;1217:7;
1239:2
**mere (1)**
1205:17
**Merrill (2)**
1234:9;1237:17
**message (8)**
1099:17;1187:6;
1190:11;1198:13,17;
1199:5;1243:4;

1248:10
**messages (1)**
1185:15
**messaging (2)**
1059:9,21
**messenger (1)**
1264:7
**met (22)**
1068:9;1069:9,12;
1105:14;1106:19;
1133:13,22;1134:2,5;
1139:19;1142:11;
1145:1;1162:6,6,8,12,
17;1182:24;1189:14;
1209:9;1221:9;
1269:21
**method (1)**
1272:21
**metric (1)**
1193:8
**Miami (1)**
1022:4
**mic (1)**
1091:19
**Michael (4)**
1046:8,24;1047:13,
21
**microprocessor (2)**
1210:11;1211:8
**Microsemi (1)**
1154:5
**Microsystems (1)**
1093:12
**mid (3)**
1066:5;1076:25;
1077:4
**middle (6)**
1065:8;1081:2;
1095:16;1153:23;
1158:9;1193:4
**mid-quarter (2)**
1065:7,16
**might (8)**
1026:25;1034:18;
1049:16;1075:22;
1084:14;1088:8;
1106:19;1113:18
**million (6)**
1066:4;1138:5,5;
1180:7,8,17
**mind (15)**
1027:2,22,22;
1033:15,24;1046:18;
1047:10;1092:14;
1123:15;1139:16;
1144:19;1235:17,21;
1264:15;1279:2
**mine (6)**
1165:22;1215:8,19;
1260:13;1265:15,21
**minimize (1)**
1220:19
**minimum (1)**

1243:17
**minute (6)**
1025:4;1127:12;
1177:7;1191:24;
1199:3;1243:7
**minute-by-minute (1)**
1032:9
**minutes (24)**
1024:1,1;1029:3;
1038:16;1060:23;
1096:3,5;1098:5,8;
1122:17;1127:12,14;
1128:4,6;1166:7;
1200:12;1206:20;
1208:18;1215:23;
1216:7;1219:8;
1236:16,20;1280:17
**misled (1)**
1186:6
**miss (11)**
1097:23;1136:8;
1179:3,5;1180:7,11;
1190:20;1196:3;
1239:9,14;1271:6
**missed (6)**
1096:19,25;1097:4;
1150:16;1190:15;
1237:14
**missing (2)**
1027:14;1179:4
**mistake (1)**
1149:22
**mistakenly (1)**
1036:14
**mix (7)**
1044:15,17;1045:3,
8;1049:22;1079:17,19
**model (16)**
1089:6;1090:6;
1209:19,21,22;
1210:16;1211:3,4,24;
1212:3,10,15,23;
1213:4,7,24
**modeled (1)**
1227:3
**modeling (12)**
1209:18;1212:8;
1213:16,18,22;1214:4;
1216:19,22,23;1217:6,
12,14
**models (5)**
1209:15;1210:25;
1211:2;1217:18;
1218:2
**mole (12)**
1244:5,6,8;1245:14;
1246:4,4,18;1247:11,
12,15;1250:12,22
**Molloy (1)**
1111:12
**moment (12)**
1123:9;1207:3,4;
1221:8;1229:18;

1230:25,25;1231:13;
1260:3;1266:3;1267:5;
1269:1
**moments (2)**
1209:3;1216:10
**Monday (1)**
1158:13
**money (37)**
1026:13;1027:11,14,
20;1029:12,23;1032:5,
6;1034:3,6,8,12,17,24;
1035:1,4;1036:2,11,19,
21;1037:9;1049:23;
1124:22;1125:2;
1126:1,9,13;1127:7,8,
8,9;1251:19;1253:7;
1264:24;1265:5,7,8
**month (13)**
1043:23;1047:6;
1051:5;1118:15;
1120:22;1156:6;
1158:14;1189:24;
1217:23;1221:12,16;
1223:2;1264:11
**months (9)**
1023:16;1065:9;
1084:2;1144:6;
1157:10;1217:23,24;
1220:24;1221:15
**mood (2)**
1184:22,25
**more (53)**
1018:3;1019:8,15;
1020:2,2;1026:2;
1029:24;1030:8;
1033:22;1036:16,21;
1045:8;1057:15;
1061:4;1073:21;
1080:6;1081:24;
1083:23;1098:9,10;
1099:21;1102:16;
1107:4,12;1109:21;
1110:24;1111:22;
1120:6,6;1122:17;
1136:3;1139:11;
1141:3,5,8,11,20;
1148:3;1166:5;1176:5;
1188:24;1190:14;
1195:24;1196:7;
1200:21;1206:20;
1217:20;1234:1;
1236:15;1247:3;
1262:13;1263:14;
1265:9
**Morgan (6)**
1080:13;1104:18;
1164:19,19;1228:17;
1265:22
**morning (16)**
1038:13;1149:16,17;
1151:14;1261:19;
1264:3;1269:18,25;
1270:3,6,9;1271:25;

1272:16,25;1273:3,5
**most (7)**
1026:19;1057:13;
1084:7;1085:3;
1090:11;1094:21;
1210:12
**mostly (1)**
1227:14
**move (21)**
1030:21;1083:1;
1146:19;1153:12;
1156:7;1157:21;
1158:24;1160:3;
1161:15;1163:22;
1165:16;1167:7;
1173:3;1176:22;
1178:11;1179:14;
1191:16;1236:14;
1250:24;1261:20;
1277:14
**moved (2)**
1276:22;1277:2
**movement (1)**
1277:11
**movie (1)**
1173:20
**moving (3)**
1024:23;1054:21;
1168:6
**MPU (1)**
1082:16
**MSCC (2)**
1154:5;1155:1
**M-Tech (2)**
1126:21;1127:2
**much (21)**
1024:4,19;1032:22;
1038:15;1040:5;
1056:25;1057:14;
1061:3,4;1067:3;
1081:24;1100:9;
1120:8;1140:8;1141:3,
6;1210:10,10;1236:15;
1263:3;1264:18
**mug (1)**
1019:12
**multibillion (1)**
1252:6
**multiple (3)**
1025:10;1247:3;
1256:17
**must (2)**
1244:14;1246:25
**mutual (2)**
1030:1;1174:17
**myself (16)**
1047:18;1093:3;
1156:2;1161:10;
1163:20;1167:4;
1170:12;1171:12;
1172:25;1176:20;
1178:8;1191:14;
1243:4;1262:10,23;

1265:8

## N

**Nagel (5)**
1101:11;1105:1,2,
10,11
**Nagel's (1)**
1104:21
**name (19)**
1023:25;1060:8;
1068:20;1070:4;
1099:14;1101:12;
1143:19,22;1149:3;
1172:1;1175:5;1181:2;
1208:14,15;1221:23,
24;1222:1,10;1228:15
**named (3)**
1041:19;1057:8;
1101:11
**names (8)**
1051:21;1067:19;
1156:19;1182:20,22;
1183:4;1184:11;
1251:15
**namingly (1)**
1273:10
**narrative (1)**
1235:12
**NATHANSON (1)**
1141:19
**nature (5)**
1018:15,20;1020:15,
16;1184:16
**Near (2)**
1081:3;1127:11
**necessarily (4)**
1079:14;1089:19;
1229:12,12
**need (17)**
1018:4;1029:6;
1054:9;1075:22;
1127:13;1128:2,4;
1131:22;1150:5,8;
1151:5;1211:24;
1212:3,10;1231:6;
1243:7;1257:17
**needed (2)**
1210:21;1213:12
**needs (1)**
1038:12
**negative (9)**
1026:12;1043:9,25;
1097:4;1180:9;
1193:18,20;1197:23;
1218:4
**neighborhood (1)**
1232:18
**net (1)**
1020:23
**network (5)**
1048:10;1054:6;
1092:1;1160:19;

1189:19
**networking (4)**
1052:15;1221:11,20;
1222:2
**networks (5)**
1273:7,22;1274:13,
16,18
**Neuberger (5)**
1203:8,10;1271:8,
14,16
**neutral (2)**
1078:25;1079:1
**new (7)**
1067:1;1080:24;
1083:24;1084:4;
1171:10;1192:1,15
**Newman (144)**
1025:19;1035:1;
1041:18;1050:1;
1051:13;1052:24;
1053:3,23;1054:16;
1056:13;1060:14;
1061:13;1064:8;
1071:12;1072:3;
1074:16;1075:15,24;
1077:8;1078:3;1083:8,
21;1084:14,15;
1085:10;1086:20;
1090:20;1091:4,7,14,
22;1092:9,18;1093:3,
13,20;1095:5,6,7,25;
1096:15;1097:3,13,22;
1098:2,6,14,19,21;
1099:6;1100:9;1105:6,
13;1106:1,17;1109:7,
10,17;1111:5,14,17;
1112:18;1113:17;
1114:12;1115:2,14,23;
1116:21,24;1117:8;
1126:21;1131:5;
1132:8,9;1133:9,13,17,
22;1134:2,14,21;
1139:19;1177:5;
1189:11;1198:17,21;
1199:6,25;1200:15;
1206:17,18;1207:11;
1209:8;1213:3,15,19;
1214:1,3,6;1215:21;
1216:9,10;1217:19;
1218:14;1242:12,18;
1243:5;1244:8,12,14,
19;1245:6,7,10,18,20,
24;1246:12,24;
1247:11;1248:22;
1249:21;1250:2,5,7;
1251:6,14;1252:2,23;
1259:1,6,20;1261:6;
1262:5,22;1263:17;
1264:1;1269:25;
1272:4,16,19,22;
1273:3;1276:11
**Newman's (19)**
1028:23,24;1052:2;

1085:13;1092:14;
1099:9;1199:11;
1206:10;1207:16;
1217:13;1218:1;
1246:5,13;1262:25;
1272:7,13,20,25;
1273:1
**news (5)**
1026:12,25;1047:17;
1257:24;1258:20
**next (46)**
1023:22;1035:2;
1037:25;1055:1;
1058:20;1063:13;
1067:19;1072:15,23;
1073:25;1083:21;
1103:6;1117:2;1118:1;
1127:15;1128:10;
1129:13;1140:14;
1141:24;1147:10;
1180:15;1193:10;
1197:1,8,14;1198:24;
1205:2;1206:2;1209:1;
1215:1,13,14,20,21;
1226:21;1234:18;
1236:22;1243:18;
1247:25;1248:15;
1265:3,4;1267:19;
1272:9;1279:7;1280:3
**nice (1)**
1279:4
**night (3)**
1019:19;1022:6,6
**nilly (1)**
1169:9
**nine (2)**
1084:2;1200:12
**None (2)**
1031:17;1194:14
**nonleading (1)**
1242:17
**non-public (6)**
1027:18;1028:6;
1033:9,10;1199:15,16
**norm (1)**
1040:25
**note (3)**
1072:13;1074:16;
1102:25
**notebook (2)**
1209:25,25
**notebooks (2)**
1223:2;1279:3
**notes (2)**
1056:6;1057:10
**notice (1)**
1235:19
**noticed (1)**
1068:14
**notified (1)**
1091:9
**notify (1)**
1090:22

noting (1)
1054:13
November (15)
1032:3;1105:4,10;
1130:18;1131:5,12,12;
1213:2;1215:16,25;
1238:10;1266:14;
1268:7;1276:19;
1280:19
number (95)
1030:2;1031:4,9;
1033:17;1041:2;
1099:21;1111:14,21;
1112:24,25;1121:6;
1142:19;1154:23;
1157:2;1159:7;
1173:14,15;1180:17;
1181:11;1183:23;
1200:15;1203:2,3,7,8,
11,12,13,14,15;1205:4,
7,9;1206:1,2,5,6,7,10,
11;1208:1,6,11,14;
1209:14;1210:6;
1211:23;1212:19;
1213:24;1214:21;
1215:4,5,6,7,14,17,17,
20,21,21,24;1216:1,1,
3,4;1220:16;1228:14,
23;1229:25;1230:4;
1231:9;1235:21;
1236:11,12;1238:7;
1251:3,21;1253:17;
1256:2;1258:8;1260:9;
1261:5;1270:10,13,15;
1271:4,4,14;1272:8,10,
14,14,19,21;1273:1
numbers (30)
1061:4;1076:8;
1129:6;1205:10,12;
1206:1;1208:19;
1211:12;1212:10,21;
1213:5,23;1222:22,25;
1223:4,4;1228:3,6,9,
20;1240:12,15;
1250:25;1251:2;
1252:21,24;1272:18,
23,24,25

# O

o0o (1)
1219:15
object (5)
1123:9;1207:17;
1220:4;1233:7;
1234:13
objected (1)
1149:17
objecting (4)
1019:21;1021:1;
1056:18;1150:13
objection (87)
1018:7;1025:5,6,17;

1040:12;1042:3;
1050:5;1052:10;
1053:19,20;1056:16;
1060:17;1061:17;
1064:12,13;1071:20;
1074:13;1078:7;
1080:21;1093:7;
1094:3;1095:4;1102:5,
6,18;1104:14;1115:7;
1117:22;1118:6;
1121:18;1123:13;
1130:10,24,25;
1131:18;1135:17;
1137:24;1141:16;
1146:20,23;1153:13,
14;1156:8;1157:22;
1158:25;1160:4;
1161:16;1163:23;
1165:17;1167:8;
1173:4;1176:23;
1178:12;1179:15,16;
1183:12;1191:17;
1202:10;1204:18,20;
1212:11;1214:6,22,23;
1217:15;1220:11;
1223:12;1231:14,19;
1233:11;1234:11;
1239:1;1242:15;
1243:11;1244:2;
1247:5;1248:7;
1250:17;1253:11;
1255:10;1258:3;
1259:2;1260:25;
1263:4,10;1266:19;
1278:11
objections (2)
1148:4;1150:15
objects (1)
1131:24
obligations (3)
1220:21;1253:17,20
observation (1)
1106:21
observe (2)
1071:6;1106:16
observed (1)
1109:17
obtaining (1)
1242:4
obviously (4)
1021:2;1034:15;
1036:4;1081:24
occasion (5)
1142:25;1143:5;
1194:3;1271:19,22
Occasionally (1)
1102:16
occasions (6)
1089:9;1142:19;
1144:24;1152:5;
1159:19;1271:2
occur (1)
1273:24

occurred (4)
1084:2;1157:13;
1204:23;1274:20
October (18)
1121:10,21;1131:9;
1137:21;1138:10;
1156:2;1157:19,19,19,
20,20;1158:1,6,23,23;
1159:25;1160:8;
1266:5
off (12)
1023:1;1039:13;
1056:24;1096:15;
1177:23,23;1180:16;
1230:24;1235:20;
1251:5,19;1264:2
offer (9)
1028:23;1108:3;
1123:12;1127:1;
1129:5,6,10;1214:19,
21
offered (12)
1035:21;1126:21;
1234:12,16;1235:2,3,5;
1236:2;1244:11;
1246:11,12;1257:10
offering (6)
1131:22;1158:16;
1159:20;1191:9;
1214:17;1276:5
offers (31)
1042:2;1050:4;
1053:18;1056:15;
1060:16;1061:16;
1064:11;1071:19;
1074:12;1078:6;
1080:20;1093:6;
1094:2;1102:4;1115:6;
1117:21;1118:5;
1126:4;1130:9,23;
1131:17;1135:16;
1137:23;1220:3;
1231:17;1233:6;
1234:10;1237:2;
1243:6;1248:3;
1260:24
office (13)
1083:3,8,11,16,18,
19,20;1145:3;1157:1;
1254:14,15;1270:21;
1273:1
officers (1)
1088:11
official (11)
1085:24;1086:8;
1087:24;1088:1;
1090:24;1091:3,4,8,15;
1092:21;1110:10
offset (2)
1034:19;1237:21
often (2)
1171:7;1262:11
oftentimes (1)

1105:17
old (1)
1182:1
OM (1)
1268:18
once (9)
1088:1;1122:1;
1129:11;1134:5;
1138:15;1170:14;
1171:15,17;1247:16
one (168)
1018:3,5,12;1021:3,
11;1023:4,15,20;
1027:12;1029:5,12;
1030:13,13,16;1031:8;
1033:20;1034:24;
1042:13,21;1043:23;
1049:16,19;1051:10;
1052:17,20;1053:12,
12;1057:16;1059:1;
1060:20;1065:6;
1069:2;1070:25;
1071:5,8;1073:14;
1081:23;1082:1;
1085:15;1086:5;
1087:13;1088:18;
1094:7,12;1096:10;
1098:10,12;1099:21,
23;1100:1;1101:2,19;
1106:4,5;1107:4,12;
1110:3,6,20,22,23,24;
1111:2,2,8;1112:10;
1116:1,21;1117:2,13;
1118:1,3;1119:1;
1120:7,21;1121:14;
1123:20;1124:10;
1127:11;1129:7,13,16;
1136:3;1139:12;
1141:5;1142:24;
1143:5,16;1144:12;
1149:18;1150:1,2,2,5,
16;1157:12,14;1158:5,
6,7,8,8;1159:4,23;
1161:22,25,25;1162:1;
1170:23;1171:1;
1173:14;1176:5;
1177:7;1179:9;1180:2;
1181:14;1182:5,6;
1184:12;1185:9,9,21;
1188:24;1189:18,24;
1190:14;1191:3,24;
1195:4;1199:3;
1205:10;1207:3,20;
1209:23;1210:24;
1211:3;1216:16;
1219:1,4;1221:12;
1223:8;1228:19;
1229:18;1230:25,25;
1231:13,16;1238:3;
1241:20;1247:10;
1252:15;1259:15;
1260:3,4;1261:4,6,18;
1262:13,14;1263:14;

1266:3;1267:5;1269:1,
5;1272:11;1274:25;
1276:10;1278:1
one-on-one (14)
1059:23;1107:1,7,
12,15;1108:5;1109:6,9,
10,11,14;1110:2,3,5
one-on-ones (3)
1108:3,13;1111:3
ones (11)
1053:15;1094:7;
1119:1;1156:23;
1157:14;1162:3,12;
1170:11;1261:4,19;
1263:13
ongoings (1)
1137:16
only (22)
1023:19;1024:4;
1027:21;1034:12;
1044:16;1091:4;
1124:16;1125:15,16,
24;1126:5;1141:2;
1148:25;1168:6,6;
1173:15;1213:12,22;
1217:22;1247:7;
1256:20;1272:21
open (10)
1018:2;1038:1;
1128:1;1129:1;1142:1;
1200:6;1237:1;1248:1;
1279:2;1280:1
opened (4)
1037:16;1118:15;
1200:13;1247:20
opening (1)
1018:19
operating (6)
1061:9;1063:20;
1214:10;1226:13;
1268:23;1275:17
operation (1)
1143:11
operations (1)
1189:19
opex (3)
1063:9,20;1064:1
opine (1)
1154:15
opinion (4)
1031:6;1039:13;
1226:3;1240:13
opinions (1)
1080:4
opportunity (1)
1108:8
opposed (2)
1141:13;1234:13
opposite (1)
1246:20
optimistic (2)
1177:20;1184:23
options (6)

1028:17,19;1037:11;
1121:2;1125:6,12
**order (3)**
1144:3;1152:20;
1210:17
**organized (1)**
1171:21
**original (4)**
1125:24,25;1126:9;
1231:8
**originally (1)**
1126:11
**originating (1)**
1270:15
**Otellini (1)**
1079:25
**others (15)**
1040:17;1050:2;
1052:1;1053:3,14;
1056:13;1090:1;
1117:12;1149:19;
1175:19;1176:17;
1236:5;1242:11;
1254:6,13
**otherwise (1)**
1025:1
**out (66)**
1019:18;1020:17;
1021:2;1022:9,10;
1023:7,10;1024:17;
1027:20;1028:15;
1030:12;1031:20;
1037:14,23;1039:9;
1040:16,21,23;
1047:13;1053:12;
1063:4;1068:17;
1072:17;1079:11;
1082:1;1083:3;
1098:11;1102:24;
1104:11;1107:10;
1134:10,11,13;
1143:21;1144:1;
1148:1,3;1151:6;
1152:17;1154:7,8;
1162:21;1165:6;
1168:4,7;1169:9,10;
1170:4,6;1177:7,21;
1181:3;1191:22;
1194:5;1195:11;
1205:23;1211:24;
1225:6,17;1236:12;
1249:12;1259:12;
1272:20;1276:2,11,15
**outdoor (1)**
1106:6
**outfit (1)**
1167:17
**outline (2)**
1033:21;1256:13
**outrageous (1)**
1246:6
**outside (5)**
1101:13;1109:8;

1170:23;1171:17;
1205:22
**outweigh (1)**
1244:10
**outweighs (1)**
1247:18
**over (22)**
1018:16;1024:24;
1028:8,8;1039:4;
1059:2,3;1078:18;
1083:20;1097:9;
1100:6;1114:13;
1122:2,4;1126:18;
1132:3;1142:14;
1150:7,9;1217:24;
1254:24;1259:16
**overall (8)**
1021:20,21;1056:24;
1063:7;1080:5;
1192:16;1211:4,9
**overlap (1)**
1162:25
**overly (2)**
1275:17,21
**overrule (1)**
1131:25
**Overruled (10)**
1040:13;1126:6;
1207:19;1220:11;
1233:17;1247:19;
1255:12;1258:4;
1263:5,13
**owed (1)**
1220:21
**own (17)**
1028:23,25,25;
1032:5;1089:1;
1111:15;1121:10;
1124:22;1126:21;
1127:5,9;1143:21;
1212:15;1245:5;
1249:4;1253:8;
1264:24
**owned (1)**
1253:3
**Oxley (2)**
1087:10;1088:7

**P**

**page (38)**
1031:25;1037:7,25;
1044:11;1055:1;
1057:2;1067:9;
1086:20;1099:23;
1103:6;1127:15;
1128:10;1140:14;
1141:24;1147:10;
1153:23,23;1165:21;
1198:24;1205:2;
1215:1,13;1220:14;
1222:20;1223:14;
1226:21;1232:1;

1234:18;1236:22;
1239:24;1241:8;
1243:18;1247:25;
1252:17;1254:9;
1267:19;1272:9;
1279:7
**pages (1)**
1269:11
**paid (2)**
1143:10;1220:16
**Pallazo (1)**
1019:6
**paragraph (18)**
1044:11;1072:2,18,
23;1115:4;1123:22;
1124:14,15,21;
1178:23;1180:6;
1192:14;1193:14;
1225:22;1240:7;
1241:24;1242:2;
1275:13
**paragraphs (1)**
1124:18
**parallel (1)**
1026:9
**parcel (1)**
1021:20
**pare (1)**
1150:7
**parenthesis (3)**
1190:8;1192:17,18
**part (23)**
1020:24;1021:20;
1054:20;1062:20;
1079:4;1084:7,19,21;
1120:7;1123:18,19;
1148:7,18;1174:17;
1185:4,6;1202:9;
1213:2;1223:10;
1245:18;1255:11;
1274:9;1277:18
**partial (1)**
1082:8
**particular (26)**
1034:8;1039:25;
1062:15;1071:15;
1072:20;1088:18;
1093:16,18;1103:1;
1110:22;1121:19;
1144:2;1208:4,5;
1214:20;1217:1,15;
1220:18;1223:1;
1224:25;1226:17;
1239:20;1252:11;
1254:21;1259:15,16
**particularly (7)**
1022:5,16;1054:13;
1148:6,7,19,20
**parties (16)**
1102:1;1129:15,17;
1202:17;1203:7;
1205:9;1206:9;
1207:21;1208:3,7,13;

1215:5,20;1216:2;
1229:23;1272:13
**parts (5)**
1120:6,7;1148:7;
1209:22;1210:5,12
**party (1)**
1171:2
**passed (3)**
1068:22;1094:21;
1212:24
**passing (1)**
1214:2
**past (9)**
1040:5;1044:6;
1045:21;1216:25;
1217:1,3;1220:24;
1248:21;1251:7
**paste (5)**
1116:23,24;1117:1,
12;1118:3
**pasting (1)**
1117:14
**paths (1)**
1142:22
**Paul (2)**
1079:22,25
**Pause (3)**
1025:3;1269:6;
1278:2
**pay (3)**
1166:5;1252:8;
1263:3
**paying (8)**
1136:1,18,19;
1138:15;1165:25;
1166:3;1168:17;
1169:7
**PC (5)**
1081:9;1209:25;
1245:6;1249:5;
1276:15
**PCs (1)**
1249:13
**people (51)**
1020:22;1021:13;
1034:11;1040:24;
1043:2;1051:23;
1068:1;1071:2;1075:9,
9,12,13;1085:25;
1086:9;1087:8;
1105:19,22;1108:10,
12;1109:13;1110:25;
1127:13;1132:7,25;
1136:13;1144:16;
1146:1,6;1160:20,20;
1161:1;1162:7;1163:2,
3,4;1184:9,11;
1190:11;1192:9,10;
1218:12;1244:4;
1246:10,16,18;
1247:15;1255:2,3,4;
1256:2;1271:16
**people's (3)**

1086:12;1098:19;
1127:8
**per (12)**
1084:10,18;1098:22;
1146:10;1210:15;
1213:11,13,25;1226:6;
1227:5;1262:13;
1268:24
**percent (31)**
1030:18;1044:15,23;
1057:3;1058:2,5;
1113:11;1120:8;
1136:2;1173:17;
1177:20;1179:3,4,6;
1180:11,16;1192:17,
18;1198:6;1207:2;
1211:4,5;1216:11;
1230:2,7;1232:13,18;
1237:22,23;1240:8,14
**percentage (5)**
1113:8;1120:3,3;
1211:3;1232:8
**percentages (2)**
1067:19,23
**performance (4)**
1173:16;1218:7,10,
17
**perhaps (8)**
1035:3;1044:5;
1046:22;1059:14,17;
1127:11;1170:19;
1269:11
**period (20)**
1048:17;1049:5;
1069:8;1094:17;
1111:12;1122:2,4,7,13,
13;1144:4;1145:8;
1171:8;1187:21;
1211:12;1217:17;
1224:10;1237:18;
1260:14;1274:5
**periodic (3)**
1086:12;1088:16;
1262:5
**periods (2)**
1120:18;1122:12
**permitted (3)**
1026:3;1049:10;
1254:20
**person (20)**
1069:12;1084:7;
1104:12,12;1108:9,9;
1110:3,13,21;1136:3;
1154:7;1166:11;
1185:24;1192:10,11;
1239:16;1245:22,22;
1265:13,14
**personal (36)**
1025:7,9;1026:4;
1028:18,19;1029:1;
1030:11;1032:5;
1033:12;1037:9;
1060:4;1068:3;1085:5,

7,10,14,16;1089:1;
1092:9,14,18;1107:5;
1118:9;1120:14;
1121:10;1122:7,20;
1123:7;1125:1,17;
1168:25;1169:19,22,
25;1181:6;1249:12
**personally (2)**
1176:15,16
**Pessimism (1)**
1043:5
**pessimistic (1)**
1184:23
**Peter (1)**
1053:24
**PGR (34)**
1033:7;1048:10,12,
17;1049:13,18,20,23;
1050:2,10,20,23;
1051:11,14,24;1052:4,
5;1054:11,13;1056:1,
22;1057:6;1160:17,19,
21;1161:3,4,5,13,20;
1162:2,23;1223:8;
1274:23
**phone (8)**
1069:14;1084:12;
1085:2,4;1094:22;
1144:16,20;1169:14;
1199:10;1202:1,2,9,14,
16,17;1203:11,12,14,
15;1205:1,5,10;1206:1,
1,2,10,16;1207:22,22;
1208:4,5;1214:14;
1215:13;1216:1;
1248:13;1258:9,14;
1269:11,13;1270:17,
19,25;1271:2,18;
1272:3,8,21
**photo (1)**
1019:10
**photograph (2)**
1020:15,16
**photos (1)**
1019:11
**Phrase (3)**
1023:11;1044:3;
1123:21
**physical (2)**
1083:13;1142:21
**physically (1)**
1144:25
**pick (5)**
1043:6;1044:15;
1147:6;1169:14;
1278:24
**picked (1)**
1259:15
**picture (5)**
1018:12;1020:9,19;
1255:5,6
**piece (10)**
1041:7;1053:12;

1073:23;1076:1,21,21;
1098:10,12,13;1211:9
**pieces (1)**
1075:14
**pile (1)**
1064:4
**piles (1)**
1034:24
**pitch (1)**
1223:10
**place (6)**
1021:16;1044:16;
1159:9;1233:16;
1266:13;1267:10
**plan (7)**
1058:4,12,13;
1179:3;1191:9;
1192:17,18
**plans (2)**
1024:24;1131:19
**plausible (1)**
1029:22
**play (1)**
1175:24
**playing (2)**
1165:6;1251:7
**pleasantries (5)**
1106:9,10,20;
1109:8,22
**please (16)**
1099:19;1142:5;
1153:17;1159:3,5,22;
1164:4;1166:25;
1176:18;1178:15,23;
1179:19;1180:6,10;
1190:6,10
**pled (1)**
1036:14
**plug (1)**
1213:23
**plus (2)**
1177:19;1265:5
**pm (23)**
1095:22,25;1123:21;
1124:11,17;1151:2;
1153:23;1156:12;
1167:12;1178:20;
1196:11,18;1200:2;
1205:4,15;1206:3,19,
23;1207:10;1208:22;
1223:16;1264:17;
1272:14
**point (61)**
1020:8;1026:6;
1027:7,9,12,12;
1028:12;1029:5,8;
1030:11,12,20;
1033:25;1034:3;
1038:24;1039:8;
1058:10;1061:3;
1065:8,21;1066:5;
1068:22;1075:18,19,
22;1077:4;1079:22;

1083:23;1084:4;
1086:5;1089:23,23;
1101:24;1102:14;
1104:7,21;1105:1,15;
1107:10;1111:8;
1125:11;1143:16;
1148:13,16;1168:10,
15,16;1169:4;1178:9;
1179:5;1182:16,18;
1186:10;1220:7;
1224:4,10;1236:9;
1240:6;1246:3,23;
1268:17
**pointed (8)**
1072:17;1082:1;
1169:10;1225:17;
1272:20;1275:14;
1276:11,15
**pointing (4)**
1045:23;1079:11;
1225:6;1276:2
**points (19)**
1029:4;1030:12;
1156:19;1157:3,5,7,9,
11;1158:12,16;
1159:20;1160:15;
1168:4;1169:15;
1171:22;1173:15;
1178:24;1198:5;
1236:13
**policy (22)**
1218:21;1220:6,6;
1221:3,17;1273:6,6,9,
10,12,13,16,17,21;
1274:3,6,10,25;1278:5,
6,13,14
**portfolio (4)**
1111:18;1122:20;
1253:10,14
**portion (2)**
1119:10;1264:16
**POS (1)**
1224:5
**position (9)**
1018:14;1053:25;
1054:1;1070:6;1119:7;
1195:11;1197:23;
1198:1;1206:25
**positions (1)**
1098:20
**positive (13)**
1026:12;1047:13;
1058:17;1059:4;
1063:7;1079:20;
1080:6;1081:9;
1082:11;1190:8;
1218:11;1249:10,12
**positively (1)**
1063:5
**possibility (1)**
1021:10
**possible (4)**
1087:2;1142:23;

1152:17;1269:13
**possibly (4)**
1087:19;1098:7,7;
1116:9
**post (4)**
1217:7;1225:12;
1233:21;1273:25
**potential (2)**
1018:16;1025:5
**potentially (4)**
1022:14;1024:6;
1088:22;1092:21
**practice (4)**
1065:13;1086:2,4;
1222:2
**precise (4)**
1036:3;1235:15;
1245:7;1249:21
**predict (1)**
1217:2
**prediction (2)**
1113:23;1228:12
**predictions (5)**
1024:10;1227:23;
1244:13;1245:4;
1248:21
**prejudice (6)**
1018:16;1020:13,14,
22;1244:10;1247:18
**prejudicial (2)**
1022:14;1246:20
**prepare (1)**
1162:10
**prepared (2)**
1146:23;1162:9
**presence (1)**
1142:21
**present (7)**
1018:2;1038:1;
1105:25;1128:1;
1129:1;1151:9;1280:1
**presentation (1)**
1062:5
**presented (1)**
1018:6
**presenting (1)**
1235:13
**presents (1)**
1266:22
**press (1)**
1258:6
**presumably (1)**
1024:23
**presume (1)**
1234:11
**pretty (3)**
1125:3;1245:7;
1249:21
**preview (5)**
1102:13,22,23;
1104:9,11
**previous (2)**
1161:22;1268:21

**previously (5)**
1038:4;1059:19;
1069:16,17;1110:20
**price (19)**
1193:6,7;1210:4;
1212:18;1230:15,24;
1231:15,21;1232:9,16;
1235:25;1276:5,6,15,
22;1277:2,9,11,14
**prices (9)**
1079:19;1130:21;
1210:9;1211:6;
1216:24;1217:1;
1232:2;1233:8;1276:3
**pricing (5)**
1033:6;1275:18,22;
1276:3,13
**Primary (5)**
1048:12;1090:17;
1097:3;1263:1;1276:2
**primed (1)**
1207:20
**print (2)**
1245:5;1249:4
**prior (18)**
1043:20;1044:6;
1045:21;1058:2,13,19,
21,23;1059:9,11,20;
1113:18;1146:22;
1179:5;1184:12;
1203:22;1220:17;
1272:4
**private (5)**
1087:7;1089:16,25;
1090:4,7
**privilege (1)**
1142:13
**probably (3)**
1038:13;1135:6;
1170:23
**probative (4)**
1018:15;1022:14;
1244:10;1247:18
**problem (1)**
1088:5
**proceed (5)**
1024:2,18;1038:17;
1142:4;1248:2
**process (3)**
1052:24;1054:14;
1088:10
**processor (1)**
1211:8
**procurement (1)**
1189:24
**producing (1)**
1166:22
**product (11)**
1044:19,22,24,24,25;
1045:4,6;1079:19;
1108:17;1210:24;
1212:16
**productive (1)**

1025:2
**products (4)**
1045:9,9;1210:8;
1211:10
**professional (2)**
1020:3;1169:20
**profitability (2)**
1058:25;1059:22
**profitable (2)**
1058:15;1059:6
**profits (3)**
1064:1;1125:16,24
**progressed (1)**
1223:21
**prohibit (1)**
1278:14
**projects (1)**
1152:6
**promises (2)**
1069:24;1070:1
**proper (1)**
1126:2
**propose (2)**
1023:8;1026:3
**prosecutor (4)**
1160:16;1174:8,21;
1186:17
**prove (2)**
1020:11;1149:2
**proven (2)**
1022:12;1265:5
**provide (25)**
1070:10;1094:20;
1146:7;1163:6,7;
1166:21;1176:14,16;
1177:5;1186:12,13;
1194:8;1217:9;1255:7,
14,17,20,23;1256:1,11;
1262:2,5;1263:8,15,19
**provided (24)**
1049:7;1070:13;
1081:25;1149:15;
1183:22;1186:8;
1213:19;1222:3;
1226:10;1236:3;
1238:23;1239:16;
1256:16;1262:3,16,21;
1263:17,18,20;1267:4;
1268:6,10,22,25
**provides (1)**
1242:10
**providing (12)**
1143:13;1184:7;
1186:2,10,19;1187:3,4,
20;1190:17;1222:22;
1242:1;1277:19
**proxy (2)**
1026:12,24
**Pru (1)**
1173:13
**prudent (1)**
1065:16
**Prudential (30)**

1042:9;1088:9,10;
1133:5,11,15,20;
1134:1;1138:19;
1143:4,8,11,25;
1151:24;1180:24;
1181:3,15,20;1182:17,
19;1183:24;1184:3;
1188:1;1209:19;
1210:17;1212:9;
1214:5;1217:11,11;
1265:11
**public (13)**
1033:9;1036:17;
1058:14;1065:10,22;
1072:19;1199:15;
1211:18;1274:13,14,
15,18;1278:15
**publicly (2)**
1216:23;1217:11
**publish (8)**
1153:17;1157:25;
1159:3;1160:7;1173:7;
1177:1;1178:15;
1179:19
**published (4)**
1070:16;1079:2,4;
1156:11
**pull (1)**
1078:18
**purchases (1)**
1034:3
**purpose (7)**
1107:23;1110:10,13;
1235:2;1258:25;
1259:4,8
**purposes (2)**
1090:12;1257:16
**pursue (1)**
1032:23
**push (1)**
1069:22;1177:21
**put (44)**
1022:8;1024:15,16;
1043:10;1046:22;
1071:6;1094:6;
1097:13;1098:19;
1113:14;1124:7;
1126:1,12;1131:20;
1134:11;1137:14;
1143:21;1144:20;
1150:5;1176:12;
1187:7,12;1191:2,4;
1195:1;1196:16;
1197:7;1198:3,15;
1203:25;1206:15;
1226:14;1235:19;
1241:6;1245:19;
1252:16;1259:24;
1261:19;1264:13,16;
1267:14;1269:12,13;
1273:20
**putting (3)**
1077:20;1213:10;

1264:15

## Q

**Q1 (6)**
1057:3;1058:2;
1073:24;1076:22;
1177:21,23
**Q2 (4)**
1177:20,22;1249:18,
20
**Q3 (3)**
1058:15;1062:14,23
**Q3/Q4 (2)**
1063:8,12
**Q4 (6)**
1058:15;1067:4,7;
1073:15;1076:2;
1177:21
**QCY (1)**
1076:7
**quarter (91)**
1038:21;1039:1,8,
17;1041:6,24;1043:15,
20,21,23;1044:6;
1045:15,21;1046:12,
15;1057:15;1058:2;
1059:7;1062:13;
1063:13,13;1064:24;
1065:1,5,8,10,12,14,
25;1067:7;1071:16,16;
1072:9;1073:19,24,25;
1076:2,7;1084:18;
1103:1;1130:5,5;
1131:9,11;1138:5;
1177:19;1180:7,8,11,
15,15,16,16,17;1189:9;
1190:8,13;1193:12;
1224:13,20;1225:22,
25;1226:10;1227:3;
1229:10,16;1232:6,20,
21,22;1233:14,21;
1234:7;1235:9,13,14,
23;1236:11;1237:9;
1239:13;1245:7;
1250:1;1251:13;
1262:14;1268:5,7,12,
21;1275:11,16;
1276:18
**quarterly (3)**
1041:5;1047:1;
1226:10
**quarters (4)**
1190:7;1251:7,18;
1277:5
**questionable (1)**
1022:13
**quick (1)**
1113:23
**quicker (1)**
1141:6
**quickly (4)**
1024:23;1040:17;

1192:19;1280:5
**quite (4)**
1104:3,4;1105:14;
1133:4
**quote (13)**
1044:14,17;1066:9;
1076:24;1081:3;
1082:3;1096:18;
1116:14,15;1117:5;
1125:5;1266:6;
1275:15
**quotes (1)**
1046:24
**quoting (1)**
1047:21

## R

**raided (1)**
1258:5
**raise (4)**
1038:14;1063:8,12;
1177:24
**ran (3)**
1213:4,7;1253:3
**rate (2)**
1023:16;1213:13
**rates (2)**
1097:9,14
**rather (4)**
1099:1;1147:4;
1201:8;1266:7
**Ray (1)**
1208:14
**re (3)**
1060:14;1064:8;
1072:23
**reaccelerate (1)**
1082:16
**reached (5)**
1134:10,11;1152:17;
1163:5;1194:5
**Reaching (1)**
1134:13
**reaction (1)**
1246:14
**read (29)**
1060:22;1062:17;
1075:17,20;1154:2;
1159:4;1164:4;1166:2;
1177:17;1178:23;
1180:6;1184:25;
1189:23;1192:14,15,
19,21;1193:14;1206:6,
7;1207:11;1208:11;
1243:7;1249:5,15,19;
1273:13,14;1276:1
**reader (1)**
1075:2
**reading (7)**
1045:24;1062:15;
1082:8;1101:13;
1138:16;1140:7;

1190:6
**Ready (4)**
1140:13;1150:19;
1151:3,4
**real (5)**
1087:12;1088:10,12;
1114:20,20
**realize (1)**
1149:22
**really (19)**
1020:24;1022:13;
1029:21;1032:16;
1034:3,21;1036:21;
1037:8;1038:12;
1066:13;1082:10;
1106:8;1117:11;
1224:12;1235:24;
1238:4;1244:19;
1246:20;1247:17
**rearrange (1)**
1098:8
**rearranging (1)**
1098:5
**reason (13)**
1028:13,13;1037:14,
15;1090:11,17,23;
1116:9;1126:25;
1137:14;1148:12;
1168:12;1224:5
**reasonable (1)**
1220:18
**reasonably (1)**
1193:8
**reasons (2)**
1030:14;1059:1
**recall (168)**
1024:14;1028:22;
1038:22;1039:6,15;
1041:15;1046:9;
1047:17;1048:3,7;
1050:9;1052:20;
1058:17;1069:21,23;
1070:3;1085:13,15,23,
24;1086:11,13;
1088:19;1091:9;
1092:10,15;1094:18;
1098:7;1099:9;
1100:16,19,24;1103:2;
1104:3,6,8,25;1105:2,
16;1106:10,12,15;
1109:24;1114:18;
1116:8;1121:1,9,12;
1125:14,18;1126:10;
1131:10,11;1142:19,
22;1143:2;1144:8,12;
1152:16,18;1156:24;
1159:12;1162:5,25;
1165:6;1173:19;
1176:9,9,10;1178:1;
1182:4,4;1184:17;
1188:9,10,11;1192:13;
1193:1;1194:5,9;
1195:2,6,22;1197:3,12,

18,20;1198:13;
1200:24;1201:4,8,15,
19;1202:8;1204:4,7,
14;1209:2,15,21;
1211:14;1213:18;
1218:8,12,19;1221:21,
25;1224:16;1225:3,17,
19;1226:9,9,12;
1227:11,21;1228:25;
1230:11,12,15;
1233:12;1238:22;
1239:3,4,15,18,19;
1240:4,25;1241:4;
1242:18;1251:24;
1252:3;1254:25;
1256:8,22;1257:6,23;
1258:2,8,15,22;
1259:10,22;1260:1;
1261:25;1262:11;
1263:24;1264:3,10,11,
11;1265:18;1266:9,12,
16;1267:1,3;1269:24;
1270:2;1273:3,5,7,9,
20;1274:3,5,9

**recalled (2)**
1140:3;1227:7

**receive (14)**
1045:18;1061:1,3,4;
1090:13;1129:11;
1135:2;1139:4,24;
1175:9,14;1176:2,7,12

**received (105)**
1041:19;1042:5,6;
1045:15,18,20;1050:6,
7;1053:21,22;1056:19,
20;1060:18,19;
1061:18,19,23;
1064:13,14;1066:25;
1071:21,22,24;
1074:14,15;1078:8,9;
1080:22,23;1086:25,
25;1092:17;1093:8,9;
1094:4,5;1095:22;
1102:7,8,10;1115:8,9;
1117:24,25;1118:7,8;
1124:2;1129:20,21;
1130:11,12,13,18;
1131:1,2;1132:1,2;
1135:18,19;1137:25;
1138:1;1139:13;
1140:1;1145:23;
1153:15,16;1156:9,10;
1157:23,24;1159:1,2;
1160:5,6;1161:17,18;
1163:24,25;1165:18,
19;1167:9,10;1173:5,
6;1175:9;1176:15,24,
25;1178:13,14;
1179:17,18;1191:18,
19;1211:12;1214:24;
1220:12,13;1231:24,
25;1233:18;1237:4,5;
1248:4,5

**receives (1)**
1235:18

**receiving (11)**
1025:15,16,24;
1104:3,25;1105:2;
1138:10;1140:3;
1168:9,11;1223:3

**recently (1)**
1220:24

**Recess (4)**
1128:8;1147:9;
1150:20;1219:14

**recipient (5)**
1023:6;1086:1;
1087:3,20;1090:1

**recipients (3)**
1129:8,14,17

**recognize (19)**
1041:18;1064:7;
1074:3,6;1080:13;
1091:21;1115:2;
1130:2;1219:24;
1230:22,23;1231:4,12;
1233:2;1234:4;1241:9;
1243:1;1260:17;
1272:23

**recollection (31)**
1041:1;1051:16;
1061:10;1088:15;
1090:9;1091:16;
1092:13,16,17;
1104:20;1107:5;
1145:4;1157:10;
1165:2;1172:9;
1174:25;1186:15;
1189:22;1194:12,13;
1202:13;1203:17;
1205:20;1221:2;
1224:9;1227:14;
1232:15;1268:8,8;
1273:18,24

**recommendation (2)**
1078:25;1194:8

**recommendations (1)**
1112:8

**recommended (2)**
1259:20;1261:6

**record (16)**
1092:7;1109:15;
1117:18;1128:3;
1202:19;1203:6,11,17;
1206:7;1208:3;1209:3;
1215:13;1223:22;
1248:6;1257:15;
1269:11

**recorded (4)**
1257:11,13,18,21

**recording (1)**
1257:3

**records (28)**
1200:23;1201:19,21;
1202:1,2,9,11,15,16,
18;1203:13;1204:10;

1205:1,18;1206:12,15,
17;1207:22,23;1208:4,
5,8;1209:8;1214:14;
1269:13;1270:5;
1271:24;1272:3

**recovery (1)**
1177:21

**recross (3)**
1236:17;1269:3,7

**redirect (7)**
1035:2;1194:17,19;
1219:17;1269:10;
1277:25;1278:3

**Reed (1)**
1142:11

**refer (11)**
1041:21;1063:12;
1067:12;1079:24;
1100:12;1102:11;
1109:22;1122:14;
1139:23;1172:7;
1277:2

**reference (7)**
1095:16;1120:21;
1131:15;1173:15;
1204:6;1246:4;1264:8

**referenced (6)**
1258:9,20;1260:5,6,
7;1278:8

**referencing (2)**
1174:3;1199:8

**referred (3)**
1102:10;1172:13;
1276:21

**referring (29)**
1039:20;1040:20;
1043:16;1045:21,23;
1048:12;1054:4;
1059:21;1066:21;
1079:18;1107:15;
1110:2;1114:15,25;
1163:15;1166:6;
1183:11;1185:17;
1216:17;1222:25;
1223:25;1225:7;
1227:1;1260:8;1268:3;
1273:12;1277:3,10,22

**refers (6)**
1037:1;1041:21;
1093:4;1094:16;
1109:14;1196:7

**reflect (2)**
1051:10;1236:8

**reflected (1)**
1077:8

**reflecting (1)**
1061:13

**refresh (12)**
1057:19,23,24;
1087:6;1100:25;
1101:9;1104:20;
1125:22;1150:5;
1187:15;1203:17;

1232:15

**refreshes (3)**
1057:20;1101:2;
1121:5

**refused (1)**
1194:10

**regard (1)**
1122:9

**regarded (1)**
1138:20

**regarding (3)**
1078:3;1119:14;
1239:17

**regardless (2)**
1136:21;1274:14

**regular (3)**
1065:13;1262:21;
1263:19

**regularly (2)**
1065:7;1239:19

**regulators (3)**
1088:7,22;1092:22

**reiterated (1)**
1229:3

**rejected (1)**
1028:23

**relate (4)**
1018:10;1037:7;
1161:13;1228:1

**related (2)**
1110:22;1143:7

**relates (1)**
1074:9

**relating (7)**
1018:11;1089:10;
1090:7;1115:3;1153:1;
1177:2;1211:13

**relation (3)**
1040:6;1199:1;
1206:18

**relations (24)**
1040:3,10;1041:22;
1042:21,24;1043:1;
1057:9,11,21;1059:1;
1061:14,24,25;1062:3,
7,10,20;1064:20;
1067:2,25;1068:4;
1108:14;1183:7,9

**relationship (23)**
1018:11,20,22;
1019:13;1021:12;
1022:24;1028:13;
1049:20;1114:11;
1134:14;1151:20;
1164:24,25;1168:25;
1169:12,20;1181:6,8;
1217:8;1246:12;
1265:13,20,23

**relationships (1)**
1218:11

**relative (2)**
1040:6;1122:13;
1208:24;1223:23

1232:15

**refreshes (3)**
1057:20;1101:2;
1121:5

**relatively (3)**
1030:1;1192:16;
1223:11

**relayed (1)**
1136:8

**releases (2)**
1104:4,5

**relevance (5)**
1018:17;1022:13;
1025:21;1255:10;
1260:25

**relevant (17)**
1019:24;1021:7,11,
21;1022:5,7,15,16;
1028:11,20;1036:20;
1119:7,14;1148:2,22;
1220:5,7

**relied (1)**
1033:11

**remainder (1)**
1270:3

**Remember (56)**
1039:4;1046:13;
1048:3;1052:23;
1059:13,15;1065:18,
20;1068:23,25;1069:2,
4,22;1086:10;1093:15,
18;1100:1;1106:4;
1110:25;1111:2;
1113:19,20;1114:21;
1125:17;1126:18;
1138:16;1142:23,23;
1143:6,17;1144:13;
1159:8;1174:10;
1178:2;1187:13;
1189:4;1192:3;
1202:14;1203:20;
1213:17;1217:23;
1227:9;1232:17;
1258:12;1261:1;
1264:7;1267:18;
1270:1,7,8;1273:1;
1274:9;1276:16,19,25;
1277:6

**remembers (1)**
1266:22

**remove (1)**
1030:24;1031:1;
1137:14

**removed (1)**
1030:10

**removing (1)**
1033:14

**rent (2)**
1170:8,15

**rented (2)**
1170:11,18

**repackaged (2)**
1098:1,2

**repeat (3)**
1074:5;1161:24;
1169:3

**repeating (1)**

1244:3
**rephrase (5)**
1102:19,20;1139:3;
1266:25;1278:12
**reply (1)**
1053:16
**report (51)**
1041:18;1042:14,23;
1043:9;1044:1;
1061:13;1063:22;
1068:20;1074:4,7,19,
24;1075:16;1076:7,7,
12,16,23;1077:9;
1079:12,14;1080:14;
1082:2,10,20;1129:8,
14,17;1162:15;1176:1;
1178:19;1190:23;
1192:25;1193:21;
1225:7,8,12,18,21;
1230:5;1233:5,19;
1237:8,16,17;1240:2;
1241:13;1263:18;
1275:3,6;1276:12
**reported (14)**
1038:21;1041:21;
1043:20;1045:16;
1046:15;1071:16;
1072:16;1131:12;
1190:16;1230:1;
1233:22;1234:8;
1237:9;1268:21
**reporting (10)**
1043:16;1072:14;
1076:18,18;1181:18;
1184:3;1189:13;
1190:20;1233:21;
1245:1
**reports (54)**
1039:16,18,20,22,23;
1041:13;1068:14,20;
1070:17,24;1071:3,6,
10;1077:16,20,22,24;
1079:4;1084:22;
1102:17;1143:17,21;
1144:1,3,3,5;1155:1;
1181:2;1189:6;
1223:24;1224:21;
1227:17;1228:1,10;
1232:20,21;1233:13;
1234:7;1235:8,10,24;
1241:3;1242:7;
1244:17;1251:3;
1258:6;1262:5,7,11,17;
1263:8,16,20;1276:14
**representation (1)**
1271:11
**representative (1)**
1107:16
**representatives (4)**
1108:15;1148:8,19,
23
**representing (1)**
1142:13

**request (2)**
1043:10;1169:5
**required (1)**
1253:25
**requirements (2)**
1054:3,10
**research (49)**
1031:4;1033:16;
1048:12;1070:17,24;
1071:3,6,10;1074:3,7,
19;1075:16;1077:16,
20,22,23;1079:4;
1080:13;1082:2,10,20;
1101:24;1102:14,14,
16,23;1103:3,4;1104:4,
7,11,19,21;1105:1;
1112:2,11,19;1114:16,
20;1115:3;1129:8,14,
16;1181:4;1217:11;
1220:16,17;1265:6,9
**resent (1)**
1096:7
**resources (1)**
1050:14
**respect (28)**
1022:7;1025:22;
1032:8;1039:25;
1052:19;1053:4;
1070:4;1072:9;
1073:11;1076:15;
1077:11;1112:10,11;
1120:2;1181:7;1208:8;
1220:8;1230:13;
1237:19;1247:5;
1249:1,2;1254:12;
1256:11;1262:24;
1263:7;1265:10;
1275:10
**respond (3)**
1249:3;1250:11;
1251:6
**responded (3)**
1109:11;1174:20;
1201:11
**responds (8)**
1163:21;1178:10;
1216:11;1244:15;
1248:22;1249:21;
1251:6,14
**response (14)**
1112:24;1113:21;
1144:7;1156:25;
1160:16;1186:17;
1187:23;1199:11;
1207:16;1217:13;
1218:1,3,4;1246:5
**responsibilities (2)**
1071:5;1112:11
**responsible (2)**
1112:1,19
**rest (5)**
1044:17;1053:16;
1089:18;1148:2;

1186:12
**restocking (1)**
1177:19
**result (1)**
1227:5
**results (8)**
1041:5;1042:14;
1163:6,8;1212:16;
1224:6;1268:17;
1275:7
**resume (3)**
1038:10;1151:16;
1219:16
**résumé (2)**
1187:16,17
**resumed (1)**
1018:1
**retired (1)**
1253:6
**return (1)**
1187:5
**Reuters (2)**
1228:5,9
**rev (3)**
1190:12;1198:5;
1268:18
**revenue (33)**
1033:8;1038:25;
1039:6,17,17,25;
1061:4,7;1066:5;
1076:12;1097:3;
1180:11;1199:14;
1210:6,14,18;1211:17,
23,24;1213:9,11;
1214:10;1225:21,24,
25;1226:1,2,12;
1227:14;1237:21;
1239:14;1252:24;
1268:22
**revenues (11)**
1040:22,24;1041:2;
1063:16;1076:8,25;
1082:4,16;1180:7,16;
1193:16
**revert (1)**
1217:10
**review (11)**
1052:8;1085:21,25;
1087:2;1088:22;
1092:22;1161:19,20;
1162:2;1188:1;
1218:17
**reviewed (3)**
1052:4;1081:25;
1087:19
**reviewing (3)**
1047:18;1087:11;
1088:11
**reviews (2)**
1086:12;1088:16
**revs (3)**
1063:9,16;1239:9
**right (328)**

1020:12;1023:14;
1024:8,21;1027:17;
1039:1;1040:8;1041:3,
4,8;1042:4,11,21;
1043:3,7,9,13,18,21,22,
23;1044:9,22;1045:6,
10,16,19,22;1046:1,3,
5,16;1047:3,4,6,11;
1048:12,15,20;1049:8,
14;1050:20;1051:14,
17,21;1052:3,5,9;
1053:15;1054:4,6,14;
1056:2,25;1057:4;
1058:2,11,21,25;
1059:7,24;1060:5;
1061:21,25;1062:7,10,
13,21;1063:5,16,18,20,
23;1064:1;1065:5,23;
1066:1,2;1068:10,12,
15;1069:9,17;1070:2,
19,20,24;1071:4,17,24;
1072:6,15;1074:10,17,
20,22,25;1075:3,10;
1076:2,4,8,10,13,16,19,
23;1077:12,14,17,20;
1079:4,6,9,12;1080:16;
1081:3;1083:9,24;
1084:19,24;1085:9,22;
1086:16;1087:14,17;
1088:2,5,20;1089:3,6,
10,13,16,19;1090:20,
25;1091:25;1092:3,5,
13,23;1093:4;1095:2,
14,23;1096:1,3,7,10,
16;1097:18;1098:2,6,
17,24;1099:2,7,10,13;
1100:4,10;1101:15;
1102:17;1104:9,13;
1105:7,11,20,23;
1106:7,22,24;1107:16,
18,21,25;1108:3,6,10,
11,20,22,24;1109:2,4,
13;1110:1,1,11,14,17;
1111:8,10,12;1112:5,8,
14,16;1113:2,5,22;
1114:14,20;1115:10,
15,17,20,24;1116:11,
12,18;1117:9,12,20;
1118:3,10,12,18,21,24;
1119:15;1122:9,21;
1124:1,13,17;1126:17,
21,23;1128:6;1130:6,
21;1132:9,13,15,19;
1133:2,5,11,15,18,20,
23;1134:3,6,10,19,21;
1135:3,5,18,20,22;
1136:6;1137:8,25;
1138:3,6,11,20,22;
1139:2,5,7,10,14,17,19,
22;1140:6,10,13;
1146:15;1147:3;
1164:11,12;1177:13;
1183:25;1188:18;

1189:9,14,16;1190:1,4,
23,24;1191:22,24;
1193:4,21;1200:13;
1209:6,7;1217:25;
1219:9,16;1233:15;
1236:20;1240:16;
1246:17,21;1248:8;
1251:17,18;1261:16,
17;1262:19;1265:11;
1269:22;1270:5,11,15,
17,25;1271:8,14,22;
1272:10;1274:4,11;
1275:10;1276:4,13,22;
1278:19,22;1280:2
**ring (3)**
1101:13,15;1159:6
**rise (1)**
1279:5
**risk (2)**
1220:19;1229:9
**Rob (1)**
1208:14
**robe (1)**
1219:2
**role (1)**
1050:17;1104:21;
1175:6;1262:25
**rolled (2)**
1097:9;1212:20
**rolling (1)**
1212:18
**rollup (2)**
1212:10,14
**roll-up (1)**
1196:4
**Ron (2)**
1132:17;1133:25
**room (1)**
1279:3
**rough (1)**
1171:15
**roughly (5)**
1043:19,23;1065:9;
1143:25;1156:6
**round (1)**
1124:21
**rouse (1)**
1259:8,12,16,16
**royalties (1)**
1067:18
**Ruchi (5)**
1188:17;1263:7,7,
13,15
**rule (3)**
1173:14,15;1221:16
**rumors (1)**
1040:25
**run (1)**
1028:23
**Ruth (4)**
1057:8,9,16,20

## S

**Sachs (4)**
1233:5,20,20;1275:3

**sad (1)**
1184:22

**sale (3)**
1195:12;1272:1,17

**sales (13)**
1045:8;1080:1;
1180:12;1193:6;
1200:3;1210:3,8;
1211:4;1223:1;
1233:17;1245:8;
1250:2;1269:25

**salesperson (1)**
1049:22

**salt (1)**
1229:10

**Sam (75)**
1116:9;1132:15;
1144:17,19,19;1145:1;
1151:20;1153:24;
1154:4,10,18;1155:5,
18;1156:2,18,19,22;
1157:3,10,14,17;
1158:9,11,12;1159:4,
13,20;1160:8,13,14;
1161:3,4,10;1162:6,15,
21,24;1163:1,2,2,9,11,
13,20,21;1164:7,9,21,
23,23,24;1165:4,15,20;
1167:5,6,12;1168:19;
1169:4,10,17;1170:12;
1171:12;1173:13;
1186:11,12,16;
1188:20;1189:16;
1190:1;1194:3,5,7;
1216:3,18

**same (48)**
1026:14;1033:13;
1039:23;1046:11;
1057:25;1061:20,23;
1063:22;1074:9;
1080:18;1081:21,23;
1083:8,11,13,14,15;
1093:24;1105:17,18;
1106:18;1107:3;
1110:1;1112:14;
1133:11;1152:4,5;
1154:24;1164:21;
1166:6;1170:22;
1176:16;1198:14;
1199:3;1205:12;
1207:20;1209:5;
1210:7;1215:16;
1217:3;1223:21;
1234:11;1235:6,11,12;
1237:18;1252:17,23

**Sam's (4)**
1062:16;1063:14;
1156:25;1189:21

**San (1)**
1180:22

**Sandy (40)**
1024:2;1085:3;
1089:6,8;1090:6;
1132:9;1186:22,25;
1187:3,6,16,17,20;
1188:16;1195:20;
1198:10,18,22;1199:5,
8;1203:20;1205:10,22;
1207:14;1211:12,23;
1212:23;1213:9,21;
1214:2,9;1227:7;
1255:6;1263:19;
1268:6,22,25;1269:21;
1270:17;1280:7

**Sandy's (3)**
1196:6;1213:23;
1227:3

**Sarbanes (2)**
1087:9;1088:7

**sarcastic (2)**
1172:7;1173:16

**sat (1)**
1183:1

**Saturday (1)**
1022:6

**save (4)**
1141:5;1150:9;
1192:19;1193:1

**saved (4)**
1087:16,24;1088:2,
20

**saw (15)**
1022:10;1039:15;
1041:2;1089:5;
1090:16;1098:23;
1099:17;1143:16;
1199:1;1201:21;
1209:8;1221:16;
1225:13;1241:19;
1276:24

**saying (55)**
1027:4;1029:9;
1031:10,12,13;
1032:10;1036:6;
1056:24;1058:6,20,23;
1059:3,14,21;1073:20;
1080:2;1088:16;
1105:9;1106:19,22;
1109:17;1116:20;
1124:18;1125:2;
1149:12;1174:1;
1185:13;1192:20;
1224:12;1229:11;
1233:13;1236:11;
1239:7,13;1240:23;
1244:20;1245:1,1,11,
11;1246:10,16,20;
1247:1;1249:14;
1250:4,6,13,14;1251:1,
2,3;1257:21;1275:24;
1277:8

**scheduling (1)**
1024:12

**scientific (1)**
1114:4

**scope (4)**
1233:8;1239:1,5;
1263:11

**Scott (14)**
1164:5,14,14,15,15,
19,23,24,24;1165:3,
1166:3,6,6;1263:16

**Scottsdale (2)**
1022:4;1106:4

**screen (21)**
1046:23;1054:18;
1082:13;1094:12;
1113:15;1124:7;
1195:1,17;1197:25;
1198:3;1199:22;
1200:19;1218:25;
1222:20;1225:1,9;
1252:15,20;1268:2;
1269:12,14

**Seagate (5)**
1238:20,23;1239:1,
3,5

**Sean (1)**
1079:25

**search (1)**
1258:20

**seat (1)**
1128:2,9;1219:16;
1280:2

**seated (1)**
1142:13

**SEC (1)**
1088:24

**Second (35)**
1027:12;1028:12;
1033:25;1053:10;
1069:5;1072:2,18;
1073:23;1076:21;
1086:20;1115:4;
1119:10;1124:15;
1126:17;1158:9;
1161:25;1164:1;
1165:21;1168:10;
1189:9;1193:14;
1195:4;1197:24;
1198:4;1215:6;
1223:14;1227:15;
1231:16;1236:11;
1240:6;1241:8;1254:9;
1268:17;1269:5;
1278:1

**secondly (2)**
1025:13,22

**seconds (7)**
1121:25;1122:16,17;
1140:12;1205:17;
1215:23;1216:7

**secretive (1)**
1090:2

**section (2)**
1067:9;1123:24

**sectors (1)**
1118:24

**securities (1)**
1121:10

**seeing (8)**
1053:5;1136:11;
1177:16,18;1197:20;
1202:14;1209:2;
1270:1

**seek (5)**
1020:1;1152:14;
1155:17,21,22

**seem (2)**
1029:14;1098:23

**seems (3)**
1019:19;1057:14;
1235:23

**sees (1)**
1246:24

**segments (1)**
1212:16

**select (1)**
1021:9

**selected (2)**
1019:2,5

**sell (45)**
1039:22;1040:17;
1070:19;1071:1,1;
1077:14;1078:25;
1143:11,16,21;
1167:17;1168:3;
1210:25;1211:2,3;
1218:11;1224:21;
1225:7,18;1227:2,17,
20;1228:1,10,11,17;
1232:20,21;1233:5;
1235:8,10;1237:8;
1238:17;1241:2;
1242:6,13,18;1244:13,
17,19,22;1245:21,22;
1248:13;1251:13

**sell-in (1)**
1180:13

**selling (9)**
1079:19;1130:21;
1190:12;1193:7;
1210:4,9;1212:18;
1276:6,8

**sells (1)**
1044:20

**sem (1)**
1244:24

**semi (2)**
1031:11;1248:11

**semiconductor (15)**
1026:23;1030:18;
1031:8,10;1032:17;
1119:1,5,6,9,19,21,24;
1120:10;1179:25;
1244:25

**semiconductors (1)**

**send (10)**
1088:1;1090:13;
1102:23;1168:4,19;
1177:7;1185:15;
1216:9,13;1265:8

**sending (7)**
1021:18;1053:13;
1085:13;1090:15;
1092:8;1105:11;
1191:22

**sends (2)**
1086:20;1104:11,12

**senior (1)**
1068:19

**sense (5)**
1042:20;1066:20;
1067:3;1077:6;
1162:25

**sent (27)**
1023:7;1050:12;
1054:16;1064:7;
1085:20;1086:9,25;
1087:8,12;1089:8,9;
1092:14;1095:25;
1097:13;1098:6;
1168:7,12;1173:16;
1178:16;1199:7;
1213:3;1217:18;
1218:1;1252:12,23;
1260:21,22

**sentence (11)**
1058:20;1067:3;
1073:14;1082:8;
1096:18;1193:11;
1213:7;1229:2;1265:3,
4;1275:15

**sentences (2)**
1096:6,8

**sentencing (1)**
1256:7

**Sentz (4)**
1260:6,12,13,21

**separate (2)**
1079:15;1164:24

**September (6)**
1064:22;1065:1,4;
1100:6;1155:16;
1156:14

**series (15)**
1195:10;1200:3,22,
25;1205:11;1218:5;
1220:9;1222:8,17;
1224:1,19,21;1259:19;
1266:9;1267:6

**server (2)**
1082:15;1210:1

**servers (1)**
1097:4

**service (4)**
1049:7;1051:2,20,24

**services (2)**
1262:2,3

**SESSION (1)**
1151:1

**set (4)**
1035:24;1058:19;
1063:4;1257:15

**sets (2)**
1031:22;1254:10

**setting (1)**
1057:25

**setup (1)**
1083:15

**seven (3)**
1110:8;1160:11;
1210:25

**several (15)**
1051:23;1063:4;
1074:22;1090:16,16;
1107:3;1110:6,7,8;
1111:20,22,23;1132:3;
1154:6;1217:24

**severe (1)**
1082:4

**shaky (1)**
1059:4

**shall (1)**
1254:11

**share (17)**
1083:19;1186:2,11,
16;1188:22;1197:21,
21,24;1200:3;1210:15;
1213:11,13,14,25;
1226:6;1227:5;
1268:24

**shared (3)**
1083:18;1145:23;
1183:10

**shares (6)**
1197:23;1198:1;
1200:15;1206:22,24;
1209:9

**sharing (4)**
1034:25;1171:18;
1182:10;1191:24

**Shep (1)**
1184:12

**ship (1)**
1040:11

**shipment (1)**
1082:5

**shipping (1)**
1180:15

**shook (1)**
1142:25

**short (22)**
1034:1;1038:14;
1111:12;1114:16;
1116:4,14;1122:13,15;
1145:11;1174:19;
1195:11,12;1197:23;
1198:1;1200:3,21;
1206:22,22,24;
1269:25;1272:1,17

**shortcuts (1)**

1114:24

**shorted (2)**
1200:16;1209:9

**shorter (3)**
1024:4,6;1151:14

**shorting (1)**
1206:20

**shortly (1)**
1205:11

**shots (1)**
1019:12

**show (43)**
1022:25;1023:5;
1025:10,13;1027:25;
1030:22;1035:14,20,
22,24;1036:16;1037:8;
1101:17;1120:19;
1152:19;1165:12;
1195:9;1197:18;
1199:22;1200:20;
1201:25;1202:11,16;
1206:12;1207:21;
1212:24;1214:13;
1218:23;1223:20;
1229:15,16;1231:2,8;
1232:19,20;1234:1;
1235:10,14,25;1236:2,
10;1242:24;1260:4

**showed (25)**
1046:19;1104:17;
1140:4;1194:22;
1196:15;1197:1;
1200:23;1202:6,8;
1212:22;1218:3,7;
1221:8;1225:2;1228:2;
1232:19;1235:6;
1237:25;1238:3;
1239:21;1241:2;
1269:10;1273:13;
1276:12,14

**showing (13)**
1023:9;1194:24;
1202:18;1207:23;
1209:8;1224:20;
1230:18;1233:1;
1234:1;1235:8;
1246:24;1247:4;
1260:15

**shown (7)**
1039:18;1048:2;
1201:18;1227:16;
1269:24;1273:6;
1277:4

**shows (7)**
1027:15;1057:24;
1195:7,10,12;1245:23;
1246:1

**shy (1)**
1138:6

**side (51)**
1030:21;1035:6,14;
1037:8;1039:22;
1040:17;1070:19;

1071:1,2;1077:14;
1094:6,7;1143:11,16,
21;1167:17;1168:3;
1218:12;1224:21;
1225:7,18;1227:2,17,
20;1228:1,10,11,17;
1232:20,21;1233:5;
1234:15;1235:1,8,10,
11;1237:8;1238:17;
1241:3;1242:6,13,19;
1243:15;1244:1,17,20,
22;1245:22,22;
1248:13;1273:20

**sidebar (1)**
1141:1

**side's (1)**
1244:13

**sign (7)**
1044:15;1051:4;
1052:8;1164:5,6;
1165:1,7

**signed (5)**
1164:5,20;1165:2;
1229:23;1254:18

**significance (1)**
1242:5

**significant (4)**
1038:25;1148:18;
1187:21;1232:17

**significantly (3)**
1039:16;1193:20;
1230:17

**similar (5)**
1081:20;1234:7;
1237:17,20;1241:2

**simple (1)**
1214:12

**simply (5)**
1034:1;1099:1;
1148:9;1213:10;
1277:8

**single (6)**
1051:5;1076:25;
1119:18;1121:10,13;
1270:2

**sit (9)**
1038:8;1092:8,13;
1099:12;1141:12;
1182:22;1227:11;
1256:20;1272:23

**sitting (4)**
1083:21;1106:6;
1159:8;1178:2

**situation (1)**
1091:25

**situations (1)**
1040:16

**six (6)**
1084:2;1110:8;
1160:11;1220:24;
1221:15,16

**six-page (1)**
1053:13

**skeptical (1)**
1229:3

**skip (1)**
1038:13

**slightly (3)**
1077:3;1177:22;
1198:5

**slipped (1)**
1097:14

**sloppy (2)**
1114:14,24

**small (5)**
1018:5;1030:1;
1100:20;1107:12;
1211:9

**smallish (1)**
1236:13

**snag (1)**
1237:10

**socialize (3)**
1171:4;7;1175:22

**socialized (3)**
1022:10;1106:24;
1170:2

**soft (2)**
1096:13,15

**software (1)**
1179:4

**sold (1)**
1045:4

**solid (1)**
1275:15

**somebody (17)**
1035:5;1038:12;
1058:24;1086:3;
1087:11,20;1088:13;
1101:11;1108:5;
1134:14;1169:12;
1221:19;1228:15;
1239:19;1242:5;
1244:15;1261:22

**somehow (4)**
1030:10;1218:17;
1244:8,17

**someone (5)**
1050:13;1087:2;
1161:4;1184:21;
1189:25

**sometime (2)**
1049:5;1269:25

**sometimes (11)**
1020:8,9;1021:15;
1031:5;1032:9;
1033:18;1110:18;
1170:13;1184:15;
1185:15;1243:17

**somewhere (2)**
1113:5;1205:21

**soon (2)**
1155:17,20

**sophistication (1)**
1244:21

**sorry (39)**

1050:1;1069:7;
1070:19;1074:5;
1078:2;1082:8;1085:3;
1090:23;1091:11,19;
1092:5;1122:24,25;
1124:19,19,19;
1125:15;1131:12;
1153:2;1155:19;
1157:19;1158:8;
1161:24;1166:15;
1167:22;1172:18;
1175:2;1177:10;
1183:18;1184:1;
1218:16;1221:11;
1229:12;1231:1,13;
1236:8;1243:16;
1263:14;1273:19

**sort (7)**
1022:19,22;1030:21;
1094:9;1107:24;
1145:22;1235:12

**sought (3)**
1052:20;1152:14;
1194:1

**sound (2)**
1059:4,4

**Sounds (14)**
1043:4;1045:22,25;
1050:11;1056:24;
1062:14,23;1063:8;
1066:4;1139:25;
1157:1;1245:13;
1250:11,20

**source (7)**
1033:5;1175:19;
1185:21;1186:19;
1187:4;1245:13;
1248:19

**sources (20)**
1041:3;1047:17;
1176:17;1182:9;
1183:6,8,10,13,16,16,
23;1184:2,7;1216:23;
1244:22;1245:9,18;
1246:14,14;1247:22

**Souza (12)**
1041:19;1042:7,8;
1043:2;1166:10,11;
1259:25;1260:1;
1261:24;1262:2;
1263:8,16

**speak (12)**
1056:4;1060:5;
1068:1;1091:19;
1109:18;1183:9;
1184:9;1192:9;
1274:13,16,18;1278:8

**speaking (14)**
1065:9;1076:20;
1114:18;1142:19;
1144:2,19;1184:21;
1192:11;1213:18;
1224:17;1244:24;

1248:11;1273:3;
1278:15
**special (3)**
1027:9;1031:16;
1185:21
**specific (28)**
1040:19;1057:14,15;
1061:4;1081:24;
1094:20;1105:16;
1109:24;1110:21,23,
24;1112:24;1114:21;
1122:14;1135:6;
1139:11;1154:14;
1183:24;1211:12;
1217:20,23;1222:22;
1249:13;1251:2;
1252:24;1264:6,11;
1271:23
**specifically (11)**
1041:10;1063:4;
1185:17;1186:11;
1193:4;1194:5;
1196:23;1220:22;
1260:8;1264:8;1277:3
**specify (1)**
1057:12
**speculate (3)**
1067:6;1136:14,15
**speculation (2)**
1032:9;1035:5
**speech (1)**
1108:2
**spend (9)**
1019:14;1020:24;
1021:13;1022:6;
1029:7;1033:22;
1121:16;1127:1;
1163:3
**spending (6)**
1020:23;1025:11,18;
1029:1;1036:21;
1083:23
**spent (7)**
1020:3,5;1022:1;
1023:15;1028:16;
1098:5,7
**spoke (24)**
1033:5;1056:6;
1068:11,11;1072:3;
1075:6;1134:7,8;
1146:1,6,7,9;1160:25;
1181:23;1192:11;
1206:20;1209:1;
1221:19;1222:15,18;
1241:19,22;1266:17;
1273:5
**spoken (3)**
1040:5;1069:14;
1162:14
**spreads (1)**
1040:17
**spring (1)**
1171:20

**Stabilization (1)**
1043:6
**stable (2)**
1079:19;1193:5
**stacked (1)**
1223:18
**stand (2)**
1201:22;1202:4
**standard (5)**
1086:2,4;1208:22,
24;1222:2
**standpoint (1)**
1119:8
**stands (3)**
1062:9;1114:1,4
**Stanley (4)**
1080:13;1104:18;
1228:17;1265:22
**start (19)**
1040:24;1075:23;
1096:12,15;1129:24;
1153:22;1155:17;
1156:13,19;1165:20;
1173:8;1180:15;
1183:20;1184:20;
1191:20;1194:21;
1200:23;1206:17;
1217:6
**started (23)**
1049:13;1050:9,25;
1056:24;1083:23;
1084:3;1086:17;
1092:22;1114:12;
1139:10,16;1141:22,
23;1156:4;1157:11;
1178:9;1181:12,18;
1194:24;1216:19;
1217:18;1224:17;
1269:25
**starting (6)**
1044:12;1084:4;
1155:20;1156:12;
1200:2;1231:22
**starts (4)**
1032:16;1050:22;
1197:14;1248:10
**state (6)**
1027:22,22;1033:24;
1123:15;1235:17,20
**stated (2)**
1175:18;1201:7
**statement (9)**
1045:17;1047:7,12;
1062:23;1132:8;
1148:10;1210:14;
1213:10;1248:10
**statements (9)**
1025:9,10;1026:4,
16;1120:20;1150:6;
1217:5;1243:14;
1247:4
**states (2)**
1249:3;1254:14

**station (2)**
1044:15,19
**stations (1)**
1044:22
**stay (1)**
1134:23
**Stearns (9)**
1068:19;1070:17;
1074:3,7,19;1076:6,23;
1077:8;1241:13
**step (8)**
1021:3;1140:12;
1207:3,4;1233:24;
1252:5;1275:16;
1278:20
**stepfather (11)**
1089:12;1123:6;
1124:4,12;1251:22;
1252:2,8,21,21;1253:2;
1264:22
**steps (1)**
1220:18
**sticking (2)**
1058:4,12
**still (12)**
1023:14;1079:23;
1101:15;1122:17;
1138:10;1153:5;
1177:24;1180:13;
1190:11;1229:3;
1253:5;1257:9
**stipulate (3)**
1129:9,15,17
**stipulated (12)**
1102:1;1203:7;
1205:9;1206:9;
1207:21;1208:4,7,13;
1215:5,20;1216:2;
1272:13
**stipulation (6)**
1023:11,12;1202:17;
1229:15,19,23;
1231:20;1271:7,12,13
**stock (40)**
1029:20;1030:13,17;
1035:9,9;1036:1;
1039:15;1104:13;
1106:14;1115:3;
1118:23;1119:8;
1120:9;1144:2;1168:5;
1186:25;1187:5;
1206:18;1209:9;
1216:24;1217:1;
1230:15,24;1231:15,
21;1233:8,24;1235:25;
1245:3,5;1250:15;
1251:4,13,22;1268:5;
1276:21;1277:2,9,11,
14
**stocks (42)**
1025:8,23,25;
1026:19,21,22;1027:1;
1029:11,15,20,23;

1030:1,13,15,16,25;
1031:10,19;1032:13;
1033:15;1034:19;
1035:5;1036:16;
1048:6,9;1089:10;
1109:25;1111:17;
1112:1,16,18;1113:1,4,
7;1119:5,6,20;
1138:11;1143:24;
1186:25;1228:18;
1253:9
**stop (1)**
1246:6
**storage (3)**
1100:12;1179:4;
1210:2
**story (3)**
1021:20,21;1107:24
**strange (4)**
1245:6,13;1249:21;
1250:11
**street (6)**
1058:5;1145:23;
1146:6;1177:23;
1226:18;1235:9
**strengthening (2)**
1177:16,18
**stretch (3)**
1028:5;1126:18;
1147:7
**strike (3)**
1099:5;1125:15;
1138:24
**strong (4)**
1054:8;1148:20;
1179:5;1237:21
**stuff (3)**
1018:18;1141:3,6
**STX (3)**
1238:13,19,20
**subject (14)**
1033:21;1056:13;
1085:21,25;1087:2;
1088:22;1092:21;
1109:1;1135:20;
1143:6;1207:18;
1213:3;1233:9;1276:9
**subjective (1)**
1185:8
**subjects (1)**
1276:10
**subparagraph (1)**
1254:11
**subsection (1)**
1220:23
**subsequently (1)**
1241:22
**substance (3)**
1240:22;1246:15;
1266:13
**substantial (1)**
1256:6
**substantive (1)**

1106:12
**substantives (1)**
1031:22
**subtle (1)**
1185:15
**subway (1)**
1038:8
**suck (1)**
1043:5;1046:3
**suffered (1)**
1082:4
**suffers (1)**
1045:9
**suggested (2)**
1218:14,16
**suggesting (5)**
1026:7;1109:6,23;
1149:11;1247:20
**suggestion (1)**
1156:22
**suggests (2)**
1226:2;1244:20
**sum (1)**
1148:18
**summarize (2)**
1154:2;1192:20
**summarizing (1)**
1095:12
**summary (3)**
1056:22;1095:9;
1116:17
**summation (1)**
1244:7
**summer (1)**
1187:18
**summers (4)**
1170:8,15,19;
1171:17
**Sun (7)**
1093:11,13,21,25;
1094:17,18,19
**Sun's (1)**
1095:20
**supersedes (2)**
1153:9;1161:22
**suppliers (1)**
1075:13
**supply (1)**
1081:9
**support (1)**
1193:21
**supportable (1)**
1029:15
**suppose (1)**
1124:6
**supposed (2)**
1028:20;1218:6
**supposedly (2)**
1034:25;1116:18
**sure (43)**
1023:18;1028:4;
1029:10;1032:24;
1038:6,6;1044:23;

1049:18;1050:18;
1057:6;1062:4,4;
1075:21;1085:12;
1087:18;1088:6,9,23;
1094:10;1099:11;
1141:10;1149:2;
1153:18;1162:7;
1167:20;1168:3;
1169:4,6;1174:17;
1180:3,21;1182:11;
1184:19;1196:4;
1201:13;1206:8;
1210:24;1220:6;
1234:16;1246:2,21;
1247:8;1255:11
**surprise (4)**
1066:9,21;1194:6;
1235:11
**surprised (1)**
1249:24
**suspicion (1)**
1258:13
**sustain (1)**
1261:23
**Sustained (8)**
1121:19;1126:6;
1214:7;1223:13;
1242:16;1253:12;
1266:25;1278:12
**swag (5)**
1113:18,19,22;
1114:2,4
**swap (1)**
1160:15
**swapping (1)**
1156:19
**Sweden (1)**
1022:4
**swings (1)**
1184:25
**switch (2)**
1046:7;1195:5
**sworn (1)**
1038:4
**symbol (2)**
1093:11;1238:20
**system (14)**
1085:21,25;1086:8;
1087:1,24;1088:2;
1090:24;1091:3,5,8;
1092:21;1154:21;
1265:5,7
**systems (1)**
1178:20

# T

**tab (29)**
1041:16;1049:25;
1053:2;1056:8;
1057:18;1060:11;
1061:11;1071:11;
1074:3;1078:1,2;

1080:11;1091:18,20;
1092:25;1093:24;
1099:19;1115:1;
1117:19;1122:24,24;
1123:1,2,17;1125:19;
1135:8,10;1137:18;
1146:13
**table (2)**
1105:18;1106:6
**tables (1)**
1109:20
**tag (1)**
1240:7
**tails (1)**
1067:5
**Taiwan (3)**
1245:6;1249:5,12
**takeaway (1)**
1080:5
**Talk (21)**
1022:8,9;1059:1;
1071:2;1072:12;
1075:7;1105:7;1128:5;
1147:4;1158:13;
1174:5;1186:25;
1199:25;1203:21;
1207:14;1213:16;
1227:15;1255:2;
1265:23;1267:13;
1278:16
**talked (33)**
1033:4,6,7,22;
1037:19;1040:22;
1046:7;1048:9,14;
1075:9;1076:1;
1091:25;1095:17;
1098:16;1102:9;
1105:8;1112:5;1116:9;
1124:4;1131:11;
1132:9;1134:5;1139:9;
1160:17;1209:19;
1212:9;1213:15;
1218:11;1233:9;
1242:12;1262:16;
1268:3;1271:18
**talking (36)**
1018:12;1031:4,8,9;
1033:3,17;1038:20;
1041:24;1047:18;
1067:4;1070:18;
1074:10;1100:1,3;
1113:14,16,17;
1122:17;1124:12;
1149:13;1157:7;
1159:17;1181:20;
1183:25;1184:1;
1187:15,18;1202:4;
1207:5;1217:17;
1221:3;1233:10;
1245:4;1246:2;
1257:20;1258:17
**talks (7)**
1190:11;1198:6;

1204:7;1239:24;
1240:18;1244:16;
1264:23
**tanked (2)**
1029:16;1035:13
**Tao (1)**
1018:25
**taped (1)**
1258:10
**tapped (2)**
1258:9,14
**targets (4)**
1190:12,15,18,21
**TARLOWE (3)**
1280:14,15,16
**taught (1)**
1257:14
**tax (1)**
1213:13
**team (5)**
1049:20;1050:9;
1051:7;1052:2;1152:4
**technical (1)**
1187:25
**technically (1)**
1214:19
**Technology (2)**
1180:1;1269:16
**telephone (15)**
1084:6;1201:18,21;
1203:2,2,13;1206:5;
1208:8,13,18;1209:2;
1215:17;1216:1;
1257:3;1259:9
**telling (12)**
1059:17;1079:8;
1184:24;1213:21;
1245:8,9;1250:3,10,21,
23,25;1266:16
**tells (2)**
1058:4;1094:14
**temperature (1)**
1219:11
**ten (6)**
1029:3;1120:7;
1143:25;1182:5,6,7
**tense (1)**
1045:21
**term (4)**
1028:7;1081:3;
1109:13;1120:2
**terms (13)**
1024:11;1049:24;
1100:23;1153:19;
1210:14;1211:2,5;
1213:25;1242:5;
1253:25;1254:21;
1256:16;1257:24
**testified (32)**
1018:14;1025:6;
1026:11;1028:9,12;
1030:5,5,8,23;1037:13;
1038:4;1041:7;1068:6;

1071:15;1072:9;
1094:24;1098:18;
1119:4,13;1132:4;
1160:24;1170:2;
1193:23;1211:11;
1227:6,19;1230:8;
1240:22;1254:23;
1256:20;1259:7;
1275:10
**testify (3)**
1256:25;1257:2;
1272:24
**testimony (30)**
1018:16;1031:21;
1037:23;1047:10;
1111:5;1113:18;
1139:9;1140:4;
1151:21;1171:19;
1172:14;1184:17;
1188:16;1189:13,18;
1201:15;1202:9;
1209:21;1211:14;
1221:21;1225:19;
1227:9;1230:11;
1254:25;1256:22;
1259:10,22;1260:1;
1261:1;1265:18
**Texas (23)**
1026:11,23;1027:10;
1030:19;1031:15,18;
1033:6;1034:9;1048:6;
1060:7;1061:14;
1062:3;1064:8,20,23;
1065:7,15;1067:20,25;
1068:4;1119:10,14,24
**thanks (3)**
1018:9;1243:10;
1279:5
**Thanksgiving (1)**
1279:1
**theirs (1)**
1073:21
**theoretically (2)**
1065:15;1119:18
**theory (2)**
1021:16;1173:18
**thereafter (3)**
1024:4;1155:17;
1157:3
**thinking (1)**
1105:9
**third (8)**
1065:1;1075:19;
1076:23;1079:21;
1198:4;1205:22;
1229:2;1275:14
**Thompson (2)**
1228:5,9
**thorough (3)**
1114:21;1161:19,20
**though (2)**
1163:1;1190:11
**thought (12)**

1030:6;1046:11;
1073:8;1087:19;
1123:2;1148:8,17;
1188:2;1235:10;
1249:19;1268:18;
1277:9
**thoughts (3)**
1079:15;1087:13;
1112:8
**thousand (2)**
1020:9,10
**thousands (1)**
1126:15
**three (22)**
1023:16;1024:3;
1033:21;1043:19;
1065:9;1077:9;
1084:18;1110:8;
1123:20;1129:23;
1144:3;1156:16;
1170:16,17,19;
1171:16,17,24;1179:1;
1206:20;1207:9;
1236:21
**throughout (1)**
1195:12
**throwing (1)**
1095:2
**thumb (1)**
1141:7
**Thursday (2)**
1019:19;1022:6
**ticker (3)**
1093:11;1154:5;
1238:20
**till (1)**
1278:25
**times (23)**
1028:9;1077:21,22;
1088:11;1090:21;
1091:10;1107:3,11;
1109:3,5;1114:21,23;
1132:24;1145:15;
1162:24;1168:5;
1170:7,23;1171:16;
1175:23;1258:9;
1262:13;1270:22
**timing (1)**
1180:14
**tips (3)**
1037:15;1186:25;
1251:22
**title (1)**
1237:20
**titled (1)**
1064:15
**tnewman@diamondbackcapcom (1)**
1086:21
**today (16)**
1024:9,15,15,17;
1094:15;1098:15;
1117:5;1140:7;1147:6;
1158:13;1159:8;

1164:5;1182:23;
1227:11;1256:20,21
**Todd (46)**
1042:9;1047:18;
1049:23;1053:13;
1086:5;1088:17;
1093:3;1094:21,21;
1100:3;1105:17;
1106:7,8,9;1107:11;
1114:22;1127:7;
1133:9,13,17,22;
1134:2,21;1139:19;
1163:20;1167:5;
1176:20;1178:8;
1187:17;1191:14;
1195:10;1213:18;
1215:21;1217:8;
1223:20;1243:4;
1250:10,24;1260:22,
22;1262:10,13,23;
1265:7,7,8
**Todd's (2)**
1049:20;1124:15
**together (26)**
1019:14;1020:3,6;
1021:14,15,25;1022:1,
1,10,11;1106:24;
1152:3,5;1160:19;
1162:22;1168:24;
1170:8,15,18,21,25;
1171:5,8;1177:9;
1189:25;1197:7
**told (30)**
1028:10,10;1068:25;
1069:3,6,11,24;1086:3;
1095:11;1099:11;
1100:16;1107:3;
1117:5,8,17;1136:13,
18;1137:7;1149:19;
1176:10;1202:7;
1213:21;1229:8;
1257:14;1266:6,7,17;
1267:1,2;1274:10
**tomorrow (6)**
1024:8,17,19;
1157:1;1278:25;
1280:2
**tone (5)**
1056:24;1058:22;
1059:2;1062:17;
1185:2
**tonight (1)**
1207:11
**Tony (2)**
1056:1;1057:14
**took (9)**
1021:15;1083:2;
1096:5;1114:23;
1159:9;1229:10;
1233:16;1266:13;
1275:16
**top (29)**
1043:4;1045:22,25;

1053:10,11;1060:13;
1062:13;1125:22;
1126:5;1153:7;
1158:10;1159:13;
1162:12;1178:16;
1188:4;1191:20;
1193:15;1197:22;
1207:9;1215:14;
1216:13;1223:18;
1225:10,13;1237:10;
1248:10;1252:20;
1264:23;1275:15
**topics (1)**
1046:7
**Tortora (129)**
1018:22;1023:5;
1024:13,15;1025:6,11,
14,24;1028:8;1037:23;
1038:2,11,20;1042:7;
1046:7;1050:8;
1056:12,21;1057:17;
1059:23;1060:20;
1061:12,20;1070:15;
1074:16;1075:14;
1078:10;1080:24;
1082:2;1083:1;
1093:10;1094:8;
1102:1,9;1113:16;
1118:9;1120:23;
1124:3,10;1129:23;
1130:15;1131:3;
1132:3;1135:20;
1138:2;1142:3,9;
1148:12;1151:17,18;
1153:20;1164:2;
1165:22;1170:18;
1172:22;1179:20;
1180:19;1194:21;
1195:16;1197:4,12;
1198:2,4;1199:20;
1200:8,22;1202:23;
1203:9;1204:6,10,16;
1206:17;1207:10,24;
1208:10;1209:1,2,14;
1214:8,25;1217:21;
1219:17,19;1220:14;
1221:7;1223:15;
1224:1,19,25;1227:18;
1230:4;1231:4,12;
1232:1,22;1235:16;
1237:7,24;1239:23;
1240:15;1241:9;
1244:3,25;1245:3,13,
17,20;1246:13;1247:1;
1248:9;1250:16;
1251:21;1252:19;
1254:11;1255:5;
1256:19;1259:18;
1261:6,25;1263:7;
1265:10;1266:2;
1269:9,18;1273:18;
1275:20;1278:5,13,19
**Tortora's (4)**

1026:4;1129:9,15,18
**total (2)**
1200:15;1210:6
**totaling (1)**
1200:3
**touch (2)**
1134:11,23
**towards (7)**
1028:14;1045:8;
1053:10;1073:14;
1086:24;1114:10;
1237:25
**track (2)**
1116:7;1223:22
**Tracked (4)**
1116:4,11,14;1264:9
**tracker (5)**
1130:17,20;1262:16;
1276:9,10
**tracking (10)**
1039:17;1040:24;
1062:13,14,23;1063:8;
1066:4,5;1138:5;
1180:7
**trade (23)**
1025:8;1026:13,25;
1027:1,2;1030:5,15;
1034:23;1121:25;
1125:6,12,16,24;
1126:8;1197:6,8,8,11,
14;1199:18;1200:4;
1270:2,6
**traded (16)**
1025:7,7;1026:18,
18;1031:7,9;1032:8,
18;1094:21;1111:18;
1112:19;1113:2,7;
1118:20,20;1119:1
**trader (3)**
1122:9,11;1176:8
**trades (22)**
1026:17;1028:19;
1037:11;1120:24;
1121:2,10,13,17,22;
1122:16;1195:7,9;
1196:18,20;1197:18;
1199:21;1200:1;
1203:25;1204:11,15,
23;1270:3
**trading (67)**
1025:7,9,12,19;
1026:5,7,9,13,14;
1027:4,8,11,14,24;
1028:17;1029:9;
1030:11,14;1032:5,7,9,
11,25;1033:12,15;
1035:18;1036:12,13;
1037:2,9;1083:16,18;
1094:24;1111:14;
1118:9,16;1119:15;
1120:12,17,18;1122:7;
1123:7,7;1124:12,14,
14,15;1125:9;1126:19;

1127:1,4,6;1194:23;
1195:14;1197:2;
1199:20;1203:24;
1204:2,10;1206:15,17;
1209:8;1253:7;1265:6,
9;1269:24;1271:24
**trafficking (1)**
1179:3
**transcript (1)**
1031:25
**transferred (1)**
1137:6
**transition (1)**
1084:2
**translate (1)**
1082:17
**transmitted (2)**
1262:7,9
**travel (3)**
1022:21,22;1170:21
**traveled (2)**
1022:1,11
**trends (2)**
1081:9;1082:11
**Trial (7)**
1018:1;1035:6;
1142:20;1143:16;
1167:16;1256:3,20
**trials (2)**
1256:25;1257:1
**TriBeCa (6)**
1049:3,4;1052:21;
1053:4,7;1054:4
**tried (5)**
1021:9;1098:3,8;
1114:19;1217:2
**trigger (1)**
1078:18
**trip (1)**
1170:23
**triple (2)**
1246:9;1247:3
**tripped (1)**
1124:21
**trouble (1)**
1038:7
**true (8)**
1110:1;1126:11;
1143:3;1163:13;
1168:6;1194:10;
1222:15;1246:16
**truly (1)**
1148:23
**trumped (1)**
1027:19
**truth (14)**
1150:6;1184:24;
1234:13;1235:3,25;
1244:12;1245:2,8,9,16;
1246:11;1250:3;
1253:22;1254:2
**truthfully (1)**
1254:11

**try (15)**
1025:13;1054:2;
1184:21;1185:2;
1188:7;1209:22;
1210:13,17;1216:23,
25;1242:16;1243:16;
1259:12;1269:16;
1278:24
**trying (25)**
1019:13;1025:22;
1027:7,8,20,25;
1031:14;1050:19;
1095:3;1127:7;
1139:25;1141:13;
1148:1,11;1162:3,10;
1205:20,21;1207:11;
1210:6;1229:19;
1235:14;1236:10;
1264:5,6
**turn (12)**
1060:7;1067:9;
1068:6;1092:25;
1093:23;1151:20;
1215:13;1220:14;
1223:14;1241:8;
1254:9;1279:1
**turnaround (1)**
1275:16
**turns (1)**
1110:16
**twice (2)**
1171:15;1262:23
**two (56)**
1024:3;1026:18;
1029:4;1031:22;
1033:20;1048:6;
1051:19;1061:2,5;
1065:4,9,25;1066:2;
1073:10;1074:9;
1079:15;1084:18;
1087:8,13;1109:18,21;
1123:20;1124:18;
1127:12;1135:7;
1136:13;1140:12;
1144:3,3;1149:25;
1150:2;1157:12;
1158:20;1160:1;
1166:7;1170:16,18,23;
1171:17;1173:15;
1180:9,9;1188:24;
1189:6;1190:16;
1195:24;1196:5,7;
1205:12;1208:19;
1219:8;1234:1;1250:6;
1251:7;1254:24;
1269:11
**two-thirds (2)**
1057:2;1180:12
**TXN (2)**
1060:14;1064:15
**TY (2)**
1216:11,11
**type (12)**

1060:25;1084:15;
1102:21;1104:3,4,5;
1106:18;1137:12;
1211:7,8;1217:12;
1234:7
**types (1)**
1108:12
**Typically (2)**
1104:11;1171:8
**typo (2)**
1066:14,17
**Tyson (8)**
1060:9,21;1061:1,6,
21;1063:23,25;1247:5

## U

**UBS (1)**
1174:14
**UG (2)**
1078:18,21
**unable (2)**
1020:10;1217:9
**uncertainty (1)**
1044:8
**unclear (4)**
1040:21;1063:14;
1095:11;1145:7
**uncomfortable (2)**
1038:14;1219:8
**under (12)**
1028:21;1080:24;
1143:19,21;1146:22;
1152:4;1224:3;1232:8;
1253:17,21;1254:10,21
**underneath (3)**
1054:20,22;1220:16
**understands (1)**
1023:12
**understood (22)**
1043:1,9,25;
1045:12;1046:5;
1052:4,15;1058:9;
1059:18;1060:1;
1067:23,25;1075:6;
1077:19;1081:6;
1085:19;1088:1;
1184:5;1250:5;
1257:20;1274:20;
1275:20
**undisclosed (4)**
1023:6;1129:8,14,17
**unique (5)**
1031:16;1033:1,2;
1034:15;1052:2
**unit (5)**
1033:6;1067:18;
1210:3,8;1223:1
**United (1)**
1254:14
**units (7)**
1067:16,20;1192:16;
1210:2;1211:5;

1212:17,18
**universe (2)**
1019:3;1021:9
**unless (2)**
1029:7;1038:11
**unnamed (2)**
1244:3,4
**unquestionably (1)**
1023:18
**unquote (1)**
1117:6
**up (106)**
1018:8,25;1022:12;
1029:15;1037:15,16;
1039:15;1043:6,11;
1044:7,9,15;1046:22;
1048:14;1051:4;
1052:9;1057:25;
1083:6;1090:13;
1094:6,12,14;1098:15;
1111:14;1112:20,23;
1119:9,20,22;1120:3,4;
1124:7;1137:15;
1140:12;1145:4,9;
1147:6;1148:18;
1149:7;1156:20;
1159:6;1160:15;
1164:5,5,6,20;1165:1,
2,7;1169:14;1173:17,
18;1177:22;1179:2;
1180:16;1187:7,12;
1191:2,4;1192:16;
1196:16;1198:15;
1203:25;1205:21,23;
1206:15,23;1207:8;
1209:19,21,22;1210:6,
12,13,18;1211:4;
1212:8,15,19,19,21;
1214:4;1217:9,12;
1220:8;1222:21;
1225:10,13,14;
1226:14;1227:23;
1241:6;1247:8;1250:3;
1252:17;1257:15;
1259:8,24;1264:13,15,
16;1267:11;1269:12,
13;1274:24;1278:24
**upcoming (2)**
1067:7;1073:24
**update (7)**
1065:8;1115:19;
1138:3;1196:6,7;
1207:14;1230:12
**updated (2)**
1115:21,23
**updates (3)**
1065:17;1167:13;
1230:8
**Upgrade (5)**
1078:22,23,24;
1079:9;1104:18
**upgrades (1)**
1079:2

**upper (2)**
1076:16,19
**upside (4)**
1066:10;1081:12;
1082:17;1239:9
**use (25)**
1018:6;1019:12;
1022:21,22;1038:15;
1049:10;1052:5;
1054:9,10;1090:1,11,
24;1091:4;1100:9;
1108:21;1120:14;
1150:8;1216:16;
1224:7;1247:17;
1264:2;1273:7,21;
1274:12,17
**used (19)**
1028:7;1032:10;
1034:2;1089:1;
1090:19;1091:2,7,15;
1094:20;1113:18;
1166:11;1181:24;
1190:1,2,17;1212:23;
1239:19;1241:3;
1264:7
**useful (24)**
1027:10,16;1028:2,
3,5,9,9,10;1029:13;
1031:16;1034:15,16,
18,23;1035:21;1036:4,
7,8,9,18;1037:2;
1049:17;1058:24;
1162:4
**usefulness (1)**
1036:24
**user (2)**
1051:5,7
**users (1)**
1051:20
**uses (3)**
1022:21;1035:1;
1241:15
**using (9)**
1032:13;1034:23;
1035:18;1049:13;
1050:10,20;1051:24;
1090:20,22,23;
1091:10;1092:3;
1113:20;1214:18;
1216:23;1224:14;
1227:3;1235:24;
1236:9
**usually (3)**
1141:5;1151:13;
1170:22
**utility (2)**
1028:11;1036:21
**utilization (1)**
1217:4
**utter (1)**
1035:14

## V

**vacation (5)**
1021:7;1115:12,15,
17,23
**vacay (2)**
1116:4,15
**vague (1)**
1251:5
**Valouktzis (2)**
1050:12;1260:21
**value (3)**
1018:15;1022:14;
1119:8
**variables (2)**
1210:20;1227:12
**varies (1)**
1104:17
**variety (1)**
1262:3
**various (9)**
1033:8;1039:15;
1048:15;1067:19;
1093:21;1102:17;
1138:11;1233:12;
1277:5
**varying (1)**
1146:8
**vast (3)**
1210:19,19,19
**Vegas (6)**
1022:4,7;1023:1;
1125:6;1170:25;
1171:2
**venk (2)**
1164:5;1165:2
**versus (5)**
1062:24;1127:8;
1177:23;1180:8;
1222:23
**vetted (1)**
1052:14
**via (1)**
1094:22
**Victor (1)**
1179:20
**view (8)**
1058:10,25;1132:21;
1175:8;1176:2,6,12,14
**viewed (1)**
1114:8
**views (2)**
1141:15,18
**visibility (1)**
1043:5
**visit (1)**
1170:13
**visited (2)**
1144:25;1145:16
**Vista (8)**
1048:24;1054:11;
1189:14,18,21;1221:9,

10,11
**voice (2)**
1059:10;1159:14
**volume (3)**
1120:17;1157:11,11
**volunteered (1)**
1070:2
**vow (3)**
1125:12,23;1126:3

## W

**Wade (1)**
1053:24
**waiting (3)**
1018:3,4;1023:14
**waived (1)**
1150:15
**walk (3)**
1026:16;1075:19;
1096:9
**Wall (2)**
1145:22;1146:6
**wants (4)**
1025:8;1185:15;
1202:11;1249:4
**war (1)**
1276:15
**warm (2)**
1219:2,3
**waste (1)**
1100:9
**watch (1)**
1223:13
**watched (1)**
1019:19
**watching (1)**
1018:25
**way (34)**
1031:7;1051:18;
1052:17;1053:24;
1058:12,18;1059:8,23;
1064:22;1068:9;
1069:19;1079:21;
1085:15;1090:2;
1098:3;1110:20;
1113:1;1142:24;
1148:18;1149:9;
1162:25;1172:7;
1188:11;1223:8;
1225:10;1235:6;
1239:18;1241:20;
1242:17;1246:21;
1256:19;1275:14;
1276:21;1277:2
**ways (2)**
1020:23;1071:8
**weak (1)**
1179:4
**weaker (2)**
1041:11;1120:8
**weeds (1)**
1245:24

**week (10)**
1023:15;1046:18,24;
1083:7;1156:20;
1160:14;1171:15,16,
16;1262:23
**weekend (1)**
1078:18
**weekly (3)**
1263:8,15,19
**weeks (12)**
1043:20;1065:4,25;
1066:2;1156:4,16;
1160:11;1171:17;
1179:1;1195:24;
1196:5,7
**weight (3)**
1032:22;1034:21;
1036:18
**weighted (2)**
1119:7;1120:2
**weightings (1)**
1119:12
**Weingarten (88)**
1018:6,19;1019:2,8,
9,11,23;1020:1,8;
1021:8,12,24;1022:16;
1056:17;1140:11,12;
1141:2,12,20;1142:3,4,
6,8,11,11;1146:13,19;
1147:1,2;1148:6,17,23;
1149:5,8,9,15,21;
1150:1,4,11;1151:3,17;
1152:22;1153:9,12,17;
1156:7,11;1157:21,25;
1158:24;1159:3;
1160:3,7;1161:15;
1163:22;1164:1;
1165:16;1166:25;
1167:7;1169:1;
1172:15,18,21;1173:3,
7;1176:14,18,22;
1177:1;1178:11,15;
1179:14,19;1181:21;
1182:16,19;1187:7,10;
1188:25;1189:3;
1191:2,6,16;1194:15;
1221:8;1236:21;
1277:25;1280:18
**Weingarten's (1)**
1172:14
**weird (3)**
1246:7,8;1251:6
**well-known (1)**
1048:17
**weren't (7)**
1059:14;1109:6;
1122:6;1127:4;
1168:14;1201:13;
1224:6
**west (5)**
1042:16,17,19;
1262:4,12
**what's (25)**

1024:25;1054:22;
1064:4;1067:14;
1072:11;1079:14;
1080:24;1120:19;
1125:1;1156:25;
1172:18;1173:24;
1197:21;1207:23;
1214:13,18;1218:23;
1219:19;1230:18;
1231:2;1233:1;1234:2;
1242:24;1260:15;
1272:7
**whatsoever (2)**
1174:22,22
**whenever (1)**
1166:5
**Whichever (1)**
1162:1
**whole (7)**
1035:6;1085:3;
1108:9;1119:21;
1120:4;1146:25;
1209:23;1233:9
**who's (1)**
1020:18
**whose (7)**
1024:3;1195:19;
1203:13;1215:7,17;
1233:19;1253:7
**wide (1)**
1168:5
**widely (1)**
1102:17
**wife (2)**
1089:20;1188:17
**wild (1)**
1114:4
**Williams (1)**
1167:4
**willy (1)**
1169:9
**wind (1)**
1129:3
**WINTC (1)**
1248:22
**wireless (1)**
1067:20
**wires (1)**
1047:17
**wish (3)**
1141:7;1149:7;
1251:14
**wished (1)**
1251:19
**withdraw (1)**
1149:6
**withdrawn (7)**
1201:25;1203:12;
1208:2;1221:16;
1258:24;1259:18;
1278:6
**withhold (1)**
1254:20

**within (8)**
1046:23;1120:9;
1126:21;1146:6;
1220:24;1221:15,16;
1243:13
**without (4)**
1072:11;1111:15;
1131:20;1148:9
**witness (33)**
1018:14;1023:15,18,
19,20;1024:5,15;
1038:3;1052:12;
1066:19;1091:16;
1148:11,14;1172:10,
13,16;1174:16;
1183:18;1201:22;
1202:4,14,20;1208:25;
1217:22;1220:4;
1247:8,23;1250:20;
1259:5;1278:21;
1279:1;1280:3,15
**wizard (1)**
1187:25
**wonder (1)**
1245:12;1250:4
**wondering (1)**
1245:11
**wonders (1)**
1250:9
**word (12)**
1036:25;1075:4;
1081:4;1108:21;
1113:18,20;1212:22;
1216:16;1240:23;
1241:3,15;1247:16
**words (26)**
1020:9,10;1023:6;
1047:20;1062:19;
1066:23;1074:24;
1083:13,15;1088:12;
1089:25;1098:8,15;
1105:16;1107:23;
1112:1;1116:22;
1120:14;1143:10;
1174:24;1187:25;
1220:5;1224:3;
1241:19;1245:9;
1246:17
**work (37)**
1044:14,19,22;
1083:17;1090:5;
1098:23;1114:14,24;
1125:2;1144:7;
1145:21;1150:18;
1152:3,4;1154:7,8,15;
1155:20,21,22;1159:7;
1162:21,22;1164:9;
1166:12,22;1181:24;
1182:3;1190:1,2,17;
1193:24;1203:9;
1264:2,25;1272:8;
1273:10
**workday (1)**

1021:16
**worked (24)**
1042:8;1050:13;
1083:3,8,18;1094:17;
1124:23;1145:7,11,16;
1151:24;1152:5;
1162:13,18;1166:12;
1168:24;1173:13;
1180:25;1221:5;
1222:12;1238:18;
1266:7,8;1274:15
**working (17)**
1025:12;1054:2;
1084:3;1085:5;1089:2;
1115:14;1136:2;
1145:19;1155:15,17;
1164:18,19;1181:12;
1216:20;1250:10;
1253:5,5
**work-related (3)**
1115:19,21,24
**works (1)**
1164:9
**world (4)**
1145:23;1146:6;
1148:21;1166:14
**worries (1)**
1159:14
**worrying (1)**
1122:20
**worth (5)**
1020:9,10,23;
1033:20;1035:15
**write (9)**
1053:23;1054:2;
1058:12;1072:2;
1116:25;1195:23;
1198:21;1249:18;
1256:7
**writes (1)**
1074:24
**write-up (4)**
1060:20,24;1061:20;
1082:23
**written (3)**
1116:16;1258:7;
1274:10
**wrong (6)**
1199:18;1267:16;
1268:4;1276:18,21;
1277:21
**wrongdoers (1)**
1175:4
**wrongdoing (3)**
1174:22;1175:10;
1176:3
**wrote (13)**
1058:18;1080:9;
1097:3,22;1098:4;
1124:4;1136:5,7;
1199:6;1229:7;
1248:17;1249:7;
1250:18

1021:16
**WTF (1)**
1249:3

**X**

**X86 (1)**
1179:5
**Xilinx (12)**
1071:13;1072:13,16,
19;1073:15,21;1074:9;
1075:7;1076:4,15,24;
1077:4

**Y**

**Yang (1)**
1111:9
**year (5)**
1058:5;1084:11;
1114:11;1181:9,14
**years (10)**
1056:25;1086:6;
1087:11,21;1088:17;
1134:19;1181:11,12;
1182:3;1254:24
**Yep (2)**
1108:18;1250:11
**yesterday (6)**
1038:20;1046:7;
1047:11;1090:8;
1104:17;1160:24
**York (3)**
1083:24;1084:4;
1171:10
**Yup (1)**
1099:24

**Z**

**zero (1)**
1180:8;1211:20
**Zielinski (1)**
1100:18
**zipping (1)**
1023:1

**0**

**02 (1)**
1270:11
**06 (1)**
1181:16
**07 (2)**
1068:12;1076:8
**08 (4)**
1118:16;1120:22;
1189:9;1232:3
**09 (8)**
1043:5;1046:3,5;
1173:17;1178:9,10;
1191:15;1225:25
**09-'10 (1)**
1118:18

**1**

**1 (3)**
1032:15;1156:3;
1220:16
**1:00 (2)**
1151:11,12
**1:10 (1)**
1178:19
**1:25 (1)**
1150:19
**1:30 (5)**
1141:9;1147:6,8;
1148:15;1151:2
**1:54 (1)**
1205:4
**1:57 (1)**
1167:11
**10 (9)**
1043:20;1066:4;
1138:5;1165:15,21;
1179:4;1211:4;
1236:20;1270:1
**10:22 (1)**
1191:20
**10:24 (3)**
1272:1,4,17
**10:30 (2)**
1208:22;1270:1
**100 (2)**
1086:14;1173:17
**10025 (1)**
1057:18
**10042 (2)**
1101:1,2
**10042A (1)**
1101:3
**11 (3)**
1157:19,20;1158:7
**11/14/08 (1)**
1215:12
**11:06 (1)**
1173:8
**11:43 (2)**
1213:3;1216:10
**1111 (1)**
1239:22
**112 (1)**
1180:7
**1131 (1)**
1202:24
**114 (1)**
1180:7
**1148 (1)**
1205:2
**1150 (1)**
1205:11
**1151 (1)**
1205:12
**1153 (1)**
1206:3
**1176 (4)**

1077:25;1078:6,8,9
**12 (1)**
1157:20
**12/28/09 (1)**
1118:2
**12:30 (2)**
1278:25;1280:17
**120 (1)**
1180:8
**1218 (6)**
1093:23;1094:2,4,5,
13;1096:9
**1234 (5)**
1231:3,10,18,24,25
**13.8 (1)**
1232:13
**1350 (1)**
1241:7
**1358 (4)**
1071:11,19,21,22
**14 (9)**
1060:14;1105:4,10;
1161:11;1197:2;
1207:7;1213:2;
1215:16,25
**1414 (4)**
1060:11,16,18,19
**1455 (5)**
1056:8,11,15,19,20
**15 (21)**
1032:3;1065:4;
1074:20;1075:16;
1113:16;1179:3;
1202:24;1203:18,24;
1204:1,3,15;1206:16;
1207:5;1208:19;
1209:5;1236:16,20;
1269:19;1270:9;
1272:17
**15.15 (1)**
1214:10
**15th (3)**
1271:25;1272:25;
1273:4
**16 (10)**
1064:22;1093:3,25;
1095:8,22;1096:1;
1158:23;1198:5;
1226:17;1269:11
**17 (4)**
1158:23;1223:15,25;
1224:16
**17.3 (1)**
1237:22
**17.5 (2)**
1198:6;1230:7
**17.7 (2)**
1240:8,13
**175 (1)**
1222:19
**18 (7)**
1074:17;1075:16;
1077:8;1100:6;

1153:23;1167:6,11
**18.3 (1)**
1230:2
**18.4 (1)**
1237:23
**180,000 (2)**
1200:3,17
**187 (1)**
1226:15
**18th (1)**
1075:23
**19 (1)**
1153:7
**1F (1)**
1225:25

**2**

**2 (3)**
1032:15;1153:23;
1231:22
**2.1 (1)**
1222:22
**2.2 (1)**
1222:23
**2.5 (1)**
1222:23
**2/27/2009 (1)**
1268:15
**2:05 (1)**
1205:15
**2:09 (1)**
1264:17
**2:13 (1)**
1208:19
**2:33 (1)**
1223:16
**2:38 (1)**
1177:5
**20 (7)**
1131:5;1178:8;
1211:5;1236:16;
1238:10;1267:15;
1268:7
**20,000 (1)**
1197:23
**2006 (1)**
1181:10
**2007 (13)**
1048:17;1068:10;
1069:10;1071:16;
1086:16;1094:19;
1153:7;1156:3;
1157:20;1158:7,23;
1159:25;1218:7
**2008 (70)**
1046:9;1047:2;
1050:8;1071:17;
1084:3;1093:3,25;
1094:19;1095:23;
1096:1;1099:7;1100:7;
1105:4,10;1118:14,15;
1126:23;1130:3,18;

1131:5,12,12;1161:11;
1171:20;1187:18;
1194:23,23,25;1195:3,
7;1197:2,2;1198:12,
23;1200:16,18,19;
1202:24;1203:19,24;
1204:1,3;1207:7;
1213:2;1215:16;
1221:5;1224:18,20;
1225:14;1226:17;
1229:17;1230:1,6,16;
1231:22;1232:6,23;
1233:22;1234:8;
1235:7;1237:9;
1238:10;1243:5;
1251:23;1260:23;
1268:7;1270:10;
1274:3,24;1276:19
**2009 (58)**
1028:14,21;1038:21,
22;1041:24;1045:16,
19;1046:5;1048:17;
1052:20;1053:4;
1060:14;1064:22;
1067:18;1078:4;
1080:18;1091:22;
1114:11,23;1115:3,10,
12;1118:12,13;1121:1,
11,21;1123:21;1124:3,
11;1125:8,11,23;
1126:17,19;1127:5;
1163:21;1165:15;
1167:6;1173:2;
1174:15,16;1176:21;
1178:19;1179:13;
1191:20;1221:5;
1222:21;1223:15;
1224:16;1231:23;
1264:17;1267:10,15;
1268:13;1274:2,21,24
**2010 (20)**
1082:16;1114:21;
1118:13;1120:22;
1126:19;1135:5,14;
1136:25;1137:2,21;
1138:10;1216:20;
1217:6,14,18,21;
1257:4,23;1266:14,14
**2012 (3)**
1266:5,11;1280:19
**202 (2)**
1187:8,10
**206 (2)**
1195:15,16
**21 (5)**
1136:25;1163:21;
1164:2;1264:17;
1280:19
**211 (2)**
1046:21,23
**212 (1)**
1203:11
**212-287-5382 (1)**

1216:2
**212-476-9000 (3)**
1203:3,7;1270:15
**214 (8)**
1041:16;1113:15;
1198:3;1199:2,14;
1200:8;1230:3;
1252:17
**2146 (4)**
1041:16;1042:2,4,6
**215 (2)**
1198:16;1199:4
**216 (3)**
1129:16,19,21
**2165 (3)**
1129:13,19,21
**2184 (3)**
1129:7,19,21
**222 (1)**
1207:6
**223 (4)**
1200:24;1202:6;
1204:7;1206:13
**2252 (5)**
1218:24;1219:20;
1220:3,12,13
**23 (2)**
1159:25;1160:8
**231 (1)**
1050:1
**232 (1)**
1049:25
**234 (1)**
1053:2
**235 (1)**
1228:22
**237 (3)**
1188:25;1189:2;
1221:8
**24 (5)**
1195:10;1196:11,19,
23;1197:8
**243B (2)**
1099:18,22
**25 (1)**
1113:11
**257 (2)**
1212:25;1216:8
**259 (3)**
1056:9,10,11
**26 (4)**
1043:16;1173:2;
1176:21;1179:13
**2606 (1)**
1214:18
**2606A (3)**
1202:20;1269:10,12
**2606-A (1)**
1205:1
**2606-B (3)**
1214:14,17,24
**2607-A (1)**
1207:24

**261 (1)**
  1057:18
**2674 (4)**
  1137:17,23,25;
  1138:1
**27 (7)**
  1047:21;1091:22;
  1121:10,21;1178:9,10,
  19
**271 (1)**
  1060:12
**272 (1)**
  1061:11
**274 (3)**
  1191:3,18,19
**278 (1)**
  1071:11
**279 (1)**
  1074:3
**28 (11)**
  1046:16;1047:2;
  1130:6;1230:16;
  1232:2,11,23;1233:22;
  1234:8;1237:9;1275:7
**280 (3)**
  1091:18,20;1268:14
**29 (3)**
  1046:9;1222:20;
  1232:11
**292 (1)**
  1078:2
**293 (1)**
  1080:12
**2Q09 (1)**
  1081:12

## 3

**3 (5)**
  1032:16;1086:16;
  1122:24;1123:2;
  1178:8
**3:08pm (1)**
  1124:3
**3:09 (3)**
  1123:21;1124:11,17
**3:10 (4)**
  1206:3,19;1272:10,
  14
**3:13 (1)**
  1206:23
**3:24 (3)**
  1196:11,18,22
**3:29 (1)**
  1200:2
**3:31 (2)**
  1206:22;1207:10
**3:32 (1)**
  1153:23
**30 (5)**
  1024:1;1179:5;
  1225:14;1228:11,13
**300 (1)**

**1207:2**
**300,000 (1)**
  1206:24
**308 (5)**
  1242:25;1243:6;
  1248:3,4,5
**31 (8)**
  1050:8;1115:3,10,
  12;1123:21;1124:3,11;
  1231:23
**317 (2)**
  1135:8,10
**3185 (3)**
  1163:16,24,25
**319 (1)**
  1137:18
**325 (2)**
  1260:16,24
**33 (2)**
  1226:18;1227:3
**330,000 (1)**
  1198:1
**335 (1)**
  1125:19
**338 (3)**
  1122:24;1123:1,17
**350,000 (1)**
  1209:9
**3500 (1)**
  1150:2
**3516-3 (1)**
  1254:8
**351681 (2)**
  1146:11,14
**3516-81 (1)**
  1149:20
**36 (2)**
  1226:18;1227:4
**37 (2)**
  1226:18;1227:4
**38 (2)**
  1030:18;1226:8
**3876 (1)**
  1215:1
**3877 (1)**
  1215:14
**3885 (1)**
  1215:25
**3Q (2)**
  1066:4;1097:9
**3rd (1)**
  1043:19

## 4

**4 (8)**
  1037:7;1053:3;
  1078:4;1080:18;
  1130:3;1155:16;
  1191:15,20
**4:34 (1)**
  1095:22
**4:42 (1)**

**1095:25**
**40 (2)**
  1038:16;1179:5
**4002 (4)**
  1233:1,6,18;1275:2
**4004 (7)**
  1234:3,10;1237:2,3,
  5,7,8
**4005 (6)**
  1234:3,10;1237:2,4,
  5,15
**401 (2)**
  1025:16;1146:23
**4020 (5)**
  1205:5;1215:6,17;
  1216:1;1270:11
**403 (3)**
  1018:7;1025:17;
  1026:1
**415-216-6961 (3)**
  1205:7,10;1215:4
**415-596-4020 (2)**
  1203:3,13
**415-738-2210 (1)**
  1208:7
**415-964 (1)**
  1270:11
**42 (2)**
  1057:3;1058:2
**44 (1)**
  1180:17
**45 (3)**
  1024:1;1044:15;
  1180:17
**450,000 (1)**
  1032:6
**46 (1)**
  1058:4
**47 (1)**
  1216:7
**49 (1)**
  1208:18
**4Q (3)**
  1066:5,10;1097:9

## 5

**5 (21)**
  1024:14;1033:19;
  1066:4;1093:24;
  1121:4;1157:19;
  1158:1;1177:19;
  1180:16;1197:6,8,19;
  1198:12,23;1199:21;
  1200:16,18;1230:6,7,9;
  1252:12
**5:30 (1)**
  1024:14
**50 (3)**
  1030:1;1058:5;
  1113:11
**540 (4)**
  1032:1,12,14;1037:7

**5476 (3)**
  1176:18,24,25
**57 (1)**
  1215:23
**5712 (6)**
  1135:7,9,10,16,18,19
**59 (2)**
  1091:18,20
**591 (4)**
  1129:24;1130:9,11,
  12
**5K (2)**
  1256:7,11
**5th (3)**
  1121:1;1199:25;
  1200:1

## 6

**6 (2)**
  1033:19;1092:25
**6.1 (1)**
  1214:11
**60 (1)**
  1180:11
**6017 (4)**
  1092:25;1093:6,8,9
**6108 (3)**
  1178:4,13,14
**617 (1)**
  1272:14
**617817-1138 (1)**
  1272:10
**617-817-1138 (3)**
  1206:8,10;1215:21

## 7

**7 (5)**
  1038:22;1043:16;
  1045:16,19;1115:1
**7:22 (1)**
  1156:12
**7:53 (1)**
  1226:18
**7229 (4)**
  1061:11,16,18,19

## 8

**8 (12)**
  1032:20;1037:7;
  1117:19;1135:14;
  1137:2;1180:16;
  1197:2,15,19;1199:21;
  1200:18;1260:23
**8/15 (1)**
  1272:5
**8/5/2008 (1)**
  1195:13
**8:31 (1)**
  1215:10
**8:38 (1)**

**1215:16**
**8:39 (1)**
  1200:11
**8:40 (1)**
  1198:23
**8:49 (5)**
  1203:18;1204:15;
  1209:2;1269:19;
  1270:10
**8:57 (1)**
  1164:2
**80 (1)**
  1192:18
**813-380-4010 (1)**
  1208:12
**8173 (4)**
  1130:14,23;1131:1,2
**8185 (5)**
  1074:2,6,12,14,15
**8228 (2)**
  1224:22,24
**835 (1)**
  1138:5
**8424 (4)**
  1080:11,20,22,23
**8591 (6)**
  1122:25;1152:19,21;
  1153:3,15,16
**8599 (4)**
  1259:24;1261:4,15,
  16
**8616 (3)**
  1155:23;1156:9,10
**8620 (3)**
  1157:15,23,24
**8623 (3)**
  1158:18;1159:1,2
**8629 (3)**
  1159:22;1160:5,6
**8700 (4)**
  1049:25;1050:4,6,7
**8723 (3)**
  1161:6,17,18
**8924 (6)**
  1131:3,17,25;
  1132:2;1237:25;
  1238:8
**894 (6)**
  1101:18,21,22;
  1102:4,7,8
**8985 (5)**
  1053:2,5,18,21,22
**8995 (3)**
  1166:25;1167:9,10

## 9

**9 (2)**
  1125:23;1243:5
**9:23 (1)**
  1165:21
**9:30 (3)**
  1200:7;1278:25;

1280:19
**9:39 (3)**
  1200:2,4,12
**9:45 (1)**
  1215:25
**900,000 (2)**
  1126:11,12
**9002 (5)**
  1172:15,19,22;
  1173:5,6
**9165 (5)**
  1064:3,5,11,13,14
**9224 (4)**
  1118:1,5,7,8
**9225 (3)**
  1117:21,24,25
**9226 (4)**
  1115:1,6,8,9
**9255 (1)**
  1117:19
**93 (2)**
  1230:19,20
**9370 (3)**
  1179:8,17,18
**95 (1)**
  1192:17
**9531T (1)**
  1257:9
**972 (2)**
  1267:7,8
**9819 (1)**
  1252:12
**9845 (6)**
  1122:23;1123:1,12,
  17;1124:2;1264:14
**9847 (2)**
  1125:19;1126:4
**9874 (3)**
  1165:13,18,19
**9876 (1)**
  1120:20
**9881 (1)**
  1121:7
**9886 (1)**
  1121:11
**9893 (1)**
  1120:20

**In The Matter Of:**

*UNITED STATES OF AMERICA, v*
*TODD NEWMAN,*

*November 21, 2012*

*SOUTHERN DISTRICT REPORTERS*

*500 PEARL STREET*

*NEW YORK, NY 10007*

*212 805-0330*

Original File CBLMNEWF.txt
Min-U-Script® with Word Index

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                        12 Cr. 121 (RJS)

5  TODD NEWMAN,
   ANTHONY CHIASSON,
6
            Defendants.
7
   ------------------------------x
8
                              New York, N.Y.
9                             November 21, 2012
                              9:35 a.m.
10

11 Before:

12              HON. RICHARD J. SULLIVAN,

13                            District Judge

14
                APPEARANCES
15
   PREET BHARARA
16      United States Attorney for the
        Southern District of New York
17 ANTONIA APPS
   JOHN ZACH
18 RICHARD TARLOWE
        Assistant United States Attorneys
19
   SHEARMAN & STERLING
20      Attorneys for Defendant Newman
   BY:  STEPHEN R. FISHBEIN
21      JOHN A. NATHANSON

22 STEPTOE & JOHNSON
        Attorneys for Defendant Chiasson
23 BY:  REID WEINGARTEN
        ERIK KITCHEN
24      MICHELLE LEVIN
        -and-
25 MORVILLO LLP

1          (Trial resumed; jury not present)

2          THE COURT: Anything we need to discuss before the

3  jury comes out?

4          Mr. Morvillo, you had an issue?

5          MR. MORVILLO: Yesterday the U.S. Attorney's Office

6  charge Matthew Martoma from SAC. It's been all over the press,

7  New York Times, Wall Street Journal, Internet, all over the

8  press. It's linked directly to Mr. Chiasson. It's linked to a

9  lot of the names that have come up, like Jon Horvath, SAC

10 Capital.

11         THE COURT: How is it linked to them?

12         MR. MORVILLO: The newspaper articles.

13         THE COURT: They reference the other cases?

14         MR. MORVILLO: Mention this case. Mention the fact

15 that this case is derivative of Operation Perfect Hedge, which

16 is the operation the U.S. Attorney's Office and the FBI ran and

17 that resulted in the indictments here. We think that you need

18 to make discrete inquiry of the jury to see if anybody read

19 those articles because those articles implicate, discuss this

20 trial and discuss the fact that Mr. Chiasson is a graduate of

21 SAC Capital and that multiple people from SAC Capital have been

22 charged, multiple people have pled guilty, and John Horvath,

23 SAC is all going to come up. We opened on it and we think we

24 need to understand whether anybody has read those articles.

25         THE COURT: How do you expect me to discretely do

1  that?

2          Has anybody read anything interesting lately?

3          MR. MORVILLO: I would ask your Honor to ask whether

4  anyone read the articles related to the insider cases yesterday

5  without mentioning names. If no one has read them, that is

6  fine. If people read them and we got to the end, it would not

7  be under your Honor's order not to have read those articles.

8          THE COURT: Not to read touching anything on this

9  case. If they see the name of either of the defendants, they

10 should, under my instructions, be telling me that they read it.

11         MR. MORVILLO: But those names might not come to the

12 very end of the article. They have may have read all about

13 SAC, they may have all about this case, they may have read

14 about John Horvath, SAC, other cases, Galleon, et cetera, et

15 cetera, and only seen Mr. Chiasson's name in the last paragraph

16 or may have stopped halfway through it. Whether there has been

17 any discussion with Jon Horvath or with SAC, anybody who has

18 read it.

19         THE COURT: One juror has approached Mr. Feith,

20 Mr. Pendrock, and indicated he had seen an article and did not

21 read it. So I think at least some of them are I think savvy

22 enough to understand the connection and be scrupulous with

23 respect to my instructions.

24         Anybody else have a view as to what we ought to do?

25         MS. APPS: Your Honor, I think the jury has shown that

1  it is very careful with respect to reading articles. One

2  possible solution would be just to remind the jury of that and

3  they should steer clear from this point of any kind of insider

4  trading articles. I am not sure that we really need to go and

5  voir dire the jury here. It's just one option for your Honor's

6  consideration.

7          THE COURT: Mr. Fishbein, do you want to say

8  something?

9          MR. FISHBEIN: No.

10         THE COURT: I'm inclined to just say that there was an

11 announcement yesterday relating to a different case. There

12 were some articles written, some of which may have referenced

13 this case. Mr. Pendrock mentioned that he had seen such an

14 article and didn't read it. Thank you. That's what you are

15 supposed to do. If anyone else has seen an article or read an

16 article that did touch on this case, they should let us know,

17 tell Mr. Feith. I am not going to make them raise their hands

18 in open court.

19         That should do it, Mr. Morvillo?

20         MR. MORVILLO: Yes.

21         THE COURT: One scheduling issue. Ms. Gallo, I don't

22 remember what juror number she is, has an appointment with the

23 New York Department of Education related to the placement of a

24 child. It's something that's been in the works for a long time

25 and something that is scheduled for next Wednesday in the

1 morning and is something that she is loathed to reschedule
2 because timing can be very sensitive for those things related
3 to a placement of a special education program. So I'm inclined
4 to allow her to go to that.
5     It actually kind of works out all right because I had
6 previously scheduled to be on a PLI panel related to trials and
7 I'm on a panel with Mary Jo White and Judge Cote and some
8 others. I was going to try to bow out of that.
9     What we will do, I will tell the jury to be here at
10 12:30 and we will go from 12:30 to 5:30 that day. That's what
11 I'm inclined to do.
12     Does anybody have a view otherwise?
13     I'll tell that juror today so she knows not to sweat
14 it. If we have time, I'll tell the rest of the jury that's
15 what we are doing. Otherwise, I will tell them Monday.
16     MR. WEINGARTEN: Have you decided for sure next
17 Friday, a week from Friday?
18     THE COURT: I have such a full calendar because of the
19 Hurricane that I think we are not going to sit. I'm hopeful
20 that by sort of Monday, Tuesday, we will have a better sense of
21 how we are doing, if we are making up time for the other
22 witnesses. Right now we spent a week on one witness. I think
23 we can revisit that, but I think for now I'm planning not to
24 sit Friday.
25     MR. WEINGARTEN: I want to know whether to schedule

1 stuff myself.
2     THE COURT: I don't think we will sit on the 30th.
3     MR. MORVILLO: Could we take down the mug shots,
4 unless they are using them for Mr. Hadlock.
5     THE COURT: Mr. Hadlock is here?
6     MS. APPS: Yes.
7     THE COURT: Let's get him up here.
8     Dan, you can bring in the jury.
9     (Jury present)
10     THE COURT: Thanks for being on time. We had a couple
11 of things we were discussing.
12     I wanted to just remind you again about my
13 instructions not to read anything about this case. And
14 yesterday, I gather, there was a news story or a news stories
15 related to a different case, an indictment that was handed
16 down. Some of the articles may have referenced other cases,
17 including this one. Mr. Pendrock had indicated to Mr. Feith
18 that he had seen an article and did not read it, which is
19 great. You did exactly what I've asked you to do. So thank
20 you for doing that. Others during the course of the trial have
21 brought to Mr. Feith's attention articles that they came across
22 that they followed my instructions, didn't read, and then
23 mentioned it to Mr. Feith.
24     You don't have to tell me now. At the next break if
25 anybody saw an article that mentioned anybody who has been

1 mentioned in this case or any of the parties in this case, let
2 Mr. Feith know that and maybe I'll follow up with you. If you
3 didn't see it or didn't read anything, that's fine.
4     We are now going to move on to the next witness. It's
5 the government's case. They are going to call their next
6 witness.
7     Ms. Apps, who does the government call?
8     MS. APPS: The government calls Mr. Mark Hadlock.
9 MARK HADLOCK,
10     called as a witness by the Government,
11     having been duly sworn, testified as follows:
12 DIRECT EXAMINATION
13 BY MS. APPS:
14 Q. Mr. Hadlock, where did you go to school?
15 A. University of Notre Dame.
16 Q. Did you graduate with a degree?
17 A. Yes. Biology.
18     THE COURT: Notre Dame?
19     THE WITNESS: Yes.
20     THE COURT: You guys are riding high these days.
21 Saturday could be tough. It wouldn't be appropriate for me to
22 take a position.
23 Q. What year did you graduate from Notre Dame?
24 A. 1981.
25 Q. Are you familiar with an entity called Diamondback Capital

1 Management?
2 A. Yes.
3 Q. How are you familiar with Diamondback Capital Management?
4 A. I was employed there.
5 Q. When did you start working for Diamondback Capital
6 Management?
7 A. July 2005.
8 Q. Can you briefly describe the jobs you had between
9 graduating from Notre Dame in 1981 and joining Diamondback
10 Capital Management in 2005?
11 A. Yes. I worked six years at J.C. Penney in their quality
12 assurance lab.
13     I then left and started a sales career in hosiery with
14 several hosiery manufacturers up until 1996.
15     In 1996, I worked as a consultant for a small
16 registered investment advisor for a year and a half.
17     I then went to C.E. Unterberg, Towbin, which was a
18 small boutique investment bank that had a broker dealer and
19 investment advisory division, published research. It was a
20 full service investment bank. Spent nine years there. And
21 then was hired at Diamondback in July of 2005.
22 Q. And what was your position at C.E. Unterberg, Towbin?
23 A. I was their chief administrative and chief compliance
24 officer by the time I left. I had held various positions
25 prior.

1 Q. What position did you have when you first joined
2 Diamondback Capital Management?
3 A. I was hired to be their chief administrative and chief
4 compliance officer.
5 Q. And how long were you at Diamondback Capital Management?
6 A. Up until May 2010.
7 Q. Did you hold those positions of chief compliance officer
8 and chief administrative officer for the entire time that you
9 were at Diamondback or did they in some way change?
10 A. I was the chief administrative officer the entire time. I
11 relinquished my role as chief compliance officer in December of
12 2009.
13 Q. Now, what kind of entity is Diamondback Capital Management?
14 A. Diamondback Capital Management is a registered investment
15 advisor managing a hedge fund.
16 Q. What kind of investors did the hedge fund have?
17 A. All different types. Pension and endowments, high net
18 worth individual, fund to funds, family office.
19 Q. What was the structure of Diamondback Capital Management
20 investment advisor you mentioned?
21 A. The Diamondback model was similar to the SAC model. It had
22 multiple portfolio management teams. Each portfolio management
23 team managed a sum of money. Each portfolio management team
24 was an expert in a sector of the S&P 500, for instance,
25 technology, energy, financials, TNT, whatever the sector was.

1 Q. You mentioned something there. I think you said SAC model?
2 A. SAC Capital was one the first hedges that had this
3 multimanager approach.
4 Q. How was capital allocated amongst the portfolio managers?
5 A. The partners of the firm allocated a portion of the total
6 investors capital.
7 Q. Approximately how many portfolio managers were there in
8 2008 and 2009?
9 A. I don't know the exact number. I would say approximately
10 40 by the end of 2009.
11 Q. What were your responsibilities at Diamondback as the chief
12 administrative officer?
13 A. Mostly, back office function. Human resources, oversee
14 human resources, IT, investor relations, anything pretty much
15 not related to trading or finance. We have a CFO.
16 Q. Just to be clear, IT refers to what?
17 A. Information technology.
18 Q. And who, if anyone, assisted you in carrying out the human
19 resource side of your administrative officer responsibilities?
20 A. Cathy Magee.
21 Q. Could you take a look at what has been marked for
22 identification as Government Exhibit 2254.
23     MS. APPS: May I approach, your Honor?
24     THE COURT: Yes.
25 Q. Mr. Hadlock, are you familiar with the form that is

1 Government Exhibit 2254?
2 A. Yes.
3 Q. And how are you familiar with that form?
4 A. It's an employment application, all employees completed
5 one.
6 Q. Did that fall within your purview of responsibilities as a
7 chief administrative officer?
8 A. Yes.
9 Q. And whose employment application is that?
10 A. Todd Newman.
11     MS. APPS: The government offers 2254.
12     MR. NATHANSON: No objection.
13     THE COURT: Government Exhibit 2254 is received.
14     (Government's Exhibit 2254 received in evidence)
15 Q. Mr. Hadlock, the top part of that document has been blown
16 up on the screen, and it's cut off a little bit at the top, but
17 there is an address, One Landmark Square-15th floor, Stamford,
18 Connecticut.
19     Do you see that?
20 A. Yes.
21 Q. Are you familiar with that address?
22 A. Yes.
23 Q. What address is that?
24 A. It's the address of Diamondback Capital.
25 Q. It indicates there the name Todd Newman.

1     Do you see that?
2 A. Yes.
3 Q. The date on the top there, what is that date?
4 A. March 1, 2006.
5 Q. If you could turn to the second page of this document,
6 there is a heading work experience about two-thirds of the way
7 down the page.
8     Do you see that?
9 A. Yes.
10 Q. And it indicates there an employer Tudor Investments.
11     Do you see that?
12 A. Yes.
13 Q. What is Tudor Investments?
14 A. A hedge fund.
15 Q. And can you tell us what the dates of employment were for
16 Tudor Investments for Mr. Newman?
17 A. March 25, 2002 through February 15, 2006.
18 Q. And this portion of the application continues on to the
19 next page, if you could turn the page, Mr. Hadlock. And the
20 top box indicates an employer Sirios Capital Management.
21     Are you familiar with that entity?
22 A. No.
23 Q. Do you see on the right-hand side there is the words type
24 of business?
25 A. Yes.

# A-848

1  Q. Can you read that?
2  A. Investments.
3  Q. And below that has dates of employment. What are the dates
4  of employment written there?
5  A. July 1, 1999 to January 31, 2006.
6        THE COURT: 2006?
7        THE WITNESS: I'm sorry. '99 to 2002.
8  Q. In the last box under this section, Mr. Hadlock, the
9  employer listed there is Merrill Lynch.
10        Are you familiar with that entity?
11  A. Yes.
12  Q. What is Merrill Lynch, or was Merrill Lynch?
13  A. An investment bank.
14  Q. And what are the dates of employment that are listed in
15  that document there?
16  A. March 15, 1996 to June 30, 1999.
17  Q. Mr. Hadlock, could you turn to what's been marked as
18  Government Exhibit 2257.
19        Do you recognize that document?
20  A. Yes.
21  Q. What is it?
22  A. Todd Newman's offer letter.
23  Q. And if you look on the third page of this document, do you
24  recognize any of the signatures on that page?
25  A. Yes.

1  Q. Which one do you recognize?
2  A. My own.
3        MS. APPS: The government offers 2257.
4        MR. NATHANSON: No objection, your Honor.
5        THE COURT: Government Exhibit 2257 is received.
6        (Government's Exhibit 2257 received in evidence)
7  Q. Mr. Hadlock, I want to draw your attention to the first
8  paragraph on the first page. What does that say about the
9  position that Mr. Newman was being offered by Diamondback
10  Capital Management LLC?
11  A. He was being hired as a portfolio manager.
12  Q. Just to be clear, Diamondback Capital Management LLC,
13  that's the investment advisor, is that correct?
14  A. Correct.
15  Q. If you can turn in this document to this appendix. And if
16  you could look at the appendix, Mr. Hadlock. What does this
17  document say about the type of stocks Mr. Newman would be
18  trading?
19  A. Mostly, a technology portfolio.
20  Q. And that's the first paragraph there on the screen?
21  A. Correct.
22  Q. And what does this document say about the amount of money
23  that Mr. Newman would be managing when he started in 2006?
24  A. He was given a book of $100 million to manage.
25  Q. Again, what does that mean, to be given a book of $100

1  million?
2  A. Capital was allocated to each portfolio manager based upon
3  the overall assets of the master fund.
4  Q. And if you could take a look at what's been marked for
5  identification as Government Exhibit 2259.
6        Do you recognize that document?
7  A. Yes.
8  Q. What is it?
9  A. A revised employment letter.
10  Q. What is the date?
11  A. December 22, 2008.
12        MS. APPS: The government offers 2259.
13        MR. NATHANSON: No objection.
14        THE COURT: Government Exhibit 2259 is received.
15        (Government's Exhibit 2259 received in evidence)
16  Q. Again, Mr. Hadlock, just directing your attention to the
17  first page, what does it say about Mr. Newman's position?
18  A. Again, he's a portfolio manager.
19  Q. Now, Mr. Hadlock, this agreement starts by saying that
20  Mr. Newman is offered a position at Diamondback advisors CT
21  LLC. And if you recall in the exhibit we just looked at it was
22  Diamondback Capital Management LLC that was making the offer.
23        Do you know why there was a change in the entity's
24  name like that?
25  A. Yes.

1  Q. And what was the reason?
2  A. The firm in 2008 decided to open an alternate location in
3  New York City due to legal and tax reasons. They wanted to
4  create affiliates. So Diamondback Advisors Connecticut LLC was
5  the Connecticut office, and Diamondback Advisors NY, New York,
6  was our New York City office.
7  Q. As far as you are aware, did the change in the name of the
8  legal entity have any significance for the purposes of the
9  day-to-day responsibilities of the portfolio managers?
10  A. They didn't.
11  Q. If you could turn on this document to page 7 of the
12  document. It's headed definitions and trading account terms.
13  And there is a section there starting with buying power.
14        Do you see that?
15  A. Yes.
16  Q. What does that say about the amount of money that
17  Mr. Newman was allocated at this time?
18  A. That it increased to 250 million from 100.
19  Q. And that was the size of his book, essentially?
20  A. Correct.
21  Q. Now, does this agreement address Mr. Newman's compensation?
22  A. Yes.
23  Q. What page is that?
24  A. It would be on page 4.
25        MS. APPS: Mr. Hoffman, if you could blow up paragraph

1   4 on page 4.
2 Q.  Mr. Hadlock, can you explain what this means in terms of
3   how Mr. Newman was compensated while he was at Diamondback?
4 A.  Not from that paragraph.
5 Q.  Do you know how Mr. Newman was compensated at Diamondback?
6 A.  Yes.  Paragraph 2 talks about how much he would be paid on
7   net profits.
8 Q.  Can you explain how Mr. Newman was compensated?  How did it
9   work?
10 A.  The portfolio manager was paid based upon the profits that
11   he made in his book.  So in Mr. Newman's case he made 15
12   percent on net performance below 15 percent, and he made 20
13   percent on profits above 15 percent.
14 Q.  When you talk about net performance, what do you mean?
15 A.  In this particular structure portfolio managers are
16   compensated based upon their net profits.  So they are paid a
17   salary, but their salary is basically considered a draw, an
18   advance.  If they have team members, they are responsible for
19   paying their team members out of their profit, as well as
20   certain other expenses.
21 Q.  When you say team members?
22 A.  Analysts, traders, secretaries.
23 Q.  Can you just sort of give us a simple example.  If you had,
24   for example, $100 million book and you made a profit of 20
25   percent or so, can you explain how the compensation would work

1   for Mr. Newman?
2 A.  On 100 million, if you made 20 percent, then he would have
3   made $20 million in gross profit.  You would reduce his profit
4   down by expenses.  And then he would be paid the requisite
5   percentage in his offer letter.  If you made 20 million and it
6   netted down to 15 million, because he had to pay everybody,
7   then he would be paid 15 percent of the 15 million.
8 Q.  If it netted to 20 percent?
9 A.  Or 20 percent, if profit was over 15 percent.  So in that
10   case it would be 20 percent.
11 Q.  Now, Mr. Hadlock, can you take a look at what's been marked
12   for identification as Government Exhibit 2662.
13         What are those documents?
14 A.  W2 forms.
15 Q.  For whom?
16 A.  Todd Newman.
17 Q.  For what years?
18 A.  For 2007, 2008, 2009.
19 Q.  And did Diamondback Capital maintain copies of W2s for
20   employees at any particular point in time?
21 A.  Yes.
22 Q.  Mr. Hadlock, could you also take a look in your binder at
23   what's been marked for identification as Government Exhibit 95.
24 A.  Yes.
25         (Continued on next page)

1 Q.  And what is that?
2 A.  A summary of the compensation amounts for years 2007
3   through 2009.
4 Q.  And before testifying today, did you compare the numbers in
5   this chart for the years to the numbers that were on the W-2
6   statements that you saw in Government Exhibit 2262?
7 A.  I did.
8 Q.  And the numbers listed on this chart in 95, do they
9   accurately state the compensation according to the W-2's?
10 A.  Yes.
11         MS. APPS:  The government offers 95.
12         MR. NATHANSON:  No objection.
13         THE COURT:  95 is received.
14         (Government's Exhibit 95 received in evidence)
15         THE COURT:  You're not offering 2262.
16         MS. APPS:  Correct, your Honor, although -- one
17   moment, your Honor.  We have a little technical difficulty.
18   One second.  Apparently, your Honor, we don't have it on the
19   electronic hookup.  Can I just publish it to the jury the old
20   fashioned way, just to show them --
21 Q.  You know what, Mr. Hadlock, why don't you do this?  Why
22   don't you read the numbers?
23 A.  Sure.  From the W-2's or from the schedule?
24 Q.  From the schedule.  What was Mr. Newman's compensation for
25   2007?

1 A.  2007, $3,354,224; 2008, $3,337,040; 2009, $3,560,690.
2 Q.  Now, Mr. Hadlock, coming to your responsibilities as chief
3   compliance officer while you were at Diamondback, what did
4   those responsibilities include?
5 A.  Creating and maintaining a registered investment advisor
6   compliance program.
7 Q.  And what did that involve?
8 A.  Writing a compliance manual -- identifying the risks of the
9   firm, writing a compliance manual and making sure policies and
10   procedures that were required of a registered investment
11   advisor were put in place, creating a culture of compliance
12   within the firm, making sure people followed the compliance
13   program.
14 Q.  And was there any training in compliance at Diamondback?
15 A.  Yes.
16 Q.  How often was the training?
17 A.  Training occurred at multiple times.  When you were first
18   employed at Diamondback you went through your human resources
19   on-boarding process, but you also went through compliance
20   training.  You were also required to attend an annual training
21   seminar required by everyone in the firm.
22 Q.  What if anything did compliance do to insure that employees
23   attended the seminar?
24 A.  The seminar was located -- I'm sorry, let me think about
25   that.  What did we do.  Employees came to the seminar.  They

# A-850

1 had to sign in because they were required to go. If they
2 didn't sign in, then they were required to watch the video.
3 All compliance training was taped.
4 Q. Could you take a look at what's being marked for
5 identification as Government Exhibit 2261? Do you recognize
6 that document?
7 A. Yes.
8 Q. What is it?
9 A. A notification from compliance, a response to a
10 notification from compliance about the annual training.
11 Q. What is the date?
12 A. April 8, 2008.
13 Q. And the notification from compliance, who from compliance
14 sent that out?
15 A. Rebecca Sheinberg.
16 Q. Who is Rebecca Sheinberg?
17 A. She was a compliance officer within the department.
18 Q. And she worked for you?
19 A. Correct.
20 Q. Was she an attorney?
21 A. Yes.
22     MS. APPS: Government offers 2261.
23     MR. NATHANSON: No objection.
24     THE COURT: All right, Government Exhibit 2261 is
25 received.

1     (Government's Exhibit 2261 received in evidence)
2 Q. Mr. Hadlock, if you could first look at the e-mail starting
3 one-third of the way down the page from Rebecca Sheinberg to a
4 number of individuals. In the "to" line, are they all
5 employees of Diamondback Capital or were employees of
6 Diamondback Capital at the time, I should say?
7 A. Yes.
8 Q. And you see Mr. Todd Newman's name there?
9 A. Yes.
10 Q. Could you just explain what that is in that e-mail?
11 A. It's an e-mail notification informing those individuals
12 that they need to watch the video from the compliance training
13 because they did not go -- let me see. Yes. They -- so,
14 again, from this I can only say they either did not attend the
15 annual training which I believe was around that date or they
16 could have been new employees and were required to watch the
17 training.
18 Q. And then if you see in this e-mail, the second paragraph
19 says, "per Mark's e-mail below." If you could turn to the
20 third page of this document. Do you see there's an e-mail --
21 A. Oh, yes.
22 Q. From you?
23 A. Yes.
24     MR. NATHANSON: You mean the second page.
25     MS. APPS: Thank you.

1 Q. It's the second page of the exhibit, I beg your pardon.
2 You see there's an e-mail from you. Is that an e-mail that you
3 sent to the firm? Withdrawn. Is that the type of e-mail that
4 you would send to the firm regarding compliance?
5 A. Right.
6 Q. And just coming back to the first page, then, just
7 publishing for the record the top portion of the e-mail from
8 Mr. Todd Newman dated April 8, 2008 to Rebecca Sheinberg and
9 Mr. Newman writes "completed."
10     Now, Mr. Hadlock, if you could look at what's been
11 marked for identification as Government Exhibit 2251.
12 A. A? Yes.
13 Q. Actually, if you could just look at 2251, not the A.
14 A. Okay.
15 Q. What is that document?
16 A. The cover page of our compliance manual.
17 Q. And if you could turn to the second page?
18 A. Mm-hmm.
19 Q. What does it indicate that this document, this particular
20 document is?
21 A. The policies and procedures to prevent insider trading.
22 Q. Is this a portion of Diamondback's compliance manual?
23 A. Yes.
24 Q. What is the date?
25 A. December 1, 2005.

1     MS. APPS: Government offers 2251.
2     MR. NATHANSON: No objection.
3     THE COURT: All right, Government Exhibit 2251 is
4 received.
5     (Government's Exhibit 2251 received in evidence)
6     MS. APPS: If we could just publish the second page,
7 the top portion there under policy statement on insider
8 trading.
9 Q. And it states, the advisor -- and who is the advisor?
10 A. The advisor would be Diamondback Capital Management.
11 Q. "The advisor forbids any officer, director or employee from
12 trading either personally or on behalf of others, including
13 private accounts managed by the advisor on material non-public
14 information or communicating material non-public information to
15 others in violation of the law." Do you see that?
16 A. Yes.
17 Q. If you could look at what's been marked for identification
18 as Government's Exhibit 2253. Do you recognize that document?
19 A. Yes.
20 Q. What is it?
21 A. It's the cover page to the compliance manual revised
22 July 16, 2008.
23 Q. And if you look at the second page following, what portion
24 of the compliance manual is included here?
25 A. Policy and procedures to detect and prevent insider

# A-851

1 trading.
2     MS. APPS: Government offers 2253.
3     MR. NATHANSON: No objection.
4     THE COURT: All right, Government Exhibit 2253 is
5 received.
6     (Government's Exhibit 2253 received in evidence)
7 Q. And, again, if you could publish it for the record, the
8 policy statement at the top, similar to the policy statement
9 that you saw before. Broadly speaking, Mr. Hadlock, what did
10 you understand Diamondback's policy with respect to insider
11 trading to be?
12 A. That no employee was to engage in that activity.
13 Q. If you could turn to the third page of this document,
14 there's a heading called "material." Do you see that?
15 A. Mm-hmm. Yes.
16 Q. And on the second paragraph --
17     MR. NATHANSON: Your Honor?
18     THE COURT: Yes.
19     MR. NATHANSON: We had discussed I think before the
20 trial about a limiting instruction with respect to policies and
21 your instructions at the end dealing with this.
22     THE COURT: I'm just going to tell the jury, I'm going
23 to instruct you at the end of the trial with respect to what
24 the elements of the crimes are. The defendants are charged
25 with crimes. A violation of a compliance manual is not a

1 crime. This evidence may be relevant to the state of mind of
2 the defendants or one of the defendants in this case, so I'll
3 give you further instructions on that. Materiality will be one
4 element that I will discuss at some length. If what I tell you
5 is different than what's in the manual, then what I say
6 matters, but you're certainly free to consider this for the
7 limited purpose for which it's been offered. Okay?
8     MR. NATHANSON: Thank you.
9 Q. You said generally that -- withdrawn.
10     MS. APPS: Mr. Hoffman, if you could come back to the
11 first page.
12 Q. Did you understand, Mr. Hadlock, that the policy prohibited
13 use of material non-public information?
14 A. Yes.
15     MS. APPS: Mr. Hoffman, if you could come down to the
16 third page where we just were, and highlight the two paragraphs
17 under "material."
18 Q. Mr. Hadlock, the second paragraph starts with examples of
19 material information. Could you just read the first two to
20 three lines there?
21 A. "Examples of material information include information about
22 unannounced dividend increases or decreases, earnings or
23 earnings estimates, changes to previously released earnings or
24 estimates, writedowns of assets, additions to reserves for bad
25 debts, liquidity problems, defaults or other credit-related

1 problems or defaults."
2 Q. Thank you. Now, did employees at Diamondback have to
3 certify review of compliance manuals?
4 A. Yes.
5 Q. Could you take a look at what's been marked for
6 identification as Government Exhibit 2271? Do you recognize
7 that document?
8 A. Yes.
9 Q. What is it?
10 A. Again, it's a compliance notification regarding a policy
11 and procedure, a new policy and procedure that was released to
12 the firm.
13     MS. APPS: Government offers 2271.
14     THE COURT: Any objection?
15     MR. NATHANSON: No objection.
16     THE COURT: Government Exhibit 2271 is received.
17 Q. Mr. Hadlock, if you could first look at the e-mail that's
18 from Rebecca Sheinberg a third of the way down the page, and
19 it's to a series of individuals. Do you recognize what that
20 group of individuals is?
21 A. Employees of the firm.
22 Q. And it says, the subject line there -- the date is May 9,
23 2008. Do you see that?
24 A. Yes.
25 Q. Subject line, "Reminder consultant policy certification

1 required by end of day." Do you see that?
2 A. Yes, I do.
3 Q. What was the consultant policy that was referred to there?
4 A. It was the -- I believe it was the policy and procedures
5 for communicating with research consultants.
6 Q. And if you could turn to the attachment to this e-mail,
7 which is three pages in.
8 A. Yes.
9 Q. Do you recognize that document?
10 A. Oh, I'm sorry. What number?
11 Q. It's the same document. Let me just make sure --
12 A. I'm sorry. I didn't go far enough. Yes, sorry.
13 Q. Do you recognize that attachment?
14 A. Yes.
15 Q. What is that?
16 A. That is the policy and procedure for communicating with
17 consultants.
18 Q. What did consultants cover?
19 A. Consultants covered people that the research staff would
20 speak to outside of the firm who were familiar with companies
21 or products or a myriad of things.
22 Q. Did it include things like the expert network firms?
23 A. Yes.
24 Q. And did this policy address the rules about Diamondback
25 employees such as research assistants talking to public company

1  insiders?
2  A. Yes.
3  Q. If you could turn to the second page of this document?
4  There's a heading, communicating with paid research
5  consultants. Do you see that?
6  A. Yes.
7  Q. Can you explain what that says on paragraph 1 and 1A?
8  A. It talks about what the research consultant should be
9  thinking about when it comes to communicating with consultants
10  and -- when it comes to communicating with consultants.
11  Particularly that, A, the consultant should not be employed by
12  the company that the research analyst is looking to trade in.
13  In other words a research consultant -- I use the word
14  consultant. A research analyst should not be talking to
15  somebody employed at a public company in which Diamondback was
16  looking to invest in or had a position.
17  Q. And you see on subparagraph A it talks about former
18  employees? Do you see that?
19  A. Yes.
20  Q. So what did that prohibition then extend to with respect to
21  former employees?
22  A. That if a research analyst was going to talk to somebody at
23  a portfolio company and that person had worked at that company,
24  they could not have worked at that company for less than six
25  months. I'm sorry. They had to be gone from that company for

1  a period of no less than -- they had to be gone from the
2  company for six months or more.
3  Q. Mr. Hadlock, I want to switch to a slightly different topic
4  here. Did Diamondback ever conduct reviews of e-mails or
5  instant messages of its employees?
6  A. Yes.
7  Q. Do you remember when that started?
8  A. Not precisely, but sometime in 2008, early 2009.
9  Q. So was that late 2008, do you remember, early 2009?
10  A. Late 2008, early 2009.
11  Q. And how did Diamondback carry that out?
12  A. Rebecca Sheinberg, my compliance officer, would do e-mail
13  reviews.
14  Q. So Rebecca Sheinberg did the e-mail reviews for you?
15  A. Yes.
16  Q. How did she do those e-mail reviews?
17  A. She would take a random set of employees from the
18  investment staff and do keyword searches on their e-mails.
19  Q. Do you know what keyword searches she employed?
20  A. Not off the top of my head, but they were, it was a list
21  commonly used or provided by or suggested by the SEC when doing
22  e-mail reviews.
23  Q. And other than reviewing e-mails in this fashion --
24  withdrawn. How many employees did Diamondback have in 2008 and
25  2009?

1  A. I wouldn't know the exact number, but I would say upwards
2  of 125 to 175 between January of 2008 and December of 2009.
3  The number changed because the firm was growing.
4  Q. Is it fair to say that it increased over time?
5  A. Yes.
6  Q. And of those I think you said there were about, you
7  testified earlier about 40 portfolio managers, is that about
8  right?
9  A. Yes, by the end of 2009, yes.
10  Q. Do you recall how many traders there were by the end of
11  2009?
12  A. I wouldn't be able to give you an accurate number.
13  Q. Did Ms. Sheinberg have anyone assist her in the task of
14  reviewing e-mails?
15  A. I don't believe so. I don't know.
16  Q. I'm sorry, you said you don't believe so? I didn't hear
17  that.
18  A. I don't know.
19  Q. Did she report to you, Ms. Sheinberg?
20  A. She did. I don't think anyone else reviewed e-mails other
21  than her when we started doing it.
22  Q. And what were Ms. Sheinberg's responsibilities other than
23  reviewing e-mails while she was at Diamondback?
24  A. She helped to, she assisted in writing policies and
25  procedures. She helped in other types of monitoring of the

1  compliance program. She was basically my right hand man in
2  compliance.
3  Q. And I think, was she the -- withdrawn. Have you heard of
4  the term soft dollars?
5  A. Yes.
6  Q. What are soft dollars?
7  A. Soft dollars are, we call them soft dollar credits, are --
8  soft dollar credits are generated from trading activity thrown
9  off of the commission amounts paid for trades.
10  Q. And what are they used for?
11  A. Soft dollars are used to pay for certain types of research
12  and execution services if they're used within Section 28(e)
13  safe harbor.
14  Q. First of all, what are execution services?
15  A. Transmitting of the order from the firm to brokers.
16  Transmission of settling the trade with the brokers and prime
17  broker.
18  Q. You said also that they're used for research services?
19  A. Yes.
20  Q. What did you mean by that?
21  A. Research services that are used for the firm when you're
22  paying people, when you're paying firms for research provided.
23  Q. And was it also, was it limited to firms or could it also
24  cover individual consultants?
25  A. It covered individual consultants as well.

1 Q. Could you look at what's been marked for identification as
2   2267.
3        THE COURT: Before you do that, I don't understand,
4 you said "generated from trading activity thrown off of the
5 commission amounts paid for trades." I don't know what that
6 means.
7        THE WITNESS: Okay. Generally when you engage a
8 broker to execute trades on your behalf, you'll say, okay, I'm
9 going to execute trades, I'm going to execute equity trades and
10 you're going to charge us .75 percent of a penny, 75 mils,
11 okay?
12        THE COURT: All right.
13        THE WITNESS: But we want to have a soft dollar, we
14 want to create a soft dollar balance as well in our trading
15 commission so we're going to add 25 mils to that 75 mils, so
16 we're going to -- you're going to charge a penny for our
17 commissions, right, per share, and you're going to segregate
18 that .25 cents off to the side.
19        THE COURT: And who is the "you" in this example?
20        THE WITNESS: The broker dealer.
21        THE COURT: There were various broker dealers with
22 whom Diamondback had arrangements?
23        THE WITNESS: Correct.
24        THE COURT: All right.
25 Q. Mr. Hadlock, what is 2267?

1 A. Policy and procedure relating to soft dollar and directed
2   brokerage arrangements.
3 Q. For Diamondback?
4 A. Yes.
5        MS. APPS: Government offers 2267.
6        THE COURT: Any objection?
7        MR. NATHANSON: No objection.
8        THE COURT: 2267 is received.
9        (Government's Exhibit 2267 received in evidence)
10 Q. In the first paragraph of that document, it talks about
11   something that you mentioned a few moments ago, Section 28(e).
12   What is that about?
13 A. 28(e) is a safe harbor provided for the use of soft dollars
14   that restricts the use of soft dollars to trading execution and
15   research.
16 Q. And were there particular forms at Diamondback for purposes
17   of signing up research consultants that you recall?
18 A. Particular forms for --
19 Q. Withdrawn. Let me ask you this, Mr. Hadlock. Could you
20   look at what's been marked -- well, withdrawn. Just to follow
21   up on Section 28(e) here, how did that relate to the payment of
22   soft dollars to research consultants?
23 A. How did 28(e) relate?
24 Q. Yes. Did that impose some restraints on the rules about
25   soft dollar payments?

1 A. Well, at Diamondback, Diamondback for the time that I was
2   there was not restricted to 28(e).
3 Q. Explain what that means.
4 A. So what that means is, as long as we disclose to our
5   clients exactly what we were doing with soft dollars and what
6   services and products we were paying for through the use of
7   these soft dollar credits, we could do so. Some of those
8   products and services were within safe harbor because they were
9   related to execution and trading and research, and others were
10   not.
11 Q. Could you look at what's been marked for identification as
12   Government Exhibit 2270?
13 A. Yes.
14 Q. Do you recognize that document?
15 A. Yes.
16 Q. What is it?
17 A. A soft dollar request form.
18        MS. APPS: Government offers 2270.
19        MR. NATHANSON: Objection, your Honor.
20        THE COURT: Objection?
21        MR. NATHANSON: Yes. I don't think this is the
22   complete document.
23        THE COURT: On the rule of completeness you're
24   objecting?
25        MS. APPS: One moment, your Honor.

1        MR. NATHANSON: I think it's a multi-page document,
2   your Honor.
3        THE COURT: Well, I mean, is there some portion of the
4   remainder that matters?
5        MS. APPS: Let me do this. May I approach, your
6   Honor?
7        THE COURT: Yes.
8 Q. Take a look at this document. This is marked as Government
9   Exhibit 2270. How many pages does that have?
10 A. Five.
11 Q. And do you recognize pages 2, 3, 4 and 5?
12 A. Not off the top of my head, no.
13 Q. And do you know one way or another whether these documents
14   were attached as a single document in Diamondback's files?
15 A. I don't know.
16        MS. APPS: So, your Honor, if I could do this, just
17   one moment.
18        (Pause)
19        MS. APPS: Your Honor, I think the parties have to
20   stipulate that the five-page document that is now Government
21   Exhibit 2270 was produced to the government as one document.
22   Obviously, this witness doesn't recognize pages 2 to 5, but
23   we're happy to stipulate that that's the way it was provided to
24   the government.
25        THE COURT: And to offer the five-page document?

# A-854

1    MS. APPS: And to offer the five-page document.

2    THE COURT: No objection to that?

3    MR. NATHANSON: No.

4    THE COURT: So government's Exhibit 2270, the

5    five-page document, is admitted.

6    (Government's Exhibit 2270 received in evidence)

7  Q. Just looking at the first page, Mr. Hadlock, the only page

8   you recognize here, at the bottom of the page there's something

9   "approved by." Do you see that?

10 A. Yes.

11 Q. And there's a signature there?

12 A. Yes.

13 Q. Do you recognize that signature?

14 A. My signature.

15 Q. And beneath that it says, "To be completed by trading." Do

16  you see that?

17 A. Yes.

18 Q. What does that mean?

19 A. That the senior trader, Tony Bechelany's, signature is

20  required.

21 Q. And underneath that, "To be completed by department

22  manager." Do you see that?

23 A. Yes.

24 Q. Who is the manager that's listed there?

25 A. Todd Newman.

1  Q. Now, coming back to the -- and the dollar amount, what is

2   the dollar amount listed there?

3  A. 145,000.

4  Q. So coming back to the top of the page, and it's headed,

5   "Soft dollar request form." Do you see that?

6  A. Yes.

7  Q. And there's a request on there. Who is listed as the

8   requester?

9  A. Todd Newman.

10 Q. And vendor, what is meant by vendor on this form?

11 A. The research provider.

12 Q. There are a number of vendors on this form.

13 A. Yes.

14 Q. Who are the vendors?

15 A. Eskay, J. Souza, Ruchi Goyal.

16 Q. And the date of this document is what, Mr. Hadlock?

17 A. 12/23/2008.

18 Q. It says, "Total cost." What does that refer to?

19 A. The amount to be paid to these two providers.

20 Q. And below that there's a series of circles and one is

21  filled in next to research service. And again, what is that?

22 A. Research service would indicate that these providers were

23  providing research services to the requester.

24 Q. And do you see that there's on the right-hand side an

25  amount within 28(e) and outside 28(e) and none of those are

1   filled in?

2  A. Yes.

3  Q. And below that there is a heading, "Description of

4   expenditures outside of 28(e)." Do you see that?

5  A. Yes.

6  Q. There's a series of lines and none of them are ticked, is

7   that fair to say?

8  A. Yes.

9  Q. Was this the standard form used for soft dollar requests at

10  Diamondback?

11 A. At the time, yes.

12 Q. Just publishing for the record, I know you don't recognize

13  this document, but if you could turn to the second page of this

14  document. Mr. Hoffman, if you could blow that up? It's an

15  e-mail from Todd Newman December 19, 2008 to Katherine Magee

16  and Lauren Conant. Who is Lauren Conant?

17 A. She worked for Cathy.

18 Q. It says, "Consultant bonuses for 2008." Publishing for the

19  record, "Below is a list of bonuses Mtec wants to pay out for

20  2008. Also changes to be made for 2009. Bonus for 2008, Eskay

21  $25,000, J Souza 200,000 --"

22 A. 20,000.

23 Q. Sorry, sorry, sorry. "$20,000, Ruchi Goyal $100,000." Do

24  you see that?

25 A. Yes.

1  Q. And below there's, "2009 will cut cents to $30,000 for the

2   year. IPR is out, Gartner Group, also CXL."

3    Now, Mr. Hadlock, are you familiar with Mtec, what

4   that means?

5  A. Mtec?

6  Q. Yes.

7  A. The name of Todd's book.

8  Q. Are there any rules at Diamondback with respect to the

9   payment of bonuses to soft dollar research providers?

10 A. We did not.

11 Q. Did not what?

12 A. Pay bonuses to research providers.

13 Q. And why was that?

14 A. Because I said so. I mean, you just don't pay, you don't

15  pay soft dollars to -- you pay soft dollars to research

16  providers for services that they render.

17 Q. Could you look at what's been marked for identification as

18  Government Exhibit 2269?

19    MS. APPS: One moment, your Honor.

20    (Pause)

21 Q. Let me ask you, do you recognize the first page of this

22  document?

23 A. I recognize it to be a soft dollar request form.

24 Q. And are you familiar with the second and third pages of

25  this document?

1 A. I am not.
2      MS. APPS: Government offers 2269.
3      MR. NATHANSON: The complete document, yes, your
4 Honor. We don't object.
5      THE COURT: So Government's 2269, which is a
6 three-page document, is received.
7      (Government's Exhibit 2269 received in evidence)
8 Q. Starting at the top, Mr. Hadlock, is this the same type of
9 form we just saw in 2270?
10 A. Yes.
11 Q. It says, "Soft dollar request form" at the top. The
12 requester is Jesse Tortora. Do you know who Jesse Tortora is?
13 A. A research analyst at Diamondback.
14 Q. Do you ever recall talking to Jesse Tortora while at
15 Diamondback?
16 A. Specifically no. I'm sure I did at some point, but I have
17 no recollection of any conversation.
18 Q. On the right-hand side it says "paying broker." Do you see
19 those words?
20 A. Yes.
21 Q. Written there is "ITG Hoenig."
22 A. Yes.
23 Q. What is ITG Hoenig?
24 A. A broker dealer that provides soft dollar aggregation
25 services.

1 Q. And it says description, under the word -- sorry. Next to
2 the word "description" on the left-hand side, "Services
3 provided from April to June 2008." Do you see that?
4 A. Yes.
5 Q. And again, research services is ticked off there.
6      Mr. Hadlock, if you look further down the page under
7 "approved by," do you recognize that signature?
8 A. I believe it's Cathy Magee's.
9 Q. Again, what was Ms. Magee's role with respect to soft
10 dollar payments?
11 A. Cathy was very close to the soft dollar process.
12 Q. Did Diamondback keep records of the amounts of money that
13 are paid out to the soft dollar research providers?
14 A. Yes.
15 Q. Like the ones we've seen here?
16 A. Yes.
17 Q. Was there any requirement by Diamondback for samples of
18 research to be provided by research providers in the soft
19 dollar context?
20 A. As part of our practice we tried to have samples of
21 research provided when signing on a research provider. It
22 wasn't our policy, it was more of a best practice.
23 Q. And as part of your job in dealing with soft dollar payors,
24 meaning the broker dealers, did you become familiar with some
25 of the requirements of the brokerage firms for soft dollar

1 payments?
2 A. Yes.
3 Q. Were you ever aware that some of those brokerage firms
4 required sample research for a research consultant to be paid
5 by soft dollars?
6 A. I believe they did.
7      MS. APPS: Just one moment, your Honor.
8      No further questions.
9      THE COURT: Okay, Mr. Nathanson. Cross.
10 CROSS-EXAMINATION
11 BY MR. NATHANSON:
12 Q. Good morning, Mr. Hadlock.
13 A. Good morning.
14 Q. We haven't met before, have we?
15 A. No, sir.
16 Q. I want to first ask you about compensation. You were shown
17 a document, a summary of the document representing Mr. Newman's
18 compensation for the years '07, '08 and '09. Do you recall
19 that?
20 A. Yes.
21 Q. Do you have that document in front of you? It's Government
22 Exhibit 95.
23 A. Yes.
24 Q. And am I right that Mr. Newman's compensation for 2007 was
25 about 3.35 million, is that right?

1 A. Yes.
2 Q. For 2008 about 3.37 million -- I'm sorry, 3.33 million or
3 so, is that right?
4 A. Yes.
5 Q. And 3.56 million for '09, correct?
6 A. Yes.
7 Q. So his compensation was roughly similar over those three
8 years, is that correct?
9 A. Yes.
10 Q. Would you describe Mr. Newman as having been, let's just
11 take the period from his start through 2009, was he a
12 successful portfolio manager at Diamondback?
13 A. Yes.
14 Q. And he was successful from the time he started in 2006 for
15 that year and subsequent years, is that correct, through 2009,
16 let's say?
17 A. I can't remember about 2006, but I believe for those other
18 years, yes.
19 Q. So you don't recall one way or the other for 2006 whether
20 or not he was a successful --
21 A. I don't know if he was up or down.
22 Q. But he certainly was for '07 and the two subsequent years,
23 is that correct?
24 A. Yes.
25 Q. Thank you. You mentioned a Ms. Magee during your testimony

1   and referenced that she was head of HR and worked for you,
2   under you in your chief administrative officer role, is that
3   right?
4   A. Yes.
5   Q. She also had a compliance function, is that correct?
6   A. Yes.
7   Q. She was under you as a compliance officer, is that right?
8   A. Yes.
9   Q. You mentioned before a Ms. Sheinberg, correct?
10  A. Yes.
11  Q. She was also a compliance officer working under you?
12  A. Yes.
13  Q. And I think you mentioned that she was a lawyer, at least
14  had legal training as well, is that right?
15  A. I believe she's a lawyer.
16  Q. You talked about soft dollars during your direct testimony
17  and you mentioned certain of the things that soft dollars can
18  be used for. They can be used for things like Bloomberg
19  Financial, isn't that right?
20  A. Yes.
21  Q. And they can be used for individual consultants, is that
22  correct?
23  A. Yes.
24  Q. And Diamondback during the time that you were there, its
25  various professionals hired quite a number of individual

1   consultants as well as other soft dollar vendors, isn't that
2   right?
3   A. Yes.
4   Q. And they hired a number of expert networks as well,
5   correct?
6   A. Yes.
7   Q. Do you recognize the name Primary Global Research?
8   A. Yes.
9   Q. That was one of the soft dollar expert network services
10  that was used, is that right?
11  A. Yes.
12  Q. And there were others too, correct?
13  A. Yes.
14  Q. So if I mention the names Coleman, that's one of them, is
15  that right? Do you recall that name?
16  A. I don't specifically recall that name.
17  Q. How about DeMatteo, is that one?
18  A. I do recall DeMatteo.
19  Q. Vista; do you recall Vista?
20  A. Yes.
21  Q. GLG or Gerson Lehrman Group?
22  A. Yes.
23  Q. I may not be getting all of them, but there were a number
24  of expert service providers, is that right? I've listed a
25  number of them, correct?

1   A. Agreed.
2   Q. And those were used by a number of people within
3   Diamondback, is that correct?
4   A. Yes.
5   Q. Have any idea, Mr. Hadlock, how much on an annual basis
6   Diamondback spends on expert network services?
7         MS. APPS: Objection. 401.
8         THE COURT: Overruled. You can answer.
9   A. I don't.
10  Q. Do you know if it's hundreds of thousands of dollars a
11  year?
12  A. Hundreds of thousand? Again, I don't have any recollection
13  of the amount spent specifically on expert networks.
14  Q. Mr. Hadlock, soft dollars are a standard part of hedge
15  funds as you're aware, correct?
16  A. Correct.
17  Q. In other words, soft dollars are used by all hedge funds
18  to, among other things, pay for research consultants, isn't
19  that right?
20  A. Not all hedge funds. Again, it depends on their requisite
21  practice.
22  Q. But certainly many hedge funds, isn't that right?
23  A. Many, yes.
24  Q. Do you have any idea, Mr. Hadlock, about how much money Mr.
25  Newman's book Mtec spent on soft dollars for the years 2008 and

1   2009?
2   A. No.
3   Q. Do you have any idea if it was millions of dollars each
4   year?
5   A. I have no idea.
6   Q. But he would generate trading commissions, correct, out of
7   his book, right?
8   A. Yes.
9   Q. And then he would be able to spend those trading
10  commissions on soft dollars, isn't that right?
11  A. Again, trading commissions or soft dollar commissions.
12  Q. Soft dollar commissions?
13  A. Soft dollar credits.
14  Q. He generated soft dollar commissions out of his trading,
15  isn't that right?
16  A. Yes.
17  Q. And he would be able to spend those on the soft dollar
18  consultants, right?
19  A. Yes.
20  Q. And that was an example of how portfolio managers worked at
21  Diamondback, right?
22  A. Yes.
23  Q. Now, the process for reviewing soft dollar payment, how is
24  that done at Diamondback? So a soft dollar vendor is bought on
25  and you want to pay him. How is that done?

1   A. Again, it would start with the soft dollar request form, so
2   the portfolio manager, somebody in his group would fill out a
3   soft dollar request form. They would go to the head trader
4   talk about the services provided as well as the cost. The form
5   was then sent down to compliance for review, whether that was
6   an inside or outside of safe harbor expense, for instance.
7          Somebody in compliance, in this case it was mostly
8   Cathy who helped set this whole process up, would do certain,
9   would obtain certain documents from the soft dollar provider
10  like a W9, samples of research if they could get it, things of
11  that nature, keep a database of our service providers.
12  Q. So there was a process that involved compliance among other
13  functions within Diamondback when a payment was made to a soft
14  dollar provider, is that right?
15  A. Yes.
16  Q. And part of that process was the soft dollar request forms
17  that Ms. Apps showed you a couple of them, correct?
18  A. Yes.
19  Q. You mentioned written research and you said that there
20  was --
21  A. I'm sorry, I mentioned what?
22  Q. Written research. Do you recall that?
23  A. Yes.
24  Q. And you said that there was no policy that required written
25  research, isn't that correct?

1   A. Right.
2   Q. In other words, you said there may be a practice but there
3   was no policy, isn't that right?
4   A. Yes.
5   Q. And you're aware that on occasion certain consultants would
6   provide their research or analysis in meetings or in person or
7   in telephone calls, isn't that right?
8   A. Yes.
9   Q. Did there come a time in 2009, late 2009, Mr. Hadlock,
10  where there was conversations between Diamondback and various
11  expert network firms about their practices?
12  A. I recall on-boarding expert network firms.
13  Q. In 2009?
14  A. Yes.
15  Q. You don't recall at the end of 2009 there being a movement
16  to call expert network firms and define with them the
17  appropriate role that they had vis-a-vis the professionals at
18  Diamondback?
19  A. I don't.
20  Q. You were shown, Mr. Hadlock, a 2008 policy with respect to
21  consultants. Do you recall that?
22  A. Yes.
23  Q. And you were shown a document that Mr. Newman and others
24  were on asking them to acknowledge the policy. Do you recall
25  that?

1   A. Yes.
2   Q. That policy was required by, to be acknowledged by all
3   professionals within Diamondback, isn't that right?
4   A. Yes.
5   Q. And that would include Mr. Tortora, isn't that right?
6   A. Yes.
7   Q. By the way, are you aware of whether or not Mr. Newman and
8   Mtec used Primary Global Research? Do you know one way or the
9   other?
10  A. I'm not aware.
11  Q. Is it fair to say you wouldn't be aware of who on his team,
12  if anybody, actually communicated with Primary Global Research,
13  is that right?
14  A. Correct.
15  Q. Did you ever have an occasion to speak to Mr. Newman about
16  his understanding of that consultant policy from May '08 that
17  Ms. Apps showed you?
18  A. No recollection.
19  Q. Same question with respect to Mr. Tortora; ever have any
20  discussion about his understanding of the policy?
21  A. No recall.
22  Q. I want to go to Government Exhibit 2251. This is a
23  compliance policy for 2005, is that right?
24  A. Yes.
25  Q. And so was that the policy that was in place when Mr.

1   Newman started in March of 2006, approximately?
2   A. Yes.
3   Q. I want to take you to page G-2 and in particular, if we can
4   blow up what it is, number 3, that first item that says
5   "contacts with public companies," and if we could just
6   highlight that first sentence. Mr. Hadlock, that sentence
7   reads: "The advisor may make investment decisions on the basis
8   of the firm's conclusions formed through such contacts." I'll
9   just stop there. Do you understand "such contacts" meaning
10  contacts with public companies?
11  A. Yes.
12  Q. "And analysis of publicly available information regarding
13  foreign and U.S. companies." Do you see that?
14  A. Yes.
15  Q. So it was contemplated by Diamondback's policies that its
16  professionals would have contacts with public companies, is
17  that correct?
18  A. Yes.
19  Q. That was part of their job in fact was to have contact with
20  public companies in furtherance of their research efforts,
21  isn't that right?
22  A. Yes.
23  Q. Now, I want to go to Government Exhibit 2253, which I don't
24  believe --
25          MR. NATHANSON: Sorry, is that in evidence?

# A-858

1        MS. APPS: It is.

2    Q. If we could go to 2253 which is in evidence. And again,

3    that's a compliance policy that was in effect in 2008, is that

4    right?

5    A. Yes.

6    Q. And that's a revised policy from the one that we just saw

7    from 2005?

8    A. Yes.

9    Q. And if you could take a look at page F-5, do you have that

10   in front of you?

11   A. I do.

12   Q. And again, if we could just blow up the contacts with the

13   public companies. Thank you. And, Mr. Hadlock, that reads,

14   "Contacts with public companies represent an important part of

15   the advisor's research efforts. The advisor may make

16   investment decisions based upon conclusions reached through

17   discussions with such contacts and analysis of publicly

18   available information." Do you see that?

19   A. Yes.

20   Q. Again, it's a reaffirmation, is it not, that contacts with

21   public companies was a standard part of the research process at

22   Diamondback, isn't that right?

23   A. Yes.

24   Q. And in fact, it was expected of analysts, professionals

25   generally within Diamondback that they would have such contacts

1    in order to further their research efforts when they were

2    analyzing companies, isn't that right?

3    A. Again, I'm not a research analyst and I never worked for a

4    portfolio manager, but my general understanding is yes.

5    Q. I want to go to page F1, if we could, of that policy.

6    2253. And if we could blow up the definition section. And if

7    we could just read, "In the ordinary course of your activities

8    for the advisor you may obtain confidential information. From

9    time to time you may also obtain confidential information that

10   is material to the price of an issuer's securities." Do you

11   see that?

12   A. Yes.

13   Q. Am I right that that recognizes that some information can

14   be confidential but not material and then there's some

15   information that's confidential but is also material, is that

16   right?

17   A. Yes.

18   Q. And if you could go to F2, to the next page of the

19   document, and I believe if you recall Ms. Apps asked you about

20   the section that reads "material" on top and asked you about

21   the paragraphs below that. Do you recall that?

22   A. Yes.

23   Q. I just want to go to the paragraph above that, if we could

24   blow that up. That says, "Information is non-public based on

25   the --" Withdrawn. Mr. Hadlock, this is the compliance

1    policy, this compliance policy's definition of these words, is

2    that right?

3    A. Yes.

4    Q. It says, "Information is non-public unless it has been

5    broadly disseminated or made widely available to the general

6    public such as by means of press release carried over a major

7    news service, a major news publication, a third party research

8    report, a public filing," etc. Do you see that?

9    A. Yes.

10   Q. So that says that one of -- would you agree that one of the

11   definitions of information that's not -- non-public can be that

12   it's published in a third party research report based on this

13   definition, isn't that right?

14   A. Yes.

15   Q. And if we could go to F3, so it's the third page of the

16   policy. By the way, we were talking just a moment ago about

17   third party research report. Do you understand that to mean or

18   include sell side analyst reports, is that what we mean by

19   third party research reports?

20   A. Yes, as long as it's broadly disseminated.

21   Q. And you understand that sell side research reports from the

22   likes of Merrill Lynch or a Lehman, those get broad

23   dissemination, isn't that right?

24   A. Yes.

25   Q. Again, F3, if we could go to that box that's highlighted

1    there. And this says, that first sentence says, "The

2    determination of whether information is material or nonpublic

3    or whether there exists a duty of confidentiality can be very

4    difficult to make." Do you see that?

5    A. Yes.

6    Q. These words are in your compliance policy, isn't that

7    right?

8    A. Yes.

9    Q. Now, if we can go to go back in this policy to F1 and if we

10   can go to the number A down in the bottom there. This is a

11   definition generally of confidential information under this

12   policy, isn't that right?

13   A. Yes.

14   Q. And am I right, without reading all the words here, am I

15   right that generally the confidential information at issue here

16   is at least in part confidential information that belongs to

17   Diamondback, isn't that right?

18   A. Yes.

19   Q. And am I right that under these policies, and you can look

20   at this section -- well, let me just ask the question. Am I

21   right that under policies, this Diamondback policy, that

22   confidential information of Diamondback would include its

23   trading positions, for example?

24   A. Yes.

25   Q. And it would include its P&L, is that right, your profit

# A-859

1  and loss?

2  A.  Yes.

3  Q.  And the profit and loss and P&L information was considered

4  confidential information with respect to Diamondback, isn't

5  that right?

6  A.  Yes.

7  Q.  And Diamondback employees were not permitted under this

8  policy to disseminate that unless it was necessary within their

9  job function, isn't that right?

10  A.  Yes.

11  Q.  So, for example, you couldn't disseminate your trading

12  positions or your, if you were an analyst your portfolio's

13  trading positions to your relative, isn't that right?

14  A.  Correct.

15  Q.  Now, you had mentioned that Diamondback was a registered

16  investment advisor, and if you didn't, forgive me.  It was a

17  registered investment advisor, was it not?

18  A.  Yes.

19  Q.  When did it become registered?

20  A.  The application went in January, so sometime in late

21  January, early February.  Of 2006, I'm sorry.

22  Q.  And as a registered investment advisor, Diamondback was,

23  had to submit to various regulations, isn't that right?

24  A.  Yes.

25  Q.  And was one of the rules that it had to submit to the fact

1  that it had archived communications?

2  A.  Yes.

3  Q.  That includes e-mails and instant messages, is that right?

4  A.  Yes.

5  Q.  So that from the time it was registered up until the time

6  you were employed all the e-mails internally at Diamondback or

7  externally, they were sent externally, those were all archived,

8  isn't that correct?

9  A.  Correct.

10  Q.  By the way, was there any policy on using your personal

11  e-mail account?

12  A.  The policy within the firm was that you could only use firm

13  methods, Diamondback methods of communication for Diamondback

14  business, especially trading and investment.

15  Q.  Now, am I right that you had mentioned that there was

16  certain monitoring that went on within Diamondback I think you

17  said in late 2008, early 2009, it started within that period,

18  is that right?

19  A.  Yes.

20  Q.  And you said that Ms. Sheinberg who you had identified

21  before as a compliance officer and a lawyer, she was the person

22  that you recall who did the monitoring of e-mails during that

23  period, is that right?

24  A.  Yes.

25          (Continued next page)

1  Q.  Do you know if Ms. Magee, who is your compliance officer,

2  assisted or did any monitoring herself?

3  A.  Not that I recall.

4  Q.  Do you know, can the SEC come in as part of its routine

5  exam as a registered investment advisor and look at any

6  communications on Diamondback's system?

7  A.  Yes.

8  Q.  That's one of its exam functions, is that right, periodic

9  exams, where it comes in and looks at the books and records of

10  an investment advisor, is that right?

11  A.  Yes.

12  Q.  That would include e-mails or instant messages on

13  Diamondback's e-mail or IM system, isn't that right?

14  A.  Yes.

15  Q.  I want to show you, if I could, Government Exhibit 100

16  that's in evidence.

17          MR. NATHANSON:  If we could just put it up on the

18  screen.  If we can just go to the bottom e-mail on the

19  left-hand page.  That's fine.  And then on the next page, just

20  that portion that you are just pulling up.  Terrific.

21  Q.  You'll see, Mr. Hadlock, and I understand you don't

22  recognize this document, but you will see that it's got a date

23  of August 3 of 2007, correct?

24  A.  Yes.

25  Q.  And I just want to go to the footer.  And do you recognize

1  the form of this footer, generally?

2  A.  Yes.

3  Q.  And if we could go to the section, the footer, it's the

4  second sentence from the left, from the bottom.  It starts all

5  e-mails?

6  A.  Yes.

7  Q.  This says:  All e-mails sent to or received from this

8  address will be received by Diamondback Capital Management's

9  company e-mail system and is subject to archival and possible

10  review by someone other than the recipient.

11          Do you see that?

12  A.  Yes.

13  Q.  And that was a standard tag that Diamondback had put on

14  e-mails that came in or out of the firm, is that right?

15  A.  Yes.

16  Q.  And one of the things it did is notify the participants to

17  an e-mail communication that e-mails were subject to archive

18  and review, is that right?

19  A.  Yes.

20  Q.  And if we could go to Government Exhibit 243A in evidence.

21  I really just care about the top two.  It's really the tag that

22  I care about, Mr. Hadlock, at the moment.

23          And this tag reads:  All instant messages sent to and

24  from this buddy name will be logged by the IM auditor and are

25  subject to archival, monitoring or review and/or disclosure to

1  someone other than the recipient.
2      Do you see that?
3  A. Yes.
4  Q. Do you recognize that as a standard tag that was put on
5  instant messages at Diamondback when Diamondback employees
6  participated in an IM session?
7  A. Yes.
8  Q. Now, if we could go to -- and I believe this is in your
9  binder as Defense Exhibit 10030.
10     THE COURT: What tab?
11     MR. NATHANSON: I'm sorry. It's tab 7, your Honor.
12 A. 10030.
13 Q. Correct. Do you see that?
14 A. Yes.
15 Q. Do you recognize that as a portion of the compliance manual
16 that Diamondback adopted December 1, 2005 and revised as of
17 April 6, 2009?
18 A. Yes.
19     MR. NATHANSON: The defense offers Defense Exhibit
20 10030.
21     MS. APPS: No objection.
22     THE COURT: Defense Exhibit 10030 is received.
23     (Defendant's Exhibit 10030 received in evidence)
24 Q. Generally, Mr. Padlock, is there a policy that governs
25 personal trading at Diamondback?

1  A. Yes.
2  Q. Does this compliance policy generally speak about personal
3  trading?
4  A. Our code of ethics, yes.
5  Q. And if you could go to page 69. It's obviously not 69 of
6  the document. If you look at the bottom, it says 69 on it.
7      Do you see that?
8  A. Yes.
9      MR. NATHANSON: If you could just blow up from
10 reporting of potential violations through the new accounts
11 paragraph.
12 Q. I just want to go to number 3 first. This says each
13 covered person would include any professionals at Diamondback,
14 isn't that right?
15 A. There is a definition of covered persons on page 1.
16 Q. Do you recall that it includes, for example, analysts at
17 Diamondback?
18 A. Yes.
19 Q. It says: Each covered person must notify the compliance
20 department promptly if the covered person opens any new
21 accounts.
22     Do you see that?
23 A. Yes.
24 Q. So if you open an account while you're an employee at
25 Diamondback you are supposed to notify the compliance

1  department of that fact, is that correct?
2  A. Yes.
3  Q. And this policy, by the way, is dated April 2009.
4      Did you recall that that policy of reporting new
5  accounts was in effect prior to April of 2009?
6  A. I believe it was.
7  Q. If you have any doubt I'm happy to show you a prior policy.
8  Do you believe that it was in effect prior to that?
9  A. Yes.
10 Q. And if you look at the top, number 1 here, it says: All
11 covered persons must arrange for a duplicate report of their
12 securities transactions to be provided to the compliance
13 department no later than 30 days after the end of each calendar
14 quarter.
15     Do you see that?
16 A. Yes.
17 Q. And that generally provided that if you had an account that
18 you would have to report your securities transactions on a
19 regular basis to Diamondback compliance, isn't that right?
20 A. Yes.
21 Q. And then if we could go to page 68, the prior page. If we
22 could go to the -- you see that there is a section that reads
23 restriction on personal investing activities?
24 A. Yes.
25 Q. And under that there are a series of subportions describing

1  the restrictions, is that right?
2  A. Yes.
3  Q. If you could go to what is number 6, closed-end ETFs?
4  A. Yes.
5  Q. And it says: A covered person may buy or sell closed-end
6  ETFs. Did you understand that closed-end ETFs are
7  exchange-traded funds that are traded on an exchange like the
8  NASDAQ, for example, is that right?
9  A. Correct.
10 Q. And it says: A covered person may buy or sell, correct?
11 A. Yes.
12 Q. But it's got a however, purchases or sales will require
13 compliance department preclearance as follows.
14     Do you see that?
15 A. Yes.
16 Q. And it has a couple of bullets that are sector-based ETFs
17 falling within a covered person's sector.
18     Do you see that?
19 A. Yes.
20 Q. Does that mean, for example, if you trade in a technology
21 fund that technology sector ETFs would have to have
22 preclearance, is that right?
23 A. Yes.
24 Q. And then under that it says: Broad-based ETFs that are
25 traded within any Diamondback portfolio that a covered person

1  is assigned to.
         Do you see that?
3  A. Yes.
4  Q. Now, broad-based ETFs are ones that are not sector specific
5  but I have a bundle or represent a bundle of stocks that
6  perhaps over multiple sectors or that represents the NASDAQ
7  generally, for example.
         Do you understand that?
9  A. Yes.
10 Q. And what this says is that if you have a broad-based ETF,
11 one of the ones that we just described that is traded within
12 the portfolio that you are assigned to that you have to get
13 preclearance, is that right?
14 A. Yes.
15 Q. So if you're an analyst and your portfolio manager trades
16 in a broad-based ETF as we have described, then you have to get
17 preclearance before you trade in that yourself in your own
18 personal account, is that right?
19 A. Correct.
20 Q. Do you know one way or the other whether Jesse Tortora ever
21 reported any ETF trades or got any preclearance for any ETF
22 trades to compliance? Were you ever asked for that, to your
23 knowledge, one way or the other?
24 A. I have no knowledge.
25 Q. Do you know one way or the other whether he ever provided

1  account statements to compliance?
2  A. Not directly, but I would know if he didn't.
3  Q. You would know if he didn't?
4  A. Yes.
5  Q. I'd like you to look at Defense Exhibit 8663, which I
6  believe in your binder is tab 9.
7         Now you'll see, Mr. Hadlock, that Defense Exhibit 8663
8  is a multiple-page document.
9         Do you see that?
10 A. Yes.
11 Q. Now, tell me, you recognize the first page of this
12 document?
13 A. I recognize it as a soft dollar request form.
14 Q. Do you recognize the other pages in this particular
15 document?
16 A. Specifically, no. I know what a W9 is.
17 Q. How about the last page?
18 A. I don't recall seeing it, but it looks like some sort of
19 soft dollar request.
20      MR. NATHANSON: The defense offers 8663, your Honor.
21      MS. APPS: No objection.
22      THE COURT: Defense 8663 is received.
23      (Defendant's Exhibit 8663 received in evidence)
24      MR. NATHANSON: If you can publish that. If you can
25 just highlight the document.

1  Q. Start with the top portion. This is a soft dollar request
2  form similar in type to the couple that Ms. Apps showed you, is
3  that right?
4  A. Yes.
5  Q. And this says it's for a vendor named Ruchi Goyal.
6         You see that?
7  A. Yes.
8  Q. Do you know whether Ruchi Goyal is a man or a woman, by the
9  way?
10 A. No.
11 Q. No idea, right?
12 A. No idea.
13 Q. You can't tell by this name whether Ruchi Goyal is a man or
14 a woman, is that right?
15 A. No, I can't.
16 Q. The date on this is January 23, '08, is that right?
17 A. Yes.
18 Q. You see the requester, it says Todd Newman/Jesse Tortora,
19 is that right?
20 A. Yes.
21 Q. You'll see the total is 18,750 quarterly.
22         You see that?
23 A. Yes.
24 Q. Do you know one way or the other who brought Ruchi Goyal on
25 as a consultant at Diamondback other than what you are seeing

1  here?
2  A. No.
3         MR. NATHANSON: If you could just, Mr. McLeod, blow up
4  the bottom portion of that. Thank you.
5  Q. And that's your signature, Mr. Hadlock?
6  A. Yes.
7  Q. So you're approving this soft dollar request form with
8  respect to this particular soft dollar vendor Ruchi Goyal, is
9  that right?
10 A. Yes.
11 Q. You'll see that there is a name Anthony Bechalany?
12 A. Bechalany.
13 Q. And he is the head trader at Diamondback, is that right?
14 A. Yes.
15 Q. And in addition to a compliance officer, Mr. Bechalany is
16 the head trader on signing off on all soft dollar request
17 forms, is that right?
18 A. Yes.
19 Q. You'll see on the top portion that's blown up, it says,
20 description, please see invoice attached.
21         You see it says that?
22 A. Yes, I see that.
23 Q. And then if you go to the second page of this document,
24 this has an invoice that says Ruchi Goyal and then it's got the
25 amount, 18,750.

1        You see that?
2  A.  Yes.
3  Q.  Then it's got service provided and it says:  Research
4    consulting services to Diamondback Capital Management,
5    including market research, industry and company analysis, and
6    network with industry contacts for the semiconductors and IT
7    hardware industries.
8        You see that?
9  A.  Yes.
10  Q.  Is that a fairly standard description of what an individual
11    consultant, what kind of service they might provide to
12    Diamondback?
13  A.  Yes.
14  Q.  And then you'll see the period October 9, 2007 to December
15    31, 2007 and then the invoice is dated January 2, 2008.
16        You see that?
17  A.  Yes.
18  Q.  Am I right that nothing about this invoice and the soft
19    dollar request form that you signed, nothing stands out to you
20    as unusual or suspicious in any way, based on the face of these
21    documents, isn't that right?
22  A.  Correct.
23        MR. NATHANSON:  Then if we could quickly go to the
24    fourth page of the document, and if we could just blow that up
25    so the jury can see it.

1  Q.  You'll see this is attached and it's a soft dollar request
2    and this is from the prior year, December 6, '07.
3        You see that?
4  A.  Yes.
5  Q.  Now, this says Mark Hadlock, CCO, highlighted.
6        That's not your signature, is it?
7  A.  No.
8  Q.  Do you recognize that as Cathy Magee's signature?
9  A.  Yes.
10  Q.  And from time to time she would sign in your stead these
11    soft dollar request forms, is that right?
12  A.  Yes.
13  Q.  And that's because she was essentially your designee in the
14    compliance function, right?
15  A.  Yes.
16  Q.  And it's also signed by Mr. Bechalany, right?
17  A.  Yes.
18  Q.  And by, in this case, Todd Newman as the portfolio manager,
19    right?
20  A.  Yes.
21  Q.  And is my understanding correct that even if an analyst
22    brings on a soft dollar consultant, the portfolio manager is
23    the individual who has to approve it from within the team that
24    the analyst is on, isn't that right?
25  A.  Yes.

1  Q.  So even if Jesse Tortora brings on a consultant or has the
2    relationship with a consultant, as the portfolio manager
3    Mr. Newman would have to sign these forms, isn't that right?
4  A.  Yes.
5  Q.  And this, you'll see, has a purpose and it says:  Quarterly
6    allocation for research services.  And you'll see it's a
7    similar description from the one we saw previously, is that
8    right?
9  A.  Yes.
10  Q.  Now, if we can go to Government Exhibit 2269 in evidence.
11    I believe Ms. Apps showed you this document.
12        Do you recall that?
13  A.  Yes.
14  Q.  And, again, this is another soft dollar request form.  It's
15    for a little later in 2008.  This one, July 17.  It's got the
16    cost.  It says:  Requester in this case, Mr. Tortora.  Vendor.
17    And it was approved by, it looks like Ms. Magee -- is that
18    right?
19  A.  Yes.
20  Q.  -- in your stead and Mr. Bechalany, and I believe there is
21    a signature.  If we could just scroll a little down on the
22    bottom portion, you'll see that there is a scrawl there.  I
23    don't know if you recognize this as Mr. Newman's signature or
24    not.  But there is a purported signature of the portfolio
25    manager below, Mr. Bechalany, right?

1  A.  Yes.
2        MR. NATHANSON:  If we can go to the second page of
3    that document and blow that up, if you will.
4  Q.  That, again, that's a similar invoice to the one that we
5    had seen with respect to the prior soft dollar request form,
6    same description, very similar.
7        Wouldn't you agree?
8  A.  Yes.
9  Q.  Nothing again suspect on the face of these documents with
10    respect to this invoice or the soft dollar request form
11    generally, isn't that right?
12  A.  Yes.
13  Q.  If we could go now to Government Exhibit 2270.  And this
14    was another form that Ms. Apps showed you, soft dollar request
15    form, this one from December 23 of 2008.
16        You see that?
17  A.  Yes.
18  Q.  It's got a total cost of $145,000.
19        You see that?
20  A.  Yes.
21  Q.  Again, this happens to be your signature, isn't that right?
22  A.  Yes.
23  Q.  And the date we just saw of December 23, '08, correct?
24  A.  Yes.
25  Q.  Let's go to the second page of that document which Ms. Apps

# A-863

1 also showed you.

2      And you'll recognize the date here is December 19,

3 2008. That's four days prior to the form itself, correct? In

4 other words, the form itself was December 23, I think we just

5 established?

6 A. Yes.

7 Q. And this is four days prior, on December 19, isn't that

8 right?

9 A. Yes.

10 Q. And it's from Mr. Newman to Ms. Magee and Lauren Conant.

11      Do you see that?

12 A. Yes.

13 Q. Ms. Magee, we have talked about, was one of your

14 subordinates who both had an HR and compliance function. And

15 Ms. Conant, who was she?

16 A. She worked for Cathy.

17 Q. She was an assistant to Cathy, essentially?

18 A. Yes.

19 Q. And did she have an administrative function with respect to

20 the soft dollar request forms?

21 A. I believe so, yes.

22 Q. And this says: Subject for Mr. Newman, he appears to have

23 written subject. Consultant bonuses for 2008.

24      You see that?

25 A. Yes.

1 Q. It says: Below is a list of bonus Mtec wants to pay out.

2      Do you see that?

3 A. Yes.

4 Q. Again, this is written from Mr. Newman to Ms. Magee, who is

5 a member of compliance, and Ms. Conant, who is the assistant.

6 Then it's got bonus for 2008 and it's got one, two, three

7 entries. And you'll agree, will you not, that they add up to

8 $145,000?

9 A. Yes.

10 Q. And that's the total that's on the prior page, 145,000, on

11 the soft dollar request form that you signed, is that right?

12 A. Yes.

13 Q. And, again, if you go to the last page of that document,

14 that's the last page -- the one that says Ruchi Goyal on it.

15      Do you see that page?

16 A. Yes.

17 Q. And, again, this is an invoice, it's got 100,000 on it,

18 similar descriptions to the one we have seen before. It's got

19 a period, which is October 9, 2007 through September 30, 2008,

20 and then it's got a date from January 8, 2009. So this looks

21 like a later date. But the invoice description is the same

22 description that we had seen before in those prior invoices,

23 isn't that right?

24 A. Yes.

25 Q. You would agree, would you not, that on those last

1 documents Mr. Newman was describing the components of that

2 $145,000 as a bonus on that e-mail? I understand that you

3 don't recognize it, but it's got bonus and it has three

4 different components and they add up to $145,000, correct?

5 A. Yes.

6      MR. NATHANSON: No further questions.

7      MS. APPS: Just a little bit on redirect.

8      THE COURT: Any cross?

9      MR. MORVILLO: What, am I chopped liver?

10      Now that I made a big stink about it, no further

11 questions.

12      THE COURT: Redirect.

13      MS. APPS: May I proceed.

14 REDIRECT EXAMINATION

15 BY MS. APPS:

16 Q. Mr. Hadlock, if you could turn back to Government Exhibit

17 2251 which you were asked about. You were specifically

18 directed to page 3 of the document which at the bottom has G-2.

19 It's 2251. And you were asked about the paragraph that is

20 headed contacts with public companies. You were asked about

21 the first sentence. The advisor may make investment decisions

22 on the basis of the firm's conclusions formed through contacts

23 and analysis of publicly-available information regarding

24 foreign and U.S. companies.

25      Now, I want to ask you about the rest of the

1 paragraph. It continues with difficult legal issues arise,

2 however, when, in the course of these contacts, an employee of

3 the advisor, Diamondback, becomes aware of material, nonpublic

4 information about those companies.

5      Do you see that?

6 A. Yes.

7 Q. And then it continues: This could happen, for example, if

8 a company's chief financial officer prematurely discloses

9 quarterly results to an analyst or an investor relations

10 representative makes a selective disclosure of adverse news to

11 a handful of investors.

12      Do you see that?

13 A. Yes.

14 Q. Then it continues: In such situations, you should contact

15 the compliance officer immediately if you believe that you may

16 have received material, nonpublic information about a company.

17      In 2008, just to be clear, in 2008 and 2009, up until

18 late 2009, you were the chief compliance officer, is that fair

19 to say?

20 A. Yes.

21 Q. Do you ever remember Mr. Newman asking you any questions

22 about information he received?

23 A. I don't recall.

24 Q. You don't recall that he ever did?

25 A. I don't recall speaking to Todd about any nonpublic

1   information.
2   Q. And Mr. Nathanson also asked you about what's in evidence
3   as Government Exhibit 2253.  And in particular he asked you --
4   actually, along similar lines there is a page in 2253 with F3
5   on the bottom.  It's actually the fourth page of the document.
6          Do you see that?
7   A. Yes.
8   Q. He asked you again about what's in the box.  And he asked
9   you about the first sentence, the determination of whether
10  information is material or nonpublic or whether there exists a
11  duty of confidentiality may be difficult to make.  Therefore,
12  you should consult legal compliance if you have any questions
13  about information in your possession.
14         Do you see that?
15  A. Yes.
16  Q. Again, do you recall if Mr. Newman ever came to you and
17  asked you about information he received that could be material
18  or nonpublic information?
19  A. I don't recall.
20  Q. Mr. Nathanson asked you about some other portions of this
21  manual.  I just want to quickly go there.  If you can look at
22  what's marked at the bottom as page F-5, which is the sixth
23  page of the document.  He asked you about the portion a little
24  after halfway down where it talks about contacts with public
25  companies.

1          Do you see that?
2   A. Yes.
3   Q. And he asked you about the first paragraph there where it
4   says:  Contacts with public companies represent an important
5   part of the advisor's research efforts.  The advisor may make
6   investment decisions based upon conclusions reached through
7   discussions with such contacts and analysis of
8   publicly-available information.
9          I want to ask you a little bit further down on the
10  same page.  It says:  When speaking to officers, directors,
11  employees or agents of a public company -- and I skipped over a
12  couple of words -- you must ensure that such person understands
13  that you are not seeking any material nonpublic information.
14         Do you see that?
15  A. Yes.
16  Q. And in the next sentence then it references different
17  policies and procedures for communicating with consultants.
18         Do you see that?
19  A. I'm sorry.  Could you repeat that?
20  Q. In the same paragraph, which is highlighted, it continues:
21  When interacting with a third-party research consultants by the
22  advisor, you must comply with Diamondback's consultant policy
23  and procedures, and there is a reference to policy and
24  procedures for communicating with consultants.
25         Do you see that?

1   A. Yes.
2   Q. In other words, if you are speaking to public company
3   employees, what is the rule about -- withdrawn.
4          It refers to this policy and procedures on
5   communicating with consultants.
6          Do you see that?
7   A. Yes.
8   Q. And did we look at that earlier today?  Do you recall?
9   A. Yes.
10  Q. Have a look at 2271.
11         That was the e-mail blast with the attachment of the
12  policy.  Do you see that?
13  A. Yes.
14  Q. If you look at appendix, policy attached to that e-mail,
15  the heading there, policy and procedures for communicating with
16  consultants.
17         Do you see that?
18  A. Yes.
19  Q. And the first paragraph makes it clear -- look at the first
20  paragraph of this policy, Mr. Hadlock.  Do you see there it
21  says:  In communicating with the consultants.  Advisor should
22  conduct its activities in a manner designed to avoid the
23  receipt and misuse of material nonpublic information and to
24  comply with appendix G, policy and procedures to prevent
25  insider trading.

1          Do you see that?
2   A. Yes.
3   Q. Again, with respect to talking to public company employees,
4   if you could turn the page and look at Section C.  And did this
5   portion of the policy permit contact with consultants who were
6   employed by public companies?
7          MR. NATHANSON: Objection, your Honor.  Asked and
8   answered.
9          THE COURT: Overruled.  I'll allow it.
10  A. Could you repeat the question, please?
11  Q. What did this portion of the policy permit or not permit
12  when a research analyst at Diamondback is talking to a public
13  company employee?
14  A. If a research analyst intends to pay someone for research,
15  that person could not be working at the public company that
16  they were talking about.  And if they were previously employed
17  by that company, there had to be a six-month garden leave.
18  Q. Did Diamondback policies permit a research analyst at
19  Diamondback to talk to a public company insider about that
20  company?
21  A. It depends what you mean by insider.  Were they allowed to
22  pay somebody for that information?  No.  Could they talk to
23  somebody at a public company?  Yes.
24  Q. This policy in particular, when it talks about hiring
25  consultants and paying public company employees, were the

# A-865

1   expert networking firms paid by Diamondback?

2  A.  Yes.

3  Q.  When Diamondback is paying for research services, is it

4   fair to say that if an analyst is talking to a public company

5   employee, were they permitted or not permitted to give

6   information about that company?

7  A.  Not permitted.

8  Q.  Mr. Nathanson asked you a few questions about soft dollar

9   payers.

10      Who did the discretion over how to use soft dollar

11   money for research services within Diamondback?

12  A.  The portfolio managers put the request in.

13      MS. APPS: One moment, your Honor.

14      Nothing further.

15  RECROSS EXAMINATION

16  BY MR. NATHANSON:

17  Q.  Mr. Hadlock, you said just a moment ago that the policy on

18   paid consultants was that they weren't allowed to pay the

19   public company -- you weren't allowed to pay consultants with

20   respect to talking about the public company they were talking

21   about, is that right? In other words, if you're at company X,

22   the policy, as you understood it, said that you couldn't pay

23   them to pay the consultant to talk about their own company, is

24   that right?

25  A.  Correct.

1  Q.  You could pay them to talk about a competitor supplier, et

2   cetera, not just their own company, correct?

3  A.  Correct.

4  Q.  Now, you were also asked about whether you recalled

5   instances in which Mr. Newman came to you and asked you about

6   whether or not a piece of information might be a problem or not

7   a problem or material or immaterial.

8      Do you recall that you were asked about that?

9  A.  Yes.

10  Q.  And isn't it fair to say you don't recall one way or the

11   other whether he came to you?

12  A.  When I say I don't recall, it means he might have, he might

13   not have. I don't remember.

14  Q.  A lot of people in Diamondback, you've mentioned 125, 175

15   employees. So fair to say you wouldn't remember every

16   conversation you had with a professional about the subject,

17   isn't that right?

18  A.  Correct.

19  Q.  Now, Diamondback had a restricted list, isn't that right?

20  A.  Yes.

21  Q.  And just so the jury --

22      MS. APPS: Objection. Beyond the scope.

23      MR. NATHANSON: Disagree, your Honor. This is about

24   coming into compliance with respect to information --

25      THE COURT: I'll allow a question or two.

1  Q.  Diamondback had a restricted list, isn't that right?

2  A.  Yes.

3  Q.  And from time to time professionals came to compliance and

4   said that they wanted to put things on the restrictive list,

5   isn't that right?

6  A.  Yes.

7  Q.  Do you recall that Mr. Newman in fact came to compliance

8   from time to time?

9  A.  I don't recall.

10  Q.  You don't recall one way or the other?

11  A.  I don't recall one way or another.

12  Q.  I want to show you what's marked Defense Exhibit 9055 and

13   it's tab 4 in your binder.

14      Do you recognize that type of document, Mr. Hadlock?

15  A.  Yes.

16  Q.  And that's a restricted list, isn't it?

17  A.  Yes.

18  Q.  And this one happens to be from May 13, 2009.

19      Do you see that?

20  A.  Yes.

21  Q.  And it goes out to all Diamondback employees, right?

22  A.  Yes.

23  Q.  It would go out to you among everybody else, right?

24  A.  Yes.

25      MR. NATHANSON: Defense offers 9055.

1      MS. APPS: Objection, your Honor.

2      THE COURT: Sustained. We don't need this. He has

3   already testified that there was a restricted list.

4  Q.  Mr. Hadlock, do you recall that Mr. Newman came to

5   compliance and asked them to put Wind River on the restricted

6   list?

7  A.  I don't recall.

8      MS. APPS: Objection.

9      THE COURT: Sustained.

10      MR. NATHANSON: Nothing further, your Honor.

11      THE COURT: Anything else?

12      MS. APPS: No, your Honor.

13      THE COURT: You can step down, Mr. Hadlock. Good luck

14   to your team on Saturday.

15      THE WITNESS: Thanks.

16      (Witness excused)

17      THE COURT: Government, your next witness?

18      MR. TARLOWE: The government calls Sandy Goyal.

19      THE COURT: I though we would go to 12:30 today,

20   ladies and gentlemen.

21      Does anybody need a bathroom break?

22      Let's have a quick bathroom break and in five minutes

23   we will come back and start this witness.

24      (Jury not present)

25      THE COURT: With respect to limiting instruction on

1 the compliance manual, is that acceptable to everybody?

2      MR. NATHANSON: Yes, your Honor.

3      MS. APPS: Yes.

4      THE COURT: Then with respect to the instructions

5 concerning the news articles that Mr. Morvillo had raised, is

6 that sufficient?

7      MR. MORVILLO: Yes, your Honor. I assume we have not

8 heard from anybody.

9      THE COURT: If we hear anything, I'll let you know.

10      Anything else we should take up before I have a

11 bathroom break?

12      See you in about five.

13      (Recess)

14      THE COURT: Let's bring in the jury.

15      (Jury present)

16      THE COURT: We will start with the government's next

17 witness which I guess will be by Mr. Tarlowe.

18      Who is the next witness, Mr. Tarlowe?

19      MR. TARLOWE: The government calls Mr. Sandy Goyal.

20      SANDEEP GOYAL,

21      called as a witness by the Government,

22      having been duly sworn, testified as follows:

23      THE COURT: Mr. Goyal, let me ask you to keep your

24 voice up, maybe move a little closer to the microphone. You

25 are somewhat soft spoken. This is a very big room. Keep your

1 voice up.

2      Mr. Tarlowe, you may proceed.

3      MR. TARLOWE: Thank you, your Honor.

4 DIRECT EXAMINATION

5 BY MR. TARLOWE:

6 Q. Mr. Goyal, what name do you go by?

7 A. Sandy.

8 Q. How old are you?

9 A. 40 years.

10 Q. Where do you live?

11 A. New Jersey.

12 Q. Are you married?

13 A. Yes, I am.

14 Q. Do you have any children?

15 A. Yes, I do.

16 Q. Where were you born?

17 A. I was born in India.

18 Q. How far did you go in school in India?

19 A. I did my bachelor's degree there.

20 Q. What did you get a degree in?

21 A. Engineering.

22 Q. When did you leave India?

23 A. It was in 1995.

24 Q. Where did you move to?

25 A. Canada.

1 Q. Did you attend school in Canada?

2 A. Yes, I did.

3 Q. Did you receive any degrees?

4 A. Yes, I did.

5 Q. What degree or degrees did you receive while you were in

6 Canada?

7 A. I got master's in engineering.

8 Q. When approximately was that?

9 A. '97.

10 Q. After receiving that degree did you go to work in Canada?

11 A. Yes, I did.

12 Q. What did you do?

13 A. I worked as a software developer.

14 Q. When did you move to the United States?

15 A. 2001.

16 Q. Why did you come to the United States at that time?

17 A. To study.

18 Q. Where did you study?

19 A. University of Texas at Austin.

20 Q. Did you graduate from the University of Texas at Austin?

21 A. Yes, I did.

22 Q. When?

23 A. 2003.

24 Q. What degree or degrees did you receive from the University

25 of Texas at Austin?

1 A. Master's in business administration.

2 Q. After receiving your master's in business administration or

3 MBA, where did you go to work?

4 A. Dell.

5 Q. What is Dell?

6 A. Dell is a manufacturer of personal computers.

7 Q. What types of customers does Dell sell its products to?

8 A. It sells it to all kind of customers, ranging from

9 individual consumers to large companies.

10 Q. Where does Dell sell its products?

11 A. It sells its products worldwide.

12 Q. Where are the company's headquarters located?

13 A. Austin, Texas.

14 Q. When you worked at Dell, which office did you work in?

15 A. Austin.

16 Q. How long did you work at Dell?

17 A. Three years.

18 Q. From when to when?

19 A. May 2003 to May 2006.

20 Q. During the time you worked at Dell from 2003 to 2006, did

21 you have any role in preparing the company's quarterly earnings

22 results?

23 A. No.

24 Q. How did you learn of the company's quarterly financial

25 results during the time you worked at Dell?

1  A. Through its public announcement.

2  Q. During the time you worked at Dell, did you work in one

3     department or more than one department?

4  A. More than one.

5  Q. Where did you work when you first started at Dell?

6  A. Corporate planning.

7  Q. Generally, what did you do during the time you were in

8     corporate planning?

9  A. I looked at market share of Dell and its competitors and

10    projected it going forward.

11 Q. What other department or departments did you work in at

12    Dell?

13 A. U.S. consumer.

14 Q. What does that department do?

15 A. That is mostly responsible for selling products online to

16    U.S. customers, individual customers.

17 Q. Generally, what did you do for the U.S. consumer

18    department?

19 A. I was involved in pricing strategy for overall the

20    computer, as well as its parts, like memory or hard drive, with

21    the goal to maximize profitability.

22 Q. When you left Dell in 2006, where did you go to work?

23 A. Prudential Equity Group.

24 Q. Where was that job located?

25 A. San Francisco.

1  Q. What was your title or position at Prudential?

2  A. Associate analyst.

3  Q. Who did you work for at Prudential?

4  A. Jesse Tortora.

5  Q. What was his position or title?

6  A. He was senior analyst.

7  Q. What were Mr. Tortora's general responsibilities as the

8     senior analyst at Prudential?

9  A. He would provide research report and stock recommendations

10    to the clients.

11 Q. What types of clients did Prudential have?

12 A. This would be asset management firms and hedge funds.

13 Q. What do you mean by asset management firms?

14 A. Investment management firms which manage money for their

15    clients.

16 Q. What were your responsibilities as an associate analyst

17    working under Mr. Tortora?

18 A. I drafted the reports, I prepared the financial models, and

19    I did other back-up work.

20 Q. What kind of companies did you and Mr. Tortora cover during

21    the time you were at Prudential?

22 A. IT hardware companies.

23 Q. What does that mean?

24 A. Companies involved in making hardware, like PCs and servers

25    and includes companies like Dell, HP, Apple, Lexmark, Sun, and

1     so on.

2  Q. Do you recall who some of the people were who interviewed

3     you for the job at Prudential?

4  A. Yes.

5  Q. Who interviewed you?

6  A. It was Jesse Tortora, Sam Adondakis, and Mark Lipacis.

7  Q. What was Mr. Lipacis' job at Prudential?

8  A. He was senior semiconductor analyst.

9  Q. He was an analyst for a different sector, different types

10    of companies?

11 A. Yes.

12 Q. What was Mr. Adondakis' job at Prudential?

13 A. He was associate analyst for semiconductors.

14 Q. So he worked under Mr. Lipacis?

15 A. Yes.

16 Q. During your interview with Mr. Tortora, do you recall

17    whether Dell came up?

18 A. Yes.

19 Q. What, if anything, do you recall Mr. Tortora asking you

20    about Dell during your interview at Prudential?

21 A. He asked if I have friends at Dell who would keep talking

22    to me after I leave Dell.

23 Q. What did you say?

24 A. I said yes.

25 Q. Was that the only thing that you and Mr. Tortora discussed

1     about Dell during the interview process or did you discuss

2     other things as well?

3  A. There may have been general questions about how the company

4     does in relation to the overall IT hardware sector and others.

5  Q. When did you leave Prudential?

6  A. Summer of 2007.

7  Q. Why did you leave Prudential?

8  A. The parent company Prudential shut down its equity group.

9  Q. That was the group that you and Mr. Tortora worked in?

10 A. Yes.

11 Q. Did Prudential shut down all of the research equity

12    operations or just that particular group?

13 A. The whole equity research operations.

14 Q. After you left Prudential in 2007, where did you go to

15    work?

16 A. Neuberger Berman.

17 Q. Where was that job located?

18 A. New York City.

19 Q. What is Neuberger Berman?

20 A. It's an investment management firm.

21 Q. Which means what?

22 A. It manages money for its clients.

23 Q. What types of investors does Neuberger Berman manage money

24    for?

25 A. The clients range from individual clients to entities like

# A-868

1  public pension funds and others.
2  Q. And approximately, if you know, approximately how much
3    money does Neuberger Berman manage for its investors?
4  A. It's around $100 billion in equities.
5  Q. By equities, what do you mean?
6  A. Stocks.
7  Q. What was your position or title at Neuberger Berman?
8  A. I was associate analyst.
9  Q. Who did you work for?
10 A. Fayad Abbasi.
11 Q. What was Mr. Abassi's position?
12 A. He was senior analyst.
13 Q. Did you know Mr. Abassi before that?
14 A. Yes.
15 Q. How did you know him?
16 A. He was Prudential's client and had once come to San
17    Francisco and had worked there.
18 Q. What were your responsibilities as an associate analyst at
19    Neuberger Berman?
20 A. It goes to draft research reports, preparing financial
21    models, talk to outside analysts, and talk to other third-party
22    providers.
23 Q. Who was the research intended for?
24 A. Neuberger Berman portfolio managers.
25 Q. What kind of companies did you and Mr. Abassi provide

1  research for?
2  A. Initially, I was involved in the IT hardware companies,
3    like Dell, HP, Apple.
4  Q. Did you later become responsible for other types of
5    companies as well?
6  A. Yes, I did.
7  Q. What types of companies were those?
8  A. Semiconductor companies.
9  Q. Did you continue to cover the IT hardware companies as
10    well?
11 A. Yes, I did.
12 Q. How, if at all, did the research reports that you prepared
13    at Neuberger Berman differ from the research reports that you
14    and Mr. Tortora had done at Prudential?
15 A. The audience was different.  At Prudential the research was
16    meant for external clients and there were a lot of them.  At
17    Neuberger they were meant for internal Neuberger Berman
18    portfolio managers.
19 Q. What was the role of those portfolio managers within
20    Neuberger Berman?
21 A. They buy and sell stocks.
22 Q. Do you still work for Neuberger Berman today?
23 A. No.
24 Q. When did you stop working there?
25 A. January 2012.

1  Q. Why?
2  A. I resigned.
3  Q. What happened before you resigned that ultimately led you
4    to resign?
5  A. I pleaded guilty to a couple of charges and was cooperating
6    with the government.
7  Q. What charges did you plead guilty to?
8  A. Two charges.  One for securities fraud and one for
9    conspiracy to commit securities fraud.
10 Q. When did you plead guilty to those crimes?
11 A. It was some time in October or November 2011.
12 Q. What did you do to commit those crimes?
13 A. I got Dell's confidential information from Rob Ray and gave
14    it to Jesse Tortora.
15 Q. Prior to pleading guilty to those crimes, did you speak to
16    agents of the FBI?
17 A. Yes.
18 Q. When was the first time you spoke to the FBI?
19 A. July 2011.
20 Q. How did that come about?
21 A. They approached me.
22 Q. Where?
23 A. In New Jersey.
24 Q. Did you tell them at that time about Rob Ray?
25 A. No.

1  Q. Did you tell them at that time that you had made educated
2    guesses about Dell?
3  A. Yes.
4  Q. When you said that, were you referring to information you
5    received from Rob Ray?
6  A. No.
7  Q. Did you meet with the FBI again after that first day?
8  A. Yes.
9  Q. Approximately how soon or how much after that initial
10    approach?
11 A. About a week later.
12 Q. Did you tell them at that time about Rob Ray?
13 A. Yes.
14 Q. Who mentioned Rob Ray first?  You or the government?
15 A. I did.
16 Q. What is the maximum sentence that you face on the charges
17    you pled guilty to?
18 A. 25 years.
19 Q. Did you plead guilty to those charges pursuant to an
20    agreement between you and the United States Attorney's Office?
21 A. Yes.
22 Q. I'm handing you what's been marked for identification as
23    3507-2.  You could take a look at that, Mr. Goyal.  Do you
24    recognize that document?
25 A. Yes.

1 Q. What is it?
2 A. It's the cooperation agreement.
3 Q. Cooperation agreement between you and the United States
4 Attorney's Office?
5 A. U.S. -- yes.
6 Q. If you could turn to the last page. Do you recognize your
7 signature on that page?
8 A. Yes.
9 Q. Now, in that cooperation agreement did you agree to
10 cooperate with the government?
11 A. Yes, I did.
12 Q. Are you testifying today pursuant to that agreement?
13 A. Yes.
14 Q. Have you been sentenced yet?
15 A. No.
16 Q. Who will decide your sentence?
17 A. The judge.
18 Q. What's your understanding of what your obligations are
19 under that agreement?
20 A. To tell everything truthfully, to not commit any crime and
21 to testify if and when the government wants.
22 Q. What's your understanding as to what the United States
23 Attorney's Office will do if you satisfy your obligations under
24 that agreement?
25 A. It will write a 5K1 letter to the judge.

1 Q. What's your understanding of what will be included in that
2 letter?
3 A. It will describe the crimes I committed and the cooperation
4 I have provided to the government.
5 Q. Has anyone made any promises to you about what your
6 sentence will be?
7 A. No.
8 Q. What is your understanding as to whether the government
9 will recommend a particular sentence to the judge?
10 A. My understanding is that the government won't recommend any
11 sentence.
12 Q. Will the outcome of this case have any effect on whether or
13 not the United States Attorney's Office writes that letter to
14 the judge?
15 A. My understanding is that it won't have any effect.
16 Q. What's your understanding as to whether the outcome of this
17 case affects your sentence at all?
18 A. It won't affect.
19 Q. Are you a United States citizen?
20 A. No.
21 Q. When you moved to the United States, were you authorized to
22 do so?
23 A. Yes.
24 Q. What kind of authorization did you have?
25 A. Student. Student visa.

1 Q. While you worked at Neuberger Berman did you have a visa?
2 A. Yes.
3 Q. What kind?
4 A. Employment visa.
5 Q. At the time you pled guilty, did you tell Neuberger Berman
6 about your guilty plea?
7 A. No.
8 Q. Why not?
9 A. Because I was cooperating with the government and that was
10 supposed to be secret, it was all under seal.
11 Q. Did there come a time when someone from the compliance
12 department at Neuberger Berman asked to speak to you?
13 A. Yes.
14 Q. What did you do?
15 A. I contacted my lawyers.
16 Q. Did that occur after you had already plead guilty?
17 A. Yes.
18 Q. After speaking to your lawyer what did you do?
19 A. I resigned.
20 Q. What if anything happened to your visa when you resigned
21 from Neuberger Berman?
22 A. After some time it expires.
23 Q. What is your current immigration status?
24 A. I'm on deferred action status.
25 Q. What do you understand that to mean?

1 A. It means that my current stay in the U.S. is lawful and I
2 can't be deported.
3 Q. Can or cannot?
4 A. Cannot, I won't.
5 Q. Is there a time when that deferment expires?
6 A. Yes.
7 Q. When is that?
8 A. April of 2013.
9 Q. Who applied for that deferred action status for you?
10 A. The government.
11 Q. Did the government apply for deferred action for anyone
12 else in your family?
13 A. Yes.
14 Q. Who?
15 A. My wife.
16 Q. Has anyone made any promises to you about what will happen
17 when the deferred action expires?
18 A. No.
19 Q. Now, I want to go back for a moment, for a few moments to
20 the time when you worked at Prudential. When you worked at
21 Prudential, what are some of the ways in which you obtained
22 information about the companies that you were covering?
23 A. We looked at the public earnings announcement, we looked
24 at, read transcripts of various or slide shows of various
25 presentations by management in the various conferences. We

1   talked to investor relations and company management and then
2   followed the news on different websites and also got some data
3   from some third party resources.
4   Q.  When you worked at Neuberger Berman, did you generally
5   obtain information in the same way or a different way?
6   A.  It was pretty much same except that we had couple of extra
7   resources, providers and also we also talked to sell side
8   analysts.
9   Q.  You mentioned that one of the ways in which you obtained
10  information about companies was speaking to management of those
11  companies.
12  A.  Yes.
13  Q.  If you wanted to speak to the management of companies you
14  were covering, how did you go about doing that generally?
15  A.  Normally we would contact investor relations.
16  Q.  Why?
17  A.  That is the normal protocol.
18  Q.  Were there any other ways in which you obtained information
19  about Dell that you used for your work at Prudential?
20  A.  Yes.
21  Q.  How?
22  A.  I talked to my friends at Dell.
23  Q.  Approximately how many people?
24  A.  Around five.
25  Q.  How did you know those people?

1   A.  They were my personal friends from my days back in Austin.
2   Q.  How did you communicate with them?
3   A.  Normally on phone or sometimes permanent visits.
4   Q.  Where would those personal visits take place?
5   A.  Austin.
6   Q.  What is in Austin?
7   A.  Dell's headquarters.
8   Q.  What kind of information did those friends provide to you
9   when you were at Prudential?
10  A.  It was generally about business conditions in their
11  respective segments.
12  Q.  When you say segments, what do you mean?
13  A.  Like Dell has a lot of segments, for example, U.S.
14  consumer, small and medium businesses, then large enterprise,
15  public and other groups.
16  Q.  What were some of the business segments in which your
17  friends worked?
18  A.  U.S. consumer, U.S. commercial, product group, that's it.
19  Q.  What do you mean by product group?
20  A.  It's a group that's involved in laying out, developing
21  products for the company.
22  Q.  To your knowledge, did any of those people have access to
23  Dell's quarterly financial results before they were announced
24  to the public?
25  A.  No.

1   Q.  When you were at Prudential, what did you do with the
2   information that you got from those friends at Dell?
3   A.  I gave it to Jesse.
4   Q.  Jesse Tortora?
5   A.  Yes.
6   Q.  What if anything did you tell Mr. Tortora about where you
7   got that information from?
8   A.  I told him that I got it from my friends.
9   Q.  Did you tell him where those friends worked?
10  A.  Yes, at Dell.
11  Q.  Did you tell Mr. Tortora their names?
12  A.  No.
13  Q.  When you first joined Neuberger Berman, did you continue
14  speaking to those friends at Dell?
15  A.  Yes.
16  Q.  Did you ask them about Dell's business?
17  A.  Yes.
18  Q.  Did they continue to provide information to you about their
19  respective business segments?
20  A.  Yeah, general business conditions in their segments.
21  Q.  What did you do with the information you got from those
22  friends when you worked at Neuberger Berman?
23  A.  I gave it to Jesse and also to some folks at Neuberger
24  Berman.
25  Q.  At that time, when you were at Neuberger Berman where was

1   Mr. Tortora working?
2   A.  Diamondback Capital.
3   Q.  What was his job there?
4   A.  He was an analyst there.
5   Q.  Who did he work for?
6   A.  Todd Newman.
7   Q.  What did you understand Mr. Newman's job to be at
8   Diamondback Capital?
9   A.  He was Jesse's portfolio manager.
10  Q.  Have you ever met Mr. Newman yourself?
11  A.  Once.
12  Q.  You could take a look, Mr. Goyal, you should have a binder
13  in front of you.  You could take a look at what's marked for
14  identification as Government Exhibit 755.  Do you see that,
15  Mr. Goyal?
16  A.  Yes.
17  Q.  What is that?
18  A.  It is an e-mail from me.
19  Q.  To who?
20  A.  To Fayad Abbasi.
21  Q.  What's the date?
22  A.  Date is January 7, 2008.
23      MR. TARLOWE: Government offers Government Exhibit
24  755.
25      THE COURT: Any objection?

# A-871

UNITED STATES OF AMERICA, v
TODD NEWMAN,

1      MR. FISHBEIN: No objection.
2      THE COURT: Government Exhibit 755 is received.
3      (Government's Exhibit 755 received in evidence)
4  Q. At that time, Mr. Goyal, January 7, 2008, where were you
5  working?
6  A. Neuberger Berman.
7  Q. And you sent the e-mail to Mr. Abbasi and you testified
8  that you worked for Mr. Abbasi, is that correct?
9  A. True.
10 Q. And you write: "Hi. I visited Austin this weekend to meet
11 with some contacts and here are some key points." Again, what
12 is in Austin?
13 A. Dell's headquarters.
14 Q. Looking at the key points that you wrote below, numbers 1,
15 2, 3 and 4, do those describe Dell's overall business or
16 particular business segments?
17 A. Particular business segments.
18 Q. So number one references U.S. corporate business bit slow.
19 Is that a reference to one of Dell's business segments?
20 A. Yes.
21 Q. Now, in number 1 it says, "Rich Garber beat me to this
22 one." What did you mean by that?
23 A. Rich Garber is a sell side analyst and he sent out a report
24 either that morning or the day before, sometime just before
25 that saying the same things, that U.S. corporate business is

1  getting slower, there's a declining market.
2  Q. Number 2, "U.S. consumer doing good." U.S. consumer, is
3  that another business segment of Dell?
4  A. Yes.
5  Q. Number 3 you describe or you provide information about DIS,
6  Dell International Services. Is that another business segment
7  of Dell?
8  A. Right.
9  Q. What is that?
10 A. This was basically, there's an India-based service team
11 that used to take some phone calls which provided on-phone
12 support service.
13 Q. Number 4 you write, "SMB is just okay." What is SMB?
14 A. Small and medium business.
15 Q. Who did you get that information from, the information
16 that's contained in that e-mail?
17 A. From my friends.
18 Q. Did the information in this e-mail come from Rob Ray?
19 A. No.
20 Q. Now, when Dell announces its quarterly financial results
21 does it announce results for the consolidated overall company?
22 A. Yes.
23 Q. Now, did there come a time when you began to receive
24 information about Dell's consolidated financial results as
25 opposed to information about business segments?

1  A. Yes.
2  Q. When was that?
3  A. Sometime late 2007.
4  Q. Who did you get that information from?
5  A. From Rob Ray.
6  Q. When did you first meet Rob Ray?
7  A. It was in business school 2002 or 2003.
8  Q. That was at the University of Texas?
9  A. Right.
10 Q. Were you and Rob Ray in the same class in business school?
11 A. No.
12 Q. What did Rob Ray do after business school?
13 A. He went to work at Dell.
14 Q. Where were you working at the time?
15 A. Dell.
16 Q. What if any contact did you have with Rob Ray during the
17 time you were both working at Dell?
18 A. Once we were interviewing for an opposition in our team so
19 I interviewed with him and then towards the end I may have had
20 a couple of conversations with him, mostly regarding careers,
21 career.
22 Q. When you worked at Prudential, were you in contact with Rob
23 Ray?
24 A. Yes.
25 Q. How? How did you communicate with him during that time?

1  A. On e-mail or phone.
2  Q. What did you talk to Mr. Ray about during the time you were
3  working at Prudential?
4  A. His career. Was mostly his career.
5  Q. What sorts of things did you discuss about his career?
6  A. His long-term career objectives and best way to reach
7  there.
8  Q. What if anything did he tell you about his long-term career
9  objectives?
10 A. He wanted to be working in investment management.
11 Q. Again, meaning what?
12 A. Investment management is either sell side research or buy
13 side, basically managing clients' money putting into stocks.
14 Q. Could you please take a look at what's marked for
15 identification as Government Exhibit 700. Do you see that,
16 Mr. Goyal?
17 A. Not yet.
18 Q. 700.
19 A. Not sure if I have it here.
20     THE COURT: In my book it's before 314A.
21 A. Yes. I see it.
22 Q. Is that an e-mail exchange between you and Rob Ray?
23 A. Yes.
24 Q. From September of 2006?
25 A. Yes.

1    MR. TARLOWE: Government offers Exhibit 700.

2    MR. NATHANSON: No objection.

3    THE COURT: Government Exhibit 700 is received.

4  Q. Just looking briefly at the e-mail on the bottom, that's an

5  e-mail from you to Rob Ray on September 27, 2006, is that

6  correct?

7  A. True.

8  Q. You write, "How are you? Hope everything is going well.

9  We are now fully settled here in SF." That means San

10 Francisco?

11 A. Yes.

12 Q. What did you mean? Had you recently moved to San

13 Francisco?

14 A. Yes.

15 Q. Why?

16 A. To start working at Prudential Equities.

17 Q. We could scroll up to Rob Ray's e-mail to you. You could

18 blow up that whole thing with the date, please.

19    In this e-mail Mr. Ray wrote to you, "Hey, Sandy.

20 Great to hear from you. I have been thinking about sending you

21 an e-mail for quite a while now but wanted to give you some

22 time to settle down. Things are going well here in Austin. I

23 wanted to call and chat with you sometime and get some feedback

24 about your experience so far when you have a little time. As

25 you know, I am extremely interested in the equity research area

1  and it will be great to get some perspective from you." What

2  did you understand Mr. Ray to be saying there in the sentence

3  that begins with "as you know"?

4  A. He wanted to work in investment management, research so he

5  wanted to call regarding that I started working in this

6  industry how's my experience.

7  Q. If you look at his signature line under "best regards," it

8  says, "Rob Ray, Dell, Inc. Enterprise PG Finance." Did you

9  know what Enterprise PG Finance is?

10 A. Yes.

11 Q. What is that?

12 A. PG here stands for product group, so it's enterprise

13 product group. It is the group that develops products for

14 enterprise which is large company customers, so the products

15 are like servers and also desktops, notebooks, especially for

16 those kind of customers.

17 Q. So it's your understanding at that time in September of

18 2006 that Mr. Ray worked in the enterprise product group area

19 at Dell?

20 A. Yes.

21 Q. Take a look at what's been marked for identification as

22 Government Exhibit 701. Do you see that, Mr. Goyal?

23 A. Yes, I do.

24 Q. Is that another e-mail exchange between you and Rob Ray

25 from October 2006?

1  A. Yes, it is.

2    MR. TARLOWE: Government offers Exhibit 701.

3    MR. FISHBEIN: No objection.

4    THE COURT: Government Exhibit 701 is received.

5    MR. TARLOWE: Mr. Hoffman, if you could focus on the

6  top e-mail down through the signature.

7  Q. Mr. Goyal, what's shown on the screen, that's an e-mail

8  from Rob Ray to you, is that correct?

9  A. Yes.

10 Q. And Mr. Rob Ray wrote to you, "Thanks so much for talking

11 to me on the phone tonight. I really appreciate all the advice

12 and feedback I received from you. As you know, I am extremely

13 interested to break into this industry. So if you come to know

14 of any opportunity, please let me know."

15    When Mr. Ray wrote to you "I am extremely interested

16 to break into this industry," what did you understand him to be

17 referring to?

18 A. Investment management.

19 Q. When he wrote, "So if you come to know of any opportunity,

20 please let me know," what did you understand him to be asking

21 you to do?

22 A. If I happen to know that there's some open positions

23 somewhere somebody is looking for an associate or somebody

24 else, I should let Rob Ray know about that.

25 Q. If you could turn to what's been marked for identification

1  as Government Exhibit 703. Do you see that, Mr. Goyal?

2  A. Yes.

3  Q. Is that another e-mail exchange between you and Rob Ray?

4  A. It is.

5  Q. And this one looks like it spans from October, from 2006

6  through March of 2007, is that correct?

7  A. Right.

8    MR. TARLOWE: Government offers Exhibit 703?

9    MR. FISHBEIN: No objection.

10    THE COURT: Government Exhibit 703 is received.

11    MR. TARLOWE: Mr. Hoffman, if you could please enlarge

12 the e-mail on top.

13 Q. This is an e-mail from Rob Ray to you, is that correct?

14 A. Correct.

15 Q. And focusing on the second paragraph, Rob Ray wrote, "On a

16 personal front I found out that I will be going to IR end of

17 this month." What did you understand IR to be?

18 A. Investor relations.

19 Q. He continues. "I am very excited about it and really

20 looking forward to the experience. I am sure we will be

21 talking more often now. I have also registered for the CFA

22 exam since I think it will be invaluable for what I want to do

23 long term."

24    Let me just stop there for a moment. When he wrote,

25 "I have also registered for the CFA exam," do you know what the

UNITED STATES OF AMERICA, v
TODD NEWMAN,

1   CFA is?
2   A.  Yes.
3   Q.  What is it?
4   A.  CFA is chartered financial analyst and it consists of three
5   exams.
6   Q.  When he wrote, "I think it will be invaluable for what I
7   want to do long term," what did you understand him to want to
8   do long term?
9   A.  Working investment management industry.
10  Q.  Then he goes on to ask you about the CFA exam and at the
11  end of that paragraph writes, "BTW," which you understand that
12  to be by the way?
13  A.  Right.
14  Q.  "By the way, given my career objectives, do you think I am
15  doing the right thing by going for the CFA?"  What did you
16  understand his career objectives to be?
17  A.  Working in investment management.
18  Q.  Then the final paragraph he writes, "Hope all is well by
19  your end.  Please keep an eye out for me if something pops up."
20  What did you understand him to mean by that?
21  A.  Again, it's like if I happen to know of some opposition or
22  somebody looking for an associate then I should let him know.
23  Q.  In that second paragraph he asks you some questions about
24  the CFA exam and asks you for some, he asks your opinion about
25  which curriculum you recommended.  Do you see that?

1   A.  Yes.
2   Q.  Did you provide any advice or recommendations to him about
3   the CFA exam?
4   A.  Yes, I did.
5   Q.  If you could take a look at what's marked for
6   identification as Government Exhibit 704.  Is that an e-mail
7   exchange between you and Rob Ray?
8   A.  Yes, it is.
9   Q.  From March of 2007?
10  A.  Correct.
11            MR. TARLOWE: Government offers Government Exhibit
12  704.
13            MR. FISHBEIN: No objection.
14            THE COURT: Government Exhibit 704 is received.
15  Q.  Focusing on the e-mail on top from Rob Ray to you, do you
16  see that?
17  A.  Yes.
18  Q.  Mr. Ray wrote to you, "Hey, Sandy.  Thanks for the tips on
19  CFA.  I will probably go with Schweser also."  That's a
20  reference to one of the different courses on the CFA exam?
21  A.  One of the different guide books.
22  Q.  Then he wrote, "I am very excited about IR since it will
23  give me the exposure that I need and hopefully help with my
24  long-term interests in research and asset management."  Do you
25  see that?

1   A.  I do.
2   Q.  Please take a look at what's marked for identification as
3   Government Exhibit 705.  Do you see that, Mr. Goyal?
4   A.  Yes.
5   Q.  Is that another e-mail between you and Rob Ray?
6   A.  Yes.
7   Q.  From June of 2007?
8   A.  Yes.
9            MR. TARLOWE: Government offers Government Exhibit
10  705.
11           MR. FISHBEIN: No objection.
12           THE COURT: Government Exhibit 705 received.
13  Q.  And here Rob Ray wrote to you, "Great chatting with you
14  today.  I'm really glad that things worked out very well for
15  you."  Do you know what that's a reference to?
16  A.  Yes.
17  Q.  What?
18  A.  It is Prudential Equity Group shutting down and me finding
19  job at Neuberger Berman.
20  Q.  And Rob Ray continues, wrote, "Thanks again for your advice
21  which I always find very helpful.  As promised I am attaching
22  an updated copy of my resume with my IR experience.  Since you
23  have successfully made the transition from Dell to investment
24  management I would love to hear your feedback on my resume only
25  if when you have some time.  I am looking for some pointers on

1   how I should frame things to better highlight my interest in
2   IR."  When Rob Ray wrote about his interest in IM, what did you
3   understand IM to be?
4   A.  Investment management.
5   Q.  He asked you for some pointers.  Do you recall providing
6   pointers to him?
7   A.  Yes.
8   Q.  Do you recall sitting here today what they were?
9   A.  No, I don't remember the particulars.
10  Q.  Then Rob Ray continued in the e-mail, "Please keep an eye
11  out for me both buy and sell side and let me know whenever you
12  come across something interesting.  My ultimate objective is to
13  get to the buy side but I fully realize that sell side may be
14  my only ticket to entry."  What did you understand him to mean
15  by that?
16  A.  Buy side, which is managing clients' money, normally hires
17  people only who have some sort of equity research experience
18  and they don't hire directly from companies, so in this
19  industry normal career path is people from companies like Dell
20  or HP or Intel they first come to work in sell side research
21  and that after a while that's when they go to buy side.
22  Q.  Then he continued in the e-mail at the end of that
23  paragraph, "Do you still think it is a good idea to get some
24  sell side experience under my belt?  If I do it, I am sure I
25  should only consider the top firms."  Do you see that?

1 A. Yes.

2 Q. Do you recall discussing that with Mr. Ray?

3 A. I don't have a particular memory of this conversation.

4 Q. At the end he wrote, "Anyway, enough about me. I wanted to

5 wish you all the best in your new job. I am really happy for

6 you. I bet you are excited and so am I. I will talk to you

7 soon. Have a great weekend."

8       When did you start working at Neuberger Berman?

9 A. It was the summer of 2007.

10 Q. Where was Rob Ray working at that time?

11 A. In Dell.

12 Q. Where in Dell was he working at that time?

13 A. Investor relations.

14 Q. Did you continue to speak to him after you joined Neuberger

15 Berman?

16 A. Yes.

17 Q. If you please take a look at Government Exhibit 708, what's

18 marked for identification as Government Exhibit 708. Do you

19 see that, Mr. Goyal?

20 A. Yes.

21 Q. Is that an e-mail exchange between you and Rob Ray from

22 September of 2007?

23 A. Yes.

24       MR. TARLOWE: Offer Government Exhibit 708.

25       MR. FISHBEIN: No objection.

1       THE COURT: Government Exhibit 708 is received.

2       (Government's Exhibit 708 received in evidence)

3       MR. TARLOWE: Mr. Hoffman, if I could ask you to start

4 with the e-mail that starts at the bottom of the first page and

5 spills over to the second page? I guess we have to do one at a

6 time. Your Honor, I noticed the time. If I could maybe finish

7 this document?

8       THE COURT: Yes, that's what I was going to suggest.

9 Q. So this is an e-mail, Mr. Goyal, from you to Rob Ray, is

10 that correct? This particular one, the one on the bottom of

11 the first page?

12 A. Yes.

13 Q. And it's from September 17, 2007?

14 A. Correct.

15 Q. And you wrote, start with the second paragraph. "You,"

16 meaning Rob Ray, "had sent your resume to a buy side person who

17 was sitting next to me during a lunch. Put in a good word for

18 you but got the impression that he wasn't looking to hire

19 anybody." Are you saying there that you, Mr. Goyal, put in a

20 good word for him?

21 A. I put in a good word for Rob Ray, that's what I mean.

22 Q. With a buy side person?

23 A. Yes.

24 Q. And then you continued. "Also, there was another analyst

25 in our company looking for someone. Talked about you, but he

1 was in a different industry and wanted someone with Wall Street

2 experience in that space."

3       Then you continued. "Just keep trying, it's a matter

4 of time. You never know when things click." Do you see that?

5 A. Right.

6 Q. What did you mean by that when you wrote, "Just keep

7 trying, it's a matter of time."

8 A. It means just keep looking, just keep applying for jobs,

9 that's it.

10 Q. Then if we could just look finally at the e-mail on top,

11 that's an e-mail from Rob Ray to you, is that correct?

12 A. Yes.

13 Q. Looking at the first paragraph, you can just start in the

14 middle of that paragraph. "Was looking for some advice

15 regarding a new development that happened last week. I had

16 written to Andy Neff (Bear) expressing my interest in research.

17 He wrote back to me saying he will be interested to chat and

18 the impression I got was he is looking for someone now." Do

19 you know who Andy Neff is?

20 A. Yes.

21 Q. Who is he?

22 A. He was a senior IT analyst at Bear Stearns at the time.

23 Q. Then he continues. "Do you have any scoop about Andy or

24 Bear?" Then he goes on to ask you several questions, "How

25 about Andy? Is he pretty well respected on the Street? Is he

1 a good guy to work for? What kind of things do you think he

2 will ask? Looking forward to some tips from you. By the way,

3 thanks so much for putting in a good word for me with Jeff and

4 keeping an eye out for me. I really appreciate it."

5       Do you see that?

6 A. Yes.

7       MR. TARLOWE: You can take that down.

8       THE COURT: All right, why don't we break here, ladies

9 and gentlemen. Obviously, tomorrow is Thanksgiving and so we

10 won't be back until Monday. Be here ready to go at 9:30. I

11 was going to tell you not to eat too much tomorrow, but, you

12 know, you can eat a lot tomorrow, that's the whole point of the

13 day. Another point of the day is to be thankful for what we

14 have in this country and you just have to look around the world

15 to see we are very, very fortunate relative to a lot of people

16 in a lot of places.

17       One of the things that I am grateful for, and I know I

18 speak for the lawyers and the parties, is that we have people

19 like you who are willing to dedicate themselves to this public

20 service that we're on, serving on a jury. That's a pretty long

21 stint. I want to say we really appreciate all the time that

22 you put into this trial already and all that you will continue

23 to put in. It's important work, and we're very appreciative.

24       So with that, have a wonderful holiday and we'll see

25 you Monday. Thank you, you're excused.

# A-875

1     (In open court; jury not present)

2     THE COURT: Okay, have a seat.  Anything we should

3 discuss before we break?  Okay.  Mr. Weingarten, you can catch

4 your train.

5     MR. WEINGARTEN: I'm out of here.

6     THE COURT: You should be very well rested, because

7 you haven't been doing much.

8     MR. WEINGARTEN: That's about to change.

9     THE COURT: I'm sure.  I'll see you folks Monday

10 morning.  If anything comes up during the weekend, shoot an

11 e-mail to chambers.  We'll be checking in.  Great, enjoy the

12 holiday.  Mr. Goyal, we'll start Monday, so be here ready to go

13 by nine or 9:15 at the latest.  Thank you.  So long, have a

14 good day.

15     (Adjourned to November 26, 2012 at 9:30 a.m.)

16

17

18

19

20

21

22

23

24

25

1                 INDEX OF EXAMINATION

2 Examination of:                            Page

3 MARK HADLOCK

4 Direct By Ms. Apps . . . . . . . . . . . . .1291

5 Cross By Mr. Nathanson . . . . . . . . . . .1327

6 Redirect By Ms. Apps . . . . . . . . . . . .1359

7 Recross By Mr. Nathanson . . . . . . . . . .1365

8 SANDEEP GOYAL

9 Direct By Mr. Tarlowe . . . . . . . . . . .1370

10                GOVERNMENT EXHIBITS

11 Exhibit No.                          Received

12  2254   . . . . . . . . . . . . . . . .1295

13  2257   . . . . . . . . . . . . . . . .1298

14  2259   . . . . . . . . . . . . . . . .1299

15  95     . . . . . . . . . . . . . . . .1303

16  2261   . . . . . . . . . . . . . . . .1306

17  2251   . . . . . . . . . . . . . . . .1308

18  2253   . . . . . . . . . . . . . . . .1309

19  2267   . . . . . . . . . . . . . . . .1318

20  2270   . . . . . . . . . . . . . . . .1321

21  2269   . . . . . . . . . . . . . . . .1325

22  755    . . . . . . . . . . . . . . . .1389

23

24

25

1  708   . . . . . . . . . . . . . . . . . .1402

2                DEFENDANT EXHIBITS

3 Exhibit No.                          Received

4  10030  . . . . . . . . . . . . . . . .1345

5  8663   . . . . . . . . . . . . . . . .1350

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$100 (4)**
1297:24,25;1300:24;
1376:4
**$100,000 (1)**
1322:23
**$145,000 (4)**
1355:18;1357:8;
1358:2,4
**$20 (1)**
1301:3
**$20,000 (1)**
1322:23
**$25,000 (1)**
1322:21
**$3,337,040 (1)**
1303:1
**$3,354,224 (1)**
1303:1
**$3,560,690 (1)**
1303:1
**$30,000 (1)**
1323:1

## A

**Abassi (2)**
1376:13,25
**Abassi's (1)**
1376:11
**Abbasi (4)**
1376:10;1387:20;
1388:7,8
**able (3)**
1314:12;1331:9,17
**above (3)**
1300:13;1337:23
**acceptable (1)**
1368:1
**access (1)**
1385:22
**according (1)**
1302:9
**account (6)**
1299:12;1341:11;
1345:24;1346:17;
1348:18;1349:1
**accounts (4)**
1307:13;1345:10,21;
1346:5
**accurate (1)**
1314:12
**accurately (1)**
1302:9
**acknowledge (1)**
1333:24
**acknowledged (1)**
1334:2
**across (2)**
1289:21;1399:12
**action (4)**

1382:24;1383:9,11,
17
**activities (3)**
1337:7;1346:23;
1362:22
**activity (3)**
1308:12;1315:8;
1316:4
**actually (5)**
1288:5;1306:13;
1334:12;1360:4,5
**add (3)**
1316:15;1357:7;
1358:4
**addition (1)**
1351:15
**additions (1)**
1309:24
**address (7)**
1294:17,21,23,24;
1299:21;1311:24;
1343:8
**Adjourned (1)**
1404:15
**administration (2)**
1371:1,2
**administrative (9)**
1291:23;1292:3,8,
10;1293:12,19;1294:7;
1328:2;1356:19
**admitted (1)**
1320:5
**Adondakis (1)**
1374:6
**Adondakis' (1)**
1374:12
**adopted (1)**
1344:16
**advance (1)**
1300:18
**adverse (1)**
1359:10
**advice (4)**
1394:11;1397:2;
1398:20;1402:14
**advisor (24)**
1291:16;1292:15,20;
1297:13;1303:5,11;
1307:9,9,10,11,13;
1335:7;1336:15;
1337:8;1340:16,17,22;
1342:5,10;1358:21;
1359:3;1361:5,22;
1362:21
**advisors (2)**
1298:20;1299:4,5
**advisor's (2)**
1336:15;1361:5
**advisory (1)**
1291:19
**affect (1)**
1381:18
**affects (1)**

1381:17
**affiliates (1)**
1299:4
**again (34)**
1289:12;1297:25;
1298:16,18;1305:14;
1308:7;1310:10;
1321:21;1325:5,9;
1330:12,20;1331:11;
1332:1;1336:2,12,20;
1337:3;1338:25;
1354:14;1355:4,9,21;
1357:4,13,17;1360:8,
16;1363:3;1379:7;
1388:11;1391:11;
1396:21;1398:20
**agents (2)**
1361:11;1378:16
**aggregation (1)**
1324:24
**ago (3)**
1317:11;1338:16;
1364:17
**agree (5)**
1338:10;1355:7;
1357:7,25;1380:9
**Agreed (1)**
1330:1
**agreement (9)**
1298:19;1299:21;
1379:20;1380:2,3,9,12,
19,24
**allocated (4)**
1293:4,5;1298:2;
1299:17
**allocation (1)**
1354:6
**allow (3)**
1288:4;1363:9;
1365:25
**allowed (3)**
1363:21;1364:18,19
**along (1)**
1360:4
**alternate (1)**
1299:2
**although (1)**
1302:16
**always (1)**
1398:21
**among (3)**
1330:18;1332:12;
1366:23
**amongst (1)**
1293:4
**amount (8)**
1297:22;1299:16;
1321:1,2,19,25;
1330:13;1351:25
**amounts (4)**
1302:2;1315:9;
1316:5;1325:12
**analysis (6)**

1333:6;1335:12;
1336:17;1352:5;
1358:23;1361:7
**analyst (30)**
1312:12,14,22;
1324:13;1337:3;
1338:18;1340:12;
1348:15;1353:21,24;
1359:9;1363:12,14,18;
1364:4;1373:2,6,8,16;
1374:8,9,13;1376:8,12,
18;1387:4;1388:23;
1396:4;1401:24;
1402:22
**Analysts (5)**
1300:22;1336:24;
1345:16;1376:21;
1384:8
**analyzing (1)**
1337:2
**and/or (1)**
1343:25
**Andy (4)**
1402:16,19,23,25
**announce (1)**
1389:21
**announced (1)**
1385:23
**announcement (3)**
1287:11;1372:1;
1383:23
**announces (1)**
1389:20
**annual (4)**
1303:20;1304:10;
1305:15;1330:5
**answered (1)**
1363:8
**Anthony (1)**
1351:11
**Apparently (1)**
1302:18
**appears (1)**
1356:22
**appendix (4)**
1297:15,16;1362:14,
24
**Apple (2)**
1373:25;1377:3
**application (4)**
1294:4,9;1295:18;
1340:20
**applied (1)**
1383:9
**apply (1)**
1383:11
**applying (1)**
1402:8
**appointment (1)**
1287:22
**appreciate (1)**
1394:11;1403:4,21
**appreciative (1)**

1403:23
**approach (4)**
1293:3,23;1319:5;
1379:10
**approached (2)**
1286:19;1378:21
**appropriate (2)**
1290:21;1333:17
**approve (1)**
1353:23
**approved (3)**
1320:9;1325:7;
1354:17
**approving (1)**
1351:7
**Approximately (8)**
1293:7,9;1335:1;
1370:8;1376:2,2;
1379:9;1384:23
**APPS (50)**
1286:25;1289:6;
1290:7,8,13;1293:23;
1294:11;1297:3;
1298:12;1299:25;
1302:11,16;1304:22;
1305:25;1307:1,6;
1308:2;1309:10,15;
1310:13;1317:5;
1318:18,25;1319:5,16,
19;1320:1;1323:19;
1324:2;1326:7;1330:7;
1332:17;1334:17;
1336:1;1337:19;
1344:21;1349:21;
1350:2;1354:11;
1355:14,25;1358:7,13,
15;1364:13;1365:22;
1367:1,8,12;1368:3
**April (7)**
1304:12;1306:8;
1325:3;1344:17;
1346:3,5;1383:8
**archival (1)**
1343:9,25
**archive (1)**
1343:17
**archived (2)**
1341:1,7
**area (2)**
1392:25;1393:18
**arise (1)**
1359:1
**around (4)**
1305:15;1376:4;
1384:24;1403:14
**arrange (1)**
1346:11
**arrangements (2)**
1316:22;1317:2
**article (7)**
1286:12,20;1287:14,
15,16;1289:18,25
**articles (12)**

1285:12,19,19,24;
1286:4,7;1287:1,4,12;
1289:16,21;1368:5
**asset (3)**
1373:12,13;1397:24
**assets (2)**
1298:3;1309:24
**assigned (2)**
1348:1,12
**assist (1)**
1314:13
**assistant (2)**
1356:17;1357:5
**assistants (1)**
1311:25
**assisted (3)**
1293:18;1314:24;
1342:2
**Associate (7)**
1373:2,16;1374:13;
1376:8,18;1394:23;
1396:22
**assume (1)**
1368:7
**assurance (1)**
1291:12
**attached (4)**
1319:14;1351:20;
1353:1;1362:14
**attaching (1)**
1398:21
**attachment (3)**
1311:6,13;1362:11
**attend (3)**
1303:20;1305:14;
1370:1
**attended (1)**
1303:23
**attention (3)**
1289:21;1297:7;
1298:16
**attorney (1)**
1304:20
**Attorney's (6)**
1285:5,16;1379:20;
1380:4,23;1381:13
**audience (1)**
1377:15
**auditor (1)**
1343:24
**August (1)**
1342:23
**Austin (11)**
1370:19,20,25;
1371:13,15;1385:1,5,6;
1388:10,12;1392:22
**authorization (1)**
1381:24
**authorized (1)**
1381:21
**available (3)**
1335:12;1336:18;
1338:5

**avoid (1)**
1362:22
**aware (8)**
1299:7;1326:3;
1330:15;1333:5;
1334:7,10,11;1359:3

## B

**bachelor's (1)**
1369:19
**back (12)**
1293:13;1306:6;
1309:10;1321:1,4;
1339:9;1358:16;
1367:23;1383:19;
1385:1;1402:17;
1403:10
**back-up (1)**
1373:19
**bad (1)**
1309:24
**balance (1)**
1316:14
**bank (3)**
1291:18,20;1296:13
**based (8)**
1298:2;1300:10,16;
1336:16;1337:24;
1338:12;1352:20;
1361:6
**basically (4)**
1300:17;1315:1;
1389:10;1391:13
**basis (4)**
1330:5;1335:7;
1346:19;1358:22
**bathroom (1)**
1367:21,22;1368:11
**Bear (3)**
1402:16,22,24
**beat (1)**
1388:21
**Bechalany (6)**
1351:11,12,15;
1353:16;1354:20,25
**Bechelany's (1)**
1320:19
**become (3)**
1325:24;1340:19;
1377:4
**becomes (1)**
1359:3
**beg (1)**
1306:1
**began (1)**
1389:23
**begins (1)**
1393:3
**behalf (2)**
1307:12;1316:8
**belongs (1)**
1339:16

**below (11)**
1296:3;1300:12;
1305:19;1321:20;
1322:3,19;1323:1;
1337:21;1354:25;
1357:1;1388:14
**belt (1)**
1399:24
**beneath (1)**
1320:15
**Berman (24)**
1375:16,19,23;
1376:3,7,19,24;
1377:13,17,20,22;
1382:1,5,12,21;1384:4;
1386:13,22,24,25;
1388:6;1398:19;
1400:8,15
**best (4)**
1325:22;1391:6;
1393:7;1400:5
**bet (1)**
1400:6
**better (2)**
1288:20;1399:1
**Beyond (1)**
1365:22
**big (2)**
1358:10;1368:25
**billion (1)**
1376:4
**binder (5)**
1301:22;1344:9;
1349:6;1366:13;
1387:12
**Biology (1)**
1290:17
**bit (4)**
1294:16;1358:7;
1361:9;1388:18
**blast (1)**
1362:11
**Bloomberg (1)**
1328:18
**blow (11)**
1299:25;1322:14;
1335:4;1336:12;
1337:6,24;1345:9;
1351:3;1352:24;
1355:3;1392:18
**blown (2)**
1294:15;1351:19
**Bonus (5)**
1322:20;1357:1,6;
1358:2,3
**bonuses (5)**
1322:18,19;1323:9,
12;1356:23
**book (9)**
1297:24,25;1299:19;
1300:11,24;1323:7;
1330:25;1331:7;
1391:20

**books (2)**
1342:9;1397:21
**born (2)**
1369:16,17
**both (3)**
1356:14;1390:17;
1399:11
**bottom (13)**
1320:8;1339:10;
1342:18;1343:4;
1345:6;1351:4;
1354:22;1358:18;
1360:5,22;1392:4;
1401:4,10
**bought (1)**
1331:24
**boutique (1)**
1291:18
**bow (1)**
1288:8
**box (4)**
1295:20;1296:8;
1338:25;1360:8
**break (8)**
1289:24;1367:21,22;
1368:11;1394:13,16;
1403:8;1404:3
**briefly (2)**
1291:8;1392:4
**bring (2)**
1289:8;1368:14
**brings (2)**
1353:22;1354:1
**broad (1)**
1338:22
**Broad-based (4)**
1347:24;1348:4,10,
16
**Broadly (3)**
1308:9;1338:5,20
**broker (8)**
1291:18;1315:17;
1316:8,20,21;1324:18,
24;1325:24
**brokerage (2)**
1317:2;1325:25;
1326:3
**brokers (2)**
1315:15,16
**brought (2)**
1289:21;1350:24
**BTW (1)**
1396:11
**buddy (1)**
1343:24
**bullets (1)**
1347:16
**bundle (2)**
1348:5,5
**business (22)**
1295:24;1341:14;
1371:1,2;1385:10,16;
1386:16,19,20;

**businesses (1)**
1385:14
**buy (10)**
1347:5,10;1377:21;
1391:12;1399:11,13,
16,21;1401:16,22
**buying (1)**
1299:13

## C

**calendar (2)**
1288:18;1346:13
**call (6)**
1290:5,7;1315:7;
1333:16;1392:23;
1393:5
**called (4)**
1290:10,25;1308:14;
1368:21
**calls (5)**
1290:8;1333:7;
1367:18;1368:19;
1389:11
**came (10)**
1289:21;1303:25;
1343:14;1360:16;
1365:5,11;1366:3,7;
1367:4;1374:17
**can (40)**
1288:2,23;1289:8;
1291:8;1295:15;
1296:1;1297:15;
1300:2,8,23,25;
1301:11;1302:9;
1305:14;1312:7;
1328:17,18,21;1330:8;
1335:3;1337:13;
1338:11;1339:3,9,10,
19;1342:4,18;1349:24,
24;1352:25;1354:10;
1355:2;1360:21;
1367:13;1383:3;
1402:13;1403:7,12;
1404:3
**Canada (4)**
1369:25;1370:1,6,10
**Capital (29)**
1285:10,21,21;
1290:25;1291:3,5,10;
1292:2,5,13,14,19;
1293:2,4,6;1294:24;
1295:20;1297:10,12;
1298:2,22;1301:19;
1305:5,6;1307:10;
1343:8;1352:4;1387:2,
8
**care (2)**
1343:21,22
**career (10)**

1291:13;1390:21;
1391:4,4,5,6,8;
1396:14,16;1399:19
**careers (1)**
1390:20
**careful (1)**
1287:1
**carried (1)**
1338:6
**carry (1)**
1313:11
**carrying (1)**
1293:18
**case (20)**
1285:14,15;1286:9,
13;1287:11,13,16;
1289:13,15;1290:1,1,5;
1300:11;1301:10;
1309:2;1332:7;
1353:18;1354:16;
1381:12,17
**cases (4)**
1285:13;1286:4,14;
1289:16
**catch (1)**
1404:3
**Cathy (8)**
1293:20;1322:17;
1325:8,11;1332:8;
1353:8;1356:16,17
**CCO (1)**
1353:5
**CE (2)**
1291:17,22
**cents (2)**
1316:18;1323:1
**certain (7)**
1300:20;1315:11;
1328:17;1332:8,9;
1333:5;1341:16
**certainly (3)**
1309:6;1327:22;
1330:22
**certification (1)**
1310:25
**certify (1)**
1310:3
**cetera (3)**
1286:14,15;1365:2
**CFA (10)**
1395:21,25;1396:1,
4,10,15,24;1397:3,19,
20
**CFO (1)**
1293:15
**chambers (1)**
1404:11
**change (4)**
1292:9;1298:23;
1299:7;1404:8
**changed (1)**
1314:3
**changes (2)**

1309:23;1322:20
**charge (3)**
1285:6;1316:10,16
**charged (2)**
1285:22;1308:24
**charges (5)**
1378:5,7,8;1379:16,
19
**chart (2)**
1302:5,8
**chartered (1)**
1396:4
**chat (2)**
1392:23;1402:17
**chatting (1)**
1398:13
**checking (1)**
1404:11
**Chiasson (2)**
1285:8,20
**Chiasson's (1)**
1286:15
**chief (14)**
1291:23,23;1292:3,
3,7,8,10,11;1293:11;
1294:7;1303:2;1328:2;
1359:8,18
**child (1)**
1287:24
**children (1)**
1369:14
**chopped (1)**
1358:9
**circles (1)**
1321:20
**citizen (1)**
1381:19
**City (3)**
1299:3,6;1375:18
**class (1)**
1390:10
**clear (5)**
1287:3;1293:16;
1297:12;1359:17;
1362:19
**click (1)**
1402:4
**client (1)**
1376:16
**clients (8)**
1318:5;1373:10,11,
15;1375:22,25,25;
1377:16
**clients' (2)**
1391:13;1399:16
**close (1)**
1325:11
**closed-end (3)**
1347:3,5,6
**closer (1)**
1368:24
**code (1)**
1345:4

**Coleman (1)**
1329:14
**coming (5)**
1303:2;1306:6;
1321:1,4;1365:24
**commercial (1)**
1385:18
**commission (3)**
1315:9;1316:5,15
**commissions (7)**
1316:17;1331:6,10,
11,11,12,14
**commit (3)**
1378:9,12;1380:20
**committed (1)**
1381:3
**commonly (1)**
1313:21
**communicate (2)**
1385:2;1390:25
**communicated (1)**
1334:12
**communicating (11)**
1307:14;1311:5,16;
1312:4,9,10;1361:17,
24;1362:5,15,21
**communication (2)**
1341:13;1343:17
**communications (2)**
1341:1;1342:6
**companies (34)**
1311:20;1335:5,10,
13,16,20;1336:13,14,
21;1337:2;1358:20,24;
1359:4;1360:25;
1361:4;1363:6;1371:9;
1373:20,22,24,25;
1374:10;1376:25;
1377:2,5,7,8,9;
1383:22;1384:10,11,
13;1399:18,19
**company (35)**
1311:25;1312:12,15,
23,23,24,25;1313:2;
1343:9;1352:5;
1359:16;1361:11;
1362:2;1363:3,13,15,
17,19,20,23,25;1364:4,
6,19,20,21,23;1365:2;
1375:3,8;1384:1;
1385:21;1389:21;
1393:14;1401:25
**company's (4)**
1359:8;1371:12,21,
24
**compare (1)**
1302:4
**compensated (4)**
1300:3,5,8,16
**compensation (9)**
1299:21;1300:25;
1302:2,9,24;1326:16,
18,24;1327:7

**competitor (1)**
1365:1
**competitors (1)**
1372:9
**complete (2)**
1318:22;1324:3
**completed (4)**
1294:4;1306:9;
1320:15,21
**completeness (1)**
1318:23
**compliance (66)**
1291:23;1292:4,7,
11;1303:3,6,8,9,11,12,
14,19,22;1304:3,9,10,
13,13,17;1305:12;
1306:4,16,22;1307:21,
24;1308:25;1310:3,10;
1313:12;1315:1,2;
1328:5,7,11;1332:5,7,
12;1334:23;1336:3;
1337:25;1338:1;
1339:6;1341:21;
1342:1;1344:15;
1345:2,19,25;1346:12,
19;1347:13;1348:22;
1349:1;1351:15;
1353:14;1356:14;
1357:5;1359:15,18;
1360:12;1365:24;
1366:3,7;1367:5;
1368:1;1382:11
**comply (2)**
1361:22;1362:24
**components (2)**
1358:1,4
**computer (1)**
1372:20
**computers (1)**
1371:6
**Conant (5)**
1322:16,16;1356:10,
15;1357:5
**concerning (1)**
1368:5
**conclusions (4)**
1335:8;1336:16;
1358:22;1361:6
**conditions (2)**
1385:10;1386:20
**conduct (2)**
1313:4;1362:22
**conferences (1)**
1383:25
**confidential (10)**
1337:8,9,14,15;
1339:11,15,16,22;
1340:4;1378:13
**confidentiality (2)**
1339:3;1360:11
**Connecticut (3)**
1294:18;1299:4,5
**connection (1)**

**competitor (1)**
1286:22
**consider (2)**
1309:6;1399:25
**consideration (1)**
1287:6
**considered (2)**
1300:17;1340:3
**consists (1)**
1396:4
**consolidated (2)**
1389:21,24
**conspiracy (1)**
1378:9
**consult (1)**
1360:12
**consultant (18)**
1291:15;1310:25;
1311:3;1312:8,11,13,
14;1322:18;1326:4;
1334:16;1350:25;
1352:11;1353:22;
1354:1,2;1356:23;
1361:22;1364:23
**consultants (27)**
1311:5,17,18,19;
1312:5,9,10;1315:24,
25;1317:17,22;
1328:21;1329:1;
1330:18;1331:18;
1333:5,21;1361:17,21,
24;1362:5,16,21;
1363:5,25;1364:18,19
**consulting (1)**
1352:4
**consumer (6)**
1372:13,17;1385:14,
18;1389:2,2
**consumers (1)**
1371:9
**contact (6)**
1335:19;1359:14;
1363:5;1384:15;
1390:16,22
**contacted (1)**
1382:15
**contacts (18)**
1335:5,8,9,10,16;
1336:12,14,17,20,25;
1352:6;1358:20,22;
1359:2;1360:24;
1361:4,7;1388:11
**contained (1)**
1389:16
**contemplated (1)**
1335:15
**context (1)**
1325:19
**continue (5)**
1377:9;1386:13,18;
1400:14;1403:22
**Continued (6)**
1301:25;1341:25;
1399:10,22;1401:24;

1402:3
**continues (8)**
1295:18;1359:1,7,
14;1361:20;1395:19;
1398:20;1402:23
**conversation (3)**
1324:17;1365:16;
1400:3
**conversations (2)**
1333:10;1390:20
**cooperate (1)**
1380:10
**cooperating (2)**
1378:5;1382:9
**cooperation (4)**
1380:2,3,9;1381:3
**copies (1)**
1301:19
**copy (1)**
1398:22
**Corporate (4)**
1372:6,8;1388:18,25
**cost (4)**
1321:18;1332:4;
1354:16;1355:18
**Cote (2)**
1288:7
**country (1)**
1403:14
**couple (8)**
1289:10;1332:17;
1347:16;1350:2;
1361:12;1378:5;
1384:6;1390:20
**course (3)**
1289:20;1337:7;
1359:2
**courses (1)**
1397:20
**COURT (82)**
1285:2,11,13,25;
1286:8,19;1287:7,10,
18,21;1288:18;1289:2,
5,7,10;1290:18,20;
1293:24;1294:13;
1296:6;1297:5;
1298:14;1302:13,15;
1304:24;1307:3;
1308:4,18,22;1310:14,
16;1316:3,12,19,21,24;
1317:6,8;1318:20,23;
1319:3,7,25;1320:2,4;
1324:5;1326:9;1330:8;
1344:10,22;1349:22;
1358:8,12;1363:9;
1365:25;1367:2,9,11,
13,17,19,25;1368:4,9,
14,16,23;1387:25;
1388:2;1391:20;
1392:3;1394:4;
1395:10;1397:14;
1398:12;1401:1,8;
1403:8;1404:1,2,6,9

**cover (6)**
1306:16;1307:21;
1311:18;1315:24;
1373:20;1377:9
**covered (11)**
1311:19;1315:25;
1345:13,15,19,20;
1346:11;1347:5,10,17,
25
**covering (2)**
1383:22;1384:14
**create (2)**
1299:4;1316:14
**Creating (2)**
1303:5,11
**credit-related (1)**
1309:25
**credits (4)**
1315:7,8;1318:7;
1331:13
**crime (2)**
1309:1;1380:20
**crimes (6)**
1308:24,25;1378:10,
12,15;1381:3
**Cross (2)**
1326:9;1358:8
**CROSS-EXAMINATION (1)**
1326:10
**CT (1)**
1298:20
**culture (1)**
1303:11
**current (2)**
1382:23;1383:1
**curriculum (1)**
1396:25
**customers (6)**
1371:7,8;1372:16,
16;1393:14,16
**cut (2)**
1294:16;1323:1
**CXL (1)**
1323:2

## D

**Dame (4)**
1290:15,18,23;
1291:9
**Dan (1)**
1289:8
**data (1)**
1384:2
**database (1)**
1332:11
**date (17)**
1295:3,3;1298:10;
1304:11;1305:15;
1306:24;1310:22;
1321:16;1342:22;
1350:16;1355:23;
1356:2;1357:20,21;

1387:21,22;1392:18
**dated (3)**
1306:8;1346:3;
1352:15
**dates (4)**
1295:15;1296:3,3,14
**day (7)**
1288:10;1311:1;
1379:7;1388:24;
1403:13,13;1404:14
**days (5)**
1290:20;1346:13;
1356:3,7;1385:1
**day-to-day (1)**
1299:9
**dealer (3)**
1291:18;1316:20;
1324:24
**dealers (2)**
1316:21;1325:24
**dealing (2)**
1308:21;1325:23
**debts (1)**
1309:25
**December (13)**
1292:11;1298:11;
1306:25;1314:2;
1322:15;1344:16;
1352:14;1353:2;
1355:15,23;1356:2,4,7
**decide (1)**
1380:16
**decided (2)**
1288:16;1299:2
**decisions (4)**
1335:7;1336:16;
1358:21;1361:6
**declining (1)**
1389:1
**decreases (1)**
1309:22
**dedicate (1)**
1403:19
**defaults (2)**
1309:25;1310:1
**defendants (4)**
1286:9;1308:24;
1309:2,2
**Defendant's (2)**
1344:23;1349:23
**Defense (10)**
1344:9,19,19,22;
1349:5,7,20,22;
1366:12,25
**deferment (1)**
1383:5
**deferred (3)**
1382:24;1383:9,11,
17
**define (1)**
1333:16
**definition (5)**
1337:6;1338:1,13;

1339:11;1345:15
**definitions (2)**
1299:12;1338:11
**degree (6)**
1290:16;1369:19,20;
1370:5,10,24
**degrees (3)**
1370:3,5,24
**Dell (41)**
1371:4,5,6,7,10,14,
16,20,25;1372:2,5,9,
12,22;1373:25;
1374:17,20,21,22;
1375:1;1377:3;1379:2;
1384:19,22;1385:13;
1386:2,10,14;1389:3,6,
7,20;1390:13,15,17;
1393:8,19;1398:23;
1399:19;1400:11,12
**Dell's (8)**
1378:13;1385:7,23;
1386:16;1388:13,15,
19;1389:24
**DeMatteo (2)**
1329:17,18
**Department (13)**
1287:23;1304:17;
1320:21;1345:20;
1346:1,13;1347:13;
1372:3,3,11,14,18;
1382:12
**departments (1)**
1372:11
**depends (2)**
1330:20;1363:21
**deported (1)**
1383:2
**derivative (1)**
1285:15
**describe (5)**
1291:8;1327:10;
1381:3;1388:15;
1389:5
**described (2)**
1348:11,16
**describing (2)**
1346:25;1358:1
**Description (9)**
1322:3;1325:1,2;
1351:20;1352:10;
1354:7;1355:6;
1357:21,22
**descriptions (1)**
1357:18
**designed (1)**
1362:22
**designee (1)**
1353:13
**desktops (1)**
1393:15
**detect (1)**
1307:25
**determination (2)**

1339:11;1345:15
**developer (1)**
1370:13
**developing (1)**
1385:20
**development (1)**
1402:15
**develops (1)**
1393:13
**Diamondback (98)**
1290:25;1291:3,5,9,
21;1292:2,5,9,13,14,
19,21;1293:11;
1294:24;1297:9,12;
1298:20,22;1299:4,5;
1300:3,5;1301:19;
1303:3,14,18;1305:5,6;
1307:10;1310:2;
1311:24;1312:5;
1313:4,11,24;1314:23;
1316:22;1317:3,16;
1318:1,1;1322:10;
1323:8;1324:13,15;
1325:12,17;1327:12;
1328:24;1330:3,6;
1331:21,24;1332:13;
1333:10,18;1334:3;
1336:22,25;1339:17,
21,22;1340:4,7,15,22;
1341:6,13,13,16;
1343:8,13;1344:5,5,16,
25;1345:13,17,25;
1346:19;1347:25;
1350:25;1351:13;
1352:4,12;1359:3;
1363:12,18,19;1364:1,
3,11;1365:14,19;
1366:1,21;1387:2,8
**Diamondback's (7)**
1306:22;1308:10;
1319:14;1335:15;
1342:6,13;1361:22
**differ (1)**
1377:13
**different (15)**
1287:11;1289:15;
1292:17;1309:5;
1313:3;1358:4;
1361:16;1374:9,9;
1377:15;1384:2,5;
1397:20,21;1402:1
**difficult (3)**
1339:4;1359:1;
1360:11
**difficulty (1)**
1302:17
**dire (1)**
1287:5
**DIRECT (3)**
1290:12;1328:16;
1369:4
**directed (2)**
1317:1;1358:18

**directing (1)**
1298:16
**directly (3)**
1285:8;1349:2;
1399:18
**director (1)**
1307:11
**directors (1)**
1361:10
**DIS (1)**
1389:5
**Disagree (1)**
1365:23
**disclose (1)**
1318:4
**discloses (1)**
1359:8
**disclosure (2)**
1343:25;1359:10
**discrete (1)**
1285:18
**discretely (1)**
1285:25
**discretion (1)**
1364:10
**discuss (7)**
1285:2,19,20;
1309:4;1375:1;1391:5;
1404:3
**discussed (2)**
1308:19;1374:25
**discussing (2)**
1289:11;1400:2
**discussion (2)**
1286:17;1334:20
**discussions (2)**
1336:17;1361:7
**disseminate (2)**
1340:8,11
**disseminated (2)**
1338:5,20
**dissemination (1)**
1338:23
**dividend (1)**
1309:22
**division (1)**
1291:19
**document (63)**
1294:15;1295:5;
1296:15,19,23;
1297:15,17,22;1298:6;
1299:11,12;1304:6;
1305:20;1306:15,19,
20;1307:18;1308:13;
1310:7;1311:9,11;
1312:3;1317:10;
1318:14,22;1319:1,8,
14,20,21,25;1320:1,5;
1321:16;1322:13,14;
1323:22,25;1324:3,6;
1326:17,17,21;
1333:23;1337:19;
1342:22;1345:6;

1349:8,12,15,25;
1351:23;1352:24;
1354:11;1355:3,25;
1357:13;1358:18;
1360:5,23;1366:14;
1379:24;1401:7
**documents (6)**
1301:13;1319:13;
1332:9;1352:21;
1355:9;1358:1
**dollar (54)**
1315:7,8;1316:13,
14;1317:1,25;1318:7,
17;1321:1,2,5;1322:9;
1323:9,23;1324:11,24;
1325:10,11,13,19,23,
25;1329:1,9;1331:11,
12,13,14,17,23,24;
1332:1,3,9,14,16;
1349:13,19;1350:1;
1351:7,8,16;1352:19;
1353:1,11,22;1354:14;
1355:5,10,14;1356:20;
1357:11;1364:8,10
**dollars (19)**
1315:4,6,7,11;
1317:13,14,22;1318:5;
1323:15,15;1326:5;
1328:16,17;1330:10,
14,17,25;1331:3,10
**done (3)**
1331:24,25;1377:14
**doubt (1)**
1346:7
**down (22)**
1289:3,16;1295:7;
1301:4,6;1305:3;
1309:15;1310:18;
1325:6;1327:21;
1332:5;1339:10;
1354:21;1360:24;
1361:9;1367:13;
1375:8,11;1392:22;
1394:6;1398:18;
1403:7
**draft (1)**
1376:20
**drafted (1)**
1373:18
**draw (2)**
1297:7;1300:17
**drive (1)**
1372:20
**due (1)**
1299:3
**duly (2)**
1290:11;1368:22
**duplicate (1)**
1346:11
**during (18)**
1289:20;1327:25;
1328:16,24;1341:22;
1371:20,25;1372:2,7;

1373:20;1374:16,20;
1375:1;1390:16,25;
1391:2;1401:17;
1404:10
**duty (2)**
1339:3;1360:11

## E

**earlier (2)**
1314:7;1362:8
**early (5)**
1313:8,9,10;
1340:21;1341:17
**earnings (5)**
1309:22,23,23;
1371:21;1383:23
**eat (2)**
1403:11,12
**educated (1)**
1379:1
**Education (2)**
1287:23;1288:3
**effect (5)**
1336:3;1346:5,8;
1381:12,15
**efforts (4)**
1335:20;1336:15;
1337:1;1361:5
**either (5)**
1286:9;1305:14;
1307:12;1388:24;
1391:12
**electronic (1)**
1302:19
**element (1)**
1309:4
**elements (1)**
1308:24
**else (8)**
1286:24;1287:15;
1314:20;1366:23;
1367:11;1368:10;
1383:12;1394:24
**e-mail (53)**
1305:2,10,11,18,19,
20;1306:2,2,3,7;
1310:17;1311:6;
1313:12,14,16,22;
1322:15;1341:11;
1342:13,18;1343:9,17;
1358:2;1362:11,14;
1387:18;1388:7;
1389:16,18;1391:1,22;
1392:4,5,17,19,21;
1393:24;1394:6,7;
1395:3,12,13;1397:6,
15;1398:5;1399:10,22;
1400:21;1401:4,9;
1402:10,11;1404:11
**e-mails (14)**
1313:4,18,23;
1314:14,20,23;1341:3,

6,22;1342:12;1343:5,7,
14,17
**employed (8)**
1291:4;1303:18;
1312:11,15;1313:19;
1341:6;1363:6,16
**employee (6)**
1307:11;1308:12;
1345:24;1359:2;
1363:13;1364:5
**employees (23)**
1294:4;1301:20;
1303:22,25;1305:5,5,
16;1310:2,21;1311:25;
1312:18,21;1313:5,17,
24;1340:7;1344:5;
1361:11;1362:3;
1363:3,25;1365:15;
1366:21
**employer (3)**
1295:10,20;1296:9
**employment (5)**
1294:4,9;1295:15;
1296:3,4,14;1298:9;
1382:4
**end (16)**
1286:6,12;1293:10;
1308:21,23;1311:1;
1314:9,10;1333:15;
1346:13;1390:19;
1395:16;1396:11,19;
1399:22;1400:4
**endowments (1)**
1292:17
**energy (1)**
1292:25
**engage (2)**
1308:12;1316:7
**Engineering (2)**
1369:21;1370:7
**enjoy (1)**
1404:11
**enlarge (1)**
1395:11
**enough (3)**
1286:22;1311:12;
1400:4
**ensure (1)**
1361:12
**enterprise (6)**
1385:14;1393:8,9,
12,14,18
**entire (2)**
1292:8,10
**entities (1)**
1375:25
**entity (5)**
1290:25;1292:13;
1295:21;1296:10;
1299:8
**entity's (1)**
1298:23
**entries (1)**

6,22;1342:12;1343:5,7,
14,17
**employed (8)**
1291:4;1303:18;
1312:11,15;1313:19;
1341:6;1363:6,16
**employee (6)**
1307:11;1308:12;
1345:24;1359:2;
1363:13;1364:5
**employees (23)**
1294:4;1301:20;
1303:22,25;1305:5,5,
16;1310:2,21;1311:25;
1312:18,21;1313:5,17,
24;1340:7;1344:5;
1361:11;1362:3;
1363:3,25;1365:15;
1366:21
**employer (3)**
1295:10,20;1296:9
**employment (5)**
1294:4,9;1295:15;
1296:3,4,14;1298:9;
1382:4
**end (16)**
1286:6,12;1293:10;
1308:21,23;1311:1;
1314:9,10;1333:15;
1346:13;1390:19;
1395:16;1396:11,19;
1399:22;1400:4
**endowments (1)**
1292:17
**energy (1)**
1292:25
**engage (2)**
1308:12;1316:7
**Engineering (2)**
1369:21;1370:7
**enjoy (1)**
1404:11
**enlarge (1)**
1395:11
**enough (3)**
1286:22;1311:12;
1400:4
**ensure (1)**
1361:12
**enterprise (6)**
1385:14;1393:8,9,
12,14,18
**entire (2)**
1292:8,10
**entities (1)**
1375:25
**entity (5)**
1290:25;1292:13;
1295:21;1296:10;
1299:8
**entity's (1)**
1298:23
**entries (1)**

1357:7
**entry (1)**
1399:14
**equities (3)**
1376:4,5;1392:16
**equity (5)**
1316:9;1372:23;
1375:8,11,13;1392:25;
1398:18;1399:17
**Eskay (2)**
1321:15;1322:20
**especially (2)**
1341:14;1393:15
**essentially (3)**
1299:19;1353:13;
1356:17
**established (1)**
1356:5
**estimates (1)**
1309:23,24
**et (3)**
1286:14,14;1365:1
**etc (1)**
1338:8
**ETF (4)**
1348:10,16,21,21
**ETFs (7)**
1347:3,6,6,16,21,24;
1348:4
**ethics (1)**
1345:4
**even (2)**
1353:21;1354:1
**everybody (3)**
1301:6;1366:23;
1368:1
**everyone (1)**
1303:21
**evidence (21)**
1294:14;1297:6;
1298:15;1302:14;
1305:1;1307:5;1308:6;
1309:1;1317:9;1320:6;
1324:7;1335:25;
1336:2;1342:16;
1343:20;1344:23;
1349:23;1354:10;
1360:23;1388:3;1401:2
**exact (1)**
1293:9;1314:1
**exactly (2)**
1289:19;1318:5
**exam (8)**
1342:5,8;1395:22,
25;1396:10,24;1397:3,
20
**EXAMINATION (4)**
1290:12;1358:14;
1364:15;1369:4
**example (12)**
1300:23,24;1316:19;
1331:20;1339:23;
1340:11;1345:16;

1347:8,20;1348:7;
1359:7;1385:13
**examples (2)**
1309:18,21
**exams (2)**
1342:9;1396:5
**except (1)**
1384:6
**exchange (6)**
1347:7;1391:22;
1393:24;1395:3;
1397:7;1400:21
**exchange-traded (1)**
1347:7
**excited (3)**
1395:19;1397:22;
1400:6
**excused (2)**
1367:16;1403:25
**execute (3)**
1316:8,9,9
**execution (4)**
1315:12,14;1317:14;
1318:9
**Exhibit (76)**
1293:22;1294:1,13,
14;1296:18;1297:5,6;
1298:5,14,15,21;
1301:12,23;1302:6,14;
1304:5,24;1305:1;
1306:1,11;1307:3,5,18;
1308:4,6;1310:6,16;
1317:9;1318:12;
1319:9,21;1320:4,6;
1323:18;1324:7;
1326:22;1334:22;
1335:23;1342:15;
1343:20;1344:9,19,22,
23;1349:5,7,23;
1354:10;1355:13;
1358:16;1360:3;
1366:12;1387:14,23;
1388:2,3;1391:15;
1392:1,3;1393:22;
1394:2,4;1395:1,8,10;
1397:6,11,14;1398:3,9,
12;1400:17,18,24;
1401:1,2
**exists (2)**
1339:3;1360:10
**expect (1)**
1285:25
**expected (1)**
1336:24
**expenditures (1)**
1322:4
**expense (1)**
1332:6
**expenses (2)**
1300:20;1301:4
**experience (8)**
1295:6;1392:24;
1393:6;1395:20;

1398:22;1399:17,24;
1402:2
**expert (11)**
1292:24;1311:22;
1329:4,9,24;1330:6,13;
1333:11,12,16;1364:1
**expires (3)**
1382:22;1383:5,17
**explain (6)**
1300:2,8,25;
1305:10;1312:7;
1318:3
**exposure (1)**
1397:23
**expressing (1)**
1402:16
**extend (1)**
1312:20
**external (1)**
1377:16
**externally (2)**
1341:7,7
**extra (1)**
1384:6
**extremely (3)**
1392:25;1394:12,15
**eye (3)**
1396:19;1399:10;
1403:4

## F

**F1 (1)**
1337:5;1339:9
**F2 (1)**
1337:18
**F3 (3)**
1338:15,25;1360:4
**F-5 (2)**
1336:9;1360:22
**face (3)**
1352:20;1355:9;
1379:16
**fact (7)**
1285:14,20;1335:19;
1336:24;1340:25;
1346:1;1366:7
**fair (7)**
1314:4;1322:7;
1334:11;1359:18;
1364:4;1365:10,15
**fairly (1)**
1352:10
**fall (1)**
1294:6
**falling (1)**
1347:17
**familiar (11)**
1290:25;1291:3;
1293:25;1294:3,21;
1295:21;1296:10;
1311:20;1323:3,24;
1325:24

**family (2)**
1292:18;1383:12
**far (4)**
1299:7;1311:12;
1369:18;1392:24
**fashion (1)**
1313:23
**fashioned (1)**
1302:20
**Fayad (1)**
1376:10;1387:20
**FBI (4)**
1285:16;1378:16,18;
1379:7
**February (2)**
1295:17;1340:21
**feedback (3)**
1392:23;1394:12;
1398:24
**Feith (5)**
1286:19;1287:17;
1289:17,23;1290:2
**Feith's (1)**
1289:21
**few (3)**
1317:11;1364:8;
1383:19
**files (1)**
1319:14
**filing (1)**
1338:8
**fill (1)**
1332:2
**filled (2)**
1321:21;1322:1
**final (1)**
1396:18
**finally (1)**
1402:10
**finance (2)**
1293:15;1393:8,9
**Financial (9)**
1328:19;1359:8;
1371:24;1373:18;
1376:20;1385:23;
1389:20,24;1396:4
**financials (1)**
1292:25
**find (1)**
1398:21
**finding (1)**
1398:18
**fine (3)**
1286:6;1290:3;
1342:19
**finish (1)**
1401:6
**firm (17)**
1293:5;1299:2;
1303:9,12,21;1306:3,4;
1310:12,21;1311:20;
1314:3;1315:15,21;
1341:12,12;1343:14;

1375:20
**firms (13)**
1311:22;1315:22,23;
1325:25;1326:3;
1333:11,12,16;1364:1;
1373:12,13,14;1399:25
**firm's (2)**
1335:8;1358:22
**first (37)**
1292:1;1293:2;
1297:7,8,20;1298:17;
1303:17;1305:2;
1306:6;1309:11,19;
1310:17;1315:14;
1317:10;1320:7;
1323:21;1326:16;
1335:4,6;1339:1;
1345:12;1349:11;
1358:21;1360:9;
1361:3;1362:19,19;
1372:5;1378:18;
1379:7,14;1386:13;
1390:6;1399:20;
1401:4,11;1402:13
**Fishbein (8)**
1287:7,9;1388:1;
1394:3;1395:9;
1397:13;1398:11;
1400:25
**Five (4)**
1319:10;1367:22;
1368:12;1384:24
**five-page (4)**
1319:20,25;1320:1,5
**floor (1)**
1294:17
**focus (1)**
1394:5
**focusing (2)**
1395:15;1397:15
**folks (2)**
1386:23;1404:9
**follow (3)**
1290:2;1317:20
**followed (3)**
1289:22;1303:12;
1384:2
**following (1)**
1307:23
**follows (3)**
1290:11;1347:13;
1368:22
**footer (3)**
1342:25;1343:1,3
**forbids (1)**
1307:11
**foreign (2)**
1335:13;1358:24
**forgive (1)**
1340:16
**form (26)**
1293:25;1294:3;
1318:17;1321:5,10,12;

1322:9;1323:23;
1324:9,11;1332:1,3,4;
1343:1;1349:13;
1350:2;1351:7;
1352:19;1354:14;
1355:5,10,14,15;
1356:3,4;1357:11
**formed (2)**
1335:8;1358:22
**former (2)**
1312:17,21
**forms (8)**
1301:14;1317:16,18;
1332:16;1351:17;
1353:11;1354:3;
1356:20
**fortunate (1)**
1403:15
**forward (3)**
1372:10;1395:20;
1403:2
**found (1)**
1395:16
**four (2)**
1356:3,7
**fourth (2)**
1352:24;1360:5
**frame (1)**
1399:1
**Francisco (4)**
1372:25;1376:17;
1392:10,13
**fraud (2)**
1378:8,9
**free (1)**
1309:6
**Friday (3)**
1288:17,17,24
**friends (11)**
1374:21;1384:22;
1385:1,8,17;1386:2,8,
9,14,22;1389:17
**front (3)**
1326:21;1336:10;
1387:13;1395:16
**full (2)**
1288:18;1291:20
**fully (2)**
1392:9;1399:13
**function (6)**
1293:13;1328:5;
1340:9;1353:14;
1356:14,19
**functions (2)**
1332:13;1342:8
**fund (6)**
1292:15,16,18;
1295:14;1298:3;
1347:21
**funds (8)**
1292:18;1330:15,17,
20,22;1347:7;1373:12;
1376:1

# A-882

**further (9)**
1309:3;1325:6;
1326:8;1337:1;1358:6,
10;1361:9;1364:14;
1367:10
**furtherance (1)**
1335:20

## G

**G-2 (2)**
1335:3;1358:18
**Galleon (1)**
1286:14
**Gallo (1)**
1287:21
**Garber (2)**
1388:21,23
**garden (1)**
1363:17
**Gartner (1)**
1323:2
**gather (1)**
1289:14
**gave (3)**
1378:13;1386:3,23
**general (5)**
1337:4;1338:5;
1373:7;1375:3;
1386:20
**generally (16)**
1309:9;1316:7;
1336:25;1339:11,15;
1343:1;1344:24;
1345:2;1346:17;
1348:7;1355:11;
1372:7,17;1384:4,14;
1385:10
**generate (1)**
1331:6
**generated (3)**
1315:8;1316:4;
1331:14
**gentlemen (2)**
1367:20;1403:9
**Gerson (1)**
1329:21
**given (3)**
1297:24,25;1396:14
**glad (1)**
1398:14
**GLG (1)**
1329:21
**Global (3)**
1329:7;1334:8,12
**goal (1)**
1372:21
**goes (4)**
1366:21;1376:20;
1396:10;1402:24
**Good (11)**
1326:12,13;1367:13;
1389:2;1399:23;

1401:17,20,21;1403:1,
3;1404:14
**government (85)**
1290:7,8,10;
1293:22;1294:1,11,13;
1296:18;1297:3,5;
1298:5,12,14;1301:12,
23;1302:6,11;1304:5,
22,24;1306:11;1307:1,
3;1308:2,4;1310:6,13,
16;1317:5;1318:12,18;
1319:8,20,21,24;
1323:18;1324:2;
1326:21;1334:22;
1335:23;1342:15;
1343:20;1354:10;
1355:13;1358:16;
1360:3;1367:17,18;
1368:19,21;1378:6;
1379:14;1380:10,21;
1381:4,8,10;1382:9;
1383:10,11;1387:14,
23,23;1388:2;1391:15;
1392:1,3;1393:22;
1394:2,4;1395:1,8,10;
1397:6,11,11,14;
1398:3,9,9,12;1400:17,
18,24;1401:1
**government's (17)**
1290:5;1294:14;
1297:6;1298:15;
1302:14;1305:1;
1307:5,18;1308:6;
1317:9;1320:4,6;
1324:5,7;1368:16;
1388:3;1401:2
**governs (1)**
1344:24
**Goyal (27)**
1321:15;1322:23;
1350:5,8,13,24;1351:8,
24;1357:14;1367:18;
1368:19,20,23;1369:6;
1379:23;1387:12,15;
1388:4;1391:16;
1393:22;1394:7;
1395:1;1398:3;
1400:19;1401:9,19;
1404:12
**graduate (4)**
1285:20;1290:16,23;
1370:20
**graduating (1)**
1291:9
**grateful (1)**
1403:17
**great (6)**
1289:19;1392:20;
1393:1;1398:13;
1400:7;1404:11
**gross (1)**
1301:3
**group (16)**

1310:20;1323:2;
1329:21;1332:2;
1372:23;1375:8,9,12;
1385:18,19,20;
1393:12,13,13,18;
1398:18
**groups (1)**
1385:15
**growing (1)**
1314:3
**guess (2)**
1368:17;1401:5
**guesses (1)**
1379:2
**guide (1)**
1397:21
**guilty (10)**
1285:22;1378:5,7,
10,15;1379:17,19;
1382:5,6,16
**guy (1)**
1403:1
**guys (1)**
1290:20

## H

**Hadlock (53)**
1289:4,5;1290:8,9,
14;1293:25;1294:15;
1295:19;1296:8,17;
1297:7,16;1298:16,19;
1300:2;1301:11,22;
1302:21;1303:2;
1305:2;1306:10;
1308:9;1309:12,18;
1310:17;1313:3;
1316:25;1317:19;
1320:7;1321:16;
1323:3;1324:8;1325:6;
1326:12;1330:5,14,24;
1333:9,20;1335:6;
1336:13;1337:25;
1342:21;1343:22;
1349:7;1351:5;1353:5;
1358:16;1362:20;
1364:17;1366:14;
1367:4,13
**half (1)**
1291:16
**halfway (2)**
1286:16;1360:24
**hand (1)**
1315:1
**handed (1)**
1289:15
**handful (1)**
1359:11
**handing (1)**
1379:22
**hands (1)**
1287:17
**happen (4)**

1310:20;1323:2;
1329:21;1332:2;
1372:23;1375:8,9,12;
1385:18,19,20;
1393:12,13,13,18;
1398:18
**happened (2)**
1378:3;1382:20;
1402:15
**happens (2)**
1355:21;1366:18
**happy (3)**
1319:23;1346:7;
1400:5
**harbor (4)**
1315:13;1317:13;
1318:8;1332:6
**hard (1)**
1372:20
**hardware (6)**
1352:7;1373:22,24;
1375:4;1377:2,9
**head (6)**
1313:20;1319:12;
1328:1;1332:3;
1351:13,16
**headed (3)**
1299:12;1321:4;
1358:20
**heading (5)**
1295:6;1308:14;
1312:4;1322:3;
1362:15
**headquarters (3)**
1371:12;1385:7;
1388:13
**hear (1)**
1314:16;1368:9;
1392:20;1398:24
**heard (2)**
1315:3;1368:8
**Hedge (9)**
1285:15;1292:15,16;
1295:14;1330:14,17,
20,22;1373:12
**hedges (1)**
1293:2
**held (1)**
1291:24
**help (1)**
1397:23
**helped (3)**
1314:24,25;1332:8
**helpful (1)**
1398:21
**herself (1)**
1342:2
**Hey (2)**
1392:19;1397:18
**Hi (1)**
1388:10
**high (2)**
1290:20;1292:17
**highlight (4)**
1309:16;1335:6;
1349:25;1399:1
**highlighted (3)**

1359:7;1383:16;
1394:22;1396:21
**happened (2)**

**hire (2)**
1338:25;1353:5;
1361:20
**hire (2)**
1399:18;1401:18
**hired (5)**
1291:21;1292:3;
1297:11;1328:25;
1329:4
**hires (1)**
1399:16
**hiring (1)**
1363:24
**Hoenig (1)**
1324:21,23
**Hoffman (7)**
1299:25;1309:10,15;
1322:14;1394:5;
1395:11;1401:3
**hold (1)**
1292:7
**holiday (2)**
1403:24;1404:12
**Honor (29)**
1286:3,25;1293:23;
1297:4;1302:16,17,18;
1308:17;1318:19,25;
1319:2,6,16,19;
1323:19;1324:4;
1326:7;1344:11;
1349:20;1363:7;
1364:13;1365:23;
1367:1,10,12;1368:2,7;
1369:3;1401:6
**Honor's (2)**
1286:7;1287:5
**hookup (1)**
1302:19
**Hope (2)**
1392:8;1396:18
**hopeful (1)**
1288:19
**hopefully (1)**
1397:23
**Horvath (4)**
1285:9,22;1286:14,
17
**hosiery (2)**
1291:13,14
**how's (1)**
1393:6
**HP (3)**
1373:25;1377:3;
1399:20
**HR (2)**
1328:1;1356:14
**Human (4)**
1293:13,14,18;
1303:18
**hundreds (2)**
1330:10,12
**Hurricane (1)**
1288:19

## I

idea (7)
1330:5,24;1331:3,5;
1350:11,12;1399:23
identification (19)
1293:22;1298:5;
1301:12,23;1304:5;
1306:11;1307:17;
1310:6;1316:1;
1318:11;1323:17;
1379:22;1387:14;
1391:15;1393:21;
1394:25;1397:6;
1398:2;1400:18
identified (1)
1341:20
identifying (1)
1303:8
IM (5)
1342:13;1343:24;
1344:6;1399:2,3
immaterial (1)
1365:7
immediately (1)
1359:15
immigration (1)
1382:23
implicate (1)
1285:19
important (3)
1336:14;1361:4;
1403:23
impose (1)
1317:24
impression (2)
1401:18;1402:18
Inc (1)
1393:8
inclined (3)
1287:10;1288:3,11
include (9)
1303:4;1309:21;
1311:22;1334:5;
1338:18;1339:22,25;
1342:12;1345:13
included (2)
1307:24;1381:1
includes (3)
1341:3;1345:16;
1373:25
including (3)
1289:17;1307:12;
1352:5
increased (2)
1299:18;1314:4
increases (1)
1309:22
India (3)
1369:17,18,22
India-based (1)
1389:10

indicate (2)
1306:19;1321:22
indicated (2)
1286:20;1289:17
indicates (3)
1294:25;1295:10,20
indictment (1)
1289:15
indictments (1)
1285:17
individual (10)
1292:18;1315:24,25;
1328:21,25;1352:10;
1353:23;1371:9;
1372:16;1375:25
individuals (4)
1305:4,11;1310:19,
20
industries (1)
1352:7
industry (8)
1352:5,6;1393:6;
1394:13,16;1396:9;
1399:19;1402:1
Information (57)
1293:17;1307:14,14;
1309:13,19,21,21;
1335:12;1336:18;
1337:8,9,13,15,24;
1338:4,11;1339:2,11,
15,16,22;1340:3,4;
1358:23;1359:4,16,22;
1360:1,10,13,17,18;
1361:8,13;1362:23;
1363:22;1364:6;
1365:6,24;1378:13;
1379:4;1383:22;
1384:5,10,18;1385:8;
1386:2,7,18,21;1389:5,
15,15,18,24,25;1390:4
informing (1)
1305:11
initial (1)
1379:9
Initially (1)
1377:2
inquiry (1)
1285:18
inside (1)
1332:6
insider (9)
1286:4;1287:3;
1306:21;1307:7,25;
1308:10;1362:25;
1363:19,21
insiders (1)
1312:1
instance (2)
1292:24;1332:6
instances (1)
1365:5
instant (5)
1313:5;1341:3;

1342:12;1343:23;
1344:5
instruct (1)
1308:23
instruction (1)
1308:20;1367:25
instructions (7)
1286:10,23;1289:13,
22;1308:21;1309:3;
1368:4
insure (1)
1303:22
Intel (1)
1399:20
intended (1)
1376:23
intends (1)
1363:14
interacting (1)
1361:21
interest (3)
1399:1,2;1402:16
interested (4)
1392:25;1394:13,15;
1402:17
interesting (2)
1286:2;1399:12
interests (1)
1397:24
internal (1)
1377:17
internally (1)
1341:6
International (1)
1389:6
Internet (1)
1285:7
interview (3)
1374:16,20;1375:1
interviewed (3)
1374:2,5;1390:19
interviewing (1)
1390:18
into (5)
1365:24;1391:13;
1394:13,16;1403:22
invaluable (2)
1395:22;1396:6
invest (1)
1312:16
investing (1)
1346:23
investment (31)
1291:16,18,19,20;
1292:14,20;1296:13;
1297:13;1303:5,10;
1313:18;1335:7;
1336:16;1340:16,17,
22;1341:14;1342:5,10;
1358:21;1361:6;
1373:14;1375:20;
1391:10,12;1393:4;
1394:18;1396:9,17;

1398:23;1399:4
Investments (4)
1295:10,13,16;
1296:2
investor (6)
1293:14;1359:9;
1384:1,15;1395:18;
1400:13
investors (5)
1292:16;1293:6;
1359:11;1375:23;
1376:3
invoice (8)
1351:20,24;1352:15,
18;1355:4,10;1357:17,
21
invoices (1)
1357:22
involve (1)
1303:7
involved (5)
1332:12;1372:19;
1373:24;1377:2;
1385:20
IPR (1)
1323:2
IR (5)
1395:16,17;1397:22;
1398:22;1399:2
issue (3)
1285:4;1287:21;
1339:15
issuer's (1)
1337:10
issues (1)
1359:1
item (1)
1335:4
ITG (2)
1324:21,23

## J

January (10)
1296:5;1314:2;
1340:20,21;1350:16;
1352:15;1357:20;
1377:25;1387:22;
1388:4
JC (1)
1291:11
Jeff (1)
1403:3
Jersey (2)
1369:11;1378:23
Jesse (11)
1324:12,12,14;
1348:20;1354:1;
1373:4;1374:6;
1378:14;1386:3,4,23
Jesse's (1)
1387:9
Jo (1)

1288:7
job (12)
1325:23;1335:19;
1340:9;1372:24;
1374:3,7,12;1375:17;
1387:3,7;1398:19;
1400:5
jobs (2)
1291:8;1402:8
John (2)
1285:22;1286:14
joined (3)
1292:1;1386:13;
1400:14
joining (1)
1291:9
Jon (2)
1285:9;1286:17
Journal (1)
1285:7
Judge (5)
1288:7;1380:17,25;
1381:9,14
July (6)
1291:7,21;1296:5;
1307:22;1354:15;
1378:19
June (3)
1296:16;1325:3;
1398:7
juror (3)
1286:19;1287:22;
1288:13
jury (19)
1285:1,3,18;
1286:25;1287:2,5;
1288:9,14;1289:8,9;
1302:19;1308:22;
1352:25;1365:21;
1367:24;1368:14,15;
1403:20;1404:1

## K

Katherine (1)
1322:15
keep (11)
1325:12;1332:11;
1368:23,25;1374:21;
1396:19;1399:10;
1402:3,6,8,8
keeping (1)
1403:4
key (1)
1388:11,14
keyword (2)
1313:18,19
kind (13)
1287:3;1288:5;
1292:13,16;1352:11;
1371:8;1373:20;
1376:25;1381:24;
1382:3;1385:8;

1393:16;1403:1
**knowledge (3)**
1348:23,24;1385:22
**knows (1)**
1288:13

## L

**lab (1)**
1291:12
**ladies (2)**
1367:20;1403:8
**Landmark (1)**
1294:17
**large (3)**
1371:9;1385:14;
1393:14
**last (8)**
1286:15;1296:8;
1349:17;1357:13,14,
25;1380:6;1402:15
**late (7)**
1313:9,10;1333:9;
1340:20;1341:17;
1359:18;1390:3
**lately (1)**
1286:2
**later (5)**
1346:13;1354:15;
1357:21;1377:4;
1379:11
**latest (1)**
1404:13
**Lauren (3)**
1322:16,16;1356:10
**law (1)**
1307:15
**lawful (1)**
1383:1
**lawyer (4)**
1328:13,15;1341:21;
1382:18
**lawyers (2)**
1382:15;1403:18
**laying (1)**
1385:20
**learn (1)**
1371:24
**least (3)**
1286:21;1328:13;
1339:16
**leave (5)**
1363:17;1369:22;
1374:22;1375:5,7
**led (1)**
1378:3
**left (5)**
1291:13,24;1343:4;
1372:22;1375:14
**left-hand (2)**
1325:2;1342:19
**legal (5)**
1299:3,8;1328:14;

1359:1;1360:12
**Lehman (1)**
1338:22
**Lehrman (1)**
1329:21
**length (1)**
1309:4
**less (2)**
1312:24;1313:1
**letter (6)**
1296:22;1298:9;
1301:5;1380:25;
1381:2,13
**Lexmark (1)**
1373:25
**likes (1)**
1338:22
**limited (2)**
1309:7;1315:23
**limiting (2)**
1308:20;1367:25
**line (4)**
1305:4;1310:22,25;
1393:7
**lines (3)**
1309:20;1322:6;
1360:4
**linked (3)**
1285:8,8,11
**Lipacis (2)**
1374:6,14
**Lipacis' (1)**
1374:7
**liquidity (1)**
1309:25
**list (9)**
1313:20;1322:19;
1357:1;1365:19;
1366:1,4,16;1367:3,6
**listed (7)**
1296:9,14;1302:8;
1320:24;1321:2,7;
1329:24
**little (9)**
1294:16;1302:17;
1354:15,21;1358:7;
1360:23;1361:9;
1368:24;1392:24
**live (1)**
1369:10
**liver (1)**
1358:9
**LLC (5)**
1297:10,12;1298:21,
22;1299:4
**loathed (1)**
1288:1
**located (4)**
1303:24;1371:12;
1372:24;1375:17
**location (1)**
1299:2
**logged (1)**

1343:24
**long (10)**
1287:24;1292:5;
1318:4;1338:20;
1371:16;1395:23;
1396:7,8;1403:20;
1404:13
**long-term (3)**
1391:6,8;1397:24
**look (43)**
1293:21;1296:23;
1297:16;1298:4;
1301:11,22;1304:4;
1305:2;1306:10,13;
1307:17,23;1310:5,17;
1316:1;1317:20;
1318:11;1319:8;
1323:17;1325:6;
1336:9;1339:19;
1342:5;1345:6;
1346:10;1349:5;
1360:21;1362:8,10,14,
19;1363:4;1379:23;
1387:12,13;1391:14;
1393:7,21;1397:5;
1398:2;1400:17;
1402:10;1403:14
**looked (4)**
1298:21;1372:9;
1383:23,23
**looking (16)**
1312:12,16;1320:7;
1388:14;1392:4;
1394:23;1395:20;
1396:22;1398:25;
1401:18,25;1402:8,13,
14,18;1403:2
**looks (5)**
1342:9;1349:18;
1354:17;1357:20;
1395:5
**loss (2)**
1340:1,3
**lot (7)**
1285:9;1365:14;
1377:16;1385:13;
1403:12,15,16
**love (1)**
1398:24
**luck (1)**
1367:13
**lunch (1)**
1401:17
**Lynch (4)**
1296:9,12,12;
1338:22

## M

**Magee (8)**
1293:20;1322:15;
1327:25;1342:1;
1354:17;1356:10,13;

1357:4
**Magee's (3)**
1325:8,9;1353:8
**maintain (1)**
1301:19
**maintaining (1)**
1303:5
**major (2)**
1338:6,7
**makes (2)**
1359:10;1362:19
**making (5)**
1288:21;1298:22;
1303:9,12;1373:24
**man (3)**
1315:1;1350:8,13
**manage (4)**
1297:24;1373:14;
1375:23;1376:3
**managed (2)**
1292:23;1307:13
**Management (35)**
1291:1,3,6,10;
1292:2,5,13,14,19,22,
22,23;1295:20;
1297:10,12;1298:22;
1307:10;1352:4;
1373:12,13,14;
1375:20;1383:25;
1384:1,10,13;1391:10,
12;1393:4;1394:18;
1396:9,17;1397:24;
1398:24;1399:4
**Management's (1)**
1343:8
**manager (15)**
1297:11;1298:2,18;
1300:10;1320:22,24;
1327:12;1332:2;
1337:4;1348:15;
1353:18,22;1354:2,25;
1387:9
**managers (10)**
1293:4,7;1299:9;
1300:15;1314:7;
1331:20;1364:12;
1376:24;1377:18,19
**manages (1)**
1375:22
**managing (4)**
1292:15;1297:23;
1391:13;1399:16
**manner (1)**
1362:22
**manual (11)**
1303:8,9;1306:16,
22;1307:21,24;
1308:25;1309:5;
1344:15;1360:21;
1368:1
**manuals (1)**
1310:3
**manufacturer (1)**

1371:6
**manufacturers (1)**
1291:14
**many (7)**
1293:7;1313:24;
1314:10;1319:9;
1330:22,23;1384:23
**March (6)**
1295:4,17;1296:16;
1335:1;1395:6;1397:9
**Mark (4)**
1290:8,9;1353:5;
1374:6
**marked (24)**
1293:21;1296:17;
1298:4;1301:11,23;
1304:4;1306:11;
1307:17;1310:5;
1316:1;1317:20;
1318:11;1319:8;
1323:17;1360:22;
1366:12;1379:22;
1387:13;1391:14;
1393:21;1394:25;
1397:5;1398:2;
1400:18
**market (3)**
1352:5;1372:9;
1389:1
**Mark's (1)**
1305:19
**married (1)**
1369:12
**Martoma (1)**
1285:6
**Mary (1)**
1288:7
**master (1)**
1298:3
**master's (2)**
1370:7;1371:1,2
**material (19)**
1307:13,14;1308:14;
1309:13,17,19,21;
1337:10,14,15,20;
1339:2;1359:3,16;
1360:10,17;1361:13;
1362:23;1365:7
**Materiality (1)**
1309:3
**matter (2)**
1402:3,7
**matters (2)**
1309:6;1319:4
**Matthew (1)**
1285:6
**maximize (1)**
1372:21
**maximum (1)**
1379:16
**may (32)**
1286:12,13,13,16;
1287:12;1289:16;

1292:6;1293:23;
1309:1;1310:22;
1319:5;1329:23;
1333:2;1334:16;
1335:7;1336:15;
1337:8,9;1347:5,10;
1358:13,21;1359:15;
1360:11;1361:5;
1366:18;1369:2;
1371:19,19;1375:3;
1390:19;1399:13
**maybe (3)**
1290:2;1368:24;
1401:6
**MBA (1)**
1371:3
**McLeod (1)**
1351:3
**mean (23)**
1297:25;1300:14;
1305:24;1315:20;
1319:3;1320:18;
1323:14;1338:17,18;
1347:20;1363:21;
1373:13,23;1376:5;
1382:25;1385:12,19;
1388:22;1392:12;
1396:20;1399:14;
1401:21;1402:6
**meaning (4)**
1325:24;1335:9;
1391:11;1401:16
**means (11)**
1300:2;1316:6;
1318:3,4;1323:4;
1338:6;1365:12;
1375:21;1383:1;
1392:9;1402:8
**meant (3)**
1321:10;1377:16,17
**medium (2)**
1385:14;1389:14
**meet (3)**
1379:7;1388:10;
1390:6
**meetings (1)**
1333:6
**member (1)**
1357:5
**members (3)**
1300:18,19,21
**memory (2)**
1372:20;1400:3
**Mention (3)**
1285:14,14;1329:14
**mentioned (18)**
1287:13;1289:23,25;
1290:1;1292:20;
1293:1;1317:11;
1327:25;1328:9,13,17;
1332:19,21;1340:15;
1341:15;1365:14;
1379:14;1384:9

**mentioning (1)**
1286:5
**Merrill (4)**
1296:9,12,12;
1338:22
**messages (5)**
1313:5;1341:3;
1342:12;1343:23;
1344:5
**met (2)**
1326:14;1387:10
**methods (2)**
1341:13,13
**microphone (1)**
1368:24
**middle (1)**
1402:14
**might (5)**
1286:11;1352:11;
1365:6,12,12
**million (13)**
1297:24;1298:1;
1299:18;1300:24;
1301:2,3,5,6,7;
1326:25;1327:2,2,5
**millions (1)**
1331:3
**mils (3)**
1316:10,15,15
**mind (1)**
1309:1
**minutes (1)**
1367:22
**misuse (1)**
1362:23
**Mm-hmm (2)**
1306:18;1308:15
**model (3)**
1292:21,21;1293:1
**models (2)**
1373:18;1376:21
**moment (11)**
1302:17;1318:25;
1319:17;1323:19;
1326:7;1338:16;
1343:22;1364:13,17;
1383:19;1395:24
**moments (2)**
1317:11;1383:19
**Monday (6)**
1288:15,20;1403:10,
25;1404:9,12
**money (12)**
1292:23;1297:22;
1299:16;1325:12;
1330:24;1364:11;
1373:14;1375:22,23;
1376:3;1391:13;
1399:16
**monitoring (5)**
1314:25;1341:16,22;
1342:2;1343:25
**month (1)**

1395:17
**months (2)**
1312:25;1313:2
**more (5)**
1313:2;1325:22;
1372:3,4;1395:21
**morning (5)**
1288:1;1326:12,13;
1388:24;1404:10
**Morvillo (12)**
1285:4,5,12,14;
1286:3,11;1287:19,20;
1289:3;1358:9;1368:5,
7
**Mostly (6)**
1293:13;1297:19;
1332:7;1372:15;
1390:20;1391:4
**move (4)**
1290:4;1368:24;
1369:24;1370:14
**moved (2)**
1381:21;1392:12
**movement (1)**
1333:15
**Mtec (6)**
1322:19;1323:3,5;
1330:25;1334:8;
1357:1
**much (11)**
1293:14;1300:6;
1330:5,24;1376:2;
1379:9;1384:6;
1394:10;1403:3,11;
1404:7
**mug (1)**
1289:3
**multimanager (1)**
1293:3
**multi-page (1)**
1319:1
**multiple (5)**
1285:21,22;1292:22;
1303:17;1348:6
**multiple-page (1)**
1349:8
**must (4)**
1345:19;1346:11;
1361:12,22
**myriad (1)**
1311:21
**myself (1)**
1289:1

**N**

**name (14)**
1286:9,15;1294:25;
1298:24;1299:7;
1305:8;1323:7;1329:7,
15,16;1343:24;
1350:13;1351:11;
1369:6

**named (1)**
1350:5
**names (5)**
1285:9;1286:5,11;
1329:14;1386:11
**NASDAQ (2)**
1347:8;1348:6
**NATHANSON (41)**
1294:12;1297:4;
1298:13;1302:12;
1304:23;1305:24;
1307:2;1308:3,17,19;
1309:8;1310:15;
1317:7;1318:19,21;
1319:1;1320:3;1324:3;
1326:9,11;1335:25;
1342:17;1344:11,19;
1345:9;1349:20,24;
1351:3;1352:23;
1355:2;1358:6;1360:2,
20;1363:7;1364:8,16;
1365:23;1366:25;
1367:10;1368:2;
1392:2
**nature (1)**
1332:11
**necessary (1)**
1340:8
**need (8)**
1285:2,17,24;
1287:4;1305:12;
1367:2,21;1397:23
**Neff (2)**
1402:16,19
**net (5)**
1292:17;1300:7,12,
14,16
**netted (2)**
1301:6,8
**network (7)**
1311:22;1329:9;
1330:6;1333:11,12,16;
1352:6
**networking (1)**
1364:1
**networks (2)**
1329:4;1330:13
**Neuberger (25)**
1375:16,19,23;
1376:3,7,19,24;
1377:13,17,17,20,22;
1382:1,5,12,21;1384:4;
1386:13,22,23,25;
1388:6;1398:19;
1400:8,14
**New (15)**
1285:7;1287:23;
1299:3,5,6;1305:16;
1310:11;1345:10,20;
1346:4;1369:11;
1375:18;1378:23;
1400:5;1402:15
**Newman (36)**

1294:10,25;1295:16;
1297:9,17,23;1298:20;
1299:17;1300:3,5,8;
1301:1,16;1306:8,9;
1320:25;1321:9;
1322:15;1327:10;
1333:23;1334:7,15;
1335:1;1353:18;
1354:3;1356:10,22;
1357:4;1358:1;
1359:21;1360:16;
1365:5;1366:7;1367:4;
1387:6,10
**Newman/Jesse (1)**
1350:18
**Newman's (11)**
1296:22;1298:17;
1299:21;1300:11;
1302:24;1305:8;
1326:17,24;1330:25;
1354:23;1387:7
**news (7)**
1289:14,14;1338:7,
7;1359:10;1368:5;
1384:2
**newspaper (1)**
1285:12
**next (17)**
1287:25;1288:16;
1289:24;1290:4,5;
1295:19;1301:25;
1321:21;1325:1;
1337:18;1341:25;
1342:19;1361:16;
1367:17;1368:16,18;
1401:17
**nine (2)**
1291:20;1404:13
**none (2)**
1321:25;1322:6
**nonpublic (8)**
1339:2;1359:3,16,
25;1360:10,18;
1361:13;1362:23
**non-public (6)**
1307:13,14;1309:13;
1337:24;1338:4,11
**normal (2)**
1384:17;1399:19
**Normally (3)**
1384:15;1385:3;
1399:16
**notebooks (1)**
1393:15
**noticed (1)**
1401:6
**notification (5)**
1304:9,10,13;
1305:11;1310:10
**notify (3)**
1343:16;1345:19,25
**Notre (1)**
1290:15,18,23;

1291:9
**November (2)**
1378:11;1404:15
**number (23)**
1287:22;1293:9;
1305:4;1311:10;
1314:1,3,12;1321:12;
1328:25;1329:4,23,25;
1330:2;1335:4;
1339:10;1345:12;
1346:10;1347:3;
1388:18,21;1389:2,5,
13
**numbers (5)**
1302:4,5,8,22;
1388:14
**NY (1)**
1299:5

## O

**object (1)**
1324:4
**objecting (1)**
1318:24
**objection (29)**
1294:12;1297:4;
1298:13;1302:12;
1304:23;1307:2;
1308:3;1310:14,15;
1317:6,7;1318:19,20;
1320:2;1330:7;
1344:21;1349:21;
1363:7;1365:22;
1367:1,8;1387:25;
1388:1;1392:2;1394:3;
1395:9;1397:13;
1398:11;1400:25
**objective (1)**
1399:12
**objectives (4)**
1391:6,9;1396:14,16
**obligations (2)**
1380:18,23
**obtain (4)**
1332:9;1337:8,9;
1384:5
**obtained (3)**
1383:21;1384:9,18
**Obviously (3)**
1319:22;1345:5;
1403:9
**occasion (2)**
1333:5;1334:15
**occur (1)**
1382:16
**occurred (1)**
1303:17
**October (5)**
1352:14;1357:19;
1378:11;1393:25;
1395:5
**off (8)**

1294:16;1313:20;
1315:9;1316:4,18;
1319:12;1325:5;
1351:16
**offer (6)**
1296:22;1298:22;
1301:5;1319:25;
1320:1;1400:24
**offered (3)**
1297:9;1298:20;
1309:7
**offering (1)**
1302:15
**offers (20)**
1294:11;1297:3;
1298:12;1302:11;
1304:22;1307:1;
1308:2;1310:13;
1317:5;1318:18;
1324:2;1344:19;
1349:20;1366:25;
1387:23;1392:1;
1394:2;1395:8;
1397:11;1398:9
**Office (11)**
1285:5,16;1292:18;
1293:13;1299:5,6;
1371:14;1379:20;
1380:4,23;1381:13
**officer (22)**
1291:24;1292:4,7,8,
10,11;1293:12,19;
1294:7;1303:3;
1304:17;1307:11;
1313:12;1328:2,7,11;
1341:21;1342:1;
1351:15;1359:8,15,18
**officers (1)**
1361:10
**often (2)**
1303:16;1395:21
**old (2)**
1302:19;1369:8
**on-boarding (2)**
1303:19;1333:12
**once (3)**
1376:16;1387:11;
1390:18
**one (67)**
1286:5,19;1287:1,5,
21;1288:22;1289:17;
1293:2;1294:5,17;
1297:1;1302:10,18;
1309:2,3;1318:25;
1319:13,17,21;
1321:20;1323:19;
1326:7;1327:19;
1329:9,14,17;1334:8;
1336:6;1338:10,10;
1340:25;1342:8;
1343:16;1348:11,20,
23,25;1350:24;1354:7,
15;1355:4,15;1356:13;

1357:6,14,18;1364:13;
1365:10;1366:10,11,
18;1372:2,3,4;1378:8,
8;1384:9;1388:18,19,
22;1395:5;1397:20,21;
1401:5,10,10;1403:17
**ones (3)**
1325:15;1348:4,11
**one-third (1)**
1305:3
**online (1)**
1372:15
**only (9)**
1286:15;1305:14;
1320:7;1341:12;
1374:25;1398:24;
1399:14,17,25
**on-phone (1)**
1389:11
**open (5)**
1287:18;1299:2;
1345:24;1394:22;
1404:1
**opened (1)**
1285:23
**opens (1)**
1345:20
**Operation (2)**
1285:15,16
**operations (2)**
1375:12,13
**opinion (1)**
1396:24
**opportunity (2)**
1394:14,19
**opposed (1)**
1389:25
**opposition (2)**
1390:18;1396:21
**option (1)**
1287:5
**order (3)**
1286:7;1315:15;
1337:1
**ordinary (1)**
1337:7
**others (7)**
1288:8;1289:20;
1307:12,15;1318:9;
1329:12;1333:23;
1375:4;1376:1
**otherwise (2)**
1288:12,15
**ought (1)**
1286:24
**out (26)**
1285:3;1288:5,8;
1293:18;1300:19;
1304:14;1313:11;
1322:19;1323:2;
1325:13;1331:6,14;
1332:2;1343:14;
1352:19;1357:1;

1366:21,23;1385:20;
1388:23;1395:16;
1396:19;1398:14;
1399:11;1403:4;
1404:5
**outcome (2)**
1381:12,16
**outside (5)**
1311:20;1321:25;
1322:4;1332:6;
1376:21
**over (10)**
1285:6,7;1301:9;
1314:4;1327:7;1338:6;
1348:6;1361:11;
1364:10;1401:5
**overall (5)**
1298:3;1372:19;
1375:4;1388:15;
1389:21
**Overruled (2)**
1330:8;1363:9
**oversee (1)**
1293:13
**own (4)**
1297:2;1348:17;
1364:23;1365:2

## P

**P&L (2)**
1339:25;1340:3
**Padlock (1)**
1344:24
**page (69)**
1295:5,7,19,19;
1296:23,24;1297:8;
1298:17;1299:11,23,
24;1300:1;1301:25;
1305:3,20,24;1306:1,6,
16,17;1307:6,21,23;
1308:13;1309:11,16;
1310:18;1312:3;
1320:7,7,8;1321:4;
1322:13;1323:21;
1325:6;1335:3;1336:9;
1337:5,18;1338:15;
1341:25;1342:19,19;
1345:5,15;1346:21,21;
1349:11,17;1351:23;
1352:24;1355:2,25;
1357:10,13,14,15;
1358:18;1360:4,5,22,
23;1361:10;1363:4;
1380:6,7;1401:4,5,11
**pages (6)**
1311:7;1319:9,11,
22;1323:24;1349:14
**paid (5)**
1300:6,10,16;
1301:4,7;1312:4;
1315:9;1316:5;
1321:19;1325:13;

1326:4;1364:1,18
**panel (2)**
1288:6,7
**paragraph (27)**
1286:15;1297:8,20;
1299:25;1300:4,6;
1305:18;1308:16;
1309:18;1312:7;
1317:10;1337:23;
1345:11;1358:19;
1359:1;1361:3,20;
1362:19,20;1395:15;
1396:11,18,23;
1399:23;1401:15;
1402:13,14
**paragraphs (2)**
1309:16;1337:21
**pardon (1)**
1306:1
**parent (1)**
1375:8
**part (15)**
1294:15;1325:20,23;
1330:14;1332:16;
1335:19;1336:14,21;
1339:16;1342:4;
1361:5
**participants (1)**
1343:16
**participated (1)**
1344:6
**particular (16)**
1300:15;1301:20;
1306:19;1317:16,18;
1335:3;1349:14;
1351:8;1360:3;
1363:24;1375:12;
1381:9;1388:16,17;
1400:3;1401:10
**Particularly (1)**
1312:11
**particulars (1)**
1399:9
**parties (3)**
1290:1;1319:19;
1403:18
**partners (1)**
1293:5
**parts (1)**
1372:20
**party (5)**
1338:7,12,17,19;
1384:3
**path (1)**
1399:19
**Pause (2)**
1319:18;1323:20
**pay (17)**
1301:6;1315:11;
1322:19;1323:12,14,
15,15;1330:18;
1331:25;1357:1;
1363:14,22;1364:18,

19,22,23;1365:1
**payers (1)**
1364:9
**paying (7)**
1300:19;1315:22,22;
1318:6;1324:18;
1363:25;1364:3
**payment (4)**
1317:21;1323:9;
1331:23;1332:13
**payments (3)**
1317:25;1325:10;
1326:1
**payors (1)**
1325:23
**PCs (1)**
1373:24
**Pendrock (3)**
1286:20;1287:13;
1289:17
**Penney (1)**
1291:11
**penny (2)**
1316:10,16
**Pension (2)**
1292:17;1376:1
**people (16)**
1285:21,22;1286:6;
1303:12;1311:19;
1315:22;1330:2;
1365:14;1374:2;
1384:23,25;1385:22;
1399:17,19;1403:15,18
**per (2)**
1305:19;1316:17
**percent (12)**
1300:12,12,13,13,25;
1301:2,7,8,9,9,10;
1316:10
**percentage (1)**
1301:5
**Perfect (1)**
1285:15
**performance (2)**
1300:12,14
**perhaps (1)**
1348:6
**period (6)**
1313:1;1327:11;
1341:17,23;1352:14;
1357:19
**periodic (1)**
1342:8
**permanent (1)**
1385:3
**permit (4)**
1363:5,11,11,18
**permitted (4)**
1340:7;1364:5,5,7
**person (13)**
1312:23;1333:6;
1341:21;1345:13,19,
20;1347:5,10,25;

1361:12;1363:15;
1401:16,22
**personal (9)**
1341:10;1344:25;
1345:2;1346:23;
1348:18;1371:6;
1385:1,4;1395:16
**personally (1)**
1307:12
**persons (2)**
1345:15;1346:11
**person's (1)**
1347:17
**perspective (1)**
1393:1
**PG (3)**
1393:8,9,12
**phone (4)**
1385:3;1389:11;
1391:1;1394:11
**piece (1)**
1365:6
**place (3)**
1303:11;1334:25;
1385:4
**placement (2)**
1287:23;1288:3
**places (1)**
1403:16
**planning (3)**
1288:23;1372:6,8
**plea (1)**
1382:6
**plead (4)**
1378:7,10;1379:19;
1382:16
**pleaded (1)**
1378:5
**pleading (1)**
1378:15
**please (11)**
1351:20;1363:10;
1391:14;1392:18;
1394:14,20;1395:11;
1396:19;1398:2;
1399:10;1400:17
**pled (3)**
1285:22;1379:17;
1382:5
**PLI (1)**
1288:6
**point (5)**
1287:3;1301:20;
1324:16;1403:12,13
**pointers (3)**
1398:25;1399:5,6
**points (2)**
1388:11,14
**policies (9)**
1303:9;1306:21;
1308:20;1314:24;
1335:15;1339:19,21;
1361:17;1363:18

**policy (54)**
1307:7,25;1308:8,8,
10;1309:12;1310:10,
11,25;1311:3,4,16,24;
1317:1;1325:22;
1332:24;1333:3,20,24;
1334:2,16,20,23,25;
1336:3,6;1337:5;
1338:1,16;1339:6,9,12,
21;1340:8;1341:10,12;
1344:24;1345:2;
1346:3,4,7;1361:22,23;
1362:4,12,14,15,20,24;
1363:5,11,24;1364:17,
22
**policy's (1)**
1338:1
**pops (1)**
1396:19
**portfolio (30)**
1292:22,22,23;
1293:4,7;1297:11,19;
1298:2,18;1299:9;
1300:10,15;1312:23;
1314:7;1327:12;
1331:20;1332:2;
1337:4;1347:25;
1348:12,15;1353:18,
22;1354:2,24;1364:12;
1376:24;1377:18,19;
1387:9
**portfolio's (1)**
1340:12
**portion (16)**
1293:5;1295:18;
1306:7,22;1307:7,23;
1319:3;1342:20;
1344:15;1350:1;
1351:4,19;1354:22;
1360:23;1363:5,11
**portions (1)**
1360:20
**position (11)**
1290:22;1291:22;
1292:1;1297:9;
1298:17,20;1312:16;
1373:1,5;1376:7,11
**positions (6)**
1291:24;1292:7;
1339:23;1340:12,13;
1394:22
**possession (1)**
1360:13
**possible (2)**
1287:2;1343:9
**potential (1)**
1345:10
**power (1)**
1299:13
**practice (4)**
1325:20,22;1330:21;
1333:2
**practices (1)**

1333:11
**precisely (1)**
1313:8
**preclearance (5)**
1347:13,22;1348:13,
17,21
**prematurely (1)**
1359:8
**prepared (2)**
1373:18;1377:12
**preparing (2)**
1371:21;1376:20
**present (5)**
1285:1;1289:9;
1367:24;1368:15;
1404:1
**presentations (1)**
1383:25
**press (3)**
1285:6,8;1338:6
**pretty (4)**
1293:14;1384:6;
1402:25;1403:20
**prevent (3)**
1306:21;1307:25;
1362:24
**previously (4)**
1288:6;1309:23;
1354:7;1363:16
**price (1)**
1337:10
**pricing (2)**
1372:19
**Primary (3)**
1329:7;1334:8,12
**prime (1)**
1315:16
**prior (12)**
1291:25;1346:5,7,8,
21;1353:2;1355:5;
1356:3,7;1357:10,22;
1378:15
**private (1)**
1307:13
**probably (1)**
1397:19
**problem (2)**
1365:6,7
**problems (2)**
1309:25;1310:1
**procedure (4)**
1310:11,11;1311:16;
1317:1
**procedures (11)**
1303:10;1306:21;
1307:25;1311:4;
1314:25;1361:17,23,
24;1362:4,15,24
**proceed (2)**
1358:13;1369:2
**process (8)**
1303:19;1325:11;
1331:23;1332:8,12,16;

1336:21;1375:1
**produced (1)**
1319:21
**product (5)**
1385:18,19;1393:12,
13,18
**products (10)**
1311:21;1318:6,8;
1371:7,10,11;1372:15;
1385:21;1393:13,14
**professional (1)**
1365:16
**professionals (7)**
1328:25;1333:17;
1334:3;1335:16;
1336:24;1345:13;
1366:3
**profit (7)**
1300:19,24;1301:3,
3,9;1339:25;1340:3
**profitability (1)**
1372:21
**profits (4)**
1300:7,10,13,16
**program (4)**
1288:3;1303:6,13;
1315:1
**prohibited (1)**
1309:12
**prohibition (1)**
1312:20
**projected (1)**
1372:10
**promised (1)**
1398:21
**promises (2)**
1381:5;1383:16
**promptly (1)**
1345:20
**protocol (1)**
1384:17
**provide (8)**
1333:6;1352:11;
1373:9;1376:25;
1385:8;1386:18;
1389:5;1397:2
**provided (14)**
1313:21;1315:22;
1317:13;1319:23;
1325:3,18,21;1332:4;
1346:12,17;1348:25;
1352:3;1381:4;
1389:11
**provider (3)**
1321:11;1325:21;
1332:9,14
**providers (11)**
1321:19,22;1323:9,
12,16;1325:13,18;
1329:24;1332:11;
1376:22;1384:7
**provides (1)**
1324:24

**providing (2)**
1321:23;1399:5
**Prudential (26)**
1372:23;1373:1,3,8,
11,21;1374:3,7,12,20;
1375:5,7,8,11,14;
1377:14,15;1383:20,
21;1384:19;1385:9;
1386:1;1390:22;
1391:3;1392:16;
1398:18
**Prudential's (1)**
1376:16
**public (32)**
1311:25;1312:15;
1335:5,10,16,20;
1336:13,14,21;1338:6,
8;1358:20;1360:24;
1361:4,11;1362:2;
1363:3,6,12,15,19,23,
25;1364:4,19,20;
1372:1;1376:1;
1383:23;1385:15,24;
1403:19
**publication (1)**
1338:7
**publicly (2)**
1335:12;1336:17
**publicly-available (2)**
1358:23;1361:8
**publish (4)**
1302:19;1307:6;
1308:7;1349:24
**published (2)**
1291:19;1338:12
**publishing (3)**
1306:7;1322:12,18
**pulling (1)**
1342:20
**purchases (1)**
1347:12
**purported (1)**
1354:24
**purpose (2)**
1309:7;1354:5
**purposes (2)**
1299:8;1317:16
**pursuant (2)**
1379:19;1380:12
**purview (1)**
1294:6
**put (12)**
1303:11;1342:17;
1343:13;1344:4;
1364:12;1366:4;
1367:5;1401:17,19,21;
1403:22,23
**putting (2)**
1391:13;1403:3

**Q**

**quality (1)**

**1291:11
quarter (1)**
1346:14
**quarterly (7)**
1350:21;1354:5;
1359:9;1371:21,24;
1385:23;1389:20
**quick (1)**
1367:22
**quickly (2)**
1352:23;1360:21
**quite (2)**
1328:25;1392:21

**R**

**raise (1)**
1287:17
**raised (1)**
1368:5
**ran (1)**
1285:16
**random (1)**
1313:17
**range (1)**
1375:25
**ranging (1)**
1371:8
**Ray (42)**
1378:13,24;1379:5,
12,14;1389:18;1390:5,
6,10,12,16,23;1391:2,
22;1392:5,19;1393:2,8,
18,24;1394:8,10,15,24;
1395:3,13,15;1397:7,
15,18;1398:5,13,20;
1399:2,10;1400:2,10,
21;1401:9,16,21;
1402:11
**Ray's (1)**
1392:17
**reach (1)**
1391:6
**reached (2)**
1336:16;1361:6
**read (24)**
1285:18,24;1286:2,
4,5,6,7,8,10,12,13,18,
21;1287:14,15;
1289:13,18,22;1290:3;
1296:1;1302:22;
1309:19;1337:7;
1383:24
**reading (2)**
1287:1;1339:14
**reads (5)**
1335:7;1336:13;
1337:20;1343:23;
1346:22
**ready (2)**
1403:10;1404:12
**reaffirmation (1)**
1336:20

**realize (1)**
1399:13
**really (9)**
1287:4;1343:21,21;
1394:11;1395:19;
1398:14;1400:5;
1403:4,21
**reason (1)**
1299:1
**reasons (1)**
1299:3
**Rebecca (7)**
1304:15,16;1305:3;
1306:8;1310:18;
1313:12,14
**recall (45)**
1298:21;1314:10;
1317:17;1324:14;
1326:18;1327:19;
1329:15,16,18,19;
1332:22;1333:12,15,
21,24;1334:21;
1337:19,21;1341:22;
1342:3;1345:16;
1346:4;1349:18;
1354:12;1359:23,24,
25;1360:16,19;1362:8;
1365:8,10,12;1366:7,9,
10,11;1367:4,7;1374:2,
16,19;1399:5,8;1400:2
**recalled (1)**
1365:4
**receipt (1)**
1362:23
**receive (4)**
1370:3,5,24;1389:23
**received (40)**
1294:13,14;1297:5,
6;1298:14,15;1302:13,
14;1304:25;1305:1;
1307:4,5;1308:5,6;
1310:16;1317:8,9;
1320:6;1324:6,7;
1343:7,8;1344:22,23;
1349:22,23;1359:16,
22;1360:17;1379:5;
1388:2,3;1392:3;
1394:4,12;1395:10;
1397:14;1398:12;
1401:1,2
**receiving (2)**
1370:10;1371:2
**recently (1)**
1392:12
**Recess (1)**
1368:13
**recipient (2)**
1343:10;1344:1
**recognize (34)**
1296:19,24;1297:1;
1298:6;1304:5;
1307:18;1310:6,19;
1311:9,13;1318:14;

**realize (1)**
1399:13
**really (9)**
**1319:11,22;1320:8,13;
1322:12;1323:21,23;
1325:7;1329:7;
1342:22,25;1344:4,15;
1349:11,13,14;1353:8;
1354:23;1356:2;
1358:3;1366:14;
1379:24;1380:6
**recognizes (1)**
1337:13
**recollection (3)**
1324:17;1330:12;
1334:18
**recommend (2)**
1381:9,10
**recommendations (2)**
1373:9;1397:2
**recommended (1)**
1396:25
**record (4)**
1306:7;1308:7;
1322:12,19
**records (2)**
1325:12;1342:9
**RECROSS (1)**
1364:15
**redirect (3)**
1358:7,12,14
**reduce (1)**
1301:3
**refer (1)**
1321:18
**reference (5)**
1285:13;1361:23;
1388:19;1397:20;
1398:15
**referenced (3)**
1287:12;1289:16;
1328:1
**references (2)**
1361:16;1388:18
**referred (1)**
1311:3
**referring (2)**
1379:4;1394:17
**refers (2)**
1293:16;1362:4
**regarding (7)**
1306:4;1310:10;
1335:12;1358:23;
1390:20;1393:5;
1402:15
**regards (1)**
1393:7
**registered (12)**
1291:16;1292:14;
1303:5,10;1340:15,17,
19,22;1341:5;1342:5;
1395:21,25
**regular (1)**
1346:19
**regulations (1)**
1340:23

**relate (2)**
1317:21,23
**related (7)**
1286:4;1287:23;
1288:2,6;1289:15;
1293:15;1318:9
**relating (2)**
1287:11;1317:1
**relation (1)**
1375:4
**relations (6)**
1293:14;1359:9;
1384:1,15;1395:18;
1400:13
**relationship (1)**
1354:2
**relative (2)**
1340:13;1403:15
**release (1)**
1338:6
**released (2)**
1309:23;1310:11
**relevant (1)**
1309:1
**relinquished (1)**
1292:11
**remainder (1)**
1319:4
**remember (8)**
1287:22;1313:7,9;
1327:17;1359:21;
1365:13,15;1399:9
**remind (2)**
1287:2;1289:12
**Reminder (1)**
1310:25
**render (1)**
1323:16
**repeat (2)**
1361:19;1363:10
**report (8)**
1314:19;1338:8,12,
17;1346:11,18;1373:9;
1388:23
**reported (1)**
1348:21
**reporting (2)**
1345:10;1346:4
**reports (7)**
1338:18,19,21;
1373:18;1376:20;
1377:12,13
**represent (3)**
1336:14;1348:5;
1361:4
**representative (1)**
1359:10
**representing (1)**
1326:17
**represents (1)**
1348:6
**request (23)**
1318:17;1321:5,7;

1323:23;1324:11;
1332:1,3,16;1349:13,
19;1350:1;1351:7,16;
1352:19;1353:1,11;
1354:14;1355:5,10,14;
1356:20;1357:11;
1364:12
**requester (5)**
1321:8,23;1324:12;
1350:18;1354:16
**requests (1)**
1322:9
**require (1)**
1347:12
**required (11)**
1303:10,20,21;
1304:1,2;1305:16;
1311:1;1320:20;
1326:4;1332:24;
1334:2
**requirement (1)**
1325:17
**requirements (1)**
1325:25
**requisite (2)**
1301:4;1330:20
**reschedule (1)**
1288:1
**research (80)**
1291:19;1311:5,19,
25;1312:4,8,12,13,14,
22;1315:11,18,21,22;
1317:15,17,22;1318:9;
1321:11,21,22,23;
1323:9,12,15;1324:13;
1325:5,13,18,18,21,21;
1326:4,4;1329:7;
1330:18;1332:10,19,
22,25;1333:6;1334:8,
12;1335:20;1336:15,
21;1337:1,3;1338:7,12,
17,19,21;1352:3,5;
1354:6;1361:5,21;
1363:12,14,14,18;
1364:3,11;1373:9;
1375:11,13;1376:20,
23;1377:1,12,13,15;
1391:12;1392:25;
1393:4;1397:24;
1399:17,20;1402:16
**reserves (1)**
1309:24
**resign (1)**
1378:4
**resigned (4)**
1378:2,3;1382:19,20
**resource (1)**
1293:19
**resources (5)**
1293:13,14;1303:18;
1384:3,7
**respect (20)**
1286:23;1287:1;

1308:10,20,23;
1312:20;1323:8;
1325:9;1333:20;
1334:19;1340:4;
1351:8;1355:5,10;
1356:19;1363:3;
1364:20;1365:24;
1367:25;1368:4
**respected (1)**
1402:25
**respective (2)**
1385:11;1386:19
**response (1)**
1304:9
**responsibilities (10)**
1293:11,19;1294:6;
1299:9;1303:2,4;
1314:22;1373:7,16;
1376:18
**responsible (3)**
1300:18;1372:15;
1377:4
**rest (2)**
1288:14;1358:25
**rested (1)**
1404:6
**restraints (1)**
1317:24
**restricted (6)**
1318:2;1365:19;
1366:1,16;1367:3,5
**restriction (1)**
1346:23
**restrictions (1)**
1347:1
**restrictive (1)**
1366:4
**restricts (1)**
1317:14
**resulted (1)**
1285:17
**results (7)**
1359:9;1371:22,25;
1385:23;1389:20,21,24
**resume (3)**
1398:22,24;1401:16
**resumed (1)**
1285:1
**review (5)**
1310:3;1332:5;
1343:10,18,25
**reviewed (1)**
1314:20
**reviewing (4)**
1313:23;1314:14,23;
1331:23
**reviews (5)**
1313:4,13,14,16,22
**revised (4)**
1298:9;1307:21;
1336:6;1344:16
**revisit (1)**
1288:23

**Rich (2)**
1388:21,23
**riding (1)**
1290:20
**right (113)**
1288:5,22;1304:24;
1306:5;1307:3;1308:4;
1314:8;1315:1;
1316:12,17,24;
1326:24,25;1327:3;
1328:3,7,14,19;1329:2,
10,15,24;1330:19,22;
1331:7,10,15,18,21;
1332:14;1333:1,3,7;
1334:3,5,13,23;
1335:21;1336:4,22;
1337:2,13,16;1338:2,
13,23;1339:7,12,14,15,
17,19,21,25;1340:5,9,
13,23;1341:3,15,18,23;
1342:8,10,13;1343:14,
18;1345:14;1346:19;
1347:1,8,22;1348:13,
18;1350:3,11,14,16,19;
1351:9,13,17;1352:18,
21;1353:11,14,16,19,
24;1354:3,8,18,25;
1355:11,21;1356:8;
1357:11,23;1364:21,
24;1365:17,19;1366:1,
5,21,23;1389:8;
1390:9;1395:7;
1396:13,15;1402:5;
1403:8
**right-hand (3)**
1295:23;1321:24;
1324:18
**risks (1)**
1303:8
**River (1)**
1367:5
**Rob (36)**
1378:13,24;1379:5,
12,14;1389:18;1390:5,
6,10,12,16,22;1391:22;
1392:5,17;1393:8,24;
1394:8,10,24;1395:3,
13,15;1397:7,15;
1398:5,13,20;1399:2,
10;1400:10,21;1401:9,
16,21;1402:11
**role (6)**
1292:11;1325:9;
1328:2;1333:17;
1371:21;1377:19
**room (1)**
1368:25
**roughly (1)**
1327:7
**routine (1)**
1342:4
**Ruchi (9)**
1321:15;1322:23;

1350:5,8,13,24;1351:8,
24;1357:14
**rule (2)**
1318:23;1362:3
**rules (4)**
1311:24;1317:24;
1323:8;1340:25

---

## S

**S&P (1)**
1292:24
**SAC (11)**
1285:6,9,21,21,23;
1286:13,14,17;
1292:21;1293:1,2
**safe (4)**
1315:13;1317:13;
1318:8;1332:6
**salary (2)**
1300:17,17
**sales (2)**
1291:13;1347:12
**Sam (1)**
1374:6
**same (11)**
1311:11;1324:8;
1334:19;1355:6;
1357:21;1361:10,20;
1384:5,6;1388:25;
1390:10
**sample (1)**
1326:4
**samples (3)**
1325:17,20;1332:10
**San (4)**
1372:25;1376:16;
1392:9,12
**SANDEEP (1)**
1368:20
**Sandy (5)**
1367:18;1368:19;
1369:7;1392:19;
1397:18
**satisfy (1)**
1380:23
**Saturday (2)**
1290:21;1367:14
**savvy (1)**
1286:21
**saw (7)**
1289:25;1302:6;
1308:9;1324:9;1336:6;
1354:7;1355:23
**saying (5)**
1298:19;1388:25;
1393:2;1401:19;
1402:17
**schedule (3)**
1288:25;1302:23,24
**scheduled (2)**
1287:25;1288:6
**scheduling (1)**

1287:21
**school (6)**
1290:14;1369:18;
1370:1;1390:7,10,12
**Schweser (1)**
1397:19
**scoop (1)**
1402:23
**scope (1)**
1365:22
**scrawl (1)**
1354:22
**screen (4)**
1294:16;1297:20;
1342:18;1394:7
**scroll (2)**
1354:21;1392:17
**scrupulous (1)**
1286:22
**seal (1)**
1382:10
**searches (2)**
1313:18,19
**seat (1)**
1404:2
**SEC (2)**
1313:21;1342:4
**second (21)**
1295:5;1302:18;
1305:18,24;1306:1,17;
1307:6,23;1308:16;
1309:18;1312:3;
1322:13;1323:24;
1343:4;1351:23;
1355:2,25;1395:15;
1396:23;1401:5,15
**secret (1)**
1382:10
**secretaries (1)**
1300:22
**section (11)**
1296:8;1299:13;
1315:12;1317:11,21;
1337:6,20;1339:20;
1343:3;1346:22;
1363:4
**sector (7)**
1292:24,25;1347:17,
21;1348:4;1374:9;
1375:4
**sector-based (1)**
1347:16
**sectors (1)**
1348:6
**securities (5)**
1337:10;1346:12,18;
1378:8,9
**seeing (2)**
1349:18;1350:25
**seeking (1)**
1361:13
**segment (2)**
1389:3,6

**segments (10)**
1385:11,12,13,16;
1386:19,20;1388:16,
17,19;1389:25
**segregate (1)**
1316:17
**selective (1)**
1359:10
**sell (14)**
1338:18,21;1347:5,
10;1371:7,10;1377:21;
1384:7;1388:23;
1391:12;1399:11,13,
20,24
**selling (1)**
1372:15
**sells (2)**
1371:8,11
**semiconductor (2)**
1374:8;1377:8
**semiconductors (2)**
1352:6;1374:13
**seminar (4)**
1303:21,23,24,25
**send (1)**
1306:4
**sending (1)**
1392:20
**senior (6)**
1320:19;1373:6,8;
1374:8;1376:12;
1402:22
**sense (1)**
1288:20
**sensitive (1)**
1288:2
**sent (9)**
1304:14;1306:3;
1332:5;1341:7;1343:7,
23;1388:7,23;1401:16
**sentence (14)**
1335:6,6;1339:1;
1343:4;1358:21;
1360:9;1361:16;
1379:16;1380:16;
1381:6,9,11,17;1393:2
**sentenced (1)**
1380:14
**September (6)**
1357:19;1391:24;
1392:5;1393:17;
1400:22;1401:13
**series (4)**
1310:19;1321:20;
1322:6;1346:25
**servers (2)**
1373:24;1393:15
**service (11)**
1291:20;1321:21,22;
1329:24;1332:11;
1338:7;1352:3,11;
1389:10,12;1403:20
**services (19)**

1315:12,14,18,21;
1318:6,8;1321:23;
1323:16;1324:25;
1325:2,5;1329:9;
1330:6;1332:4;1352:4;
1354:6;1364:3,11;
1389:6
**serving (1)**
1403:20
**session (1)**
1344:6
**set (2)**
1313:17;1332:8
**settle (1)**
1392:22
**settled (1)**
1392:9
**settling (1)**
1315:16
**several (2)**
1291:14;1402:24
**SF (1)**
1392:9
**share (2)**
1316:17;1372:9
**Sheinberg (11)**
1304:15,16;1305:3;
1306:8;1310:18;
1313:12,14;1314:13,
19;1328:9;1341:20
**Sheinberg's (1)**
1314:22
**shoot (1)**
1404:10
**shots (1)**
1289:3
**show (4)**
1302:20;1342:15;
1346:7;1366:12
**showed (6)**
1332:17;1334:17;
1350:2;1354:11;
1355:14;1356:1
**shown (5)**
1286:25;1326:16;
1333:20,23;1394:7
**shows (1)**
1383:24
**shut (2)**
1375:8,11
**shutting (1)**
1398:18
**side (21)**
1293:19;1295:23;
1316:18;1321:24;
1324:18;1325:2;
1338:18,21;1384:7;
1388:23;1391:12,13;
1399:11,13,13,16,20,
21,24;1401:16,22
**sign (4)**
1304:1,2;1353:10;
1354:3

**signature (15)**
1320:11,13,14,19;
1325:7;1351:5;1353:6,
8;1354:21,23,24;
1355:21;1380:7;
1393:7;1394:6
**signatures (1)**
1296:24
**signed (3)**
1352:19;1353:16;
1357:11
**significance (1)**
1299:8
**signing (3)**
1317:17;1325:21;
1351:16
**similar (9)**
1292:21;1308:8;
1327:7;1350:2;1354:7;
1355:4,6;1357:18;
1360:4
**simple (1)**
1300:23
**single (1)**
1319:14
**Sirios (1)**
1295:20
**sit (3)**
1288:19,24;1289:2
**sitting (2)**
1399:8;1401:17
**situations (1)**
1359:14
**six (3)**
1291:11;1312:24;
1313:2
**six-month (1)**
1363:17
**sixth (1)**
1360:22
**size (1)**
1299:19
**skipped (1)**
1361:11
**slide (1)**
1383:24
**slightly (1)**
1313:3
**slow (1)**
1388:18
**slower (1)**
1389:1
**small (4)**
1291:15,18;1385:14;
1389:14
**SMB (2)**
1389:13,13
**soft (70)**
1315:4,6,7,8,11;
1316:13,14;1317:1,13,
14,22,25;1318:5,7,17;
1321:5;1322:9;1323:9,
15,15,23;1324:11,24;

**signature (15)**
1325:9,11,13,18,23,25;
1326:5;1328:16,17;
1329:1,9;1330:14,17,
25;1331:10,11,12,13,
14,17,23,24;1332:1,3,
9,13,16;1349:13,19;
1350:1;1351:7,8,16;
1352:18;1353:1,11,22;
1354:14;1355:5,10,14;
1356:20;1357:11;
1364:8,10;1368:25
**software (1)**
1370:13
**solution (1)**
1287:2
**somebody (9)**
1312:15,22;1332:2,
7;1363:22,23;1394:23,
23;1396:22
**someone (7)**
1343:10;1344:1;
1363:14;1382:11;
1401:25;1402:1,18
**sometime (5)**
1313:8;1340:20;
1388:24;1390:3;
1392:23
**sometimes (1)**
1385:3
**somewhat (1)**
1368:25
**somewhere (1)**
1394:23
**soon (2)**
1379:9;1400:7
**sorry (17)**
1296:7;1303:24;
1311:10,12,12;
1312:25;1314:16;
1322:23,23,23;1325:1;
1327:2;1332:21;
1335:25;1340:21;
1344:11;1361:19
**sort (4)**
1288:20;1300:23;
1349:18;1399:17
**sorts (1)**
1391:5
**Souza (2)**
1321:15;1322:21
**space (1)**
1402:2
**spans (1)**
1395:5
**speak (8)**
1311:20;1334:15;
1345:2;1378:15;
1382:12;1384:13;
1400:14;1403:18
**speaking (7)**
1308:9;1359:25;
1361:10;1362:2;
1382:18;1384:10;

**signature (15)**
1386:14
**special (1)**
1288:3
**specific (1)**
1348:4
**Specifically (5)**
1324:16;1329:16;
1330:13;1349:16;
1358:17
**spend (2)**
1331:9,17
**spends (1)**
1330:6
**spent (3)**
1288:22;1291:20;
1330:13,25
**spills (1)**
1401:5
**spoke (1)**
1378:18
**spoken (1)**
1368:25
**Square-15th (1)**
1294:17
**staff (2)**
1311:19;1313:18
**Stamford (1)**
1294:17
**standard (6)**
1322:9;1330:14;
1336:21;1343:13;
1344:4;1352:10
**stands (2)**
1352:19;1393:12
**start (12)**
1291:5;1327:11;
1332:1;1350:1;
1367:23;1368:16;
1392:16;1400:8;
1401:3,15;1402:13;
1404:12
**started (9)**
1291:13;1297:23;
1313:7;1314:21;
1327:14;1335:1;
1341:17;1372:5;
1393:5
**starting (3)**
1299:13;1305:2;
1324:8
**starts (4)**
1298:19;1309:18;
1343:4;1401:4
**state (2)**
1302:9;1309:1
**statement (3)**
1307:7;1308:8,8
**statements (2)**
1302:6;1349:1
**states (9)**
1307:9;1370:14,16;
1379:20;1380:3,22;
1381:13,19,21

**status (3)**
1382:23,24;1383:9
**stay (1)**
1383:1
**stead (2)**
1353:10;1354:20
**Stearns (1)**
1402:22
**steer (1)**
1287:3
**step (1)**
1367:13
**still (2)**
1377:22;1399:23
**stink (1)**
1358:10
**stint (1)**
1403:21
**stipulate (2)**
1319:20,23
**stock (1)**
1373:9
**stocks (5)**
1297:17;1348:5;
1376:6;1377:21;
1391:13
**stop (3)**
1335:9;1377:24;
1395:24
**stopped (1)**
1286:16
**stories (1)**
1289:14
**story (1)**
1289:14
**strategy (1)**
1372:19
**Street (3)**
1285:7;1402:1,25
**structure (2)**
1292:19;1300:15
**Student (2)**
1381:25,25
**study (2)**
1370:17,18
**stuff (1)**
1289:1
**subject (8)**
1310:22,25;1343:9,
17,25;1356:22,23;
1365:16
**submit (2)**
1340:23,25
**subordinates (1)**
1356:14
**subparagraph (1)**
1312:17
**subportions (1)**
1346:25
**subsequent (2)**
1327:15,22
**successful (3)**
1327:12,14,20

**successfully (1)**
1398:23
**sufficient (1)**
1368:6
**suggest (1)**
1401:8
**suggested (1)**
1313:21
**sum (1)**
1292:23
**summary (2)**
1302:2;1326:17
**Summer (2)**
1375:6;1400:9
**Sun (1)**
1373:25
**supplier (1)**
1365:1
**support (1)**
1389:12
**supposed (3)**
1287:15;1345:25;
1382:10
**sure (11)**
1287:4;1288:16;
1302:23;1303:9,12;
1311:11;1324:16;
1391:19;1395:20;
1399:24;1404:9
**suspect (1)**
1355:9
**suspicious (1)**
1352:20
**Sustained (2)**
1367:2,9
**sweat (1)**
1288:13
**switch (1)**
1313:3
**sworn (2)**
1290:11;1368:22
**system (3)**
1342:6,13;1343:9

**T**

**tab (4)**
1344:10,11;1349:6;
1366:13
**tag (4)**
1343:13,21,23;
1344:4
**talk (11)**
1300:14;1312:22;
1332:4;1363:19,22;
1364:23;1365:1;
1376:21,21;1391:2;
1400:6
**talked (6)**
1328:16;1356:13;
1384:1,7,22;1401:25
**talking (13)**
1311:25;1312:14;

1324:14;1338:16;
1363:3,12,16;1364:4,
20,20;1374:21;
1394:10;1395:21
**talks (6)**
1300:6;1312:8,17;
1317:10;1360:24;
1363:24
**taped (1)**
1304:3
**TARLOWE (18)**
1367:18;1368:17,18,
19;1369:2,3,5;
1387:23;1392:1;
1394:2,5;1395:8,11;
1397:11;1398:9;
1400:24;1401:3;
1403:7
**task (1)**
1314:13
**tax (1)**
1299:3
**team (10)**
1292:23,23;1300:18,
19,21;1334:11;
1353:23;1367:14;
1389:10;1390:18
**teams (1)**
1292:22
**technical (1)**
1302:17
**technology (5)**
1292:25;1293:17;
1297:19;1347:20,21
**telephone (1)**
1333:7
**telling (1)**
1286:10
**term (4)**
1315:4;1395:23;
1396:7,8
**terms (2)**
1299:12;1300:2
**Terrific (1)**
1342:20
**testified (5)**
1290:11;1314:7;
1367:3;1368:22;
1388:7
**testify (1)**
1380:21
**testifying (2)**
1302:4;1380:12
**testimony (2)**
1327:25;1328:16
**Texas (5)**
1370:19,20,25;
1371:13;1390:8
**thankful (1)**
1403:13
**Thanks (3)**
1289:10;1367:15;
1394:10;1397:18;

1398:20;1403:3
**Thanksgiving (1)**
1403:9
**Therefore (1)**
1360:11
**thinking (2)**
1312:9;1392:20
**third (12)**
1296:23;1305:20;
1308:13;1309:16;
1310:18;1323:24;
1338:7,12,15,17,19;
1384:3
**third-party (2)**
1361:21;1376:21
**though (1)**
1367:19
**thousand (1)**
1330:12
**thousands (1)**
1330:10
**three (7)**
1309:20;1311:7;
1327:7;1357:6;1358:3;
1371:17;1396:4
**three-page (1)**
1324:6
**thrown (2)**
1315:8;1316:4
**ticked (2)**
1322:6;1325:5
**ticket (1)**
1399:14
**Times (2)**
1285:7;1303:17
**timing (1)**
1288:2
**tips (2)**
1397:18;1403:2
**title (2)**
1373:1,5;1376:7
**TNT (1)**
1292:25
**today (8)**
1288:13;1302:4;
1362:8;1367:19;
1377:22;1380:12;
1398:14;1399:8
**Todd (13)**
1294:10,25;1296:22;
1301:16;1305:8;
1306:8;1320:25;
1321:9;1322:15;
1350:18;1353:18;
1359:25;1387:6
**Todd's (1)**
1323:7
**told (1)**
1386:8
**tomorrow (3)**
1403:9,11,12
**tonight (1)**
1394:11

**Tony (1)**
1320:19
**top (22)**
1294:15,16;1295:3,
20;1306:7;1307:7;
1308:8;1313:20;
1319:12;1321:4;
1324:8,11;1337:20;
1343:21;1346:10;
1350:1;1351:19;
1394:6;1395:12;
1397:15;1399:25;
1402:10
**topic (1)**
1313:3
**Tortora (23)**
1324:12,12,14;
1334:5,19;1348:20;
1350:18;1354:1,16;
1373:4,17,20;1374:6,
16,19,25;1375:9;
1377:14;1378:14;
1386:4,6,11;1387:1
**Tortora's (1)**
1373:7
**total (5)**
1293:5;1321:18;
1350:21;1355:18;
1357:10
**touch (1)**
1287:16
**touching (1)**
1286:8
**tough (1)**
1290:21
**towards (1)**
1390:19
**Towbin (2)**
1291:17,22
**trade (3)**
1312:12;1315:16;
1347:20;1348:17
**traded (3)**
1347:7,25;1348:11
**trader (2)**
1320:19;1332:3;
1351:13,16
**traders (2)**
1300:22;1314:10
**trades (8)**
1315:9;1316:5,8,9,9;
1348:15,21,22
**trading (26)**
1287:4;1293:15;
1297:18;1299:12;
1306:21;1307:8,12;
1308:1,11;1315:8;
1316:4,14;1317:14;
1318:9;1320:15;
1331:6,9,11,14;
1339:23;1340:11,13;
1341:14;1344:25;
1345:3;1362:25

**train (1)**
1404:4

**training (11)**
1303:14,16,17,20,20;
1304:3,10;1305:12,15,
17;1328:14

**transactions (2)**
1346:12,18

**transcripts (1)**
1383:24

**transition (1)**
1398:23

**Transmission (1)**
1315:16

**Transmitting (1)**
1315:15

**Trial (7)**
1285:1,20;1289:20;
1308:20,23;1403:22

**trials (1)**
1288:6

**tried (1)**
1325:20

**True (2)**
1388:9;1392:7

**truthfully (1)**
1380:20

**try (1)**
1288:8

**trying (2)**
1402:3,7

**Tudor (3)**
1295:10,13,16

**Tuesday (1)**
1288:20

**turn (15)**
1295:5,19;1296:17;
1297:15;1299:11;
1305:19;1306:17;
1308:13;1311:6;
1312:3;1322:13;
1358:16;1363:4;
1380:6;1394:25

**two (8)**
1309:16,19;1321:19;
1327:22;1343:21;
1357:6;1365:25;
1378:8

**two-thirds (1)**
1295:6

**type (6)**
1295:23;1297:17;
1306:3;1324:8;1350:2;
1366:14

**types (9)**
1292:17;1314:25;
1315:11;1371:7;
1373:11;1374:9;
1375:23;1377:4,7

# U

**ultimate (1)**

**1399:12**

**ultimately (1)**
1378:3

**unannounced (1)**
1309:22

**under (23)**
1286:7,10;1296:8;
1307:7;1309:17;
1325:1,6;1328:2,7,11;
1339:11,19,21;1340:7;
1346:25;1347:24;
1373:17;1374:14;
1380:19,23;1382:10;
1393:7;1399:24

**underneath (1)**
1320:21

**understands (1)**
1361:12

**understood (1)**
1364:22

**United (8)**
1370:14,16;1379:20;
1380:3,22;1381:13,19,
21

**University (5)**
1290:15;1370:19,20,
24;1390:8

**unless (3)**
1289:4;1338:4;
1340:8

**Unterberg (2)**
1291:17,22

**unusual (1)**
1352:20

**up (37)**
1285:9,23;1288:21;
1289:7;1290:2;
1291:14;1292:6;
1294:16;1299:25;
1317:17,21;1322:14;
1327:21;1332:8;
1335:4;1336:12;
1337:6,24;1341:5;
1342:17,20;1345:9;
1351:3,19;1352:24;
1355:3;1357:7;1358:4;
1359:17;1368:10,24;
1369:1;1374:17;
1392:17,18;1396:19;
1404:10

**updated (1)**
1398:22

**upon (5)**
1298:2;1300:10,16;
1336:16;1361:6

**upwards (1)**
1314:1

**use (7)**
1309:13;1312:13;
1317:13,14;1318:6;
1341:12;1364:10

**used (16)**
1313:21;1315:10,11,

12,18,21;1322:9;
1328:18,18,21;
1329:10;1330:2,17;
1334:8;1384:19;
1389:11

**using (2)**
1289:4;1341:10

# V

**various (8)**
1291:24;1316:21;
1328:25;1333:10;
1340:23;1383:24,24,25

**vendor (6)**
1321:10,10;1331:24;
1350:5;1351:8;
1354:16

**vendors (3)**
1321:12,14;1329:1

**video (2)**
1304:2;1305:12

**view (2)**
1286:24;1288:12

**violation (2)**
1307:15;1308:25

**violations (1)**
1345:10

**visa (4)**
1381:25;1382:1,4,20

**vis-a-vis (1)**
1333:17

**visited (1)**
1388:10

**visits (2)**
1385:3,4

**Vista (2)**
1329:19,19

**voice (2)**
1368:24;1369:1

**voir (1)**
1287:5

# W

**W2 (1)**
1301:14

**W-2 (1)**
1302:5

**W2s (1)**
1301:19

**W-2's (2)**
1302:9,23

**W9 (2)**
1332:10;1349:16

**Wall (2)**
1285:7;1402:1

**wants (3)**
1322:19;1357:1;
1380:21

**watch (3)**
1304:2;1305:12,16

**way (28)**

1292:9;1295:6;
1302:20;1305:3;
1310:18;1319:13,23;
1327:19;1334:7,8;
1338:16;1341:10;
1346:3;1348:20,23,25;
1350:9,24;1352:20;
1365:10;1366:10,11;
1384:5,5;1391:6;
1396:12,14;1403:2

**ways (3)**
1383:21;1384:9,18

**websites (1)**
1384:2

**Wednesday (1)**
1287:25

**week (4)**
1288:17,22;1379:11;
1402:15

**weekend (3)**
1388:10;1400:7;
1404:10

**WEINGARTEN (5)**
1288:16,25;1404:3,
5,8

**weren't (2)**
1364:18,19

**what's (31)**
1296:17;1298:4;
1301:11,23;1304:4;
1306:10;1307:17;
1309:5;1310:5;1316:1;
1317:20;1318:11;
1323:17;1360:2,8,22;
1366:12;1379:22;
1380:18,22;1381:1,16;
1387:13,21;1391:14;
1393:21;1394:7,25;
1397:5;1398:2;
1400:17

**whenever (1)**
1399:11

**White (1)**
1288:7

**whole (4)**
1332:8;1375:13;
1392:18;1403:12

**whose (1)**
1294:9

**widely (1)**
1338:5

**wife (1)**
1383:15

**willing (1)**
1403:19

**Wind (1)**
1367:5

**wish (1)**
1400:5

**Withdrawn (8)**
1306:3;1309:9;
1313:24;1315:3;
1317:19,20;1337:25;

1362:3

**within (20)**
1294:6;1303:12;
1304:17;1315:12;
1318:8;1321:25;
1330:2;1332:13;
1334:3;1336:25;
1340:8;1341:12,16,17;
1347:17,25;1348:11;
1353:23;1364:11;
1377:19

**without (2)**
1286:5;1339:14

**witness (18)**
1288:22;1290:4,6,
10,19;1296:7;1316:7,
13,20,23;1319:22;
1367:15,16,17,23;
1368:17,18,21

**witnesses (1)**
1288:22

**woman (2)**
1350:8,14

**wonderful (1)**
1403:24

**word (7)**
1312:13;1325:1,2;
1401:17,20,21;1403:3

**words (12)**
1295:23;1312:13;
1324:19;1330:17;
1333:2;1338:1;1339:6,
14;1356:4;1361:12;
1362:2;1364:21

**work (23)**
1295:6;1300:9,25;
1370:10;1371:3,14,16;
1372:2,5,11,22;1373:3,
19;1375:15;1376:9;
1377:22;1384:19;
1387:5;1390:13;
1393:4;1399:20;
1403:1,23

**worked (29)**
1291:11,15;1304:18;
1312:23,24;1322:17;
1328:1;1331:20;
1337:3;1356:16;
1370:13;1371:14,20,
25;1372:2;1374:14;
1375:9;1376:17;
1382:1;1383:20,20;
1384:4;1385:17;
1386:9,22;1388:8;
1390:22;1393:18;
1398:14

**working (18)**
1291:5;1328:11;
1363:15;1373:17;
1377:24;1387:1;
1388:5;1390:14,17;
1391:3,10;1392:16;
1393:5;1396:9,17;

1400:8,10,12
**works (2)**
1287:24;1288:5
**world (1)**
1403:14
**worldwide (1)**
1371:11
**worth (1)**
1292:18
**write (4)**
1380:25;1388:10;
1389:13;1392:8
**writedowns (1)**
1309:24
**writes (4)**
1306:9;1381:13;
1396:11,18
**Writing (3)**
1303:8,9;1314:24
**written (9)**
1287:12;1296:4;
1324:21;1332:19,22,
24;1356:23;1357:4;
1402:16
**wrote (17)**
1388:14;1392:19;
1394:10,15,19;
1395:15,24;1396:6;
1397:18,22;1398:13,
20;1399:2;1400:4;
1401:15;1402:6,17

### Y

**year (7)**
1290:23;1291:16;
1323:2;1327:15;
1330:11;1331:4;
1353:2
**years (14)**
1291:11,20;1301:17;
1302:2,5;1326:18;
1327:8,15,18,22;
1330:25;1369:9;
1371:17;1379:18
**Yesterday (4)**
1285:5;1286:4;
1287:11;1289:14
**York (6)**
1285:7;1287:23;
1299:3,5,6;1375:18

### 0

**07 (3)**
1326:18;1327:22;
1353:2
**08 (4)**
1326:18;1334:16;
1350:16;1355:23
**09 (2)**
1326:18;1327:5

### 1

**1 (9)**
1295:4;1296:5;
1306:25;1312:7;
1344:16;1345:15;
1346:10;1388:14,21
**100 (3)**
1299:18;1301:2;
1342:15
**100,000 (1)**
1357:17
**10030 (5)**
1344:9,12,20,22,23
**12/23/2008 (1)**
1321:17
**12:30 (3)**
1288:10,10;1367:19
**125 (2)**
1314:2;1365:14
**13 (1)**
1366:18
**145,000 (2)**
1321:3;1357:10
**15 (9)**
1295:17;1296:16;
1300:11,12,13;1301:6,
7,7,9
**16 (1)**
1307:22
**17 (2)**
1354:15;1401:13
**175 (2)**
1314:2;1365:14
**18,750 (2)**
1350:21;1351:25
**19 (3)**
1322:15;1356:2,7
**1981 (2)**
1290:24;1291:9
**1995 (1)**
1369:23
**1996 (3)**
1291:14,15;1296:16
**1999 (2)**
1296:5,16
**1A (1)**
1312:7

### 2

**2 (6)**
1300:6;1319:11,22;
1352:15;1388:15;
1389:2
**20 (7)**
1300:12,24;1301:2,
5,8,9,10
**20,000 (1)**
1322:22
**200,000 (1)**
1322:21

**2001 (1)**
1370:15
**2002 (3)**
1295:17;1296:7;
1390:7
**2003 (4)**
1370:23;1371:19,20;
1390:7
**2005 (7)**
1291:7,10,21;
1306:25;1334:23;
1336:7;1344:16
**2006 (18)**
1295:4,17;1296:5,6;
1297:23;1327:14,17,
19;1335:1;1340:21;
1371:19,20;1372:22;
1391:24;1392:5;
1393:18,25;1395:5
**2007 (18)**
1301:18;1302:2,25;
1303:1;1326:24;
1342:23;1352:14,15;
1357:19;1375:6,14;
1390:3;1395:6;1397:9;
1398:7;1400:9,22;
1401:13
**2008 (35)**
1293:8;1298:11;
1299:2;1301:18;
1303:1;1304:12;
1306:8;1307:22;
1310:23;1313:8,9,10,
24;1314:2;1322:15,18,
20,20;1325:3;1327:2;
1330:25;1333:20;
1336:3;1341:17;
1352:15;1354:15;
1355:15;1356:3,23;
1357:6,19;1359:17,17;
1387:22;1388:4
**2009 (30)**
1292:12;1293:8,10;
1301:18;1302:3;
1303:1;1313:8,9,10,25;
1314:2,9,11;1322:20;
1323:1;1327:11,15;
1331:1;1333:9,9,13,15;
1341:17;1344:17;
1346:3,5;1357:20;
1359:17,18;1366:18
**2010 (1)**
1292:6
**2011 (2)**
1378:11,19
**2012 (2)**
1377:25;1404:15
**2013 (1)**
1383:8
**22 (1)**
1298:11
**2251 (8)**
1306:11,13;1307:1,

3,5;1334:22;1358:17,
19
**2253 (5)**
1307:18;1308:2,4,6;
1335:23;1336:2;
1337:6;1360:3,4
**2254 (5)**
1293:22;1294:1,11,
13,14
**2257 (4)**
1296:18;1297:3,5,6
**2259 (4)**
1298:5,12,14,15
**2261 (4)**
1304:5,22,24;1305:1
**2262 (2)**
1302:6,15
**2267 (5)**
1316:2,25;1317:5,8,
9
**2269 (5)**
1323:18;1324:2,5,7;
1354:10
**2270 (8)**
1318:12,18;1319:9,
21;1320:4,6;1324:9;
1355:13
**2271 (4)**
1310:6,13,16;
1362:10
**23 (4)**
1350:16;1355:15,23;
1356:4
**243A (1)**
1343:20
**25 (4)**
1295:17;1316:15,18;
1379:18
**250 (1)**
1299:18
**26 (1)**
1404:15
**2662 (1)**
1301:12
**27 (1)**
1392:5
**28e (9)**
1315:12;1317:11,13,
21,23;1318:2;1321:25,
25;1322:4

### 3

**3 (7)**
1319:11;1335:4;
1342:23;1345:12;
1358:18;1388:15;
1389:5
**3.33 (1)**
1327:2
**3.35 (1)**
1326:25
**3.37 (1)**

1327:2
**3.56 (1)**
1327:5
**30 (3)**
1296:16;1346:13;
1357:19
**30th (1)**
1289:2
**31 (2)**
1296:5;1352:15
**314A (1)**
1391:20
**3507-2 (1)**
1379:23

### 4

**4 (7)**
1299:24;1300:1,1;
1319:11;1366:13;
1388:15;1389:13
**40 (3)**
1293:10;1314:7;
1369:9
**401 (1)**
1330:7

### 5

**5 (2)**
1319:11,22
**5:30 (1)**
1288:10
**500 (1)**
1292:24
**5K1 (1)**
1380:25

### 6

**6 (3)**
1344:17;1347:3;
1353:2
**68 (1)**
1346:21
**69 (3)**
1345:5,5,6

### 7

**7 (4)**
1299:11;1344:11;
1387:22;1388:4
**700 (4)**
1391:15,18;1392:1,3
**701 (3)**
1393:22;1394:2,4
**703 (3)**
1395:1,8,10
**704 (3)**
1397:6,12,14
**705 (3)**
1398:3,10,12

**708 (5)**
  1400:17,18,24;
  1401:1,2
**75 (3)**
  1316:10,10,15
**755 (4)**
  1387:14,24;1388:2,3

## 8

**8 (3)**
  1304:12;1306:8;
  1357:20
**8663 (5)**
  1349:5,7,20,22,23

## 9

**9 (4)**
  1310:22;1349:6;
  1352:14;1357:19
**9:15 (1)**
  1404:13
**9:30 (2)**
  1403:10;1404:15
**9055 (2)**
  1366:12,25
**95 (6)**
  1301:23;1302:8,11,
  13,14;1326:22
**97 (1)**
  1370:9
**99 (1)**
  1296:7

**In The Matter Of:**

*UNITED STATES OF AMERICA, v*
*TODD NEWMAN,*

*November 26, 2012*

*SOUTHERN DISTRICT REPORTERS*

*500 PEARL STREET*

*NEW YORK, NY 10007*

*212 805-0330*

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   UNITED STATES OF AMERICA,
3
         v.                    12 Cr. 121 (RJS)
4
   TODD NEWMAN,
5  ANTHONY CHIASSON,
6            Defendants.
   ------------------------------x
7
                          New York, N.Y.
8                         November 26, 2012
                          9:35 a.m.
9
   Before:
10
              HON. RICHARD J. SULLIVAN,
11
                              District Judge
12
                   APPEARANCES
13
   PREET BHARARA
14      United States Attorney for the
        Southern District of New York
15 ANTONIA APPS
   JOHN ZACH
16 RICHARD TARLOWE
      Assistant United States Attorneys
17
   SHEARMAN & STERLING
18      Attorneys for Defendant Newman
   BY: STEPHEN R. FISHBEIN
19      JOHN A. NATHANSON
20 STEPTOE & JOHNSON
      Attorneys for Defendant Chiasson
21 BY: REID WEINGARTEN
        ERIK KITCHEN
22      MICHELLE LEVIN
        -and-
23 MORVILLO LLP
   BY: GREGORY R. MORVILLO
24
25

1        (Trial resumed; jury not present)
2        THE COURT: All right. The government has made a
3  motion to preclude certain expert testimony. I assume this can
4  wait until sometime later?
5        MS. APPS: Yes, your Honor.
6        THE COURT: This week, even. All right, the witness
7  is here?
8        MR. TARLOWE: Yes, sir.
9        THE COURT: Anything we need to discuss before the
10 witness takes the stand? No? The jurors are all here? Okay.
11 We're running a little late because I was interviewing interns
12 this morning. Hope you had a nice Thanksgiving. Anybody go to
13 the parade? No? Okay, Dan, you can bring in the jury.
14       (Continued on next page)
15
16
17
18
19
20
21
22
23
24
25

1        (In open court; jury present)
2        THE COURT: All right. Have a seat. Good morning,
3  ladies and gentlemen. Good to see you again. I've missed you.
4  Hope you all had nice Thanksgiving and got a rest over the
5  weekend. It's hard to rest when it's Thanksgiving and black
6  Friday right after that. Today is cyber Monday, which I'm not
7  exactly sure what that means, it just means you can shop
8  without going to the store.
9        So we are going to resume the direct examination of
10 Mr. Goyal by Mr. Tarlowe. Okay.
11 SANDEEP GOYAL,
12       called as a witness by the Government,
13    having been previously duly sworn, testified as follows:
14       MR. TARLOWE: May I proceed, your Honor?
15       THE COURT: Yes, you may.
16 DIRECT EXAMINATION
17 BY MR. TARLOWE: (Continued)
18 Q. Mr. Goyal, I believe you testified last week that when you
19 were working at Prudential you spoke to some friends of yours
20 at Dell, is that correct?
21 A. Yes, it is.
22 Q. In general, what kind of information did those friends
23 provide to you about Dell?
24 A. It was about general business conditions in Dell groups, in
25 their segments.

1  Q. What do you mean by their segments?
2  A. They worked in various segments within Dell. Dell is a big
3  company, it has many different segments for different
4  customers. For example, one is international Europe, Asia, so
5  on. Then one is for U.S., within U.S. there's consumer, small
6  and medium business, large businesses, services and so on.
7  Q. Are you familiar with the term "rollup"?
8  A. Yes, I am.
9  Q. What do you understand that to mean?
10 A. It is when information from all of the different segments
11 is consolidated to get the overall company picture.
12 Q. What information is contained in the company's quarterly
13 earnings results?
14 A. Excuse me?
15 Q. When the company, when a company like Dell announces its
16 quarterly financial results, are those results the consolidated
17 rolled up results?
18 A. Yes. The financial statements are about overall company's
19 consolidated results.
20 Q. Did you receive information about Dell's rolled up or
21 consolidated financial results from anyone at Dell before they
22 were announced to the public?
23 A. Yes, I did.
24 Q. Who did you receive that information from?
25 A. From Rob Ray.

1  Q.  Mr. Goyal, I'm showing you what's been marked for
2  identification as Government Exhibit 2171.  Mr. Goyal, do you
3  recognize the person shown in that photograph?
4  A.  Yes.
5  Q.  Who is it?
6  A.  This is Rob Ray.
7      MR. TARLOWE: The government offers Government Exhibit
8  2171.
9      MR. FISHBEIN: No objection.
10      THE COURT: No objection.  Government Exhibit 2171 is
11  received.
12      (Government's Exhibit 2171 received in evidence)
13  Q.  Mr. Goyal, what was the nature of your relationship with
14  Rob Ray?
15  A.  During what time?
16  Q.  What kind of relationship did you have with him?
17  A.  It was not very close or personal.  He was not like other
18  personal friends.  It was mostly, we talked mostly regarding
19  his career objectives, that kind of relationship.
20  Q.  Were you friends with Rob Ray?
21  A.  He was not that close.  He wasn't like other personal
22  friends.
23  Q.  Where did you first meet him?
24  A.  At the business school.
25  Q.  Have you met Mr. Ray's wife?

1  A.  Yes.
2  Q.  Has Rob Ray met your wife?
3  A.  Yes.
4  Q.  If you could please take a look in your binder at what's
5  marked for identification as Government Exhibit 741.  Is that
6  an e-mail between you and Rob Ray from October of 2009?
7  A.  Yes.
8      MR. TARLOWE: The government offers Government Exhibit
9  741.
10      THE COURT: Any objection?
11      MR. FISHBEIN: No objection.
12      THE COURT: Mr. Morvillo?
13      MR. MORVILLO: No objection, your Honor.
14      THE COURT: Government Exhibit 741 is received.
15  Q.  Mr. Goyal, the bottom e-mail is an e-mail that you sent to
16  Rob Ray on October 17, 2009, the subject is happy Diwali.
17  Could you just read what you wrote to Rob Ray?
18  A.  Hi, Rob, I wish you and family a very happy and prosperous
19  Diwali.
20      MR. TARLOWE: Then Rob Ray replied to you? Hey, Sandy
21  thanks for your kind wishes.  My wife and I also wish you and
22  your family a very happy and prosperous Diwali, best, Rob.  Do
23  you see that?
24  A.  Yes.
25  Q.  Now, last week when you testified you were shown a number

1  of e-mails between you and Rob Ray.  Do you recall being shown
2  those e-mails during your testimony?
3  A.  Yes.
4  Q.  And what was the general subject matter of those e-mails?
5  A.  Rob wanted to work in investment management industry and
6  sought my guidance and tips on how to get in.
7  Q.  Where was he working at the time?
8  A.  He was working at Dell.
9  Q.  If we could take a look at Government Exhibit 708, which is
10  in evidence.  And this is an e-mail exchange between you and
11  Rob Ray.  We looked at parts of this e-mail last week.
12  Mr. Hoffman, if you could please turn to page 2.  There's a
13  part of this we did not go over last week.  If you could please
14  enlarge, Mr. Hoffman, the part that says "Hey Sandy" down.
15      This is from Rob Ray to you, this portion, is that
16  correct?
17  A.  Yes.
18  Q.  Rob Ray wrote, "Hey Sandy.  I hope you had a nice and
19  relaxing long weekend.  Mine was pretty uneventful.  Did some
20  barbecuing with friends and things like that.  Didn't go
21  anywhere this year since I'm preparing for my CFA which is
22  right around the corner."
23      I think you might have testified about this last week,
24  but what is the CFA?
25  A.  It's chartered financial analyst.

1  Q.  What is that?
2  A.  It's a kind of program and review, you have to pass three
3  exams to get that certification or charter and it's viewed very
4  favorably in investment management industry.
5  Q.  Rob Ray then continued in his e-mail to you and wrote,
6  "Hope you are fully settled in New York City and enjoying your
7  new job."  What was the new job he was referring to?
8  A.  Neuberger Berman.
9  Q.  Rob Ray wrote, "I am still desperately looking to break
10  into the buy/sell side, but no luck so far.  I have put the job
11  search on hold for now since I am trying to focus on the CFA
12  which is in December and then plan to start the search in full
13  swing come January.  I definitely want to make the transition
14  by March of next year since I have decided that's what I want
15  to pursue, so the sooner the better."
16      When he said March of next year, was that your
17  understanding it was March of 2008 that he was referring to?
18  A.  Yes.
19  Q.  And then he continues in this e-mail to you, "Please keep
20  me posted if you come across something" -- the next page -- "or
21  if you need an assistant.  But seriously, please keep me in
22  mind if you hear anything either on the buy or sell side since
23  I will make the switch in a heartbeat.  I am planning to visit
24  New York City sometime early next year.  I figured sometime
25  around the bonus season will be the best time for me to break

# A-898

1  in."
2        What is the bonus season?
3  A.  It's in January to March.  That's where most people in
4  finance field get their end-of-year bonuses.
5        MR. TARLOWE: You can take that down.
6  Q.  When was the first time that Rob Ray provided information
7  to you about Dell's rolled up or consolidated financial
8  results?
9  A.  It was sometime in late 2007.
10 Q.  Where were you working at the time?
11 A.  Neuberger Berman.
12 Q.  Where was Rob Ray working at the time?
13 A.  In Dell.
14 Q.  Where within Dell?
15 A.  Investor relations.
16 Q.  Do you recall specifically what Rob Ray said to you on that
17 particular occasion?
18 A.  No.
19 Q.  What if anything do you recall about what Rob Ray said to
20 you at that time?
21 A.  The thing I recall is I thought that information was good.
22 Q.  What do you mean by that?
23 A.  It meant that information was about the coming quarterly
24 financial results and it was regarding the numbers there.
25 Q.  Was it regarding numbers for a particular segment or for

1  the overall consolidated financial results?
2  A.  The numbers were for overall consolidated results.
3  Q.  Prior to that had you gotten that type of information from
4  your other friends at Dell?
5  A.  No, I don't recall getting that kind of information before.
6  Q.  What was different about the information from Rob Ray?
7  A.  Rob Ray's information was regarding overall consolidated
8  numbers and regarding quarterly financial results that were
9  about to be reported.
10 Q.  Was that the only time that Rob Ray reported information to
11 you about Dell's rolled up or consolidated financial results?
12 A.  No.
13 Q.  Did Rob Ray do that in connection with one quarter or more
14 than one quarter?
15 A.  More than one quarter.
16 Q.  In connection with how many quarters did Rob Ray provide
17 information to you about Dell's consolidated financial results?
18 A.  It was for about two years, so about eight quarters, I
19 guess.
20 Q.  During what period of time?
21 A.  From about late 2007 to about late 2009.
22 Q.  Which line or lines of Dell's financial results did Rob Ray
23 give you information about?
24 A.  It was mostly revenues and margins.
25 Q.  What do you mean when you say margins?

1  A.  There are two margins.  One is gross margin and other
2  operating margin.
3  Q.  And for what business segment or segments of Dell did he
4  provide that information?
5  A.  It was for overall consolidated company.
6  Q.  How did Rob Ray communicate that information to you?
7  A.  Mostly over the phone.
8  Q.  How did he describe the revenues and margins to you?
9  A.  They were either in, mostly they were in a range of numbers
10 or relative to analyst expectations.
11 Q.  So first you said a range.  What do you mean by that?
12 A.  For example, revenue could be between $14 billion to $14.3
13 billion, low 14's.
14 Q.  What about margins?
15 A.  Margins could be between 18 percent to 18.3 percent or low
16 18's.
17 Q.  Those are just examples?
18 A.  These are just examples, yes.
19 Q.  You said sometimes he provided information relative to
20 Street expectations, is that what you said?
21 A.  Yes.
22 Q.  What do you mean by that?
23 A.  There are like various sell side analysts on Wall Street
24 and consensus is average of all, or expectations are average
25 estimate of all those Wall Street analysts covering that

1  company.
2  Q.  Based on your conversations with Rob Ray, did he appear to
3  be familiar with the consensus estimates for Dell?
4  A.  Yes.
5  Q.  How did he describe -- let me rephrase that.  You said one
6  of the ways he described the information to you was relative to
7  Street expectations.  How would he do that?
8  A.  For example, revenue or margins could be very close to
9  consensus or Street expectations or slightly below or higher
10 the estimates or much lower or much higher than the estimates,
11 expectations.
12 Q.  You said that sometimes he provided ranges.  For gross
13 margin, for example, how small or large of a range did Rob Ray
14 provide?
15 A.  I think the small range was like, for example, it was 17 to
16 17.2 percent and it could be as large as like 17-6 to 17.4,
17 17.5 percent.
18 Q.  Sitting here today, do you recall any particular revenue
19 numbers that he provided, the actual numbers?
20 A.  No.
21 Q.  What about gross margin?
22 A.  Yes.
23 Q.  What do you remember about gross margin?
24 A.  There was one quarter When Street was expecting like high
25 17's to low 18's percent gross margin and he mentioned that it

# A-899

1 will be low 17 percent.

2 Q. For which quarters did Rob Ray provide information to you

3 about Dell's consolidated revenues?

4 A. I think it was for almost all the quarters he was providing

5 information.

6 Q. For which quarters did he provide information to you about

7 Dell's margins?

8 A. Again, for almost all the quarters.

9 Q. What if any information did Rob Ray provide to you about

10 Dell's earnings per share?

11 A. Sometimes he provided something about EPS and a lot of

12 times he didn't.

13 Q. A lot of times he --

14 A. Did not.

15 Q. And in those quarters in which he did not provide

16 information about earnings per share, did you attempt to

17 determine the earnings per share?

18 A. Yes.

19 Q. How?

20 A. I'll plug in the revenue and margin information he was

21 giving in my model and calculate the EPS.

22 Q. How long does it take to do that calculation?

23 A. It's pretty fast. A minute, few minutes.

24 Q. When you received information from Rob Ray, did you have to

25 use a model to calculate revenue?

1 A. No.

2 Q. Why not?

3 A. The purpose of the model is to arrive at numbers like

4 revenue margin and I was already getting that information from

5 him.

6 Q. When you received information from Rob Ray did you have to

7 use a model to calculate margins?

8 A. No.

9 Q. Why not?

10 A. Again, the same reason.

11 Q. Did you have an understanding as to whether or not the

12 information Rob Ray provided to you was confidential?

13 A. Yes.

14 Q. What was your understanding?

15 A. It was confidential.

16 Q. Did you have an understanding as to whether or not Rob Ray

17 was authorized to provide that information to you?

18 A. He wasn't.

19 Q. Did you have an understanding as to whether the information

20 he provided was public or non-public?

21 A. It was non-public.

22 Q. Approximately how long after Dell's quarters ended did Dell

23 announce its results to the public?

24 A. It was around three or four weeks later.

25 Q. What's your understanding of what happened during that time

1 between the end of the quarter and the announcement of the

2 results to the public?

3 A. Segments start sending out information to corporate

4 headquarters. Then they add up all the information and then

5 they put the information into the format or standard in line

6 with generally accepted financial and accounting standards so

7 that they can make a report.

8 Q. Were there any particular times in Dell's earnings cycle

9 when you asked Rob Ray for information about Dell's financial

10 results?

11 A. Yes.

12 Q. When?

13 A. It was generally from halfway of the quarter to about

14 two-thirds of the quarter finish, and then towards the end of

15 the quarter and then about the end of quarter to the earnings

16 statement or earnings release.

17 Q. What time of day did your calls with Rob Ray typically take

18 place?

19 A. Typically they were in the night.

20 Q. Where did you make those calls from?

21 A. Mostly my home.

22 Q. What number did you call Rob Ray at?

23 A. Usually his cell number.

24 Q. What if anything did you do as Rob Ray provided the

25 information to you?

1 A. I noted it down.

2 Q. Where?

3 A. On a piece of paper.

4 Q. What if anything did you do with that information?

5 A. I gave it to Jesse.

6 Q. Mr. Tortora?

7 A. Yes.

8 Q. How did you give it to Mr. Tortora?

9 A. Mostly over the phone.

10 Q. When did you give the information to Mr. Tortora relative

11 to when you received it from Rob Ray?

12 A. Usually it was either immediately afterwards or sometimes a

13 day or two days later.

14 Q. What if anything did you do with the piece of paper where

15 you had written down the information?

16 A. Threw it away.

17 Q. What did you say to Mr. Tortora about where you got the

18 information from?

19 A. I told him I got it from a friend at Dell.

20 Q. Did you use Rob Ray's name?

21 A. No.

22 Q. Did you tell Mr. Tortora that the person worked in investor

23 relations?

24 A. No.

25 Q. What if anything did you tell Mr. Tortora about what his

# A-900

UNITED STATES OF AMERICA, v
TODD NEWMAN,

November 26, 2012

CBQFNEW1          Goyal - direct          Page 1423

1   job was at Dell?
2   A. That he works in some corporate department and has access
3   to this information.
4   Q. When you say "this information," what do you mean?
5   A. Consolidated financial results.
6   Q. During your conversations with Rob Ray about Dell's
7   financial results, what else, if anything, did you discuss with
8   him?
9   A. Mostly his career.
10  Q. What if anything did he say to you about his career goals
11  during that time?
12  A. He wanted to work in investment management.
13  Q. What if any steps did you take to help Rob Ray with his
14  career goals?
15  A. I helped, I reviewed his resume, gave him tips about how to
16  improve that; gave him feedback about how to interview, what
17  kind of questions are typical to get asked at interviews, how
18  to prepare for that. Then if he was interviewing for somebody,
19  with somebody, I gave him some information he asked regarding
20  the background of that person, his working style or that
21  company. Then I also forwarded his resume to a recruiter.
22  Q. Did you ever discuss with Rob Ray potential employment at
23  Neuberger Berman?
24  A. Yes.
25  Q. What if anything did you say to him about that?

CBQFNEW1          Goyal - direct          Page 1424

1   A. I told him that if there is a job opening there, I'll keep
2   an eye out for that.
3   Q. What if anything did you tell Rob Ray about what you did at
4   Neuberger Berman?
5   A. I told him I work in central research department where we
6   write research reports and send stock recommendations to
7   Neuberger Berman's portfolio managers.
8   Q. Why did you provide the information you got from Rob Ray to
9   Jesse Tortora?
10  A. Because I was paid for that.
11  Q. Who paid you?
12  A. Diamondback.
13  Q. How much were you paid by Diamondback?
14  A. $75,000 in the first year and hundred thousand dollars in
15  the second year.
16  Q. What years were those?
17  A. I think 2008 and 2009.
18  Q. In those same years how much did you get paid by Neuberger
19  Berman?
20  A. About $170,000 per year.
21  Q. Did Neuberger Berman permit you to receive money from a
22  hedge fund while you were working at Neuberger Berman?
23  A. No.
24  Q. Did you tell Neuberger Berman, did you tell anyone at
25  Neuberger Berman about your arrangement with Diamondback?

CBQFNEW1          Goyal - direct          Page 1425

1   A. No.
2   Q. Who raised the idea of you getting paid by Diamondback?
3   A. Jesse did.
4   Q. When was that?
5   A. Sometime late 2007, maybe October-November.
6   Q. What did Mr. Tortora say to you at that time?
7   A. He said if you continue providing me information regarding
8   Dell we can get you paid for that.
9   Q. At that time had you received information from Rob Ray?
10  A. I don't think so.
11  Q. What did you say to Mr. Tortora?
12  A. I told him I'll have to look at that because my work visa
13  status didn't allow me to have two jobs or get paid for another
14  job.
15  Q. Did you get back to Mr. Tortora about that?
16  A. Yes.
17  Q. What did you tell him?
18  A. I told him this, that I won't be able to do that.
19  Q. What is your wife's name?
20  A. Ruchi.
21  Q. Same last name?
22  A. Yes.
23  Q. Has your wife ever worked in the financial industry?
24  A. No.
25  Q. Does your wife have any experience researching public

CBQFNEW1          Goyal - direct          Page 1426

1   companies?
2   A. No.
3   Q. Did your wife provide any services to Diamondback?
4   A. No.
5   Q. What if anything did you tell Mr. Tortora -- well, what did
6   Mr. Tortora say to you after you told him that you could not
7   receive payment from Diamondback?
8   A. He said can my wife be able to accept the payment.
9   Q. What did you tell him?
10  A. I told him I'll have to look into that.
11  Q. Did you look into that?
12  A. Yes.
13  Q. And did you get back to Mr. Tortora?
14  A. Yes.
15  Q. What did you tell him?
16  A. I told him that yes, she is allowed to get payments.
17  Q. What do you mean she was allowed to get payment?
18  A. Her visa status, it allowed her to get payments.
19  Q. After you told Mr. Tortora that your wife could receive the
20  payments, what happened next?
21  A. He told me that he'll send a sample invoice and I should
22  create an invoice based upon that, and then every quarter send
23  it out to Diamondback and then I'll be sent, I'll receive, get
24  paid.
25  Q. Would you take a look at Government Exhibit 775-A, which is

Min-U-Script®          SOUTHERN DISTRICT REPORTERS          (5) Pages 1423 - 1426

# A-901

1   in evidence?  Do you see that, Mr. Goyal?
2   A. Yes, I do.
3   Q. What is that?
4   A. This is the invoice that I created.
5   Q. What is the amount?
6   A. $18,750.
7   Q. How did you arrive at that amount?
8   A. It was $75,000 divided by four for each quarter.
9   Q. What's the period covered by this invoice?
10  A. October 9, 2007 to December 31, 2007.
11  Q. The date of the invoice?
12  A. January 2, 2008.
13  Q. Whose name is on the top of the invoice and the signature
14  line?
15  A. My wife's name.
16  Q. Whose address is that?
17  A. That was our address.
18  Q. Your home address?
19  A. Yes.
20  Q. And what about the telephone number?
21  A. Home telephone number.
22  Q. Whose signature is that?
23  A. My wife's signature.
24  Q. What if anything did you do with this invoice?
25  A. I had my wife sign this invoice and then I got it sent to

1   Diamondback.
2   Q. Did you receive payment in connection with that invoice?
3   A. Yes, I did.
4   Q. How much?
5   A. $18,750.
6   Q. Take a look at what's been marked for identification as
7   Government Exhibit 750.  Do you recognize that, Mr. Goyal?
8   A. Yes.
9   Q. What is it?
10  A. It's the check that we got in relation to the invoice.
11       MR. TARLOWE: The government offers Government Exhibit
12  750.
13       MR. FISHBEIN: No objection.
14       MR. MORVILLO: No objection.
15       THE COURT: Government Exhibits 750 is received.
16       (Government's Exhibit 750 received in evidence)
17  Q. What's the amount of this check, Mr. Goyal?
18  A. $18,750.
19  Q. Now, the check is from, the payer is Hoenig, a division of
20  ITG.  Do you know what that is?
21  A. No.
22  Q. Did you have an understanding of what the relationship was,
23  if any, between Hoenig and Diamondback?
24  A. No.
25  Q. What if anything did you do after receiving this check?

1   A. I had my wife deposit it at the bank.
2   Q. Who endorsed the check?
3   A. She did.
4   Q. Where did she deposit it?  Into what account?
5   A. Into our joint checking account.
6   Q. If you could take a look, Mr. Goyal, at Government Exhibit,
7   what's marked for identification as Government Exhibit 751, 752
8   and 753?
9   A. Yes.
10  Q. What are those?
11  A. These are the checks related to the invoices per quarter
12  relating to the year.
13       MR. TARLOWE: The government offers Government
14  Exhibits 751, 752 and 753.
15       MR. FISHBEIN: No objection.
16       MR. MORVILLO: No objection.
17       THE COURT: All right, Government Exhibits 751 through
18  753 are received.
19       (Government's Exhibits 751 through 753 received in
20  evidence)
21  Q. This is Government Exhibit 751.  What's the amount of this
22  check, Mr. Goyal?
23  A. 18,750.
24  Q. And the date?
25  A. It is May 14, 2008.

1   Q. What did you do with this check after receiving it?
2   A. Again, same thing.  I had my wife deposit it at the bank.
3   Q. Who endorsed it?
4   A. She did.
5       MR. TARLOWE: Government Exhibit 752.
6   Q. The dollar amount is also $18,750?
7   A. Yes.
8   Q. What did you do with this check?
9   A. Same thing.
10      MR. TARLOWE: Government Exhibit 753.
11  Q. What did you do with this check?
12  A. Same thing.
13  Q. Do you recall any issues coming up with respect to this
14  arrangement with Diamondback?
15  A. Yes.
16  Q. What do you remember happening?
17  A. I was contacted by someone who said they were soft dollar
18  provider for Diamondback and that I needed to submit sample
19  research report in order for them to process the invoice.
20  Q. What if any sample research did you provide after getting
21  that request?
22  A. None.
23  Q. Did you continue to receive payments from Diamondback after
24  that happened?
25  A. Yes.

# A-902

1 Q. Now, the checks you just looked at were all from 2008, is
2  that correct?
3 A. Yes.
4 Q. If you want to take a look at 751, 752 and 753.
5 A. I think the first one was January 2. Yes, I think so.
6  Yes.
7 Q. Did you have any discussions with Mr. Tortora about
8  payments for the following year, 2009?
9 A. Yes.
10 Q. One discussion or more than one discussion?
11 A. I think it was spread over a few discussions.
12 Q. What if any discussions did you have with Mr. Tortora about
13  the structure of the payments for 2009?
14 A. That it will be a lump sum payment and shown as bonus for
15  work done in 2008.
16 Q. How did that come about?
17 A. Because I told him because of the visa issues my wife
18  wouldn't be able to accept payment, she wouldn't be able to
19  work two jobs.
20 Q. What did you mean by that?
21 A. Like what?
22 Q. What did you mean when you told him that your wife wouldn't
23  be able to work two jobs?
24 A. It's the same visa thing that I had encountered earlier.
25  She had a job and because her visa status had changed she can't

1  accept, she could work only one job on that visa status.
2 Q. So it's your understanding she could not receive payment
3  from two different entities?
4 A. Right.
5 Q. Was she working at the time?
6 A. Yes.
7 Q. What did Mr. Tortora say to you after you informed him of
8  that?
9 A. Then he came back what if we structure it as a bonus
10  payment for work already done in 2008.
11 Q. What did you say?
12 A. I said that will work.
13 Q. What if anything did Mr. Tortora say to you about the size
14  of that bonus payment?
15 A. He said it will be in the amount of $100,000.
16 Q. What else, if anything, did he say to you in connection
17  with the size of the bonus payment?
18 A. He mentioned that Todd is happy with your work.
19 Q. Who did you understand him to be referring to?
20 A. Todd Newman.
21 Q. Mr. Goyal, if you could please look at Government Exhibit,
22  well, actually, I don't think you have it in your binder.
23      MR. TARLOWE: Mr. Hoffman, if you could put out. It's
24  already in evidence. Government Exhibit 2270, page 5. If you
25  could enlarge that, please.

1 Q. What is that, Mr. Goyal?
2 A. This is an invoice for $100,000.
3 Q. What's the date of the invoice?
4 A. January 8, 2009.
5 Q. And the period that the invoice purports to cover?
6 A. October 2007 to September 2008.
7 Q. Who signed that invoice?
8 A. My wife did.
9 Q. What if anything did you do with that invoice?
10 A. Same thing. I had her deposit it at the bank.
11 Q. Who selected the amount of $100,000?
12 A. That's what Jesse had mentioned.
13 Q. If you could look at what's marked for identification as
14  Government Exhibit 754? Do you recognize that, Mr. Goyal?
15 A. Yes.
16 Q. What is that?
17 A. It's the check in the amount of $100,000.
18      MR. TARLOWE: Government offers Government Exhibit
19  754?
20      MR. FISHBEIN: No objection.
21      THE COURT: All right, Government Exhibit 754 is
22  received.
23      (Government's Exhibit 754 received in evidence)
24 Q. Mr. Goyal, what is this?
25 A. This is the check.

1 Q. Which check?
2 A. This is the check of $100,000 in relation to that invoice.
3 Q. What's the date on it?
4 A. January 16, 2009.
5 Q. What did you do after receiving this check?
6 A. I had my wife deposit at the bank.
7 Q. When is the last time you spoke to Mr. Tortora?
8 A. I think it was sometime in 2011. I'm not sure, I think.
9 Q. You testified last week about the FBI coming to talk to you
10  at some point in 2011. Was the last time you spoke to Mr.
11  Tortora before that or after that?
12 A. Before that.
13 Q. Did you include the $175,000 you received from Diamondback
14  in your income tax returns?
15 A. Yes, I did.
16 Q. Did you also include any deductions in your tax returns
17  that were not accurate?
18 A. Yes.
19 Q. In what years did you do that?
20 A. 2007, eight and nine.
21 Q. What deductions were those?
22 A. They were expenses that were not true.
23 Q. Have you corrected those?
24 A. Yes, I have.
25 Q. Have you made any payment in connection with those

UNITED STATES OF AMERICA, v
TODD NEWMAN,

1  corrections?

2  A.  Yes, I have made full payments and interest payments.

3  Q.  Have any promises been made to you about whether or not you

4  will be prosecuted for any tax crimes in connection with that?

5  A.  I have been told that the information I provide won't be

6  used against me, but there are no promises about any other

7  entity prosecuting me.

8  Q.  Mr. Goyal, I'm going to just put up for your reference

9  Government Exhibit 90, which contains information about Dell's

10  quarters and the dates of various earnings announcements by

11  Dell.  If you could take a look at what's marked for

12  identification as Government Exhibit 710.  Is that on e-mail

13  between you and Rob Ray from February of 2008?

14  A.  Yes.

15         MR. TARLOWE:  The government offers Government Exhibit

16  710.

17         MR. FISHBEIN:  No objection.

18         MR. WEINGARTEN:  No objection.

19         THE COURT:  Government Exhibit 710 is received.

20         (Government's Exhibit 710 received in evidence)

21  Q.  Starting with the e-mail on the bottom, is that an e-mail

22  from Rob Ray to you?

23  A.  Yes.

24  Q.  Rob Ray wrote, "Hope you had a wonderful weekend.  Finally

25  got around to updating my resume over the weekend.  I am

1  sending it to you so that you can forward it to the appropriate

2  people if and when an opportunity opens up.  You and I have

3  already talked about what I am interested in, so you have a

4  fair idea what I am looking for.  Hopefully, I will land

5  something interesting soon."

6         When Mr. Ray said to you, "I am sending it to you so

7  that you can forward it to the appropriate people if and when

8  an opportunity opens up," what did you understand him to be

9  referring to as the appropriate people?

10  A.  Like, if I happen to know any person or analyst, analyst

11  inside or outside Neuberger Berman who was looking for an

12  associate, then I can send his resume to that person.

13  Q.  When he said, "You have a fair idea what I am looking for,"

14  at that time in February 2008 what did you understand him to be

15  looking for?

16  A.  Something in investment management.

17  Q.  Then you wrote back:  "Hi, Rob.  Resume looks good.  I have

18  some minor suggestions.  Will call in a day or two to discuss."

19  Do you see that?

20  A.  Yes.

21  Q.  And what is the date of that e-mail?

22  A.  February 12, 2008.

23  Q.  Where is that in terms of Dell's earnings cycle?

24  A.  It is after the quarter has closed and before the earnings

25  have been announced.

1  Q.  I'm showing you what's been marked for identification as

2  Government Exhibit 2607B.  This is an excerpt from Government

3  Exhibit 2607 which is already in evidence, which are phone

4  records for Sandy Goyal.

5         MR. TARLOWE:  Government offers Government Exhibit

6  2607B.

7         THE COURT:  Any objection?

8         MR. FISHBEIN:  No objection.  It's an excerpt of

9  something already in evidence.

10         THE COURT:  That's what he said.  All right,

11  Government Exhibit 2607B is received.

12         (Government's Exhibit 2607B received in evidence)

13         MR. TARLOWE:  Pursuant to the stipulation these are

14  phone records for the phone subscribed to Sandy Goyal and the

15  records are in Greenwich mean time.  So the first row that's

16  highlighted which says February 19, 2008 1:56 is actually a

17  call on February 18, 2008 at 9:56 p.m.

18  Q.  Now, the from number Mr. Goyal is 415-738-2210.  Do you

19  recognize that number?

20  A.  Yes.

21  Q.  Whose number is that?

22  A.  My home phone number.

23  Q.  And the number called is 813-380-4010.  Pursuant to the

24  stipulation, that is the phone number subscribed to Rob Ray.

25  How long was that call?

1  A.  16 minutes.

2  Q.  15 minutes 53 seconds?

3  A.  Correct.

4  Q.  And then there's another call which again, because the

5  records are in Greenwich mean time, the call is actually

6  10:14 p.m. on February 18, 2008.  Do you see that call?

7  A.  Yes.

8  Q.  That's also a call from your home number to a number

9  subscribed to Rob Ray.  How long was that call?

10  A.  About one hour.

11  Q.  And those were on the evening of February 18, 2008?

12  A.  Correct.

13  Q.  Mr. Goyal, if you could please look at what's marked for

14  identification as Government Exhibit 711.  Is that an e-mail

15  that you sent on February 19, 2008?

16  A.  Yes.

17         MR. TARLOWE:  The government offers Government Exhibit

18  711.

19         MR. FISHBEIN:  No objection.

20         THE COURT:  All right, Government Exhibit 711 is

21  received.

22         (Government's Exhibit 711 received in evidence)

23  Q.  Mr. Goyal this is an e-mail you sent the next day on

24  February 19, 2008, 12:48 p.m. to several people; Daniel

25  Fletcher, Brenden Smith and Fayad Abbasi.  You've already

1  testified about Mr. Abbasi. He was your boss at Neuberger
2  Berman?
3  A. Right.
4  Q. Who were Dan Fletcher and Brenden Smith?
5  A. Dan Fletcher was a portfolio manager in Neuberger Berman
6  and Brenden Smith was an analyst working with another portfolio
7  manager in Neuberger Berman.
8  Q. And what is the subject line of this e-mail?
9  A. Dell JanQ data points.
10 Q. What did you mean by JanQ?
11 A. January quarter.
12 Q. That's the quarter that ended when?
13 A. This is the quarter that usually ends on January 31.
14 Q. And in this particular year when did that quarter end?
15 A. February 1, 2008.
16 Q. When is this e-mail relative to when those quarterly
17 results were announced?
18 A. This is nine days before the quarterly results were
19 announced.
20 Q. You wrote, "Hi. I recently got some data points from my
21 Dell contacts regarding the JanQ."
22    Where did you get the information that's contained in
23 this e-mail?
24 A. From Rob Ray.
25 Q. The first bullet point, "Revenue is expected to be close to

1  analyst expectations," is that about Dell's consolidated rolled
2  up revenue or some business segment?
3  A. Consolidated revenue.
4  Q. And when you wrote in the third bullet point, "Gross
5  margins in high 18's and op ex in high 13's as percentage of
6  revenue," do you see that?
7  A. Yes.
8  Q. What were you referring to there?
9  A. Referring to --
10 Q. What gross margins were you talking about?
11 A. Gross margins about overall company.
12 Q. At the time that Rob Ray provided that information to you,
13 did you understand that information -- did you have an
14 understanding as to whether or not that information was
15 confidential?
16    MR. FISHBEIN: Objection. Asked and answered.
17    THE COURT: Overruled. You can answer.
18 A. Yes, it was.
19 Q. Did you have an understanding as to whether or not he was
20 authorized to provide you the information that's described in
21 this e-mail?
22 A. He was not.
23 Q. Did you do any calculations to arrive at the conclusion
24 that gross margins is in high 18's and OPEX in high 13's?
25 A. No.

1  Q. If you can take a look at what's marked for identification
2  as Government Exhibit 713. Do you see that, Mr. Goyal?
3  A. Yes, I do.
4  Q. Is that an e-mail that you sent on February 25, 2008?
5  A. Yes.
6  Q. Government offers Government Exhibit 713.
7     MR. FISHBEIN: No objection.
8     THE COURT: All right, Government Exhibit 713 is
9  received.
10    (Government's Exhibit 713 received in evidence)
11 Q. Mr. Goyal, the bottom of this, is that just you forwarding
12 the e-mail that we just looked at?
13 A. Right.
14 Q. And then the top is an e-mail you sent to Fayad Abbasi,
15 Brenden Smith and Daniel Fletcher who are the same recipients,
16 those three are the same recipients of the e-mail at the
17 bottom?
18 A. Right.
19    (Continued next page)
20
21
22
23
24
25

1  Q. And then you added another recipient, Daniel Niles.
2     Who is Daniel Niles?
3  A. He was the portfolio manager at Neuberger Berman.
4  Q. You wrote in this e-mail, the subject line: Additional
5  Dell JAN Q data points.
6     When is this e-mail relative or where within Dell's
7  earning cycle was this e-mail sent?
8  A. It is three days before their earnings announcement.
9  Q. You wrote: Some more insights. First bullet point: One
10 time charges to affect opex by around 100 BPS.
11    The squiggly line, does that mean around?
12 A. Right.
13 Q. And 100 BPS, what does that mean?
14 A. It means 100 basis points, which is 1 percent.
15 Q. What is opex?
16 A. Operating expenses.
17 Q. The second bullet point you wrote: Operating margin close
18 to 5 percent, including charges, and 6 percent excluding them.
19    What did you mean by including charges and excluding
20 them?
21 A. There are certain one-time charges and some people include
22 them in their earning statements. Some people like to exclude
23 them while analyzing the statements. So this means 5 percent
24 including those one-time charges and then 6 percent excluding
25 those one-time charges.

1  Q. The third bullet point has information about EPS. Is that
2   earnings per share?
3  A. Right.
4  Q. And information about revenue.
5       The information contained in this e-mail, where did
6   you get that information from?
7  A. Rob Ray.
8  Q. Did you do any calculations to arrive at the numbers
9   contained in this e-mail?
10  A. No.
11  Q. When Rob Ray provided this information to you, did you have
12   an understanding as to whether or not this information was
13   confidential?
14  A. It was.
15  Q. Did you have an understanding as to whether or not he was
16   authorized to provide this information to you?
17  A. He was not.
18  Q. Again, February 25, 2008 is how many days before the
19   earnings announcement?
20  A. Three days before.
21  Q. The earnings announcement was on February 28, 2008, is that
22   correct?
23  A. True.
24  Q. What time of day did Dell typically announce its earnings?
25  A. Normally, around 4:30 p.m.

1  Q. When does the market close?
2  A. 4 p.m.
3  Q. Did Dell announce its earnings after the market closed?
4  A. Yes.
5  Q. If you could please look at what's marked for
6   identification -- sorry. It's already in evidence. Government
7   Exhibit 157.
8       This is an e-mail on February 28, 2008 at 4:51 p.m.
9       When is that relative to Dell's earnings announcement?
10  A. It is a little bit after the earnings announcement.
11  Q. When you say a little bit?
12  A. Less than half an hour.
13  Q. The subject line is Dell and Mr. Tortora wrote to you:
14   Excellent call. We were short some Dell into call and short
15   INTC, et cetera.
16       When Mr. Tortora said, we were short some Dell into
17   call, what did you understand that to mean?
18  A. Short means they have bought positions that will go up if
19   the stock goes down.
20  Q. What did you understand it to mean, into call?
21  A. Into call means before the call.
22  Q. What call?
23  A. Earnings call.
24  Q. Now, during the time that Rob Ray was providing information
25   to you about Dell's financial results, did he continue to

1   discuss his career with you?
2  A. Yes, he did.
3  Q. What, if anything, did he say about what his career goals
4   were at that time?
5  A. Working in investment management.
6  Q. If you could take a look at what's marked for
7   identification as Government Exhibit 715, is that an e-mail
8   exchange between you and Rob Ray from April of 2008?
9  A. Yes.
10       MR. TARLOWE: The government offers Government Exhibit
11   715.
12       MR. FISHBEIN: No objection.
13       THE COURT: Government Exhibit 715 is received.
14       (Government's Exhibit 715 received in evidence)
15  Q. Starting, Mr. Goyal, with the e-mail at the bottom, April
16   14, 2008, that's from Rob Ray to you, is that correct?
17  A. Yes.
18  Q. And he wrote: Hey, Sandy: I have a preliminary call with
19   Ben tomorrow afternoon. Real high level. What should I expect
20   from the call? Thanks, Rob.
21       Who did you understand him to be referring to when he
22   said Ben?
23  A. Ben Reitzes. He was a senior sell side analyst.
24  Q. What firm?
25  A. I am not sure. I think he was initially at UBS, then he

1   went to Lehman Brothers and then Barclays.
2  Q. He was a sell side research analyst?
3  A. Yes.
4  Q. Then you replied to Rob Ray saying: Just be prepared with
5   your industry views and some stocks, storage space, too.
6   Otherwise, same old things, like why you want to join, et
7   cetera, your expectations, long-term goals.
8       If you could take a look at what's marked for
9   identification as Government Exhibit 719.
10       You see that, Mr. Goyal?
11  A. Yes.
12  Q. That's an e-mail from Rob Ray to you from May 5, 2008?
13  A. Correct.
14       MR. TARLOWE: The government offers Government Exhibit
15   719.
16       MR. FISHBEIN: No objection.
17       THE COURT: Government Exhibit 719 is received.
18       (Government's Exhibit 719 received in evidence)
19  Q. This is an e-mail Rob Ray sent to you and you wrote: Hey,
20   Sandy, as promised, attached is my résumé. Please feel free to
21   make my minor tweaks in wording if you deem necessary. Also, I
22   think it's best not to mention to the recruiter that Ben and I
23   already spoke. She might wonder then why you are sending my
24   résumé again. Thanks again for your help. Thanks, Rob.
25       What did you understand Rob Ray to be saying to you

# A-906

1  here when he said, I think it's best not to mention to the
2  recruiter that Ben and I already spoke?
3  A. I think there was another job within Lehman Brothers at
4  that time. There was another job which was not with Ben. So
5  that's why he didn't want to mention that he had already spoken
6  to Ben, because he was thinking of applying for that other job,
7  also.
8  Q. And attached to that was Rob Ray's résumé on the second
9  page of that exhibit?
10  A. Yes.
11  Q. Mr. Goyal, if you could take a look at what's marked for
12  identification as Government Exhibit 719B.
13  A. Yes.
14  Q. What is that?
15  A. It's an e-mail I sent to the recruiter at Lehman Brothers.
16      MR. TARLOWE: The government offers Government Exhibit
17  719B.
18      MR. FISHBEIN: No objection.
19      THE COURT: 719B is received.
20      (Government's Exhibit 719B received in evidence)
21  Q. The e-mail on top, Mr. Goyal, is an e-mail you sent to
22  Katie Morris at Lehman Brothers.
23      Who was Kate Morris?
24  A. I think she was a recruiter at Lehman Brothers.
25  Q. If you could just scroll down to the e-mail from Ms. Morris

1  to you. The subject, referral request. Ms. Morris said to
2  you: I am recruiting for the open research analyst position on
3  Ben Reitzes' team within equity research here at Lehman. I
4  noticed in our résumé database that you were working IT
5  hardware equity research before you came to Neuberger. If you
6  happen to have any previous coworkers or colleagues that have
7  some experience in equity research within the text sector that
8  you think might be interested, would you kindly share the job
9  description below with them and have them send me their résumé.
10      Then scrolling up you replied to that e-mail saying:
11  Hi, Kate, please find attached a résumé from my past colleague
12  at Dell. You may also get a résumé from John Souza, who worked
13  with me at Prudential Securities.
14      Whose résumé did you attach to the e-mail that you
15  sent to the recruiter at Lehman Brothers?
16  A. Rob Ray's.
17      MR. TARLOWE: I think that's page 3 of this document.
18  Q. That's the résumé you sent?
19  A. Right.
20  Q. Just looking back at the e-mail that you sent to the
21  recruiter, it's May 8, 2008. Where is that relative to Dell's
22  earnings cycle?
23  A. It is a few days after the quarter has closed and three
24  weeks before the quarterly results.
25  Q. If you could take a look at what's marked for

1  identification as Government Exhibit 720-A.
2      Do you see that, Mr. Goyal?
3  A. Yes.
4      MR. TARLOWE: The government offers Government Exhibit
5  720A.
6      MR. FISHBEIN: No objection.
7      THE COURT: Hearing no objection, I'll receive it,
8  Government Exhibit 720A.
9      (Government's Exhibit 720A received in evidence)
10  Q. The e-mail on the bottom is from Kate Morris, the Lehman
11  Brothers recruiter you just testified about. It's an e-mail
12  from Rob Ray, May 9, 2008. She wrote: Hi, Rob, thank you for
13  speaking with me earlier today. As discussed, please find
14  attached the job description for the technology sector
15  specialist position in institutional corporate marketing.
16      Is it your understanding that that's the same job that
17  you had forwarded his résumé for or a different job?
18  A. I'm not sure. They are discussing two jobs here, so I
19  don't know which one I forwarded. It was one of these two.
20  Q. Then Mr. Rob Ray forwarded that e-mail to you, is that
21  correct?
22  A. Yes.
23  Q. And that's on May 11, 2008?
24  A. Correct.
25  Q. And in addition to forwarding that e-mail to you he wrote:

1  Hey, Sandy, hope you are having a good weekend. Thanks a lot
2  for forwarding my résumé to the Lehman recruiter. I won't read
3  the whole thing. The last sentence is: Since you know what my
4  end goal is, can you please take a look and see whether this
5  will help me in any way? I will call you some time and get
6  your thoughts. Once again, thanks so much.
7      You see that?
8  A. Yeah.
9  Q. Again, in May of 2008, what did you understand his end goal
10  to be?
11  A. Working in investment management.
12  Q. This is May 11, 2008. Looking at the chart behind you,
13  when did Dell announce its quarterly earnings to the public for
14  that quarter?
15  A. May 29.
16  Q. If you could take a look at Government Exhibit 187, which
17  is in evidence.
18      MR. TARLOWE: Mr. Hoffman, if you could blow up the
19  top half down through the bottom e-mail. Thank you.
20  Q. This is an e-mail exchange between you and Jesse Tortora?
21  A. Yes.
22  Q. On May 16, 2008?
23  A. Correct.
24  Q. And that's 13 days before the public earnings announcement?
25  A. Right.

UNITED STATES OF AMERICA, v
TODD NEWMAN,

November 26, 2012

1 Q. In the bottom e-mail Mr. Tortora wrote to you: Let me know
2 if you have a couple minutes just to run through the model
3 before the open today. Then Mr. Tortora sent you another
4 e-mail: Hey street at 33. I get 36 to 37. Let me know if you
5 agree. You apply: Yes. I get around 36, too.
6         What were you and Mr. Tortora discussing?
7 A. EPS.
8 Q. By EPS, you mean earnings per share?
9 A. Right.
10 Q. When he wrote street at 33, what did you understand that to
11 mean?
12 A. Every Wall Street analysts are estimating 33 cents.
13 Q. He got 36 to 37. You replied: I get around 36, too.
14         How did you come to the 36?
15 A. I think it was plugging in Rob Ray's information to my
16 model and get that EPS.
17 Q. What information from Rob Ray did you plug into your model?
18 A. Revenues and margins.
19 Q. What did you understand Mr. Tortora to be doing in order to
20 arrive at 36 to 37?
21 A. He did the same thing.
22 Q. These e-mails are from the morning of May 16, 2008?
23 A. Yes.
24 Q. I'm handing you what's marked for identification as
25 Government Exhibit 2607D, which is another excerpt from

1 Government Exhibit 2607.
2         MR. TARLOWE: The government offers Government Exhibit
3 2607D.
4         THE COURT: Any objection?
5         MR. FISHBEIN: No objection.
6         THE COURT: Government Exhibit 2607D is received.
7         (Government's Exhibit 2607D received in evidence)
8         MR. TARLOWE: Mr. Hoffman, if you could please put
9 that up.
10 Q. The first row that's highlighted here, Mr. Goyal, these are
11 records for your home phone?
12 A. Correct.
13 Q. And the first line says May 16, 2008, 1:58 a.m. Again,
14 it's in Greenwich meantime. 1:42 a.m. is the start time. This
15 is actually a call May 15, 2008 at 9:42 p.m.
16         That's a call from your home phone number, is that
17 correct?
18 A. Correct.
19 Q. And it's to Rob Ray's cell phone number?
20 A. Correct.
21 Q. How long did that call last?
22 A. 16 minutes.
23 Q. That call ended, it says, 1:58, which is actually 9:58 p.m.
24 The very next call you made from your home phone number was to
25 415-596-4020, which, pursuant to the stipulation, is a cell

1 phone subscribed to Jesse Tortora.
2         How long was that call?
3 A. Three seconds.
4 Q. And the very next call is -- it says May 16 at 2:26 a.m.,
5 so it's May 15 at 10:26 p.m. That's a call from the number
6 subscribed to Jesse Tortora to your home phone.
7         How long was that call?
8 A. About seven and a half minutes.
9 Q. And these calls on the night of May 15, 2008, when are
10 these relative to the e-mail exchange we just looked at between
11 you and Mr. Tortora?
12 A. It's just the night before.
13 Q. Can you put up Government Exhibit 157 for a moment, which
14 is the e-mail we just looked at. I'm sorry. That's the wrong
15 number exhibit. 187. Sorry.
16         So this e-mail exchange on the morning of May 16, you
17 and Mr. Tortora both come to earnings per share numbers that
18 are higher than the street consensus, is that correct?
19 A. Yes.
20 Q. Can you take a look at what's been marked for
21 identification as Government Exhibit 726.
22         Is that an e-mail from Jesse Tortora to you on May 29,
23 2008?
24 A. Yes.
25         MR. TARLOWE: The government offers Government Exhibit

1 726.
2         MR. FISHBEIN: No objection.
3         MR. MORVILLO: No objection.
4         THE COURT: Government 726 is received.
5         (Government's Exhibit 726 received in evidence)
6 Q. Mr. Goyal, this e-mail on May 29, 2008 at 4:36 p.m., when
7 is that relative to Dell's earnings announcement?
8 A. It is a few minutes after the earnings announcement.
9 Q. What is the subject line that Mr. Tortora wrote to you?
10 A. Nice job.
11 Q. If you could take a look at what's marked for
12 identification as Government Exhibit 725. Is that an e-mail
13 from you to Fayad Abbasi May 29, 2008?
14 A. Yes.
15         MR. TARLOWE: The government offers Government Exhibit
16 725.
17         MR. FISHBEIN: No objection.
18         THE COURT: Government Exhibit 725 is received.
19         (Government's Exhibit 725 received in evidence)
20 Q. Focusing on the top two e-mails, these e-mails, May 29,
21 2008 at 1:48 and 1:51 p.m., those are a few hours before Dell's
22 earnings announcement?
23 A. Correct.
24 Q. And, first, the e-mail on the bottom, Mr. Abbasi wrote to
25 you: Did you talk to Niles?

UNITED STATES OF AMERICA, v
TODD NEWMAN,

November 26, 2012

1      And who was Niles again?

2  A. Dan Niles.

3  Q. And then you wrote: Yes. I am sorry Dan Niles was --

4  A. Portfolio manager at Neuberger Berman.

5  Q. Do you know what Mr. Niles' role was at Neuberger Berman?

6  A. Yes.

7  Q. What was it?

8  A. He was portfolio manager of a hedge fund within Neuberger

9   Berman located in San Francisco.

10 Q. And you wrote to Mr. Abbasi: Yes. He sounded surprised at

11  EPS beat and asked if I am confident about my contacts. The he

12  you are referring to is Dan Niles?

13 A. Yes.

14 Q. You wrote: I told him that it was pretty accurate last

15  quarter.

16      What did you mean, it was pretty accurate last

17  quarter?

18 A. I'm referring to the e-mail that I had sent last quarter

19  saying January quarter data points. And those were pretty

20  accurate compared to the actual results.

21 Q. He asked if you are confident about your contacts and you

22  told him: It was pretty accurate last quarter.

23      What was pretty accurate?

24 A. My information.

25 Q. Which had come from where?

1  A. Rob Ray.

2  Q. And then you continued that, he, Dan Niles, thought the

3   stock will go up. I thought 5 percent range. He said could be

4   higher if the results are as we expect.

5      You see that?

6  A. Yes.

7  Q. Do you recall that conversation with Dan Niles that you're

8   recounting to Mr. Abbasi?

9  A. I do not.

10 Q. I am going to ask you now to turn to Government Exhibit

11  197, which is in evidence.

12      MR. TARLOWE: Mr. Hoffman, if you could enlarge the

13  portion that has the e-mail.

14 Q. Starting on the bottom Mr. Tortora wrote to you on June 23,

15  2008. Where is that in Dell's earning cycle?

16 A. Little bit after the half of the quarter has passed.

17 Q. Mr. Tortora wrote to you, the subject Dell: Hey, Sandy,

18  please let me know if you hear anything new on Dell. Thanks,

19  Jesse. You wrote back: Sure will do. Wasn't able to contact

20  on weekend. Left message. Will try again in the evening.

21      What were you referring to when you said, wasn't able

22  to contact on the weekend, left message, will try again in the

23  evening?

24 A. It means I wasn't able to contact Rob Ray on the weekend.

25  I left a message in his e-mail.

1  Q. Then you sent another e-mail the next morning, June 24 at

2   8:45 to Mr. Tortora saying: Tried yesterday but, again,

3   couldn't get hold of him. Left a voice mail. Hopefully will

4   catch him today.

5      Who is the him that you are referring to?

6  A. Rob Ray.

7  Q. You see Mr. Tortora then forwarded that e-mail to Todd

8   Newman.

9      You see that?

10 A. Yes.

11 Q. If you could take a look at what's marked for

12  identification as Government Exhibit 198.

13      Is that an e-mail exchange between you and Mr. Tortora

14  on July 1, 2008?

15 A. Yes.

16      MR. TARLOWE: The government offers Government Exhibit

17  198.

18      THE COURT: No objection?

19      MR. FISHBEIN: No objection.

20      MR. MORVILLO: No objection.

21      THE COURT: Government Exhibit 198 is received.

22      (Government's Exhibit 198 received in evidence)

23 Q. Here Mr. Tortora said to you on July 1, 2008: Hey, Sandy,

24  let me know if you pick up anything new. Subject line is Dell.

25  You reply: Sure. Hopefully will get something today, evening.

1      What did you mean by that?

2  A. I mean that I'll contact Rob and we will get some

3   information from him.

4  Q. If you could turn now to Government Exhibit 212, which is

5   in evidence.

6      This is an e-mail exchange between you and Jesse

7   Tortora on August 4, 2008?

8  A. Yes.

9  Q. When is this in relation to Dell's earnings announcement?

10 A. Just after the quarter has ended.

11 Q. Before the earnings announcement?

12 A. Yes.

13 Q. Mr. Tortora wrote to you, subject line Dell: Hey, Sandy,

14  keep me posted if you hear anything new. Thanks, Jesse.

15      You wrote back to Mr. Tortora saying: Sure. I plan

16  to check today, evening.

17      What did you mean by that?

18 A. I planned to call Rob Ray in the evening.

19 Q. Mr. Goyal, I'm showing you what's been marked for

20  identification as Government Exhibit 2607-G, which is an

21  excerpt from Government Exhibit 2607.

22      MR. TARLOWE: The government offers Government Exhibit

23  2607-G.

24      THE COURT: No objection.

25      MR. FISHBEIN: No objection.

# A-909

1    MR. MORVILLO: No objection.

2    THE COURT: Government Exhibit 2607-G is received.

3    (Government's Exhibit 2607-G received in evidence)

4  Q. The e-mail where you wrote up, I plan to check today,

5    evening, is August 4, 2008.

6    MR. TARLOWE: Mr. Hoffman, if you could please put up

7    Government Exhibit 2607-G.

8  Q. The highlighted row is a call, it says August 5, 2008 at

9    12:55 a.m. Again, because it's Greenwich meantime this is

10   actually a call at 8:55 p.m. on the night of August 4, 2008.

11   That's a call, Mr. Goyal, from -- the from number, that's your

12   home number.

13 A. No.

14 Q. 813-380-4010?

15 A. That's not my home number.

16 Q. Whose number is that?

17 A. That's Rob's number.

18 Q. The call right before that.

19 A. Yes.

20 Q. That's a call from your home number to Rob Ray's cell

21   phone?

22 A. Correct.

23 Q. And that's a four-second long call?

24 A. Yes.

25 Q. And then the call right after it is from Rob Ray to you?

1  A. Correct.

2  Q. How long was that call?

3  A. Around 40 minutes.

4  Q. And if you could take a look at what's marked as Government

5    Exhibit 733 for identification, which is an e-mail on the

6    following day.

7    Is that an e-mail from Rob Ray to you on August 5,

8    2008?

9  A. Yes.

10   MR. TARLOWE: The government offers Government Exhibit

11   733.

12   THE COURT: No objection.

13   MR. FISHBEIN: No objection.

14   THE COURT: Government Exhibit 733 is received.

15   (Government's Exhibit 733 received in evidence)

16 Q. In this e-mail Rob Ray wrote to you: Hey, Sandy, it was

17   nice talking to you yesterday. Just a reminder to e-mail me

18   that stock pitch framework we talked about.

19   What was he referring to when he said stock pitch

20   framework?

21 A. During interviews in investment management they ask to

22   pitch a stock, which is basically asking which stock you

23   recommend to buy and then why, your reasoning behind or

24   analysis behind your recommendation. That is called stock

25   pitch.

1  Q. And then Rob Ray continued: Also, as I start talking to

2    some of the buy siders and sell siders, the question that comes

3    up often is why buy side or why sell side? How should I

4    approach this question? My response usually centers around my

5    interest in equities, strong tech background, and good writing

6    and modeling skills. For the buy side I also mention my

7    interest in investing. But this is probably something they

8    hear from a lot of prospects. How do I distinguish myself and

9    what are some of the things they are looking for? Any

10   high-level pointers will be very helpful. Thanks and talk to

11   you soon. Cheers, Rob.

12   If you could take a look now at what's marked for

13   identification as Government Exhibit 734.

14   Is that an e-mail exchange between you and Rob Ray

15   from August 14 of 2008?

16 A. Yes.

17   MR. TARLOWE: The government offers Government Exhibit

18   734.

19   MR. FISHBEIN: No objection.

20   THE COURT: Government Exhibit 734 is received.

21   (Government's Exhibit 734 received in evidence)

22 Q. Starting with the e-mail on the bottom, on August 14, 2008

23   you wrote to Rob Ray, the subject framework: Hi, Rob. Please

24   find attached a couple of investment analysis frameworks for

25   reference.

1    What is that?

2  A. This is basically in relation to the earlier e-mail stock

3    pitch framework.

4  Q. What is it that you sent to him?

5  A. I sent him a couple of our analysis -- our research reports

6    which could be used as stock pitch.

7  Q. When you say our, what do you mean?

8  A. It was basically research reports from Fayad to me.

9  Q. Then Rob Ray replied to you saying: Thanks, Sandy. This

10   is very helpful. Cheers, Rob.

11   You see that?

12 A. Yes.

13 Q. If you could take a look at what's marked for

14   identification as Government Exhibit 756. Is that an e-mail

15   that Jesse Tortora sent you on August 11, 2008?

16 A. Yes.

17   MR. TARLOWE: The government offers Government Exhibit

18   756.

19   MR. FISHBEIN: No objection.

20   THE COURT: Government Exhibit 756 is received.

21   (Government's Exhibit 756 received in evidence)

22 Q. Now, Mr. Tortora forwarded you e-mails, is that correct?

23 A. Excuse me?

24 Q. Mr. Tortora forwarded to you an e-mail exchange between him

25   and Todd Newman, is that correct?

1 A. Yes.
2 Q. And the subject line is AMD.
3     Do you know what that is?
4 A. Yes.
5 Q. What's that?
6 A. It's a semiconductor company.
7 Q. Looking at the e-mail, the top two e-mails?
8 A. Yes.
9 Q. Take a moment and look at that in the context of the
10 e-mail.
11     Did you understand that paragraph to be about AMD or
12 about a different company?
13 A. It talks about Dell.
14 Q. And Mr. Tortora wrote to Mr. Newman in the second sentence:
15 Why we need to wait for a roll-up.
16     What roll-up did you understand him to be saying that
17 he was waiting for?
18 A. Consolidating all the segment information and preparing for
19 the financial quarterly results.
20 Q. For what company?
21 A. For Dell.
22 Q. Then he forwarded that to you.
23     You see that?
24 A. Yes.
25 Q. And where were you going to get that roll-up from?

1 A. From Rob Ray.
2     THE COURT: Is there an objection?
3     MR. FISHBEIN: Objection. Speculation. He can
4 interpret this, but I am not sure that's a proper question.
5     THE COURT: Did you have a plan to get such
6 information?
7     THE WITNESS: Excuse me?
8     THE COURT: Did you have a plan to get such
9 information?
10     THE WITNESS: After this e-mail?
11     THE COURT: Yes. Or before.
12     THE WITNESS: Yeah. I think this was reported to
13 me -- they say I will take it as a pointer for me to call Rob
14 and see -- or call Rob to see how this had impacted the gross
15 margin.
16 Q. Did you learn at some point that Rob Ray left the investor
17 relations department at Dell?
18 A. Yes.
19     MR. TARLOWE: You could take that down, Mr. Hoffman.
20 Q. Where did he go?
21 A. To corporate development.
22     THE COURT: To what?
23     THE WITNESS: Corporate development.
24     THE COURT: Corporate development?
25     THE WITNESS: Yes.

1 Q. Within Dell?
2 A. Yes.
3 Q. Where were you working when he made that switch?
4 A. Neuberger Berman.
5 Q. Where was Mr. Tortora working?
6 A. Diamondback.
7 Q. Did you continue to speak to Rob Ray after he left investor
8 relations?
9 A. Yes.
10     THE COURT: Do you have a time frame for when he left
11 investor relations and went to corporate development?
12     THE WITNESS: I think -- I don't exactly know. Late
13 2009 -- late 2008, early 2009, some time there.
14 Q. What, if any, information did Rob Ray provide to you about
15 Dell's financial results after he left investor relations?
16 A. I don't recall any significant changes in the information I
17 got.
18 Q. If you could take a look at Government Exhibit 296, which
19 is in evidence. The e-mail at the bottom is from Mr. Tortora
20 to you, subject Dell. Hey, Sandy, please keep me posted.
21 Stock been going straight up since analyst day. My guess is GM
22 going to be problem when all said and done.
23     You wrote back: Hi, Jesse, sure. Will do checks
24 shortly. Was waiting for quarter to end or come closer so that
25 numbers are more firm.

1     What did you mean when you said, so that numbers are
2 more firm?
3 A. It means when quarter ends or closer to when you have more
4 and more actual information about the quarter. So then numbers
5 are actually closer to the actual quarterly numbers.
6 Q. When you wrote, will do checks shortly, what did you mean?
7 A. I meant I will call Rob shortly.
8 Q. And Mr. Tortora forwarded that e-mail on to Todd Newman
9 FYI. You see that?
10 A. Yes.
11 Q. Turning to what's marked for identification as Government
12 Exhibit 300. Actually, that's in evidence.
13     Mr. Tortora wrote to you on the bottom: Hi, Sandy,
14 just checking in if got anything new. Thanks. You wrote:
15 Nothing yet. Tried to contact yesterday. Will definitely have
16 something by Monday.
17     What were you referring to?
18 A. I tried to contact Rob Ray and contact him again.
19 Q. Where is that in relation to Dell's earnings announcement?
20 A. It is about a couple of weeks before the announcement.
21 Q. And then you see Mr. Tortora forwarded that on to
22 Mr. Newman?
23 A. Yes.
24 Q. If you could turn now to Government Exhibit 305, which is
25 in evidence, the bottom e-mail from Mr. Tortora to you. It

# A-911

1 says: Hi, Sandy, please let me know if you can get an update
2 this week. Thanks.
3      That's on August 24, 2009. When is that in relation
4 to Dell's earnings announcement?
5 A. It's three days before.
6 Q. You wrote back: Talked over weekend. Basically no change
7 from prior. Everything same.
8      What did you mean when you said talked over weekend?
9 Who did you talk to?
10 A. That means I talked to Rob Ray over the weekend.
11 Q. And then you see Mr. Tortora forwarded that to Mr. Newman
12 saying. FYI, spoke to him. Said all still the same, and will
13 do final check this week to confirm and also to see if can get
14 any more details.
15      Do you see that?
16 A. Yes.
17 Q. Mr. Newman wrote back to you, TY?
18 A. Yes.
19 Q. After you began speaking -- excuse me. Withdrawn.
20      After you began receiving information from Rob Ray,
21 did you continue speaking to your other friends at Dell?
22 A. Yes.
23 Q. Did you continue speaking to them about Dell's business?
24 A. A little bit. It declined significantly from what I used
25 to talk earlier.

1 Q. Why did it decline?
2 A. Because I was getting overall end information from Rob Ray,
3 so I really didn't need that.
4 Q. If you could look at what's marked for identification as
5 Government Exhibit 717.
6      Is that an e-mail exchange between you and Mr. Tortora
7 on April 25, 2008?
8 A. Yes.
9      MR. TARLOWE: The government offers Government Exhibit
10 717.
11      MR. FISHBEIN: No objection.
12      THE COURT: Government Exhibit 717 is received.
13      (Government's Exhibit 717 received in evidence)
14 Q. In the bottom e-mail Mr. Tortora wrote to you some
15 information he was picking up about HPQ desktop. And then he
16 ends the sentence with: Let me know if check in with your
17 guys. You reply: Will check again with my Dell U.S.
18 commercial contact.
19      What did you mean by that?
20 A. It means my friend who worked in Dell U.S. commercial
21 segment.
22 Q. What is the Dell U.S. commercial segment?
23 A. It's the segment that sells Dell's products to U.S.
24 companies, not to consumers.
25 Q. How did you know that contact?

1 A. That was a personal friend.
2 Q. Where did you meet him?
3 A. In business school.
4 Q. What, if any, information did he provide about Dell's
5 business?
6 A. General business conditions in his group.
7 Q. When you got information from him about his business group,
8 what, if anything, did you do with it?
9 A. Give it to Jesse.
10 Q. Did there come a time when Rob Ray left Dell?
11 A. Yes.
12 Q. Do you remember when that was?
13 A. I think some time March, April, some time 2010.
14 Q. Did he leave the Texas area?
15 A. Yes.
16 Q. Where did he move to?
17 A. New York.
18 Q. Did you speak to him after he moved to New York?
19 A. Yes.
20 Q. Did you see him?
21 A. Yes.
22 Q. Where?
23 A. Once we invited him and his wife over for dinner.
24 Q. Did you have any discussions with Rob Ray about traveling
25 together?

1 A. Yes.
2 Q. What did you say, what did he say?
3 A. It was July 4 weekend and we were thinking of going to Lake
4 George area. So I asked him, we are planning to go there, if
5 he is also interested. And then our plans changed. We didn't
6 go. I am not sure if he made any plans after that point.
7 Q. Were there any other times when you talked to Rob Ray about
8 traveling together?
9 A. Yes. Once they were visiting -- they were going somewhere
10 in the Middle East, Turkey, Egypt, and so they are inquiring if
11 I'm interested in going there. I was not, so we didn't go.
12 Q. When you worked at Neuberger Berman, did you have a
13 financial model for Dell?
14 A. Yes.
15 Q. When did you create that model?
16 A. I think it was initially created when I was working at
17 Prudential.
18 Q. What kind of model was it?
19 A. It's something called bottoms-up financial model.
20 Q. What does that mean?
21 A. It means it has all the information regarding complete
22 details, product level details. So then we forecast -- each
23 forecast the information at product level, and then add them up
24 together to get the estimates for total consolidated company
25 levels. That's why it's called bottoms up.

1  Q.  You use that model to try to predict future earnings?
2  A.  Yes, future revenues, margin earnings, yes.
3  Q.  How far into the future?
4  A.  Typically, one to two years.
5  Q.  After you began receiving information from Rob Ray, did you
6     continue to maintain that model?
7  A.  Yes.
8  Q.  Why?
9  A.  Well, there is some reason.  One, a lot of time people like
10    portfolio managers, they just don't want to see the number.
11    They want to go into detail behind the numbers, like look at
12    the bottoms-up model, what is driving the number, so I have to
13    make that.  Also, the model is for not just for one quarter.
14    It's for multiple quarters going forward, four to eight future
15    quarters.  Also, most of the work on the model is usually done
16    just after the company has reported its earnings.  And I
17    typically didn't have any information from Rob Ray at that
18    time, so I needed to -- this model to forecast it.
19  Q.  I believe you testified last week that if there were times
20    when you wanted to speak to management of a public company you
21    typically went through investor relations to set that up, is
22    that correct?
23  A.  Yes.
24  Q.  Why did you do that?
25  A.  That was the normal protocol.

1  Q.  Was that true of Dell as well?
2  A.  Yes.
3  Q.  And who in investor relations department at Dell did you
4     speak to if you wanted to arrange a meeting or a conversation
5     with management?
6  A.  Shep Dunlap was our primary contact at Neuberger Berman.
7  Q.  Did you know Shep Dunlap when you worked at Dell?
8  A.  Yes.
9  Q.  How?
10  A.  We worked in the same department.
11  Q.  Were there other people in Dell in investor relations who
12    you spoke to?
13  A.  I may have spoken to others as well, yes.
14  Q.  If you could take a look at what's marked for
15    identification as Government Exhibit 759.
16        You see that, Mr. Goyal?
17  A.  Yes.
18  Q.  Is that an e-mail exchange between you and Fayad Abbasi
19    from June 20, 2008?
20  A.  Correct.
21        MR. TARLOWE:  The government offers Government Exhibit
22    759.
23        MR. FISHBEIN:  No objection.
24        THE COURT:  Government Exhibit 759 is received.
25        (Government's Exhibit 759 received in evidence)

1  Q.  Starting on the bottom e-mail that Mr. Abbasi sent to you
2     on June 20, 2008, Mr. Abbasi said to you, this is on the
3     bottom:  Assuming everything is business as usual, we should
4     try to set up a call with Schuckenbrock, maybe two to three
5     weeks.  Who is Schuckenbrock?
6  A.  As far as I remember, he was Steve Schuckenbrock.  He was
7     the vice-president for services at Dell.
8  Q.  You wrote back:  Good idea.  Do you want me to call Dell
9     IR.  Shep, most probably, or do it yourself through Lynne
10    Tyson.
11        Who was Lynne Tyson?
12  A.  She was the head of investor relations at Dell at that
13    time.
14  Q.  And Mr. Abbasi wrote back:  Go ahead and see if Shep can do
15    it for us.  The less I talk to Lynn, the happier I am.
16        And you then wrote back:  Just called.  Shep is out
17    until June 25.  Will contact him again next week.
18        You see that?
19  A.  Yes.
20  Q.  At this time, in June 2008, did Rob Ray work in investor
21    relations at Dell?
22  A.  I was not sure at this time if he was there or he shifted.
23  Q.  Take a look at what's marked for identification as
24    Government Exhibit 736.
25        You see that, Mr. Goyal?

1  A.  Yes.
2  Q.  That's an e-mail exchange between you and Mr. Tortora on
3     September 16, 2008?
4  A.  Correct.
5        MR. TARLOWE:  The government offers Government Exhibit
6     736.
7        MR. FISHBEIN:  No objection.
8        THE COURT:  Government Exhibit 736 is received.
9        (Government's Exhibit 736 received in evidence)
10  Q.  The first e-mail on the bottom from Mr. Tortora to you,
11    subject, Dell/Lehman.  How is everything at NB?  Does that mean
12    Neuberger Berman?
13  A.  Yes.
14  Q.  Fayad said okay, glad to hear.  I'm surprised Dell out
15    negative this early in Q.  Any thoughts?
16        What did you understand Mr. Tortora to mean when he
17    said I'm surprised Dell out negative this early in June?
18  A.  I think it was they reported their earnings some time
19    August 28, 2008.  And then just a couple of weeks later they
20    made a big announcement saying they are seeing weakness in
21    their sales, so that will negatively impact their numbers for
22    the quarter.
23  Q.  Let me show you Government Exhibit 314A, which is in
24    evidence.  That's an 8K for Dell and has an attachment it has a
25    press release from September 16, 2008.

# A-913

1      Do you see that?
2  A.  Yes.
3  Q.  Is that what you understood Mr. Tortora to be referring to
4  when he said, I'm surprised Dell out negative this early in
5  quarter?
6  A.  Yes.
7  Q.  And going back to Government Exhibit 736, you replied:
8  Thanks, Jesse.  Have no idea why those idiots made that
9  statement.  Will check with Shep why they did that.
10      What did you mean when you said you had no idea why
11  they made that statement?
12  A.  I think it was very unusual for a company to make a change
13  just two weeks into the quarter when they have spoken to
14  investors just a couple of weeks ago.  They should have said
15  that earlier when they made the quarterly announcement.
16  Q.  And then you said:  Will check with Shep why they did that.
17      That's a reference to Shep Dunlap?
18  A.  Yes.
19  Q.  Why were you going to check with him?
20  A.  He was the primary investor relations contact with
21  Neuberger Berman.
22  Q.  Now, I believe you testified last week that at Neuberger
23  you used third-party data or research, is that correct?
24  A.  Yes.
25  Q.  What did you mean by that?

1  A.  It means data from companies like IDC Gartner, Forrester
2  Research and a couple of others.
3  Q.  Did you use expert networking firms when you were at
4  Neuberger Berman?
5  A.  Yes, we did.
6  Q.  What is that?
7  A.  These are companies that give you access to industry
8  experts.
9  Q.  Do you pay for that service?
10  A.  Yes.
11  Q.  When you say they gave you access to these people, how did
12  you communicate with those people?
13  A.  On the phone.
14  Q.  Where did those people work?
15  A.  Most of them worked in companies.
16  Q.  If you could take a look at what's marked for
17  identification as Government Exhibit 748.
18      You see that?
19  A.  Yes.
20  Q.  It's an e-mail that you sent to Fayad Abbasi on September
21  9, 2008?
22  A.  Yes.
23      MS. APPS:  The government offers Government Exhibit
24  748.
25      MR. FISHBEIN:  Your Honor, this I object to the

1  relevance.
2      THE COURT:  I am not sure.  Why don't we lay a little
3  foundation to see what relevance there is.
4      MR. TARLOWE:  Certainly, your Honor.
5  Q.  Are you familiar with a company called Primary Global
6  Research?
7  A.  Yes.
8  Q.  What is that?
9  A.  It's PGR, one of those expert consulting firms.
10  Q.  Did you use PGR when you were at Neuberger Berman?
11  A.  Yes, we did.
12  Q.  Did you speak to somebody at PGR who you knew as Dan D.?
13  A.  Yes.
14  Q.  Where did Dan D. work?
15  A.  My understanding is he worked at Dell.
16  Q.  When you talked to Dan D., did he provide any information
17  to you about Dell?
18  A.  Yes.
19      MR. TARLOWE:  The government renews the offer of
20  Government Exhibit 748.
21      MR. FISHBEIN:  Same objection.
22      THE COURT:  Overruled.  I think it's relevant to some
23  testimony that we have already had.
24      So Government Exhibit 748 is received.
25      (Government's Exhibit 748 received in evidence)

1  Q.  In this e-mail you wrote to Mr. Abbasi:  Here is the short
2  list of people for the PGR calls.  You have a list of names.
3  The names all seem to be first name and last initial.
4      Why is that?
5  A.  I think that's how it was displayed on PGR's website.
6  Q.  When you actually spoke to these people, did you learn
7  their last names?
8  A.  No.
9  Q.  Looking at Dan D. you wrote in parenthesis, the Dell guy.
10      What did you mean by that?
11  A.  It means that I understood that he worked at Dell.
12  Q.  What, if any, information did he, Dan D., provide to you
13  about Dell?
14  A.  It was mostly about sales of the hard disk drives and then
15  sales of the units, the units they are shipping in the quarter.
16  Q.  Did you have an understanding as to whether the information
17  that he provided to you about Dell was confidential?
18  A.  Yes.
19  Q.  What was your understanding?
20  A.  It was confidential.
21      THE COURT:  What was the basis of that understanding?
22      THE WITNESS:  It was just, this is information that
23  should not be given to public because this information is not
24  available from other sources.  The company doesn't publish that
25  information until its quarterly results.

# A-914

1    THE COURT: Who told you this?

2    THE WITNESS: That was just my understanding.

3    THE COURT: You inferred it from what you knew of him?

4    THE WITNESS: Inferred it based on my working in

5  investment management that this kind of information is very

6  confidential.

7  Q. Did you ever mention to anybody in Dell investor relations

8   that you talked to Dan D. about Dell?

9  A. No.

10  Q. And during the time you were at Neuberger, did you ever

11   learn Dan D.'s last name?

12  A. No.

13  Q. You also have listed Tony L. You refer to him as our AMD

14   guy.

15    What did you mean by that?

16  A. He was the person I understood who worked at AMD.

17  Q. Did you yourself speak directly to Tony L.?

18  A. Yes.

19  Q. What, if any, information did Tony L. provide to you about

20   AMD?

21  A. He provided information about units shipped out of AMD and

22   how much to customers. I think sometimes he also gave revenue

23   and I think he also once gave some margin information.

24  Q. During the time you worked at Neuberger Berman, what was

25   your understanding of the relationship between Mr. Abbasi and

1   Mr. Tortora?

2  A. They were friends.

3  Q. Did you know one way or the other whether they had any

4   business association?

5  A. Yes. They used to share the information.

6  Q. How do you know that?

7  A. There were a few e-mails that went around to a group of

8   people that included both of them, those e-mails.

9  Q. How did you see those e-mails?

10  A. Sometimes Fayad or Jesse forwarded some of those e-mails to

11   me.

12  Q. Do you recall any of the other people who were on those

13   e-mails?

14  A. Yes.

15  Q. Who?

16  A. Sam Adondakis, Jon Horvath, and Danny Kuo.

17  Q. Did you know any of those people yourself?

18  A. Sam Adondakis was the one who interviewed me at Prudential.

19   I met him once more at some function. Jon Horvath, he used to

20   be a client at Prudential, and I think I met him once or twice,

21   maybe three times. And Danny I didn't know.

22  Q. If you could take a look at what's marked for

23   identification as Government Exhibit 737.

24    Do you have that in front of you, Mr. Goyal?

25  A. Yes.

1  Q. Is that an e-mail that Mr. Abbasi forwarded to you on

2   November 5, 2008?

3  A. Right.

4    MR. TARLOWE: The government offers Government Exhibit

5   737.

6    MR. FISHBEIN: No objection.

7    THE COURT: Government Exhibit 737 is received.

8    (Government's Exhibit 737 received in evidence)

9  Q. The bottom e-mail, which Mr. Abbasi then forwarded to you,

10   it's an e-mail from Sam Adondakis to Jesse Tortora, Jon

11   Horvath, Danny Kuo, and Fayad Abbasi.

12    You see that?

13  A. Yes.

14  Q. It says Dell/HDD checks?

15  A. Right.

16  Q. What was your understanding of where this information was

17   coming from?

18  A. I understood this came from Dan D.

19  Q. Dan D. being the person at PGR?

20  A. Correct.

21  Q. If you could take a look at what's marked for

22   identification as Government Exhibit -- just going back to

23   that, can you just scroll up. You see that Mr. Abbasi

24   forwarded that to you.

25    You see that?

1  A. Correct.

2  Q. If you could look now at what's marked for identification

3   as Government Exhibit 739. Do you see that, Mr. Goyal?

4  A. Yes, I do.

5    (Continued on next page)

UNITED STATES OF AMERICA, v
TODD NEWMAN,

November 26, 2012

1  Q. What is that?
2  A. This is an e-mail Jesse forwarded me.
3  Q. And it's about what company?
4  A. Nvidia.
5       MR. TARLOWE: Government offers Government Exhibit
6  739.
7       MR. FISHBEIN: No objection, your Honor.
8       THE COURT: Government exhibit 739 is received.
9       (Government's Exhibit 739 received in evidence)
10  Q. Looking first at the bottom e-mail from Danny Kuo to Victor
11  Dosti, subject NVDA. What is NVDA?
12  A. It's the stock symbol for Nvidia.
13  Q. Then there's some information in that e-mail about Nvidia,
14  do you see that?
15  A. Yes.
16  Q. Then scrolling up, you see Mr. Kuo forwarded that to Jesse
17  Tortora, Sam Adonakis John Horvath and Fayad Abbasi and Mr.
18  Tortora forwarded it to Mr. Newman, and then scrolling up you
19  see Mr. Tortora forwarded it to you?
20  A. Yes.
21  Q. At that time in April of 2009, what was your function at
22  Neuberger Berman?
23  A. I was, still had been on IT hardware stock and some
24  semiconductor but at that time I had started my own covering of
25  select semiconductor names. I had started or was about to

1  start starting with Nvidia.
2  Q. So you were going to beginning covering Nvidia yourself?
3  A. Right.
4  Q. Had you told Mr. Tortora about that?
5  A. Yes.
6  Q. If you could now look at what's marked for identification
7  as Government Exhibit 740.
8       MR. FISHBEIN: Your Honor, I'm sorry, I could use a
9  short break, if that's possible.
10       THE COURT: All right. It's about 11:30. Why don't
11  we take a break, ladies and gentlemen. We'll come back in
12  about ten minutes. Don't discuss the case at all, but stretch
13  your legs, use the rest room. All rise for the jury.
14       (Jury excused)
15       (Continued on next page)
16
17
18
19
20
21
22
23
24
25

1       (In open court; jury not present)
2       THE COURT: Okay, have a seat. Short break? If
3  there's anything, we can take it before the jury comes out, but
4  otherwise, ten minutes.
5       (Recess)
6       THE COURT: Everybody here, we're ready to go?
7       MR. WEINGARTEN: Quick question, Judge, on scheduling.
8  Wednesday morning we're not going to be here, Friday we're not
9  going to be here, the other days we'll be here and we're going
10  to 5:30?
11       THE COURT: Let's see. Today we're going until 4:30,
12  because I have an oral argument in a criminal case, and then
13  tomorrow we'll go to 5:30 and Wednesday we'll go till 5:30.
14  Thursday we'll go to 5:30. If we finish a witness with ten
15  minutes to go I might break, but otherwise we'll go till 5:30.
16  I guess I'll let them know before lunch that we're going to go
17  until 4:30 today and Wednesday morning is off.
18       MR. WEINGARTEN: We're going to start at 12:30?
19       THE COURT: I guess it will be 1:00. My program is
20  going to finish around 12:30 so I'll need a half hour to get
21  back.
22       All right, let's get the jury.
23       (Continued on next page)
24
25

1       (In open court; jury present)
2       THE COURT: Ladies and gentlemen, let me tell you
3  about scheduling so you can make your own plans. We'll go
4  today until 4:30. I have another matter at 4:30. Tomorrow
5  we'll pick up at 9:30 normal time, go to 5:30. Wednesday, one
6  of you has an appointment in the morning so we're not going to
7  meet in the morning Wednesday. What we'll do is start
8  Wednesday at 1. So you got your morning to yourself, eat lunch
9  before you come and then we'll go from 1 until 5:30 on
10  Wednesday, then we'll sit all day Thursday and then Friday we
11  won't sit, as we typically don't sit on Fridays. Okay? So
12  that's the schedule for the week.
13       If there are any other issues, talk to Mr. Feith about
14  it, but so you can make your own plans. Wednesday morning we
15  will not be sitting, so we'll go from one until 5:30. All
16  right, let's resume with the direct examination by Mr. Tarlowe.
17       MR. TARLOWE: Thank you, your Honor.
18  BY MR. TARLOWE:
19  Q. Mr. Goyal, if you could please turn to what's been marked
20  for identification as Government Exhibit 740. Do you see that?
21  A. Yes.
22  Q. What is that?
23  A. It's e-mail that Jesse forwarded to me.
24       MR. TARLOWE: The government offers Government Exhibit
25  740.

# A-916

1    MR. FISHBEIN: No objection.

2    THE COURT: Government Exhibit 740 is received.

3    (Government's Exhibit 740 received in evidence)

4 Q. Starting on the bottom e-mail it's an e-mail from Danny Kuo

5    to Victor Dosti, subject is NVDA. Again, that is the ticker

6    symbol for what company?

7 A. Nvidia.

8 Q. Mr. Kuo wrote to Mr. Dosti, "NVDA checks. Final read

9    before the print." If I could show Government Exhibit 91, that

10   e-mail from August 6 of 2009, when was that in relation to the

11   public announcement?

12 A. It's the same day.

13 Q. What time did Nvidia announce its earnings?

14 A. A little bit before 5:00 p.m.

15 Q. Scrolling up, Mr. Kuo then forwarded that e-mail to Jesse

16   Tortora, Sam Adonakis, John Horvath and Fayad Abbasi. Do you

17   see that?

18 A. Yes.

19 Q. And Mr. Tortora forwarded that on to you.

20 A. Right.

21 Q. At that time, were you covering Nvidia at Neuberger Berman?

22 A. Yes.

23    MR. TARLOWE: No further questions.

24    THE COURT: All right. Cross-examination, Mr.

25   Fishbein?

1   CROSS-EXAMINATION

2   BY MR. FISHBEIN:

3 Q. Good afternoon, Mr. Goyal.

4 A. Good afternoon.

5 Q. Mr. Goyal, my name is Stephen Fischbein. I represent Todd

6    Newman. Let me just start, I want to make sure I understand

7    the dates of some of your employment. I believe you said you

8    were at Prudential from May 2006 until the summer of 2007, is

9    that correct?

10 A. Prudential was June 2006. June -- I mean summer 2006 to

11   summer 2007, yeah.

12 Q. Then you began at Neuberger Berman when?

13 A. Sometime in July-August in 2007.

14 Q. Do you remember the month that you began at Neuberger

15   Berman?

16 A. Not hundred percent sure. I think early July.

17 Q. If you could look at Defense Exhibit 9910, it's in your tab

18   1. If you could just read the first paragraph to yourself.

19 A. All right.

20 Q. Does that refresh your memory as to when you started at

21   Neuberger Berman?

22 A. It says that we expect your employment to begin on or about

23   July 16, 2007.

24 Q. Do you believe you began around mid-July of 2007 at

25   Neuberger Berman?

1 A. Again, I mean that could be, it seems to be right.

2 Q. You said you had friends at Dell whom you spoke to about

3    business trends, right?

4 A. Yes.

5 Q. Just to be clear, I'm not referring to Rob Ray. I'm

6    speaking about the other friends you testified about. Do you

7    understand that?

8 A. Yes.

9 Q. These are people you knew from University of Texas?

10 A. Right.

11 Q. Or from working at Dell?

12 A. Right.

13 Q. And these are social friends of yours as well?

14 A. Correct.

15 Q. So you would go to their houses for social occasions, is

16   that right?

17 A. True.

18 Q. And they would socialize with you perhaps at your house?

19 A. Yes.

20 Q. Now, do I understand correctly that one of your friends

21   worked in the consumer division at Dell, is that right?

22 A. Yes.

23 Q. And that consumer division deals with desktops, laptops and

24   other products for the consumer market, is that right?

25 A. For selling to U.S. consumers, yes.

1 Q. And then I think you said you had a friend who was in the

2    commercial division, is that right?

3 A. Right.

4 Q. And what does the commercial division deal with?

5 A. It's for the companies, large companies in U.S.

6 Q. Would that include, for example, servers?

7 A. Yes.

8 Q. And is that sometimes referred to also as the enterprise

9    business?

10 A. I think so, yes.

11 Q. Did you also have a friend who was involved with the

12   services segment of Dell's business?

13 A. I think so.

14 Q. And services refers to what?

15 A. It's the services that are provided to customers. It can

16   consist of like warranty services or support over the phone and

17   for larger customers it can consist of specialty, like setting

18   up the servers and so on.

19 Q. And you're familiar with Dell's business because you worked

20   there, right?

21 A. Right.

22 Q. And so the consumer business, the commercial or enterprise

23   business and the service business, that simply makes up Dell's

24   business, right?

25 A. There are many parts to the business. You said consume --

1  Q. The question is whether consumer, commercial and
2    services -- let me ask a different question -- those make up
3    the vast majority of Dell's business?
4  A. Services is kind of a product line, so you're talking about
5    consumers, and others, they are like the customer types.
6    Services is kind of product type, so the customers are either
7    like consumers, small and medium businesses, large enterprises,
8    public companies and so on and so forth, from customer side,
9    that kind of mix, overall business together.
10 Q. But by revenue, wouldn't it be fair to say that most of
11   Dell's revenue comes from consumer products or commercial
12   products?
13 A. Most, it may be. I don't have the numbers, but I think so.
14 Q. Now, you also had friends within the marketing department
15   of Dell, is that right?
16 A. Marketing in I think U.S. marketing is related to normally
17   a segment, so it's consumer segment or it could be some product
18   marketing, so yes.
19 Q. And some of your friends worked in the marketing area,
20   right?
21 A. I think they were like marketing U.S. consumer, if I'm
22   right.
23 Q. And then what about corporate planning, did you also have
24   friends that were in corporate planning?
25 A. They were my colleagues that I worked with in corporate

1    planning.
2  Q. And these are all people that you kept in touch with after
3    you left Dell, correct?
4  A. About all my previous friends, the social friends, and
5    corporate planning, I didn't, they were not my personal
6    friends, so --
7  Q. So what you're saying is that consumer, commercial,
8    services, those people you kept in touch with, right?
9  A. Right. They were the friends that, they were personal
10   friends from my days in school. Those are the ones that I kept
11   in touch with.
12 Q. And these are people that you got information from about
13   Dell after you left, right?
14 A. Right.
15 Q. And what about marketing and corporate planning? Did you
16   get information about marketing and corporate planning after
17   you left Dell?
18 A. Not corporate planning. And marketing, I think consumer
19   and marketing may be the same thing because it's a subdivision
20   between consumers, but I don't think I got anything regarding
21   marketing.
22 Q. If we could look at Government Exhibit 75. It's already in
23   evidence, it's at your tab 2. And if we could put that up on
24   the screen. You remember that the prosecutor showed you this
25   e-mail. Do you remember that?

1  A. Yes.
2  Q. And is this an example of some of the types of information
3    you got from your friends other than Rob Ray?
4  A. Right.
5  Q. Now, if we look at the e-mail, this is dated January 7,
6    2008, right?
7  A. Right.
8  Q. And the first item is U.S. corporate business, right?
9  A. Yes.
10 Q. And so that's what we referred to before, that's the
11   servers and other sales to big companies.
12 A. Big companies, right.
13 Q. And you make the statement "no growth Y/Y." What does that
14   mean?
15 A. Y/Y means year-over-year, so as compared to last year.
16 Q. What kind of growth are you talking about?
17 A. Revenue growth.
18 Q. So that's a comment on revenues, is that correct?
19 A. True.
20 Q. And then you say, quote, "Some decline in margins
21   sequentially." Do you see that?
22 A. Right.
23 Q. What does that mean?
24 A. It means there is some decline in margins. I'm not sure
25   there whether I'm referencing gross margin or operating margin

1    and sequentially means last quarter.
2  Q. But margins, am I correct, refers to either gross margin or
3    operating margin or both, is that right?
4  A. Correct.
5  Q. And sequentially means how the margins are doing compared
6    to the previous quarter?
7  A. Correct.
8  Q. So you would get marginal information from these friends,
9    correct?
10 A. Not always. Like I may have gotten this quarter, but it
11   doesn't mean I always got it.
12 Q. I'm not asking you whether you got it every time, but that
13   is a type of information you would get?
14 A. I got in this quarter. Sometimes, yes.
15 Q. And you continued to speak to these friends after January
16   '08, right?
17 A. Yes.
18 Q. If you look at the next number, it's number 2, it says
19   "U.S. consumer." Do you see that?
20 A. Yes.
21 Q. And that's referring to the consumer segment, laptops and
22   other computers sold to the public, right?
23 A. Yes.
24 Q. And do you see you have a comment, "Revenue growth is fine
25   expect sequential market share gains." Do you see that?

1   A.  Yes.
2   Q.  What does that mean?
3   A.  Market share, it means what percentage of market, in terms
4   of desktop and notebook units that are sold to customers, how
5   much market share Dell is gaining.  Normally like if it had
6   15 percent market share last time so it may have more than
7   that.  So it's relative to the overall unit, overall units,
8   entire pieces sold in U.S. consumer.
9   Q.  And market share is an important metric if you're trying to
10  figure out what Dell's revenue is, is that correct?
11  A.  Not exactly.
12  Q.  Well, you also comment here "revenue growth is fine,"
13  right?
14  A.  Revenue growth for U.S. consumer is fine, yes.
15  Q.  So that's information that you got specifically with
16  respect to Dell's revenue, is that right?
17  A.  This is for U.S. consumer and revenue growth is fine is
18  also, like, it's a subjective thing.  Fine could be in
19  different quarters no -- like 1 to 2 percent growth is fine,
20  sometimes that is not good.  More than 10 percent, so it's a
21  little bit subjective parameter.
22  Q.  But this is, you got some subjective feedback from your
23  friends at Dell, right?
24  A.  Correct, yes.
25  Q.  So they would give you commentary as to whether revenues

1   were fine or they were not fine, right?
2   A.  Correct.
3   Q.  And then if you continue, it says, "Operating margins could
4   be," and then it says "plus VE."  What does that mean?
5   A.  Positive.
6   Q.  "This QTR," what is "this QTR"?
7   A.  Quarter.
8   Q.  "Versus being in red last QTR."  What does that phrase
9   mean?
10  A.  It means they were negative, they lost money last quarter.
11  Q.  And your friends were telling you that the margins could be
12  positive this quarter versus being negative last quarter, is
13  that right?
14  A.  Right.
15  Q.  And margins again either means gross margin or operating
16  margin or both, right?
17  A.  Here it's operating margin.
18  Q.  Right, it says operating margin.  If you look now to the
19  bottom, number 4, it says "SMB is just okay."  What is SMB?
20  A.  Small and medium business.
21  Q.  Now, where did you get that information from?
22  A.  I think it's one of these friends.  I'm not sure who.
23  Q.  Was there a separate segment or separate division at Dell
24  that covers small and medium business?
25  A.  It kept changing.  It used to be separate division when I

1   used to be there, then it got merged with consumer.  It got
2   flung around so I'm not sure where it was.
3   Q.  But does this mean that one of your friends after you left
4   Dell covers small and medium business?
5   A.  I'm not sure if he covered.  It may be that that friend
6   heard from somewhere that SMB is doing okay, that's all.
7   Q.  But in addition to consumer and commercial you did also get
8   information from these friends about small and medium business,
9   correct?
10  A.  I did got it here -- I did get it here, so it seems like,
11  yeah.
12  Q.  Now, you continued -- I'm sorry.
13  A.  Just a thought.  One thing, going back to your question
14  when you mentioned that these segments make up all of Dell.
15  Need to -- because I'm reading this, the thing is, this is
16  U.S., and I think U.S. is around 50 percent of Dell's business.
17  It's not hundred percent of Dell's business and rest of the
18  business is overseas.
19  Q.  Okay.  But in terms of the different product lines and
20  types of customers --
21  A.  Correct.
22  Q.  We agree that commercial, consumer, small and medium
23  business services, those are Dell's primary businesses and
24  product lines, correct?
25  A.  Correct.  That's true.

1   Q.  Now, these friends, and again I'm not talking about Rob
2   Ray, you were in touch with them in the year 2008, correct?
3   A.  Yes.
4   Q.  And you were in touch with them in the year 2009, correct?
5   A.  I think I was, but again, it declined a lot after I started
6   getting Rob Ray information because I didn't really need that.
7   Q.  In 2008 you passed on information you received from these
8   friends to Jesse Tortora, is that correct?
9   A.  Right.
10  Q.  And in 2009 you continued to pass on information from these
11  friends to Jesse Tortora, is that right?
12  A.  I may have.  I don't remember.  I may have.
13  Q.  I think you said you don't remember the specifics of many
14  conversations you had about Dell, right?  Strike that.  Do you
15  have any reason to believe as you sit here now that you did not
16  continue to pass on information from these friends to Jesse
17  Tortora in the year 2009?
18  A.  What I said was the amount of information I got from these
19  friends in 2009 I think it declined relative to 2008 before.
20  Q.  My question is --
21  A.  But you're right, if I got it, I gave it to Jesse, correct.
22  Q.  You mentioned you knew people in investor relations other
23  than Rob Ray and you mentioned Shep Dunlap, is that correct?
24  A.  Correct.
25  Q.  Did you also know Rob Williams?

1  A.  Rob Williams he was director, I think at investor
2    relations.
3  Q.  Did you know him?
4  A.  Personally know him?  No.
5  Q.  Did you ever speak to him?
6  A.  I might have at Prudential or at Neuberger.
7  Q.  How about Lynne Tyson; did you speak to her?
8  A.  I don't recall like speaking over the phone.  I may have
9    once or twice at Neuberger, I think I met her once or twice in
10   a group lunch, but I don't know her personally.
11 Q.  Even if you don't remember the names, do you recall
12   speaking to people in investor relations other than Shep Dunlap
13   and Rob Ray?
14 A.  Again, I might have spoken to a couple of the people you
15   mentioned.
16 Q.  Now, you understood that the function of investor relations
17   at Dell was to speak to analysts, correct?
18 A.  Yes.
19 Q.  And did you have an understanding as to what the function
20   of investor relations was specifically with respect to mutual
21   fund firms like Neuberger Berman?
22 A.  It was the same.
23 Q.  And what was that function?  What was your understanding of
24   what investor relations was supposed to do with respect to
25   firms like Neuberger Berman?

1  A.  I don't know if there was anything special regarding mutual
2    fund firms like Neuberger Berman.  Their function was generally
3    to give information to investors and especially analysts in
4    terms of if we're asked questions and then they, you know, they
5    provide access to company management, then they take them on tours,
6    this and that.
7  Q.  Was it your understanding that Dell investor relations was
8    especially interested in developing relationships with
9    Neuberger Berman and other firms that might invest in Dell
10   stock?
11 A.  Generally speaking most companies tend to like long-term
12   investors like Neuberger Berman.
13 Q.  And did you have an understanding as to whether Dell
14   investor relations targeted Neuberger Berman as a potential
15   investor in Dell stock?
16 A.  I'm not sure if they mention that we are one of the special
17   targets.  I don't think we held that much of Dell stock so I
18   won't be surprised if it was, but I don't know if it was.
19 Q.  Did you understand that Neuberger Berman was a priority for
20   Dell investor relations in terms of reaching out to potential
21   investors?
22 A.  Again, I wouldn't be surprised it was, but I don't know
23   specifically it was.
24 Q.  Now, do you recall that when you were at Prudential you
25   would make quarterly visits to Dell and visit with the investor

1    relations department?
2  A.  I'm not sure of the frequency, but we would make visits to
3    Dell and meet with IR.
4  Q.  This was in Austin, Texas at the headquarters?
5  A.  Right.
6  Q.  And you would go and meet with the investor relations
7    department to ask them questions about Dell's business, right?
8  A.  Yes.
9  Q.  And you would ask them questions about trends in the
10   current business, right?
11 A.  There would be just questions about general business
12   conditions, sometimes clarifications about what happened in the
13   past, things that they reported, and most of the time people,
14   generally people talk about its overall strategy, what is
15   company doing, to have the long-term revenue and EPS quote,
16   what are they doing, what are the structural changes they're
17   making.
18 Q.  One of the topics you discussed with investor relations
19   when you visited them was gross margin trends, correct?
20 A.  Overall gross margin is again one of the topics that people
21   are interested in, how are we going to improve gross margins.
22 Q.  And another topic that you discuss with investor relations
23   when you visited was operating expenses, right?
24 A.  Right.  That is again a usual topic of conversation because
25   the lower the operating expense the higher your earnings.

1  Q.  And you would also talk about revenue and market share,
2    correct?
3  A.  Right.
4  Q.  And when you were at Neuberger Berman you also had
5    conversations with Dell IR, right?
6  A.  Yes.
7  Q.  And while at Neuberger Berman your conversations with Dell
8    IR covered the topic of gross margin, right?
9  A.  Yes.
10 Q.  Operating expenses, right?
11 A.  Right.
12 Q.  And revenue, correct?
13 A.  Correct.
14 Q.  I'd like you to look at what's been marked for
15   identification as Government Exhibit 757.  It's your tab 3.
16   Government Exhibit 757.  Is this an e-mail exchange between you
17   and Mr. Tortora in April of 2009 concerning Dell investor
18   relations and other topics?
19 A.  Yes.
20       MR. FISHBEIN: Defense offers Exhibit 757.
21       MR. TARLOWE: No objection.
22       THE COURT: All right, 757 is received.
23       (Defendant's Exhibit 757 received in evidence)
24 Q.  And if we look at the bottom, Mr. Goyal, that's an e-mail
25   from Mr. Tortora to you, right?

1  A.  Yes, it is.
2  Q.  April 13, 2009, correct?
3  A.  Correct.
4  Q.  And, by the way, when in Dell's quarterly reporting cycle
5  is that?  Approximately.
6  A.  I think it's couple of weeks before their quarter ends,
7  too.
8  Q.  Because the quarter typically ends towards the end of
9  April, right?
10  A.  Yes.
11  Q.  And this is a couple of weeks before, is that right?
12  A.  Yes.
13  Q.  And do you see on line 3 Mr. Tortora in his e-mail to you
14  says, "Lynne is on road in New York City with BMO on Thursday.
15  Let me know if you get an updated read on what the message will
16  be."  Do you see that?
17  A.  Yes.
18  Q.  What did you understand him to be asking you for?
19  A.  Basically what is she saying, generally, what is she just
20  generally saying.
21  Q.  So you were going to meet with Lynne Tyson of Dell investor
22  relations, right?
23  A.  I think it was a group lunch.
24  Q.  A group lunch?
25  A.  Right.

1  Q.  So that means lunch with a number of analysts?
2  A.  Right.
3  Q.  And they get to ask questions of Ms. Tyson?
4  A.  Yes.
5  Q.  So he asked you to report what you heard, right?
6  A.  Right.
7  Q.  And then in the next e-mail up the one from you back to
8  him, the last line you say, "Going to Lynne meeting and will
9  update you on their message.  Let me know if there is anything
10  specific you want to ask apart from quarter trends."  Do you
11  see that?
12  A.  Yes.
13  Q.  So you asked him if there was anything in particular he
14  wanted to know, is that right?
15  A.  Yes.
16  Q.  And then you answer, he answered at the very top, "Key
17  items demand, GM, OPEX, cash flow, handset market, etc."  Do
18  you see that?
19  A.  Yes.
20  Q.  Did you understand demand to refer to revenue?
21  A.  Demand is related to revenues.
22  Q.  And GM you understood to be gross margin?
23  A.  Right.
24  Q.  And OPEX is operating expense, right?
25  A.  Right.

1  Q.  So these were all things he was expecting you to report
2  back on after your meeting with Ms. Tyson, right?
3  A.  Yes.  Generally these are the questions people ask normally
4  and that's what he wanted to ask, yes.
5  Q.  Do you recall that you attended that group lunch with
6  Ms. Tyson?
7  A.  I have some memory that I went to a group lunch.
8  Q.  If you could look at Defense Exhibit 994, it's your tab 5.
9  Is this an e-mail you wrote on April 16 of 2009 reporting on
10  your lunch with Ms. Tyson?
11  A.  Right.
12            MR. FISHBEIN:  Defense offers Exhibit 994.
13            MR. TARLOWE:  No objection.
14            THE COURT:  Defense Exhibit 994 is received.
15            (Defendant's Exhibit 994 received in evidence)
16  Q.  This e-mail, Mr. Goyal, you report back to Mr. Tortora as
17  to what you heard from Ms. Tyson, right?
18  A.  Yes.
19  Q.  And again, this is about two weeks from the end of Dell's
20  quarter, right?
21  A.  Correct.
22  Q.  And this relates to an in-person meeting you had with Lynne
23  Tyson, the head of investor relations, right?
24  A.  Yes, a group meeting.
25  Q.  Do you recall, what was the format?  Did she have a

1  presentation or was it just question and answer?
2  A.  I think it was just question and answer.
3  Q.  Do you remember whether you asked any questions?
4  A.  I do not.
5  Q.  If you look at your writeup here, do you see there's a
6  section called demand?
7  A.  Yes.
8  Q.  Do you see that you learned various information about
9  Dell's, how Dell was doing in different geographies, do you see
10  that?
11  A.  There is some geographic information.  Europe continues to
12  be bad, China, yes.
13  Q.  So there's information about how Dell is doing from a
14  revenue basis in different geographies, right?
15  A.  I'm not sure whether it is like this is what the Dell
16  revenues, it is a general comment about overall demand, that
17  general economic condition everywhere in these segments.
18  Q.  And you understood that to relate to the current quarter,
19  the quarter that was going to end in April of 2009, right?
20  A.  It was what the condition they were saying around that
21  time, it's what you're seeing in the market right now, so
22  that's what the comment was.
23  Q.  Currently?
24  A.  Currently, yes.
25  Q.  Then you see under cost cuts, do you see that?

1  A.  Yes.
2  Q.  There is a sentence, and I'll read it, quote, "Implied that
3  normalized GM is near 18 percent levels, and should not go down
4  much as demand stabilizes," end quote.  Do you see that?
5  A.  I do.
6  Q.  And what does that mean?
7  A.  So what it means is gross margin is highly dependent on
8  sales and sales fluctuate based upon seasonality or time of the
9  year, and the sales mix.  For example, in November-December is
10  when U.S., generally consumers buy a lot due to the holiday
11  season but the products -- so higher revenues, but the products
12  sold are sometimes low margin products, so that has negative
13  impact.  And other times of the year when corporates buy more,
14  so there's a seasonality involved.  Normally gross margin means
15  if you take out the seasonality over the year out and think
16  that there were many fluctuations then like what would be
17  average level of gross margins.
18  Q.  And so this was a topic that was discussed with Ms. Tyson,
19  right?
20  A.  Seems like that, yes.
21  Q.  And people asked questions about how gross margin was
22  doing, correct?
23  A.  It says what will be normalized gross, but I don't know if
24  somebody asked that how gross margin was doing.
25  Q.  But this is a subject that came up, right?

1  A.  Yes, normalized gross margin.
2  Q.  And Ms. Tyson commented on it?
3  A.  Looks like she did, yes.
4  Q.  And you concluded that normalized GM would be near
5  18 percent, right?
6  A.  Yes.
7  Q.  Now, is that a GAAP number or non-GAAP number?
8  A.  Normally people take it to be non-GAAP number.
9  Q.  Right, so that would be a discussion of Dell's gross margin
10  before non-recurring or exceptional items, right?
11  A.  Correct.
12  Q.  Now, do you recall when Dell actually reported its gross
13  margin for this quarter, what it was on a non-GAAP basis?
14  A.  No.
15  Q.  If you could look at Defense Exhibit 1228, it's your tab 6.
16  Do you recognize that document?
17  A.  This is a transcript of the quarterly earnings call.
18  Q.  And is it the quarterly earnings call for the quarter ended
19  in April 2009?
20  A.  Yes.
21       MR. FISHBEIN: Defense offers Defense Exhibit 1228.
22       THE COURT: No objection?  Defense 1228 is received.
23       (Defendant's Exhibit 1228 received in evidence)
24  Q.  And so, Mr. Goyal, you understand this is a transcript of
25  when Dell actually released the results for the quarter we're

1  talking about, is that correct?
2  A.  Yes.
3  Q.  And when they release the results in the conference call
4  they often say what the non-gross margin is, is that right?
5  A.  Yes.
6  Q.  If you look at page 2 of 15 under the comments of
7  Mr. Gladden?
8  A.  Yes.
9  Q.  And do you see there's a paragraph, so let's take a look,
10  and then I'll read the last sentence.  "Gross margin was
11  17.6 percent for the quarter and, excluding the impact of the
12  current organizational effectiveness cost was 18.1 percent."
13  Do you see that?
14  A.  I do.
15  Q.  And so do you understand that Dell's non-GAAP gross margin
16  was 18.1 percent that quarter as reported?
17  A.  Yes.
18  Q.  And so the information that Ms. Tyson gave you two weeks
19  before the quarter ended was quite accurate, wasn't it?
20  A.  The information -- from that thing, the way I'll take it,
21  it was, the comment about normalized GM, which is not for the
22  current quarter but that 18 percent number is close to this
23  18.1 percent number.
24  Q.  It's close, right?
25  A.  Yes.

1  Q.  Now, you understood that Ms. Tyson was authorized to
2  provide this information, right?
3  A.  Which one?
4  Q.  Ms. Tyson.
5  A.  Correct.
6  Q.  When you had the lunch with Ms. Tyson, she was authorized
7  to give you that information, right?
8  A.  That's my understanding.
9  Q.  Did you speak to Mr. Dunlap about Dell's business trends
10  after you were at Neuberger Berman?
11  A.  Yes.
12  Q.  And, again, Mr. Dunlap is in the investor relations
13  department, right?
14  A.  Correct.
15  Q.  And did you speak to him about gross margins at times?
16  A.  So, again, when we talk investor relations we talk on
17  various topics and gross margin does come up in those things,
18  so I don't exactly remember talking to him margins, but I
19  wouldn't be surprised if I did.
20  Q.  And how about revenue?  Did you talk to Mr. Dunlap about
21  revenue?
22  A.  General, overall, yes.  General topics were revenue.
23  Q.  And operating expenses as well, right?
24  A.  Yes.
25  Q.  And then what about Mr. Williams, do you recall speaking to

# A-922

1  Mr. Williams, Rob Williams?
2  A.  I do not.
3  Q.  Did you ever -- you said that you kept a Dell model, right?
4  A.  I did.
5  Q.  And did you ever in your conversations with the investor
6    relations department say to them my model is showing X, you
7    see, do you think that's right or am I far off?  Did you ever
8    have a conversation like that?
9  A.  I don't recall the conversation with Dell IR about that.
10  Q.  Do you recall speaking to any investor relations department
11    at any company about your model and whether you were doing it
12    correctly?
13  A.  These, I wouldn't be surprised if I did that a lot
14    sometimes.  When you are initially launching on a company, for
15    example, you haven't done any work on that company and you
16    start working on that, sometimes they would say, you build a
17    model and say am I generally right, am I too far off and they
18    basically give some kind of indication that based on where the
19    rest of the Street is, you know, and generally this seems to be
20    too high or too low and this is about in the ballpark, so it's
21    in relation to generally this makes sense or doesn't make sense
22    at all.
23  Q.  And just to be clear, that's a conversation that you would
24    have with an investor relations department?
25  A.  It's not very frequent, but sometimes yes, I could.

1  Q.  And they would comment on your model in the way that you've
2    just discussed, is that right?
3  A.  Sometimes they would, sometimes they would say no comment.
4  Q.  Now, with respect to Rob Ray, let's turn now to Rob Ray,
5    okay?
6  A.  Okay.
7  Q.  You never paid any money to Rob Ray, is that correct?
8  A.  Correct.
9  Q.  You gave him various career advice, I think you said, is
10    that right?
11  A.  Right.
12  Q.  And you said that you socialized with him I think at least
13    one occasion, is that right?
14  A.  Correct.
15  Q.  Now, when you socialized with him, that was after he left
16    Dell, right?
17  A.  Correct.
18  Q.  And you were both living in New York City?
19  A.  No, I was living in New Jersey, he was living somewhere
20    there, but in the area.
21  Q.  In the area.
22  A.  Yes.
23  Q.  So while he was at Dell you did not socialize with him, is
24    that correct?
25  A.  Yes.

1  Q.  That's correct?
2  A.  Correct.
3  Q.  You said that what Mr. Ray was interested in was how to
4    move into investment management, is that right?
5  A.  Correct.
6  Q.  He did not, I take it, want to keep working in a company,
7    he wanted to be in a different role in investment management,
8    is that right?
9  A.  I'm sorry, I didn't get it.
10  Q.  In other words, he wanted to move away from working for a
11    corporation and instead work for investment management, is that
12    right?
13  A.  True.
14  Q.  Now, in the end he did not go into investment management,
15    right?
16  A.  Right.
17  Q.  So whatever assistance you gave him, it did not actually
18    result in him going into investment management, is that right?
19  A.  Yes.
20  Q.  Neuberger Berman is an investment management firm, right?
21  A.  Yes.
22  Q.  But did I understand you correctly, you did not arrange for
23    Mr. Ray to interview, for example, with your boss, Mr. Abbasi,
24    right?
25  A.  Right.

1  Q.  So he never interviewed with your group at Neuberger
2    Berman, is that right?
3  A.  Correct.
4  Q.  And you were never able to find him a job at Neuberger
5    Berman, right?
6  A.  Right.
7  Q.  I believe you said you started speaking to him about his
8    career in 2006, is that right?
9  A.  About the time I left there.
10  Q.  I'm sorry?
11  A.  Yes, about the time I left there, so 2000 -- maybe 2006.
12  Q.  And that's a year or two years before he started giving you
13    information, right?
14  A.  That's about, yeah, one, one and a half years before.
15  Q.  Now, in your conversations with him, did he ever connect
16    the career advice with the information he was giving you?  In
17    other words, did he ever say something like I'll give you this
18    information, but only if you give me career advice?
19        MR. TARLOWE: Objection.
20        THE COURT: Overruled.  Did he ever say anything like
21    that?
22  A.  No.
23        THE COURT: No.  Okay.
24  Q.  The answer was?
25  A.  He didn't say that.

1  Q. And in 2006 you were giving him this career advice just as
2   an accommodation to somebody you knew, right?
3  A. Correct.
4  Q. And you would have continued to give him career advice
5   whether or not he gave you information about Dell, isn't that
6   correct?
7  A. I would have not showed how much detail, the frequency and
8   the length of the conversation that I had, but generally
9   speaking, I would have given him some kind of advice.
10  Q. Because the things that you talked about, passing a resume
11   on or generally talking about how the industry works, those are
12   things you did for a lot of contacts you have, right?
13  A. At Dell? It was like very, very detailed for him and I
14   spent a lot of time, so -- I haven't done that with anybody
15   else.
16  Q. So I understand that the detail and the amount of time
17   you're saying was special with him.
18  A. Right.
19  Q. But my question is, isn't that the type of advice or
20   comments that you would give to many of your contacts in the
21   industry?
22        MR. TARLOWE: Objection. Asked and answered.
23        THE COURT: You can answer. Go ahead. Overruled.
24  A. Yes.
25  Q. Now, would it be fair to say that these conversations you

1   had with Rob Ray were casual in nature?
2  A. Meaning?
3  Q. Meaning that did you press him for information or did you
4   rather sort of accept what he gave you?
5  A. I didn't press. I didn't press.
6  Q. And in fact, you told him that you were in the research
7   department of Neuberger Berman, right?
8  A. Yes, I did.
9  Q. So he understood that you were doing research including
10   working on models, right?
11  A. Yes.
12  Q. And you told him in these conversations that you had a Dell
13   model, didn't you?
14  A. I don't remember telling him that I had that model, but I
15   think it would be understood that I have that.
16  Q. And didn't you tell him, didn't you tell Rob Ray that you
17   wanted to check your model and make sure it wasn't too far off?
18  A. You're true. You're right, yes.
19  Q. That's what you told him, right?
20  A. Yes.
21  Q. And that he would react to that, right?
22  A. Um --
23  Q. In other words, he would respond to that by saying whether
24   you were far off or not?
25  A. I don't recall that, saying I'm this or am I far off. I

1   don't recall that kind of thing.
2  Q. But is it correct that the way you got information from him
3   is that you told him you were working on a model and you wanted
4   to check the accuracy of the model?
5  A. That's what I initially told him, that's why I'm asking him
6   information, yes.
7  Q. Now, you mentioned that you got certain ranges of numbers
8   from him, is that right?
9  A. Right.
10  Q. But as you sit here today you can't remember what those
11   ranges were in any particular quarter, right?
12  A. No.
13  Q. So, for example, you said they could have been broader or
14   narrower, but you can't tell me for any particular quarter
15   whether it was a broad range or a more narrow range, correct?
16  A. They varied. They varied quarter to quarter.
17  Q. And in some cases I think you said the range was as broad
18   as, for example, for gross margin, 17 percent to 17.5 percent,
19   is that right?
20  A. That's what I think it might have been, yeah.
21  Q. You testified on direct about payments that you got from
22   Diamondback. Do you recall that?
23  A. Yes.
24  Q. Now, this arrangement where you got paid by Diamondback,
25   you discussed that with Jesse Tortora, right?

1  A. Right.
2  Q. In fact the only person at Diamondback that you spoke to
3   about that was Jesse Tortora, correct?
4  A. Yes.
5  Q. So you never spoke to Todd Newman about that, right?
6  A. No.
7  Q. Now, you mentioned on direct right at the beginning that
8   you had met Mr. Newman once, I think you said, is that right?
9  A. Yes.
10  Q. What were the circumstances of that?
11  A. I think it was a lunch even, I'm not sure if it was
12   sponsored by a company or sell side, there was a luncheon
13   event. I went to the lunch and I think Jesse and Todd were
14   there so he sort of introduced me.
15  Q. So he just introduced you and you said hello, right?
16  A. Yes.
17  Q. Do you recall any conversation of substance that you had
18   with Todd Newman?
19  A. No.
20  Q. Do you recall whether your wife Ruchi has met Todd Newman?
21  A. She hasn't.
22  Q. Has not, correct?
23  A. No.
24  Q. Do you recall, Mr. Goyal, that you first discussed this
25   arrangement with Jesse Tortora when you moved to Neuberger

# A-924

1   Berman?
2   A. Right.
3   Q. So when you first discussed it with Mr. Tortora, was he
4   still at Prudential?
5   A. I think he was at Diamondback.
6   Q. But it was early in your time at Neuberger Berman, wasn't
7   it?
8   A. So we're talking about like late 2007. So I joined there
9   in July, so yeah, that's the time period you're talking about.
10   So I was two, three, four months into Neuberger Berman.
11   Q. Do you remember exactly when it was that Mr. Tortora raised
12   this with you?
13   A. Can you please repeat that?
14   Q. Yes. Do you remember exactly when it was that Mr. Tortora
15   first raised the issue of your getting paid?
16   A. My recollection is somewhere, somewhere around October of
17   2007.
18   Q. Could it have been before that?
19   A. It may have been September. I don't think it's before
20   that.
21   Q. Do you recall that when Mr. Tortora raised the issue, what
22   he said he wanted you to do was the same kind of work you had
23   been doing for him at Prudential. Do you remember that?
24   A. Yeah.
25   Q. So the arrangement was for you to continue doing the type

1   of work that you had done for him at Prudential, right?
2   A. In terms that when I was like full employ of Prudential I
3   was doing almost all the work. I think it meant the kind of
4   the Dell information I was providing him at Prudential.
5        (Continued next page)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1   Q. But this was before you had started to get information from
2   Rob Ray, is that right?
3   A. That's what I think, yes.
4   Q. Now, if we could look at Government Exhibit 709A. That's
5   one of the documents that you were shown on direct. I'm sorry.
6   775A. I'm sorry this is in evidence. It's not in your binder.
7        I think you said this was an invoice that you had
8   created with respect to these payments from Diamondback, is
9   that right?
10   A. Correct.
11   Q. And if you look, the period that you put there was October
12   9, 2007 to December 31, 2007.
13        You see that?
14   A. Yes.
15   Q. And would I be correct, Mr. Goyal, that whatever
16   conversation you had with Mr. Tortora was certainly before
17   October 9, right?
18   A. No.
19   Q. Well, you put October 9 as the start date, right?
20   A. I put -- that's when he must have mentioned, put the last
21   quarter, October to December. Even if we had this conversation
22   in October, it would still be -- I would still done that, put
23   October 9.
24   Q. Mr. Goyal, if you could look, you have a binder in front of
25   you that's called 3500. It's a separate binder. If you could

1   look at 3507-6. It should be tab 6 in your binder.
2        Do you have that document?
3   A. Yes.
4   Q. And I am going to ask you to read a portion of it to
5   yourself, okay?
6   A. Okay.
7   Q. If you could turn to page 3. And we are looking at the
8   second full paragraph that starts CHS?
9   A. Okay.
10   Q. I am going to direct your attention to the second sentence
11   which I'd like you to just read to yourself.
12   A. Second line?
13   Q. Second sentence that starts, when CHS.
14   A. When CHS --
15   Q. Don't read it out loud. Just read it to yourself.
16   A. Just that sentence?
17   Q. Yes.
18        Mr. Goyal, does that refresh your memory that you
19   first spoke to Mr. Tortora about being paid shortly after you
20   joined Neuberger Berman?
21   A. It doesn't.
22   Q. It does not?
23   A. It does not.
24   Q. As I understand your testimony, you don't remember the
25   precise time when he first raised that, is that right?

1  A.  My best recollection is in October.
2  Q.  Now, at the time that you entered, that you made this
3  arrangement with Mr. Tortora, you understood, as we discussed
4  before, that it was to compensate you for doing the same type
5  of work you had done at Prudential, right?
6  A.  Which I understood like Dell checks.
7  Q.  So that would include information that you got from these
8  friends of yours, right?
9  A.  Correct.
10  Q.  And not Mr. Ray, because you hadn't started getting
11  information from Mr. Ray yet?
12  A.  True.
13  Q.  Did it also true work on financial modeling like you had
14  done for Mr. Tortora?
15  A.  It wouldn't include that much detail because that was
16  really a full-time job I was doing at Prudential.  That's why I
17  was spending all the time doing that.  But in case he needed
18  some help I would do it.
19  Q.  You had done modeling work for him at Prudential, right?
20  A.  Right.
21  Q.  And you understood that if he was going to pay you to
22  continue doing the same type of work, that can include
23  modeling, right?
24  A.  If he asked for help, you know, sometimes.  I don't know if
25  it was specifically said, but if he were to ask me for help, I

1  would provide some help.
2  Q.  Mr. Tortora thought very highly of your modeling abilities,
3  didn't he?
4  A.  Yes.
5  Q.  And if you'll turn with me to Defense Exhibit 9805.  It's
6  already in evidence.  It's your tab 7.
7      Mr. Goyal, do you recognize this as a performance
8  review that Mr. Tortora gave you while you were at Prudential?
9  A.  Which tab you mentioned?
10  Q.  It's tab 7.
11  A.  Of 3507?
12  Q.  I'm sorry.  It's in the first binder.  Let me know when
13  you've got that.
14  A.  Okay.
15  Q.  Do you recognize this as a performance review that
16  Mr. Tortora gave you when you were at Prudential?
17  A.  Yes.
18  Q.  And if you look at page 3 of 7, the page numbers are on the
19  bottom right.
20  A.  Okay.
21  Q.  Are you with me?
22  A.  Yes.
23  Q.  If you look at the first full paragraph, the last sentence
24  says: "Sandy's industry knowledge, contact, network,
25  creativity and commitment are just some of the reasons why he

1  is essential to the success of our team."
2      Do you see that?
3  A.  Yes.
4  Q.  Did you understand contact network to include these friends
5  that you had at Dell?
6  A.  Yes.
7  Q.  And Mr. Tortora and you made no effort to hide the fact
8  that you still had contacts at Dell, right?
9  A.  It would indicate that, yes.
10  Q.  In other words, that was something that was freely
11  discussed in your review, right?
12  A.  It was -- I didn't know -- I didn't get to see my review.
13  Q.  That actually helps me.
14      In the next paragraph he refers to you as a financial
15  wizard and master modeler.
16      Do you see that?
17  A.  Yes.
18  Q.  Were those ever phrases he used with you?
19  A.  Excuse me?
20  Q.  Were those phrases that he ever used in conversation with
21  you?
22  A.  I don't recall that.
23  Q.  But you do recall that he thought very highly of your
24  modeling work?
25  A.  Yes.

1  Q.  You said a minute ago that from time to time he would ask
2  you questions or ask for your help in various modeling issues
3  when he was at Diamondback and you were at Neuberger Berman, is
4  that right?
5  A.  Sometimes, yes, he did.
6  Q.  What kind of help did he ask you for?
7  A.  There were times like he will seek what kind of number like
8  for Apple model, what kind of estimate you have for iPhone
9  sales or something, what your overall estimate for PC market,
10  these kind of things.
11  Q.  If you will look with me at Defense Exhibit 8627, it's your
12  tab 8.
13      Do you have that?
14  A.  Yes.
15  Q.  Is that an example of the type of assistance he requested
16  on the Apple model?
17  A.  Yes.
18      MR. FISHBEIN: Defense offers Exhibit 8627.
19      MR. TARLOWE: No objection.
20      THE COURT: Defense 8627 is received.
21      (Defendant's Exhibit 8627 received in evidence)
22  Q.  If you will look at Defense Exhibit 8661, it's your tab 9.
23      Do you see that?
24  A.  Yes.
25  Q.  Is that another example of assistance that Mr. Tortora

1  requested of you when he was at Diamondback and you were at
2  Neuberger Berman?
3  A. Yes.
4      MR. FISHBEIN: Defense offers Exhibit 8661.
5      MR. TARLOWE: No objection.
6      THE COURT: Defendant's 8661 is received.
7      (Defendant's Exhibit 8661 received in evidence)
8  Q. What does this relate to, Mr. Goyal?
9  A. This relates to Apple.
10 Q. What type of information are you providing him on Apple?
11 A. He is asking for iPod revenue growth for quarter and next
12  quarter in both sequential and year over year terms.
13 Q. And this was information that you had as part of your work
14  at Neuberger Berman, right?
15 A. Correct.
16 Q. And you understood that for whatever reason he did not have
17  it at Diamondback, right?
18 A. Correct.
19 Q. So he wanted your help and he asked you for it, right?
20 A. Yes.
21 Q. And you gave it to him, right?
22 A. Yes.
23 Q. And there were other examples like this where you gave him
24  help in modeling and financial analysis at Apple, right?
25 A. That might happen, yes.

1 Q. Now, if you can turn to Defense Exhibit 8822. It's your
2  tab 10.
3 A. Yes.
4 Q. Is that another e-mail in which Mr. Tortora asks for your
5  help while he's at Diamondback and you're at Neuberger Berman?
6 A. Yes.
7      MR. FISHBEIN: Defense offers Exhibit 8822.
8      MR. TARLOWE: No objection.
9      THE COURT: Defense's 8822 is received.
10     (Defendant's Exhibit 8822 received in evidence)
11 Q. What does this refer to, Mr. Goyal?
12 A. He asked me to make a list of forward PE ratios for --
13 Q. What is a forward PE ratio?
14 A. It's price to earnings ratio.
15 Q. Is that a type of financial analysis that you used to value
16  companies?
17 A. It's not exactly an analysis. It's basically a number that
18  we use to get from third-party resources like FactSet.
19 Q. He asked for that information with respect to a long list
20  or a list of companies that is in this e-mail, correct?
21 A. Correct.
22 Q. If we look at the next page, the list goes on, correct?
23 A. Correct.
24 Q. Did you provide him this information?
25 A. I think I did.

1 Q. You understood that for whatever reason he did not have
2  access to this at Diamondback, is that right?
3 A. Correct.
4 Q. So he wanted you to do it for him?
5 A. Right.
6 Q. That's the type of work that you would have done for him at
7  Prudential, right?
8 A. I'm not sure. I think we had this at Prudential, also,
9  yes.
10 Q. But at Prudential if he wanted forward PE ratios, he would
11  say, Sandy, why don't you try to go get this for me?
12 A. Correct.
13 Q. Now when he was at Diamondback, he wanted to keep doing
14  that for you?
15 A. Yes, he asked me to do it.
16 Q. If you could look at Defense Exhibit 8883. It's your tab
17  11.
18     Does this relate to more assistance that he requested
19  of you while he was at Diamondback and you were at Neuberger
20  Berman?
21 A. Yes.
22     MR. FISHBEIN: Defense offers Exhibit 8883, Defense
23  Exhibit 8883.
24     MR. TARLOWE: No objection.
25     THE COURT: Defendant's 8883 is received.

1      (Defendant's Exhibit 8883 received in evidence)
2 Q. Mr. Goyal, does this one relate to Apple?
3 A. Yes.
4 Q. Yes, assistance with doing a model at Apple, right?
5 A. Seemed like. I don't know what he asked me to run through,
6  but it was something in the model.
7 Q. If we can go now to Defense Exhibit 9025. It's your tab
8  12.
9      Does this also relate to assistance that Mr. Tortora
10  requested of you when he was at Diamondback and you were at
11  Neuberger Berman?
12 A. Yes.
13     MR. FISHBEIN: Defense offers Exhibit 9025.
14     MR. TARLOWE: No objection.
15     THE COURT: Defendant's 9025 is received.
16     (Defendant's Exhibit 9025 received in evidence)
17 Q. What does this refer to, Mr. Goyal?
18 A. This refers to unit, which is PC unit, growth for Dell and
19  HP, and market share.
20 Q. Do you see there is a reference to IDC Gartner?
21 A. Yes.
22 Q. That's a third-party service that reports on unit sales,
23  correct?
24 A. Correct.
25 Q. Is one of the things that he asked you to help him with was

1  to obtain and to analyze the IDC and Gartner data?
2  A. It doesn't look like that I'm analyzing IDC or Gartner. I
3  think it's numbers my expectation before it came.
4  Q. So, in other words, you understood that he was asking you
5  for your assessment of what the IDC and Gartner numbers might
6  look like when they came out, is that right?
7  A. I think -- he was asking for my expectations for PC unit
8  growth, correct.
9  Q. Is that something that you used to model?
10  A. I have modeled, yes.
11  Q. Did you understand he was asking you for information that
12  you had in your model?
13  A. Right.
14  Q. And do you think that you gave this to him?
15  A. Yes.
16  Q. Do you see that he also asked you to send the actual IDC
17  and Gartner reports when they came out later that evening?
18  A. Yes.
19  Q. Now, that's a subscription service, right?
20  A. Correct.
21  Q. And you pay for that, right?
22  A. I think Neuberger Berman did, yes.
23  Q. You understood that Mr. Tortora, for whatever reason, did
24  not have access to that at Diamondback, is that right?
25  A. Correct.

1  Q. But Neuberger Berman did pay for a subscription to IDC
2  Gartner, right?
3  A. Yes.
4  Q. He asked you to get that data for him, right?
5  A. Actually, I think it's just a report. I think this report
6  was also publicly available. For some reason he asked me to
7  send it whenever it comes out because they send an e-mail to
8  people.
9  Q. They send an e-mail to people who subscribe?
10  A. I think so, yes.
11  Q. If you could look at Defense Exhibit 9142. It's your tab
12  13.
13      Does this also relate to assistance that Mr. Tortora
14  requested of you when he was at Diamondback?
15  A. This seems like they are price to earnings ratio.
16      MR. FISHBEIN: Defense offers Exhibit 9142.
17      MR. TARLOWE: No objection.
18      THE COURT: Defense Exhibit 9142 is received.
19      (Defendant's Exhibit 9142 received in evidence)
20  Q. And you said, Mr. Goyal, that this, like one of the past
21  ones, refers to price earnings ratios on various companies,
22  right?
23  A. Yes.
24  Q. Do you see that you sent him the information and you made
25  the comment, pretty big file, will send rest tomorrow.

1      Do you see that?
2  A. Yes.
3  Q. What does that mean?
4  A. It means all of this data may not have fit one file or
5  maybe it wasn't processed. Either one of those two were ours.
6  Q. It was a lot of data that he requested from you?
7  A. Seems like that, yes.
8  Q. Did you notice that when you sent him this, you just sent
9  it just to him, right?
10  A. Yes.
11  Q. And in the other e-mails we just looked at you sent the
12  information just to Jesse Tortora, right?
13  A. Correct.
14  Q. Did he ever tell you he did not want other people at
15  Diamondback to know that you were giving him this type of
16  assistance?
17  A. I don't think so.
18  Q. But you understood that he was an analyst at Diamondback,
19  right?
20  A. Correct.
21  Q. And when you were at Prudential, you were an analyst,
22  right?
23  A. Yeah.
24  Q. And you used to do this type of work for Mr. Tortora when
25  you were at Prudential, right?

1  A. Right.
2  Q. And you understood that one of his job responsibilities at
3  Diamondback was to do this type of work, right?
4  A. I wasn't sure what exactly. I know he was like an analyst
5  at hedge fund. I don't think I asked him, what are his typical
6  day-to-day duties or he talked about that. He talked about
7  mostly having stock recommendations.
8  Q. But you understood that there is various type of assistance
9  you were giving him were to assist him in doing his job at
10  Diamondback, right?
11  A. Correct.
12  Q. Now, do you recall that you actually sent him some of the
13  models that you maintained at Neuberger Berman?
14  A. I might have, yes. I don't particularly remember, but I
15  think I did.
16  Q. Why don't we look at Defense Exhibit 8656, which is your
17  tab 15.
18  A. Tab 16?
19  Q. 15.
20      Is that an e-mail from you -- actually from one e-mail
21  address of yours to another on January 15, 2008?
22  A. Correct.
23      MR. FISHBEIN: Defense offers Exhibit 8656.
24      MR. TARLOWE: No objection.
25      THE COURT: Defense 8656 is received.

1          (Defendant's Exhibit 8656 received in evidence)
2   Q. If we look at screen, Mr. Goyal, you sent an e-mail to
3     yourself, is that right?
4   A. Yes.
5   Q. On January 15, 2008?
6   A. Correct.
7   Q. And do you see that the attachments say Dell model NB XLS
8     and HP NB model XLS.
9          Do you see that?
10  A. Yes.
11  Q. What does that mean?
12  A. Dell and HP models.
13  Q. And the NB, what does that stand for?
14  A. We just use for files, Neuberger Berman.
15  Q. These were models that you maintained while you were at
16    Neuberger Berman, right?
17  A. Yes.
18  Q. The first e-mail, the e-mail from which you sent these
19    models, Sandy.Goyal@NB.com, what e-mail address was that?
20  A. That's my Neuberger Berman e-mail address.
21  Q. And the address where you sent it to was
22    Goyal_Sandy@Yahoo.com, what e-mail address is that?
23  A. That's my personal e-mail address.
24  Q. Why did you send these models from your work e-mail to your
25    personal e-mail on January 15, 2008?

1   A. That's what I used if I have to use my model at work or
2     something. Normally, at Neuberger Berman, there is no other
3     way of sending the models. So the only way for us to get the
4     models is to send it out through personal e-mail.
5   Q. If you could look at what's already been admitted in
6     evidence as Defense Exhibit 8657. It's your tab 16.
7          Do you see that?
8   A. Yes.
9   Q. And does this reflect that on the same date, January 15,
10    2008, you sent these same models to Jesse Tortora?
11  A. Yes.
12  Q. And if you'll look at 8656, that's at 4:01 p.m., right?
13  A. Okay. Yes.
14  Q. You sent it on to Jesse Tortora at 7:47 p.m. the same day,
15    right?
16  A. Yes.
17  Q. And what e-mail address did you use for Mr. Tortora?
18  A. Jesse Tortora@Gmail.com.
19  Q. Is that his personal address or his business address, to
20    your understanding?
21  A. I think it's a personal address.
22  Q. In looking at this, do you recall now that the reason you
23    sent it to your own personal e-mail address is that you wanted
24    to forward it to Mr. Tortora later that evening?
25  A. I don't recall this particular, but it does make sense that

1   I would have done for this reason.
2   Q. Now, you understood that these models that you kept at
3     Neuberger Berman were the property of Neuberger Berman, right?
4   A. Yes.
5   Q. And you understood that these models were not supposed to
6     be shared with people at other firms, right?
7   A. Yes.
8   Q. And so when you sent it to Jesse Tortora you did it in a
9     way where it wouldn't appear in Neuberger Berman's e-mail
10    system that you were sending it to Mr. Tortora, right?
11  A. Just looking at the other exhibits where I was sending some
12    files to him, so I was sending those files directly to him. So
13    I don't know which way I was thinking on that.
14  Q. Isn't it a fact that with respect to these models you were
15    concerned about people at Neuberger Berman knowing that you
16    shared those models with Jesse Tortora?
17  A. I might have. I might have.
18  Q. Isn't that why you sent it from your personal address to
19    his personal address?
20  A. I might have. I'm thinking, I sent other files directly to
21    him. If I was thinking like that, that's what I'm saying. I
22    am not sure.
23  Q. These models, the Dell and the HP models that were attached
24    to this e-mail, those are these bottoms-up models that you
25    talked about, right?

1   A. Yes.
2   Q. These were models that you worked on for several years,
3     right?
4   A. Yeah. One, two years, yes.
5   Q. With each quarter that those companies were reported, you
6     would refine the model and the various assumptions and formulas
7     in the model, right?
8   A. Right.
9   Q. These models represented several years of your work
10    product, right?
11  A. Since I started building these models.
12  Q. By the way, if you look at 8657, your tab 16.
13  A. Okay.
14  Q. At the bottom Mr. Tortora says: Hey, Sandy, can you send
15    me Apple model? Thanks.
16         Do you see that?
17  A. Yes.
18  Q. Do you also think you shared your Apple model with
19    Mr. Tortora?
20  A. I might have. I think I did.
21  Q. The Dell model, the HP model, the Apple model, they
22    represent valuable work product at Neuberger Berman, right?
23  A. Most everybody has these models, so I guess so.
24  Q. He wanted your model, right?
25  A. Right.

1 Q. He thought you were very good at modeling?
2 A. Yes.
3 Q. This was part of the assistance that you provided
4 Mr. Tortora while he was at Diamondback and you were at
5 Neuberger Berman, right?
6 A. Yes.
7 Q. Now, what did your wife, Ruchi, know about the consulting
8 arrangement with Diamondback?
9 A. I told her that they can't pay me so it will be in your
10 name so I'll have invoices and you should sign them.
11 Q. She signed the invoices, right?
12 A. Correct.
13 Q. Knowing that she did not do any of the work, right?
14 A. Correct.
15 Q. She knew you were going to submit those to Diamondback,
16 right?
17 A. She knew I was, yes.
18 Q. She knew that you got paid for that, right?
19 A. Yes.
20 Q. And the money, I think you said, went into a joint account?
21 A. Right.
22 Q. She was aware that you were getting money in exchange for
23 these invoices?
24 A. Right.
25 Q. By the way, did she ever do any consulting work for you or

1 Mr. Tortora at Prudential?
2 A. I think when she was a student that she had done some
3 project on some -- before iPhone was launched, some survey or
4 something.
5 Q. Tell me about that.
6 A. It was as part of her class project. She did a project on
7 how successful iPhone will be, and she phoned few friends, and
8 there was a survey questionnaire. So she kind of sought those
9 responses and did that.
10 Q. So she did research on how successful she thought the
11 iPhone product would be, is that right?
12 A. It was a questionnaire, yes. It was a survey
13 questionnaire, so she did that survey work.
14 Q. Did she do a write-up on that?
15 A. I think she did.
16 Q. And you are saying that she shared that with Prudential, is
17 that right?
18 A. I think she might have sent it to Jesse and me. I am not a
19 hundred percent sure.
20 Q. But your recollection is that she did do some sort of
21 consulting project for Prudential, is that right?
22 A. It was not -- I am not sure if it was a consulting -- it
23 was a class project work.
24 Q. In a class where? Where was she in school at the time?
25 A. San Francisco.

1 Q. What type of degree was she looking for?
2 A. MBA.
3 Q. So this was while she was getting a master's in business
4 administration, is that right?
5 A. Yes.
6 Q. And so while she was getting a master's in business
7 administration, she did this project which you believe was
8 shared with Prudential, is that right?
9 A. I think so. I am not sure about sharing with Prudential,
10 but she did this project.
11 Q. And I think you said before that she may have given it to
12 Mr. Tortora, is that right?
13 A. I don't remember. May have. I don't remember.
14 Q. Now, I want to ask you some questions about this bottoms-up
15 Dell model that we talked about.
16     One of the inputs to the model is unit sales for Dell,
17 is that correct?
18 A. Unit sales. Okay. That's one of the inputs.
19 Q. In other words, the number of computers that they sell they
20 refer to as units, right?
21 A. Correct.
22 Q. That's an important input to the model, right?
23 A. That is one of the important inputs, yes.
24 Q. We have talked about these third-party research providers
25 IDC and Gartner, right?

1 A. Yes.
2 Q. And you're aware that IDC and Gartner report on Dell and
3 the other computer makers unit sales, right?
4 A. They report on what all the PC makers have sold in the past
5 quarter.
6 Q. Including Dell, right?
7 A. Including Dell, yes.
8 Q. Now, the IDC and Gartner reports are based on a calendar
9 quarter, right?
10 A. True.
11 Q. Let's take an example. For the calendar quarter January,
12 February, March, when does IDC and Gartner report?
13 A. I think they report some time April or May.
14 Q. Is it right that they report usually in mid-April for the
15 January, February, March quarter?
16 A. I think they have a couple of reports. One is preliminary,
17 one is detail. I am not sure. End of May. I don't exactly
18 remember the exact timings.
19 Q. Do you recall that the Gartner and IDC reports would come
20 out before Dell reported on its quarter?
21 A. I think so. I think so. Again, I'm not a hundred percent
22 sure.
23 Q. And are you aware that Dell is on a fiscal quarter that's
24 different from the calendar quarter?
25 A. Yes.

1  Q.  So Dell's quarter would be, in my example, February, March,
2  and April, right?
3  A.  True.
4  Q.  And so the quarter for which IDC and Gartner report
5  overlaps with the Dell quarter by two months, right?
6  A.  Yes.
7  Q.  Now, when you were modeling, one of the things you looked
8  at was growth rates in unit sales, right?
9  A.  Right.
10  Q.  In other words, what you wanted to know was, has Dell sold
11  more or less than they did in the prior period, right?
12  A.  Yeah.
13  Q.  Is that one of the things you looked at?
14  A.  Right.
15  Q.  That was an important input to your model, right?
16  A.  It was one of the inputs, yes.
17  Q.  Would it be fair to say that the growth rates reported by
18  IDC and Gartner were relevant to what growth rates you might
19  expect for Dell's quarter?
20  A.  They were helpful but, again, one missing month was a big
21  part of it, too, so you had to guesstimate that, too.  But it
22  does give you some framework there.
23  Q.  In other words, the growth rate that you see in the IDC and
24  Gartner data gives you a good idea of what Dell's growth rate
25  is likely to be for the current quarter, right?

1              AFTERNOON SESSION
2                  2:05 p.m.
3          (In open court; jury not present)
4          THE COURT: By the way, Mr. Pendrock mentioned to my
5  law clerk that he had seen an article in the Times related to
6  the case, I guess related to insider trading and he did not
7  read it.  But he has been very scrupulous about telling us when
8  he has encountered and article.  He is adamant he did not read
9  them, he stopped reading.  So that was that, and there was
10  something else, too?  Searches of cell phones, he thought that
11  might implicate some things that happened here, so he didn't
12  read it.
13          All right, anything I need to follow up with
14  Mr. Pendrock?  Okay, let's bring in the jury.
15          (Continued on next page)
16
17
18
19
20
21
22
23
24
25

1  A.  Not exactly.  Because Dell's growth rate is different than
2  Dell's -- what we are talking about is, IDC and Gartner, they
3  gave you unit data, PC sales.  So, again, if you just look at
4  desktop and notebooks, I don't know how big business that is.
5  Maybe half or something.  I don't exactly remember how big that
6  is.  So you don't have knowledge about rest of the business.
7  And then the unit that was considered good -- they used to come
8  up with the detailed revenue and sales data, too, but I think
9  this was later in the quarter.  I am not sure if that came
10  before Dell reported.  It was just unit data.  You still had to
11  estimate the EPSs, which is the selling prices to get the
12  revenues.  So, again, we are just talking about revenues for
13  PCs and that doesn't mean revenue for entire Dell.
14          THE COURT: Let's stop here because it's 1:00.
15          Ladies and gentlemen, we will pick up again at 2.
16  Have a good lunch.  Don't discuss the case, of course.  See you
17  at 2.
18          All stand for the jury, please.
19          (Jury not present)
20          THE COURT: We will pick up at 2:00.
21          You're on cross-examination, Mr. Goyal, so don't
22  discuss the substance of your testimony with anyone.  Okay.
23          THE WITNESS: Okay.
24          THE COURT: Thank you.
25          (Luncheon recess)

1          (In open court; jury present)
2          THE COURT: All right, have a seat.  You had a good
3  lunch?  It's a nice day out.  We're going to resume with the
4  cross-examination of Mr. Goyal by Mr. Fishbein.  Okay, Mr.
5  Fishbein you may proceed.
6  BY MR. FISHBEIN:
7  Q.  Mr. Goyal, we were talking about the IDC and Gartner
8  reports.  Do you remember that?
9  A.  Yes.
10  Q.  By the way did IDC and Gartner put out reports about the
11  unit sales of servers as well as PCs?
12  A.  I think the data, they did that too, I think.
13  Q.  You had mentioned before the break that IDC and Gartner
14  reports also included revenue reports, did I understand that
15  right?
16  A.  I think it's depending upon the details the most widely
17  read was units, but I think after that the detail reports have
18  some details regarding revenues and EPS's.
19  Q.  And those are detailed reports that the subscribers to the
20  service get?
21  A.  That would be after a month or so.  It would take a little
22  time to compile that data.
23  Q.  But if you pay for the service you get this more detailed
24  report, is that right?
25  A.  I think so.

1  Q. That report has not only the units that the various
2   computer makers sell but also revenue and average selling
3   price?
4  A. It's their mix of them and sometimes it really doesn't
5   correspond to what companies say.
6  Q. Well, you're aware, are you not, Mr. Goyal, from your time
7   at Dell that Dell gives information directly to IDC and
8   Gartner?
9  A. I'm not sure about that.
10 Q. When you were at Dell were you involved in any way in
11  talking to IDC and Gartner?
12 A. I'm not sure about that. I don't remember that.
13 Q. So do you have any understanding one way or the other as to
14  where IDC and Gartner gets its unit and revenue data?
15 A. My understanding is they get it largely from talking to
16  retailers and companies. They have a lot of people on the
17  ground that get the data. That was my understanding.
18 Q. But you don't have any knowledge, you don't have any
19  information to contradict that the company may have spoken to
20  IDC and Gartner, is that right?
21 A. True, I don't have any knowledge.
22 Q. Let's talk about the selling prices of computers. As I
23  understand it for your model you want to know how many units
24  they're going to sell, right?
25 A. Correct.

1  Q. And the other important piece for the revenue is what the
2   selling prices are, right?
3  A. Yes.
4  Q. Now, are you familiar with the tracker that Jesse Tortora
5   used to analyze selling prices?
6  A. Yes.
7  Q. And he used that when you were at Prudential as well,
8   right?
9  A. Correct.
10 Q. You understood that he had a consultant named Scott
11  Kanowitz who did his tracker, right?
12 A. Correct.
13 Q. You used the tracker when you were at Prudential to analyze
14  the selling prices of PCs and other types of computers, right?
15 A. That was one input, one input, one of many.
16 Q. You're aware, are you not, that Mr. Tortora continued to
17  use this Kanowitz tracker while he was at Diamondback, right?
18 A. Yes.
19 Q. And he would show you the Kanowitz tracker, wouldn't he?
20 A. I think I've seen that.
21 Q. If we could look at Government Exhibit 204. It's already
22  in evidence. It's your tab 17. Do you recognize this,
23  Mr. Goyal, as the Kanowitz tracker that Mr. Tortora forwarded
24  to you in mid-July 2008?
25 A. This is the second e-mail, right?

1  Q. I'm sorry, it's your tab 17.
2  A. No, there are two or three e-mails. The e-mail from Scott
3   is regarding his tracker, right, and then Jesse replies to
4   that.
5  Q. But you understood that what Mr. Tortora was sending you
6   was this Kanowitz tracker, is that right?
7  A. Right.
8  Q. By the way, you understood Mr. Kanowitz did his analysis of
9   computer prices based on publicly available information,
10  correct?
11 A. He did his analysis based on the prices at a number of
12  different websites, so this pricing is most relevant to U.S.
13  consumer, and because there is no real good way to know the
14  pricing that is available to large enterprises because that's
15  done on a negotiation basis, so this is U.S. consumer prices.
16 Q. But you understood that the way he determined U.S. consumer
17  pricing is to go to websites and other retail outlets and
18  figure out what the prices were?
19 A. Correct.
20 Q. Did you also understand that this tracker was something
21  that Mr. Tortora developed with Mr. Kanowitz, right?
22 A. I think it was developed while at Prudential.
23 Q. Right, and it's not something that was published generally
24  to the financial community, correct?
25 A. I'm not sure about that. I think he, I think he used to

1   show it to the clients at Prudential, the end results of the
2   tracker.
3  Q. But while you were at Neuberger Berman, because July 15,
4   2008 you were at Neuberger Berman?
5  A. Right.
6  Q. Was it your understanding that Mr. Kanowitz generally
7   published this tracker or was it just available to Mr. Tortora?
8  A. I think my understanding was just for Jesse.
9  Q. So now if we look at this e-mail, this is as we said, it
10  was forwarded to you on July 15, 2008, correct?
11 A. Right.
12 Q. So this is two weeks before the quarter ends, right?
13 A. Okay. Yes.
14 Q. Roughly two weeks before the quarter ends?
15 A. Right.
16 Q. And if you look at the bottom e-mail, Mr. Tortora gives
17  some commentary on the tracker, correct?
18 A. Yes.
19 Q. This is the e-mail at 8:38 a.m., do you see that?
20 A. Yes, I do see that.
21 Q. Mr. Tortora writes, "After monitoring recent consumer PC
22  price declines I think we've now seen enough movement to call
23  it a trend." Do you see that?
24 A. Yes.
25 Q. What did you understand Mr. Tortora to be saying now?

1 A. It's that it's been going on for some time now.

2 Q. And what has been going on for some time is a price war,

3   right, with respect to PC sales, correct?

4 A. PC prices were declining.

5 Q. Because of a price war, right?

6 A. Right. Oh, because -- yeah.

7 Q. And then if you look at the last sentence of that paragraph

8   it says, quote, "Bottom line, this very negative for Dell/HP

9   margin and the PC food chain as component vendors will get

10   asked for price concessions," end quote. What did you

11   understand that to mean?

12 A. It means the lower prices will hurt their margins. Dell

13   and HP's.

14 Q. And he was commenting not only on lower computer prices but

15   also the prices of the components that go into computers,

16   right? Do you see the reference to component vendors will get

17   asked for price concessions?

18 A. Right.

19 Q. Now, Mr. Goyal --

20 A. No -- actually, I'm not fully able to understand this

21   comment, and the PC food chain as component vendors -- oh, so

22   he's saying almost everybody will have lower gross margins in

23   the PC future prices.

24 Q. So you understood that Mr. Tortora was specifically calling

25   out his analysis from this tracker that Dell's margin would

1   suffer, right?

2 A. They're saying this is negative for Dell margins.

3 Q. And you responded, correct, in the top e-mail, right?

4 A. Right.

5 Q. And you say at the end, "I agree that sequential GM does

6   get hurt." Do you see that?

7 A. Yes.

8 Q. What is sequential GM?

9 A. Sequential GM means gross margin compared to the previous

10   quarter.

11 Q. So the quarter we're talking about now is the quarter ended

12   at the end of July or beginning of August, right?

13 A. Yes.

14 Q. And the previous quarter would have been the quarter ended

15   in April, right?

16 A. Yes.

17 Q. So what you're saying is that you agree that GM in the

18   quarter ended July is going to be hurt compared to the previous

19   quarter, right?

20 A. Yes.

21 Q. Now, there's no information in this e-mail that you got

22   from Rob Ray, right?

23 A. True.

24 Q. So you made that conclusion based on Mr. Kanowitz' tracker,

25   right?

1 A. I would assume so, yes.

2 Q. If you could turn now to Defense Exhibit 8656, it is

3   your -- I'm sorry, Defense Exhibit 964 is your tab 18. Is

4   Defense Exhibit 964 a communication between you and Mr. Tortora

5   relating to modeling on Dell?

6 A. Yes.

7       MR. FISHBEIN: Defense offers Exhibit 964.

8       MR. TARLOWE: No objection.

9       THE COURT: Defense Exhibit 964 is received.

10       (Defendant's Exhibit 964 received in evidence)

11 Q. Now, this e-mail, Mr. Goyal, is dated February 4, 2009, is

12   that correct?

13 A. True.

14 Q. And that is after the end of the quarter ended

15   January 2009, right?

16 A. Right.

17 Q. So this is actually after the quarter end, but a couple of

18   weeks before Dell reported its results, right?

19 A. Right.

20 Q. And am I right, Mr. Goyal, that the subject matter of this

21   e-mail is your reporting to Jesse Tortora on your modeling of

22   Dell's results.

23 A. Yes.

24 Q. And am I right that the modeling that's referred to here,

25   this is not information that you got from Rob Ray, correct?

1 A. It does not look like that, correct.

2 Q. Let's look at this e-mail, and the first sentence that you

3   wrote to Mr. Tortora was, quote, "Looking at IDC data and

4   plugging in some estimates." Do you see that?

5 A. Yes.

6 Q. What does that refer to?

7 A. It is, I said looking at from what IDC has reported and

8   some of the estimates I put in the model.

9 Q. So you're taking IDC unit figures and you're plugging that

10   into your model, right?

11 A. It doesn't mean that I actually plugged in, but I have used

12   it in some way or shape.

13 Q. You based your modeling off the --

14 A. Something is based on IDC yes, some PC units is based.

15 Q. Then you say, "I am getting rev of 14B. Street at 14.7."

16   Do you see that?

17 A. Yes.

18 Q. Does that mean that your model is showing revenue of $14

19   billion versus the Street at 14.7?

20 A. Yes.

21 Q. And that was modeling based on the IDC numbers, correct?

22 A. I don't know if it's IDC model. It's only one small part

23   of my overall model, so I won't say that, but something based

24   upon that.

25 Q. But what you said in this e-mail, what you referred to is

# A-933

1 the IDC data?
2 A. I'm saying looking at IDC data, yes.
3 Q. Your e-mail continues, quote, "But I think GM will be
4 higher than Street estimates of 17.0 percent. Guessing around
5 18.4 or 18.5, as I don't think ASP declines were too bad
6 relative to last QTR component cost declines. You would have a
7 better idea of that with your tracker and also due to the fact
8 that biggest decline was in PCs which are lower margin
9 products." Do you see that?
10 A. Yes, I do.
11 Q. Does GM refer to gross margin?
12 A. Yes.
13 Q. And your model is showing that gross margin would be higher
14 than the Street estimates, right?
15 A. I'm saying guessing around 18-4 or 5. So I don't know if I
16 already put in the model or, you know, I was estimating that,
17 but yeah, either way I was --
18 Q. Well, am I wrong, Mr. Goyal, that you wrote this e-mail
19 after working with your model?
20 A. I'm not sure because I'm saying plugging in estimates and
21 revenue, so it does look like it's from my model.
22 Q. And your model was estimating 18.4 or 18.5 percent GM, that
23 is right?
24 A. The way normally for gross margin revenue you'd normally
25 get from bottoms up, but gross margin sometimes you put top

1 down. Basically it's very hard to do gross margin at each
2 division level, so sometimes to roll up the revenue for each
3 product comment and put the gross margin product for the entire
4 company in the model, because otherwise I wouldn't be using,
5 guessing around 18.4 or 18.5, I'm not doing that for revenue.
6 Q. You just said you would roll up the revenue in the model.
7 Could you explain what you mean?
8 A. I just said bottoms up, so I do this in the model.
9 Sometimes I have basically get project revenues at product
10 level, and then sum it, picked up to get the total number. So
11 that's the bottoms up model, that's what I was referring to
12 earlier.
13 Q. You just used the phrase "rollup," is that right?
14 A. Rollup, bottom, yes.
15 Q. In other words, the process of taking your estimates for
16 each segment or each product type and then combine that into an
17 overall revenue figure in your model, you could refer to that
18 as a rollup, right?
19 A. Normally it's not. I did use that. It's normally not used
20 as a rollup number.
21 Q. But that's how you referred to it a minute ago?
22 A. I did, yes.
23 Q. Now here where you're talking about gross margin you said,
24 "I don't think ASP declines were too bad relative to last QTR."
25 What is ASP declines?

1 A. Price declines.
2 Q. Is that average selling price?
3 A. Yes.
4 Q. That's what Mr. Kanowitz tracked in his tracker?
5 A. That's what he did.
6 Q. Then you say in parens, you say, "You would have a better
7 idea of that with your tracker." Is that right?
8 A. Correct.
9 Q. You're referring specifically to the Kanowitz tracker,
10 correct?
11 A. He also had another tracker for component costs where he
12 tracked the costs for things like hard drive memory and all, so
13 that's what I'm referring to.
14 Q. He, meaning Mr. Kanowitz?
15 A. Correct.
16 Q. So Mr. Kanowitz tracked both the prices that computers were
17 sold for and also the cost of various components, right?
18 A. Right. The prices were just for U.S. consumer, but
19 component I think was all world information.
20 Q. In this e-mail when you discussed gross margin you made
21 specific reference to that Kanowitz tracker, right?
22 A. Yes. This was for component cost declines.
23 Q. Then the next sentence says, "The one area I am not sure is
24 services as it is highly related to units and deep declines
25 there could affect GM." Do you see that?

1 A. Right.
2 Q. Then you give an analysis of the server business, right?
3 A. Yes.
4 Q. Excuse me, the services business, right?
5 A. Yes. Services, yes.
6 Q. Now, that information did not come from Rob Ray?
7 A. I don't think so.
8 Q. That was based on your general knowledge of Dell's business
9 from having worked there?
10 A. Right.
11 Q. The last sentence says, quote, "Even with lower rev, my EPS
12 is coming at .33, 3 cents higher than Street." Do you see
13 that?
14 A. Yes.
15 Q. And that refers to what your model was predicting for the
16 earnings per share for Dell for this quarter that was ended,
17 for the quarter that we've been talking about, correct?
18 A. It does seem to indicate that, yes.
19 Q. If we could look again at Defense Exhibit 8656, it's your
20 tab, we saw it. In fact, let's just put it up on the screen.
21 This is the e-mail, remember, where you sent on January 15, you
22 sent a copy of your Dell model?
23 A. Yes.
24      MR. FISHBEIN: Your Honor, I'd like to read a
25 stipulation at this point.

1      THE COURT: All right.

2      MR. FISHBEIN: Read from a stipulation that the

3  parties stipulate to the following: Defense Exhibit 8656A is a

4  compact disk containing a spreadsheet. The spreadsheet

5  contained an Exhibit 8656A was attached to an e-mail dated

6  January 15, 2008 from Sandy Goyal which is marked as Defense

7  Exhibit 8656. Defense Exhibit 8656B is a hard copy printout of

8  excerpts of the spreadsheet contained in Defense Exhibit 8656A.

9  And, your Honor, the defense will offer now Exhibits 8656A and

10  8656B.

11      THE COURT: All right. No objection, right?

12      MR. TARLOWE: No objection.

13      THE COURT: So Defendant's 8656A and 8656B are

14  received.

15 Q. Mr. Goyal, if you look at tab 19, that's 8656B which is a

16  printout of your Dell model. Do you see that?

17 A. Yes.

18 Q. And do you recognize this as your bottoms up Dell model?

19 A. Yes.

20 Q. Do you recall when you did -- the stipulation I read

21  indicated this was attached to your e-mail dated January 15.

22  Do you recall when you last updated it prior to January 15,

23  2008?

24 A. I do not.

25 Q. If you look at the cover page, there's a date on it,

1  12.05.07. Do you see that?

2 A. Yes.

3 Q. Does that mean it's the last date or it could be after

4  that?

5 A. No, I think it doesn't mean, I think there was a menu

6  there, so if you update it, then it's there. Otherwise, it's

7  not.

8 Q. And if you look at B2 in the upper left hand page there's a

9  date, 1/2/08?

10 A. Yes.

11 Q. Does that tell you anything about when this was updated?

12 A. I'm not sure if it was automatically changed for that day

13  or if it was manual. I'm not sure about that.

14 Q. I'd like to ask you a couple of questions about this model.

15  If you go to page B4.

16 A. Yes.

17 Q. And in the upper left it says, "Dell Inc. income

18  statement."

19      MR. FISHBEIN: I don't know, Mr. McLeod, if you can

20  get this bigger so the jury can see it. That's probably

21  sufficient. We're not going to spend too much time on specific

22  numbers.

23 Q. Do you see at the upper left-hand corner it says "Dell Inc.

24  income statement"?

25 A. Yes.

1 Q. Am I right this is the output from the model? In other

2  words, these are the results that the model predicts?

3 A. This is, yes, this is my model, yes.

4 Q. If you look at the top row you see it has various dates of

5  quarters, correct?

6 A. Right.

7 Q. There is shading in green starting January '08. What does

8  that mean, what does that reflect?

9 A. It means those quarters haven't been reported and those are

10  my estimates.

11 Q. This was done no later than January 15, 2008, so the next

12  quarter to report would be the quarter ended January '08, is

13  that correct?

14 A. January 31, right.

15 Q. So the upcoming quarters are shaded green, is that right?

16 A. True.

17 Q. At the top. And you did estimates here for revenue, right?

18 A. Yes.

19 Q. For earnings per share, correct?

20 A. Earnings per share, right.

21 Q. And for gross profit, right?

22 A. Yes.

23 Q. And the gross profit is also indicated as a percentage of

24  revenue, correct?

25 A. Correct.

1 Q. Which is gross margin, correct?

2 A. Correct.

3 Q. Now, if you'll turn to B6, it's called Dell product

4  breakdown. What is this?

5 A. This is the bottoms up thing, where everything is at a

6  product level.

7 Q. So you go product by product and you make an estimate as to

8  what the revenues will be, is that correct?

9 A. Correct.

10 Q. Am I right that the way you estimate revenues product by

11  product is to look at the number of units and the average

12  selling price?

13 A. That is what I input in the model. I input my estimates of

14  growth of the units and growth of EPS.

15 Q. So what you're looking at is changes of the number of units

16  sold and the changes in average selling price, right?

17 A. Correct.

18 Q. If you look at page B8, can you tell me what that is?

19 A. This is based on Scott Kanowitz tracker and he had

20  estimated what percentage of costs for each company comes from

21  different components.

22 Q. Is this an analysis of the various components that go into

23  making a computer?

24 A. Yes.

25 Q. And I think you said it's based on Scott Kanowitz' tracker,

1  is that right?
2  A.  He did that initially.  I think it was at Prudential and
3  that's where we add what component of total cost belongs to
4  each component.
5  Q.  In order to calculate gross margin in your bottoms up model
6  you need to know what the various components are of the
7  computer, right?
8  A.  Yes.
9  Q.  Because gross margin is revenues minus cost of goods sold,
10  right?
11  A.  Right.
12  Q.  So for cost of goods sold you need to know how much it
13  costs to buy the various components used to make the computer,
14  right?
15  A.  Yeah.
16  Q.  What you're analyzing here is the various component cost,
17  right?
18  A.  It is the only thing I'm not sure for which quarter this
19  has been done.
20  Q.  Okay, but the type of analysis?
21  A.  This is the type of analysis.
22  Q.  That relate specifically to component costs, right?
23  A.  Right.
24  Q.  And then if you'll look at page B9, can you tell me what
25  this section of the model shows?

1  A.  I think it's showing for 2007 fiscal year, which is
2  actually 2006 numbers, what percentage of revenue and gross
3  profit came from each product.
4  Q.  Am I right, Mr. Goyal, that as part of your model you kept
5  various charts and analyses of Dell's performance over the
6  years?
7  A.  Yes.
8  Q.  Now, I think you said that this model was prepared before
9  the quarterly report at the end of February 2008, right?
10  A.  This -- yes, before that, because it's shaded in green,
11  yes.
12  Q.  And it certainly, it was before -- strike that.  Do you
13  recall that you testified previously about Dell's quarter ended
14  April of 2008 that was reported in May?
15  A.  Excuse me?  I didn't get it.
16  Q.  Do you remember that the prosecutor asked you some
17  questions about Dell's quarter ended April 2008, or maybe it
18  was May 2nd, that was reported at the end of May, 2008.  Do you
19  remember that?
20  A.  Okay.  Which part?
21  Q.  But Dell has a quarter --
22  A.  Correct, yes.
23  Q.  That's February, March, April, right?
24  A.  January through April and so on, right.
25  Q.  But let's talk specifically about Dell, right?  Dell's

1  quarter, isn't it February, March, April and it ends in April?
2  A.  Yes, February, March and April are three months of that
3  April quarter.
4  Q.  That's the quarter for Dell?
5  A.  Right, right.
6  Q.  Now, this model was prepared before that quarter started,
7  right?
8  A.  From this information I won't say because this is before,
9  this is definitely before they reported and they report on
10  February 28th or 25th or something, so it was before
11  February 25th.
12  Q.  I'm asking a slightly different question which is directing
13  your attention to the quarter that ended at the end of
14  April 2008, okay?  Are you with me?
15  A.  Okay.
16  Q.  That quarter started in February 2008, right?
17  A.  Right.
18  Q.  And this model is dated January 15, 2008, right?
19  A.  I think that is from the e-mail, right?
20  Q.  Right.
21  A.  Okay, so January --
22  Q.  So this is a model that you prepared before the quarter
23  ended April 2008 even started, right?
24  A.  The e-mail would indicate that time, yes, right.
25  Q.  Now, let's go back to page B4 of the model.  You made a

1  prediction here as to what the results would be for the quarter
2  ended April 2008, correct?  If you look at the April '08
3  column.
4  A.  Yes.
5  Q.  And what did you predict back in January of 2008, what did
6  you predict for revenues for that quarter ended April '08?
7  A.  It will be 16 billion, around $16 billion.
8  Q.  16.071, right?
9  A.  Right.
10  Q.  And what did you predict for gross margin?
11  A.  Gross margin would be 18.5 percent.
12  Q.  What did you predict for earnings per share?
13  A.  Thirty-eight cents.
14  Q.  By the way, under earnings per share on the left, it
15  indicates GAAP.  Does that mean that you were modeling a GAAP
16  number?
17  A.  This is GAAP and pro forma only.  The difference between
18  those two numbers is one-time adjustments.  If you don't have
19  any one-time adjustments, they are same.
20  Q.  Now, do you recall how your estimate plate for that quarter
21  ended April '08 as reflected in that model, how that estimate
22  compared to the actual results?
23  A.  Say that again?
24  Q.  Do you recall how accurate your model was that you did in
25  January 2008 in predicting what the results would be in that

1    April 2008 quarter?
2    A. No.
3    Q. If we could look at Government Exhibit 1803, it's your tab
4    20. It's already in evidence. Do you recognize this,
5    Mr. Goyal, as the official Dell announcement for the quarter
6    ended May 2, 2008?
7    A. Yes.
8    Q. And that's the quarter we're talking about, it ends at the
9    end of April or the beginning of May, right?
10   A. Right.
11   Q. Now, what is the revenue number that Dell actually
12   reported?
13   A. $16.077 billion.
14   Q. And your number was 16.071 billion, right?
15   A. Yes.
16   Q. Would you say that you came very, very close?
17   A. Yes.
18   Q. And that was based on legitimate modeling, right?
19   A. Yes.
20   Q. Now, what's the gross margin that Dell reported for that
21   quarter?
22   A. 18.4 percent.
23   Q. And what did you predict?
24   A. I don't --
25   Q. Well, you can look at your tab 19, page B4. What was your

1    prediction?
2    A. 18.5 percent.
3    Q. And what was the EPS that they actually reported?
4    A. Thirty-eight cents.
5    Q. And what did you predict back in January of 2008?
6    A. Thirty-eight cents.
7    Q. You're a good modeler, aren't you, Mr. Goyal?
8    A. It would indicate so.
9    Q. You had a reputation, didn't you, for being especially
10   proficient, especially expert in Dell and Dell modeling, didn't
11   you?
12   A. I'm not sure how to answer that.
13   Q. Let's look at Defense Exhibit 8779. It's your tab 21. Is
14   this an e-mail between you and Mr. Tortora on the subject of
15   Dell on May 22, 2008, in May and June, an e-mail chain?
16   A. Yes.
17          MR. FISHBEIN: Defense offers Exhibit 8779.
18          MR. TARLOWE: No objection.
19          THE COURT: Defendant's Exhibit 8779 is received.
20   Q. Mr. Goyal, if you look at the e-mail in the middle of the
21   first page, it's from Jesse Tortora to you copied to Todd
22   Newman May 22, 2008. Do you see that?
23   A. Yes.
24   Q. And did you understand that Mr. Tortora was asking you to
25   provide some analysis on Dell for a friend of his?

1    A. Yes.
2    Q. When you responded in June of 2008 you copied the friend,
3    right?
4    A. Right.
5    Q. Sarah Chandler, is that right?
6    A. Yes.
7    Q. Do you know Sarah Chandler?
8    A. No.
9    Q. So you understood this just to be a friendly request, can
10   you find me some information, right?
11   A. Yeah. Then Jesse asked to provide that information that
12   his friend was asking for.
13   Q. This information did not come from Rob Ray, did it?
14   A. Yeah. The information she was asking for was very
15   different than is normally reported in financial results.
16   Q. So this was not information that you got from Rob Ray,
17   right?
18   A. True.
19   Q. In fact, you weren't able to find some of the information
20   but what you could find you gave back to Mr. Tortora, right?
21   A. Excuse me?
22   Q. Were you able to find all of the specific information Mr.
23   Tortora was asking for?
24   A. No.
25   Q. Now, if you look at the middle e-mail, Mr. Tortora wrote to

1    you, copied to Todd Newman, "Hi, Sandy. Hoping you could help
2    as you're the best on Dell." Do you see that?
3    A. Yes.
4    Q. And "best on Dell" refers to your expertise on Dell, right?
5    A. He meant expertise on modeling -- I don't know, yeah,
6    something like that.
7    Q. Because you had worked at Dell, right?
8    A. Yes.
9    Q. And you had studied Dell as an analyst for several years,
10   right?
11   A. Yes.
12   Q. And you were good at modeling Dell?
13   A. I don't understand -- I don't know exactly what the best,
14   but it was in overall terms like that, like, in terms of
15   modeling and all that, I'm good at it, yes.
16   Q. But you would agree that you have valuable experience and
17   expertise in analyzing Dell's results, right?
18   A. True.
19   Q. I want to direct your attention now to this quarter we
20   talked about before, the one ending May 2, 2008 reported on
21   May 29, 2008. Are you with me?
22   A. Which?
23   Q. The quarter, if you'd like, I think there's a chart, and
24   we'll be going through some of the -- feel free to refer to
25   this chart. It's Government Exhibit 90 that has the quarter

1  dates.  I want to direct you to the quarter ended May 2, 2008
2  where the earnings report was on May 29, 2008.  Are you with
3  me?
4  A.  Yes.
5  Q.  Do you recall what the information was that Rob Ray --
6  strike that.  Do you recall what the information was that you
7  say Rob Ray gave you that quarter?
8  A.  No.
9  Q.  Do you recall that the information you say you got was that
10  gross margin would be higher than street estimates?
11  A.  I don't recall what he gave me.
12  Q.  If you look in your 3500 binder, that separate binder under
13  tab 43, and I'm going to ask you to read something to yourself.
14  A.  Tab -- which one?
15  Q.  43.  And you can look at the first page of the document on
16  the upper left just so you can see what it is.  And then if you
17  turn to paragraph 7 on page 3 --
18  A.  Okay.
19  Q.  You have paragraph 7 on page 3?
20  A.  Yes, I have.
21  Q.  And three lines from the bottom, just read that to
22  yourself.
23       (Pause)
24  Q.  Have you read that?
25  A.  Yes.

1  Q.  Does that refresh your memory that the information you say
2  you got from Rob Ray was that Dell's gross margin would exceed
3  market expectations that quarter?
4  A.  No, it doesn't.
5  Q.  You upgraded Dell in your own report on May 11, 2008.  Do
6  you recall that?
7  A.  I wasn't the senior analyst.  I was the associate, so it
8  would only be my boss.
9  Q.  You and Mr. Abbasi would write research reports within
10  Neuberger Berman?
11  A.  Yes.
12  Q.  In a way you were like a sell side operation but just for
13  Neuberger Berman, right?  Strike that.
14  A.  Yes.
15  Q.  You and Mr. Abbasi would write research reports commenting
16  on certain stocks, right?
17  A.  Right.
18  Q.  Those would be read by portfolio managers and others within
19  Neuberger Berman, correct?
20  A.  Right.
21  Q.  From time to time you would upgrade Dell, meaning you would
22  change your rating on Dell, right?
23  A.  Yes.
24  Q.  And upgrade means to change a rating from neutral to buy,
25  right?

1  A.  Or from sell to neutral.
2  Q.  Do you recall you upgraded Dell on May 11, 2008?
3  A.  I don't recall that, but I think it happened.
4  Q.  You can turn to Defense Exhibit 208, it's tab 22 in your
5  binder.
6  A.  Yes.
7       MR. FISHBEIN: Defense offers Exhibit 208.
8       MR. TARLOWE: No objection.
9       THE COURT: Defense 208 is received.
10       (Defendant's Exhibit 208 received in evidence)
11  Q.  Mr. Goyal, is this your upgrade report -- strike that.  Is
12  this the upgrade report that you and Mr. Abbasi worked on
13  for Dell?
14  A.  Yes.
15  Q.  It's dated May 11, 2008, correct?
16  A.  Yes.
17  Q.  It was sent around at 5:57 p.m., right?
18  A.  Yes.
19  Q.  Now, if you look at the summary and investment conclusion,
20  are you with me there?
21  A.  I am.
22  Q.  First you say, "We are upgrading shares of Dell to a buy
23  from neutral."  Do you see that?
24  A.  Yes.
25  Q.  That means before it was a neutral, meaning you didn't have

1  a view one way or the other as to whether to buy the stock,
2  right?
3  A.  Yes.
4  Q.  Now it's being upgraded to a buy meaning you're telling
5  people at Neuberger Berman this is a stock to buy, correct?
6       MR. TARLOWE: Objection to form.  The "you"?
7  Q.  I'll rephrase.  What did you understand the sentence,
8  quote, "We are upgrading shares of Dell to a buy from neutral,"
9  what did you understand that to mean?
10  A.  We are recommending to buy, buy that stock.
11  Q.  The previous status before this upgrade was neutral,
12  correct?
13  A.  Yes.
14  Q.  What does neutral mean?
15  A.  Neutral meaning we don't have a view one way to either buy
16  or sell.
17  Q.  If you look at the next paragraph, it says, "We had
18  dinner," right?
19  A.  Yes.
20  Q.  That paragraph refers to information that you got from the
21  chief financial officer of Dell, is that correct?
22  A.  Just want to explain.  So the we, just normally, normal
23  people write, even if a single person is writing, they write
24  we, so it doesn't mean we both.
25  Q.  Did you review this upgrade before it went out?

UNITED STATES OF AMERICA, v
TODD NEWMAN,

November 26, 2012

1  A. Fayad is my boss, so he would a lot of times he sent these
2  out, so he would just send me his note, and I'll send it out.
3  Q. But you actually sent it out?
4  A. Again, it would say Sandy write this, so I would write it
5  and send it out.
6  Q. All right, but was it important to read reports that were
7  issued under Mr. Abbasi's name and your names?
8  A. Sometimes. If we're under a time crunch, he's the final on
9  it. He would do it, I would send it out.
10 Q. Typically, however, wouldn't you at least read the report
11 before it went out?
12 A. Like some parts it would be, normally the top two
13 paragraphs would be by him and again I won't say that a
14 majority of times I read it or not, so sometimes -- that's
15 final anyway.
16 Q. How about the paragraphs on the top in that report, is it
17 yours?
18 A. Normally it is, these would be at the end of the quarter.
19 The complete reports in the quarter. What would happen is
20 details and analysis would contain all the numbers, I would
21 write that part, Sandy to final, and then he would write on the
22 report he had a meeting and he would send it out.
23 Q. But you had some familiarity with these reports even if you
24 didn't draft the whole thing, is that right?
25 A. I had some familiarity.

1  Q. So if you look at the paragraph that says, "We had dinner
2  with the CFO," do you see that?
3  A. Yes.
4  Q. Do you understand that to be relating certain information
5  that Mr. Abbasi got from Dell's chief financial officer?
6  A. Yes.
7  Q. And do you recall that the information he was relating was
8  that Dell was ahead of their plan on certain cost cutting?
9  A. Right.
10 Q. Specifically, what is reported here is that Dell was
11 running three times to 3.5 times ahead of expectations of a
12 1,000 person head count reduction, do you see that?
13 A. Right.
14 Q. Do you recall that at this time Dell was telling analysts
15 that they were going to reduce costs?
16 A. I think at the end of the previous quarter, which was
17 January quarter, they had mentioned that they do plan to
18 implement some cost cutting measures.
19 Q. Cost cutting is relevant to operating expense, right?
20 A. Right.
21 Q. And that's a key driver of earnings, right?
22 A. That is one of the drivers of earnings, yes.
23 Q. So analysts pay attention to cost cutting, right?
24 A. Yes, they do.
25 Q. And Dell at the end of the last quarter said it was going

1  to cut costs including through head count reduction, right?
2  A. I think so.
3  Q. What Mr. Abbasi learned from the Dell chief financial
4  officer and what's reported here is that they were ahead of
5  plan on their cost cutting, is that right?
6  A. It's right.
7  Q. Now, if you look at Defense Exhibit 194, that's your tab
8  23, do you recognize that as a note by Mr. Abbasi of his
9  meeting with the Dell CFO?
10 A. Yes.
11        MR. FISHBEIN: Defense offers Exhibit 194.
12        MR. TARLOWE: No objection.
13 Q. And you'll see there, Mr. Abbasi --
14        THE COURT: Wait one second. Let's have a sidebar.
15        MR. FISHBEIN: I'm going to ask another foundation
16 question if you'd like, your Honor.
17        THE COURT: No, that's all right.
18        (Continued next page)
19
20
21
22
23
24
25

1        (At the side bar)
2        THE COURT: I'm not sure what I'm missing, but why is
3  this not hearsay?
4        MR. FISHBEIN: It's being offered to show the nature
5  of the information that Mr. Goyal had available to him at the
6  time, whether true or not. In other words, we don't, we're not
7  interested in the truth of how many heads they cut, what their
8  head count was. It was just that Mr. Goyal had information
9  available to him about these head count reductions and you'll
10 see as it develops that that was very important to him. It's
11 not coming from Rob Ray. It's coming from an authorized source
12 and it was a very important part of his upgrade, so I think it
13 shows what type of information was important to him at the time
14 and where he's getting it from.
15        MR. TARLOWE: Though I think the where he's getting it
16 from, that part is hearsay.
17        THE COURT: That's what I keep going back to. If
18 he's -- I'm not sure why we need this exhibit, I'm not sure we
19 need a lot of these exhibits.
20        MR. FISHBEIN: Honestly, your Honor --
21        THE COURT: But nobody is objecting to anything so I
22 don't want to overdo it. We're moving at a snail's pace.
23        MR. FISHBEIN: I'm going to spend two seconds on it.
24        THE COURT: Why do you need that he had access to --
25        MR. FISHBEIN: Actually, it's in the other exhibits.

# A-939

1   If you want I can move on.
2          THE COURT: Let's move on. I'm concerned it's almost
3   December.
4          MR. FISHBEIN: I'm not much longer here.
5          (Continued on next page)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          (In open court; jury present)
2   BY MR. FISHBEIN:
3   Q.  Mr. Goyal, if we could look now at tab 24, this is Defense
4   Exhibit, I believe this is correlating with Defense Exhibit AA,
5   excuse me, 2607-AA, which is an excerpt from 2607 already in
6   evidence.  Do you see that?  It's your tab 24.
7   A.  You're not talking about Defense Exhibit 194, you're
8   talking about other one, right?
9   Q.  This should be your tab 24.
10  A.  Okay.
11  Q.  Do you see it, phone records?  Do you see I think it's
12  paper clipped to your tab.
13         THE COURT: Tab 24.
14  A.  Yes, yes, I'm sorry.
15  Q.  Here.
16  A.  All right.
17         MR. FISHBEIN: And your Honor, this is an excerpt of
18  what's already in evidence.  To the extent we're offering the
19  excerpts we would offer it as an --
20         THE COURT: I think there's nothing wrong with it.
21  The excerpts are more pinpointed.  No objection right?
22         MR. TARLOWE: No.
23         THE COURT: So Defense Exhibit 2607AA is received.
24         (Defendant's Exhibit 2607AA received in evidence)
25  Q.  Mr. Goyal, these are records of your phone, right?  That's

1   the 415-736-2210 number, right?
2   A.  Correct.
3   Q.  If you look at May 12, 2008 at 7:57 a.m. there's a call,
4   right?  It just says 5/12/08, and that's to an 813 number,
5   correct?
6   A.  Yes.
7   Q.  That's the number you previously said was Mr. Ray's number,
8   right?
9   A.  Correct.
10  Q.  The parties stipulated this is Greenwich mean time, so
11  7:57 a.m. on the 12th is 8:57 p.m. on May 11, 2008.  Does this
12  reflect that you spoke to Rob Ray for 31 minutes at 8:57 p.m.
13  on May 11, 2008?
14  A.  Yes.
15  Q.  Now, we saw before with Exhibit 208, and you can go back to
16  your tab 22, that you issued your upgrade on May 11, 2008 at
17  5:57 p.m., right?
18  A.  Right.
19  Q.  So that's three hours before speaking to Mr. Ray, correct?
20  A.  Correct.
21  Q.  Now, did you tell Mr. Abbasi don't issue the upgrade
22  because I'm going to call Rob Ray?
23  A.  No.
24  Q.  You issued the upgrade before speaking to him, right?
25  A.  Yes.

1   Q.  And what was important to you at Neuberger Berman in doing
2   this upgrade was the information you received from the chief
3   financial officer about head count reduction, right?
4   A.  Again, it was because Fayad that did the upgrade.  It's not
5   me who did the upgrade.  He did it based on information he
6   received from CFO, yes.
7   Q.  By the way, are you aware that Michael Dell, the chief
8   executive officer of Dell, gave an interview on or about
9   May 28, 2008, the day before Dell announced its results?
10  A.  I'm not sure if I recall that.
11  Q.  You could look at your tab 25.  It's Defense Exhibit 8222
12  already in evidence.  Do you recall knowing at the time
13  that Michael Dell gave this interview?
14  A.  I would have.  I don't recall seeing this.
15  Q.  In your experience having worked at Dell, and having
16  studied Dell, was it unusual for Michael Dell to give public
17  comments shortly before the earnings release?
18  A.  Normally it's unusual for anybody in any company to do
19  that.
20  Q.  I want to direct your attention now to the quarter ended
21  August 1, 2008 that was reported August 28th.  Are you with me?
22  A.  Okay.
23  Q.  And if you could look at Government Exhibit 223 already in
24  evidence, it's your tab 26.  Am I right, Mr. Goyal, that this
25  is an e-mail exchange between you and Jesse Tortora on

# A-940

1   August 15, 2008?
2   A. Yes.
3   Q. If you look at the bottom e-mail, Mr. Tortora writes to you
4   at 10:44 a.m., quote, "Would you want to do late lunch? I can
5   meet you at 2:00 p.m. somewhere on 3rd. Let me know," end
6   quote. Do you see that?
7   A. Yes, I do.
8   Q. Whose idea was having lunch that day?
9   A. I don't recall, seems from the e-mail it's Jessie.
10  Q. Was there a conversation prior to this e-mail where you
11  suggested you have lunch?
12  A. I may have.
13  Q. But looking at this e-mail, it's your recollection that he
14  proposed it?
15  A. I don't have any recollection one way or the other that he
16  proposed it.
17  Q. Do you see there's a reference to meeting on August 15 for
18  lunch?
19  A. Yes.
20  Q. Do you recall whether you met him for lunch that day?
21  A. Yes.
22  Q. Do you recall any specific purpose for this meeting?
23  A. I don't.
24  Q. It doesn't stand out in your mind?
25  A. No.

1   Q. If you could look at Government Exhibit 713 already in
2   evidence, it's your tab 32. Mr. Tarlowe asked you some
3   questions about this and I believe you said this is an e-mail
4   that you sent to some of your colleagues at Neuberger Berman,
5   is that correct?
6   A. Right.
7   Q. And this is, if you're looking at Government Exhibit 713,
8   the top e-mail is February 25, 2008, right?
9   A. Yes.
10  Q. And then that forwards an earlier e-mail dated February 19,
11  is that correct?
12  A. True.
13  Q. And I believe you testified that this included information
14  from Rob Ray, is that right?
15  A. Yes.
16  Q. Now, if you look at the top e-mail on 7/13, the one dated
17  February 25th, and look four bullet points down, do you see
18  that?
19  A. Yes.
20  Q. It says, "Server/storage was weak. Moving away from EMC."
21  Do you see that?
22  A. Yes.
23  Q. And below that it says, "Asia was very strong, margins
24  strong too." Do you see that?
25  A. Yes.

1   Q. So am I right that this includes certain segment
2   information from Dell?
3   A. Yes.
4   Q. Isn't it correct, Mr. Goyal, that that information did not
5   come from Rob Ray?
6   A. Actually, it could have come from him.
7   Q. I thought you said that he was in investor relations at
8   this time, right?
9   A. Yes.
10  Q. And this is that same time where you had friends that were
11  working in various business segments at Dell, correct?
12  A. Yes.
13  Q. So looking at this, can you be sure that this information
14  did not come from your other friends that were involved in
15  Dell's business segments?
16  A. Most probably it is from Rob. The reason being he was in
17  investor relations and they have a view not only to the
18  consolidated results but also the results that are reported,
19  because the results are reported at product level as well as a
20  geographic level and they make presentation. Because none of
21  my friends would have, other people would have information
22  about Asia, so I think he was the only one.
23  Q. If you look at the bottom e-mail dated February 19?
24  A. Okay.
25  Q. Do you see it says, "I recently got some data points from

1   my Dell contacts." Do you see that?
2   A. Yes.
3   Q. And contacts has an S, right?
4   A. Yes.
5   Q. So you meant that as plural, is that correct?
6   A. I don't -- I don't know, because I could have just said
7   that as contacts instead of one contact.
8       (Continued next page)

1 Q. If you look on that e-mail, dated February 19, four bullet
2 points down it says: Revenue in U.S. business segment grew
3 around 1 to 2 percent.
4      Do you see that?
5 A. I do.
6 Q. Then below that it says: Revenue in U.S. consumer business
7 grew substantially.
8      Do you see that?
9 A. Yes.
10 Q. And U.S. consumer was where you had a friend who you spoke
11 to, right?
12 A. Correct.
13 Q. Looking at this, is it impossible that you got some of this
14 information from your friend?
15 A. It is possible. The only thing is, again, I'm seeing there
16 is a comment about Asia and none of my friends except Rob, they
17 have any information regarding Asia and U.S. business and
18 consumer, again, because he was in IR and he would have some
19 insight into what they were representing. So he might have
20 some insight there.
21 Q. Mr. Goyal, looking at these e-mails today, you cannot be
22 sure that this information came 100 percent from Rob Ray, isn't
23 that a fact?
24 A. Which information are we talking about?
25 Q. The U.S. business segment growth, the U.S. consumer

1 business, the server storage, the ones that I pointed out to
2 you.
3 A. These three most probably came from him, but you can see --
4 server, I don't think anybody else had this thing. So U.S.
5 business and consumer are the only ones, so there can be no
6 doubt. The other place nobody else had that information.
7 Q. As you sit here now you can't be 100 percent sure?
8 A. For these two, right.
9 Q. Now, the people that you sent this e-mail to included
10 Mr. Brendan Smith, right?
11 A. Yes.
12 Q. Mr. Dan Niles and Mr. Dan Fletcher, correct?
13 A. Correct.
14 Q. You said previously who they were, right?
15 A. Right.
16 Q. You didn't know those people very well, did you?
17 A. Not that well. I talked to Fletcher a few times. Niles I
18 don't think. Brendan Smith, maybe two, three times.
19 Q. When you wrote these e-mails and you sent these e-mails to
20 them, you were not intending to convey to them that you would
21 obtain this information improperly, were you?
22 A. I don't catch your point.
23 Q. When you wrote these e-mails that were sent to Mr. Smith,
24 Mr. Niles, and Mr. Fletcher, you did not intend to convey to
25 them that you had gotten this information improperly, did you?

1 A. I'm not sure if I was thinking whether I got it properly or
2 improperly. I just got this information and conveyed it to
3 them.
4 Q. You weren't trying to signal to them that it was obtained
5 improperly, were you?
6 A. I wasn't trying to signal anything else. I wasn't trying
7 to signal that it was obtained improperly.
8 Q. In fact, you wrote it in a way that would look like normal
9 research so as not to raise suspicion, right?
10 A. I'm not sure if this kind of information would be normal
11 research.
12 Q. But you didn't write it in a way where you thought that
13 they would be concerned about it, right?
14      MR. TARLOWE: Objection.
15      THE COURT: Sustained.
16 Q. Weren't you concerned, Mr. Goyal, that if you wrote
17 something that was obviously improper you could get in trouble
18 at Neuberger Berman?
19 A. I'm not sure if I thought about that because obviously I'm
20 writing these e-mails. I am not sure what I thought.
21 Q. If you could now look at Government Exhibit 747. It's tab
22 36.
23      Does that reflect an e-mail between you and Mr. Abbasi
24 forwarding your communication with Mr. Niles in August of 2008?
25 A. Yes.

1      MR. FISHBEIN: Defense offers Government Exhibit 747.
2      THE COURT: Any objection?
3      MR. TARLOWE: I'm sorry, your Honor. Just give me one
4 moment.
5      No objection.
6      THE COURT: Government Exhibit 747 is received.
7      (Government's Exhibit 747 received in evidence)
8 Q. Mr. Goyal, does this reflect that you spoke to Dan Niles
9 about Dell on or about August 22, 2008?
10 A. I am not sure. I think I received this e-mail and
11 forwarded that. Most probably I did speak to him. I don't
12 remember better.
13 Q. Do you remember what information you may have given him?
14      MR. TARLOWE: Objection.
15      THE COURT: Do you remember what information, if any,
16 you gave him?
17      THE WITNESS: I don't even remember talking to him, so
18 I don't remember giving any or what information to him.
19 Q. Do you recall whether, when you gave Dell-related
20 information to Mr. Niles, it was different or the same as what
21 you gave to Mr. Tortora?
22      MR. TARLOWE: Objection.
23      THE COURT: Overruled. If you can answer it, if you
24 know.
25 A. I don't remember talking to Mr. Dan. The only thing I

1   remember is through the e-mails that I sent him.
2  Q. Do you know one way or the other as to whether Mr. Niles
3   took a trading position with Dell in August of 2008?
4  A. I do not, no.
5      MR. FISHBEIN: Your Honor, I would like to read from a
6   stipulation at this point. The parties have stipulated that
7   Government Exhibit 2501, which is already in evidence, includes
8   various trading records from Diamondback Capital, Level Global,
9   Neuberger Berman, and Whittier Trust, and it goes on. And then
10  it says:
11      The Neuberger Berman trading records that are in
12   Government Exhibit 2501 are divided as follows: Government
13   Exhibit 2501-NA contains all Dell common stock trades in
14   Neuberger Berman's Satori Technology MA fund referenced in the
15   Neuberger trade records in Government Exhibit 2501. Government
16   Exhibit 2501-NAO contains Dell options trades referenced in the
17   Neuberger Berman's Satori technology MA fund referenced in the
18   Neuberger trade records in Government Exhibit 2501. It is
19   further stipulated that Dan Niles was the portfolio manager of
20   Satori Technology MA fund at Neuberger, and the defense will
21   offer Government Exhibit 2501NA which, as I said, is an excerpt
22   of the overall trading records that are in evidence.
23      THE COURT: All right.
24  Q. Mr. Goyal, if you could look at tab 37. That's what we
25   have stipulated are the trading records of the fund that

1   Mr. Niles worked on.
2  A. Okay.
3  Q. Do you see on August 26 there is a transaction in Dell?
4  A. Okay, yes.
5  Q. Do you understand that Mr. Niles bought 154,000 in Dell
6   shares at the end of August 2008?
7  A. Yes.
8  Q. So that's a long position at Dell, correct?
9  A. Yes.
10  Q. That was on August 26, 2008, correct?
11  A. Correct.
12  Q. And the e-mail from Mr. Niles to you about the phone call
13   was August 22, correct?
14  A. I think so.
15  Q. Did anybody at Dell ever try to limit your access to
16   speaking with Dell investor relations?
17  A. I don't think so.
18  Q. So nobody at Dell ever called you up and said, we don't
19   want you to speak to Dell investor relations?
20  A. I don't think so.
21  Q. Did anybody at Dell ever take any action, to your
22   knowledge, to limit or restrict your access to anybody at Dell,
23   whether they were in investor relations or not?
24  A. I don't think anybody did anything especially for me.
25  Q. Mr. Goyal, I am going to show you what's been marked as

1   Defense Exhibit 8679.
2      Do you recognize that as an e-mail from your wife to
3   you, February 19, 2008?
4  A. Yes.
5  Q. And it attaches her résumé, is that correct?
6  A. Right.
7  Q. Now, we were talking before about whether your wife did
8   consulting for Prudential.
9      Do you remember that?
10  A. Right.
11  Q. And if you look at the second page, I'll ask you whether
12   that refreshes your memory concerning my consulting that your
13   wife did for Prudential.
14  A. Correct.
15      MR. FISHBEIN: The defense offers Exhibit 8679.
16      THE COURT: Any objection?
17      MR. TARLOWE: Yes, your Honor. Hearsay.
18      MR. FISHBEIN: It goes to this witness' understanding,
19   your Honor.
20      THE COURT: Are you offering what's on the résumé for
21   the truth of it?
22      MR. FISHBEIN: Let me ask a few questions without
23   offering it.
24  Q. Mr. Goyal, isn't it a fact that your wife, Ruchi, did do
25   research for Prudential between January and April 2007?

1  A. I think it's the same thing I said earlier. It was a class
2   project where they had do the survey for the upcoming iPhones.
3   She did that survey. So that was it. So I think that's the
4   project we are talking about here.
5  Q. You're aware that she listed it on her résumé, right?
6  A. Yes.
7  Q. You don't believe that she was deceptive in her résumé,
8   right?
9  A. I think she may have like sent it to Jesse, the final
10   results. So class project means it's whatever is there, she
11   did it. And if it presented to Jesse, then she did it for
12   Prudential integral. So that's it.
13  Q. When this project was provided to Jesse Tortora, he was
14   working at Prudential, right?
15  A. Yes.
16  Q. Related to one of the companies that Mr. Tortora covered,
17   which was Apple, right?
18  A. Correct.
19  Q. Do you know if your wife got paid for this consulting?
20  A. I don't think so.
21  Q. Do you know one way or the other?
22  A. My recollection, no.
23  Q. But you do recall that she listed it as a consulting
24   project on her résumé?
25  A. Yes, she did.

# A-943

1  Q. You were first approached by the FBI in this case at the
2   end of July 2011, correct?
3  A. I just want to say, it's student consulting, just to
4   clarify.
5  Q. I was asking you about when you were first approached by
6   the FBI. Do you recall that was in late July of 2011?
7  A. Yes.
8  Q. You were at a train station, correct?
9  A. Correct.
10  Q. And two agents approached you, right?
11  A. Yes.
12  Q. That was Agent Makol, right?
13  A. Yes.
14  Q. And Agent Hinkle?
15  A. Yes.
16  Q. He's in the courtroom -- he's not in the courtroom.
17      These two FBI agents approached and said they wanted
18   your cooperation, right?
19  A. I'm not sure exactly they said to me.
20  Q. At some point they told you they wanted you to cooperate in
21   the investigation, is that correct?
22  A. I believe so.
23  Q. And they had some personal information about you, didn't
24   they?
25  A. Yes.

1  Q. And that was kind of scary to you, wasn't it?
2  A. I'm not sure scary or not, but there was some personal
3   information they had.
4  Q. Do you recall that they told you that if you cooperated you
5   might get probation?
6  A. I don't know if they used the word probation or not.
7  Q. Do you recall -- you took notes, correct?
8  A. Correct.
9  Q. And do you recall that they said something from which you
10   concluded that you might get nothing in terms of the prison
11   term?
12  A. Correct. That was my understanding.
13  Q. Your understanding was that if you cooperated you might get
14   no prison at all?
15  A. Might get, yes.
16  Q. Now, they mentioned your wife when they approached you,
17   right?
18  A. Yes.
19  Q. And that was a concern to you, wasn't it?
20  A. They mentioned that they know she is not involved.
21  Q. Did they ask you whether she was at home?
22  A. Yes.
23  Q. Now, at first you told the FBI agents that you hadn't done
24   anything wrong, right?
25  A. I do not remember saying that.

1  Q. Do you remember them getting very angry at you?
2  A. Yes.
3  Q. How did they show that they were angry at you?
4  A. They were just starting -- I remember they -- I don't
5   remember exactly, but I do remember that's one of the things,
6   they got angry at me, and basically I said I'll need to talk to
7   a lawyer.
8  Q. What did they say, though, that made you believe that they
9   were angry?
10  A. I think they said, you are lying.
11  Q. They said that forcefully, right?
12  A. I think so.
13  Q. Ultimately, you decided to cooperate, didn't you?
14  A. I talked to my lawyers and I decided to cooperate.
15  Q. Now, when you decided to cooperate you understood that you
16   had submitted false instructions to Diamondback, right?
17  A. Yes.
18  Q. In other words, these payments that you got from
19   Diamondback, you understood that you had written out and
20   submitted invoices for that that were fake, right?
21  A. Okay.
22  Q. Did you understand that?
23  A. Yes.
24  Q. And you understood that that's a crime, right?
25  A. I am not sure like what kind of crime. I understood, but I

1   knew they were not true.
2  Q. And at the time that you decided to cooperate you also
3   understood that you had potential tax problems, right?
4  A. I decided -- are we talking about July?
5  Q. Whenever you decided to cooperate.
6  A. At that time I didn't realize that.
7  Q. But you knew at that time that you had taken improper
8   deductions on your tax returns, right?
9  A. I knew, but I don't think they were like on the top of my
10   mind or they were even -- so much was going on, I don't even
11   think that was a topic for me.
12  Q. Just so we are clear, the amount of the improper deductions
13   that you took was $17,000 in 2007?
14  A. Yes.
15  Q. 75,000 in 2008, right?
16  A. Maybe. I am not sure.
17  Q. And $100,000 in 2009, right?
18  A. I'm not sure about those amounts.
19  Q. Do you recall that in 2008 and 2009 it was the same amount
20   as the consulting payments you got from Diamondback?
21  A. Yeah, okay.
22  Q. Is that right?
23  A. Right.
24  Q. In other words, you got this additional income from
25   Diamondback and you offset it with fake deductions in 2008 and

1   2009, right?
2   A. I don't think I totally offset them with deductions. They
3     were not fully offset.
4   Q. Was it around the amount of the payments from Diamondback?
5   A. No. It was way less than that. That's what I think.
6   Q. Now, you understood when the FBI approached you that your
7     wife, Ruchi, that she had signed these invoices to Diamondback,
8     right?
9   A. I knew? I didn't.
10  Q. Who signed the invoices that were sent to Diamondback for
11    payments you received?
12  A. Ruchi, my wife, did.
13  Q. And the money went into a joint account?
14  A. Correct.
15  Q. And your tax returns are joint returns, correct?
16  A. Correct.
17  Q. Were you concerned that your wife might have some exposure
18    here as well?
19  A. Again, for some reason that didn't arise in my mind at all
20    for quite some time.
21  Q. Now, when you made the agreement with the government you
22    ultimately agreed to plead guilty, right?
23  A. Yes.
24  Q. And the crime that you pleaded guilty to was securities
25    fraud, right?

1   A. Right.
2   Q. You did not plead guilty to tax fraud, right?
3   A. Right.
4   Q. And you did not plead guilty to obtaining money from
5     Diamondback for submitting false invoices, right?
6   A. Right.
7   Q. And your wife, Ruchi, she didn't agree to plead guilty to
8     anything, right?
9   A. True.
10  Q. And she has not been charged with anything, correct?
11  A. Correct.
12  Q. Now, the government also told you that if you cooperate you
13    can get lenient treatment in any penalty you face, right?
14  A. I could.
15  Q. I think you testified on direct about a 5K letter, is that
16    right?
17  A. Yes.
18  Q. And you understand that based on your cooperation the
19    prosecutors may write a letter to the judge about your
20    cooperation, right?
21  A. Right.
22  Q. And you understand that in order to get that letter you
23    have to provide substantial assistance in their investigation
24    or prosecution, right?
25  A. Right.

1   Q. You also understand the decision as to whether you provide
2     substantial assistance is made by the prosecutor, right?
3   A. I am not sure. I know it's part of the government. I
4     don't know exactly who in the government.
5   Q. If you could look at, in your 3500 binder, tab 2.
6         Do you have that?
7   A. Yes.
8   Q. Is that your plea agreement?
9   A. I think so.
10  Q. If you look at page 3, second full paragraph.
11  A. Okay.
12  Q. The sentence in the middle that says, in addition.
13        Do you see that?
14  A. Yes.
15  Q. If we read that, does that refresh your memory that it's
16    the government, the prosecutor, that decides whether you have
17    provided substantial assistance?
18  A. Yes. I mean, I knew this office, but I am not exactly sure
19    who within the office. It's the U.S. Government.
20  Q. It is the government that decides, correct?
21  A. Yes.
22  Q. You have not been sentenced yet, correct?
23  A. Correct.
24  Q. There has been no determination of any prison term, fine,
25    anything else?

1   A. Correct.
2   Q. You said you're not a U.S. citizen, right?
3   A. Correct.
4   Q. Nor is your wife, correct?
5   A. Correct.
6   Q. There is potential deportation issues as well, correct?
7   A. Correct.
8   Q. There has not anything regarding that, either, correct?
9   A. True.
10  Q. You did not leave your job at Neuberger Berman until
11    January 2012, is that correct?
12  A. Correct.
13  Q. That was about six months after you were first approached
14    by the FBI, right?
15  A. Right.
16  Q. And it was about two months after you went to court and
17    pleaded guilty to securities fraud, is that right?
18  A. Right.
19  Q. The guilty plea in court was under seal, wasn't it?
20  A. Yes.
21  Q. That means that the proceedings were secret and not public,
22    correct?
23  A. Correct.
24  Q. Whose decision was it to make that secret?
25  A. I think it was the government's decision.

UNITED STATES OF AMERICA, v
TODD NEWMAN,                                                                November 26, 2012

1  Q. You did not tell Neuberger Berman that you had been
2  approached by the government, did you?
3  A. No.
4  Q. You did not tell Neuberger Berman that you had entered a
5  guilty plea in court, correct?
6  A. Correct.
7  Q. You did not tell Neuberger Berman that you had sent false
8  invoices to Diamondback, right?
9  A. Right.
10  Q. And you did not tell Neuberger Berman that you had claimed
11  false deductions on your tax returns, right?
12  A. Right.
13  Q. You just went right on working at Neuberger Berman as if
14  nothing had happened, is that it?
15  A. Correct.
16  Q. You continued to do research, right?
17  A. Yes.
18  Q. You continued to give advice to Neuberger Berman traders,
19  right?
20  A. Whatever I was doing, portfolio managers and others, yes.
21  Q. You understood these portfolio managers managed stock for
22  investors, right?
23  A. Right.
24  Q. They were making decisions as to what stocks to buy and
25  sell based on your advice, right?

1  A. Correct.
2  Q. You continued to issue these reports even after you were
3  approached by the government and pled guilty, right?
4       MR. TARLOWE: Objection.
5       THE COURT: Overruled.
6  A. Yes.
7  Q. On December 2, 2011, Neuberger Berman announced publicly
8  that Mr. Abbasi was placed on leave, correct?
9  A. Correct.
10  Q. And so you knew at that point that Neuberger -- did you
11  have an understanding why he was placed on leave?
12  A. I think there was an article in Wall Street Journal about
13  him being involved in insider trading.
14  Q. In this case, right?
15  A. Correct.
16  Q. So you understood that Neuberger Berman did not want people
17  working there that were involved in insider trading, right?
18  A. I am not sure exactly, but at some point there were other
19  issues as well, but generally you are correct.
20  Q. You understand that Neuberger Berman is a regulated
21  business, right?
22  A. Right.
23  Q. They are regulated by the SEC, right?
24  A. Right.
25  Q. You understood that they would want to know if you pled

1  guilty to securities fraud, right?
2  A. I am not sure what they would want to know and what they
3  would not.
4  Q. You thought that Neuberger Berman would be okay with
5  employing somebody that pled guilty to securities fraud?
6  A. I don't think they would be okay.
7  Q. So you deceived them, right?
8  A. Again, I was cooperating with the government. This
9  cooperation was under seal, supposed to be secret. I was not
10  supposed to tell anybody about this.
11  Q. The government didn't want you to tell, right?
12  A. Right.
13  Q. And so you lived a lie for every day for six months at
14  Neuberger Berman without telling them, right?
15       MR. TARLOWE: Objection.
16       THE COURT: Sustained.
17  Q. You went along with the government's request that you keep
18  this secret, right?
19  A. Yes.
20  Q. Even though that meant working every day at Neuberger
21  Berman without telling them, right?
22  A. Yes.
23  Q. Did you think it was wrong of you to work every day at
24  Neuberger Berman after pleading guilty without telling anyone?
25       MR. TARLOWE: Objection.

1       THE COURT: Sustained. I am not sure where all of
2  this is going. Sustained.
3       MR. FISHBEIN: Your Honor, could I have one minute to
4  confer? I think we are done.
5       THE COURT: That's fine.
6       MR. FISHBEIN: Nothing further, your Honor.
7       THE COURT: Mr. Morvillo.
8    We could take a break now or take a break after you
9  go.
10       MR. MORVILLO: Break will be fine.
11       THE COURT: We will take a break before Mr. Morvillo
12  starts, short ten-minute break. Use the restroom, take a
13  drink. We are going to go until 4:30 or so today. Not too
14  much more today.
15       All rise for the jury.
16       (Jury not present)
17       THE COURT: I had one question. Government Exhibit
18  2501NA, is that already in or did you offer that on cross?
19       MR. FISHBEIN: 2501 is an exhibit in evidence. It has
20  all those Neuberger Berman records embedded in it. This is an
21  excerpt that takes those out and presents it for just the Dell
22  trading.
23       THE COURT: You are offering it. I will then admit
24  it. So 2501-NA is in.
25       (Government's Exhibit 2501-NA received in evidence)

UNITED STATES OF AMERICA, v
TODD NEWMAN,

November 26, 2012

1     THE COURT: Anybody else we should cover now?
2     All right.  You can use the restroom and we will be
3 back in eight minutes.
4     (Recess)
5     THE COURT: Mr. Morvillo, are you ready?
6     Let's bring them in.
7     (Jury present)
8     THE COURT: We will now have cross-examination by Mr.
9 Morvillo on behalf of Mr. Chiasson.
10 CROSS-EXAMINATION
11 BY MR. MORVILLO:
12 Q.  Good afternoon, Mr. Goyal.
13 A.  Good afternoon.
14 Q.  My name is Greg Morvillo and I have the privilege of
15     representing Anthony Chiasson in this matter.
16     When I just introduced myself to you and mentioned
17 Mr. Chiasson's name, the entire time that you've been on the
18 stand, that's the first time his name is mentioned, isn't that
19 correct?
20 A.  True.
21 Q.  And we have seen dozens of exhibits on the screen, in the
22 book, and in those exhibits we did not see his name mentioned
23 either.
24     Would you agree with that?
25 A.  True.

1 Q.  A lot of names were mentioned.  Jesse Tortora, yes?
2 A.  Yes.
3 Q.  Rob Ray?
4 A.  Yes.
5 Q.  Several Neuberger Berman employees?
6 A.  Right.
7 Q.  Danny Kuo?
8 A.  Yes.
9 Q.  John Horvath?
10 A.  Right.
11 Q.  Even some Lehman Brother recruiter, right?
12 A.  Right.
13 Q.  Not Mr. Chiasson, correct?
14 A.  Correct.
15 Q.  And that's because, at least in the e-mails that you sent,
16     it's because you don't know Anthony Chiasson, isn't that right?
17 A.  That's right.
18 Q.  You have never e-mailed with him?
19 A.  No.
20 Q.  Never IM'd, instant messages, no text message, correct?
21 A.  No.
22 Q.  No telephone calls?
23 A.  No.
24 Q.  You don't follow each other on Twitter, right?
25 A.  No.

1 Q.  In fact, you and Mr. Chiasson have never been in the same
2     room until the first time you took the stand, right?
3 A.  I didn't know who he was.
4 Q.  Total strangers, right?
5 A.  Right.
6 Q.  Now, Mr. Fishbein mentioned that you pled guilty, you pled
7     guilty to two different counts, isn't that right?
8 A.  Right.
9 Q.  Conspiracy count, right?
10 A.  Right.
11 Q.  And a securities fraud count as well?
12 A.  Right.
13 Q.  As part of the guilty plea, I believe that you said that
14     you secured information you were not permitted to have and you
15     passed it on to an individual at a hedge fund.  Is that
16     accurate?
17 A.  Yes.
18 Q.  And that individual was Jesse Tortora, correct?
19 A.  Correct.
20 Q.  And the hedge fund was Diamondback, right?
21 A.  Yes.
22 Q.  It was not Level Global?
23 A.  No.
24 Q.  And it was not Anthony Chiasson?
25 A.  No.

1 Q.  And in all of the meetings that you had with the
2     government, the proffer sessions and the telephone calls, how
3     many would you say there were, sir?
4 A.  Proffer sessions, five, six, maybe.
5 Q.  And phone calls?
6 A.  I don't think there were phone calls.
7 Q.  No phone calls with the FBI?
8 A.  There were.  I don't know how many, number.
9 Q.  Would it be fair to say that in total you spoke to the FBI
10     or the United States Attorney's Office or both upwards of 10,
11     15 times?
12 A.  Yes.
13 Q.  And in none of those meetings did you suggest that you and
14     Anthony Chiasson agreed to commit a crime together, correct?
15 A.  Correct.
16 Q.  In fact, it's almost the exact opposite, because you asked
17     Mr. Tortora at one point if he was sharing this information
18     with anybody else and he said no, correct?
19 A.  Yes, something to that effect, yes.
20 Q.  And when you obtained information it was for Mr. Tortora.
21     That's who you spoke with, correct?
22 A.  Correct.
23 Q.  That's who instructed you to get information?
24 A.  I am not sure -- yes, correct.  There were times when he
25     would ask me to call my contact and get some information.

1 Q. And the other person that you spoke to was Rob Ray, right?
2 A. Correct.
3 Q. Now, as far as you know, is Rob Ray still working?
4 A. I do not know.
5 Q. You don't know if he's still working in investor relations
6    at a publicly-traded company?
7 A. I do not know.
8 Q. Now, you testified that in late 2007 Mr. Ray started to
9    give you information, correct?
10 A. Correct.
11 Q. And you told him at some point that you were using that for
12    your modeling work, right?
13 A. Right.
14 Q. To help with your analysis, right?
15 A. Right.
16 Q. You did not tell him that you were passing it to someone so
17    that they might trade on it, correct?
18 A. Correct.
19 Q. He was in the dark about that piece of information, wasn't
20    he?
21        MR. TARLOWE: Objection.
22        THE COURT: Do you know one way or the other whether
23    he was in the dark?
24        THE WITNESS: He did not know or I didn't tell him
25    that I was giving it to Jesse or somebody at the hedge fund.

1 Q. And you never shared any of the money you received from
2    Diamondback with Mr. Ray, correct?
3 A. Correct.
4 Q. Or with any other money that you had, right?
5 A. Correct.
6 Q. And the point of that was that you didn't want him to be
7    paid because then he would have suspected something was wrong,
8    right?
9 A. Right.
10 Q. And the money that you were paid, that Mr. Tortora arranged
11    for you to get paid, that was him, correct?
12 A. Excuse me?
13 Q. Mr. Tortora is the one who arranged for you to be paid by
14    Diamondback, yes?
15        MR. TARLOWE: Objection.
16        THE COURT: Sustained. Rephrase.
17 Q. Mr. Tortora is the one who approached you about being a
18    consultant for Diamondback, correct?
19 A. Correct.
20 Q. And under that consulting agreement you received payment
21    from Diamondback, correct?
22 A. Correct.
23 Q. You did not receive payment from Level Global, right?
24 A. Right.
25 Q. And did you not receive payment from Anthony Chiasson,

1    correct?
2 A. Correct.
3 Q. Now, you obtained information and then you passed it to
4    Jesse Tortora, correct?
5 A. Correct.
6 Q. And after that you don't know what happened to that
7    information from your personal knowledge, do you?
8 A. The only thing was when he mentioned that that Todd is
9    happy with your work.
10        THE COURT: Todd is happy with your work?
11        THE WITNESS: Yes.
12 Q. Let's focus on Mr. Chiasson for just a moment. You never
13    passed any information to him, correct?
14 A. Correct.
15 Q. And you have no personal knowledge about what information
16    he ever received on any company, correct?
17 A. Correct.
18 Q. You don't know anything about Level Global's trades in Dell
19    in May, July, August 2008, correct?
20 A. Correct.
21 Q. You don't know anything about their trades in any stock at
22    any time, isn't that right?
23 A. I think so.
24 Q. You don't know whether they traded Dell, correct?
25 A. Yeah. I didn't have any personal information about Level

1    Global trading Dell.
2 Q. So all you know, correct me if I'm wrong, all you know is
3    what you, Sandy Goyal, did. And as to what Anthony Chiasson
4    did or didn't do or knew or didn't know, you have no
5    information whatsoever, correct?
6        MR. TARLOWE: Objection, form.
7        THE COURT: Sustained as to form.
8 Q. You have no personal knowledge as to anything Mr. Chiasson
9    did ever in his entire life, is that right?
10 A. True.
11        MR. MORVILLO: I have no further questions, your
12    Honor.
13        THE COURT: Redirect, Mr. Tarlowe.
14        MR. TARLOWE: Yes, your Honor.
15 REDIRECT EXAMINATION
16 BY MR. TARLOWE:
17 Q. Mr. Goyal, you were asked some questions on
18    cross-examination by Mr. Fishbein about your contact with other
19    friends at Dell, excluding Rob Ray.
20       Do you recall being asked some questions about that?
21 A. Yes.
22 Q. What was more valuable, the information that you got from
23    those people or from Rob Ray?
24        MR. FISHBEIN: Objection, more valuable.
25        THE COURT: I am not sure. Sustained as to form.

# A-948

1   Rephrase.
2 Q. Whose information did you find to be more useful?
3       MR. FISHBEIN: Objection.
4       THE COURT: For your purposes, whose was more useful?
5       THE WITNESS: Rob Ray's.
6 Q. Why?
7 A. Because it was the overall consolidated information about
8   the upcoming quarterly financial results.
9 Q. If we could look at Government Exhibit 755 which you were
10   shown both in your direct and also during your
11   cross-examination.
12       Do you recall this document?
13 A. Yes.
14 Q. You testified this document contains information that you
15   got from your other friends at Dell, not Rob Ray, is that
16   correct?
17 A. Correct.
18 Q. And it contains information about different business units
19   in which those friends worked?
20 A. Correct.
21 Q. Just looking, for example, at number 1, it says: Corporate
22   bit slow.
23       You see that?
24 A. Yes.
25 Q. Number 2, it says: U.S. consumer doing good.

1       You see that?
2 A. Yes.
3 Q. Revenue growth is fine.
4 A. Correct.
5 Q. And number 4 it says: SMB is just okay, not doing good,
6   but not too bad.
7       You see that?
8 A. Yes.
9 Q. How did that information compare to information you got
10   from Rob Ray?
11       MR. FISHBEIN: Objection.
12       THE COURT: Overruled. You can answer.
13 A. This was like very general broad information about special
14   business segments; again, what I told others. It's just U.S.
15   related. And some parts of U.S. business. The information I
16   received from Rob was directly about the upcoming quarterly
17   financial results for the overall company.
18 Q. When you spoke to Rob Ray did he use numbers in your
19   conversations with him?
20 A. Numbers like?
21 Q. Did he use numbers?
22 A. I think he did in some of them, yes.
23 Q. For example, number 4 here says SMB is just okay, not doing
24   good, but not too bad.
25       When Rob Ray gave you information about the quarterly

1   financial results, did he discuss actual numbers?
2       MR. FISHBEIN: Objection. Asked and answered.
3       THE COURT: Overruled.
4       MR. FISHBEIN: And leading.
5       THE COURT: You can answer.
6 A. Yes.
7 Q. What would you rather have, numbers or that a particular
8   business segment is just okay, not doing good, but not too bad?
9       MR. FISHBEIN: Objection. Argumentative.
10       THE COURT: Overruled. You can answer.
11 A. Numbers.
12 Q. You testified that sometimes Rob Ray gave you the
13   information in a range, is that correct?
14 A. Correct.
15 Q. And Mr. Fishbein asked you about the size of that range in
16   cross-examination.
17       Do you recall that?
18 A. Yes.
19 Q. How, if at all, did the size of the range change over the
20   course of the earnings cycle?
21 A. Earnings cycle, within the quarter?
22 Q. Yes.
23 A. Normally, it would narrow as the quarter would end and as
24   we got closer to the earnings report.
25 Q. So the range would become smaller is what you mean by

1   narrow?
2 A. Right.
3 Q. If we could look at Government Exhibit 713.
4       MR. TARLOWE: If you could blow that up, Mr. Hoffman,
5   please.
6 Q. This was another document you were shown on direct and
7   asked some questions about on cross-examination by Mr.
8   Fishbein.
9       Do you recall that document?
10 A. Right.
11 Q. I believe you testified that the information in here was
12   information from Rob Ray, is that correct?
13 A. Correct.
14 Q. And the bottom e-mail was February 19, 2008. And during
15   your direct testimony we looked at a phone record which showed
16   a call between you and Rob Ray on the night of February -- the
17   night before that, which is the night of February 18?
18 A. Right.
19 Q. Do you recall that?
20 A. Yes.
21 Q. The top e-mail is February 25, 2008, is that correct?
22 A. Correct.
23 Q. I would like to show you what's been marked for
24   identification as Government Exhibit 2607C, which is an excerpt
25   of your phone records from Government Exhibit 2607.

UNITED STATES OF AMERICA, v
TODD NEWMAN,

November 26, 2012

1    MR. TARLOWE: The government offers Government Exhibit
2  2607C.
3    THE COURT: Pursuant to the stipulation that the
4  parties already have, Government Exhibit 2607C is received.
5    (Government's Exhibit 2607C received in evidence)
6  Q. Mr. Goyal, I would like to direct your attention to the
7  line that has a call at February 25, 2008 at -- it says 1:42
8  a.m., which is actually February 24, '08 at 9:42 p.m.
9  A. Yes.
10 Q. You see that? And that's a call from what number to what
11 number?
12 A. It's call from my home number to Rob Ray's cell number.
13 Q. How long was that call?
14 A. About half an hour.
15 Q. That's a 31-minute call between your number and Rob Ray's
16 number on the night of February 24, 2008.
17    Now, just turning back to Government Exhibit 713,
18 that's on February 25, 2008 at 10:32 in the morning, is that
19 correct?
20 A. Correct.
21 Q. And you were asked some questions by Mr. Fishbein on
22 cross-examination about Government Exhibit 713. And you were
23 asked something about whether you intended to indicate that you
24 had obtained this information improperly.
25    Do you recall that?

1  A. Yes.
2  Q. I would like to direct your attention to the bottom e-mail,
3  to the third bullet point. After gross margins in high 18s and
4  opex in high 13s, you wrote: Not sure if this includes
5  one-time charges or not.
6    What did you mean by that?
7  A. That I got this information, but I'm not sure, so it means
8  that there was no discussion about it being one-time charges.
9  Q. If you come to a gross margin or opex number through a
10 model that you built, would you know whether the numbers
11 included one-time charges or not?
12 A. Yes, I would.
13 Q. Now, you also testified, I believe, on cross-examination
14 with respect to that same document that you thought the
15 information, not just the overall consolidated information, but
16 also the segment information you thought came from Rob Ray, is
17 that correct?
18 A. Correct.
19 Q. If you could take a look at the segment information,
20 looking at the bottom e-mail, so after revenue, EPS, and then
21 gross margins, those three are consolidated rolled up numbers,
22 correct?
23 A. Correct.
24 Q. The next few bullet points talk about the U.S. business
25 segment, U.S. consumer business, and international, including

1  Asia.
2    You see that?
3  A. Yes.
4  Q. Let me know you what's marked for identification as
5  Government Exhibit 1800.
6    Do you recognize that?
7  A. This seems to be Dell's quarterly earnings release.
8  Q. For what date?
9  A. It is on 28th February, 2008.
10    MR. TARLOWE: The government offers Government Exhibit
11 1800.
12    MR. FISHBEIN: No objection.
13    MR. MORVILLO: No objection.
14    THE COURT: Government's 1800 is received.
15    (Government's Exhibit 1800 received in evidence)
16 Q. Mr. Goyal, if you could look at the second page.
17 A. Yes.
18 Q. This is Dell's press release that was issued on February
19 28, 2008, is that correct?
20 A. Correct.
21 Q. And looking under the section that says regional
22 highlights?
23 A. Yes.
24 Q. Can you just tell what the business units are that are
25 listed? Is this the first one, Americas business unit?

1    MR. MORVILLO: Object to the leading, your Honor.
2    THE COURT: Overruled. Let's watch the leading.
3  Q. Can you read, Mr. Goyal, the first one?
4  A. Americas business unit.
5  Q. The second one?
6  A. U.S. consumer.
7  Q. The third one?
8  A. Asia Pacific and Japan.
9  Q. And now flipping back to the e-mail, 713, you see on the
10 bottom it has U.S. business, then U.S. consumer and then it is
11 national?
12 A. Yes.
13 Q. If you could take a look at Government Exhibit 197.
14 A. Yes.
15 Q. You testified that the him he referred to in the middle
16 e-mail to Jesse Tortora was Rob Ray, is that correct?
17 A. Correct.
18 Q. I would like to show you what's been marked for
19 identification as 2607E.
20    MR. FISHBEIN: Your Honor, I object insofar as this
21 was not covered during cross. I did not refer to this document
22 at all.
23    THE COURT: What's the exhibit?
24    MR. TARLOWE: 2607.
25    THE COURT: The exhibit that's on the screen.

# A-950

1     I don't think it came up.
2         MR. TARLOWE: Your Honor, I can explain.
3         MR. FISHBEIN: Your Honor, I think he is just going
4     over again something that he could have and did cover on
5     direct.
6         THE COURT: Do we need a side bar on this?
7         MR. TARLOWE: I would like to use it.
8         THE COURT: Let me hear the next question. What's the
9     next question?
10         Now you're offering 2607E?
11         MR. TARLOWE: E.
12         THE COURT: That's covered by the same stipulation as
13     before, right?
14         MR. FISHBEIN: I'm just objecting to the line of
15     questioning, covering something that wasn't dealt with during
16     cross. This is redirect.
17         MR. TARLOWE: Your Honor, the e-mail wasn't dealt
18     with.
19         THE COURT: The time period was dealt with.
20     Overruled. I'll allow it.
21 Q.  So 197 is an e-mail on June 24, 2008 where you have said,
22     tried yesterday, but again couldn't get hold of him. Left a
23     voice mail. Hopefully will catch him today. That's the
24     morning of June 24, 2008.
25         Mr. Goyal, if you can look at Government Exhibit 2607E

1     for identification.
2         MR. TARLOWE: The government offers 2607E.
3         THE COURT: 2607E is covered by the same stipulation
4     as before, so that's received.
5         (Government's Exhibit 2607E received in evidence)
6 Q.  Mr. Goyal, if you could please take a look at that phone
7     record, your own phone records, and look at the line that has a
8     call on what's listed as June 25, '08 at 12:17 a.m.
9 A.  Yes.
10 Q.  You see that?
11 A.  Right.
12 Q.  And that's a call, June 24, '08, at 8:17 p.m.
13         How long was that call?
14 A.  35 minutes.
15 Q.  And it was from whose number to whose number?
16 A.  My number to Rob's number.
17 Q.  And the very next call you made, which was at 10:14 p.m. on
18     the night of June 25, who was that call to?
19 A.  Jesse Tortora.
20 Q.  That call was four seconds long?
21 A.  Right.
22 Q.  And then take a look at the next call.
23         Who is that call from?
24 A.  Jesse called me back.
25 Q.  How long was that call?

1 A.  17 minutes.
2 Q.  And that sequence of calls took place on the night of June
3     24, 2008, correct?
4 A.  Right.
5 Q.  And the e-mail we just looked at, 197, was the among of
6     June 24, is that correct?
7 A.  Yes.
8 Q.  And flipping back to 197, when Mr. Tortora asked you here
9     whether you hear anything new, did you understand him to be
10     asking you for your model on Dell?
11 A.  No.
12 Q.  What did you understand him to be asking you?
13 A.  If I got something new from Rob.
14 Q.  Turning to Government Exhibit 198, here is an e-mail on
15     July 1, 2008 where Jesse Tortora asked you, let me know if you
16     pick up anything new, subject, Dell.
17         Did you understand that to be asking you for your
18     model on Dell?
19 A.  No.
20 Q.  What was he asking you?
21 A.  If I hear anything new from Rob.
22 Q.  Taking a look at 2607F, there is another excerpt from the
23     phone records?
24         MR. TARLOWE: The government offers 2607F.
25         THE COURT: Same stipulation. 2607F.

1         (Government's Exhibit 2607F received in evidence)
2 Q.  The e-mail July 1, 2008 in the morning, correct?
3 A.  Correct.
4 Q.  You say: Hopefully will get something today, evening.
5         Mr. Goyal, if you could take a look at those phone
6     records, the excerpted phone records from your home phone. And
7     if you look at July 3, '08, there is a call at 12:01 a.m., so
8     that's actually the night of July 2, '08 at 8:01 p.m.
9         Do you see that call, listed as July 3, 2008, 12:01?
10 A.  Right, yes.
11 Q.  You see that?
12 A.  Yes.
13 Q.  And that's a call from whose number to whose number?
14 A.  From Rob's number to my number.
15         MR. TARLOWE: Mr. Hoffman, if you could put that up
16     and if you could just highlight that row.
17 Q.  So it's July 3, '08. It says call -- 0:01 is the start
18     time.
19         How long was that call between your number and Rob
20     Ray's number?
21 A.  Around half an hour.
22 Q.  What's the next call that you made after that?
23 A.  To Jesse.
24 Q.  How long was that call?
25 A.  10 minutes.

# A-951

1 Q. And Government Exhibit 300, Mr. Tortora asks you on the
2 bottom, just checking in if you got anything new. You said
3 nothing yet, tried to contact yesterday, will definitely have
4 something by Monday.
5     Were you referring in this e-mail to any modeling that
6 you were doing?
7 A. No.
8 Q. If I could show you what's marked as 2607H for
9 identification.
10     MR. TARLOWE: The government offers 2607H pursuant to
11 the same stipulation.
12     THE COURT: 2607H is received.
13     (Government's Exhibit 2607H received in evidence)
14 Q. So the e-mail, before we leave the e-mail, 300, on August
15 14, which is a Friday, according to the e-mail, you said, you
16 tried to contact yesterday. Will definitely have something by
17 Monday, which would be the 17th, correct?
18 A. Right.
19 Q. Taking a look at phone records in front of you, 2607H,
20 that's a call from whose number to whose number?
21 A. My number to Rob's number.
22 Q. That's the night of August 13, '09 at 9:36 p.m.?
23 A. Right.
24 Q. And how long is that call?
25 A. Three seconds.

1 Q. What's the next call?
2 A. Again, to Rob.
3 Q. How long is that call?
4 A. Two seconds.
5 Q. Based on those records do you think you spoke to Rob Ray
6 that night?
7 A. No.
8 Q. And then turning to the next page of that excerpt, you see
9 there there is a call labeled August 17, '09, which would be
10 August 16 at 9:46 p.m.?
11 A. Yes.
12 Q. And that call was from --
13 A. This is Austin base number.
14 Q. Look at the number above it.
15 A. That number above this is a call from my home number to
16 Rob.
17 Q. How long is the call?
18 A. Six, seven minutes.
19 Q. And that is the night of August 16, 2009, correct?
20 A. Correct.
21 Q. Going back to the e-mail on August 14, on Friday, you said,
22 will definitely have something by Monday, the 17th, correct?
23 A. Correct.
24 Q. Some of the calls we looked at with Rob Ray were quite
25 lengthy?

1 A. Yes.
2 Q. Did you enjoy speaking to Rob Ray on the phone?
3 A. It was okay. I don't think I had opinion one way or
4 another.
5 Q. Did you like talking to people on the phone?
6     MR. FISHBEIN: Objection.
7     THE COURT: You can answer the question.
8 A. Generally, I don't.
9     (Continued on next page)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1 Q. Why did you continue to engage in those lengthy calls with
2 Rob Ray over that extended period of time?
3 A. Because I wanted to get that information.
4 Q. Why?
5 A. To give it to Jesse.
6 Q. Why?
7 A. Because I was getting paid.
8 Q. You said during your cross-examination by Mr. Fishbein when
9 he asked you about career advice you provided to Rob Ray
10 compared to career advice you provided to other people, do you
11 recall being asked about that?
12 A. Yes.
13 Q. And I think you were trying to say that, or you said
14 something about the detail and amount of time you spent with
15 Rob Ray was different than with others. What did you mean by
16 that?
17 A. It means I would give career advice and review his resume
18 and other things for people too if they asked me, but I haven't
19 talked to somebody for half an hour or one hour or longer in
20 procession for so many times. He's the only one that called
21 me.
22 Q. And the calls to Rob Ray you testified took place usually
23 at night, right?
24 A. Correct.
25 Q. And the phone records we looked at of the calls with Rob

1   Ray were at night, right?
2  A.  Right.
3  Q.  Did you have an understanding of the physical layout of
4   investor relations at Dell headquarters?
5  A.  Yes.
6  Q.  What was your understanding?
7  A.  Generally like everywhere at Dell most of the offices were
8   cubicles.
9  Q.  You testified there were some other people including Shep
10   Dunlap who you talked to in investor relations, correct?
11  A.  Correct.
12  Q.  Did you call those people at night?
13  A.  No.
14  Q.  Did you call those people from home?
15  A.  No.
16  Q.  Did you typically call those people on their cell phones?
17  A.  I'm not sure.  I may have called once or twice on the work
18   cell phone number or if they were not available on their office
19   number.
20  Q.  Did anyone else in Dell investor relations ever give you
21   quarterly financial results before they were announced to the
22   public?
23  A.  No.
24  Q.  Now, you talked about, you were asked some questions --
25   let's take a look at Defense Exhibit 994.  Would you put that

1   up?  Thank you.  If you could enlarge it, please.  I think you
2   testified on cross-examination that these were notes of a lunch
3   meeting that Lynne Tyson held.  Do you recall that?
4  A.  Yes.
5  Q.  And when Mr. Fishbein asked you about the section called
6   demand and the bullet point on geographically, I think you were
7   explaining that you weren't sure if that was a commentary on
8   Dell's business.  What did you mean by that?
9  A.  Typically companies instead of seeing that their revenue is
10   bad they talk about general demand being weak to overall
11   economic situation or overall demand, not just for their
12   product is good or bad in which geographic segments.
13  Q.  Did you understand that to be about Dell's business or the
14   PC business?
15  A.  I'm not sure which way it would be.  Generally markets
16   would be all the PC markets not just Dell.
17  Q.  Scrolling down under cost cuts the last bullet point you
18   were asked questions about the comment implied that normalized
19   GM is near 18 percent.  What did you understand normalized GM
20   would be?
21  A.  As I said at that time normalized means if we take out the
22   sales fluctuation from quarter to quarter, then on the average
23   the level would be around 18 percent.
24  Q.  Did you view that as a commentary on the long-term outlook
25   or short-term?

1       MR. FISHBEIN:  Objection.
2       THE COURT:  Overruled.  You could answer.
3  A.  I saw it as a long-term level.
4       THE COURT:  Long-term what?
5       THE WITNESS:  Level.
6       THE COURT:  Level.
7  Q.  How did that -- withdrawn.  Now, you were asked about, you
8   were asked some questions on cross-examination about talking to
9   investor relations for help with models.  Do you recall being
10   asked about that?
11  A.  I'm not sure if I was asked.
12  Q.  When did you typically update your models?
13  A.  Typically after the company reported.  That was biggest
14   time.
15  Q.  After the announcement, after results were made public?
16  A.  Right.
17  Q.  When you talked to investor relations about your model, did
18   you typically talk about the past results that had already been
19   announced or future results?
20  A.  Generally the past results explanation of various line
21   items.
22  Q.  You were asked some questions about your model on Dell.  Do
23   you recall that?
24  A.  Yes.
25  Q.  If we can take a look at Defense Exhibit 964 which is in

1   tab 18 in your defense binder.  If you could blow up the top.
2   You testified I believe on cross-examination that you did not
3   believe the information in here came from Rob Ray, correct?
4  A.  Correct.
5  Q.  I think you said that was because you were saying things
6   like you were guessing around 18.4.
7  A.  Right.
8  Q.  Do you remember whether as of February 4, 2009 you had
9   information from Rob Ray about the upcoming quarterly earnings
10   announcement?
11  A.  I'm not sure.
12  Q.  If you could take a look at Government Exhibit 2607J, which
13   is another excerpt from the phone records we offer pursuant to
14   the same stipulation.
15       THE COURT:  2607, Government 2607J is received
16   pursuant to the stipulation.
17       (Government's Exhibit 2607J received in evidence)
18       MR. FISHBEIN:  Mr. Hoffman, if you could highlight the
19   first row.
20  Q.  This is a call that shows up on February 5 at 3:58 a.m.,
21   which is February 4, '09 at 11:58 p.m.  That's the night of the
22   e-mail we just looked at?
23  A.  Yes.
24  Q.  Who is this a call between?
25  A.  Me and Rob.

1 Q. How long?

2 A. About half an hour.

3 Q. You can take that down and if we could put up Defense

4 Exhibit 208. You were asked some questions about this research

5 report issued by you and Fayad Abbasi on May 11, 2008. Do you

6 recall that?

7 A. Yes.

8 Q. And if you look in the box in the middle and to the right

9 it says quarter F04/08 estimate. Do you see that?

10 A. Yes, I do.

11      MR. TARLOWE: Mr. McLeod, would you mind highlighting

12 that? You could highlight on the right-hand side under quarter

13 over there? Yes.

14 Q. What is that, just the first row. So what is that an

15 estimate for?

16 A. This is quarter ending in April of '08.

17 Q. Which was announced at the end of May '08?

18 A. Right.

19 Q. Next to it it says NB and next to it it says 33 cents?

20 A. Yes.

21 Q. Is that an estimate for Dell's earnings per share for the

22 May 2008 announcement?

23      MR. MORVILLO: Object to the leading, your Honor.

24      THE COURT: Yes. What is NB?

25      THE WITNESS: Neuberger Berman.

1      THE COURT: What's the number refer to?

2      THE WITNESS: It's Neuberger Berman, which is our

3 estimate of the EPS for that quarter.

4      THE COURT: Of the EPS, all right.

5 Q. Is that based on your model?

6 A. Yes.

7 Q. And so as of May 11, 2008 your model was showing an

8 estimate of 33 cents per share, correct?

9 A. Correct.

10 Q. I think Mr. Fishbein showed you the actual announcement of

11 that quarter which was higher than that. Do you recall that?

12 A. Yes, I do.

13 Q. So perhaps your modeling was not as good as Mr. Fishbein

14 suggested?

15      MR. FISHBEIN: Objection.

16      THE COURT: Yes. That's not a question. Okay.

17 Sustained.

18      MR. TARLOWE: I'll rephrase it.

19 Q. Was that estimate accurate?

20 A. I don't think so.

21 Q. And that's on May 11. If we could now look at the e-mail

22 from May 16 which is five days later which is Government

23 Exhibit 187. And if you remember on your direct testimony, you

24 were shown a phone call between you and Rob Ray the night

25 before this e-mail. Do you recall that?

1 A. Yes.

2 Q. And in this e-mail you and Mr. Tortora are talking about he

3 says he gets 36 to 37 cents per share, you get around 36. Do

4 you see that?

5 A. Yes.

6 Q. Is that higher, lower or the same as your model was

7 predicting as of May 11?

8 A. It's higher than that.

9 Q. What was this information based on?

10 A. I think it was based upon Rob Ray's information.

11 Q. Going back to Defense Exhibit 208. You were asked some

12 questions about Mr. -- the information that was attributed to

13 Dell's CFO about head count reduction. Do you recall that?

14 A. Yes.

15 Q. And if you could take a look at the second paragraph under

16 summary and investment conclusion?

17 A. Yes.

18 Q. And do you see the third sentence says, "While EPS may be a

19 hair shy of consensus estimate for the quarter," do you see

20 that?

21 A. I do.

22 Q. So in this research report -- could you highlight that

23 portion, "while EPS may be a hair shy." So in this report in

24 May of 2008 was Neuberger Berman predicting that EPS would be

25 above, the same as or below consensus?

1 A. Slightly lower than consensus.

2 Q. And so this report which you were cross-examined about

3 whether it took into account this information about head count

4 reduction, notwithstanding that information, Mr. Abbasi and you

5 were predicting that earnings per share would be slightly below

6 consensus, is that correct?

7 A. Right.

8 Q. And turning to the second page, the top of the second page,

9 if you could highlight where it says the first two rows, it

10 talks about the head count reduction information and in a

11 parenthesis it says, "Although we believe it was late in the

12 quarter and did not have much of a benefit for the April

13 quarter," is the April quarter the one that gets announced at

14 the end of the May?

15 A. Yes.

16 Q. What did you understand this to mean that it did not have

17 much of a benefit for the April quarter?

18 A. It means that this head count reduction or cost cuts took

19 so late in the quarter that it won't have much benefit for the

20 quarter that is already ended. It wouldn't benefit their EPS.

21 Q. Now, you were asked some questions about your cooperation

22 agreement with the government, do you recall that?

23 A. Yes.

24 Q. I'm showing you, it's marked for identification as

25 Government Exhibit 3507-2.

1    MR. TARLOWE: The government offers 3507-2.
2    MR. FISHBEIN: No objection.
3    THE COURT: All right, Government Exhibit 3507-2 is
4  received.
5 Q. Mr. Goyal, this is a copy of your cooperation agreement
6  with the government?
7 A. Yes.
8 Q. What happens with this agreement if you don't tell the
9  truth?
10 A. It gets canceled.
11 Q. And then what happens to that 5K letter that you testified
12  you hope to receive?
13 A. It doesn't get written.
14 Q. You were asked some questions by Mr. Fishbein about whether
15  you told Neuberger Berman that you had pled guilty. Do you
16  recall that?
17 A. Yes.
18 Q. Why didn't you tell Neuberger Berman?
19 A. Because I was cooperating with the government and it was
20  all secret so I didn't tell anyone.
21 Q. Who instructed you not to tell anyone?
22 A. The government did.
23 Q. You testified that your guilty plea was under seal. Do you
24  recall that?
25 A. Yes.

1 Q. Do you have an understanding as to whether a judge decides
2  to seal the courtroom?
3 A. I think so.
4 Q. Now, you were asked some questions about the payments you
5  received from Diamondback. Do you recall that?
6 A. Yes.
7 Q. What did you believe you were getting paid for?
8 A. It was for the Dell information, providing Jesse with the
9  Dell information.
10 Q. And you testified you got paid $175,000 over two years.
11 A. Right.
12 Q. I'm sorry, what information did you believe you were being
13  paid for?
14    MR. MORVILLO: Objection. Asked and answered several
15  times.
16    THE COURT: You said information that you provided to
17  Jesse. Could you be more specific?
18    THE WITNESS: Information about Dell quarterly
19  results.
20 Q. You testified that you got $175,000 from Diamondback over
21  two years, is that correct?
22 A. Right.
23 Q. Do you believe you got that money because you were an
24  expert modeler?
25    MR. FISHBEIN: Objection.

1    THE COURT: Overruled. You can answer.
2 A. I don't think so.
3 Q. How did that money compare to your full-time salary at
4  Neuberger Berman?
5 A. It was approximately half of that.
6 Q. Your salary at Neuberger Berman or --
7 A. Yes, I mean, salary, I received 170,000 per year and I
8  received 175 here for two years.
9 Q. And you were asked some questions by Mr. Morvillo about Mr.
10  Chiasson and Level Global. Do you recall that?
11 A. Right.
12 Q. Did you know Sam Adonakis?
13 A. I did.
14 Q. And did you know whether or not Mr. Tortora had a
15  relationship with Mr. Adonakis?
16 A. They were friends.
17 Q. And did you know anything else about the nature of their
18  relationship?
19 A. Like?
20 Q. Did you know whether they had any business relationship or
21  association?
22 A. It was Dell, the e-mails they used to share.
23 Q. You testified you knew about that because they were copied
24  on those?
25 A. Yes.

1 Q. Did you know that Mr. Adonakis worked at a hedge fund?
2 A. Yes.
3 Q. Did you know, you testified you knew Mr. Tortora worked at
4  Diamondback, correct?
5 A. Right.
6 Q. And you understand that a hedge fund trades stocks?
7 A. Yes.
8 Q. Did you understand that portfolio managers at the hedge
9  funds are the people who make the decisions about which stocks
10  to buy or sell?
11    MR. MORVILLO: Object to the leading.
12    MR. FISHBEIN: Objection. Leading, argumentative.
13    THE COURT: Sustained with respect to the leading.
14 Q. Do you know who at hedge funds make decisions about what
15  stocks to buy or sell?
16    MR. FISHBEIN: Objection.
17    THE COURT: Overruled. You could answer.
18 A. Normally it's the portfolio managers.
19 Q. And you were asked some questions about what you told Rob
20  Ray you were doing with information. Do you remember that?
21 A. Yes.
22 Q. And I think you said that was one of the things you told
23  him was that you used it in connection with your models, do you
24  recall that?
25 A. Yes.

1 Q. Was that true?
2 A. I used that -- I didn't. The numbers he gave me I did not
3  put those numbers in my models. I just used it so that my
4  estimates are not too far away from the actual results, but I
5  didn't use those actual numbers.
6 Q. Did you tell Rob Ray -- what if anything did you tell Rob
7  Ray about what you did at Neuberger Berman?
8 A. I told him that I work in central research department.
9 Q. What if anything did you tell him about who those models
10  were for?
11 A. So they are for our portfolio managers.
12 Q. What do the portfolio managers do?
13 A. They trade stocks.
14 Q. And did you tell -- what if anything did you tell Mr. Rob
15  Ray about who your stock recommendations were intended for?
16 A. Portfolio managers.
17        MR. TARLOWE: Just one moment.
18    Nothing further.
19        THE COURT: Okay, Mr. Fishbein?
20  RECROSS EXAMINATION
21  BY MR. FISHBEIN:
22 Q. If we could just get Exhibit, Defense 994 on screen. And
23  it's, Mr. Goyal, it's your tab 5. If we could blow up the part
24  under cost cuts.
25    Do you recall, Mr. Goyal, this is your notes of your

1  conversation with Lynne Tyson, correct?
2 A. Yes.
3 Q. And you actually put a specific number in here relating to
4  gross margins, right?
5 A. Near 18 percent levels, yes.
6 Q. And just so we're clear, that number, 18 percent for gross
7  margin, that relates to Dell, correct?
8 A. Dell, yes.
9 Q. That's not an industry number, right?
10 A. True.
11 Q. And that's a rolled up, consolidated number for all of
12  Dell, correct?
13 A. Correct.
14 Q. And you testified previously that Ms. Tyson, as far as you
15  understood, was authorized to give you that information, right?
16 A. That was my understanding, yes.
17 Q. If we could look at Government Exhibit 197 and just, if we
18  could just roll up the middle part there. This is an e-mail
19  from you to Mr. Tortora, right?
20 A. Correct.
21 Q. And you make a reference to get hold of him, right?
22 A. Yes.
23 Q. You do not say Rob Ray, right?
24 A. Correct.
25 Q. In fact, in none of your e-mails to Mr. Tortora did you

1  name the name Rob Ray, correct?
2 A. Correct.
3 Q. So from the face of the e-mail it's not apparent who you're
4  talking to, correct?
5 A. It's not, but it's like generally there is only one Dell
6  contact who is in corporate who gives that kind of information,
7  so it was implied. He didn't know the name, but I think it was
8  implied the person who has that information.
9 Q. You never told Jesse Tortora the name, right?
10 A. True.
11 Q. And you certainly never put it in an e-mail, correct?
12 A. Correct.
13 Q. If we could -- oh. You mentioned that your calls with Rob
14  Ray were in the evening, is that right?
15 A. Right.
16 Q. Now, do you happen to know whether the personnel within
17  Dell's IR department were permitted to do work calls out of the
18  office? Do you know?
19 A. They were permitted to do what?
20 Q. I'm asking you, do you happen to know whether the people
21  working at Dell's investor relations department, whether they
22  were permitted to do work calls when they were out of the
23  office?
24 A. If they're on like trips, investor relations doing travel,
25  it's my understanding they took calls, because to my

1  understanding calls came in during their business trips.
2 Q. In other words, you understand investor relations they're
3  supposed to be responsive to investor calls, right?
4 A. Right.
5 Q. And if that means taking calls while they're out of the
6  office, that's okay, right?
7 A. Generally speaking they could, yes.
8 Q. If we could look at Government Exhibit 2607H. Those are
9  the phone records. Do you see those? You have 2607H?
10 A. Okay, yes.
11 Q. And we're going to look at page 2. Now, Mr. Tarlowe just
12  asked you about a call with Rob Ray I believe it was on
13  August 17. If you look at August 17 at 1:39 there's a call
14  from your number to 813-804 -- I'm sorry, 813-380-3010. Do you
15  see that?
16 A. Yes.
17 Q. You said that's Rob Ray's number?
18 A. Correct.
19 Q. I notice there are some other calls on this page with a 512
20  area code. Do you see that?
21 A. Yes.
22 Q. Where is 512?
23 A. Austin, Texas.
24 Q. The people, the friends that you had at Dell, who you
25  stayed in touch with after you left, where did they live?

1  A. Austin, Texas.
2  Q. If you look at these numbers, let's start with August 15 at
3  6:03, do you see that, 1803? There's a number 512-689-5530.
4  Do you see that?
5  A. Yes.
6  Q. Is that one of your friends?
7  A. There's I think this friend lives in New York and they just
8  have an Austin area code number.
9  Q. Did that person used to work at Dell?
10 A. He left before me.
11 Q. There's another number August 16, 1:13, 512-300-8959. Do
12 you see that?
13 A. Same thing. It's that person, they live in New York.
14 Q. And then there's a 512-797-1597. Do you see that one?
15 A. That's my cell number.
16 Q. Oh, I'm sorry. Okay. And then there's on August 17 at
17 1:39 there's a -- do you see the call to Rob Ray, the 813
18 number? That's at 1:39?
19 A. Yes.
20 Q. And then there's a call from a 512-733-8406?
21 A. I'm not hundred percent sure, but this may be Rob's other
22 number. I think so.
23 Q. But you're not sure, right?
24 A. You can double check. Yes, I'm not sure.
25 Q. In any event, there are a number of different 512 numbers,

1  is that correct? When you spoke to your friends, when you
2  at Dell, did you speak by phone?
3  A. Yes.
4  Q. And you would call them on their cell and other phone
5  numbers?
6  A. Correct.
7  Q. Now, if we could go to Defense Exhibit 964 and Mr. Tarlowe
8  showed you some phone records, and if you look in front of you,
9  it's Government Exhibit 2607J. Do you see that?
10 A. I see that.
11 Q. And there's a call on August 5th at 4:28, and I believe?
12     MR. FISHBEIN: Mr. Tarlowe, you said that that
13 translates after the adjustment to what time?
14     MR. TARLOWE: I think it's four hours earlier.
15 Q. So it's late in the evening on February 4, is that correct?
16 Anyway, I believe that's what the representation was. If you
17 look at Defense Exhibit 964, are you with me? That's the
18 e-mail.
19 A. Which?
20 Q. Defense Exhibit 964, it's your tab 18.
21 A. Yes, I'm looking at it here on the monitor, yes.
22 Q. And that's at 4:05 p.m., correct?
23 A. Yes.
24 Q. So that's before the evening of February 4, right?
25 A. Yes.

1  Q. And you don't recall speaking to Rob Ray before writing
2  this e-mail on February 4, 2009 at 4:05 p.m., do you?
3  A. No.
4  Q. And I believe you testified before that as best you can
5  tell this e-mail does not contain information from Rob Ray,
6  correct?
7  A. Correct.
8      MR. FISHBEIN: That's all I have.
9      THE COURT: Mr. Morvillo?
10     MR. MORVILLO: No questions, your Honor.
11     THE COURT: Okay. Mr. Tarlowe, any re-redirect?
12 REDIRECT EXAMINATION
13 BY MR. TARLOWE:
14 Q. If you could just put up 2607H. You were just shown this
15 by Mr. Fishbein. If I could direct your attention to page 2.
16 A. Yes.
17 Q. And you look at the call that's listed as August 17, 2009
18 at 1:46 a.m.?
19 A. Yes. Yes.
20 Q. And you see the first number Mr. Fishbein asked you about
21 is a 512 number?
22 A. Yes.
23 Q. And who do you think that number belonged to?
24 A. I thought it was Rob. I wasn't sure.
25     MR. TARLOWE: I'm going to read, your Honor, from a

1  stipulation. I believe it's Defense Exhibit A. Phone number
2  512-733-8406 was assigned to Rob Ray.
3      THE COURT: Is that it?
4      MR. TARLOWE: Yes.
5      THE COURT: All right. Mr. Goyal, you can step down.
6      (Witness excused)
7      THE COURT: I don't assume you have a two-minute
8  witness after that?
9      MR. TARLOWE: Our next witness is going to be lengthy.
10     THE COURT: All right, so why don't we break now.
11 We'll adjourn until tomorrow morning at 9:30. Have a good
12 evening. Watch Monday night football. Don't discuss the case.
13 Keep an open mind and we'll see you tomorrow at 9:30. Thank
14 you. All rise for the jury.
15     (Jury excused)
16     (Continued on next page)
17
18
19
20
21
22
23
24
25

UNITED STATES OF AMERICA, v
TODD NEWMAN,

| CBQFNEW7 | Goyal - redirect | Page 1651 |

1      (In open court; jury not present)

2      THE COURT: Okay, have a seat.  So what's the order

3   going forward?

4      MS. APPS: The next witness is Sam Adonakis and he's

5   going to be on the stand for a while.

6      THE COURT: For the full day tomorrow you think?

7      MS. APPS: It's quite possible it will be the full day

8   tomorrow.  It's hard to judge exactly, but yes.  We presume

9   cross-examination will be almost the rest of the week,

10   presumably.  I'm not sure.  I shouldn't speak for defense

11   counsel for cross-examination, but prior indications are that

12   there will be considerable cross-examination.

13      THE COURT: Mr. Weingarten, are you planning to cross

14   this witness?

15      MR. WEINGARTEN: I am, your Honor.

16      THE COURT: All right.  Okay, keep each other apprised

17   as to sort of the next witnesses so nobody is caught flat

18   footed, but a lot of it depends on how long certain witnesses

19   take.  So I'll see you tomorrow.  Anything else we need to

20   discuss today?

21      The government, as I mentioned this morning, had filed

22   a supplemental motion to preclude certain expert testimony.  Do

23   the defendants intend to respond?

24      MR. NATHANSON: Your Honor, we just got this this

25   morning, so if we do, it will be obviously very brief.  I think

| CBQFNEW7 | Goyal - redirect | Page 1652 |

1   that was two or three pages.

2      THE COURT: Yes, this is four pages, but it's really

3   three pages, double spaced.

4      MR. NATHANSON: If we put in something it will be very

5   brief and we should have it by tomorrow morning.

6      MS. APPS: With some trigger because we recently

7   received slides and that gave us more context to the exhibits

8   with the slides.  The big binder I gave you.

9      THE COURT: We can talk about that tomorrow, we can

10   talk about that Wednesday.  We're not getting to this for some

11   time, I think.  You don't have to rush to get me something

12   tomorrow morning if later in the day tomorrow or the next day

13   is fine with me.

14      MR. NATHANSON: Thank you, your Honor.

15      THE COURT: Okay.  Great, have a good evening.  I'll

16   see you tomorrow.

17      (Adjourned to November 27, 2012 at 9:30 a.m.)

18

19

20

21

22

23

24

25

| | Page 1653 |

```
1              INDEX OF EXAMINATION

2   Examination of:                              Page

3   SANDEEP GOYAL

4   Direct By Mr. Tarlowe . . . . . . . . . . .1409

5   Cross By Mr. Fishbein . . . . . . . . . . .1488

6   Cross By Mr. Morvillo . . . . . . . . . . .1607

7   Redirect By Mr. Tarlowe . . . . . . . . . .1614

8   Recross By Mr. Fishbein . . . . . . . . . .1643

9   Redirect By Mr. Tarlowe . . . . . . . . . .1649

10              GOVERNMENT EXHIBITS

11  Exhibit No.                              Received

12  2171  . . . . . . . . . . . . . . . . . . .1411

13  750  . . . . . . . . . . . . . . . . . . . .1428

14  751 through 753  . . . . . . . . . . . . . .1429

15  754  . . . . . . . . . . . . . . . . . . . .1433

16  710  . . . . . . . . . . . . . . . . . . . .1435

17  2607B  . . . . . . . . . . . . . . . . . . .1437

18  711  . . . . . . . . . . . . . . . . . . . .1438

19  713  . . . . . . . . . . . . . . . . . . . .1441

20  715  . . . . . . . . . . . . . . . . . . . .1445

21  719  . . . . . . . . . . . . . . . . . . . .1446

22  719B  . . . . . . . . . . . . . . . . . . . .1447

23  720A  . . . . . . . . . . . . . . . . . . . .1449

24  2607D  . . . . . . . . . . . . . . . . . . .1452

25  726  . . . . . . . . . . . . . . . . . . . .1454
```

| | Page 1654 |

```
1   725  . . . . . . . . . . . . . . . . . . . .1454

2   198  . . . . . . . . . . . . . . . . . . . .1457

3   2607-G  . . . . . . . . . . . . . . . . . . .1459

4   733  . . . . . . . . . . . . . . . . . . . .1460

5   734  . . . . . . . . . . . . . . . . . . . .1461

6   756  . . . . . . . . . . . . . . . . . . . .1462

7   717  . . . . . . . . . . . . . . . . . . . .1468

8   759  . . . . . . . . . . . . . . . . . . . .1472

9   736  . . . . . . . . . . . . . . . . . . . .1474

10  748  . . . . . . . . . . . . . . . . . . . .1477

11  737  . . . . . . . . . . . . . . . . . . . .1481

12  739  . . . . . . . . . . . . . . . . . . . .1483

13  740  . . . . . . . . . . . . . . . . . . . .1487

14  747  . . . . . . . . . . . . . . . . . . . .1590

15  2501-NA  . . . . . . . . . . . . . . . . . .1606

16  2607C  . . . . . . . . . . . . . . . . . . .1619

17  1800  . . . . . . . . . . . . . . . . . . . .1621

18  2607E  . . . . . . . . . . . . . . . . . . .1624

19  2607F  . . . . . . . . . . . . . . . . . . . .1626

20  2607H  . . . . . . . . . . . . . . . . . . .1627

21  2607J  . . . . . . . . . . . . . . . . . . .1634

22              DEFENDANT EXHIBITS

23  Exhibit No.                              Received

24  757  . . . . . . . . . . . . . . . . . . . .1502

25  994  . . . . . . . . . . . . . . . . . . . .1505
```

# A-958

Page 1655

1   1228    . . . . . . . . . . . . . . . . . . .1508
2   8627    . . . . . . . . . . . . . . . . . . .1526
3   8661    . . . . . . . . . . . . . . . . . . .1527
4   8822    . . . . . . . . . . . . . . . . . . .1528
5   8883    . . . . . . . . . . . . . . . . . . .1530
6   9025    . . . . . . . . . . . . . . . . . . .1530
7   9142    . . . . . . . . . . . . . . . . . . .1532
8   8656    . . . . . . . . . . . . . . . . . . .1535
9   964     . . . . . . . . . . . . . . . . . . .1553
10  208     . . . . . . . . . . . . . . . . . . .1573
11  2607AA  . . . . . . . . . . . . . . . . . .1580
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## $

**$100,000 (6)**
1432:15;1433:2,11,
17;1434:2;1598:17
**$14 (2)**
1417:12;1554:18
**$14.3 (1)**
1417:12
**$16 (1)**
1566:7
**$16.077 (1)**
1567:13
**$17,000 (1)**
1598:13
**$170,000 (1)**
1424:20
**$175,000 (3)**
1434:13;1640:10,20
**$18,750 (4)**
1427:6;1428:5,18;
1430:6
**$75,000 (2)**
1424:14;1427:8

## A

**AA (1)**
1580:4
**Abbasi (33)**
1438:25;1439:1;
1441:14;1454:13,24;
1455:10;1456:8;
1472:18;1473:1,2,14;
1476:20;1478:1;
1479:25;1481:1,9,11,
23;1483:17;1487:16;
1513:23;1572:9,15;
1573:12;1576:5;
1577:3,8,13;1581:21;
1589:23;1604:8;
1635:5;1638:4
**Abbasi's (1)**
1575:7
**abilities (1)**
1524:2
**able (12)**
1425:18;1426:8;
1431:18,18,23;
1456:19,21,24;1514:4;
1551:20;1569:19,22
**above (3)**
1628:14,15;1637:25
**accept (4)**
1426:8;1431:18;
1432:1;1516:4
**accepted (1)**
1421:6
**access (9)**
1423:2;1476:7,11;
1500:5;1529:2;
1531:24;1578:24;

1592:15,22
**accommodation (1)**
1515:2
**according (1)**
1627:15
**account (5)**
1429:4,5;1539:20;
1599:13;1638:3
**accounting (1)**
1421:6
**accuracy (1)**
1517:4
**accurate (10)**
1434:17;1455:14,16,
20,22,23;1509:19;
1566:24;1609:16;
1636:19
**across (1)**
1414:20
**action (1)**
1592:21
**actual (10)**
1418:19;1455:20;
1466:4,5;1531:16;
1566:22;1617:1;
1636:10;1643:4,5
**actually (28)**
1432:22;1437:16;
1438:5;1452:15,23;
1459:10;1466:5,12;
1478:6;1508:12,25;
1513:17;1525:13;
1532:5;1534:12,20;
1551:20;1553:17;
1554:11;1564:2;
1567:11;1568:3;
1575:3;1578:25;
1585:6;1619:8;1626:8;
1644:3
**adamant (1)**
1545:8
**add (3)**
1421:4;1470:23;
1563:3
**added (1)**
1442:1
**addition (3)**
1449:25;1497:7;
1601:12
**Additional (2)**
1442:4;1598:24
**address (16)**
1427:16,17,18;
1534:21;1535:19,20,
21,22,23;1536:17,19,
19,21,23;1537:18,19
**adjourn (1)**
1650:11
**Adjourned (1)**
1652:17
**adjustment (1)**
1648:13
**adjustments (2)**

1566:18,19
**administration (2)**
1541:4,7
**admit (1)**
1606:23
**admitted (1)**
1536:5
**Adonakis (6)**
1483:17;1487:16;
1641:12,15;1642:1;
1651:4
**Adondakis (3)**
1480:16,18;1481:10
**advice (12)**
1512:9;1514:16,18;
1515:1,4,9,19;1603:18,
25;1630:9,10,17
**affect (2)**
1442:10;1557:25
**afternoon (6)**
1445:19;1488:3,4;
1545:1;1607:12,13
**afterwards (1)**
1422:12
**again (49)**
1409:3;1419:8;
1420:10;1430:2;
1438:4;1443:18;
1446:24,24;1450:6,9;
1452:13;1455:1;
1456:20,22;1457:2;
1459:9;1466:18;
1468:17;1473:17;
1487:5;1489:1;
1496:15;1498:1,5;
1499:14;1500:22;
1501:20,24;1505:19;
1510:12,16;1542:21;
1543:20;1544:3,12,15;
1558:19;1566:23;
1575:4,13;1582:4;
1587:15,18;1599:19;
1605:8;1616:14;
1623:4,22;1628:2
**against (1)**
1435:6
**Agent (2)**
1595:12,14
**agents (3)**
1595:10,17;1596:23
**ago (3)**
1475:14;1526:1;
1556:21
**agree (7)**
1451:5;1497:22;
1552:5,17;1570:16;
1600:7;1607:24
**agreed (2)**
1599:22;1610:14
**agreement (6)**
1599:21;1601:8;
1612:20;1638:22;
1639:5,8

**ahead (5)**
1473:14;1515:23;
1576:8,11;1577:4
**allow (2)**
1425:13;1623:20
**allowed (3)**
1426:16,17,18
**almost (7)**
1419:4,8;1520:3;
1551:22;1579:2;
1610:16;1651:9
**along (1)**
1605:17
**Although (1)**
1638:11
**always (2)**
1494:10,11
**AMD (6)**
1463:2,11;1479:13,
16,20,21
**Americas (2)**
1621:25;1622:4
**among (1)**
1625:5
**amount (14)**
1427:5,7;1428:17;
1429:21;1430:6;
1432:15;1433:11,17;
1498:18;1515:16;
1598:12,19;1599:4;
1630:14
**amounts (1)**
1598:18
**analyses (1)**
1564:5
**analysis (16)**
1460:24;1461:24;
1462:5;1527:24;
1528:15,17;1549:8,11;
1551:25;1558:2;
1562:22;1563:20,21;
1568:25;1575:20;
1611:14
**analyst (15)**
1413:25;1417:10;
1436:10,10;1439:6;
1440:1;1445:23;
1446:2;1448:2;
1465:21;1533:18,21;
1534:4;1570:9;1572:7
**analysts (8)**
1417:23,25;1451:12;
1499:17;1500:3;
1504:1;1576:14,23
**analyze (3)**
1531:1;1548:5,13
**analyzing (4)**
1442:23;1531:2;
1536:16;1570:17
**angry (4)**
1597:1,3,6,9
**announce (2)**
1420:23;1443:24;

**ahead (5)**
1444:3;1450:13;
1487:13
**announced (10)**
1410:22;1436:25;
1439:17,19;1582:9;
1604:7;1631:21;
1633:19;1635:17;
1638:13
**announcement (23)**
1421:1;1442:8;
1443:19,21;1444:9,10;
1450:24;1454:7,8,22;
1458:9,11;1466:19,20;
1467:4;1474:20;
1475:15;1487:11;
1567:5;1633:15;
1634:10;1635:22;
1636:10
**announcements (1)**
1435:10
**announces (1)**
1410:15
**answered (5)**
1440:16;1504:16;
1515:22;1617:2;
1640:14
**Anthony (6)**
1607:15;1608:16;
1609:24;1610:14;
1612:25;1614:3
**apart (1)**
1504:10
**apparent (1)**
1645:3
**appear (2)**
1418:2;1537:9
**Apple (11)**
1526:8,16;1527:9,
10,24;1530:2,4;
1538:15,18,21;1594:17
**apply (1)**
1451:5
**applying (1)**
1447:6
**appointment (1)**
1486:6
**apprised (1)**
1651:16
**approach (1)**
1461:4
**approached (10)**
1595:1,5,10,17;
1596:16;1599:6;
1602:13;1603:2;
1604:3;1612:17
**appropriate (3)**
1436:1,7,9
**Approximately (3)**
1420:22;1503:5;
1641:5
**APPS (5)**
1408:5;1476:23;
1651:4,7;1652:6

**April (35)**
1445:8,15;1468:7;
1469:13;1483:21;
1502:17;1503:2,9;
1505:9;1506:19;
1508:19;1542:13;
1543:2;1552:15;
1564:14,17,23,24;
1565:1,1,2,3,14,23;
1566:2,2,6,21;1567:1,
9;1593:25;1635:16;
1638:12,13,17

**area (8)**
1469:14;1470:4;
1491:19;1512:20,21;
1557:23;1646:20;
1647:8

**argument (1)**
1485:12

**Argumentative (2)**
1617:9;1642:12

**arise (1)**
1599:19

**around (29)**
1413:22;1414:25;
1420:24;1435:25;
1442:10,11;1443:25;
1451:5,13;1460:3;
1461:4;1480:7;
1485:20;1488:24;
1497:2,16;1506:20;
1519:16;1555:4,15;
1556:5;1566:7;
1573:17;1587:3;
1599:4;1626:21;
1632:23;1634:6;
1637:3

**arrange (2)**
1472:4;1513:22

**arranged (2)**
1612:10,13

**arrangement (7)**
1424:25;1430:14;
1517:24;1518:25;
1519:25;1523:3;
1539:8

**arrive (3)**
1420:3;1427:7;
1440:23;1443:8;
1451:20

**article (3)**
1545:5,8;1604:12

**Asia (7)**
1410:4;1584:23;
1585:22;1587:16,17;
1621:1;1622:8

**ASP (3)**
1555:5;1556:24,25

**assessment (1)**
1531:5

**assigned (1)**
1650:2

**assist (1)**

---

1534:9

**assistance (13)**
1513:17;1526:15,25;
1529:18;1530:4,9;
1532:13;1533:16;
1534:8;1539:3;
1600:23;1601:2,17

**assistant (1)**
1414:21

**associate (2)**
1436:12;1572:7

**association (2)**
1480:4;1641:21

**assume (3)**
1408:3;1553:1;
1650:7

**Assuming (1)**
1473:3

**assumptions (1)**
1538:6

**attach (1)**
1448:14

**attached (8)**
1446:20;1447:8;
1448:11;1449:14;
1461:24;1537:23;
1559:5,21

**attaches (1)**
1593:5

**attachment (1)**
1474:24

**attachments (1)**
1535:7

**attempt (1)**
1419:16

**attended (1)**
1505:5

**attention (8)**
1522:10;1565:13;
1570:19;1576:23;
1582:20;1619:6;
1620:2;1649:15

**Attorney's (1)**
1610:10

**attributed (1)**
1637:12

**August (37)**
1458:7;1459:5,8,10;
1460:7;1461:15,22;
1462:15;1467:3;
1474:19;1487:10;
1552:12;1582:21,21;
1583:1,17;1589:24;
1590:9;1591:3;1592:3,
6,10,13;1613:19;
1627:14,22;1628:9,10,
19,21;1646:13,13;
1647:2,11,16;1648:11;
1649:17

**Austin (5)**
1501:4;1628:13;
1646:23;1647:1,8

**authorized (7)**

---

1420:17;1440:20;
1443:16;1510:1,6;
1578:11;1644:15

**automatically (1)**
1560:12

**available (8)**
1478:24;1532:6;
1549:9,14;1550:7;
1578:5,9;1631:18

**average (8)**
1417:24,24;1507:17;
1547:2;1557:2;
1562:11,16;1632:22

**aware (7)**
1539:22;1542:2,23;
1547:6;1548:16;
1582:7;1594:5

**away (4)**
1422:16;1513:10;
1584:20;1643:4

## B

**B2 (1)**
1560:8

**B4 (3)**
1560:15;1565:25;
1567:25

**B6 (1)**
1562:3

**B8 (1)**
1562:18

**B9 (1)**
1563:24

**back (34)**
1425:15;1426:13;
1432:9;1436:17;
1448:20;1456:19;
1458:15;1465:23;
1467:6,17;1473:8,14,
16;1475:7;1481:22;
1484:11;1485:21;
1497:13;1504:7;
1505:2,16;1565:25;
1566:5;1568:5;
1569:20;1578:17;
1581:15;1607:3;
1619:17;1622:9;
1624:24;1625:8;
1628:21;1637:11

**background (2)**
1423:20;1461:5

**bad (8)**
1506:12;1555:5;
1556:24;1616:6,24;
1617:8;1632:10,12

**ballpark (1)**
1511:20

**bank (4)**
1429:1;1430:2;
1433:10;1434:6

**bar (2)**
1578:1;1623:6

---

**barbecuing (1)**
1413:20

**Barclays (1)**
1446:1

**base (1)**
1628:13

**Based (25)**
1418:2;1426:22;
1479:4;1507:8;
1511:18;1542:8;
1549:9,11;1552:24;
1554:13,14,21,23;
1558:8;1562:19,25;
1567:18;1582:5;
1600:18;1603:25;
1628:5;1636:5;1637:9,
10

**basically (10)**
1460:22;1462:2,8;
1467:6;1503:19;
1511:18;1528:17;
1556:1,9;1597:6

**basis (5)**
1442:14;1478:21;
1506:14;1508:13;
1549:15

**beat (1)**
1455:11

**become (1)**
1617:25

**began (6)**
1467:19,20;1471:5;
1488:12,14,24

**begin (1)**
1488:22

**beginning (4)**
1484:2;1518:7;
1552:12;1567:9

**behalf (1)**
1607:9

**behind (4)**
1450:12;1460:23,24;
1471:11

**belonged (1)**
1649:23

**belongs (1)**
1563:3

**below (6)**
1418:9;1448:9;
1584:23;1587:6;
1637:25;1638:5

**Ben (8)**
1445:19,22,23;
1446:22;1447:2,4,6;
1448:3

**benefit (4)**
1638:12,17,19,20

**Berman (102)**
1414:8;1415:11;
1423:23;1424:4,19,21,
22,24,25;1436:11;
1439:2,5,7;1442:3;
1455:4,5,9;1465:4;

---

1470:12;1472:6;
1474:12;1475:21;
1476:4;1477:10;
1479:24;1483:22;
1487:21;1488:12,15,
21,25;1499:21,25;
1500:2,9,12,14,19;
1502:4,7;1510:10;
1513:20;1514:2,5;
1516:7;1519:1,6,10;
1522:20;1526:3;
1527:2,14;1528:5;
1529:20;1530:11;
1531:22;1532:1;
1534:13;1535:14,16,
20;1536:2;1537:3,3,
15;1538:22;1539:5;
1550:3,4;1572:10,13,
19;1574:5;1582:1;
1584:4;1589:18;
1591:9,11;1602:10;
1603:1,4,7,10,13,18;
1604:7,16,20;1605:4,
14,21,24;1606:20;
1608:5;1635:25;
1636:2;1637:24;
1639:15,18;1641:4,6;
1643:7

**Berman's (4)**
1424:7;1537:9;
1591:14,17

**best (9)**
1412:22;1414:25;
1446:22;1447:1;
1523:1;1570:2,4,13;
1649:4

**better (4)**
1414:15;1555:7;
1557:6;1590:12

**big (9)**
1410:2;1474:20;
1493:11,12;1532:25;
1543:20;1544:4,5;
1652:8

**bigger (1)**
1560:20

**biggest (2)**
1555:8;1633:13

**billion (7)**
1417:12,13;1554:19;
1566:7,7;1567:13,14

**binder (13)**
1412:4;1432:22;
1521:6,24,25;1522:1;
1524:12;1571:12,12;
1573:5;1601:5;1634:1;
1652:8

**bit (7)**
1444:10,11;1456:16;
1467:24;1487:14;
1495:21;1615:22

**black (1)**
1409:5

**blow (4)**
1450:18;1618:4;
1634:1;1643:23
**BMO (1)**
1503:14
**bonus (6)**
1414:25;1415:2;
1431:14;1432:9,14,17
**bonuses (1)**
1415:4
**book (1)**
1607:22
**boss (4)**
1439:1;1513:23;
1572:8;1575:1
**both (10)**
1453:17;1480:8;
1494:3;1496:16;
1512:18;1527:12;
1557:16;1574:24;
1610:10;1615:10
**bottom (36)**
1412:15;1435:21;
1441:11,17;1445:15;
1449:10;1450:19;
1451:1;1454:24;
1456:14;1461:22;
1465:19;1466:13,25;
1468:14;1473:1,3;
1474:10;1481:9;
1483:10;1487:4;
1496:19;1502:24;
1524:19;1538:14;
1550:16;1551:8;
1583:3;1585:23;
1618:14;1620:2,20;
1622:10;1627:2
**bottoms (7)**
1470:25;1555:25;
1556:8,11;1559:18;
1562:5;1563:5
**bottoms-up (4)**
1470:19;1471:12;
1537:24;1541:14
**bought (2)**
1444:18;1592:5
**box (1)**
1635:8
**BPS (2)**
1442:10,13
**break (13)**
1414:9,25;1484:9,
11;1485:2,15;1546:13;
1606:8,8,10,11,12;
1650:10
**breakdown (1)**
1562:4
**Brendan (2)**
1588:10,18
**Brenden (3)**
1438:25;1439:4,6;
1441:15

**brief (2)**
1651:25;1652:5
**bring (3)**
1408:13;1545:14;
1607:6
**broad (3)**
1517:15,17;1616:13
**broader (1)**
1517:13
**Brother (1)**
1608:11
**Brothers (7)**
1446:1;1447:3,15,
22,24;1448:15;
1449:11
**build (1)**
1511:16
**building (1)**
1538:11
**built (1)**
1620:10
**bullet (11)**
1439:25;1440:4;
1442:9,17;1443:1;
1584:17;1587:1;
1620:3,24;1632:6,17
**business (68)**
1409:24;1410:6;
1411:24;1417:3;
1440:2;1467:23;
1469:3,5,6,7;1473:3;
1480:4;1489:3;1490:9,
12,19,22,23,23,24,25;
1491:3,9;1493:8;
1496:20,24;1497:4,8,
16,17,18,23;1501:7,10,
11;1510:9;1536:19;
1541:3,6;1544:4,6;
1558:2,4,8;1585:11,15;
1587:2,6,17,25;1588:1,
5;1604:21;1615:18;
1616:14,15;1617:8;
1620:24,25;1621:24,
25;1622:4,10;1632:8,
13,14;1641:20;1646:1
**businesses (3)**
1410:6;1491:7;
1497:23
**buy (20)**
1414:22;1460:23;
1461:2,3,6;1507:10,13;
1563:13;1572:24;
1573:22;1574:1,4,5,8,
10,10,15;1603:24;
1642:10,15
**buy/sell (1)**
1414:10

## C

**calculate (4)**
1419:21,25;1420:7;
1563:5

**calculation (1)**
1419:22
**calculations (2)**
1440:23;1443:8
**calendar (3)**
1542:8,11,24
**call (94)**
1421:22;1436:18;
1437:17,25;1438:4,5,6,
8,9;1444:14,14,17,20,
21,21,22,23;1445:18,
20;1450:5;1452:15,16,
21,23,24;1453:2,4,5,7;
1458:18;1459:8,10,11,
18,20,23,25;1460:2;
1464:13,14;1466:7;
1473:4,8;1508:17,18;
1509:3;1550:22;
1581:3,22;1592:12;
1610:25;1618:16;
1619:7,10,12,13,15;
1624:8,12,13,17,18,20,
22,23,25;1626:7,9,13,
17,19,22,24;1627:20,
24;1628:1,3,9,12,15,
17;1631:12,14,16;
1634:20,24;1636:24;
1646:12,13;1647:17,
20;1648:4,11;1649:17
**called (15)**
1409:12;1437:23;
1460:24;1470:19,25;
1473:16;1477:5;
1506:6;1521:25;
1562:3;1592:18;
1624:24;1630:20;
1631:17;1632:5
**calling (1)**
1551:24
**calls (22)**
1421:17,20;1453:9;
1478:2;1608:22;
1610:2,5,6,7;1625:2;
1628:24;1630:1,22,25;
1645:13,17,22,25;
1646:1,3,5,19
**came (16)**
1432:9;1448:5;
1481:18;1507:25;
1531:3,6,17;1544:9;
1564:3;1567:16;
1587:22;1588:3;
1620:16;1623:1;
1634:3;1646:1
**can (65)**
1408:3,13;1409:7;
1415:5;1421:7;1425:8;
1426:8;1436:1,7,12;
1440:17;1441:1;
1450:4;1453:13,20;
1464:3;1467:1,13;
1473:14;1481:23;
1485:3;1486:3,14;

**calculation (1)** _(col 4 continued)_
1490:15,17;1515:23;
1519:13;1523:22;
1528:1;1530:7;
1538:14;1560:19,20;
1562:18;1563:24;
1567:25;1569:9;
1571:15,16;1573:4;
1579:1;1581:15;
1583:4;1585:13;
1588:3,5;1590:23;
1600:13;1607:2;
1616:12;1617:5,10;
1621:24;1622:3;
1623:2,25;1629:7;
1633:25;1635:3;
1641:1;1647:24;
1649:4;1650:5;1652:9,
9
**canceled (1)**
1639:10
**Capital (1)**
1591:8
**career (15)**
1411:19;1423:9,10,
14;1445:1,3;1512:9;
1514:8,16,18;1515:1,4;
1630:9,10,17
**case (8)**
1484:12;1485:12;
1523:17;1544:16;
1545:6;1595:1;
1604:14;1650:12
**cases (1)**
1517:17
**cash (1)**
1504:17
**casual (1)**
1516:1
**catch (3)**
1457:4;1588:22;
1623:23
**caught (1)**
1651:17
**cell (10)**
1421:23;1452:19,25;
1459:20;1545:10;
1619:12;1631:16,18;
1647:15;1648:4
**centers (1)**
1461:4
**central (2)**
1424:5;1643:8
**cents (8)**
1451:12;1558:12;
1566:13;1568:4,6;
1635:19;1636:8;
1637:3
**certain (9)**
1408:3;1442:21;
1517:7;1572:16;
1576:4,8;1585:1;
1651:18,22
**Certainly (4)**

1477:4;1521:16;
1564:12;1645:11
**certification (1)**
1414:3
**cetera (2)**
1444:15;1446:7
**CFA (3)**
1413:21,24;1414:11
**CFO (4)**
1576:2;1577:9;
1582:6;1637:13
**chain (3)**
1551:9,21;1568:15
**Chandler (2)**
1569:5,7
**change (6)**
1467:6;1471:12;
1475:12;1572:22,24;
1617:19
**changed (3)**
1431:25;1470:5;
1560:12
**changes (4)**
1465:16;1501:16;
1562:15,16
**changing (1)**
1496:25
**charged (1)**
1600:10
**charges (9)**
1442:10,18,19,21,24,
25;1620:5,8,11
**chart (3)**
1450:12;1570:23,25
**charter (1)**
1414:3
**chartered (1)**
1413:25
**charts (1)**
1564:5
**check (25)**
1428:10,17,19,25;
1429:2,22;1430:1,8,11;
1433:17,25;1434:1,2,5;
1458:16;1459:4;
1467:13;1468:16,17;
1475:9,16,19;1516:17;
1517:4;1647:24
**checking (3)**
1429:5;1466:14;
1627:2
**checks (7)**
1429:11;1431:1;
1465:23;1466:6;
1481:14;1487:8;
1523:6
**Cheers (2)**
1461:11;1462:10
**Chiasson (12)**
1607:9,15;1608:13,
16;1609:1,24;1610:14;
1612:25;1613:12;
1614:3,8;1641:10

**Chiasson's (1)**
1607:17
**chief (5)**
1574:21;1576:5;
1577:3;1582:2,7
**China (1)**
1506:12
**CHS (3)**
1522:8,13,14
**circumstances (1)**
1518:10
**citizen (1)**
1602:2
**City (4)**
1414:6,24;1503:14;
1512:18
**claimed (1)**
1603:10
**clarifications (1)**
1501:12
**clarify (1)**
1595:4
**class (5)**
1540:6,23,24;
1594:1,10
**clear (4)**
1489:5;1511:23;
1598:12;1644:6
**clerk (1)**
1545:5
**client (1)**
1480:20
**clients (1)**
1550:1
**clipped (1)**
1580:12
**close (9)**
1411:17,21;1418:8;
1439:25;1442:17;
1444:1;1509:22,24;
1567:16
**closed (3)**
1436:24;1444:3;
1448:23
**closer (4)**
1465:24;1466:3,5;
1617:24
**code (2)**
1646:20;1647:8
**colleague (1)**
1448:11
**colleagues (3)**
1448:6;1491:25;
1584:4
**column (1)**
1566:3
**combine (1)**
1556:16
**coming (4)**
1415:23;1430:13;
1434:9;1481:17;
1558:12;1578:11,11
**comment (13)**

1493:18;1494:24;
1495:12;1506:16,22;
1509:21;1512:1,3;
1532:25;1551:21;
1556:3;1587:16;
1632:18
**commentary (4)**
1495:25;1550:17;
1632:7,24
**commented (1)**
1508:2
**commenting (2)**
1551:14;1572:15
**comments (3)**
1509:6;1515:20;
1582:17
**commercial (11)**
1468:18,20,22;
1490:2,4,22;1491:1,11;
1492:7;1497:7,22
**commit (1)**
1610:14
**commitment (1)**
1524:25
**common (1)**
1591:13
**communicate (2)**
1417:6;1476:12
**communication (2)**
1553:4;1589:24
**community (1)**
1549:24
**compact (1)**
1559:4
**companies (19)**
1426:1;1468:24;
1476:1,7,15;1490:5,5;
1491:8;1493:11,12;
1500:11;1528:16,20;
1532:21;1538:5;
1547:5,16;1594:16;
1632:9
**company (34)**
1410:3,11,15,15;
1417:5;1418:1;
1423:21;1440:11;
1463:6,12,20;1470:24;
1471:16,20;1475:12;
1477:5;1478:24;
1483:3;1487:6;1500:5;
1501:15;1511:11,14,
15;1513:6;1518:12;
1547:19;1556:4;
1562:20;1582:18;
1611:6;1613:16;
1616:17;1633:13
**company's (2)**
1410:12,18
**compare (2)**
1616:9;1641:3
**compared (7)**
1455:20;1493:15;
1494:5;1552:9,18;

1566:22;1630:10
**compensate (1)**
1523:4
**compile (1)**
1546:22
**complete (2)**
1470:21;1575:19
**component (11)**
1551:9,16,21;
1555:6;1557:11,19,22;
1563:3,4,16,22
**components (6)**
1551:15;1557:17;
1562:21,22;1563:6,13
**computer (7)**
1542:3;1547:2;
1549:9;1551:14;
1562:23;1563:7,13
**computers (6)**
1494:22;1541:19;
1547:22;1548:14;
1551:15;1557:16
**concern (1)**
1596:19
**concerned (5)**
1537:15;1579:2;
1589:13,16;1599:17
**concerning (2)**
1502:17;1593:12
**concessions (2)**
1551:10,17
**concluded (2)**
1508:4;1596:10
**conclusion (4)**
1440:23;1552:24;
1573:19;1637:16
**condition (2)**
1506:17,20
**conditions (3)**
1409:24;1469:6;
1501:12
**confer (1)**
1606:4
**conference (1)**
1509:3
**confident (2)**
1455:11,21
**confidential (7)**
1420:12,15;1440:15;
1443:13;1478:17,20;
1479:6
**confirm (1)**
1467:13
**connect (1)**
1514:15
**connection (7)**
1416:13,16;1428:2;
1432:16;1434:25;
1435:4;1642:23
**consensus (8)**
1417:24;1418:3,9;
1453:18;1637:19,25;
1638:1,6

**considerable (1)**
1651:12
**considered (1)**
1544:7
**consist (2)**
1490:16,17
**consolidated (21)**
1410:11,16,19,21;
1415:7;1416:1,2,7,11,
17;1417:5;1419:3;
1423:5;1440:1,3;
1470:24;1485:18;
1615:7;1620:15,21;
1644:11
**Consolidating (1)**
1463:18
**Conspiracy (1)**
1609:9
**consultant (2)**
1548:10;1612:18
**consulting (12)**
1477:9;1539:7,25;
1540:21,22;1593:8,12;
1594:19,23;1595:3;
1598:20;1612:20
**consume (1)**
1490:25
**consumer (33)**
1410:5;1489:21,23,
24;1490:22;1491:1,11,
17,21;1492:7,18;
1494:19,21;1495:8,14,
17;1497:1,7,22;
1549:13,15,16;
1550:21;1557:18;
1587:6,10,18,25;
1588:5;1615:25;
1620:25;1622:6,10
**consumers (6)**
1468:24;1489:25;
1491:5,7;1492:20;
1507:10
**contact (20)**
1456:19,22,24;
1458:2;1466:15,18,18;
1468:18,25;1472:6;
1473:17;1475:20;
1524:24;1525:4;
1586:7;1610:25;
1614:18;1627:3,16;
1645:6
**contacted (1)**
1430:17
**contacts (9)**
1439:21;1455:11,21;
1515:12,20;1525:8;
1586:1,3,7
**contain (2)**
1575:20;1649:5
**contained (6)**
1410:12;1439:22;
1443:5,9;1559:5,8
**containing (1)**

1559:4
**contains (5)**
1435:9;1591:13,16;
1615:14,18
**context (2)**
1463:9;1652:7
**continue (12)**
1425:7;1430:23;
1444:25;1465:7;
1467:21,23;1471:6;
1496:3;1498:16;
1519:25;1523:22;
1630:1
**Continued (24)**
1408:14;1409:17;
1414:5;1441:19;
1456:2;1461:1;1482:5;
1484:15;1485:23;
1494:15;1497:12;
1498:10;1515:4;
1520:5;1545:15;
1548:16;1577:18;
1579:5;1586:8;
1603:16,18;1604:2;
1629:9;1650:16
**continues (3)**
1414:19;1506:11;
1555:3
**contradict (1)**
1547:19
**conversation (13)**
1456:7;1472:4;
1501:24;1511:8,9,23;
1515:8;1518:17;
1521:16,21;1525:20;
1583:10;1644:1
**conversations (10)**
1418:2;1423:6;
1498:14;1502:5,7;
1511:5;1514:15;
1515:25;1516:12;
1616:19
**convey (2)**
1588:20,24
**conveyed (1)**
1589:2
**cooperate (1)**
1595:20;1597:13,14,
15;1598:2,5;1600:12
**cooperated (2)**
1596:4,13
**cooperating (2)**
1605:8;1639:19
**cooperation (3)**
1595:18;1600:18,20;
1605:9;1638:21;
1639:5
**copied (4)**
1568:21;1569:2;
1570:1;1641:23
**copy (3)**
1558:22;1559:7;
1639:5

**corner (2)**
1413:22;1560:23
**corporate (17)**
1421:3;1423:2;
1449:15;1464:21,23,
24;1465:11;1491:23,
24,25;1492:5,15,16,18;
1493:8;1615:21;
1645:6
**corporates (1)**
1507:13
**corporation (1)**
1513:11
**corrected (1)**
1434:23
**corrections (1)**
1435:1
**correctly (3)**
1489:20;1511:12;
1513:22
**correlating (1)**
1580:4
**correspond (1)**
1547:5
**cost (17)**
1506:25;1509:12;
1555:6;1557:17,22;
1563:3,9,12,16;1576:8,
18,19,23;1577:5;
1632:17;1638:18;
1643:24
**costs (7)**
1557:11,12;1562:20;
1563:13,22;1576:15;
1577:1
**counsel (1)**
1651:11
**count (11)**
1576:12;1577:1;
1578:8,9;1582:3;
1609:9,11;1637:13;
1638:3,10,18
**counts (1)**
1609:7
**couple (13)**
1451:2;1461:24;
1462:5;1466:20;
1474:19;1475:14;
1476:2;1499:14;
1503:6,11;1542:16;
1553:17;1560:14
**course (2)**
1544:16;1617:20
**COURT (173)**
1408:2,6,9;1409:1,2,
15;1411:10;1412:10,
12,14;1428:15;
1429:17;1433:21;
1435:19;1437:7,10;
1438:20;1440:17;
1441:8;1445:13;
1446:17;1447:19;
1449:7;1452:4,6;

**corner (2)**
1454:4,18;1457:18,21;
1458:24;1459:2;
1460:12,14;1461:20;
1462:20;1464:2,5,8,11,
22,24;1465:10;
1468:12;1472:24;
1474:8;1477:2,22;
1478:21;1479:1,3;
1481:7;1483:8;
1484:10;1485:1,2,6,11,
19;1486:1,2;1487:2,
24;1502:22;1505:14;
1508:22;1514:20,23;
1515:23;1526:20;
1527:6;1528:9;
1529:25;1530:15;
1532:18;1534:25;
1544:14,20,24;1545:3,
4;1546:1,2;1553:9;
1559:1,11,13;1568:19;
1573:9;1577:14,17;
1578:2,17,21,24;
1579:2;1580:1,13,20,
23;1589:15;1590:2,6,
15,23;1591:23;
1593:16,20;1602:16,
19;1603:5;1604:5;
1605:16;1606:1,5,7,11,
17,23;1607:1,5,8;
1611:22;1612:16;
1613:10;1614:7,13,25;
1615:4;1616:12;
1617:3,5,10;1619:3;
1621:14;1622:2,23,25;
1623:6,8,12,19;1624:3;
1625:25;1627:12;
1629:7;1633:2,4,6;
1634:15;1635:24;
1636:1,4,16;1639:3;
1640:16;1641:1;
1642:13,17;1643:19;
1649:9,11;1650:3,5,7,
10;1651:1,2,6,13,16;
1652:2,9,15
**courtroom (3)**
1595:16,16;1640:2
**cover (4)**
1433:5;1559:25;
1607:1;1623:4
**covered (7)**
1427:9;1497:5;
1502:8;1594:16;
1622:21;1623:12;
1624:3
**covering (5)**
1417:25;1483:24;
1484:2;1487:21;
1623:15
**covers (2)**
1496:24;1497:4
**coworkers (1)**
1448:6
**create (2)**

1426:22;1470:15
**created (3)**
1427:4;1470:16;
1521:8
**creativity (1)**
1524:25
**crime (4)**
1597:24,25;1599:24;
1610:14
**crimes (1)**
1435:4
**criminal (1)**
1485:12
**cross (4)**
1606:18;1622:21;
1623:16;1651:13
**Cross-examination (19)**
1487:24;1488:1;
1544:21;1546:4;
1607:8,10;1614:18;
1615:11;1617:16;
1618:7;1619:22;
1620:13;1630:8;
1632:2;1633:8;1634:2;
1651:9,11,12
**cross-examined (1)**
1638:2
**crunch (1)**
1575:8
**cubicles (1)**
1631:8
**current (5)**
1501:10;1506:18;
1509:12,22;1543:25
**Currently (2)**
1506:23,24
**customer (2)**
1491:5,8
**customers (7)**
1410:4;1479:22;
1490:15,17;1491:6;
1495:4;1497:20
**cut (2)**
1577:1;1578:7
**cuts (4)**
1506:25;1632:17;
1638:18;1643:24
**cutting (5)**
1576:8,18,19,23;
1577:5
**cyber (1)**
1409:6
**cycle (8)**
1421:8;1436:23;
1442:7;1448:22;
1456:15;1503:4;
1617:20,21

**D**

**Dan (22)**
1408:13;1439:4,5;
1455:2,3,12;1456:2,7;

1477:12,14,16;1478:9,
12;1479:8,11;1481:18,
19;1588:12,12;1590:8,
25;1591:19
**Daniel (4)**
1438:24;1441:15;
1442:1,2
**Danny (6)**
1480:16,21;1481:11;
1483:10;1487:4;
1608:7
**dark (2)**
1611:19,23
**data (22)**
1439:9,20;1442:5;
1455:19;1475:23;
1476:1;1531:1;1532:4;
1533:4,6;1543:24;
1544:3,8,10;1546:12,
22;1547:14,17;1554:3;
1555:1,2;1585:25
**database (1)**
1448:4
**date (11)**
1427:11;1429:24;
1433:3;1434:3;
1436:21;1521:19;
1536:9;1559:25;
1560:3,9;1621:8
**dated (10)**
1493:5;1553:11;
1559:5,21;1565:18;
1573:15;1584:10,16;
1585:23;1587:1
**dates (4)**
1435:10;1488:7;
1561:4;1571:1
**day (11)**
1421:17;1422:13;
1436:18;1438:23;
1443:24;1460:6;
1465:21;1486:10;
1487:12;1536:14;
1546:3;1560:12;
1582:9;1583:8,20;
1605:13,20,23;1651:6,
7;1652:12,12
**days (11)**
1422:13;1439:18;
1442:8;1443:18,20;
1448:23;1450:24;
1467:5;1485:9;
1492:10;1636:22
**day-to-day (1)**
1534:6
**deal (1)**
1490:4
**deals (1)**
1489:23
**dealt (3)**
1623:15,17,19
**deceived (1)**
1605:7

**December (6)**
1414:12;1427:10;
1521:12,21;1579:3;
1604:7
**deceptive (1)**
1594:7
**decided (7)**
1414:14;1597:13,14,
15;1598:2,4,5
**decides (3)**
1601:16,20;1640:1
**decision (3)**
1601:1;1602:24,25
**decisions (3)**
1603:24;1642:9,14
**decline (4)**
1468:1;1493:20,24;
1555:8
**declined (3)**
1467:24;1498:5,19
**declines (8)**
1550:22;1555:5,6;
1556:24,25;1557:1,22,
24
**declining (1)**
1551:4
**deductions (7)**
1434:16,21;1598:8,
12,25;1599:2;1603:11
**deem (1)**
1446:21
**deep (1)**
1557:24
**defendants (1)**
1651:23
**Defendant's (18)**
1502:23;1505:15;
1508:23;1526:21;
1527:6,7;1528:10;
1529:25;1530:1,15,16;
1532:19;1535:1;
1553:10;1559:13;
1568:19;1573:10;
1580:24
**Defense (67)**
1488:17;1502:20;
1505:8,12,14;1508:15,
21,21,22;1524:5;
1526:11,18,20,22;
1527:4;1528:1,7;
1529:16,22,22;1530:7,
13;1532:11,16,18;
1534:16,23,25;1536:6;
1553:2,3,4,7,9;
1558:19;1559:3,6,7,8,
9;1568:13,17;1573:4,7,
9;1577:7,11;1580:3,4,
7,23;1582:11;1590:1;
1591:20;1593:1,15;
1631:25;1633:25;
1634:1;1635:3;
1637:11;1643:22;
1648:7,17,20;1650:1;

1651:10
**Defense's (1)**
　1528:9
**definitely (6)**
　1414:13;1466:15;
　1565:9;1627:3,16;
　1628:22
**degree (1)**
　1541:1
**Dell (213)**
　1409:20,23,24;
　1410:2,2,15,21;1413:8;
　1415:13,14;1416:4;
　1417:3;1418:3;
　1420:22;1422:19;
　1423:1;1425:8;
　1435:11;1439:9,21;
　1442:5;1443:24;
　1444:3,13,14,16;
　1448:12;1450:13;
　1456:17,18;1457:24;
　1458:13;1463:13,21;
　1464:17;1465:1,20;
　1467:21;1468:17,20,
　22;1469:10;1470:13;
　1472:1,3,7,11;1473:7,
　8,12,21;1474:14,17,24;
　1475:4;1477:15,17;
　1478:9,11,13,17;
　1479:7,8;1489:2,11,21;
　1491:15;1492:3,13,17;
　1495:5,23;1496:23;
　1497:4,14;1498:14;
　1499:17;1500:7,9,13,
　15,17,20,25;1501:3;
　1502:5,7,17;1503:21;
　1506:9,13,15;1508:12,
　25;1511:3,9;1512:16,
　23;1515:5,13;1516:12;
　1520:4;1523:6;1525:5,
　8;1530:18;1535:7,12;
　1537:23;1538:21;
　1541:15,16;1542:2,6,7,
　20,23;1543:5,10;
　1544:10,13;1547:7,7,
　10;1551:12;1552:2;
　1553:5,18;1558:16,22;
　1559:16,18;1560:17,
　23;1562:3;1564:21,25;
　1565:4;1567:5,11,20;
　1568:10,10,15,25;
　1570:2,4,4,7,9,12;
　1572:5,21,22;1573:2,
　13,22;1574:8,21;
　1576:8,10,14,25;
　1577:3,9;1582:7,8,9,
　13,15,16,16;1585:2,11;
　1586:1;1590:9;1591:3,
　13,16;1592:3,5,8,15,
　16,18,19,21,22;
　1606:21;1613:18,24;
　1614:1,19;1615:15;
　1625:10,16,18;1631:4,

7,20;1632:16;1633:22;
　1640:8,9,18;1641:22;
　1644:7,8,12;1645:5;
　1646:24;1647:9;
　1648:2
**Dell/HDD (1)**
　1481:14
**Dell/HP (1)**
　1551:8
**Dell/Lehman (1)**
　1474:11
**Dell-related (1)**
　1590:19
**Dell's (70)**
　1410:20;1415:7;
　1416:11,17,22;1419:3,
　7,10;1420:22;1421:8,
　9;1423:6;1435:9;
　1436:23;1440:1;
　1442:6;1444:9,25;
　1448:21;1454:7,21;
　1456:15;1458:9;
　1465:15;1466:19;
　1467:4,23;1468:23;
　1469:4;1490:12,19,23;
　1491:3,11;1495:10,16;
　1497:16,17,23;1501:7;
　1503:4;1505:19;
　1506:9;1508:9;
　1509:15;1510:9;
　1543:1,19,24;1544:1,2;
　1551:25;1553:22;
　1558:8;1564:5,13,17,
　25;1570:17;1572:2;
　1576:5;1585:15;
　1621:7,18;1632:8,13;
　1635:21;1637:13;
　1645:17,21
**demand (9)**
　1504:17,20,21;
　1506:6,16;1507:4;
　1632:6,10,11
**department (16)**
　1423:2;1424:5;
　1464:17;1472:3,10;
　1491:14;1501:1,7;
　1510:13;1511:6,10,24;
　1516:7;1643:8;
　1645:17,21
**dependent (1)**
　1507:7
**depending (1)**
　1546:16
**depends (1)**
　1651:18
**deportation (1)**
　1602:6
**deposit (5)**
　1429:1,4;1430:2;
　1433:10;1434:6
**describe (2)**
　1417:8;1418:5
**described (2)**

1418:6;1440:20
**description (2)**
　1448:9;1449:14
**desktop (3)**
　1468:15;1495:4;
　1544:4
**desktops (1)**
　1489:23
**desperately (1)**
　1414:9
**detail (7)**
　1471:11;1515:7,16;
　1523:15;1542:17;
　1546:17;1630:14
**detailed (4)**
　1515:13;1544:8;
　1546:19,23
**details (6)**
　1467:14;1470:22,22;
　1546:16,18;1575:20
**determination (1)**
　1601:24
**determine (1)**
　1419:17
**determined (1)**
　1549:16
**developed (2)**
　1549:21,22
**developing (1)**
　1500:8
**development (4)**
　1464:21,23,24;
　1465:11
**develops (1)**
　1578:10
**Diamondback (55)**
　1424:12,13,25;
　1425:2;1426:3,7,23;
　1428:1,23;1430:14,18,
　23;1434:13;1465:6;
　1517:22,24;1518:2;
　1519:5;1521:8;1526:3;
　1527:1,17;1528:5;
　1529:2,13,19;1530:10;
　1531:24;1532:14;
　1533:15,18;1534:3,10;
　1539:4,8,15;1548:17;
　1591:8;1597:16,19;
　1598:20,25;1599:4,7,
　10;1600:5;1603:8;
　1609:20;1612:2,14,18,
　21;1640:5,20;1642:4
**difference (1)**
　1566:17
**different (24)**
　1410:3,3,10;1416:6;
　1432:3;1449:17;
　1463:12;1491:2;
　1495:19;1497:19;
　1506:9,14;1513:7;
　1542:24;1544:1;
　1549:12;1562:21;
　1565:12;1569:15;

1590:20;1609:7;
　1615:18;1630:15;
　1647:25
**dinner (3)**
　1469:23;1574:18;
　1576:1
**direct (19)**
　1409:9,16;1486:16;
　1517:21;1518:7;
　1521:5;1522:10;
　1570:19;1571:1;
　1582:20;1600:15;
　1615:10;1618:6,15;
　1619:6;1620:2;1623:5;
　1636:23;1649:15
**directing (1)**
　1565:12
**directly (5)**
　1479:17;1537:12,20;
　1547:7;1616:16
**director (1)**
　1499:1
**discuss (12)**
　1408:9;1423:7,22;
　1436:18;1445:1;
　1484:12;1501:22;
　1544:16,22;1617:1;
　1650:12;1651:20
**discussed (10)**
　1449:13;1501:18;
　1507:18;1512:2;
　1517:25;1518:24;
　1519:3;1523:3;
　1525:11;1557:20
**discussing (2)**
　1449:18;1451:6
**discussion (4)**
　1431:10,10;1508:9;
　1620:8
**discussions (4)**
　1431:7,11,12;
　1469:24
**disk (2)**
　1478:14;1559:4
**displayed (1)**
　1478:5
**distinguish (1)**
　1461:8
**divided (2)**
　1427:8;1591:12
**division (8)**
　1428:19;1489:21,23;
　1490:2,4;1496:23,25;
　1556:2
**Diwali (3)**
　1412:16,19,22
**document (10)**
　1448:17;1508:16;
　1522:2;1571:15;
　1615:12,14;1618:6,9;
　1620:14;1622:21
**documents (1)**
　1521:5

**dollar (2)**
　1430:6,17
**dollars (1)**
　1424:14
**done (19)**
　1431:15;1432:10;
　1465:22;1471:15;
　1511:15;1515:14;
　1520:1;1521:22;
　1523:5,14,19;1529:6;
　1537:1;1540:2;
　1549:15;1561:11;
　1563:19;1596:23;
　1606:4
**Dosti (3)**
　1483:11;1487:5,8
**double (2)**
　1647:24;1652:3
**doubt (1)**
　1588:6
**down (15)**
　1413:14;1415:5;
　1422:1,15;1444:19;
　1447:25;1450:19;
　1464:19;1507:3;
　1556:1;1584:17;
　1587:2;1632:17;
　1635:3;1650:5
**dozens (1)**
　1607:21
**draft (1)**
　1575:24
**drink (1)**
　1606:13
**drive (1)**
　1557:12
**driver (1)**
　1576:21
**drivers (1)**
　1576:22
**drives (1)**
　1478:14
**driving (1)**
　1471:12
**D's (1)**
　1479:11
**due (2)**
　1507:10;1555:7
**duly (1)**
　1409:13
**Dunlap (9)**
　1472:6,7;1475:17;
　1498:23;1499:12;
　1510:9,12,20;1631:10
**During (16)**
　1411:15;1413:2;
　1416:20;1420:25;
　1423:6,11;1444:24;
　1460:21;1479:10,24;
　1615:10;1618:14;
　1622:21;1623:15;
　1630:8;1646:1
**duties (1)**

1534:6

# E

**earlier (9)**
1431:24;1449:13;
1462:2;1467:25;
1475:15;1556:12;
1584:10;1594:1;
1648:14
**early (7)**
1414:24;1465:13;
1474:15,17;1475:4;
1488:16;1519:6
**earning (3)**
1442:7,22;1456:15
**earnings (58)**
1410:13;1419:10,16,
17;1421:8,15,16;
1435:10;1436:23,24;
1442:8;1443:2,19,21,
24;1444:3,9,10,23;
1448:22;1450:13,24;
1451:8;1453:17;
1454:7,8,22;1458:9,11;
1466:19;1467:4;
1471:1,2,16;1474:18;
1487:13;1501:25;
1508:17,18;1528:14;
1532:15,21;1558:16;
1561:19,20;1566:12,
14;1571:2;1576:21,22;
1582:17;1617:20,21,
24;1621:7;1634:9;
1635:21;1638:5
**East (1)**
1470:10
**eat (1)**
1486:8
**economic (2)**
1506:17;1632:11
**effect (1)**
1610:19
**effectiveness (1)**
1509:12
**effort (1)**
1525:7
**Egypt (1)**
1470:10
**eight (4)**
1416:18;1434:20;
1471:14;1607:3
**either (11)**
1414:22;1417:9;
1422:12;1491:6;
1494:2;1496:15;
1533:5;1555:17;
1574:15;1602:8;
1607:23
**else (13)**
1423:7;1432:16;
1515:15;1545:10;
1588:4,6;1589:6;

1601:25;1607:1;
1610:18;1631:20;
1641:17;1651:19
**e-mail (188)**
1412:6,15,15;
1413:10,11;1414:5,19;
1435:12,21,21;
1436:21;1438:14,23;
1439:8,16,23;1440:21;
1441:4,12,14,16;
1442:4,6,7;1443:5,9;
1444:8;1445:7,15;
1446:12,19;1447:15,
21,21,25;1448:10,14,
20;1449:10,11,20,25;
1450:19,20;1451:1,4;
1453:10,14,16,22;
1454:6,12,24;1455:18;
1456:13,25;1457:1,7,
13;1458:6;1459:4;
1460:5,7,16,17;
1461:14,22;1462:2,14,
24;1463:7,10;1464:10;
1465:19;1466:8,25;
1468:6,14;1472:18;
1473:1;1474:2,10;
1476:20;1478:1;
1481:1,9,10;1483:2,10,
13;1486:23;1487:4,4,
10,15;1492:25;1493:5;
1502:16,24;1503:13;
1504:7;1505:9,16;
1528:4,20;1532:7,9;
1534:20,20;1535:2,18,
18,19,20,22,23,24,25;
1536:4,17,23;1537:9,
24;1548:25;1549:2;
1550:9,16,19;1552:3,
21;1553:11,21;1554:2,
25;1555:3,18;1557:20;
1558:21;1559:5,21;
1565:19,24;1568:14,
15,20;1569:25;
1582:25;1583:3,9,10,
13;1584:3,8,10,16;
1585:23;1587:1;
1588:9;1589:23;
1590:10;1592:12;
1593:2;1618:14,21;
1620:2,20;1622:9,16;
1623:17,21;1625:5,14,
15;1628:21;1634:22;
1636:21,25;1637:2;
1644:18;1645:3,11;
1648:18;1649:2,5
**e-mailed (1)**
1608:18
**e-mails (24)**
1413:1,2,4;1451:22;
1454:20,20;1462:22;
1463:7;1480:7,8,9,10,
13;1533:11;1549:2;

1587:21;1588:19,19,
23;1589:20;1591:1;
1608:15;1641:22;
1644:25
**embedded (1)**
1606:20
**EMC (1)**
1584:20
**employ (1)**
1520:2
**employees (1)**
1608:5
**employing (1)**
1605:5
**employment (3)**
1423:22;1488:7,22
**encountered (2)**
1431:24;1545:8
**end (33)**
1421:1,14,15;
1439:14;1450:4,9;
1465:24;1468:2;
1503:8;1505:19;
1506:19;1507:4;
1513:14;1542:17;
1550:1;1551:10;
1552:5,12;1553:14,17;
1564:9,18;1565:13;
1567:9;1575:18;
1576:16,25;1583:5;
1592:6;1595:2;
1617:23;1635:17;
1638:14
**ended (23)**
1420:22;1439:12;
1452:23;1458:10;
1508:18;1509:19;
1552:11,14,18;
1553:14;1558:16;
1561:12;1564:13,17;
1565:13,23;1566:2,6,
21;1567:6;1571:1;
1582:20;1638:20
**ending (2)**
1570:20;1635:16
**end-of-year (1)**
1415:4
**endorsed (2)**
1429:2;1430:3
**ends (9)**
1439:13;1466:3;
1468:16;1503:6,8;
1550:12,14;1565:1;
1567:8
**engage (1)**
1630:1
**enjoy (1)**
1629:2
**enjoying (1)**
1414:6
**enlarge (4)**
1413:14;1432:25;
1456:12;1632:1

**enough (1)**
1550:22
**entered (2)**
1523:2;1603:4
**enterprise (2)**
1490:8,22
**enterprises (2)**
1491:7;1549:14
**entire (5)**
1495:8;1544:13;
1556:3;1607:17;
1614:9
**entities (1)**
1432:3
**entity (1)**
1435:7
**EPS (18)**
1419:11,21;1443:1;
1451:7,8,16;1455:11;
1501:15;1558:11;
1562:14;1568:3;
1620:20;1636:3,4;
1637:18,23,24;1638:20
**EPSs (1)**
1544:11
**EPS's (1)**
1546:18
**equities (1)**
1461:5
**equity (3)**
1448:3,5,7
**especially (5)**
1500:3,8;1568:9,10;
1592:24
**essential (1)**
1525:1
**estimate (15)**
1417:25;1526:8,9;
1544:11;1562:7,10;
1566:20,21;1635:9,15,
21;1636:3,8,19;
1637:19
**estimated (1)**
1562:20
**estimates (15)**
1418:3,10,10;
1470:24;1554:4,8;
1555:4,14,20;1556:15;
1561:10,17;1562:13;
1571:10;1643:4
**estimating (3)**
1451:12;1555:16,22
**et (2)**
1444:15;1446:6
**etc (1)**
1504:17
**Europe (2)**
1410:4;1506:11
**even (14)**
1408:6;1499:11;
1518:11;1521:21;
1558:11;1565:23;
1574:23;1575:23;

1590:17;1598:10,10;
1604:2;1605:20;
1608:11
**evening (15)**
1438:11;1456:20,23;
1457:25;1458:16,18;
1459:5;1531:17;
1536:24;1626:4;
1645:14;1648:15,24;
1650:12;1652:15
**event (2)**
1518:13;1647:25
**Everybody (3)**
1485:6;1538:23;
1551:22
**everywhere (2)**
1506:17;1631:7
**evidence (75)**
1411:12;1413:10;
1427:1;1428:16;
1429:20;1432:24;
1433:23;1435:20;
1437:3,9,12;1438:22;
1441:10;1444:6;
1445:14;1446:18;
1447:20;1449:9;
1450:17;1452:7;
1454:5,19;1456:11;
1457:22;1458:5;
1459:3;1460:15;
1461:21;1462:21;
1465:19;1466:12,25;
1468:13;1472:25;
1474:9,24;1477:25;
1481:8;1483:9;1487:3;
1492:23;1502:23;
1505:15;1508:23;
1521:6;1524:6;
1526:21;1527:7;
1528:10;1530:1,16;
1532:19;1535:1;
1536:6;1548:22;
1553:10;1567:4;
1573:10;1580:6,18,24;
1582:12,24;1584:2;
1590:7;1591:7,22;
1606:19,25;1619:5;
1621:15;1624:5;
1626:1;1627:13;
1634:17
**ex (1)**
1440:5
**exact (2)**
1542:18;1610:16
**exactly (18)**
1409:7;1465:12;
1495:11;1510:18;
1519:11,14;1528:17;
1534:4;1542:17;
1544:1,5;1570:13;
1595:19;1597:5;
1601:4,18;1604:18;
1651:8

**examination (6)**
1409:9,16;1486:16;
1614:15;1643:20;
1649:12
**example (18)**
1410:4;1417:12;
1418:8,13,15;1490:6;
1493:2;1507:9;
1511:15;1513:23;
1517:13,18;1526:15,
25;1542:11;1543:1;
1615:21;1616:23
**examples (3)**
1417:17,18;1527:23
**exams (1)**
1414:3
**exceed (1)**
1572:2
**Excellent (1)**
1444:14
**except (1)**
1587:16
**exceptional (1)**
1508:10
**excerpt (12)**
1437:2,8;1451:25;
1458:21;1580:5,17;
1591:21;1606:21;
1618:24;1625:22;
1628:8;1634:13
**excerpted (1)**
1626:6
**excerpts (3)**
1559:8;1580:19,21
**exchange (15)**
1413:10;1445:8;
1450:20;1453:10,16;
1457:13;1458:6;
1461:14;1462:24;
1468:6;1472:18;
1474:2;1502:16;
1539:22;1582:25
**exclude (1)**
1442:22
**excluding (5)**
1442:18,19,24;
1509:11;1614:19
**Excuse (10)**
1410:14;1462:23;
1464:7;1467:19;
1525:19;1558:4;
1564:15;1569:21;
1580:5;1612:12
**excused (3)**
1484:14;1650:6,15
**executive (1)**
1582:8
**Exhibit (261)**
1411:2,7,10,12;
1412:5,8,14;1413:9;
1426:25;1428:7,11,16;
1429:6,7,21;1430:5,10;
1432:21,24;1433:14,

18,21,23;1435:9,12,15,
19,20;1437:2,3,5,11,
12;1438:14,17,20,22;
1441:2,6,8,10;1444:7;
1445:7,10,13,14;
1446:9,14,17,18;
1447:9,12,16,20;
1449:1,4,8,9;1450:16;
1451:25;1452:1,2,6,7;
1453:13,15,21,25;
1454:5,12,15,18,19;
1456:10;1457:12,16,
21,22;1458:4,20,21,22;
1459:2,3,7;1460:5,10,
14,15;1461:13,17,20,
21;1462:14,17,20,21;
1465:18;1466:12,24;
1468:5,9,12,13;
1472:15,21,24,25;
1473:24;1474:5,8,9,23;
1475:7;1476:17,23;
1477:20,24,25;
1480:23;1481:4,7,8,22;
1482:3;1483:5,8,9;
1484:7;1486:20,24;
1487:2,3,9;1488:17;
1492:22;1502:15,16,
20,23;1505:8,12,14,15;
1508:15,21,23;1521:4;
1524:5;1526:11,18,21,
22;1527:4,7;1528:1,7,
10;1529:16,22,23;
1530:1,7,13,16;
1532:11,16,18,19;
1534:16,23;1535:1;
1536:6;1548:21;
1553:2,3,4,7,9,10;
1558:19;1559:3,5,7,7,
8;1567:3;1568:13,17,
19;1570:25;1573:4,7,
10;1577:7,11;1578:18;
1580:4,4,7,23,24;
1581:15;1582:11,23;
1584:1,7;1589:21;
1590:1,6,7;1591:7,12,
13,15,16,18,21;1593:1,
15;1606:17,19,25;
1615:9;1618:3,24,25;
1619:1,4,5,17,22;
1621:5,10,15;1622:13,
23,25;1623:25;1624:5;
1625:14;1626:1;
1627:1,13;1631:25;
1633:25;1634:12,17;
1635:4;1636:23;
1637:11;1638:25;
1639:3;1643:22;
1644:17;1646:8;
1648:7,9,17,20;1650:1
**Exhibits (11)**
1428:15;1429:14,17,
19;1537:11;1559:9;
1578:19,25;1607:21,

22;1652:7
**expect (5)**
1445:19;1456:4;
1488:22;1494:25;
1543:19
**expectation (1)**
1531:3
**expectations (11)**
1417:10,20,24;
1418:7,9,11;1440:1;
1446:7;1531:7;1572:3;
1576:11
**expected (1)**
1439:25
**expecting (2)**
1418:24;1505:1
**expense (3)**
1501:25;1504:24;
1576:19
**expenses (5)**
1434:22;1442:16;
1501:23;1502:10;
1510:23
**experience (4)**
1425:25;1448:7;
1570:16;1582:15
**expert (6)**
1408:3;1476:3;
1477:9;1568:10;
1640:24;1651:22
**expertise (3)**
1570:4,5,17
**experts (1)**
1476:8
**explain (3)**
1556:7;1574:22;
1623:2
**explaining (1)**
1632:7
**explanation (1)**
1633:20
**exposure (1)**
1599:17
**extended (1)**
1630:2
**extent (1)**
1580:18
**eye (1)**
1424:2

## F

**F04/08 (1)**
1635:9
**face (2)**
1600:13;1645:3
**fact (13)**
1516:6;1518:2;
1525:7;1537:14;
1555:7;1558:20;
1569:19;1587:23;
1589:8;1593:24;
1609:1;1610:16;

1644:25
**FactSet (1)**
1528:18
**fair (6)**
1436:4,13;1491:10;
1515:25;1543:17;
1610:9
**fake (2)**
1597:20;1598:25
**false (4)**
1597:16;1600:5;
1603:7,11
**familiar (5)**
1410:7;1418:3;
1477:5;1490:19;
1548:4
**familiarity (2)**
1575:23,25
**family (2)**
1412:18,22
**far (11)**
1414:10;1471:3;
1473:6;1511:7,17;
1516:17,24,25;1611:3;
1643:4;1644:14
**fast (1)**
1419:23
**favorably (1)**
1414:4
**Fayad (14)**
1438:25;1441:14;
1454:13;1462:8;
1472:18;1474:14;
1476:20;1480:10;
1481:11;1483:17;
1487:16;1575:1;
1582:4;1635:5
**FBI (9)**
1434:9;1595:1,6,17;
1596:23;1599:6;
1602:14;1610:7,9
**February (47)**
1435:13;1436:14,22;
1437:16,17;1438:6,11,
15,24;1439:15;1441:4;
1443:18,21;1444:8;
1542:12,15;1543:1;
1553:11;1564:9,23;
1565:1,2,10,11,16;
1584:8,10,17;1585:23;
1587:1;1593:3;
1618:14,16,17,21;
1619:7,8,16,18;1621:9,
18;1634:8,20,21;
1648:15,24;1649:2
**feedback (2)**
1423:16;1495:22
**feel (2)**
1446:20;1570:24
**Feith (1)**
1486:13
**few (10)**
1419:23;1431:11;

1448:23;1454:8,21;
1480:7;1540:7;
1588:17;1593:22;
1620:24
**field (1)**
1415:4
**figure (3)**
1495:10;1549:18;
1556:17
**figured (1)**
1414:24
**figures (1)**
1554:9
**file (2)**
1532:25;1533:4
**filed (1)**
1651:21
**files (4)**
1535:14;1537:12,15,
20
**final (6)**
1467:13;1487:8;
1575:8,15,21;1594:9
**Finally (1)**
1435:24
**finance (1)**
1415:4
**financial (35)**
1410:16,18,21;
1413:25;1415:7,24;
1416:1,8,11,17,22;
1421:6,9;1423:5,7;
1425:23;1444:25;
1463:19;1465:15;
1470:13,19;1523:13;
1525:14;1527:24;
1528:15;1549:24;
1569:15;1574:21;
1576:5;1577:3;1582:3;
1615:8;1616:17;
1617:1;1631:21
**find (9)**
1448:11;1449:13;
1461:24;1514:4;
1569:10,19,20,22;
1615:2
**fine (13)**
1494:24;1495:12,14,
17,18,19;1496:1,1;
1601:24;1606:5,10;
1616:3;1652:13
**finish (3)**
1421:14;1485:14,20
**firm (4)**
1445:24;1465:25;
1466:2;1513:20
**firms (7)**
1476:3;1477:9;
1499:21,25;1500:2,9;
1537:6
**first (40)**
1411:23;1415:6;
1417:11;1424:14;

1431:5;1437:15;
1439:25;1442:9;
1452:10,13;1454:24;
1474:10;1478:3;
1483:10;1488:18;
1493:8;1518:24;
1519:3,15;1522:19,25;
1524:12,23;1535:18;
1554:2;1568:21;
1571:15;1573:22;
1595:1,5;1596:23;
1602:13;1607:18;
1609:2;1621:25;
1622:3;1634:19;
1635:14;1638:9;
1649:20

**fiscal (2)**
1542:23;1564:1

**Fischbein (1)**
1488:5

**FISHBEIN (104)**
1411:9;1412:11;
1428:13;1429:15;
1433:20;1435:17;
1437:8;1438:19;
1440:16;1441:7;
1445:12;1446:16;
1447:18;1449:6;
1452:5;1454:2,17;
1457:19;1458:25;
1460:13;1461:19;
1462:19;1464:3;
1468:11;1472:23;
1474:7;1476:25;
1477:21;1481:6;
1483:7;1484:8;1487:1,
25;1488:2;1502:20;
1505:12;1508:21;
1526:18;1527:4;
1528:7;1529:22;
1530:13;1532:16;
1534:23;1546:4,5,6;
1553:7;1558:24;
1559:2;1560:19;
1568:17;1573:7;
1577:11,15;1578:4,20,
23,25;1579:4;1580:2,
17;1590:1;1591:5;
1593:15,18,22;1606:3,
6,19;1609:6;1614:18,
24;1615:3;1616:11;
1617:2,4,9,15;1618:8;
1619:21;1621:12;
1622:20;1623:3,14;
1629:6;1630:8;1632:5;
1633:1;1634:18;
1636:10,13,15;1639:2,
14;1640:25;1642:12,
16;1643:19,21;
1648:12;1649:8,15,20

**fit (1)**
1533:4

**five (2)**

1610:4;1636:22

**flat (1)**
1651:17

**Fletcher (7)**
1438:25;1439:4,5;
1441:15;1588:12,17,24

**flipping (2)**
1622:9;1625:8

**flow (1)**
1504:17

**fluctuate (1)**
1507:8

**fluctuation (1)**
1632:22

**fluctuations (1)**
1507:16

**flung (1)**
1497:2

**focus (2)**
1414:11;1613:12

**Focusing (1)**
1454:20

**follow (2)**
1545:13;1608:24

**following (3)**
1431:8;1460:6;
1559:3

**follows (2)**
1409:13;1591:12

**food (2)**
1551:9,21

**football (1)**
1650:12

**footed (1)**
1651:18

**forcefully (1)**
1597:11

**forecast (3)**
1470:22,23;1471:18

**form (4)**
1574:6;1614:6,7,25

**forma (1)**
1566:17

**format (2)**
1421:5;1505:25

**formulas (1)**
1538:6

**Forrester (1)**
1476:1

**forth (1)**
1491:8

**forward (8)**
1436:1,7;1471:14;
1528:12,13;1529:10;
1536:24;1651:3

**forwarded (25)**
1423:21;1449:17,19,
20;1457:7;1462:22,24;
1463:22;1466:8,21;
1467:11;1480:10;
1481:1,9,24;1483:2,16,
18,19;1486:23;
1487:15,19;1548:23;

1550:10;1590:11

**forwarding (4)**
1441:11;1449:25;
1450:2;1589:24

**forwards (1)**
1584:10

**foundation (2)**
1477:3;1577:15

**four (9)**
1420:24;1427:8;
1471:14;1519:10;
1584:17;1587:1;
1624:20;1648:14;
1652:2

**four-second (1)**
1459:23

**frame (1)**
1465:10

**framework (5)**
1460:18,20;1461:23;
1462:3;1543:22

**frameworks (1)**
1461:24

**Francisco (2)**
1455:9;1540:25

**fraud (6)**
1599:25;1600:2;
1602:17;1605:1,5;
1609:11

**free (2)**
1446:20;1570:24

**freely (1)**
1525:10

**frequency (2)**
1501:2;1515:7

**frequent (1)**
1511:25

**Friday (5)**
1409:6;1485:8;
1486:10;1627:15;
1628:21

**Fridays (1)**
1486:11

**friend (12)**
1422:19;1468:20;
1469:1;1490:1,11;
1497:5;1568:25;
1569:2,12;1587:10,14;
1647:7

**friendly (1)**
1569:9

**friends (49)**
1409:19,22;1411:18,
20,22;1413:20;1416:4;
1467:21;1480:2;
1489:2,6,13,20;
1491:14,19,24;1492:4,
4,6,9,10;1493:3;
1494:8,15;1495:23;
1496:11,22;1497:3,8;
1498:1,8,11,16,19;
1523:8;1525:4;1540:7;
1585:10,14,21;

1587:16;1614:19;
1615:15,19;1641:16;
1646:24;1647:6;
1648:1,1

**front (8)**
1480:24;1521:24;
1627:19;1648:8

**full (8)**
1414:12;1435:2;
1520:2;1522:8;
1524:23;1601:10;
1651:6,7

**full-time (2)**
1523:16;1641:3

**fully (3)**
1414:6;1551:20;
1599:3

**function (6)**
1480:19;1483:21;
1499:16,19,23;1500:2

**fund (14)**
1424:22;1455:8;
1499:21;1500:2;
1534:5;1591:14,17,20,
25;1609:15,20;
1611:25;1642:1,6

**funds (2)**
1642:9,14

**further (5)**
1487:23;1591:19;
1606:6;1614:11;
1643:18

**future (9)**
1471:1,2,3,14;
1551:23;1633:19

**FYI (2)**
1466:9;1467:12

# G

**GAAP (4)**
1508:7;1566:15,15,
17

**gaining (1)**
1495:5

**gains (1)**
1494:25

**Gartner (23)**
1476:1;1530:20;
1531:1,2,5,17;1532:2;
1541:25;1542:2,8,12,
19;1543:4,18,24;
1544:2;1546:7,10,13;
1547:8,11,14,20

**gave (32)**
1422:5;1423:15,16,
19;1476:11;1479:22,
23;1498:21;1509:18;
1512:9;1513:17;
1515:5;1516:4;1524:8,
16;1527:21,23;
1531:14;1544:3;
1569:20;1571:7,11;

1582:8,13;1590:16,19,
21;1616:25;1617:12;
1643:2;1652:7,8

**general (12)**
1409:22,24;1413:4;
1469:6;1501:11;
1506:16,17;1510:22,
22;1558:8;1616:13;
1632:10

**generally (23)**
1421:6,13;1500:2,
11;1501:14;1503:19,
20;1505:3;1507:10;
1511:17,19,21;1515:8,
11;1549:23;1550:6;
1604:19;1629:8;
1631:7;1632:15;
1633:20;1645:5;
1646:7

**gentlemen (4)**
1409:3;1484:11;
1486:2;1544:15

**geographic (3)**
1506:11;1585:20;
1632:12

**geographically (1)**
1632:6

**geographies (2)**
1506:9,14

**George (1)**
1470:4

**gets (4)**
1547:14;1637:3;
1638:13;1639:10

**given (4)**
1478:23;1515:9;
1541:11;1590:13

**gives (4)**
1543:24;1547:7;
1550:16;1645:6

**giving (8)**
1419:21;1514:12,16;
1515:1;1533:15;
1534:9;1590:18;
1611:25

**glad (1)**
1474:14

**Gladden (1)**
1509:7

**Global (6)**
1477:5;1591:8;
1609:22;1612:23;
1614:1;1641:10

**Global's (1)**
1613:18

**GM (16)**
1465:21;1504:17,22;
1507:3;1508:4;
1509:21;1552:5,8,9,17;
1555:3,11,22;1557:25;
1632:19,19

**goal (2)**
1450:4,9

**goals (4)**
1423:10,14;1445:3;
1446:7
**goes (4)**
1444:19;1528:22;
1591:9;1593:18
**Good (29)**
1409:2,3;1415:21;
1436:17;1450:1;
1461:5;1473:8;1488:3,
4;1495:20;1539:1;
1543:24;1544:7,16;
1546:2;1549:13;
1568:7;1570:12,15;
1607:12,13;1615:25;
1616:5,24;1617:8;
1632:12;1636:13;
1650:11;1652:15
**goods (2)**
1563:9,12
**government (207)**
1408:2;1409:12;
1411:2,7,7,10;1412:5,
8,8,14;1413:9;
1426:25;1428:7,11,11,
15;1429:6,7,13,13,17,
21;1430:5,10;1432:21,
24;1433:14,18,18,21;
1435:9,12,15,15,19;
1437:2,2,5,5,11;
1438:14,17,17,20;
1441:2,6,6,8;1444:6;
1445:7,10,10,13;
1446:9,14,14,17;
1447:12,16,16;1449:1,
4,4,8;1450:16;
1451:25;1452:1,2,2,6;
1453:13,21,25,25;
1454:4,12,15,15,18;
1456:10;1457:12,16,
16,21;1458:4,20,21,22,
22;1459:2,7;1460:4,10,
10,14;1461:13,17,17,
20;1462:14,17,17,20;
1465:18;1466:11,24;
1468:5,9,9,12;1472:15,
21,21,24;1473:24;
1474:5,5,8,23;1475:7;
1477:19,20,24;
1480:23;1481:4,4,7,22;
1482:3;1483:5,5,8;
1484:7;1486:20,24,24;
1487:2,9;1492:22;
1502:15,16;1521:4;
1548:21;1567:3;
1570:25;1582:23;
1584:1,7;1589:21;
1590:1,6;1591:7,12,12,
15,15,18,21;1599:21;
1600:12;1601:3,4,16,
19,20;1603:2;1604:3;
1605:8,11;1606:17;

1610:2;1615:9;1618:3,
24,25;1619:1,1,4,17,
22;1621:5,10,10;
1622:13;1623:25;
1624:2;1625:14,24;
1627:1,10;1634:12,15;
1636:22;1638:22,25;
1639:1,3,6,19,22;
1644:17;1646:8;
1648:9;1651:21
**Government's (38)**
1411:12;1428:16;
1429:19;1433:23;
1435:20;1437:12;
1438:22;1441:10;
1445:14;1446:18;
1447:20;1449:9;
1452:7;1454:5,19;
1457:22;1459:3;
1460:15;1461:21;
1462:21;1468:13;
1472:25;1474:9;
1477:25;1481:8;
1483:9;1487:3;1590:7;
1602:25;1605:17;
1606:25;1619:5;
1621:14,15;1624:5;
1626:1;1627:13;
1634:17
**Goyal (95)**
1409:10,11,18;
1411:1,2,13;1412:15;
1427:1;1428:7,17;
1429:6,22;1432:21;
1433:1,14,24;1435:8;
1437:4,14,18;1438:13,
23;1441:2,11;1445:15;
1446:10;1447:11,21;
1449:2;1452:10;
1454:6;1458:19;
1459:11;1472:16;
1473:25;1480:24;
1482:3;1486:19;
1488:3,5;1502:24;
1505:16;1508:24;
1518:24;1521:15,24;
1522:18;1524:7;
1527:8;1528:11;
1530:2,17;1532:20;
1535:2;1544:21;
1546:4,7;1547:6;
1548:23;1551:19;
1553:11,20;1555:18;
1559:6,15;1564:4;
1567:5;1568:7,20;
1573:11;1578:5,8;
1580:3,25;1582:24;
1585:4;1587:21;
1589:16;1590:8;
1591:24;1592:25;
1593:24;1607:12;
1614:3,17;1619:6;
1621:16;1622:3;

1623:25;1624:6;
1626:5;1639:5;
1643:23,25;1650:5
**Goyal_Sandy@Yahoocom (1)**
1535:22
**Great (1)**
1652:15
**green (3)**
1561:7,15;1564:10
**Greenwich (5)**
1437:15;1438:5;
1452:14;1459:9;
1581:10
**Greg (1)**
1607:14
**grew (2)**
1587:2,7
**gross (58)**
1417:1;1418:12,21,
23,25;1440:4,10,11,24;
1464:14;1493:25;
1494:2;1496:15;
1501:19,20,21;1502:8;
1504:22;1507:7,14,17,
21,23,24;1508:1,9,12;
1509:10,15;1510:15,
17;1517:18;1551:22;
1552:9;1555:11,13,24,
25;1556:1,3,23;
1557:20;1561:21,23;
1562:1;1563:5,9;
1564:2;1566:10,11;
1567:20;1571:10;
1572:2;1620:3,9,21;
1644:4,6
**ground (1)**
1547:17
**group (10)**
1469:6,7;1480:7;
1499:10;1503:23,24;
1505:5,7,24;1514:1
**groups (1)**
1409:24
**growth (21)**
1493:13,16,17;
1494:24;1495:12,14,
17,19;1527:11;
1530:18;1531:8;
1543:8,17,18,23,24;
1544:1;1562:14,14;
1587:25;1616:3
**guess (6)**
1416:19;1465:21;
1485:16,19;1538:23;
1545:6
**Guessing (4)**
1555:4,15;1556:5;
1634:6
**guesstimate (1)**
1543:21
**guidance (1)**
1413:6
**guilty (17)**

1599:22,24;1600:2,
4,7;1602:17,19;
1603:5;1604:3;1605:1,
5,24;1609:6,7,13;
1639:15,23
**guy (2)**
1478:9;1479:14
**guys (1)**
1468:17

---

# H

**hair (2)**
1637:19,23
**half (12)**
1444:12;1450:19;
1453:8;1456:16;
1485:20;1514:14;
1544:5;1619:14;
1626:21;1630:19;
1635:2;1641:5
**halfway (1)**
1421:13
**hand (1)**
1560:8
**handing (1)**
1451:24
**handset (1)**
1504:17
**happen (6)**
1436:10;1448:6;
1527:25;1575:19;
1645:16,20
**happened (8)**
1420:25;1426:20;
1430:24;1501:12;
1545:11;1573:3;
1603:14;1613:6
**happening (1)**
1430:16
**happens (2)**
1639:8,11
**happier (1)**
1473:15
**happy (6)**
1412:16,18,22;
1432:18;1613:9,10
**hard (6)**
1409:5;1478:14;
1556:1;1557:12;
1559:7;1651:8
**hardware (2)**
1448:5;1483:23
**head (11)**
1473:12;1505:23;
1576:12;1577:1;
1578:8,9;1582:3;
1637:13;1638:3,10,18
**headquarters (3)**
1421:4;1501:4;
1631:4
**heads (1)**
1578:7

**hear (8)**
1414:22;1456:18;
1458:14;1461:8;
1474:14;1623:8;
1625:9,21
**heard (3)**
1497:6;1504:5;
1505:17
**Hearing (1)**
1449:7
**hearsay (3)**
1578:3,16;1593:17
**heartbeat (1)**
1414:23
**hedge (10)**
1424:2;1455:8;
1534:5;1609:15,20;
1611:25;1642:1,6,8,14
**held (2)**
1500:17;1632:3
**hello (1)**
1518:15
**help (16)**
1423:13;1446:24;
1450:5;1523:18,24,25;
1524:1;1526:2,6;
1527:19,24;1528:5;
1530:25;1570:1;
1611:14;1633:9
**helped (1)**
1423:15
**helpful (3)**
1461:10;1462:10;
1543:20
**helps (1)**
1525:13
**Hey (13)**
1412:20;1413:14,18;
1445:18;1446:19;
1450:1;1451:4;
1456:17;1457:23;
1458:13;1460:16;
1465:20;1538:14
**Hi (10)**
1412:18;1436:17;
1439:20;1448:11;
1449:12;1461:23;
1465:23;1466:13;
1467:1;1570:1
**hide (1)**
1525:7
**high (9)**
1418:24;1440:5,5,
24,24;1445:19;
1511:20;1620:3,4
**higher (13)**
1418:9,10;1453:18;
1456:4;1501:25;
1507:11;1555:4,13;
1558:12;1571:10;
1636:11;1637:6,8
**high-level (1)**
1461:10

**highlight (5)**
1626:16;1634:18;
1635:12;1637:22;
1638:9
**highlighted (3)**
1437:16;1452:10;
1459:8
**highlighting (1)**
1635:11
**highlights (1)**
1621:22
**highly (4)**
1507:7;1524:2;
1525:23;1557:24
**Hinkle (1)**
1595:14
**Hoenig (2)**
1428:19,23
**Hoffman (11)**
1413:12,14;1432:23;
1450:18;1452:8;
1456:12;1459:6;
1464:19;1618:4;
1626:15;1634:18
**hold (4)**
1414:11;1457:3;
1623:22;1644:21
**holiday (1)**
1507:10
**home (17)**
1421:21;1427:18,21;
1437:22;1438:8;
1452:11,16,24;1453:6;
1459:12,15,20;
1596:21;1619:12;
1626:6;1628:15;
1631:14
**Honestly (1)**
1578:20
**Honor (32)**
1408:5;1409:14;
1412:13;1476:25;
1477:4;1483:7;1484:8;
1486:17;1558:24;
1559:9;1577:16;
1578:20;1580:17;
1590:3;1591:5;
1593:17,19;1606:3,6;
1614:12,14;1622:1,20;
1623:2,3,17;1635:23;
1649:10,25;1651:15,
24;1652:14
**Hope (7)**
1408:12;1409:4;
1413:18;1414:6;
1435:24;1450:1;
1639:12
**Hopefully (5)**
1436:4;1457:3,25;
1623:23;1626:4
**Hoping (1)**
1570:1
**Horvath (6)**

1480:16,19;1481:11;
1483:17;1487:16;
1608:9
**hour (8)**
1438:10;1444:12;
1485:20;1619:14;
1626:21;1630:19,19;
1635:2
**hours (3)**
1454:21;1581:19;
1648:14
**house (1)**
1489:18
**houses (1)**
1489:15
**HP (5)**
1530:19;1535:8,12;
1537:23;1538:21
**HPQ (1)**
1468:15
**HP's (1)**
1551:13
**hundred (6)**
1424:14;1488:16;
1497:17;1540:19;
1542:21;1647:21
**hurt (3)**
1551:12;1552:6,18

# I

**IDC (31)**
1476:1;1530:20;
1531:1,2,5,16;1532:1;
1541:25;1542:2,8,12,
19;1543:4,18,23;
1544:2;1546:7,10,13;
1547:7,11,14,20;
1554:3,7,9,14,21,22;
1555:1,2
**idea (10)**
1425:2;1436:4,13;
1473:8;1475:8,10;
1543:24;1555:7;
1557:7;1583:8
**identification (39)**
1411:2;1412:5;
1428:6;1429:7;
1433:13;1435:12;
1437:1;1438:14;
1441:1;1444:6;1445:7;
1446:9;1447:12;
1449:1;1451:24;
1453:21;1454:12;
1457:12;1458:20;
1460:5;1461:13;
1462:14;1466:11;
1468:4;1472:15;
1473:23;1476:17;
1480:23;1481:22;
1482:2;1484:6;
1486:20;1502:15;
1618:24;1621:4;

1622:19;1624:1;
1627:9;1638:24
**idiots (1)**
1475:8
**IM'd (1)**
1608:20
**immediately (1)**
1422:12
**impact (3)**
1474:21;1507:13;
1509:11
**impacted (1)**
1464:14
**implement (1)**
1576:18
**implicate (1)**
1545:11
**Implied (4)**
1507:2;1632:18;
1645:7,8
**important (10)**
1495:9;1541:22,23;
1543:15;1548:1;
1575:6;1578:10,12,13;
1582:1
**impossible (1)**
1587:13
**improper (3)**
1589:17;1598:7,12
**improperly (6)**
1588:21,25;1589:2,
5,7;1619:24
**improve (2)**
1423:16;1501:21
**Inc (2)**
1560:17,23
**include (8)**
1434:13,16;1442:21;
1490:6;1523:7,15,22;
1525:4
**included (5)**
1480:8;1546:14;
1584:13;1588:9;
1620:11
**includes (3)**
1585:1;1591:7;
1620:4
**including (9)**
1442:18,19,24;
1516:9;1542:6,7;
1577:1;1620:25;
1631:9
**income (4)**
1434:14;1560:17,24;
1598:24
**indicate (5)**
1525:9;1558:18;
1565:24;1568:8;
1619:23
**indicated (2)**
1559:21;1561:23
**indicates (1)**
1566:15

**indication (1)**
1511:18
**indications (1)**
1651:11
**individual (2)**
1609:15,18
**industry (9)**
1413:5;1414:4;
1425:23;1446:5;
1476:7;1515:11,21;
1524:24;1644:9
**inferred (2)**
1479:3,4
**information (230)**
1409:22;1410:10,12,
20,24;1415:6,21,23;
1416:3,5,6,7,10,17,23;
1417:4,6,19;1418:6;
1419:2,5,6,9,10,20,24;
1420:4,6,12,17,19;
1421:3,4,5,9,25;
1422:4,10,15,18;
1423:3,4,19;1424:8;
1425:7,9;1435:5,9;
1439:22;1440:12,13,
14,20;1443:1,4,5,6,11,
12,16;1444:24;
1451:15,17;1455:24;
1458:3;1463:18;
1464:6,9;1465:14,16;
1466:4;1467:20;
1468:2,15;1469:4,7;
1470:21,23;1471:5,17;
1477:16;1478:12,16,
22,23,25;1479:5,19,21,
23;1480:5;1481:16;
1483:13;1492:12,16;
1493:2;1494:8,13;
1495:15;1496:21;
1497:8;1499:6,7,10,16,
18;1500:3;1506:8,11,
13;1509:18,20;1510:2,
7;1514:13,16,18;
1515:5;1516:3;1517:2,
6;1520:4;1521:1;
1523:7,11;1527:10,13;
1528:19,24;1531:11;
1532:24;1533:12;
1547:7,19;1549:9;
1552:21;1553:25;
1557:19;1558:6;
1565:8;1569:10,11,13,
14,16,19,22;1571:5,6,
9;1572:1;1574:20;
1576:4,7;1578:5,8,13;
1582:2,5;1584:13;
1585:2,4,13,21;
1587:14,17,22,24;
1588:6,21,25;1589:2,
10;1590:13,15,18,20;
1595:23;1596:3;
1609:14;1610:17,20,
23,25;1611:9,19;

1613:3,7,13,15,25;
1614:5,22;1615:2,7,14,
18;1616:9,9,13,15,25;
1617:13;1618:11,12;
1619:24;1620:7,15,15,
16,19;1630:3;1634:3,
9;1637:9,10,12;1638:3,
4,10;1640:8,9,12,16,
18;1642:20;1644:15;
1645:6,8;1649:5
**informed (1)**
1432:7
**initial (1)**
1478:3
**initially (5)**
1445:25;1470:16;
1511:14;1517:5;
1563:2
**in-person (1)**
1505:22
**input (6)**
1541:22;1543:15;
1548:15,15;1562:13,13
**inputs (4)**
1541:16,18,23;
1543:16
**inquiring (1)**
1470:10
**inside (1)**
1436:11
**insider (3)**
1545:6;1604:13,17
**insight (2)**
1587:19,20
**insights (1)**
1442:9
**insofar (1)**
1622:20
**instant (1)**
1608:20
**instead (3)**
1513:11;1586:7;
1632:9
**institutional (1)**
1449:15
**instructed (2)**
1610:23;1639:21
**instructions (1)**
1597:16
**INTC (1)**
1444:15
**integral (1)**
1594:12
**intend (2)**
1588:24;1651:23
**intended (2)**
1619:23;1643:15
**intending (1)**
1588:20
**interest (3)**
1435:2;1461:5,7
**interested (2)**
1436:3;1448:8;

1470:5,11;1500:8;
1501:21;1513:3;
1578:7
**interesting (1)**
1436:5
**international (2)**
1410:4;1620:25
**interns (1)**
1408:11
**interpret (1)**
1464:4
**interview (4)**
1423:16;1513:23;
1582:8,13
**interviewed (1)**
1480:18;1514:1
**interviewing (2)**
1408:11;1423:18
**interviews (2)**
1423:17;1460:21
**into (26)**
1414:10;1421:5;
1426:10,11;1429:4,5;
1444:14,16,20,21;
1451:17;1471:3,11;
1475:13;1513:4,14,18;
1519:10;1539:20;
1551:15;1554:10;
1556:16;1562:22;
1587:19;1599:13;
1638:3
**introduced (3)**
1518:14,15;1607:16
**invest (1)**
1500:9
**investigation (2)**
1595:21;1600:23
**investing (1)**
1461:7
**investment (17)**
1413:5;1414:4;
1423:12;1436:16;
1445:5;1450:11;
1460:21;1461:24;
1479:5;1513:4,7,11,14,
18,20;1573:19;
1637:16
**Investor (50)**
1415:15;1422:22;
1464:16;1465:7,11,15;
1471:21;1472:3,11;
1473:12,20;1475:20;
1479:7;1498:22;
1499:1,12,16,20,24;
1500:7,14,15,20,25;
1501:6,18,22;1502:17;
1503:21;1505:23;
1510:12,16;1511:5,10,
24;1585:7,17;1592:16,
19,23;1611:5;1631:4,
10,20;1633:9,17;
1645:21,24;1646:2,3
**investors (5)**

1475:14;1500:3,12,
21;1603:22
**invited (1)**
1469:23
**invoice (18)**
1426:21,22;1427:4,
9,11,13,24,25;1428:2,
10;1430:19;1433:2,3,5,
7,9;1434:2;1521:7
**invoices (9)**
1429:11;1539:10,11,
23;1597:20;1599:7,10;
1600:5;1603:8
**involved (7)**
1490:11;1507:14;
1547:10;1585:14;
1596:20;1604:13,17
**iPhone (4)**
1526:8;1540:3,7,11
**iPhones (1)**
1594:2
**iPod (1)**
1527:11
**IR (7)**
1473:9;1501:3;
1502:5,8;1511:9;
1587:18;1645:17
**issue (4)**
1519:15,21;1581:21;
1604:2
**issued (5)**
1575:7;1581:16,24;
1621:18;1635:5
**issues (6)**
1430:13;1431:17;
1486:13;1526:2;
1602:6;1604:19
**item (1)**
1493:8
**items (3)**
1504:17;1508:10;
1633:21
**ITG (1)**
1428:20

# J

**JAN (1)**
1442:5
**JanQ (3)**
1439:9,10,21
**January (35)**
1414:13;1415:3;
1427:12;1431:5;
1433:4;1434:4;
1439:11,13;1455:19;
1493:5;1494:15;
1534:21;1535:5,25;
1536:9;1542:11,15;
1553:15;1558:21;
1559:6,21,22;1561:7,
11,12,14;1564:24;
1565:18,21;1566:5,25;

1568:5;1576:17;
1593:25;1602:11
**Japan (1)**
1622:8
**Jersey (1)**
1512:19
**Jesse (59)**
1422:5;1424:9;
1425:3;1433:12;
1450:20;1453:1,6,22;
1456:19;1458:6,14;
1462:15;1465:23;
1469:9;1475:8;
1480:10;1481:10;
1483:2,16;1486:23;
1487:15;1498:8,11,16,
21;1517:25;1518:3,13,
25;1533:12;1536:10,
14,18;1537:8,16;
1540:18;1548:4;
1549:3;1550:8;
1553:21;1568:21;
1569:11;1582:25;
1594:9,11,13;1608:1;
1609:18;1611:25;
1613:4;1622:16;
1624:19,24;1625:15;
1626:23;1630:5;
1640:8,17;1645:9
**Jessie (1)**
1583:9
**job (21)**
1414:7,7,10;1423:1;
1424:1;1425:14;
1431:25;1432:1;
1447:3,4,6;1448:8;
1449:14,16,17;
1454:10;1514:4;
1523:16;1534:2,9;
1602:10
**jobs (4)**
1425:13;1431:19,23;
1449:18
**John (4)**
1448:12;1483:17;
1487:16;1608:9
**join (1)**
1446:6
**joined (2)**
1519:8;1522:20
**joint (4)**
1429:5;1539:20;
1599:13,15
**Jon (3)**
1480:16,19;1481:10
**Journal (1)**
1604:12
**Judge (4)**
1485:7;1600:19;
1640:1;1651:8
**July (20)**
1457:14,23;1470:3;
1488:16,23;1519:9;

1550:3,10;1552:12,18;
1595:2,6;1598:4;
1613:19;1625:15;
1626:2,7,8,9,17
**July-August (1)**
1488:13
**June (18)**
1456:14;1457:1;
1472:19;1473:2,17,20;
1474:17;1488:10,10;
1568:15;1569:2;
1623:21,24;1624:8,12,
18;1625:2,6
**jurors (1)**
1408:10
**jury (22)**
1408:1,13;1409:1;
1484:13,14;1485:1,3,
22;1486:1;1544:18,19;
1545:3,14;1546:1;
1560:20;1580:1;
1606:15,16;1607:7;
1650:14,15;1651:1

# K

**Kanowitz (14)**
1548:11,17,19,23;
1549:6,8,21;1550:6;
1557:4,9,14,16,21;
1562:19
**Kanowitz' (2)**
1552:24;1562:25
**Kate (3)**
1447:23;1448:11;
1449:10
**Katie (1)**
1447:22
**keep (11)**
1414:19,21;1424:1;
1458:14;1465:20;
1513:6;1529:13;
1578:17;1605:17;
1650:13;1651:16
**kept (7)**
1492:8,8,10;
1496:25;1511:3;
1537:2;1564:4
**Key (2)**
1504:16;1576:21
**kind (27)**
1409:22;1411:16,19;
1412:21;1414:2;
1416:5;1423:17;
1470:18;1479:5;
1491:4,6,9;1493:16;
1511:18;1515:9;
1517:1;1519:22;
1520:3;1526:6,7,8,10;
1540:8;1589:10;
1596:1;1597:25;
1645:6
**kindly (1)**

1448:8
**knew (17)**
1477:12;1479:3;
1489:9;1498:22;
1515:2;1539:15,17,18;
1598:1,7,9;1599:9;
1601:18;1604:10;
1614:4;1641:23;
1642:3
**knowing (3)**
1537:15;1539:13;
1582:12
**knowledge (9)**
1524:24;1544:6;
1547:18,21;1558:8;
1592:22;1613:7,15;
1614:8
**Kuo (8)**
1480:16;1481:11;
1483:10,16;1487:4,8,
15;1608:7

# L

**labeled (1)**
1628:9
**ladies (4)**
1409:3;1484:11;
1486:2;1544:15
**Lake (1)**
1470:3
**land (1)**
1436:4
**laptops (2)**
1489:23;1494:21
**large (6)**
1410:6;1418:13,16;
1490:5;1491:7;
1549:14
**largely (1)**
1547:15
**larger (1)**
1490:17
**last (38)**
1409:18;1412:25;
1413:11,13,23;
1425:21;1434:7,9,10;
1450:3;1452:21;
1455:14,16,18,22;
1471:19;1475:22;
1478:3,7;1479:11;
1493:15;1494:1;
1495:6;1496:8,10,12;
1504:8;1509:10;
1521:20;1524:23;
1551:7;1555:6;
1556:24;1558:11;
1559:22;1560:3;
1576:25;1632:17
**late (14)**
1408:11;1415:9;
1416:21,21;1425:5;
1465:12,13;1519:8;

1583:4;1595:6;1611:8;
1638:11,19;1648:15
**later (10)**
1408:4;1420:24;
1422:13;1474:19;
1531:17;1536:24;
1544:9;1561:11;
1636:22;1652:12
**launched (1)**
1540:3
**launching (1)**
1511:14
**law (1)**
1545:5
**lawyer (1)**
1597:7
**lawyers (1)**
1597:14
**lay (1)**
1477:2
**layout (1)**
1631:3
**leading (7)**
1617:4;1622:1,2;
1635:23;1642:11,12,13
**learn (3)**
1464:16;1478:6;
1479:11
**learned (2)**
1506:8;1577:3
**least (3)**
1512:12;1575:10;
1608:15
**leave (5)**
1469:14;1602:10;
1604:8,11;1627:14
**Left (23)**
1456:20,22,25;
1457:3;1464:16;
1465:7,10,15;1469:10;
1492:3,13,17;1497:3;
1512:15;1514:9,11;
1560:8,17;1566:14;
1571:16;1623:22;
1646:25;1647:10
**left-hand (1)**
1560:23
**legitimate (1)**
1567:18
**legs (1)**
1484:13
**Lehman (10)**
1446:1;1447:3,15,
22,24;1448:3,15;
1449:10;1450:2;
1608:11
**length (1)**
1515:8
**lengthy (3)**
1628:25;1630:1;
1650:9
**lenient (1)**
1600:13

**Less (4)**
1444:12;1473:15;
1543:11;1599:5
**letter (4)**
1600:15,19,22;
1639:11
**level (19)**
1445:19;1470:22,23;
1507:17;1556:2,10;
1562:6;1585:19,20;
1591:8;1609:22;
1612:23;1613:18,25;
1632:23;1633:3,5,6;
1641:10
**levels (3)**
1470:25;1507:3;
1644:5
**lie (1)**
1605:13
**life (1)**
1614:9
**likely (1)**
1543:25
**limit (2)**
1592:15,22
**line (21)**
1416:22;1421:5;
1427:14;1439:8;
1442:4,11;1444:13;
1452:13;1454:9;
1457:24;1458:13;
1463:2;1491:4;
1503:13;1504:8;
1522:12;1551:8;
1619:7;1623:14;
1624:7;1633:20
**lines (4)**
1416:22;1497:19,24;
1571:21
**list (6)**
1478:2,2;1528:12,
19,20,22
**listed (7)**
1479:13;1594:5,23;
1621:25;1624:8;
1626:9;1649:17
**little (9)**
1408:11;1444:10,11;
1456:16;1467:24;
1477:2;1487:14;
1495:21;1546:21
**live (2)**
1646:25;1647:13
**lived (1)**
1605:13
**lives (1)**
1647:7
**living (3)**
1512:18,19,19
**located (1)**
1455:9
**long (23)**
1413:19;1419:22;

1420:22;1437:25;
1438:9;1452:21;
1453:2,7;1459:23;
1460:2;1528:19;
1592:8;1619:13;
1624:13,20,25;
1626:19,24;1627:24;
1628:3,17;1635:1;
1651:18
**longer (2)**
1579:4;1630:19
**long-term (6)**
1446:7;1500:11;
1501:15;1632:24;
1633:3,4
**look (140)**
1412:4;1413:9;
1425:12;1426:10,11,
25;1428:6;1429:6;
1431:4;1432:21;
1433:13;1435:11;
1438:13;1441:1;
1444:5;1445:6;1446:8;
1447:11;1448:25;
1450:4,16;1453:20;
1454:11;1457:11;
1460:4;1461:12;
1462:13;1463:9;
1465:18;1468:4;
1471:11;1472:14;
1473:23;1476:16;
1480:22;1481:21;
1482:2;1484:6;
1488:17;1492:22;
1493:5;1494:18;
1496:18;1502:14,24;
1505:8;1506:5;
1508:15;1509:6,9;
1521:4,11,24;1522:1;
1524:18,23;1526:11,
22;1528:22;1529:16;
1531:2,6;1532:11;
1534:16;1535:2;
1536:5,12;1538:12;
1544:3;1548:21;
1550:9,16;1551:7;
1554:1,2;1555:21;
1558:19;1559:15,25;
1560:8;1561:4;
1562:11,18;1563:24;
1566:2;1567:3,25;
1568:13,20;1569:25;
1571:12,15;1573:19;
1574:17;1576:1;
1577:7;1580:3;1581:3;
1582:11,23;1583:3;
1584:1,16,17;1585:23;
1587:1;1589:8,21;
1591:24;1593:11;
1601:5,10;1615:9;
1618:3;1620:19;
1621:16;1622:13;
1623:25;1624:6,7,22;

1625:22;1626:5,7;
1627:19;1628:14;
1631:25;1633:25;
1634:12;1635:8;
1636:21;1637:15;
1644:17;1646:8,11,13;
1647:2;1648:8,17;
1649:17
**looked (13)**
1413:11;1431:1;
1441:12;1453:10,14;
1533:11;1543:7,13;
1618:15;1625:5;
1628:24;1630:25;
1634:22
**looking (28)**
1414:9;1436:4,11,
13,15;1448:20;
1450:12;1461:9;
1463:7;1478:9;
1483:10;1522:7;
1536:22;1537:11;
1541:1;1554:3,7;
1555:2;1562:15;
1583:13;1584:7;
1585:13;1587:13,21;
1615:21;1620:20;
1621:21;1648:21
**looks (2)**
1436:17;1508:3
**lost (1)**
1496:10
**lot (16)**
1419:11,13;1450:1;
1461:8;1471:9;1498:5;
1507:10;1511:13;
1515:12,14;1533:6;
1547:16;1575:1;
1578:19;1608:1;
1651:18
**loud (1)**
1522:15
**low (6)**
1417:13,15;1418:25;
1419:1;1507:12;
1511:20
**lower (9)**
1418:10;1501:25;
1551:12,14,22;1555:8;
1558:11;1637:6;
1638:1
**luck (1)**
1414:10
**lump (1)**
1431:14
**lunch (20)**
1485:16;1486:8;
1499:10;1503:23,24;
1504:1;1505:5,7,10;
1510:6;1518:11,13;
1544:16;1546:3;
1583:4,8,11,18,20;
1632:2

**luncheon (2)**
1518:12;1544:25
**lying (1)**
1597:10
**Lynn (1)**
1473:15
**Lynne (9)**
1473:9,11;1499:7;
1503:14,21;1504:8;
1505:22;1632:3;
1644:1

---

# M

**MA (3)**
1591:14,17,20
**mail (2)**
1457:3;1623:23
**maintain (1)**
1471:6
**maintained (2)**
1534:13;1535:15
**majority (2)**
1491:3;1575:14
**makers (3)**
1542:3,4;1547:2
**makes (2)**
1490:23;1511:21
**making (3)**
1501:17;1562:23;
1603:24
**Makol (1)**
1595:12
**managed (1)**
1603:21
**management (17)**
1413:5;1414:4;
1423:12;1436:16;
1445:5;1450:11;
1460:21;1471:20;
1472:5;1479:5;1500:5;
1513:4,7,11,14,18,20
**manager (6)**
1439:5,7;1442:3;
1455:4,8;1591:19
**managers (10)**
1424:7;1471:10;
1572:18;1603:20,21;
1642:8,18;1643:11,12,
16
**manual (1)**
1560:13
**many (13)**
1410:3;1416:16;
1443:18;1490:25;
1498:13;1507:16;
1515:20;1547:23;
1548:15;1578:7;
1603:8;1630:20
**March (11)**
1414:14,16,17;
1415:3;1469:13;
1542:12,15;1543:1;

1564:23;1565:1,2
**margin (59)**
　1417:1,2;1418:13,
　21,23,25;1419:20;
　1420:4;1442:17;
　1464:15;1471:2;
　1479:23;1493:25,25;
　1494:2,3;1496:15,16,
　17,18;1501:19,20;
　1502:8;1504:22;
　1507:7,12,14,21,24;
　1508:1,9,13;1509:4,10,
　15;1510:17;1517:18;
　1551:9,25;1552:9;
　1555:8,11,13,24,25;
　1556:1,3,23;1557:20;
　1562:1;1563:5,9;
　1566:10,11;1567:20;
　1571:10;1572:2;
　1620:9;1644:7
**marginal (1)**
　1494:8
**margins (32)**
　1416:24,25;1417:1,
　8,14,15;1418:8;
　1419:7;1420:7;1440:5,
　10,11,24;1451:18;
　1493:20,24;1494:2,5;
　1496:3,11,15;1501:21;
　1507:17;1510:15,18;
　1551:12,22;1552:2;
　1584:23;1620:3,21;
　1644:4
**marked (40)**
　1411:1;1412:5;
　1428:6;1429:7;
　1433:13;1435:11;
　1437:1;1438:13;
　1441:1;1444:5;1445:6;
　1446:8;1447:11;
　1448:25;1451:24;
　1453:20;1454:11;
　1457:11;1458:19;
　1460:4;1461:12;
　1462:13;1466:11;
　1468:4;1472:14;
　1473:23;1476:16;
　1480:22;1481:21;
　1482:2;1484:6;
　1486:19;1502:14;
　1559:6;1592:25;
　1618:23;1621:4;
　1622:18;1627:8;
　1638:24
**market (15)**
　1444:1,3;1489:24;
　1494:25;1495:3,3,5,6,
　9;1502:1;1504:17;
　1506:21;1526:9;
　1530:19;1572:3
**marketing (12)**
　1449:15;1491:14,16,
　16,18,19,21;1492:15,

16,18,19,21
**markets (2)**
　1632:15,16
**master (1)**
　1525:15
**master's (2)**
　1541:3,6
**matter (4)**
　1413:4;1486:4;
　1553:20;1607:15
**May (79)**
　1409:14,15;1429:25;
　1446:12;1448:12,21;
　1449:12,23;1450:9,12,
　15,22;1451:22;
　1452:13,15;1453:4,5,9,
　16,22;1454:6,13,20;
　1472:13;1488:8;
　1491:13;1492:19;
　1494:10;1495:6;
　1497:5;1498:12,12;
　1499:8;1519:19;
　1533:4;1541:11,13;
　1542:13,17;1546:5;
　1547:19;1564:14,18,
　18;1567:6,9;1568:15,
　15,22;1570:20,21;
　1571:1,2;1572:5;
　1573:2,15;1581:3,11,
　13,16;1582:9;1583:12;
　1590:13;1594:9;
　1600:19;1613:19;
　1631:17;1635:5,17,22;
　1636:7,21,22;1637:7,
　18,23,24;1638:14;
　1647:21
**maybe (10)**
　1425:5;1473:4;
　1480:21;1514:11;
　1533:5;1544:5;
　1564:17;1588:18;
　1598:16;1610:4
**MBA (1)**
　1541:2
**McLeod (2)**
　1560:19;1635:11
**mean (68)**
　1410:1,9;1415:22;
　1416:25;1417:11,22;
　1423:4;1426:17;
　1431:20,22;1437:15;
　1438:5;1439:10;
　1442:11,13,19;
　1444:17,20;1451:8,11;
　1455:16;1458:1,2,17;
　1462:7;1466:1,6;
　1467:8;1468:19;
　1470:20;1474:11,16;
　1475:10,25;1478:10;
　1479:15;1488:10;
　1489:1;1493:14,23;
　1494:11;1495:2;
　1496:4,9;1497:3;

1507:6;1533:3;
　1535:11;1544:13;
　1551:11;1554:11,18;
　1556:7;1560:3,5;
　1561:8;1566:15;
　1574:9,14,24;1581:10;
　1601:18;1617:25;
　1620:6;1630:15;
　1632:8;1638:16;
　1641:7
**Meaning (7)**
　1516:2,3;1557:14;
　1572:21;1573:25;
　1574:4,15
**means (36)**
　1409:7,7;1442:14,
　23;1444:18,21;
　1454:24;1466:3;
　1467:10;1468:20;
　1470:21;1476:1;
　1478:11;1493:15,24;
　1494:1,5;1495:3;
　1496:10,15;1504:1;
　1507:7,14;1533:4;
　1551:12;1552:9;
　1561:9;1572:24;
　1573:25;1594:10;
　1602:21;1620:7;
　1630:17;1632:21;
　1638:18;1646:5
**meant (6)**
　1415:23;1466:7;
　1520:3;1570:5;1586:5;
　1605:20
**meantime (2)**
　1452:14;1459:9
**measures (1)**
　1576:18
**medium (7)**
　1410:6;1491:7;
　1496:20,24;1497:4,8,
　22
**meet (7)**
　1411:23;1469:2;
　1486:7;1501:3,6;
　1503:21;1583:5
**meeting (10)**
　1472:4;1504:8;
　1505:2,22,24;1575:22;
　1577:9;1583:17,22;
　1632:3
**meetings (2)**
　1610:1,13
**memory (6)**
　1488:20;1505:7;
　1522:18;1557:12;
　1572:1;1593:12;
　1601:15
**mention (6)**
　1446:22;1447:1,5;
　1461:6;1479:7;
　1500:16
**mentioned (24)**

1418:25;1432:18;
　1433:12;1497:14;
　1498:22,23;1499:15;
　1517:7;1518:7;
　1521:20;1524:9;
　1545:4;1546:13;
　1576:17;1596:16,20;
　1607:16,18,22;1608:1;
　1609:6;1613:8;
　1645:13;1651:21
**menu (1)**
　1560:5
**merged (1)**
　1497:1
**message (6)**
　1456:20,22,25;
　1503:15;1504:9;
　1608:20
**messages (1)**
　1608:20
**met (8)**
　1411:25;1412:2;
　1480:19,20;1499:9;
　1518:8,20;1583:20
**metric (1)**
　1495:9
**Michael (3)**
　1582:7,13,16
**mid-April (1)**
　1542:14
**Middle (7)**
　1470:10;1568:20;
　1569:25;1601:12;
　1622:15;1635:8;
　1644:18
**mid-July (2)**
　1488:24;1548:24
**might (25)**
　1413:23;1446:23;
　1448:8;1485:15;
　1499:6,14;1500:9;
　1517:20;1527:25;
　1531:5;1534:14;
　1537:17,17,20;
　1538:20;1540:18;
　1543:18;1545:11;
　1587:19;1596:5,10,13,
　15;1599:17;1611:17
**mind (6)**
　1414:22;1583:24;
　1598:10;1599:19;
　1635:11;1650:13
**Mine (1)**
　1413:19
**minor (2)**
　1436:18;1446:21
**minus (1)**
　1563:9
**minute (4)**
　1419:23;1526:1;
　1556:21;1606:3
**minutes (17)**
　1419:23;1438:1,2;

1451:2;1452:22;
　1453:8;1454:8;1460:3;
　1484:12;1485:4,15;
　1581:12;1607:3;
　1624:14;1625:1;
　1626:25;1628:18
**missed (1)**
　1409:3
**missing (2)**
　1543:20;1578:2
**mix (3)**
　1491:9;1507:9;
　1547:4
**model (91)**
　1419:21,25;1420:3,
　7;1451:2,16,17;
　1470:13,15,18,19;
　1471:1,6,12,13,15,18;
　1511:3,6,11,17;1512:1;
　1516:13,14,17;1517:3,
　4;1526:8,16;1530:4,6;
　1531:9,12;1535:7,8;
　1536:1;1538:6,7,15,18,
　21,21,21,24;1541:15,
　16,22;1543:15;
　1547:23;1554:8,10,18,
　22,23;1555:13,16,19,
　21,22;1556:4,6,8,11,
　17;1558:15,22;
　1559:16,18;1560:14;
　1561:1,2,3;1562:13;
　1563:5,25;1564:4,8;
　1565:6,18,22,25;
　1566:21,24;1620:10;
　1625:10,18;1633:17,
　22;1636:5,7;1637:6
**modeled (1)**
　1531:10
**modeler (3)**
　1525:15;1568:7;
　1640:24
**modeling (24)**
　1461:6;1523:13,19,
　23;1524:2;1525:24;
　1526:2;1527:24;
　1539:1;1543:7;1553:5,
　21,24;1554:13,21;
　1566:15;1567:18;
　1568:10;1570:5,12,15;
　1611:12;1627:5;
　1636:13
**models (25)**
　1516:10;1534:13;
　1535:12,15,19,24;
　1536:3,4,10;1537:2,5,
　14,16,23,23,24;1538:2,
　9,11,23;1633:9,12;
　1642:23;1643:3,9
**moment (5)**
　1453:13;1463:9;
　1590:4;1613:12;
　1643:17
**Monday (6)**

1409:6;1466:16;
1627:4,17;1628:22;
1650:12
**money (12)**
1424:21;1496:10;
1512:7;1539:20,22;
1599:13;1600:4;
1612:1,4,10;1640:23;
1641:3
**monitor (1)**
1648:21
**monitoring (1)**
1550:21
**month (3)**
1488:14;1543:20;
1546:21
**months (6)**
1519:10;1543:5;
1565:2;1602:13,16;
1605:13
**more (25)**
1416:13,15;1431:10;
1442:9;1465:25;
1466:2,3,4;1467:14;
1480:19;1495:6,20;
1507:13;1517:15;
1529:18;1543:11;
1546:23;1580:21;
1606:14;1614:22,24;
1615:2,4;1640:17;
1652:7
**morning (19)**
1408:12;1409:2;
1451:22;1453:16;
1457:1;1485:8,17;
1486:6,7,8,14;1619:18;
1623:24;1626:2;
1650:11;1651:21,25;
1652:5,12
**Morris (5)**
1447:22,23,25;
1448:1;1449:10
**Morvillo (23)**
1412:12,13;1428:14;
1429:16;1454:3;
1457:20;1459:1;
1606:7,10,11;1607:5,9,
11,14;1614:11;
1621:13;1622:1;
1635:23;1640:14;
1641:9;1642:11;
1649:9,10
**most (15)**
1415:3;1471:15;
1473:9;1476:15;
1491:10,13;1500:11;
1501:13;1538:23;
1546:16;1549:12;
1585:16;1588:3;
1590:11;1631:7
**mostly (10)**
1411:18,18;1416:24;
1417:7,9;1421:21;

1422:9;1423:9;
1478:14;1534:7
**motion (2)**
1408:3;1651:22
**move (5)**
1469:16;1513:4,10;
1579:1,2
**moved (2)**
1469:18;1518:25
**movement (1)**
1550:22
**moving (2)**
1578:22;1584:20
**much (20)**
1418:10,10;1424:13,
18;1428:4;1450:6;
1479:22;1495:5;
1500:17;1507:4;
1515:7;1523:15;
1560:21;1563:12;
1579:4;1598:10;
1606:14;1638:12,17,19
**multiple (1)**
1471:14
**must (1)**
1521:20
**mutual (2)**
1499:20;1500:1
**myself (2)**
1461:8;1607:16

# N

**name (18)**
1422:20;1425:19,21;
1427:13,15;1478:3;
1479:11;1488:5;
1539:10;1575:7;
1607:14,17,18,22;
1645:1,1,7,9
**named (1)**
1548:10
**names (7)**
1478:2,3,7;1483:25;
1499:11;1575:7;
1608:1
**narrow (3)**
1517:15;1617:23;
1618:1
**narrower (1)**
1517:14
**NATHANSON (3)**
1651:24;1652:4,14
**national (1)**
1622:11
**nature (4)**
1411:13;1516:1;
1578:4;1641:17
**NB (6)**
1474:11;1535:7,8,
13;1635:19,24
**near (4)**
1507:3;1508:4;

1632:19;1644:5
**necessary (1)**
1446:21
**need (16)**
1408:9;1414:21;
1463:15;1468:3;
1485:20;1497:15;
1498:6;1545:13;
1563:6,12;1578:18,19,
24;1597:6;1623:6;
1651:19
**needed (2)**
1430:18;1471:18;
1523:17
**negative (8)**
1474:15,17;1475:4;
1496:10,12;1507:12;
1551:8;1552:2
**negatively (1)**
1474:21
**negotiation (1)**
1549:15
**network (2)**
1524:24;1525:4
**networking (1)**
1476:3
**Neuberger (115)**
1414:8;1415:11;
1423:23;1424:4,7,18,
21,22,24,25;1436:11;
1439:1,5,7;1442:3;
1448:5;1455:4,5,8;
1465:4;1470:12;
1472:6;1474:12;
1475:21,22;1476:4;
1477:10;1479:10,24;
1483:22;1487:21;
1488:12,14,21,25;
1499:6,9,21,25;1500:2,
9,12,14,19;1502:4,7;
1510:10;1513:20;
1514:1,4;1516:7;
1518:25;1519:6,10;
1522:20;1526:3;
1527:2,14;1528:5;
1529:19;1530:11;
1531:22;1532:1;
1534:13;1535:14,16,
20;1536:2;1537:3,3,9,
15;1538:22;1539:5;
1550:3,4;1572:10,13,
19;1574:5;1582:1;
1584:4;1589:18;
1591:9,11,14,15,17,18,
20;1602:10;1603:1,4,7,
10,13,18;1604:7,10,16,
20;1605:4,14,20,24;
1606:20;1608:5;
1635:25;1636:2;
1637:24;1639:15,18;
1641:4,6;1643:7
**neutral (8)**
1572:24;1573:1,23,

25;1574:8,11,14,15
**New (20)**
1414:6,7,7,24;
1456:18;1457:24;
1458:14;1466:14;
1469:17,18;1503:14;
1512:18,19;1625:9,13,
16,21;1627:2;1647:7,
13
**Newman (16)**
1432:20;1457:8;
1462:25;1463:14;
1466:8,22;1467:11,17;
1483:18;1488:6;
1518:5,8,18,20;
1568:22;1570:1
**next (44)**
1408:14;1414:14,16,
20,24;1426:20;
1438:23;1441:19;
1452:24;1453:4;
1457:1;1473:17;
1482:5;1484:15;
1485:23;1494:18;
1504:7;1520:5;
1525:14;1527:11;
1528:22;1545:15;
1557:23;1561:11;
1574:17;1577:18;
1579:5;1586:8;
1620:24;1623:8,9;
1624:17,22;1626:22;
1628:1,8;1629:9;
1635:19,19;1650:9,16;
1651:4,17;1652:12
**nice (6)**
1408:12;1409:4;
1413:18;1454:10;
1460:17;1546:3
**night (20)**
1421:19;1453:9,12;
1459:10;1618:16,17,
17;1619:16;1624:18;
1625:2;1626:8;
1627:22;1628:6,19;
1630:23;1631:1,12;
1634:21;1636:24;
1650:12
**Niles (20)**
1442:1,2;1454:25;
1455:1,2,3,12;1456:2,
7;1588:12,17,24;
1589:24;1590:8,20;
1591:2,19;1592:1,5,12
**Niles' (1)**
1455:5
**nine (2)**
1434:20;1439:18
**nobody (4)**
1578:21;1588:6;
1592:18;1651:17
**None (5)**
1430:22;1585:20;

1587:16;1610:13;
1644:25
**non-GAAP (4)**
1508:7,8,13;1509:15
**non-gross (1)**
1509:4
**non-public (2)**
1420:20,21
**non-recurring (1)**
1508:10
**Nor (1)**
1602:4
**normal (5)**
1471:25;1486:5;
1574:22;1589:8,10
**normalized (8)**
1507:3,23;1508:1,4;
1509:21;1632:18,19,21
**Normally (18)**
1443:25;1491:16;
1495:5;1505:3;
1507:14;1508:8;
1536:2;1555:24,24;
1556:19,19;1569:15;
1574:22;1575:12,18;
1582:18;1617:23;
1642:18
**note (2)**
1575:2;1577:8
**notebook (1)**
1495:4
**notebooks (1)**
1544:4
**noted (1)**
1422:1
**notes (3)**
1596:7;1632:2;
1643:25
**notice (2)**
1533:8;1646:19
**noticed (1)**
1448:4
**notwithstanding (1)**
1638:4
**November (2)**
1481:2;1652:17
**November-December (1)**
1507:9
**number (99)**
1412:25;1421:22,23;
1427:20,21;1437:18,
19,21,22,23,24;1438:8,
8;1452:16,19,24;
1453:5,15;1459:11,12,
15,16,17,20;1471:10;
1494:18,18;1496:19;
1504:1;1508:7,7,8;
1509:22,23;1526:7;
1528:17;1541:19;
1549:11;1556:10,20;
1562:11,15;1566:16;
1567:11,14;1581:1,4,7,
7;1610:8;1615:21,25;

1616:5,23;1619:10,11,
12,12,15,16;1620:9;
1624:15,15,16,16;
1626:13,13,14,14,19,
20;1627:20,20,21,21;
1628:13,14,15,15;
1631:18,19;1636:1;
1644:3,6,9,11;1646:14,
17;1647:3,8,11,15,18,
22,25;1649:20,21,23;
1650:1

**numbers (40)**
1415:24,25;1416:2,
8;1417:9;1418:19,19;
1420:3;1443:8;
1453:17;1465:25;
1466:1,4,5;1471:11;
1474:21;1491:13;
1517:7;1524:18;
1531:3,5;1554:21;
1560:22;1564:2;
1566:18;1575:20;
1616:18,20,21;1617:1,
7,11;1620:10,21;
1643:2,3,5;1647:2,25;
1648:5

**NVDA (4)**
1483:11,11;1487:5,8

**Nvidia (8)**
1483:4,12,13;
1484:1,2;1487:7,13,21

# O

**object (5)**
1476:25;1622:1,20;
1635:23;1642:11

**objecting (2)**
1578:21;1623:14

**objection (93)**
1411:9,10;1412:10,
11,13;1428:13,14;
1429:15,16;1433:20;
1435:17,18;1437:7,8;
1438:19;1440:16;
1441:7;1445:12;
1446:16;1447:18;
1449:6,7;1452:4,5;
1454:2,3,17;1457:18,
19,20;1458:24,25;
1459:1;1460:12,13;
1461:19;1462:19;
1464:2,3;1468:11;
1472:23;1474:7;
1477:21;1481:6;
1483:7;1487:1;
1502:21;1505:13;
1508:22;1514:19;
1515:22;1526:19;
1527:5;1528:8;
1529:24;1530:14;
1532:17;1534:24;
1553:8;1559:11,12;

1568:18;1573:8;
1574:6;1577:12;
1580:21;1589:14;
1590:2,5,14,22;
1593:16;1604:4;
1605:15,25;1611:21;
1612:15;1614:6,24;
1615:3;1616:11;
1617:2,9;1621:12,13;
1629:6;1633:1;
1636:15;1639:2;
1640:14,25;1642:12,16

**objectives (1)**
1411:19

**obtain (2)**
1531:1;1588:21

**obtained (5)**
1589:4,7;1610:20;
1613:3;1619:24

**obtaining (1)**
1600:4

**obviously (3)**
1589:17,19;1651:25

**occasion (2)**
1415:17;1512:13

**occasions (1)**
1489:15

**October (12)**
1412:6,16;1427:10;
1433:6;1519:16;
1521:11,17,19,21,22,
23;1523:1

**October-November (1)**
1425:5

**off (7)**
1485:17;1511:7,17;
1516:17,24,25;1554:13

**offer (6)**
1477:19;1559:9;
1580:19;1591:21;
1606:18;1634:13

**offered (1)**
1578:4

**offering (5)**
1580:18;1593:20,23;
1606:23;1623:10

**offers (50)**
1411:7;1412:8;
1428:11;1429:13;
1433:18;1435:15;
1437:5;1438:17;
1441:6;1445:10;
1446:14;1447:16;
1449:4;1452:2;
1453:25;1454:15;
1457:16;1458:22;
1460:10;1461:17;
1462:17;1468:9;
1472:21;1474:5;
1476:23;1481:4;
1483:5;1486:24;
1502:20;1505:12;
1508:21;1526:18;

1527:4;1528:7;
1529:22;1530:13;
1532:16;1534:23;
1553:7;1568:17;
1573:7;1577:11;
1590:1;1593:15;
1619:1;1621:10;
1624:2;1625:24;
1627:10;1639:1

**office (7)**
1601:18,19;1610:10;
1631:18;1645:18,23;
1646:6

**officer (5)**
1574:21;1576:5;
1577:4;1582:3,8

**offices (1)**
1631:7

**official (1)**
1567:5

**offset (3)**
1598:25;1599:2,3

**often (2)**
1461:3;1509:4

**old (1)**
1446:6

**Once (10)**
1450:6;1469:23;
1470:9;1479:23;
1480:19,20;1499:9,9;
1518:8;1631:17

**one (95)**
1410:4,5;1416:13,
14,15;1417:1;1418:5,
24;1431:5,10,10;
1432:1;1438:10;
1442:9;1449:19,19;
1471:4,9,13;1477:9;
1480:3,18;1486:5,15;
1489:20;1496:22;
1497:3,13;1500:16;
1501:18,20;1504:7;
1510:3;1512:13;
1514:14,14;1521:5;
1530:2,25;1532:20;
1533:4,5;1534:2,20;
1538:4;1541:16,18,23;
1542:16,17;1543:7,13,
16,20;1547:13;
1548:15,15,15;
1554:22;1557:23;
1570:20;1571:14;
1574:1,15;1576:22;
1577:14;1580:8;
1583:15;1584:16;
1585:22;1586:7;
1590:3;1591:2;
1594:16,21;1597:5;
1606:3,17;1610:17;
1611:22;1612:13,17;
1621:25;1622:3,5,7;
1629:3;1630:19,20;
1638:13;1642:22;

1643:17;1645:5;
1647:6,14

**ones (4)**
1492:10;1532:21;
1588:1,5

**one-time (8)**
1442:21,24,25;
1566:18,19;1620:5,8,
11

**only (19)**
1416:10;1432:1;
1514:18;1518:2;
1536:3;1547:1;
1551:14;1554:22;
1563:18;1566:17;
1572:8;1585:17,22;
1587:15;1588:5;
1590:25;1613:8;
1630:20;1645:5

**op (1)**
1440:5

**open (10)**
1409:1;1448:2;
1451:3;1485:1;1486:1;
1545:3;1546:1;1580:1;
1650:13;1651:1

**opening (1)**
1424:1

**opens (2)**
1436:2,8

**operating (15)**
1417:2;1442:16,17;
1493:25;1494:3;
1496:3,15,17,18;
1501:23,25;1502:10;
1504:24;1510:23;
1576:19

**operation (1)**
1572:12

**OPEX (7)**
1440:24;1442:10,15;
1504:17,24;1620:4,9

**opinion (1)**
1629:3

**opportunity (2)**
1436:2,8

**opposite (1)**
1610:16

**options (1)**
1591:16

**oral (1)**
1485:12

**order (5)**
1430:19;1451:19;
1563:5;1600:22;
1651:2

**organizational (1)**
1509:12

**others (7)**
1472:13;1476:2;
1491:5;1572:18;
1603:20;1616:14;
1630:15

**Otherwise (5)**
1446:6;1485:4,15;
1556:4;1560:6

**ours (1)**
1533:5

**out (40)**
1421:3;1424:2;
1426:23;1432:23;
1473:16;1474:14,17;
1475:4;1479:21;
1485:3;1495:10;
1500:20;1507:15,15;
1522:15;1531:6,17;
1532:7;1536:4;
1542:20;1546:3,10;
1549:18;1551:25;
1574:25;1575:2,2,3,5,
9,11,22;1583:24;
1588:1;1597:19;
1606:21;1632:21;
1645:17,22;1646:5

**outlets (1)**
1549:17

**outlook (1)**
1632:24

**output (1)**
1561:1

**outside (1)**
1436:11

**over (21)**
1409:4;1413:13;
1417:7;1422:9;
1431:11;1435:25;
1467:6,8,10;1469:23;
1490:16;1499:8;
1507:15;1527:12;
1564:5;1617:19;
1623:4;1630:2;
1635:13;1640:10,20

**overall (25)**
1410:11,18;1416:1,
2,7;1417:5;1440:11;
1468:2;1491:9;1495:7,
7;1501:14,20;1506:16;
1510:22;1526:9;
1554:23;1556:17;
1570:14;1591:22;
1615:7;1616:17;
1620:15;1632:10,11

**overdo (1)**
1578:22

**overlaps (1)**
1543:5

**Overruled (14)**
1440:17;1477:22;
1514:20;1515:23;
1590:23;1604:5;
1616:12;1617:3,10;
1622:2;1623:20;
1633:2;1641:1;
1642:17

**overseas (1)**
1497:18

**own (6)**
1483:24;1486:3,14;
1536:23;1572:5;
1624:7

## P

**pace (1)**
1578:22
**Pacific (1)**
1622:8
**page (42)**
1408:14;1413:12;
1414:20;1432:24;
1441:19;1447:9;
1448:17;1482:5;
1484:15;1485:23;
1509:6;1520:5;1522:7;
1524:18,18;1528:22;
1545:15;1559:25;
1560:8,15;1562:18;
1563:24;1565:25;
1567:25;1568:21;
1571:15,17,19;
1577:18;1579:5;
1586:8;1593:11;
1601:10;1621:16;
1628:8;1629:9;1638:8,
8;1646:11,19;1649:15;
1650:16
**pages (3)**
1652:1,2,3
**paid (22)**
1424:10,11,13,18;
1425:2,8,13;1426:24;
1512:7;1517:24;
1519:15;1522:19;
1539:18;1594:19;
1612:7,10,11,13;
1630:7;1640:7,10,13
**paper (3)**
1422:3,14;1580:12
**parade (1)**
1408:13
**paragraph (14)**
1463:11;1488:18;
1509:9;1522:8;
1524:23;1525:14;
1551:7;1571:17,19;
1574:17,20;1576:1;
1601:10;1637:15
**paragraphs (2)**
1575:13,16
**parameter (1)**
1495:21
**parens (1)**
1557:6
**parenthesis (2)**
1478:9;1638:11
**part (16)**
1413:13,14;1527:13;
1539:3;1540:6;
1543:21;1554:22;

**particular (10)**
1415:17,25;1418:18;
1421:8;1439:14;
1504:13;1517:11,14;
1536:25;1617:7
**particularly (1)**
1534:14
**parties (4)**
1559:3;1581:10;
1591:6;1619:4
**parts (4)**
1413:11;1490:25;
1575:12;1616:15
**pass (3)**
1414:2;1498:10,16
**passed (5)**
1456:16;1498:7;
1609:15;1613:3,13
**passing (2)**
1515:10;1611:16
**past (6)**
1448:11;1501:13;
1532:20;1542:4;
1633:18,20
**Pause (1)**
1571:23
**pay (7)**
1476:9;1523:21;
1531:21;1532:1;
1539:9;1546:23;
1576:23
**payer (1)**
1428:19
**payment (14)**
1426:7,8,17;1428:2;
1431:14,18;1432:2,10,
14,17;1434:25;
1612:20,23,25
**payments (15)**
1426:16,18,20;
1430:23;1431:8,13;
1435:2,2;1517:21;
1521:8;1597:18;
1598:20;1599:4,11;
1640:4
**PC (14)**
1526:9;1530:18;
1531:7;1542:4;1544:3;
1550:21;1551:3,4,9,21,
23;1554:14;1632:14,
16
**PCs (4)**
1544:13;1546:11;
1548:14;1555:8
**PE (3)**
1528:12,13;1529:10
**penalty (1)**
1600:13
**Pendrock (2)**

**people (53)**
1415:3;1436:2,7,9;
1438:24;1442:21,22;
1471:9;1472:11;
1476:11,12,14;1478:2,
6;1480:8,12,17;
1489:9;1492:2,8,12;
1498:22;1499:12,14;
1501:13,14,20;1505:3;
1507:21;1508:8;
1532:8,9;1533:14;
1537:6,15;1547:16;
1574:5,23;1585:21;
1588:9,16;1604:16;
1614:23;1629:5;
1630:10,18;1631:9,12,
14,16;1642:9;1645:20;
1646:24
**per (18)**
1419:10,16,17;
1424:20;1429:11;
1443:2;1451:8;
1453:17;1558:16;
1561:19,20;1566:12,
14;1635:21;1636:8;
1637:3;1638:5;1641:7
**percent (42)**
1417:15,15;1418:16,
17,25;1419:1;1442:14,
18,18,23,24;1456:3;
1488:16;1495:6,19,20;
1497:16,17;1507:3;
1508:5;1509:11,12,16,
22,23;1517:18,18;
1540:19;1542:21;
1555:4,22;1566:11;
1567:22;1568:2;
1587:3,22;1588:7;
1632:19,23;1644:5,6;
1647:21
**percentage (5)**
1440:5;1495:3;
1561:23;1562:20;
1564:2
**performance (3)**
1524:7,15;1564:5
**perhaps (2)**
1489:18;1636:13
**period (8)**
1416:20;1427:9;
1433:5;1519:9;
1521:11;1543:11;
1623:19;1630:2
**permit (1)**
1424:21
**permitted (4)**
1609:14;1645:17,19,
22
**person (14)**
1411:3;1422:22;
1423:20;1436:10,12;
1479:16;1481:19;

**personal (20)**
1411:17,18,21;
1469:1;1492:5,9;
1535:23,25;1536:4,19,
21,23;1537:18,19;
1595:23;1596:2;
1613:7,15,25;1614:8
**Personally (2)**
1499:4,10
**personnel (1)**
1645:16
**PGR (5)**
1477:9,10,12;
1478:2;1481:19
**PGR's (1)**
1478:5
**phone (43)**
1417:7;1422:9;
1437:3,14,14,22,24;
1452:11,16,19,24;
1453:1,6;1459:21;
1476:13;1490:16;
1499:8;1580:11,25;
1592:12;1610:5,6,7;
1618:15,25;1624:6,7;
1625:23;1626:5,6,6;
1627:19;1629:2,5;
1630:25;1631:18;
1634:13;1636:24;
1646:9;1648:2,4,8;
1650:1
**phoned (1)**
1540:7
**phones (2)**
1545:10;1631:16
**photograph (1)**
1411:3
**phrase (2)**
1496:8;1556:13
**phrases (2)**
1525:18,20
**physical (1)**
1631:3
**pick (5)**
1457:24;1486:5;
1544:15,20;1625:16
**picked (1)**
1556:10
**picking (1)**
1468:15
**picture (1)**
1410:11
**piece (4)**
1422:3,14;1548:1;
1611:3
**pieces (1)**
1495:8
**pinpointed (1)**
1580:21
**pitch (6)**

**plug (2)**
1419:20;1451:17
**plugged (1)**
1554:11
**plugging (4)**
1451:15;1554:4,9;
1555:20
**plural (1)**
1586:5
**plus (1)**
1496:4
**pm (30)**
1437:17;1438:6,24;
1443:25;1444:2,8;
1452:15,23;1453:5;
1454:6,21;1459:10;
1487:14;1536:12,14;

**place (5)**
1421:18;1588:6;
1625:2;1630:22
**placed (2)**
1604:8,11
**plan (8)**
1414:12;1458:15;
1459:4;1464:5,8;
1576:8,17;1577:5
**planned (1)**
1458:18
**planning (10)**
1414:23;1470:4;
1491:23,24;1492:1,5,
15,16,18;1651:13
**plans (4)**
1470:5,6;1486:3,14
**plate (1)**
1566:20
**plea (5)**
1601:8;1602:19;
1603:5;1609:13;
1639:23
**plead (4)**
1599:22;1600:2,4,7
**pleaded (2)**
1599:24;1602:17
**pleading (1)**
1605:24
**please (25)**
1412:4;1413:12,13;
1414:19,21;1432:21,
25;1438:13;1444:5;
1446:20;1448:11;
1449:13;1450:4;
1452:8;1456:18;
1459:6;1461:23;
1465:20;1467:1;
1486:19;1519:13;
1544:18;1618:5;
1624:6;1632:1
**pled (6)**
1604:3,25;1605:5;
1609:6,6;1639:15

1545:2;1573:17;
1581:11,12,17;1583:5;
1619:8;1624:12,17;
1626:8;1627:22;
1628:10;1634:21;
1648:22;1649:2
**point (20)**
1434:10;1439:25;
1440:4;1442:9,17;
1443:1;1464:16;
1470:6;1558:25;
1588:22;1591:6;
1595:20;1604:10,18;
1610:17;1611:11;
1612:6;1620:3;1632:6,
17
**pointed (1)**
1588:1
**pointer (1)**
1464:13
**pointers (1)**
1461:10
**points (9)**
1439:9,20;1442:5,
14;1455:19;1584:17;
1585:25;1587:2;
1620:24
**portfolio (16)**
1424:7;1439:5,6;
1442:3;1455:4,8;
1471:10;1572:18;
1591:19;1603:20,21;
1642:8,18;1643:11,12,
16
**portion (4)**
1413:15;1456:13;
1522:4;1637:23
**position (4)**
1448:2;1449:15;
1591:3;1592:8
**positions (1)**
1444:18
**Positive (2)**
1496:5,12
**possible (3)**
1484:9;1587:15;
1651:7
**posted (3)**
1414:20;1458:14;
1465:20
**potential (5)**
1423:22;1500:14,20;
1598:3;1602:6
**precise (1)**
1522:25
**preclude (2)**
1408:3;1651:22
**predict (7)**
1471:1;1566:5,6,10,
12;1567:23;1568:5
**predicting (5)**
1558:15;1566:25;
1637:7,24;1638:5

**prediction (2)**
1566:1;1568:1
**predicts (1)**
1561:2
**preliminary (2)**
1445:18;1542:16
**prepare (1)**
1423:18
**prepared (4)**
1446:4;1564:8;
1565:6,22
**preparing (2)**
1413:21;1463:18
**present (11)**
1408:1;1409:1;
1485:1;1486:1;
1544:19;1545:3;
1546:1;1580:1;
1606:16;1607:7;
1651:1
**presentation (2)**
1506:1;1585:20
**presented (1)**
1594:11
**presents (1)**
1606:21
**press (5)**
1474:25;1516:3,5,5;
1621:18
**presumably (1)**
1651:10
**presume (1)**
1651:8
**pretty (8)**
1413:19;1419:23;
1455:14,16,19,22,23;
1532:25
**previous (8)**
1448:6;1492:4;
1494:6;1552:9,14,18;
1574:11;1576:16
**previously (5)**
1409:13;1564:13;
1581:7;1588:14;
1644:14
**price (13)**
1528:14;1532:15,21;
1547:3;1550:22;
1551:2,5,10,17;1557:1,
2;1562:12,16
**prices (16)**
1544:11;1547:22;
1548:2,5,14;1549:9,11,
15,18;1551:4,12,14,15,
23;1557:16,18
**pricing (3)**
1549:12,14,17
**primary (4)**
1472:6;1475:20;
1477:5;1497:23
**print (1)**
1487:9
**printout (2)**

1559:7,16
**Prior (6)**
1416:3;1467:7;
1543:11;1559:22;
1583:10;1651:11
**priority (1)**
1500:19
**prison (1)**
1596:10,14;1601:24
**privilege (1)**
1607:14
**pro (1)**
1566:17
**probably (6)**
1461:7;1473:9;
1560:20;1585:16;
1588:3;1590:11
**probation (2)**
1596:5,6
**problem (1)**
1465:22
**problems (1)**
1598:3
**proceed (2)**
1409:14;1546:5
**proceedings (1)**
1602:21
**process (2)**
1430:19;1556:15
**processed (1)**
1533:5
**procession (1)**
1630:20
**product (23)**
1470:22,23;1491:4,
6,17;1497:19,24;
1538:10,22;1540:11;
1556:3,3,9,16;1562:3,
6,7,7,10,11;1564:3;
1585:19;1632:12
**products (8)**
1468:23;1489:24;
1491:11,12;1507:11,
11,12;1555:9
**proffer (2)**
1610:2,4
**proficient (1)**
1568:10
**profit (3)**
1561:21,23;1564:3
**program (2)**
1414:2;1485:19
**project (13)**
1540:3,6,6,21,23;
1541:7,10;1556:9;
1594:2,4,10,13,24
**promised (1)**
1446:20
**promises (2)**
1435:3,6
**proper (1)**
1464:4
**properly (1)**

1589:1
**property (1)**
1537:3
**proposed (2)**
1583:14,16
**prosecuted (1)**
1435:4
**prosecuting (1)**
1435:7
**prosecution (1)**
1600:24
**prosecutor (4)**
1492:24;1564:16;
1601:2,16
**prosecutors (1)**
1600:19
**prospects (1)**
1461:8
**prosperous (2)**
1412:18,22
**protocol (1)**
1471:25
**provide (28)**
1409:23;1416:16;
1417:4;1418:14;
1419:2,6,9,15;1420:17;
1424:8;1426:3;
1430:20;1435:5;
1440:20;1443:16;
1465:14;1469:4;
1477:16;1478:12;
1479:19;1500:5;
1510:2;1524:1;
1528:24;1568:25;
1569:11;1600:23;
1601:1
**provided (19)**
1415:6;1417:19;
1418:12,19;1419:11;
1420:12,20;1421:24;
1440:12;1443:11;
1478:17;1479:21;
1490:15;1539:3;
1594:13;1601:17;
1630:9,10;1640:16
**provider (1)**
1430:18
**providers (1)**
1541:24
**providing (6)**
1419:4;1425:7;
1444:24;1520:4;
1527:10;1640:8
**Prudential (39)**
1409:19;1448:13;
1470:17;1480:18,20;
1488:8,10;1499:6;
1500:24;1519:4,23;
1520:1,2,4;1523:5,16,
19;1524:8,16;1529:7,8,
10;1533:21,25;1540:1,
16,21;1541:8,9;1548:7,
13;1549:22;1550:1;

1563:2;1593:8,13,25;
1594:12,14
**public (16)**
1410:22;1420:20,23;
1421:2;1425:25;
1450:13,24;1471:20;
1478:23;1487:11;
1491:8;1494:22;
1582:16;1602:21;
1631:22;1633:15
**publicly (3)**
1532:6;1549:9;
1604:7
**publicly-traded (1)**
1611:6
**publish (1)**
1478:24
**published (2)**
1549:23;1550:7
**purports (1)**
1433:5
**purpose (2)**
1420:3;1583:22
**purposes (1)**
1615:4
**Pursuant (7)**
1437:13,23;1452:25;
1619:3;1627:10;
1634:13,16
**pursue (1)**
1414:15
**put (27)**
1414:10;1421:5;
1432:23;1435:8;
1452:8;1453:13;
1459:6;1492:23;
1521:11,19,20,20,22;
1546:10;1554:8;
1555:16,25;1556:3;
1558:20;1626:15;
1631:25;1635:3;
1643:3;1644:3;
1645:11;1649:14;
1652:4

# Q

**QTR (5)**
1496:6,6,8;1555:6;
1556:24
**quarter (137)**
1416:13,14,15;
1418:24;1421:1,13,14,
15,15;1426:22;1427:8;
1429:11;1436:24;
1439:11,12,13,14;
1448:23;1450:14;
1455:15,17,18,19,22;
1456:16;1458:10;
1465:24;1466:3,4;
1471:13;1474:22;
1475:5,13;1478:15;
1494:1,6,10,14;1496:7,

10,12,12;1503:6,8;
1504:10;1505:20;
1506:18,19;1508:13,
18,25;1509:11,16,19,
22;1517:11,14,16,16;
1521:21;1527:11,12;
1538:5;1542:5,9,11,15,
20,23,24;1543:1,4,5,
19,25;1544:9;1550:12,
14;1552:10,11,11,14,
14,18,19;1553:14,17;
1558:16,17;1561:12,
12;1563:18;1564:13,
17,21;1565:1,3,4,6,13,
16,22;1566:1,6,20;
1567:1,5,8,21;1570:19,
23,25;1571:1,7;
1572:3;1575:18,19;
1576:16,17,25;
1582:20;1617:21,23;
1632:22,22;1635:9,12,
16,636:3,11;1637:19;
1638:12,13,13,17,19,
20
**quarterly (24)**
1410:12,16;1415:23;
1416:8;1439:16,18;
1448:24;1450:13;
1463:19;1466:5;
1475:15;1478:25;
1500:25;1503:4;
1508:17,18;1564:9;
1615:8;1616:16,25;
1621:7;1631:21;
1634:9;1640:18
**quarters (15)**
1416:16,18;1419:2,
4,6,8,15;1420:22;
1435:10;1471:14,15;
1495:19;1561:5,9,15
**questionnaire (3)**
1540:8,12,13
**Quick (1)**
1485:7
**quite (1)**
1509:19;1599:20;
1628:24;1651:7
**quote (12)**
1493:20;1501:15;
1507:2,4;1551:8,10;
1554:3;1555:3;
1558:11;1574:8;
1583:4,6

## R

**raise (1)**
1589:9
**raised (5)**
1425:2;1519:11,15,
21;1522:25
**range (1)**
1417:9,11;1418:13,

15;1456:3;1517:15,15,
17;1617:13,15,19,25
**ranges (3)**
1418:12;1517:7,11
**rate (3)**
1543:23,24;1544:1
**rates (3)**
1543:8,17,18
**rather (2)**
1516:4;1617:7
**rating (2)**
1572:22,24
**ratio (3)**
1528:13,14;1532:15
**ratios (3)**
1528:12;1529:10;
1532:21
**Ray (159)**
1410:25;1411:6,14,
20;1412:2,6,16,17,20;
1413:1,11,15,18;
1414:5,9;1415:6,12,16,
19;1416:6,10,13,16,22;
1417:6;1418:2,13;
1419:2,9,24;1420:6,12,
16;1421:9,17,22,24;
1422:11;1423:6,13,22;
1424:3,8;1425:9;
1435:13,22,24;1436:6;
1437:24;1438:9;
1439:24;1440:12;
1443:7,11;1444:24;
1445:8,16;1446:4,12,
19,25;1449:12,20;
1451:17;1456:1,24;
1457:6;1458:18;
1459:25;1460:7,16;
1461:1,14,23;1462:9;
1464:1,16;1465:7,14;
1466:18;1467:10,20;
1468:2;1469:10,24;
1470:7;1471:5,17;
1473:20;1489:5;
1493:3;1498:2,6,23;
1499:13;1512:4,4,7;
1513:3,23;1516:1,16;
1521:2;1523:10,11;
1552:22;1553:25;
1558:6;1569:13,16;
1571:5,7;1572:2;
1578:11;1581:12,19,
22;1584:14;1585:5;
1587:22;1608:3;
1611:1,3,8;1612:2;
1614:19,23;1615:15;
1616:10,18,25;
1617:12;1618:12,16;
1620:16;1622:16;
1628:5,24;1629:2;
1630:2,9,15,22;1631:1;
1634:3,9;1636:24;
1642:20;1643:6,7,15;
1644:23;1645:1,14;

1646:12;1647:17;
1649:1,5;1650:2
**Ray's (15)**
1411:25;1416:7;
1422:20;1447:8;
1448:16;1451:15;
1452:19;1459:20;
1581:7;1615:5;
1619:12,15;1626:20;
1637:10;1646:17
**reaching (1)**
1500:20
**react (1)**
1516:21
**read (29)**
1412:17;1450:2;
1487:8;1488:18;
1503:15;1507:2;
1509:10;1522:4,11,15,
15;1545:7,8,12;
1546:17;1558:24;
1559:2,20;1571:13,21,
24;1572:18;1575:6,10,
14;1591:5;1601:15;
1622:3;1649:25
**reading (2)**
1497:15;1545:9
**ready (2)**
1485:6;1607:5
**Real (2)**
1445:19;1549:13
**realize (1)**
1598:6
**really (5)**
1468:3;1498:6;
1523:16;1547:4;
1652:2
**reason (11)**
1420:10;1471:9;
1498:15;1527:16;
1529:1;1531:23;
1532:6;1536:22;
1537:1;1585:16;
1599:19
**reasoning (1)**
1460:23
**reasons (1)**
1524:25
**recall (81)**
1413:1;1415:16,19,
21;1416:5;1418:18;
1430:13;1456:7;
1465:16;1480:12;
1499:8,11;1500:24;
1505:5,25;1508:12;
1510:25;1511:9,10;
1516:25;1517:1,22;
1518:17,20,24;
1519:21;1525:22,23;
1534:12;1536:22,25;
1542:19;1559:20,22;
1564:13;1566:20,24;
1571:5,6,9,11;1572:6;

1573:2,3;1576:7,14;
1582:10,12,14;1583:9,
20,22;1590:19;
1594:23;1595:6;
1596:4,7,9;1598:19;
1614:20;1615:12;
1617:17;1618:9,19;
1619:25;1630:11;
1632:3;1633:9,23;
1635:6;1636:11,25;
1637:13;1638:22;
1639:16,24;1640:5;
1641:10;1642:24;
1643:25;1649:1
**receive (13)**
1410:20,24;1424:21;
1426:7,19,23;1428:2;
1430:23;1432:2;
1449:7;1612:23,25;
1639:12
**received (115)**
1411:11,12;1412:14;
1419:24;1420:6;
1422:11;1425:9;
1428:15,16;1429:18,
19;1433:22,23;
1434:13;1435:19,20;
1437:11,12;1438:21,
22;1441:9,10;1445:13,
14;1446:17,18;
1447:19,20;1449:9;
1452:6,7;1454:4,5,18,
19;1457:21,22;1459:2,
3;1460:14,15;1461:20,
21;1462:20,21;
1468:12,13;1472:24,
25;1474:8,9;1477:24,
25;1481:7,8;1483:8,9;
1487:2,3;1498:7;
1502:22,23;1505:14,
15;1508:22,23;
1526:20,21;1527:6,7;
1528:9,10;1529:25;
1530:1,15,16;1532:18,
19;1534:25;1535:1;
1553:9,10;1559:14;
1568:19;1573:9,10;
1580:23,24;1582:2,6;
1590:6,7,10;1599:11;
1606:25;1612:1,20;
1613:16;1616:16;
1619:4,5;1621:14,15;
1624:4,5;1626:1;
1627:12,13;1634:15,
17;1639:4;1640:5;
1641:7,8;1652:7
**receiving (5)**
1428:25;1430:1;
1434:5;1467:20;
1471:5
**recent (1)**
1550:21
**recently (3)**

1439:20;1585:25;
1652:6
**Recess (3)**
1485:5;1544:25;
1607:4
**recipient (1)**
1442:1
**recipients (2)**
1441:15,16
**recognize (13)**
1411:3;1428:7;
1433:14;1437:19;
1508:16;1524:7,15;
1548:22;1559:18;
1567:4;1577:8;1593:2;
1621:6
**recollection (6)**
1519:16;1523:1;
1540:20;1583:13,15;
1594:22
**recommend (1)**
1460:23
**recommendation (1)**
1460:24
**recommendations (3)**
1424:6;1534:7;
1643:15
**recommending (1)**
1574:10
**record (2)**
1618:15;1624:7
**records (25)**
1437:4,14,15;
1438:5;1452:11;
1580:11,25;1591:8,11,
15,18,22,25;1606:20;
1618:25;1624:7;
1625:23;1626:6,6;
1627:19;1628:5;
1630:25;1634:13;
1646:9;1648:8
**recounting (1)**
1456:8
**RECROSS (1)**
1643:20
**recruiter (10)**
1423:21;1446:22;
1447:2,15,24;1448:15,
21;1449:11;1450:2;
1608:11
**recruiting (1)**
1448:2
**red (1)**
1496:8
**Redirect (4)**
1614:13,15;1623:16;
1649:12
**reduce (1)**
1576:15
**reduction (7)**
1576:12;1577:1;
1582:3;1637:13;
1638:4,10,18

**reductions (1)**
1578:9
**refer (11)**
1479:13;1504:20;
1528:11;1530:17;
1541:20;1554:6;
1555:11;1556:17;
1570:24;1622:21;
1636:1
**reference (8)**
1435:8;1461:25;
1475:17;1530:20;
1551:16;1557:21;
1583:17;1644:21
**referenced (3)**
1591:14,16,17
**referencing (1)**
1493:25
**referral (1)**
1448:1
**referred (6)**
1490:8;1493:10;
1553:24;1554:25;
1556:21;1622:15
**referring (20)**
1414:7,17;1432:19;
1436:9;1440:8,9;
1445:21;1455:12,18;
1456:21;1457:5;
1460:19;1466:17;
1475:3;1489:5;
1494:21;1556:11;
1557:9,13;1627:5
**refers (8)**
1490:14;1494:2;
1525:14;1530:18;
1532:21;1558:15;
1570:4;1574:20
**refine (1)**
1538:6
**reflect (5)**
1536:9;1561:8;
1581:12;1589:23;
1590:8
**reflected (1)**
1566:21
**refresh (4)**
1488:20;1522:18;
1572:1;1601:15
**refreshes (1)**
1593:12
**regarding (15)**
1411:18;1415:24,25;
1416:7,8;1423:19;
1425:7;1439:21;
1470:21;1492:20;
1500:1;1546:18;
1549:3;1587:17;
1602:8
**regional (1)**
1621:21
**regulated (2)**
1604:20,23

**Reitzes (1)**
1445:23
**Reitzes' (1)**
1448:3
**relate (7)**
1506:18;1527:8;
1529:18;1530:2,9;
1532:13;1563:22
**related (8)**
1429:11;1491:16;
1504:21;1545:5,6;
1557:24;1594:16;
1616:15
**relates (3)**
1505:22;1527:9;
1644:7
**relating (5)**
1429:12;1553:5;
1576:4,7;1644:3
**relation (8)**
1428:10;1434:2;
1458:9;1462:2;
1466:19;1467:3;
1487:10;1511:21
**relations (48)**
1415:15;1422:23;
1464:17;1465:8,11,15;
1471:21;1472:3,11;
1473:12,21;1475:20;
1479:7;1498:22;
1499:2,12,16,20,24;
1500:7,14,20;1501:1,6,
18,22;1502:18;
1503:22;1505:23;
1510:12,16;1511:6,10,
24;1585:7,17;1592:16,
19,23;1611:5;1631:4,
10,20;1633:9,17;
1645:21,24;1646:2
**relationship (8)**
1411:13,16,19;
1428:22;1479:25;
1641:15,18,20
**relationships (1)**
1500:8
**relative (14)**
1417:10,19;1418:6;
1422:10;1439:16;
1442:6;1444:9;
1448:21;1453:10;
1454:7;1495:7;
1498:19;1555:6;
1556:24
**relaxing (1)**
1413:19
**release (6)**
1421:16;1474:25;
1509:3;1582:17;
1621:7,18
**released (1)**
1508:25
**relevance (2)**
1477:1,3

**relevant (4)**
1477:22;1543:18;
1549:12;1576:19
**remember (44)**
1418:23;1430:16;
1469:12;1473:6;
1488:14;1492:24,25;
1498:12,13;1499:11;
1506:3;1510:18;
1516:14;1517:10;
1519:11,14,23;
1522:24;1534:14;
1541:13,13;1542:18;
1544:5;1546:8;
1547:12;1558:21;
1564:16,19;1590:12,
13,15,17,18,25;1591:1;
1593:9;1596:25;
1597:1,4,5,5;1634:8;
1636:23;1642:20
**reminder (1)**
1460:17
**renews (1)**
1477:19
**repeat (1)**
1519:13
**rephrase (5)**
1418:5;1574:7;
1612:16;1615:1;
1636:18
**replied (6)**
1412:20;1446:4;
1448:10;1451:13;
1462:9;1475:7
**replies (1)**
1549:3
**reply (2)**
1457:25;1468:17
**report (30)**
1421:7;1430:19;
1504:5;1505:1,16;
1532:5,5;1542:2,4,12,
13,14;1543:4;1546:24;
1547:1;1561:12;
1564:9;1565:9;1571:2;
1572:5;1573:11,12;
1575:10,16,22;
1617:24;1635:5;
1637:22,23;1638:2
**reported (29)**
1416:9,10;1464:12;
1471:16;1474:18;
1501:13;1508:12;
1509:16;1538:5;
1542:20;1543:17;
1544:10;1553:18;
1554:7;1561:9;
1564:14,18;1565:9;
1567:12,20;1568:3;
1569:15;1570:20;
1576:10;1577:4;
1582:21;1585:18,19;
1633:13

**relevant** *(continued)*
**reporting (3)**
1503:4;1505:9;
1553:21
**reports (20)**
1424:6;1462:5,8;
1530:22;1531:17;
1542:8,16,19;1546:8,
10,14,14,17,19;1572:9,
15;1575:6,19,23;
1604:2
**represent (2)**
1488:5;1538:22
**representation (1)**
1648:16
**represented (1)**
1538:9
**representing (2)**
1587:19;1607:15
**reputation (1)**
1568:9
**request (4)**
1430:21;1448:1;
1569:9;1605:17
**requested (6)**
1526:15;1527:1;
1529:18;1530:10;
1532:14;1533:6
**re-redirect (1)**
1649:11
**research (27)**
1424:5,6;1430:19,
20;1446:2;1448:2,3,5,
7;1462:5,8;1475:23;
1476:2;1477:6;1516:6,
9;1540:10;1541:24;
1572:9,15;1589:9,11;
1593:25;1603:16;
1635:4;1637:22;
1643:8
**researching (1)**
1425:25
**resources (1)**
1528:18
**respect (11)**
1430:13;1495:16;
1499:20,24;1512:4;
1521:8;1528:19;
1537:14;1551:3;
1620:14;1642:13
**respond (2)**
1516:23;1651:23
**responded (2)**
1552:3;1569:2
**response (1)**
1461:4
**responses (1)**
1540:9
**responsibilities (1)**
1534:2
**responsive (1)**
1646:3
**rest (8)**
1409:4,5;1484:13;

**reporting** *(continued)*
1497:17;1511:19;
1532:25;1544:6;
1651:9
**restrict (1)**
1592:22
**restroom (2)**
1606:12;1607:2
**result (1)**
1513:18
**results (54)**
1410:13,16,16,17,19,
21;1415:8,24;1416:1,2,
8,11,17,22;1420:23;
1421:2,10;1423:5,7;
1439:17,18;1444:25;
1448:24;1455:20;
1456:4;1463:19;
1465:15;1478:25;
1508:25;1509:3;
1550:1;1553:18,22;
1561:2;1566:1,22,25;
1569:15;1570:17;
1582:9;1585:18,18,19;
1594:10;1615:8;
1616:17;1617:1;
1631:21;1633:15,18,
19,20;1640:19;1643:4
**resume (10)**
1409:9;1423:15,21;
1435:25;1436:12,17;
1486:16;1515:10;
1546:3;1630:17
**résumé (16)**
1446:20,24;1447:8;
1448:4,9,11,12,14,18;
1449:17;1450:2;
1593:5,20;1594:5,7,24
**resumed (1)**
1408:1
**retail (1)**
1549:17
**retailers (1)**
1547:16
**returns (6)**
1434:14,16;1598:8;
1599:15,15;1603:11
**rev (2)**
1554:15;1558:11
**revenue (52)**
1417:12;1418:8,18;
1419:20,25;1420:4;
1439:25;1440:2,3,6;
1443:4;1479:22;
1491:10,11;1493:17;
1494:24;1495:10,12,
14,16,17;1501:15;
1502:1,12;1504:20;
1506:14;1510:20,21,
22;1527:11;1544:8,13;
1546:14;1547:2,14;
1548:1;1554:18;
1555:21,24;1556:2,5,6,
17;1561:17,24;1564:2;

1567:11;1587:2,6;
1616:3;1620:20;
1632:9
**revenues (18)**
1416:24;1417:8;
1419:3;1451:18;
1471:2;1493:18;
1495:25;1504:21;
1506:16;1507:11;
1544:12,12;1546:18;
1556:9;1562:8,10;
1563:9;1566:6
**review (7)**
1414:2;1524:8,15;
1525:11,12;1574:25;
1630:17
**reviewed (1)**
1423:15
**right (524)**
1408:2,6;1409:2,6;
1413:22;1429:17;
1432:4;1433:21;
1437:10;1438:20;
1439:3;1441:8,13,18;
1442:12;1443:3;
1448:19;1450:25;
1451:9;1459:18,25;
1481:3,15;1484:3,10;
1485:22;1486:16;
1487:20,24;1488:19;
1489:1,3,10,12,16,21,
24;1490:2,3,20,21,24;
1491:15,20,22;1492:8,
9,13,14;1493:4,6,7,8,
12,22;1494:3,16,22;
1495:13,16,23;1496:1,
13,14,16,18;1498:9,11,
14,21;1501:5,7,10,23,
24;1502:3,5,8,10,11,
22,25;1503:9,11,22,25;
1504:2,5,6,14,23,24,
25;1505:2,11,17,20,23;
1506:14,19,21;
1507:19,25;1508:5,9,
10;1509:4,24;1510:2,7,
13,23;1511:3,7,17;
1512:2,10,11,13,16;
1513:4,8,12,15,16,18,
20,24,25;1514:2,5,6,8,
13;1515:2,12,18;
1516:7,10,18,19,21;
1517:8,9,11,19,25;
1518:1,5,7,8,15;
1519:2;1520:1;1521:2,
9,17,19;1522:25;
1523:5,8,19,20,23;
1524:19;1525:8,11;
1526:4;1527:14,17,19,
21,24;1529:2,5,7;
1530:4;1531:6,13,19,
21,24;1532:2,12,22,25;
1533:9,12,19,22,25;
1534:1,3,10;1535:3,16;

1536:12,15;1537:3,6,
10,25;1538:3,7,8,10,
22,24,25;1539:5,11,13,
16,18,21,24;1540:11,
17,21;1541:4,8,12,20,
22,25;1542:3,6,9,14;
1543:2,5,8,9,11,14,15,
25;1545:13;1546:2,15,
24;1547:20,24;1548:2,
8,11,14,17,25;1549:3,
6,7,21,23;1550:5,11,
12,15;1551:3,5,6,16,
18;1552:1,3,4,12,15,
19,22,25;1553:15,16,
18,19,20,24;1554:10;
1555:14,23;1556:13,
18;1557:7,17,18,21;
1558:1,2,4,10;1559:1,
11,11;1561:1,6,14,15,
17,20,21;1562:10,16;
1563:1,7,10,11,14,17,
22,23;1564:4,9,23,24,
25;1565:5,5,7,16,17,
18,19,20,23,24;1566:8,
9;1567:9,10,14,18;
1569:3,4,5,10,17,20;
1570:4,7,10,17;
1572:13,16,17,20,22,
25;1573:17;1574:2,18;
1575:6,24;1576:9,13,
19,20,21,23;1577:1,5,
6,17;1580:8,16,21,25;
1581:1,4,8,17,18,24;
1582:3,24;1584:6,8,14;
1585:1,8;1586:3;
1587:11;1588:8,10,14,
15;1589:9,13;1591:23;
1593:6,10;1594:5,8,14,
17;1595:10,12,18;
1596:17,24;1597:11,
16,20,24;1598:3,8,15,
17,22,23;1599:1,8,22,
25;1600:1,2,3,5,6,8,13,
16,20,21,24,25;1601:2;
1602:2,14,15,17,18;
1603:8,9,11,12,13,16,
19,22,23,25;1604:3,14,
17,21,22,23,24;1605:1,
7,11,12,14,18,21;
1607:2;1608:6,10,11,
12,16,17,24;1609:2,4,
5,7,8,9,10,12,20;
1611:1,12,13,14,15;
1612:4,8,9,23,24;
1613:22;1614:9;
1618:2,10,18;1623:13;
1624:11,21;1625:4;
1626:10;1627:18,23;
1630:23;1631:1,2;
1633:16;1634:7;
1635:8,18;1636:4;
1638:7;1639:3;
1640:11,22;1641:11;

1642:5;1644:4,9,15,19,
21,23;1645:9,14,15;
1646:3,4,6;1647:23;
1648:24;1650:5,10;
1651:16
**right-hand (1)**
1635:12
**rise (3)**
1484:13;1606:15;
1650:14
**road (1)**
1503:14
**Rob (190)**
1410:25;1411:6,14,
20;1412:2,6,16,17,18,
20,22;1413:1,5,11,15,
18;1414:5,9;1415:6,12,
16,19;1416:6,7,10,13,
16,22;1417:6;1418:2,
13;1419:2,9,24;1420:6,
12,16;1421:9,17,22,24;
1422:11,20;1423:6,13,
22;1424:3,8;1425:9;
1435:13,22,24;
1436:17;1437:24;
1438:9;1439:24;
1440:12;1443:7,11;
1444:24;1445:8,16,20;
1446:4,12,19,24,25;
1447:8;1448:16;
1449:12,12,20;
1451:15,17;1452:19;
1456:1,24;1457:6;
1458:2,18;1459:20,25;
1460:7,16;1461:1,11,
14,23,23;1462:9,10;
1464:1,13,14,16;
1465:7,14;1466:7,18;
1467:10,20;1468:2;
1469:10,24;1470:7;
1471:5,17;1473:20;
1489:5;1493:3;1498:1,
6,23,25;1499:1,13;
1511:1;1512:4,4,7;
1516:1,16;1521:2;
1552:22;1553:25;
1558:6;1569:13,16;
1571:5,7;1572:2;
1578:11;1581:12,22;
1584:14;1585:5,16;
1587:16,22;1608:3;
1611:1,3;1614:19,23;
1615:5,15;1616:10,16,
18,25;1617:12;
1618:12,16;1619:12,
15;1620:16;1622:16;
1625:13,21;1626:19;
1628:2,5,16,24;1629:2;
1630:2,9,15,22,25;
1634:3,9,25;1636:24;
1637:10;1642:19;
1643:6,6,14;1644:23;
1645:1,13;1646:12,17;

1647:17;1649:1,5,24;
1650:2
**Rob's (5)**
1459:17;1624:16;
1626:14;1627:21;
1647:21
**role (2)**
1455:5;1513:7
**roll (3)**
1556:2,6;1644:18
**rolled (7)**
1410:17,20;1415:7;
1416:11;1440:1;
1620:21;1644:11
**rollup (5)**
1410:7;1556:13,14,
18,20
**roll-up (3)**
1463:15,16,25
**room (2)**
1484:13;1609:2
**Roughly (1)**
1550:14
**row (7)**
1437:15;1452:10;
1459:8;1561:4;
1626:16;1634:19;
1635:14
**rows (1)**
1638:9
**Ruchi (7)**
1425:20;1518:20;
1539:7;1593:24;
1599:7,12;1600:7
**run (2)**
1451:2;1530:5
**running (2)**
1408:11;1576:11
**rush (1)**
1652:11

## S

**salary (3)**
1641:3,6,7
**sales (18)**
1474:21;1478:14,15;
1493:11;1507:8,8,9;
1526:9;1530:22;
1541:16,18;1542:3;
1543:8;1544:3,8;
1546:11;1551:3;
1632:22
**Sam (7)**
1480:16,18;1481:10;
1483:17;1487:16;
1641:12;1651:4
**same (41)**
1420:10;1424:18;
1425:21;1430:2,9,12;
1431:24;1433:10;
1441:15,16;1446:6;
1449:16;1451:21;

1467:7,12;1472:10;
1477:21;1487:12;
1492:19;1499:22;
1519:22;1523:4,22;
1536:9,10,14;1566:19;
1585:10;1590:20;
1594:1;1598:19;
1609:1;1620:14;
1623:12;1624:3;
1625:25;1627:11;
1634:14;1637:6,25;
1647:13
**sample (3)**
1426:21;1430:18,20
**San (2)**
1455:9;1540:25
**SANDEEP (1)**
1409:11
**Sandy (23)**
1412:20;1413:14,18;
1437:4,14;1445:18;
1446:20;1450:1;
1456:17;1457:23;
1458:13;1460:16;
1462:9;1465:20;
1466:13;1467:1;
1529:11;1538:14;
1559:6;1570:1;1575:4,
21;1614:3
**SandyGoyal@NBcom (1)**
1535:19
**Sandy's (1)**
1524:24
**Sarah (2)**
1569:5,7
**Satori (3)**
1591:14,17,20
**saw (2)**
1558:20;1581:15;
1633:3
**saying (28)**
1446:4,25;1448:10;
1455:19;1457:2;
1458:15;1462:9;
1463:16;1467:12;
1474:20;1492:7;
1503:19,20;1506:20;
1515:17;1516:23,25;
1537:21;1540:16;
1550:25;1551:22;
1552:2,17;1555:2,15,
20;1596:25;1634:5
**scary (2)**
1596:1,2
**schedule (1)**
1486:12
**scheduling (2)**
1485:7;1486:3
**school (4)**
1411:24;1469:3;
1492:10;1540:24
**Schuckenbrock (3)**
1473:4,5,6

**Scott (4)**
1548:10;1549:2;
1562:19,25
**screen (6)**
1492:24;1535:2;
1558:20;1607:21;
1622:25;1643:22
**scroll (2)**
1447:25;1481:23
**scrolling (5)**
1448:10;1483:16,18;
1487:15;1632:17
**scrupulous (1)**
1545:7
**seal (4)**
1602:19;1605:9;
1639:23;1640:2
**search (2)**
1414:11,12
**Searches (1)**
1545:10
**season (3)**
1414:25;1415:2;
1507:11
**seasonality (3)**
1507:8,14,15
**seat (4)**
1409:2;1485:2;
1546:2;1651:2
**SEC (1)**
1604:23
**second (17)**
1424:15;1442:17;
1447:8;1463:14;
1522:8,10,12,13;
1548:25;1577:14;
1593:11;1601:10;
1621:16;1622:5;
1637:15;1638:8,8
**seconds (6)**
1438:2;1453:3;
1578:23;1624:20;
1627:25;1628:4
**secret (5)**
1602:21,24;1605:9,
18;1639:20
**section (4)**
1506:6;1563:25;
1621:21;1632:5
**sector (2)**
1448:7;1449:14
**secured (1)**
1609:14
**Securities (6)**
1448:13;1599:24;
1602:17;1605:1,5;
1609:11
**seeing (5)**
1474:20;1506:21;
1582:14;1587:15;
1632:9
**seek (1)**
1526:7

**seem (2)**
1478:3;1558:18
**Seemed (1)**
1530:5
**seems (8)**
1489:1;1497:10;
1507:20;1511:19;
1532:15;1533:7;
1583:9;1621:7
**segment (20)**
1415:25;1417:3;
1440:2;1463:18;
1468:21,22,23;
1490:12;1491:17,17;
1494:21;1496:23;
1556:16;1585:1;
1587:2,25;1617:8;
1620:16,19,25
**segments (13)**
1409:25;1410:1,2,3,
10;1417:3;1421:3;
1497:14;1506:17;
1585:11,15;1616:14;
1632:12
**select (1)**
1483:25
**selected (1)**
1433:11
**sell (16)**
1414:22;1417:23;
1445:23;1446:2;
1461:2,3;1518:12;
1541:19;1547:2,24;
1572:12;1573:1;
1574:16;1603:25;
1642:10,15
**selling (10)**
1489:25;1544:11;
1547:2,22;1548:2,5,14;
1557:2;1562:12,16
**sells (1)**
1468:23
**semiconductor (3)**
1463:6;1483:24,25
**send (18)**
1424:6;1426:21,22;
1436:12;1448:9;
1531:16;1532:7,7,9,25;
1535:24;1536:4;
1538:14;1575:2,2,5,9,
22
**sending (9)**
1421:3;1436:1,6;
1446:23;1536:3;
1537:10,11,12;1549:5
**senior (2)**
1445:23;1572:7
**sense (3)**
1511:21,21;1536:25
**sent (51)**
1412:15;1426:23;
1427:25;1438:15,23;
1441:4,14;1442:7;

1446:19;1447:15,21;
1448:15,18,20;1451:3;
1455:18;1457:1;
1462:4,5,15;1473:1;
1476:20;1532:24;
1533:8,8,11;1534:12;
1535:2,18,21;1536:10,
14,23;1537:8,18,20;
1540:18;1558:21,22;
1573:17;1575:1,3;
1584:4;1588:9,19,23;
1591:1;1594:9;
1599:10;1603:7;
1608:15
**sentence (16)**
1450:3;1463:14;
1468:16;1507:2;
1509:10;1522:10,13,
16;1524:23;1551:7;
1554:2;1557:23;
1558:11;1574:7;
1601:12;1637:18
**sentenced (1)**
1601:22
**separate (5)**
1496:23,23,25;
1521:25;1571:12
**September (5)**
1433:6;1474:3,25;
1476:20;1519:19
**sequence (1)**
1625:2
**sequential (5)**
1494:25;1527:12;
1552:5,8,9
**sequentially (3)**
1493:21;1494:1,5
**seriously (1)**
1414:21
**server (3)**
1558:2;1588:1,4
**Server/storage (1)**
1584:20
**servers (4)**
1490:6,18;1493:11;
1546:11
**service (6)**
1476:9;1490:23;
1530:22;1531:19;
1546:20,23
**services (15)**
1410:6;1426:3;
1473:7;1490:12,14,15,
16;1491:2,4,6;1492:8;
1497:23;1557:24;
1558:4,5
**SESSION (1)**
1545:1
**sessions (2)**
1610:2,4
**set (2)**
1471:21;1473:4
**setting (1)**

1490:17
**settled (1)**
1414:6
**seven (2)**
1453:8;1628:18
**several (6)**
1438:24;1538:2,9;
1570:9;1608:5;
1640:14
**shaded (2)**
1561:15;1564:10
**shading (1)**
1561:7
**shape (1)**
1554:12
**share (25)**
1419:10,16,17;
1443:2;1448:8;1451:8;
1453:17;1480:5;
1494:25;1495:3,5,6,9;
1502:1;1530:19;
1558:16;1561:19,20;
1566:12,14;1635:21;
1636:8;1637:3;1638:5;
1641:22
**shared (6)**
1537:6,16;1538:18;
1540:16;1541:8;
1612:1
**shares (3)**
1573:22;1574:8;
1592:6
**sharing (2)**
1541:9;1610:17
**Shep (11)**
1472:6,7;1473:9,14,
16;1475:9,16,17;
1498:23;1499:12;
1631:9
**shifted (1)**
1473:22
**shipped (1)**
1479:21
**shipping (1)**
1478:15
**shop (1)**
1409:7
**short (8)**
1444:14,14,16,18;
1478:1;1484:9;1485:2;
1606:12
**shortly (5)**
1465:24;1466:6,7;
1522:19;1582:17
**short-term (1)**
1632:25
**show (10)**
1474:23;1487:9;
1548:19;1550:1;
1578:4;1592:25;
1597:3;1618:23;
1622:18;1627:8
**showed (5)**

1492:24;1515:7;
1618:15;1636:10;
1648:8
**showing (9)**
1411:1;1437:1;
1458:19;1511:6;
1554:18;1555:13;
1564:1;1636:7;
1638:24
**shown (9)**
1411:3;1412:25;
1413:1;1431:14;
1521:5;1615:10;
1618:6;1636:24;
1649:14
**shows (3)**
1563:25;1578:13;
1634:20
**shy (2)**
1637:19,23
**side (14)**
1414:10,22;1417:23;
1445:23;1446:2;
1461:3,3,6;1491:8;
1518:12;1572:12;
1578:1;1623:6;
1635:12
**sidebar (1)**
1577:14
**siders (2)**
1461:2,2
**sign (2)**
1427:25;1539:10
**signal (3)**
1589:4,6,7
**signature (3)**
1427:13,22,23
**signed (3)**
1433:7;1539:11;
1599:7,10
**significant (1)**
1465:16
**significantly (1)**
1467:24
**simply (1)**
1490:23
**single (2)**
1574:23
**sit (6)**
1486:10,11,11;
1498:15;1517:10;
1588:7
**Sitting (2)**
1418:18;1486:15
**situation (1)**
1632:11
**six (4)**
1602:13;1605:13;
1610:4;1628:18
**size (4)**
1432:13,17;1617:15,
19
**skills (1)**

1461:6
**slides (2)**
1652:7,8
**slightly (4)**
1418:9;1565:12;
1638:1,5
**slow (1)**
1615:22
**small (10)**
1410:5;1418:13,15;
1491:7;1496:20,24;
1497:4,8,22;1554:22
**smaller (1)**
1617:25
**SMB (5)**
1496:19,19;1497:6;
1616:5,23
**Smith (7)**
1438:25;1439:4,6;
1441:15;1588:10,18,23
**snail's (1)**
1578:22
**social (3)**
1489:13,15;1492:4
**socialize (2)**
1489:18;1512:23
**socialized (2)**
1512:12,15
**soft (1)**
1430:17
**sold (10)**
1494:22;1495:4,8;
1507:12;1542:4;
1543:10;1557:17;
1562:16;1563:9,12
**somebody (8)**
1423:18,19;1477:12;
1507:24;1515:2;
1605:5;1611:25;
1630:19
**someone (2)**
1430:17;1611:16
**sometime (7)**
1408:4;1414:24,24;
1415:9;1425:5;1434:8;
1488:13
**sometimes (25)**
1417:19;1418:12;
1419:11;1422:12;
1479:22;1480:10;
1490:8;1494:14;
1495:20;1501:12;
1507:12;1511:14,16,
25;1512:3,3;1523:24;
1526:5;1547:4;
1555:25;1556:2,9;
1575:8,14;1617:12
**somewhere (6)**
1470:9;1497:6;
1512:19;1519:16,16;
1583:5
**soon (2)**
1436:5;1461:11

**sooner (1)**
1414:15
**sorry (18)**
1444:6;1453:14,15;
1455:3;1484:8;
1497:12;1513:9;
1514:10;1521:5,6;
1524:12;1549:1;
1553:3;1580:14;
1590:3;1640:12;
1646:14;1647:16
**sort (4)**
1516:4;1518:14;
1540:20;1651:17
**sought (2)**
1413:6;1540:8
**sounded (1)**
1455:10
**source (1)**
1578:11
**sources (1)**
1478:24
**Souza (1)**
1448:12
**space (1)**
1446:5
**spaced (1)**
1652:3
**speak (16)**
1465:7;1469:18;
1471:20;1472:4;
1477:12;1479:17;
1494:15;1499:5,7,17;
1510:9,15;1590:11;
1592:19;1648:2;
1651:10
**speaking (18)**
1449:13;1467:19,21,
23;1489:6;1499:8,12;
1500:11;1510:25;
1511:10;1514:7;
1515:9;1581:19,24;
1592:16;1629:2;
1646:7;1649:1
**special (4)**
1500:1,16;1515:17;
1616:13
**specialist (1)**
1449:15
**specialty (1)**
1490:17
**specific (7)**
1504:10;1557:21;
1560:21;1569:22;
1583:22;1640:17;
1644:3
**specifically (10)**
1415:16;1495:15;
1499:20;1500:23;
1523:25;1551:24;
1557:9;1563:22;
1564:25;1576:10
**specifics (1)**

1498:13
**Speculation (1)**
1464:3
**spend (2)**
1560:21;1578:23
**spending (1)**
1523:17
**spent (2)**
1515:14;1630:14
**spoke (21)**
1409:19;1434:7,10;
1446:23;1447:2;
1467:12;1472:12;
1478:6;1489:2;1518:2,
5;1522:19;1581:12;
1587:10;1590:8;
1610:9,21;1611:1;
1616:18;1628:5;
1648:1
**spoken (5)**
1447:5;1472:13;
1475:13;1499:14;
1547:19
**sponsored (1)**
1518:12
**spread (1)**
1431:11
**spreadsheet (3)**
1559:4,4,8
**squiggly (1)**
1442:11
**stabilizes (1)**
1507:4
**stand (7)**
1408:10;1535:13;
1544:18;1583:24;
1607:18;1609:2;
1651:5
**standard (1)**
1421:5
**standards (1)**
1421:6
**start (5)**
1414:12;1421:3;
1452:14;1461:1;
1484:1;1485:18;
1486:7;1488:6;
1511:16;1521:19;
1626:17;1647:2
**started (13)**
1483:24,25;1488:20;
1498:5;1514:7,12;
1521:1;1523:10;
1538:11;1565:6,16,23;
1611:8
**Starting (9)**
1435:21;1445:15;
1456:14;1461:22;
1473:1;1484:1;1487:4;
1561:7;1597:4
**starts (3)**
1522:8,13;1606:12
**statement (6)**

1421:16;1475:9,11;
1493:13;1560:18,24
**statements (3)**
1410:18;1442:22,23
**States (1)**
1610:10
**station (1)**
1595:8
**status (5)**
1425:13;1426:18;
1431:25;1432:1;
1574:11
**stayed (1)**
1646:25
**step (1)**
1650:5
**Stephen (1)**
1488:5
**steps (1)**
1423:13
**Steve (1)**
1473:6
**still (10)**
1414:9;1467:12;
1483:23;1519:4;
1521:22,22;1525:8;
1544:10;1611:3,5
**stipulate (1)**
1559:3
**stipulated (4)**
1581:10;1591:6,19,
25
**stipulation (15)**
1437:13,24;1452:25;
1558:25;1559:2,20;
1591:6;1619:3;
1623:12;1624:3;
1625:25;1627:11;
1634:14,16;1650:1
**stock (24)**
1424:6;1444:19;
1456:3;1460:18,19,22,
22,24;1462:2,6;
1465:21;1483:12,23;
1500:10,15,17;1534:7;
1574:1,5,10;1591:13;
1603:21;1613:21;
1643:15
**stocks (7)**
1446:5;1572:16;
1603:24;1642:6,9,15;
1643:13
**stop (1)**
1544:14
**stopped (1)**
1545:9
**storage (2)**
1446:5;1588:1
**store (1)**
1409:8
**straight (1)**
1465:21
**strangers (1)**

1609:4
**strategy (1)**
1501:14
**Street (18)**
1417:20,23,25;
1418:7,9,24;1451:4,10,
12;1453:18;1511:19;
1554:15,19;1555:4,14;
1558:12;1571:10;
1604:12
**stretch (1)**
1484:12
**Strike (5)**
1498:14;1564:12;
1571:6;1572:13;
1573:11
**strong (3)**
1461:5;1584:23,24
**structural (1)**
1501:16
**structure (2)**
1431:13;1432:9
**student (2)**
1540:2;1595:3
**studied (2)**
1570:9;1582:16
**style (1)**
1423:20
**subdivision (1)**
1492:19
**subject (20)**
1412:16;1413:4;
1439:8;1442:4;
1444:13;1448:1;
1454:9;1456:17;
1457:24;1458:13;
1461:23;1463:2;
1465:20;1474:11;
1483:11;1487:5;
1507:25;1553:20;
1568:14;1625:16
**subjective (3)**
1495:18,21,22
**submit (2)**
1430:18;1539:15
**submitted (2)**
1597:16,20
**submitting (1)**
1600:5
**subscribe (1)**
1532:9
**subscribed (5)**
1437:14,24;1438:9;
1453:1,6
**subscribers (1)**
1546:19
**subscription (2)**
1531:19;1532:1
**substance (2)**
1518:17;1544:22
**substantial (3)**
1600:23;1601:2,17
**substantially (1)**

1587:7
**success (1)**
1525:1
**successful (2)**
1540:7,10
**suffer (1)**
1552:1
**sufficient (1)**
1560:21
**suggest (1)**
1610:13
**suggested (2)**
1583:11;1636:14
**suggestions (1)**
1436:18
**sum (2)**
1431:14;1556:10
**summary (2)**
1573:19;1637:16
**summer (3)**
1488:8,10,11
**supplemental (1)**
1651:22
**support (1)**
1490:16
**supposed (5)**
1499:24;1537:5;
1605:9,10;1646:3
**sure (77)**
1409:7;1434:8;
1445:25;1449:18;
1456:19;1457:25;
1458:15;1464:4;
1465:23;1470:6;
1473:22;1477:2;
1488:6,16;1493:24;
1496:22;1497:2,5;
1500:16;1501:2;
1506:15;1516:17;
1518:11;1529:8;
1534:4;1537:22;
1540:19,22;1541:9;
1542:17,22;1544:9;
1547:9,12;1549:25;
1555:20;1557:23;
1560:12,13;1563:18;
1568:12;1578:2,18,18;
1582:10;1585:13;
1587:22;1588:7;
1589:1,10,19,20;
1590:10;1595:19;
1596:2;1597:25;
1598:16,18;1601:3,18;
1604:18;1605:2;
1606:1;1610:24;
1614:25;1620:4,7;
1631:17;1632:7,15;
1633:11;1634:11;
1647:21,23,24;
1649:24;1651:10
**surprised (8)**
1455:10;1474:14,17;
1475:4;1500:18,22;

1510:19;1511:13
**survey (6)**
1540:3,8,12,13;
1594:2,3
**suspected (1)**
1612:7
**suspicion (1)**
1589:9
**Sustained (9)**
1589:15;1605:16;
1606:1,2;1612:16;
1614:7,25;1636:17;
1642:13
**swing (1)**
1414:13
**switch (2)**
1414:23;1465:3
**sworn (1)**
1409:13
**symbol (2)**
1483:12;1487:6
**system (1)**
1537:10

## T

**tab (46)**
1488:17;1492:23;
1502:15;1505:8;
1508:15;1522:1;
1524:6,9,10;1526:12,
22;1528:2;1529:16;
1530:7;1532:11;
1534:17,18;1536:6;
1538:12;1548:22;
1549:1;1553:3;
1558:20;1559:15;
1567:3,25;1568:13;
1571:13,14;1573:4;
1577:7;1580:3,6,9,12,
13;1581:16;1582:11,
24;1584:2;1589:21;
1591:24;1601:5;
1634:1;1643:23;
1648:20
**talk (20)**
1434:9;1454:25;
1461:10;1467:9,25;
1473:15;1486:13;
1501:14;1502:1;
1510:16,16,20;
1547:22;1564:25;
1597:6;1620:24;
1632:10;1633:18;
1652:9,10
**talked (22)**
1411:18;1436:3;
1460:18;1467:6,8,10;
1470:7;1477:16;
1479:8;1515:10;
1534:6,6;1537:25;
1541:15,24;1570:20;
1588:17;1597:14;

1630:19;1631:10,24;
1633:17
**talking (32)**
1440:10;1460:17;
1461:1;1491:4;
1493:16;1498:1;
1509:1;1510:18;
1515:11;1519:8,9;
1544:2,12;1546:7;
1547:11,15;1552:11;
1556:23;1558:17;
1567:8;1580:7,8;
1587:24;1590:17,25;
1593:7;1594:4;1598:4;
1629:5;1633:8;1637:2;
1645:4
**talks (2)**
1463:13;1638:10
**targeted (1)**
1500:14
**targets (1)**
1500:17
**TARLOWE (107)**
1408:8;1409:10,14,
17;1411:7;1412:8,20;
1415:5;1428:11;
1429:13;1430:5,10;
1432:23;1433:18;
1435:15;1437:5,13;
1438:17;1445:10;
1446:14;1447:16;
1448:17;1449:4;
1450:18;1452:2,8;
1453:25;1454:15;
1456:12;1457:16;
1458:22;1459:6;
1460:10;1461:17;
1462:17;1464:19;
1468:9;1472:21;
1474:5;1477:4,19;
1481:4;1483:5;
1486:16,17,18,24;
1487:23;1502:21;
1505:13;1514:19;
1515:22;1526:19;
1527:5;1528:8;
1529:24;1530:14;
1532:17;1534:24;
1553:8;1559:12;
1568:18;1573:8;
1574:6;1577:12;
1578:15;1580:22;
1584:2;1589:14;
1590:3,14,22;1593:17;
1604:4;1605:15,25;
1611:21;1612:15;
1614:6,13,14,16;
1618:4;1619:1;
1621:10;1622:24;
1623:2,7,11,17;1624:2;
1625:24;1626:15;
1627:10;1635:11;
1636:18;1639:1;

1643:17;1646:11;
1648:7,12,14;1649:11,
13,25;1650:4,9
**tax (8)**
1434:14,16;1435:4;
1598:3,8;1599:15;
1600:2;1603:11
**team (2)**
1448:3;1525:1
**tech (1)**
1461:5
**technology (4)**
1449:14;1591:14,17,
20
**telephone (4)**
1427:20,21;1608:22;
1610:2
**telling (8)**
1496:11;1516:14;
1545:7;1574:4;
1576:14;1605:14,21,24
**ten (3)**
1484:12;1485:4,14
**tend (1)**
1500:11
**ten-minute (1)**
1606:12
**term (3)**
1410:7;1596:11;
1601:24
**terms (10)**
1436:23;1495:3;
1497:19;1500:4,20;
1520:2;1527:12;
1570:14,14;1596:10
**testified (32)**
1409:13,18;1412:25;
1413:23;1434:9;
1439:1;1449:11;
1471:19;1475:22;
1489:6;1517:21;
1564:13;1584:13;
1600:15;1611:8;
1615:14;1617:12;
1618:11;1620:13;
1622:15;1630:22;
1631:9;1632:2;1634:2;
1639:11,23;1640:10,
20;1641:23;1642:3;
1644:14;1649:4
**testimony (8)**
1408:3;1413:2;
1477:23;1522:24;
1544:22;1618:15;
1636:23;1651:22
**Texas (5)**
1469:14;1489:9;
1501:4;1646:23;
1647:1
**thanks (14)**
1412:21;1445:20;
1446:24,24;1450:1,6;
1456:18;1458:14;

1461:10;1462:9;
1466:14;1467:2;
1475:8;1538:15
**Thanksgiving (3)**
1408:12;1409:4,5
**thinking (6)**
1447:6;1470:3;
1537:13,20,21;1589:1
**third (5)**
1440:4;1443:1;
1620:3;1622:7;
1637:18
**third-party (4)**
1475:23;1528:18;
1530:22;1541:24
**Thirty-eight (3)**
1566:13;1568:4,6
**Though (3)**
1578:15;1597:8;
1605:20
**thought (17)**
1415:21;1456:2,3;
1497:13;1524:2;
1525:23;1539:1;
1540:10;1545:10;
1585:7;1589:12,19,20;
1605:4;1620:14,16;
1649:24
**thoughts (2)**
1450:6;1474:15
**thousand (1)**
1424:14
**three (22)**
1414:2;1420:24;
1441:16;1442:8;
1443:20;1448:23;
1453:3;1467:5;1473:4;
1480:21;1519:10;
1549:2;1565:2;
1571:21;1576:11;
1581:19;1588:3,18;
1620:21;1627:25;
1652:1,3
**Threw (1)**
1422:16
**Thursday (3)**
1485:14;1486:10;
1503:14
**ticker (1)**
1487:5
**till (2)**
1485:13,15
**times (20)**
1419:12,13;1421:8;
1470:7;1471:19;
1480:21;1507:13;
1510:15;1526:7;
1545:5;1575:1,14;
1576:11,11;1588:17,
18;1610:11,24;
1630:20;1640:15
**timings (1)**
1542:18

**tips (2)**
1413:6;1423:15
**Today (18)**
1409:6;1418:18;
1449:13;1451:3;
1457:4,25;1458:16;
1459:4;1485:11,17;
1486:4;1517:10;
1587:21;1606:13,14;
1623:23;1626:4;
1651:20
**Todd (14)**
1432:18,20;1457:7;
1462:25;1466:8;
1488:5;1518:5,13,18,
20;1568:21;1570:1;
1613:8,10
**together (5)**
1469:25;1470:8,24;
1491:9;1610:14
**told (34)**
1422:19;1424:1,5;
1425:12,18;1426:6,10,
16,19,21;1431:17,22;
1435:5;1455:14,22;
1479:1;1484:4;1516:6,
12,19;1517:3,5;
1539:9;1595:20;
1596:4,23;1600:12;
1611:11;1616:14;
1639:15;1642:19,22;
1643:8;1645:9
**tomorrow (14)**
1445:19;1485:13;
1486:4;1532:25;
1650:11,13;1651:6,8,
19;1652:5,9,12,12,16
**Tony (3)**
1479:13,17,19
**took (9)**
1591:3;1596:7;
1598:13;1609:2;
1625:2;1630:22;
1638:3,18;1645:25
**top (9)**
1427:13;1441:14;
1447:21;1450:19;
1454:20;1463:7;
1504:16;1552:3;
1555:25;1561:4,17;
1575:12,16;1584:8,16;
1598:9;1618:21;
1634:1;1638:8
**topic (5)**
1501:22,24;1502:8;
1507:18;1598:11
**topics (5)**
1501:18,20;1502:18;
1510:17,22
**Tortora (151)**
1422:6,8,10,17,22,
25;1424:9;1425:6,11,
15;1426:5,6,13,19;

1431:7,12;1432:7,13;
1434:7,11;1444:13,16;
1450:20;1451:1,3,6,19;
1453:1,6,11,17,22;
1454:9;1456:14,17;
1457:2,7,13,23;1458:7,
13,15;1462:15,22,24;
1463:14;1465:5,19;
1466:8,13,21,25;
1467:11;1468:6,14;
1474:2,10,16;1475:3;
1480:1;1481:10;
1483:17,18,19;1484:4;
1487:16,19;1498:8,11,
17;1502:17,25;
1503:13;1505:16;
1517:25;1518:3,25;
1519:3,11,14,21;
1521:16;1522:19;
1523:3,14;1524:2,8,16;
1525:7;1526:25;
1528:4;1530:9;
1531:23;1532:13;
1533:12,24;1536:10,
14,17,24;1537:8,10,16;
1538:14,19;1539:4;
1540:1;1541:12;
1548:4,16,23;1549:5,
21;1550:7,16,21,25;
1551:24;1553:4,21;
1554:3;1568:14,21,24;
1569:20,23,25;
1582:25;1583:3;
1590:21;1594:13,16;
1608:1;1609:18;
1610:17,20;1612:10,
13,17;1613:4;1622:16;
1624:19;1625:8,15;
1627:1;1637:2;
1641:14;1642:3;
1644:19,25;1645:9
**Tortora@Gmailcom (1)**
1536:18
**total (5)**
1470:24;1556:10;
1563:3;1609:4;1610:9
**totally (1)**
1599:2
**touch (6)**
1492:2,8,11;1498:2,
4;1646:25
**tours (1)**
1500:5
**towards (2)**
1421:14;1503:8
**tracked (3)**
1557:4,12,16
**tracker (22)**
1548:4,11,13,17,19,
23;1549:3,6,20;1550:2,
7,17;1551:25;1552:24;
1555:7;1557:4,7,9,11,
21;1562:19,25

**trade (4)**
1591:15,18;1611:17;
1643:13
**traded (1)**
1613:24
**traders (1)**
1603:18
**trades (5)**
1591:13,16;1613:18,
21;1642:6
**trading (10)**
1545:6;1591:3,8,11,
22,25;1604:13,17;
1606:22;1614:1
**train (1)**
1595:8
**transaction (1)**
1592:3
**transcript (2)**
1508:17,24
**transition (1)**
1414:13
**translates (1)**
1648:13
**travel (1)**
1645:24
**traveling (2)**
1469:24;1470:8
**treatment (1)**
1600:13
**trend (1)**
1550:23
**trends (5)**
1489:3;1501:9,19;
1504:10;1510:9
**Trial (1)**
1408:1
**Tried (6)**
1457:2;1466:15,18;
1623:22;1627:3,16
**trigger (1)**
1652:6
**trips (2)**
1645:24;1646:1
**trouble (1)**
1589:17
**true (29)**
1434:22;1443:23;
1472:1;1489:17;
1493:19;1497:25;
1513:13;1516:18;
1523:12,13;1542:10;
1543:3;1547:21;
1552:23;1553:13;
1561:16;1569:18;
1570:18;1578:6;
1584:12;1598:1;
1600:9;1602:9;
1607:20,25;1614:10;
1643:1;1644:10;
1645:10
**Trust (1)**
1591:9

**truth (3)**
1578:7;1593:21;
1639:9
**try (6)**
1456:20,22;1471:1;
1473:4;1529:11;
1592:15
**trying (6)**
1414:11;1495:9;
1589:4,6,6;1630:13
**Turkey (1)**
1470:10
**turn (13)**
1413:12;1456:10;
1458:4;1466:24;
1486:19;1512:4;
1522:7;1524:5;1528:1;
1553:2;1562:3;
1571:17;1573:4
**Turning (5)**
1466:11;1619:17;
1625:14;1628:8;
1638:8
**tweaks (1)**
1446:21
**twice (1)**
1480:20;1499:9,9;
1631:17
**Twitter (1)**
1608:24
**two (40)**
1416:18;1417:1;
1422:13;1425:13;
1431:19,23;1432:3;
1436:18;1449:18,19;
1454:20;1463:7;
1471:4;1473:4;
1475:13;1505:19;
1509:18;1514:12;
1519:10;1533:5;
1538:4;1543:5;1549:2;
1550:12,14;1566:18;
1575:12;1578:23;
1588:8,18;1595:10,17;
1602:16;1609:7;
1628:4;1638:9;
1640:10,21;1641:8;
1652:1
**two-minute (1)**
1650:7
**two-thirds (1)**
1421:14
**TY (1)**
1467:17
**type (20)**
1416:3;1491:6;
1494:13;1515:19;
1519:25;1523:4,22;
1526:15;1527:10;
1528:15;1529:6;
1533:15,24;1534:3,8;
1541:1;1556:16;
1563:20,21;1578:13

**types (4)**
1491:5;1493:2;
1497:20;1548:14
**typical (2)**
1423:17;1534:5
**typically (14)**
1421:17,19;1443:24;
1471:4,17,21;1486:11;
1503:8;1575:10;
1631:16;1632:9;
1633:12,13,18
**Tyson (19)**
1473:10,11;1499:7;
1503:21;1504:3;
1505:2,6,10,17,23;
1507:18;1508:2;
1509:18;1510:1,4,6;
1632:3;1644:1,14

## U

**UBS (1)**
1445:25
**Ultimately (2)**
1597:13;1599:22
**Um (1)**
1516:22
**under (15)**
1506:25;1509:6;
1566:14;1571:12;
1575:7,8;1602:19;
1605:9;1612:20;
1621:21;1632:17;
1635:12;1637:15;
1639:23;1643:24
**understood (38)**
1475:3;1478:11;
1479:16;1481:18;
1499:16;1504:22;
1506:18;1510:1;
1516:9,15;1523:3,6,21;
1527:16;1529:1;
1531:4,23;1533:18;
1534:2,8;1537:2,5;
1548:10;1549:5,8,16;
1551:24;1569:9;
1597:15,19,24,25;
1598:3;1599:6;
1603:21;1604:16,25;
1644:15
**uneventful (1)**
1413:19
**unit (17)**
1495:7;1530:18,18,
22;1531:7;1541:16,18;
1542:3;1543:8;1544:3,
7,10;1546:11;1547:14;
1554:9;1621:25;
1622:4
**United (1)**
1610:10
**units (16)**
1478:15,15;1479:21;

1495:4,7;1541:20;
1546:17;1547:1,23;
1554:14;1557:24;
1562:11,14,15;
1615:18;1621:24
**University (1)**
1489:9
**unusual (3)**
1475:12;1582:16,18
**up (67)**
1410:17,20;1415:7;
1416:11;1421:4;
1430:13;1435:8;
1436:2,8;1440:2;
1444:18;1448:10;
1450:18;1452:9;
1453:13;1456:3;
1457:24;1459:4,6;
1461:3;1465:21;
1468:15;1470:23,25;
1471:21;1473:4;
1481:23;1483:16,18;
1486:5;1487:15;
1490:18,23;1491:2;
1492:23;1497:14;
1504:7;1507:25;
1510:17;1544:8,15,20;
1545:13;1555:25;
1556:2,6,8,10,11;
1558:20;1559:18;
1562:5;1563:5;
1592:18;1618:4;
1620:21;1623:1;
1625:16;1626:15;
1632:1;1634:1,20;
1635:3;1643:23;
1644:11,18;1649:14
**upcoming (5)**
1561:15;1594:2;
1615:8;1616:16;
1634:9
**update (4)**
1467:1;1504:9;
1560:6;1633:12
**updated (3)**
1503:15;1559:22;
1560:11
**updating (1)**
1435:25
**upgrade (13)**
1572:21,24;1573:11,
12;1574:11,25;
1578:12;1581:16,21,
24;1582:2,4,5
**upgraded (3)**
1572:5;1573:2;
1574:4
**upgrading (2)**
1573:22;1574:8
**upon (5)**
1426:22;1507:8;
1546:16;1554:24;
1637:10

**upper (4)**
1560:8,17,23;
1571:16
**upwards (1)**
1610:10
**use (20)**
1419:25;1420:7;
1422:20;1471:1;
1476:3;1477:10;
1484:8,13;1528:18;
1535:14;1536:1,17;
1548:17;1556:19;
1606:12;1607:2;
1616:18,21;1623:7;
1643:5
**used (29)**
1435:6;1462:6;
1467:24;1475:23;
1480:5,19;1496:25;
1497:1;1525:18,20;
1528:15;1531:9;
1533:24;1536:1;
1544:7;1548:5,7,13;
1549:25;1554:11;
1556:13,19;1563:13;
1596:6;1641:22;
1642:23;1643:2,3;
1647:9
**useful (2)**
1615:2,4
**using (2)**
1556:4;1611:11
**usual (2)**
1473:3;1501:24
**Usually (7)**
1421:23;1422:12;
1439:13;1461:4;
1471:15;1542:14;
1630:22

## V

**valuable (4)**
1538:22;1570:16;
1614:22,24
**value (1)**
1528:15
**varied (2)**
1517:16,16
**various (21)**
1410:2;1417:23;
1435:10;1506:8;
1510:17;1512:9;
1526:2;1532:21;
1534:8;1538:6;1547:1;
1557:17;1561:4;
1562:22;1563:6,13,16;
1564:5;1585:11;
1591:8;1633:20
**vast (1)**
1491:3
**VE (1)**
1496:4

**vendors (3)**
1551:9,16,21
**Versus (3)**
1496:8,12;1554:19
**vice-president (1)**
1473:7
**Victor (2)**
1483:10;1487:5
**view (4)**
1574:1,15;1585:17;
1632:24
**viewed (1)**
1414:3
**views (1)**
1446:5
**visa (6)**
1425:12;1426:18;
1431:17,24,25;1432:1
**visit (2)**
1414:23;1500:25
**visited (2)**
1501:19,23
**visiting (1)**
1470:9
**visits (2)**
1500:25;1501:2
**voice (2)**
1457:3;1623:23

## W

**wait (3)**
1408:4;1463:15;
1577:14
**waiting (2)**
1463:17;1465:24
**Wall (4)**
1417:23,25;1451:12;
1604:12
**war (2)**
1551:2,5
**warranty (1)**
1490:16
**watch (2)**
1622:2;1650:12
**way (37)**
1450:5;1480:3;
1503:4;1509:20;
1512:1;1517:2;1536:3,
3;1537:9,13;1538:12;
1539:25;1545:4;
1546:10;1547:10,13;
1549:8,13,16;1554:12;
1555:17,24;1562:10;
1566:14;1572:12;
1574:1,15;1582:7;
1583:15;1589:8,12;
1591:2;1594:21;
1599:5;1611:22;
1629:3;1632:15
**ways (1)**
1418:6
**weak (2)**

**vendors (3)**
1584:20;1632:10
**weakness (1)**
1474:20
**website (1)**
1478:5
**websites (2)**
1549:12,17
**Wednesday (9)**
1485:8,13,17;
1486:5,7,8,10,14;
1652:10
**week (14)**
1408:6;1409:18;
1412:25;1413:11,13,
23;1434:9;1467:2,13;
1471:19;1473:17;
1475:22;1486:12;
1651:9
**weekend (12)**
1409:5;1413:19;
1435:24,25;1450:1;
1456:20,22,24;1467:6,
8,10;1470:3
**weeks (14)**
1420:24;1448:24;
1466:20;1473:5;
1474:19;1475:13,14;
1503:6,11;1505:19;
1509:18;1550:12,14;
1553:18
**WEINGARTEN (5)**
1435:18;1485:7,18;
1651:13,15
**weren't (4)**
1569:19;1589:4,16;
1632:7
**what's (57)**
1411:1;1412:4;
1420:25;1427:9;
1428:6,17;1429:7,21;
1433:3,13;1434:3;
1435:11;1437:1;
1438:13;1441:1;
1444:5;1445:6;1446:8;
1447:11;1448:25;
1451:24;1453:20;
1454:11;1457:11;
1458:19;1460:4;
1461:12;1462:13;
1463:5;1466:11;
1468:4;1472:14;
1473:23;1476:16;
1480:22;1481:21;
1482:2;1484:6;
1486:19;1502:14;
1536:5;1567:20;
1577:4;1580:18;
1592:25;1593:20;
1618:23;1621:4;
1622:18,23;1623:8;
1624:8;1626:22;
1627:8;1628:1;1636:1;
1651:2

**whatsoever (1)**
1614:5
**whenever (2)**
1532:7;1598:5
**Whittier (1)**
1591:9
**whole (2)**
1450:3;1575:24
**Whose (16)**
1427:13,16,22;
1437:21;1448:14;
1459:16;1583:8;
1602:24;1615:2,4;
1624:15,15;1626:13,
13;1627:20,20
**widely (1)**
1546:16
**wife (29)**
1411:25;1412:2,21;
1425:23,25;1426:3,8,
19;1427:25;1429:1;
1430:2;1431:17,22;
1433:8;1434:6;
1469:23;1518:20;
1539:7;1593:2,7,13,24;
1594:19;1596:16;
1599:7,12,17;1600:7;
1602:4
**wife's (7)**
1425:19;1427:15,23
**Williams (5)**
1498:25;1499:1;
1510:25;1511:1,1
**wish (2)**
1412:18,21
**wishes (1)**
1412:21
**Withdrawn (5)**
1467:19;1633:7
**within (15)**
1410:2,5;1415:14;
1442:6;1447:3;1448:3,
7;1455:8;1465:1;
1491:14;1572:9,18;
1601:19;1617:21;
1645:16
**without (5)**
1409:8;1593:22;
1605:14,21,24
**witness (27)**
1408:6,10;1409:12;
1464:7,10,12,23,25;
1465:12;1478:22;
1479:2,4;1485:14;
1544:23;1590:17;
1611:24;1613:11;
1615:5;1633:5;
1635:25;1636:2;
1640:18;1650:6,8,9;
1651:4,14
**witness' (1)**
1593:18
**witnesses (2)**

1651:17,18
**wizard (1)**
　1525:15
**wonder (1)**
　1446:23
**wonderful (1)**
　1435:24
**word (1)**
　1596:6
**wording (1)**
　1446:21
**words (14)**
　1513:10;1514:17;
　1516:23;1525:10;
　1531:4;1541:19;
　1543:10,23;1556:15;
　1561:2;1578:6;
　1597:18;1598:24;
　1646:2
**work (46)**
　1413:5;1423:12;
　1424:5;1425:12;
　1431:15,19,23;1432:1,
　10,12,18;1471:15;
　1473:20;1476:14;
　1477:14;1511:15;
　1513:11;1519:22;
　1520:1,3;1523:5,13,19,
　22;1525:24;1527:13;
　1529:6;1533:24;
　1534:3;1535:24;
　1536:1;1538:9,22;
　1539:13,25;1540:13,
　23;1605:23;1611:12;
　1613:9,10;1631:17;
　1643:8;1645:17,22;
　1647:9
**worked (26)**
　1410:2;1422:22;
　1425:23;1448:12;
　1468:20;1470:12;
　1472:7,10;1476:15;
　1477:15;1478:11;
　1479:16,24;1489:21;
　1490:19;1491:19,25;
　1538:2;1558:9;1570:7;
　1573:12;1582:15;
　1592:1;1615:19;
　1642:1,3
**working (31)**
　1409:19;1413:7,8;
　1415:10,12;1423:20;
　1424:22;1432:5;
　1439:6;1445:5;1448:4;
　1450:11;1465:3,5;
　1470:16;1479:4;
　1489:11;1511:16;
　1513:6,10;1516:10;
　1517:3;1555:19;
　1585:11;1594:14;
　1603:13;1604:17;
　1605:20;1611:3,5;
　1645:21

**works (2)**
　1423:2;1515:11
**world (1)**
　1557:19
**write (11)**
　1424:6;1572:9,15;
　1574:23,23;1575:4,4,
　21,21;1589:12;
　1600:19
**writes (2)**
　1550:21;1583:3
**writeup (1)**
　1506:5
**write-up (1)**
　1540:14
**writing (4)**
　1461:5;1574:23;
　1589:20;1649:1
**written (3)**
　1422:15;1597:19;
　1639:13
**wrong (7)**
　1453:14;1555:18;
　1580:20;1596:24;
　1605:23;1612:7;
　1614:2
**wrote (54)**
　1412:17;1413:18;
　1414:5,9;1435:24;
　1436:17;1439:20;
　1440:4;1442:4,9,17;
　1444:13;1445:18;
　1446:19;1449:12,25;
　1451:1,10;1454:9,24;
　1455:3,10,14;1456:14,
　17,19;1458:13,15;
　1459:4;1460:16;
　1461:23;1463:14;
　1465:23;1466:6,13,14;
　1467:6,17;1468:14;
　1473:8,14,16;1478:1,9;
　1487:8;1505:9;1554:3;
　1555:18;1569:25;
　1588:19,23;1589:8,16;
　1620:4

**X**

**XLS (2)**
　1535:7,8

**Y**

**Y/Y (2)**
　1493:13,15
**year (22)**
　1413:21;1414:14,16,
　24;1424:14,15,20;
　1429:12;1431:8;
　1439:14;1493:15;
　1498:2,4,17;1507:9,13,
　15;1514:12;1527:12,
　12;1564:1;1641:7

**year-over-year (1)**
　1493:15
**years (15)**
　1416:18;1424:16,18;
　1434:19;1471:4;
　1514:12,14;1538:2,4,9;
　1564:6;1570:9;
　1640:10,21;1641:8
**yesterday (6)**
　1457:2;1460:17;
　1466:15;1623:22;
　1627:3,16
**York (8)**
　1414:6,24;1469:17,
　18;1503:14;1512:18;
　1647:7,13

**0**

**0:01 (1)**
　1626:17
**08 (14)**
　1494:16;1561:7,12;
　1566:2,6,21;1619:8;
　1624:8,12;1626:7,8,17;
　1635:16,17
**09 (3)**
　1627:22;1628:9;
　1634:21

**1**

**1 (13)**
　1439:15;1442:14;
　1457:14,23;1486:8,9;
　1488:18;1495:19;
　1582:21;1587:3;
　1615:21;1625:15;
　1626:2
**1,000 (1)**
　1576:12
**1/2/08 (1)**
　1560:9
**1:00 (2)**
　1485:19;1544:14
**1:13 (1)**
　1647:11
**1:39 (3)**
　1646:13;1647:17,18
**1:42 (2)**
　1452:14;1619:7
**1:46 (1)**
　1649:18
**1:48 (1)**
　1454:21
**1:51 (1)**
　1454:21
**1:56 (1)**
　1437:16
**1:58 (2)**
　1452:13,23
**10 (4)**
　1495:20;1528:2;

1610:10;1626:25
**10:14 (2)**
　1438:6;1624:17
**10:26 (1)**
　1453:5
**10:32 (1)**
　1619:18
**10:44 (1)**
　1583:4
**100 (5)**
　1442:10,13,14;
　1587:22;1588:7
**11 (14)**
　1449:23;1450:12;
　1462:15;1529:17;
　1572:5;1573:2,15;
　1581:11,13,16;1635:5;
　1636:7,21;1637:7
**11:30 (1)**
　1484:10
**11:58 (1)**
　1634:21
**12 (3)**
　1436:22;1530:8;
　1581:3
**12.05.07 (1)**
　1560:1
**12:01 (2)**
　1626:7,9
**12:17 (1)**
　1624:8
**12:30 (2)**
　1485:18,20
**12:48 (1)**
　1438:24
**12:55 (1)**
　1459:9
**1228 (4)**
　1508:15,21,22,23
**12th (1)**
　1581:11
**13 (4)**
　1450:24;1503:2;
　1532:12;1627:22
**13s (1)**
　1620:4
**13's (2)**
　1440:5,24
**14 (6)**
　1429:25;1445:16;
　1461:15,22;1627:15;
　1628:21
**14.7 (2)**
　1554:15,19
**14B (1)**
　1554:15
**14's (1)**
　1417:13
**15 (24)**
　1438:2;1452:15;
　1453:5,9;1495:6;
　1509:6;1534:17,19,21;
　1535:5,25;1536:9;

1550:3,10;1558:21;
　1559:6,21,22;1561:11;
　1565:18;1583:1,17;
　1610:11;1647:2
**154,000 (1)**
　1592:5
**157 (2)**
　1444:7;1453:13
**16 (20)**
　1434:4;1438:1;
　1450:22;1451:22;
　1452:13,22;1453:4,16;
　1474:3,25;1488:23;
　1505:9;1534:18;
　1536:6;1538:12;
　1566:7;1628:10,19;
　1636:22;1647:11
**16.071 (2)**
　1566:8;1567:14
**17 (12)**
　1412:16;1418:15;
　1419:1;1517:18;
　1548:22;1549:1;
　1625:1;1628:9;
　1646:13,13;1647:16;
　1649:17
**17.0 (1)**
　1555:4
**17.2 (1)**
　1418:16
**17.4 (1)**
　1418:16
**17.5 (2)**
　1418:17;1517:18
**17.6 (1)**
　1509:11
**170,000 (1)**
　1641:7
**175 (1)**
　1641:8
**17-6 (1)**
　1418:16
**17's (1)**
　1418:25
**17th (2)**
　1627:17;1628:22
**18 (15)**
　1417:15;1437:17;
　1438:6,11;1507:3;
　1508:5;1509:22;
　1553:3;1618:17;
　1632:19,23;1634:1;
　1644:5,6;1648:20
**18,750 (1)**
　1429:23
**18.1 (3)**
　1509:12,16,23
**18.3 (1)**
　1417:15
**18.4 (5)**
　1555:5,22;1556:5;
　1567:22;1634:6
**18.5 (5)**

1555:5,22;1556:5;
1566:11;1568:2
**1800 (4)**
1621:5,11,14,15
**1803 (2)**
1567:3;1647:3
**18-4 (1)**
1555:15
**187 (3)**
1450:16;1453:15;
1636:23
**18s (1)**
1620:3
**18's (4)**
1417:16;1418:25;
1440:5,24
**19 (10)**
1437:16;1438:15,24;
1559:15;1567:25;
1584:10;1585:23;
1587:1;1593:3;
1618:14
**194 (3)**
1577:7,11;1580:7
**197 (6)**
1456:11;1622:13;
1623:21;1625:5,8;
1644:17
**198 (5)**
1457:12,17,21,22;
1625:14

## 2

**2 (19)**
1413:12;1427:12;
1431:5;1492:23;
1494:18;1495:19;
1509:6;1544:15,17;
1567:6;1570:20;
1571:1;1587:3;1601:5;
1604:7;1615:25;
1626:8;1646:11;
1649:15
**2:00 (2)**
1544:20;1583:5
**2:05 (1)**
1545:2
**2:26 (1)**
1453:4
**20 (3)**
1472:19;1473:2;
1567:4
**2000 (1)**
1514:11
**2006 (7)**
1488:8,10,10;
1514:8,11;1515:1;
1564:2
**2007 (20)**
1415:9;1416:21;
1425:5;1427:10,10;
1433:6;1434:20;

1488:8,11,13,23,24;
1519:8,17;1521:12,12;
1564:1;1593:25;
1598:13;1611:8
**2008 (133)**
1414:17;1424:17;
1427:12;1429:25;
1431:1,15;1432:10;
1433:6;1435:13;
1436:14,22;1437:16,
17;1438:6,11,15,24;
1439:15;1441:4;
1443:18,21;1444:8;
1445:8,16;1446:12;
1448:21;1449:12,23;
1450:9,12,22;1451:22;
1452:13,15;1453:9,23;
1454:6,13,21;1456:15;
1457:14,23;1458:7;
1459:5,8,10;1460:8;
1461:15,22;1462:15;
1465:13;1468:7;
1472:19;1473:2,20;
1474:3,19,25;1476:21;
1481:2;1493:6;1498:2,
7,19;1534:21;1535:5,
25;1536:10;1548:24;
1550:4,10;1559:6,23;
1561:11;1564:9,14,17,
18;1565:14,16,18,23;
1566:2,5,25;1567:1,6;
1568:5,15,22;1569:2;
1570:20,21;1571:1,2;
1572:5;1573:2,15;
1581:3,11,13,16;
1582:9,21;1583:1;
1584:8;1589:24;
1590:9;1591:3;1592:6,
10;1593:3;1598:15,19,
25;1613:19;1618:14,
21;1619:7,16,18;
1621:9,19;1623:21,24;
1625:3,15;1626:2,9;
1635:5,22;1636:7;
1637:24
**2009 (31)**
1412:6,16;1416:21;
1424:17;1431:8,13;
1433:4;1434:4;
1465:13,13;1467:3;
1483:21;1487:10;
1498:4,10,17,19;
1502:17;1503:2;
1505:9;1506:19;
1508:19;1553:11,15;
1598:17,19;1599:1;
1628:19;1634:8;
1649:2,17
**2010 (1)**
1469:13
**2011 (5)**
1434:8,10;1595:2,6;
1604:7

**2012 (2)**
1602:11;1652:17
**204 (1)**
1548:21
**208 (7)**
1573:4,7,9,10;
1581:15;1635:4;
1637:11
**21 (1)**
1568:13
**212 (1)**
1458:4
**2171 (4)**
1411:2,8,10,12
**22 (6)**
1568:15,22;1573:4;
1581:16;1590:9;
1592:13
**223 (1)**
1582:23
**2270 (1)**
1432:24
**23 (2)**
1456:14;1577:8
**24 (13)**
1457:1;1467:3;
1580:3,6,9,13;1619:8,
16;1623:21,24;
1624:12;1625:3,6
**25 (11)**
1441:4;1443:18;
1468:7;1473:17;
1582:11;1584:8;
1618:21;1619:7,18;
1624:8,18
**2501 (5)**
1591:7,12,15,18;
1606:19
**2501NA (2)**
1591:21;1606:18
**2501-NA (3)**
1591:13;1606:24,25
**2501-NAO (1)**
1591:16
**25th (3)**
1565:10,11;1584:17
**26 (3)**
1582:24;1592:3,10
**2607 (7)**
1437:3;1452:1;
1458:21;1580:5;
1618:25;1622:24;
1634:15
**2607AA (2)**
1580:23,24
**2607-AA (1)**
1580:5
**2607B (4)**
1437:2,6,11,12
**2607C (4)**
1618:24;1619:2,4,5
**2607D (4)**
1451:25;1452:3,6,7

**2607E (6)**
1622:19;1623:10,25;
1624:2,3,5
**2607F (4)**
1625:22,24,25;
1626:1
**2607-G (5)**
1458:20,23;1459:2,
3,7
**2607H (8)**
1627:8,10,12,13,19;
1646:8,9;1649:14
**2607J (4)**
1634:12,15,17;
1648:9
**27 (1)**
1652:17
**28 (5)**
1443:21;1444:8;
1474:19;1582:9;
1621:19
**28th (3)**
1565:10;1582:21;
1621:9
**29 (7)**
1450:15;1453:22;
1454:6,13,20;1570:21;
1571:2
**296 (1)**
1465:18
**2nd (1)**
1564:18

## 3

**3 (12)**
1448:17;1502:15;
1503:13;1522:7;
1524:18;1558:12;
1571:17,19;1601:10;
1626:7,9,17
**3.5 (1)**
1576:11
**3:58 (1)**
1634:20
**300 (3)**
1466:12;1627:1,14
**305 (1)**
1466:24
**31 (5)**
1427:10;1439:13;
1521:12;1561:14;
1581:12
**314A (1)**
1474:23
**31-minute (1)**
1619:15
**32 (1)**
1584:2
**33 (6)**
1451:4,10,12;
1558:12;1635:19;
1636:8

**35 (1)**
1624:14
**3500 (3)**
1521:25;1571:12;
1601:5
**3507 (1)**
1524:11
**3507-2 (3)**
1638:25;1639:1,3
**3507-6 (1)**
1522:1
**36 (9)**
1451:4,5,13,13,14,
20;1589:22;1637:3,3
**37 (5)**
1451:4,13,20;
1591:24;1637:3
**3rd (1)**
1583:5

## 4

**4 (14)**
1444:2;1458:7;
1459:5,10;1470:3;
1496:19;1553:11;
1616:5,23;1634:8,21;
1648:15,24;1649:2
**4:01 (1)**
1536:12
**4:05 (2)**
1648:22;1649:2
**4:28 (1)**
1648:11
**4:30 (6)**
1443:25;1485:11,17;
1486:4,4;1606:13
**4:36 (1)**
1454:6
**4:51 (1)**
1444:8
**40 (1)**
1460:3
**415-596-4020 (1)**
1452:25
**415-736-2210 (1)**
1581:1
**415-738-2210 (1)**
1437:18
**43 (2)**
1571:13,15

## 5

**5 (12)**
1432:24;1442:18,23;
1446:12;1456:3;
1459:8;1460:7;1481:2;
1505:8;1555:15;
1634:20;1643:23
**5/12/08 (1)**
1581:4
**5:00 (1)**

1487:14
**5:30 (8)**
    1485:10,13,13,14,15;
    1486:5,9,15
**5:57 (2)**
    1573:17;1581:17
**50 (1)**
    1497:16
**512 (4)**
    1646:19,22;1647:25;
    1649:21
**512-300-8959 (1)**
    1647:11
**512-689-5530 (1)**
    1647:3
**512-733-8406 (2)**
    1647:20;1650:2
**512-797-1597 (1)**
    1647:14
**53 (1)**
    1438:2
**5K (2)**
    1600:15;1639:11
**5th (1)**
    1648:11

---

## 6

**6 (5)**
    1442:18,24;1487:10;
    1508:15;1522:1
**6:03 (1)**
    1647:3

---

## 7

**7 (6)**
    1493:5;1524:6,10,
    18;1571:17,19
**7/13 (1)**
    1584:16
**7:47 (1)**
    1536:14
**7:57 (2)**
    1581:3,11
**708 (1)**
    1413:9
**709A (1)**
    1521:4
**710 (4)**
    1435:12,16,19,20
**711 (4)**
    1438:14,18,20,22
**713 (10)**
    1441:2,6,8,10;
    1584:1,7;1618:3;
    1619:17,22;1622:9
**715 (4)**
    1445:7,11,13,14
**717 (4)**
    1468:5,10,12,13
**719 (4)**
    1446:9,15,17,18

**719B (4)**
    1447:12,17,19,20
**720A (3)**
    1449:5,8,9
**720-A (1)**
    1449:1
**725 (4)**
    1454:12,16,18,19
**726 (4)**
    1453:21;1454:1,4,5
**733 (4)**
    1460:5,11,14,15
**734 (4)**
    1461:13,18,20,21
**736 (5)**
    1473:24;1474:6,8,9;
    1475:7
**737 (4)**
    1480:23;1481:5,7,8
**739 (4)**
    1482:3;1483:6,8,9
**740 (5)**
    1484:7;1486:20,25;
    1487:2,3
**741 (3)**
    1412:5,9,14
**747 (4)**
    1589:21;1590:1,6,7
**748 (5)**
    1476:17,24;1477:20,
    24,25
**75 (1)**
    1492:22
**75,000 (1)**
    1598:15
**750 (4)**
    1428:7,12,15,16
**751 (6)**
    1429:7,14,17,19,21;
    1431:4
**752 (4)**
    1429:7,14;1430:5;
    1431:4
**753 (6)**
    1429:8,14,18,19;
    1430:10;1431:4
**754 (4)**
    1433:14,19,21,23
**755 (1)**
    1615:9
**756 (4)**
    1462:14,18,20,21
**757 (5)**
    1502:15,16,20,22,23
**759 (4)**
    1472:15,22,24,25
**775A (1)**
    1521:6
**775-A (1)**
    1426:25

---

## 8

**8 (3)**
    1433:4;1448:21;
    1526:12
**8:01 (1)**
    1626:8
**8:17 (1)**
    1624:12
**8:38 (1)**
    1550:19
**8:45 (1)**
    1457:2
**8:55 (1)**
    1459:10
**8:57 (2)**
    1581:11,12
**813 (2)**
    1581:4;1647:17
**813-380-3010 (1)**
    1646:14
**813-380-4010 (2)**
    1437:23;1459:14
**813-804 (1)**
    1646:14
**8222 (1)**
    1582:11
**8627 (4)**
    1526:11,18,20,21
**8656 (8)**
    1534:16,23,25;
    1535:1;1536:12;
    1553:2;1558:19;
    1559:7
**8656A (5)**
    1559:3,5,8,9,13
**8656B (4)**
    1559:7,10,13,15
**8657 (2)**
    1536:6;1538:12
**8661 (4)**
    1526:22;1527:4,6,7
**8679 (2)**
    1593:1,15
**8779 (3)**
    1568:13,17,19
**8822 (4)**
    1528:1,7,9,10
**8883 (5)**
    1529:16,22,23,25;
    1530:1
**8K (1)**
    1474:24

---

## 9

**9 (8)**
    1427:10;1449:12;
    1476:21;1521:12,17,
    19,23;1526:22
**9:30 (4)**
    1486:5;1650:11,13;
    1652:17
**9:36 (1)**
    1627:22

**9:42 (2)**
    1452:15;1619:8
**9:46 (1)**
    1628:10
**9:56 (1)**
    1437:17
**9:58 (1)**
    1452:23
**90 (2)**
    1435:9;1570:25
**9025 (4)**
    1530:7,13,15,16
**91 (1)**
    1487:9
**9142 (4)**
    1532:11,16,18,19
**964 (9)**
    1553:3,4,7,9,10;
    1633:25;1648:7,17,20
**9805 (1)**
    1524:5
**9910 (1)**
    1488:17
**994 (6)**
    1505:8,12,14,15;
    1631:25;1643:22